1   COOLEY LLP
    Stephen C. Neal (170085) (nealsc@cooley.com)
2   John C. Dwyer (136533) (dwyerjc@cooley.com)
    Bennett S. Miller (254368) (millerbs@cooley.com)
3   Five Palo Alto Square
    3000 El Camino Real
4   Palo Alto, CA 94306
    Telephone:     (650) 843-5000
5   Facsimile:     (650) 857-0663

6   Beatriz Mejia (190948) (mejiab@cooley.com)
    Scott D. Joiner (223313) (sjoiner@cooley.com)
7   101 California Street, 5th Floor
    San Francisco, CA 94111-5800
8   Telephone:     (415) 693-2000
    Facsimile:     (415) 693-2222
9
    Counsel for Defendants
10  Sony Corporation, Sony Energy Devices Corporation and
    Sony Electronics Inc.
11
    [*Additional Moving Defendants and Counsel Listed*
12  *on Signature Page*]

13

14              UNITED STATES DISTRICT COURT

15             NORTHERN DISTRICT OF CALIFORNIA

16                   OAKLAND DIVISION

17

18  | IN RE: LITHIUM ION BATTERIES | Case No. 4:13-MD-2420 YGR |
19  | ANTITRUST LITIGATION | MDL NO. 2420 |

20  This Document Relates To:      **NOTICE OF MOTION, MOTION, AND
                                   MEMORANDUM OF POINTS AND
21  ALL DIRECT PURCHASER ACTIONS   AUTHORITIES IN SUPPORT OF CERTAIN
                                   DEFENDANTS' JOINT MOTION TO
22                                 DISMISS THE DIRECT PURCHASER
                                   PLAINTIFFS' CONSOLIDATED AMENDED
23                                 COMPLAINT**

24                                 **ORAL ARGUMENT REQUESTED**

25                                 Date:  December 6, 2013
                                   Time:  10:00 a.m.
26                                 Judge:  Hon. Yvonne Gonzalez Rogers
                                   Location:  Courtroom 5
27

28

COOLEY LLP
ATTORNEYS AT LAW

NOTICE AND MPA ISO CERTAIN DEFENDANTS' JOINT
MTD THE DIRECT PURCHASER PLAINTIFFS' CAC -
CASE NO. 4:13-MD-2420 YGR

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................ 1

STATEMENT OF FACTS .................................................................................................. 3

LEGAL STANDARD .......................................................................................................... 7

ARGUMENT ........................................................................................................................ 8

I.    PLAINTIFFS' ALLEGATIONS FALL WELL SHORT OF PLAUSIBLY
      ALLEGING AN ONGOING ELEVEN-YEAR AGREEMENT AMONG THE
      EIGHTEEN NAMED DEFENDANTS TO FIX THE PRICE OF ALL TYPES OF
      LITHIUM ION BATTERY CELLS. .......................................................................... 8

      A.    There Are No Factual Allegations in the DPP-CAC to Plausibly Support
            The Massive Overarching Conspiracy. .................................................................. 8

      B.    Plaintiffs' Economic Allegations Fail to Support the Alleged Conspiracy. ......... 14

            1.    Plaintiffs' Pricing Allegations Are Inaccurate & Misleading. .................. 14

            2.    Plaintiffs' Other Economic Allegations Are Equally Unavailing. ............ 17

      C.    Government Investigations and Lawsuits Involving Other Products Are
            Irrelevant. ............................................................................................................. 18

II.   PLAINTIFFS ARE INDIRECT PURCHASERS AND THUS LACK STANDING
      UNDER *ILLINOIS BRICK* AND *ASSOCIATED GENERAL CONTRACTORS*. ............ 18

      A.    Plaintiffs Did Not Purchase Battery Cells from Any Defendant. ......................... 18

      B.    Plaintiffs Lack Direct Purchaser Standing Under *Illinois Brick*. ......................... 19

      C.    Plaintiffs Do Not Satisfy Any Exception to the *Illinois Brick* Doctrine. ............. 21

      D.    Plaintiffs Also Lack Antitrust Standing Under *AGC*. .......................................... 22

III.  CLAIMS FOR DAMAGES INCURRED PRIOR TO OCTOBER 11, 2008 ARE
      TIME BARRED. ......................................................................................................... 24

IV.   CONCLUSION .......................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Am. Ad. Mgmt., Inc. v. Gen. Tel. Co.*,
  190 F.3d 1051 (9th Cir. 1999) .......................................................................... 23

*In re Apple iPhone Antitrust Litig.*,
  No. 11-cv-6714, 2013 WL 4425720 (N.D. Cal. Aug. 15, 2013) ("*Apple iPhone*") ......... 20, 21

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ................................................................................... 7, 13

*Ass'n of Wash. Pub. Hosp. Dists. v. Philip Morris Inc.*,
  241 F.3d 696 (9th Cir. 2001) .......................................................................... 23

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
  459 U.S. 519 (1983) .............................................................................. passim

*In re ATM Fee Antitrust Litig.*,
  686 F.3d 741 (9th Cir. 2012) .................................................................. 20, 21, 22

*In re Baby Food Antitrust Litig.*,
  166 F.3d 112 (3d Cir. 1999) ........................................................................ 7, 16

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) .............................................................................. passim

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
  509 U.S. 209 (1993) ................................................................................. 8, 15

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
  911 F. Supp. 2d 857 (N.D. Cal. 2012) ....................................................... 20, 21, 22

*Conerly v. Westinghouse Elec. Corp.*,
  623 F.2d 117 (9th Cir. 1980) .......................................................................... 25

*Conmar Corp. v. Mitsui & Co. (U.S.A.), Inc.*,
  858 F.2d 499 (9th Cir. 1988) ...................................................................... 24, 25

*Datel Holdings Ltd. v. Microsoft Corp.*,
  712 F. Supp. 2d 974 (N.D. Cal. 2010) ................................................................. 23

*Del. Valley Surgical Supply Inc. v. Johnson & Johnson*,
  523 F.3d 1116 (9th Cir. 2008) ......................................................................... 20

*In re Ditropan XL Antitrust Litig.*,
  529 F. Supp. 2d 1098 (N.D. Cal. 2007) ................................................................ 23

# TABLE OF AUTHORITIES
### (continued)

Page(s)

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
536 F. Supp. 2d 1129 (N.D. Cal. 2008) ............................................................ 24

*In re Elevator Antitrust Litig.*,
502 F.3d 47 (2d Cir. 2007).............................................................................. 14

*Exhibitors' Serv., Inc. v. Am. Multi-Cinema, Inc.*,
788 F.2d 574 (9th Cir. 1986)....................................................................... 23, 24

*In re Gilead Scis. Secs. Litig.*,
536 F.3d 1049 (9th Cir. 2008)....................................................................... 7, 13

*In re Graphics Processing Units Antitrust Litig.*,
527 F. Supp. 2d 1011 (N.D. Cal. 2007) ....................................................... 17, 18

*Ill. Brick Co. v. Illinois*,
431 U.S. 720 (1977) ................................................................................ passim

*In re Ins. Antitrust Litig.*,
723 F. Supp. 464 (N.D. Cal. 1989) .................................................................. 14

*Jablon v. Dean Witter & Co.*,
614 F.2d 677 (9th Cir. 1980)............................................................................ 24

*Jung v. Ass'n of Am. Med. Colls.*,
300 F. Supp. 2d 119 (D.D.C. 2004) ................................................................... 9

*Kansas v. UtiliCorp United, Inc.*,
497 U.S. 199 (1990) ........................................................................................ 20

*Kendall v. Visa U.S.A., Inc.*,
518 F.3d 1042 (9th Cir. 2008).................................................................. 9, 14, 20

*Lorenzo v. Qualcomm Inc.*,
603 F. Supp. 2d 1291 (S.D. Cal. 2009) ........................................................ 23, 24

*Mountain View Pharmacy v. Abbott Labs.*,
630 F.2d 1383 (10th Cir. 1980)..................................................................... 8, 10

*In re Optical Disk Drive Antitrust Litig.*,
No. 10-md-2143, 2011 WL 3894376 (N.D. Cal. Aug. 3, 2011) ..................... passim

*Or. Laborers-Emp'rs Health & Welfare Trust Fund v. Philip Morris Inc.*,
185 F.3d 957 (9th Cir. 1999)........................................................................... 22

COOLEY LLP
ATTORNEYS AT LAW

iii.

NOTICE AND MPA ISO CERTAIN DEFENDANTS'
JOINT MTD THE DIRECT PURCHASER PLAINTIFFS'
CAC - CASE NO. 4:13-MD-2420 YGR

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*R.C. Dick Geothermal Corp. v. Thermogenics, Inc.*,
   890 F.2d 139 (9th Cir. 1989) ................................................................. 23

*Ralph C. Wilson Indus., Inc. v. Chronicle Broad. Co.*,
   794 F.2d 1359 (9th Cir. 1986) ............................................................... 12

*In re Refrigerant Compressors Antitrust Litig.*,
   No. 09-md-2042, 2013 WL 1431756 (E.D. Mich. Apr. 9, 2013) ......................... 24

*Royal Printing Co. v. Kimberly Clark Corp.*,
   621 F.2d 323 (9th Cir. 1980) ............................................................ 21, 22

*Rutledge v. Bos. Woven Hose and Rubber Co.*,
   576 F.2d 248 (9th Cir. 1978) ................................................................. 24

*Stanislaus Food Prods. Co. v. USS-POSCO Indus.*,
   No. 09-cv-0560, 2010 WL 3521979 (E.D. Cal. Sept. 3, 2010) ........................... 20

*Sun Microsys. v. Hynix Semiconductors, Inc.*,
   608 F. Supp. 2d 1166 (N.D. Cal. 2009) .................................................... 22

*In re Tableware Antitrust Litig.*,
   363 F. Supp. 2d 1203 (N.D. Cal. 2005) .................................................... 18

*In re TFT–LCD (Flat Panel) Antitrust Litig.*,
   586 F. Supp. 2d 1109 (N.D. Cal. 2008) ................................................. 7, 8, 9

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   No. 07-md-1827, 2010 WL 2609434 (N.D. Cal. June 28, 2010) ....................... 8, 10

*The Jeanery, Inc. v. James Jeans, Inc.*,
   849 F.2d 1148 (9th Cir. 1988) ................................................................. 7

*Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*,
   552 F.3d 430 (6th Cir. 2008) ............................................................... 8, 9

*In re Transpac. Passenger Air Transp. Antitrust Litig.*,
   No. 07-cv-5634, 2011 WL 1753738 (N.D. Cal. May 9, 2011) ............................ 24

*In re Travel Agent Comm'n Antitrust Litig.*,
   583 F.3d 896 (6th Cir. 2009) ................................................................. 12

*In re Urethane Antitrust Litig.*,
   663 F. Supp. 2d 1067 (D. Kan. 2009) ...................................................... 12

COOLEY LLP
ATTORNEYS AT LAW

iv.

NOTICE AND MPA ISO CERTAIN DEFENDANTS'
JOINT MTD THE DIRECT PURCHASER PLAINTIFFS'
CAC - CASE NO. 4:13-MD-2420 YGR

# TABLE OF AUTHORITIES
### (continued)

Page(s)

*Williamson Oil Co. v. Philip Morris USA*,
  346 F.3d 1287 (11th Cir. 2003) ................................................................. 7, 12, 18

**STATUTES**

15 U.S.C.
  § 15b ................................................................................................................. 24

**OTHER AUTHORITIES**

Clayton Act § 4 ..................................................................................................... 20

Fed. R. Civ. P.
  § 9 (b) ......................................................................................................... passim
  § 12(b)(6) ...................................................................................................... vi, 7

1

**NOTICE OF MOTION AND MOTION TO DISMISS**

2          PLEASE TAKE NOTICE that on Friday, December 6, 2013, at 10:00 a.m., or as soon

3   thereafter as this motion may be heard, in Courtroom 5, 1301 Clay Street, Oakland, California,

4   before the Honorable Yvonne Gonzalez Rogers, the undersigned Defendants will and hereby do

5   move the Court, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, for an Order

6   dismissing the Direct Purchaser Plaintiffs' Consolidated Amended Complaint ("DPP-CAC") for:

7   (1) failure to state a claim that satisfies the pleading standards of *Bell Atlantic Corp. v. Twombly*,

8   550 U.S. 544 (2007); (2) failure to establish antitrust standing under *Illinois Brick Co. v. Illinois*,

9   431 U.S. 720 (1977) and *Associated General Contractors of Caifornia, Inc. v. California State*

10  *Council of Carpenters*, 459 U.S. 519 (1983) ("*AGC*"); and (3) failure to allege with particularity

11  specific facts that would toll the applicable statute of limitations for fraudulent concealment.  This

12  motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points

13  and Authorities, the pleadings on file, oral argument of counsel, and such other materials and

14  argument as may be presented in connection with the hearing on the motion.

15

**STATEMENT OF ISSUES PRESENTED**

16          1.      Whether the DPP-CAC fails to state a claim for relief under *Bell Atlantic Corp. v.*

17  *Twombly*, 550 U.S. 544 (2007), where it relies almost exclusively on disparate bilateral contacts

18  to support its implausible claims of a massive, 11-year continuing agreement among 18

19  Defendants to fix the prices of every lithium ion battery cell they produced, regardless of battery

20  type, product application, or the end customer it was designed for.

21          2.      Whether Plaintiffs have pled facts sufficient to show they have (a) standing to

22  bring damages claims under *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977) and (b) antitrust

23  standing under *Associated General Contractors of California, Inc. v. California State Council of*

24  *Carpenters*, 459 U.S. 519 (1983), when they have not alleged that they directly purchased the

25  purportedly price-fixed lithium ion battery cells from any Defendant.

26          3.      Whether Plaintiffs have pled sufficient facts to satisfy the Rule 9 (b) pleading

27  requirements for fraudulent concealment in order to toll the statute of limitations which bars

28  claims accruing before October 11, 2008.

COOLEY LLP
ATTORNEYS AT LAW

vi.

NOTICE AND MPA ISO CERTAIN DEFENDANTS' JOINT
MTD THE DIRECT PURCHASER PLAINTIFFS' CAC -
CASE NO. 4:13-MD-2420 YGR

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

Upon first glance, Plaintiffs' allegations in the DPP-CAC may appear to be deceptively substantial because of their sheer length.  However, when one applies the scrutiny required by the Federal Rules of Civil Procedure, it is clear that the DPP-CAC falls well short of adequately supporting, with well-pled factual allegations, the expansive and substantially overbroad conspiracy that it attempts to present.  Accordingly, Defendants respectfully request that the DPP-CAC be dismissed in its entirety, without prejudice.

The DPP-CAC alleges that Defendants engaged in a massive, industry-wide conspiracy "to fix, raise, stabilize, and maintain" the prices for lithium ion batteries from January 2000 through May 2011.  According to Plaintiffs, the conspiracy continued uninterrupted throughout the Class Period, involved each of the 18 Defendants, encompassed three distinct types of lithium ion battery cells and was directed at virtually every end product using those cells.  In a failed effort to give the appearance of meeting the requisite pleading standards, Plaintiffs rely on three sets of allegations.  First, they identify disjointed meetings and communications involving small subsets of the Defendants in which information was purportedly exchanged between the participants and, in a handful of disparate circumstances, broadly alleging that discrete agreements were reached.  Second, Plaintiffs rely on allegations which appear to match the recent very narrow plea agreements of Defendants SANYO Electric Co., Ltd. and LG Chem, Ltd. – which only relate to a few Defendants, the limited category of cylindrical lithium ion battery cells for notebook computers, and a brief 17-month period during the years 2007 and 2008.  Third, Plaintiffs rely on inaccurate, incomplete, and misleading economic allegations concerning various price movements, capacity utilization, and industry characteristics which they contend "render the conspiracy economically plausible." DPP-CAC, Part II.F.

None of these allegations – separately or collectively – plausibly support the massive, 11-year continuing agreement, covering every type of lithium ion battery cell for portable electronic products, that Plaintiffs have chosen to present.  Indeed, Plaintiffs' failure to follow the most fundamental pleading requirements obscure the very basic facts of "who, what, when, and where"

that are critical to advancing any viable conspiracy claim.  The DPP-CAC broadly defines various defendant and product groups and then employs those definitions in a way that makes it impossible to discern precisely what is actually being alleged.  Further, the DPP-CAC fails to include any allegations at all regarding six of the 18 Defendants or several of the applications at issue (*e.g.*, digital cameras and camcorders).  Moreover, the DPP-CAC is bereft of any allegations of any contacts or other allegedly collusive conduct during the first 26 months of the Class Period and is limited to allegations directed to just two of the 18 Defendants during the final 29 months.  Thus, even accepting the adequacy of some of the DPP-CAC's allegations to support more limited claims, it fails to allege any factual basis for the claimed conspiracy for nearly half of the Class Period and a third of the Defendants.

The remaining allegations largely focus on meetings or exchanges of information between no more than two Defendants that do not rise to the level of an agreement.  Even where Plaintiffs' claims do characterize certain allegations in the DPP-CAC as an "agreement," such alleged agreements are generally limited in scope, dispersed over several years, and involve only small subsets of Defendants, battery types, or individual bids.  These allegations do not plausibly support the overarching conspiracy among all Defendants covering all lithium ion battery cells that Plaintiffs have chosen to present.

As for the DPP-CAC's economic allegations, they allege that, in a competitive market, average battery prices should have decreased throughout the Class Period given the increasing production capacity of the Defendants.  But such allegations ignore the most basic principles of supply and demand.  As is clear from the DPP-CAC, demand for lithium ion batteries skyrocketed throughout the Class Period as mobile technologies revolutionized consumer electronics.  Moreover, the rapidly changing market shares of the Defendants during the Class Period – in which newer entrants to the industry rapidly gained market share from older, more established battery producers – are far more consistent with a competitive market than with the conspiracy that has been claimed.

Indeed, the purported scope of the alleged conspiracy deserves close scrutiny.  Plaintiffs are seeking to use their overbroad complaint as the basis upon which to subject the parties and the

Court to massive worldwide discovery encompassing a wide swath of products, sold through innumerable channels for more than a decade.  The sheer size of the proposed Class and staggering scope of discovery Plaintiffs ask this Court to bless would be unprecedented as well as unwarranted.  Under the mandates of *Twombly*, as well as principles of sound judicial administration, it would be improper to allow such an overreaching complaint to move forward on the facts alleged.  Even if Plaintiffs could plead and pursue a more limited conspiracy claim (based, for example, on the limited scope of the criminal plea agreements), the conspiracy claim they have chosen to plead should be dismissed.  Numerous courts have recognized that *Twombly* requires that the unsupported aspects of an overreaching and implausible antitrust conspiracy claim be dismissed, and that the remaining claim be narrowed to those elements with plausible support.  The Court should insist on specific factual allegations which plausibly support the scope of an alleged conspiracy before allowing such a massive factual controversy to proceed.

In addition, even if Plaintiffs' conspiracy claims were properly pled (they are not), Plaintiffs would still be indirect purchasers and thus lack standing under *Illinois Brick*, as well as under *AGC*.  The only products that are the subject of the alleged conspiracy are lithium ion battery cells – not lithium ion battery packs and not finished products containing lithium ion battery packs.  Yet, not a single Plaintiff alleges that it was a direct purchaser of a lithium ion battery cell from any of the Defendants.  Instead, Plaintiffs allege they are direct purchasers of either an assembled lithium ion battery pack, which contains lithium ion battery cells, or a finished lithium ion battery product (such as a cell phone or notebook computer) containing a lithium ion battery pack, which, in turn, contains lithium ion battery cells.  Plaintiffs are thus only "indirect" purchasers of the allegedly price-fixed product, and they lack standing to bring their federal antitrust claims.

Finally, Plaintiffs' claims accruing before October 11, 2008 are time-barred.  Plaintiffs have simply failed to meet the Rule 9(b) requirements for pleading with particularity the facts necessary to toll the statute of limitations under the fraudulent concealment doctrine.

## STATEMENT OF FACTS

**The Parties:** Plaintiffs are nine individuals or companies who claim to be direct

purchasers of "Lithium Ion Batteries" (defined in the DPP-CAC as lithium ion battery packs), or "Lithium Ion Battery Products."  ¶¶ 16-24.[1] For each, the DPP-CAC alleges that the Plaintiff purchased such products from "one" or "one or more of the named Defendants, their divisions, subsidiaries or affiliates, or their co-conspirators," without any additional specificity.  *Id.*  They seek to represent a class of "[a]ll persons and entities that purchased a Lithium Ion Battery or Lithium Ion Battery Product from any Defendant, or any division, subsidiary or affiliate thereof, or any co-conspirator in the United States during the Class Period, from January 1, 2000 through May 31, 2011."  ¶ 199.

Defendants are 18 entities headquartered in Japan, Korea and the United States, that are variously alleged to be involved in the manufacture and sale of "Lithium Ion Batteries."  ¶¶ 25-53.  Despite being separate entities, the DPP-CAC groups 18 Defendants into nine groups referred to by a single corporate title (*e.g.*, the "LG Defendants").  Throughout the DPP-CAC, Plaintiffs refer to the LG and Samsung SDI Defendants as "Korean Defendants" and the remaining groups as "Japanese Defendants."  ¶¶ 31, 53.

**Scope of the Alleged Conspiracy**: Plaintiffs allege that the 18 Defendants engaged in a global "conspiracy to fix, raise, stabilize, and maintain the prices of Lithium Ion Batteries from at least as early as January 1, 2000 through at least May 31, 2011," which "artificially raised the prices of Lithium Ion Battery Products."  ¶ 1.  "Lithium Ion Batteries" are defined broadly to encompass different battery "packs," or "modules" that contain one of three distinct battery cell types – cylindrical, prismatic and polymer – each of which, at a basic level, use lithium ions to generate power.  ¶¶ 2, 3, 73.  "Lithium Ion Battery Products," in turn, are defined to include a vast array of portable electronics containing one or more lithium ion battery cells, including applications such as "notebook computers, cellular (mobile) phones, digital cameras, camcorders, power tools, and other devices as the evidence may show."  ¶ 4.  Lithium Ion Batteries and Lithium Ion Battery Products are sold through a variety of sales channels.  These channels involve intermediaries such as original equipment manufacturers ("OEMs"), distributors, and

---

[1] All paragraph references are to the DPP-CAC unless otherwise noted.

"brick-and-mortar" retailers, as well as "packers" who purchase and assemble the cells into battery packs for sale to OEMs and others.   ¶¶ 62, 81-83; *see also* Indir. Purch. Consol. Am. Compl.  ("IPP-CAC") ¶¶ 1, 30, 77, 250, 256.   The DPP-CAC ignores the undisputed facts, recognized in the IPP-CAC, that different types of lithium ion battery cells are used almost exclusively in different applications.  In particular:

- **Cylindrical cells** are spherically shaped and "mostly used for Notebook PC and camcorders" because of their high capacity, in the "1600~2400mAh" range, "which is higher than prismatic type."  IPP-CAC ¶ 46.
- **Prismatic cells** are "usually used for mobile devices" and have a lower capacity, in the "500~1200mAh" range.  *Id.* ¶ 46.  To facilitate their use in mobile devices, prismatic cells are assembled into small, flat, rectangular battery packs, and therefore they are also commonly referred to as "square" or "rectangular" batteries.  *See id.* ¶¶ 31, 43.
- **Polymer cells** have a different chemistry from the other types, which "offers advantages…in terms of fabrication and ruggedness since the electrolyte is a solid polymer as opposed to a gel or liquid electrolyte."  *Id.* ¶ 33.  Polymer cells allow for "more freedom in battery shape…."  *Id.* ¶ 32.

Further, battery suppliers customize their batteries for different product applications and pursue different marketing, pricing, and distribution strategies for different batteries and customers.[2]

**The Alleged Contacts**:  Although the DPP-CAC alleges a broad conspiracy covering more than 11 years, the specificity and nature of its allegations vary greatly within that period.  Of the roughly 50 fact-specific allegations in the DPP-CAC (¶¶ 100-52), more than half (¶¶ 120-47) are dedicated to the 21-month period between February 2007 and October 2008 which are the subject of the SANYO Electric Co., Ltd. and LG Chem, Ltd. plea agreements.  The DPP-CAC is devoid of any allegations regarding any contacts between any of the Defendants during the first 27 months of the alleged Class Period.  Rather, according to the DPP-CAC, the first meetings involving any of the Defendants took place in March 2002 during which Samsung SDI ("SDI") and other Defendants (in separate bi-lateral meetings) allegedly discussed with SDI "current and forecasted supply and demand for cylindrical, polymer, and prismatic Lithium Ion Batteries; production capacity; possible entry into China; the notebook computer battery market; and

---

[2]   *See* Decl. of Scott D. Joiner, filed herewith ("Joiner Decl."), **Ex. C** at 56-57 ("extremely clear strategies specific to cylindrical, prismatic and polymer cells"; Sony is producing "specialized" prismatic cells for "camcorders and digital cameras…"); **Ex. D** at 30 ("prismatic models [are] changing dramatically.  The most prominent change is the increase in custom cells.").

problems caused by excess product supply." ¶ 100. The DPP-CAC alleges a number of similar meetings took place later in 2002 and 2003. ¶¶ 101-04. The only agreement claimed to have been made during this period allegedly took place after the March 2002 meetings; Plaintiffs make the conclusory assertion that three of the Defendants and "likely other[s]…agreed to refrain from extending their existing capacity…to keep supply tight." ¶ 100.

According to the DPP-CAC, "2004 represented a significant escalation in the intensity of the collusive conduct." ¶ 105. Plaintiffs allege that LG, SDI and Sony had several bi-lateral contacts between them during this period and that, among other things, Sony, Sanyo, and other manufacturers announced in March 2004 that they planned to increase prices for unspecified batteries. ¶ 107. In June, Sony and SDI allegedly discussed "price fluctuation in the notebook PC market" and Sony purportedly "committed to avoiding any price cuts." ¶ 108.

Plaintiffs allege a number of additional bi-lateral meetings involving various Defendants during 2005, 2006 and 2007. ¶¶ 111-33. For example, the DPP-CAC claims that, in February and March 2005, two of the 18 Defendants (LG and SDI) met to discuss "sales forecasts for various types of Lithium Ion Batteries" and agreed to cooperate in setting prices "as much as possible going forward." ¶ 112. At about the same time, Plaintiffs make the conclusory assertion that "Defendants" allegedly agreed to "refrain from adding new production lines to reduce supply and thus stabilize prices." ¶ 111. Plaintiffs further claim that, in response to the sharply rising cost of cobalt in early 2007, Defendants engaged in a series of "meetings, phone calls, and coded emails" aimed at raising the price of Lithium Ion Batteries. ¶¶ 120-48. These contacts allegedly included the first and only meeting that involved more than two of the Defendants. According to the DPP-CAC, in June 2007, SDI, Sanyo, and Panasonic met and "discussed the successful early 2007 price increase[,]…plotted to raise prices again later that year… [and] sought to establish a bottom-line selling price." ¶ 130. Similar contacts involving cylindrical batteries for notebook computers are alleged in 2008 following another increase in cobalt prices. ¶¶ 134-39.

The allegations of competitor meetings diminish substantially following the alleged conduct in 2007 and 2008 (which appears to match the narrow Sanyo and LG Chem pleas relating to cylindrical cells for notebook computers during the same time period) and nearly cease

1   altogether in 2009.  During the final two-and-a-half years of the Class Period, Plaintiffs allege a

2   total of three competitor contacts.  ¶¶ 149-51.  There are no allegations from this period involving

3   any of the companies referred to as the Japanese Defendants.  Rather, the only contacts alleged

4   during this 29-month period involve three contacts between SDI and LG, purportedly discussing

5   discrete bids for specific Apple and Hewlett Packard products.  *Id.*  None of the alleged

6   competitor contacts during the entire 11-year period are purported to have ever involved more

7   than three Defendants or to have ever involved any discussion of the massive conspiracy alleged.

8                                   **LEGAL STANDARD**

9        To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain sufficient factual

10   matter, accepted as true, to "state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v.*

11   *Twombly*, 550 U.S. 544, 570 (2007).  This standard requires that a plaintiff allege specific facts

12   that add up to "more than a sheer possibility that a defendant has acted unlawfully."  *Ashcroft v.*

13   *Iqbal*, 556 U.S. 662, 678 (2009).  The Federal Rules, however, "do not require courts to credit a

14   complaint's conclusory statements without reference to its factual context."  *Id.* at 686.

15   Accordingly, the Court is not required to accept as true "allegations that are merely conclusory,

16   unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Secs. Litig.*, 536

17   F.3d 1049, 1055 (9th Cir. 2008).

18        A "common scheme" or "meeting of minds" is a "prerequisite to section 1 liability."

19   *Jeanery, Inc. v. James Jeans, Inc.*, 849 F.2d 1148, 1155, 1160 (9th Cir. 1988).  Accordingly, the

20   mere "opportunity to fix prices without any showing that [defendants] actually conspired" is

21   insufficient to support an antitrust conspiracy claim.  *Williamson Oil Co. v. Philip Morris USA*,

22   346 F.3d 1287, 1319 (11th Cir. 2003).  Similarly, "communications between competitors [will]

23   not permit an inference of an agreement to fix prices unless those communications rise to the

24   level of an agreement, tacit or otherwise."  *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 126

25   (3d Cir. 1999).

26        The complaint must also "allege that each individual defendant joined the conspiracy and

27   played some role in it because, at the heart of an antitrust conspiracy is an agreement and a

28   conscious decision by each defendant to join it."  *In re TFT–LCD (Flat Panel) Antitrust Litig.*,

586 F. Supp. 2d 1109, 1117 (N.D. Cal. 2008) ("*LCD I*") (citations omitted).  Plaintiffs cannot avoid this requirement by grouping multiple defendants together as "Defendants" or "Japanese Defendants," or by referring to defendants in a corporate family by a single name.  *Id.*; *see also Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 436 (6th Cir. 2008); *Mountain View Pharmacy v. Abbott Labs.*, 630 F.2d 1383, 1388 (10th Cir. 1980). Similarly, allegations of bid-rigging on various occasions by a subset of defendants will not establish "plausibility for a broad…continuing agreement among all defendants."  *In re Optical Disk Drive Antitrust Litig.*, No. 10-md-2143, 2011 WL 3894376 at *9 (N.D. Cal. Aug. 3, 2011) ("*ODD*").  Further, specific allegations concerning only a subset of the products at issue will not plausibly support a broader conspiracy for all related products.  *See In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 07-md-1827, 2010 WL 2609434, at * 4 (N.D. Cal. June 28, 2010) ("*LCD II*").  Nor do allegations of rising prices or a concentrated industry with high barriers to entry establish collusion.  *See Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 237 (1993).  As the Supreme Court recognized decades ago, "a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." *AGC*, 459 U.S. at 528 n.17.

ARGUMENT

**I.  PLAINTIFFS' ALLEGATIONS FALL WELL SHORT OF PLAUSIBLY ALLEGING AN ONGOING ELEVEN-YEAR AGREEMENT AMONG THE EIGHTEEN NAMED DEFENDANTS TO FIX THE PRICE OF ALL TYPES OF LITHIUM ION BATTERY CELLS.**

**A.  There Are No Factual Allegations in the DPP-CAC to Plausibly Support The Massive Overarching Conspiracy.**

Plaintiffs employ an improper pleading technique throughout the DPP-CAC that, though appearing specific and particularized, actually confuses and obfuscates.  The DPP-CAC broadly defines various defendant and product groups and then uses those definitions throughout its various allegations in a way that makes it impossible to know precisely what is actually being alleged and against whom.  Such allegations do not satisfy the requirements of *Twombly* and its progeny.  Moreover, although the DPP-CAC details a series of bi-lateral contacts between various Defendants, those allegations fail to plausibly support the nearly 12-year, 18-member conspiracy

involving the three distinct battery cell types and broad spectrum of customer applications alleged in the DPP-CAC.   The few allegations that assert the existence of agreements between competitors involve small subsets of the Defendants and reflect, at most, allegations involving discrete customers, products and/or time periods.

There are five major flaws in the DPP-CAC's factual allegations that render the massive conspiracy alleged implausible.  *First*, the DPP-CAC's systematic use of impermissible group pleading hopelessly obscures the "who, what, when, and where" of the claimed conspiracy and fails to adequately allege how each Defendant joined and played a role in it.  No conspiracy claim can proceed without such essential allegations.  Plaintiffs must allege facts sufficient to "answer the basic questions: who, did what, to whom (or with whom), where, and when?"  *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008).   Yet nowhere do Plaintiffs set forth the specifics of how each of the 18 named Defendants joined such a massive conspiracy or played any role in it.   Instead, Plaintiffs repeatedly lump together individual Defendants within overbroad and legally insufficient definitions such as "Defendants," "Korean Defendants," or "Japanese Defendants."  *E.g.*, ¶¶ 31, 53, 92, 94, 96, 121, 129, 131.  More subtly, the DPP-CAC lumps together separate, though related, corporate entities under a single name (for example, there are three separate corporations referred to throughout the DPP-CAC as "Sony").  *E.g.*, ¶¶ 38-41.   The effect is that the DPP-CAC essentially abandons the task of asserting well-pled factual allegations against each separate Defendant.[3]   However, Plaintiffs "cannot escape their burden of alleging that each Defendant participated in or agreed to join the conspiracy by using the term 'defendants' to apply to numerous parties without any specific allegations."  *Jung v. Ass'n of Am. Med. Colls.*, 300 F. Supp. 2d 119, 163 (D.D.C. 2004); *see also LCD I*, 586 F. Supp. 2d at 1117 ("general allegations as to all defendants, to 'Japanese defendants,' or to a single corporate entity" are insufficient to state a claim); *Total Benefits Planning Agency*, 552 F.3d at 436 ("Generic pleading, alleging misconduct against defendants without specifics as to the role

---

[3]  Plaintiffs fail to include any allegations specifically connecting six of the 18 named Defendants to any competitor contacts: Panasonic Corporation of North America, SANYO North America Corp., Sony Energy Devices Corp., Sony Electronics Inc., Maxell Corporation of America, and Toshiba America Electronic Components, Inc.

1   each played in the alleged conspiracy, was specifically rejected by *Twombly*."); *Mountain View*

2   *Pharmacy*, 630 F.2d at 1388 (a "blanket statement [concerning multiple defendants] does not

3   provide adequate notice for responsive pleading").

4        **Second**, to sustain the overarching conspiracy claimed in the DPP-CAC, Plaintiffs must

5   provide factual allegations specifically directed at each of the three battery cell types at issue. *See*

6   *LCD II*, 2010 WL 2609434, at * 4 (rejecting conspiracy for STN-LCD panels where allegations

7   focused solely on TFT-LCD panels). They have not. Rather, Plaintiffs simply define the term

8   "Lithium Ion Batteries" to include all cylindrical, prismatic, and polymer batteries packs and

9   battery cells, even though Plaintiffs contradictorily allege that each type of cell is subject to

10  separate supply and demand dynamics, manufacturing processes, production capacity, and

11  pricing. Because these three separate cell types have unique physical characteristics and

12  electrical capacities (as even a cursory review of the diagrams at ¶ 85 reveals), they must be

13  separately designed to function as an integrated component of the diverse product applications or

14  battery packs that incorporate them. ¶ 75. Plaintiffs' assertion that they be treated as a single

15  interchangeable product is thus belied by their own allegations and cannot be accepted by this

16  Court.[4] *ODD*, 2011 WL 3894376, at *3 ("[T]here is no requirement to adopt the nomenclature of

17  the complaint, particularly where doing so would obfuscate rather than illuminate the dispositive

18  issues.").

19       This fundamental defect with Plaintiffs' pleading is illustrated with the DPP-CAC's

20  treatment of polymer battery cells. The DPP-CAC makes absolutely no mention of polymer cells

21  during eight of the 11 years encompassed by the Class Period (2000-2001 and 2004-2010).

22  

---

23  [4]  Plaintiffs' allegations seek to oversimplify the markets at issue. For example, they allege that
    all cells are subject to a single market because "the chemistry of polymer batteries and prismatic
24  batteries is the same" (¶ 86.) But there is no plausible reason why the underlying chemical
    reaction behind polymer and prismatic cells should define a single market for all three (or even
25  two) types of battery cells. Plaintiffs' attempt to do so is inconsistent with other allegations in the
    DPP-CAC, which repeatedly indicate that different cell types have separate supply and demand
26  traits, manufacturing facilities, production capacity, and pricing. *E.g.*, ¶ 75 (different
    manufacturing process and designs for each); ¶¶ 100, 104 (separate forecasted supply and demand
27  for three distinct battery types); ¶ 111 (distinct capacity for cylindrical; oversupply of prismatic
    batteries); ¶ 129 ("shortage in supply of cylindrical type"); ¶ 166 (figure identifying total
28  shipments and capacity utilization for cylindrical type); ¶ 174 (new entrant for "cylindrical
    battery business").

Cooley LLP
Attorneys At Law

10.

NOTICE AND MPA ISO CERTAIN DEFENDANTS' JOINT
MTD THE DIRECT PURCHASER PLAINTIFFS' CAC -
CASE NO. 4:13-MD-2420 YGR

Moreover, the few allegations that are directed to polymer batteries or polymer battery customers do not come close to alleging the type of expansive conspiracy claimed by Plaintiffs.  *See* ¶ 100 (general allegation in March 2002 of bi-lateral discussion concerning "forecasted supply and demand" of polymer batteries); ¶ 103 (November 2002 purported offer by one defendant to follow another's price increases for polymer cells); ¶ 150 (contact between two defendants concerning discrete bid to supply polymer batteries for Apple iPad).  As a result, it is implausible to allege an overarching conspiracy involving all three types of lithium ion battery cells over an 11-year period when there is such scant factual support for one third of the purported object of such a conspiracy.

*Third*, the DPP-CAC's definition of "Lithium Ion Battery Products" is vastly overbroad.  Plaintiffs seek to represent a class that includes all purchasers of any "Lithium Ion Battery Product," which in turn is defined to include "notebook computers, cellular (mobile) phones, digital cameras, camcorders, power tools and other devices."  ¶¶ 4, 199.  However, the 234-paragraph DPP-CAC does not contain a single allegation where Defendants discussed battery cells or customers for camcorders or digital cameras, and it includes only one contact – in 2007 – purportedly involving power tools.[5]  ¶ 132 (reference to Bosch).[6]  Yet, according to the DPP-CAC shipments for "digital cameras, camcorders, power tools and other devices" accounted for over 29% of the total lithium ion battery shipments in 2011.  ¶ 79.  Plaintiffs should not be allowed to pursue a massive conspiracy theory involving customers, battery types, and applications for which their complaint is virtually silent in any factual support.

*Fourth,* even a cursory review of the DPP-CAC makes clear that Plaintiffs fail to adequately allege any viable conspiracy during five of the 11 years encompassed by the Class Period.  The DPP-CAC is absolutely devoid of any specific factual allegations regarding any Defendants during the first 27 months of the Class Period (January 2000 to March 2002).  ¶¶ 95-

---

[5]  Plaintiffs also purport to include within their conspiracy "other devices as the evidence may show."  ¶ 4.  Such an unbounded allegation is obviously improper and further underscores the implausible character of the conspiracy that has been alleged.

[6]  Notably, the gaps in Plaintiffs' allegations correspond closely to the product applications which fall outside of the recently announced plea agreements. Joiner Decl., **Ex. J**.

Cooley LLP
Attorneys At Law

11.

Notice and MPA ISO Certain Defendants' Joint
MTD the Direct Purchaser Plaintiffs' CAC -
Case No. 4:13-MD-2420 YGR

100.   And during the final two-and-a-half years of the Class Period (December 2008 to May 2011), Plaintiffs allege a total of three contacts involving just two competitors concerning the alleged discussion of three specific bids to two customers.   ¶¶ 149-51.   Further, none of these allegations during this period involve any of the "Japanese Defendants."   The only plausible inference from the allegations is that the contacts alleged during this period reflect isolated discussions of specific bids by two competitors rather than the continuation of any gigantic industry-wide conspiracy.   *See Twombly*, 550 U.S. at 556-57; *In re Urethane Antitrust Litig.*, 663 F. Supp. 2d 1067, 1076-77 (D. Kan. 2009) (dismissing claims relating to time periods for which plaintiffs failed to allege "any specific meeting or communication.").

*Fifth*, even limiting the alleged conspiracy to the six-year period (2002 to 2008) for which the DPP-CAC provides at least some factual support, the DPP-CAC still fails to allege facts capable of plausibly supporting the overarching, industry-wide, 18-member conspiracy Plaintiffs seek to pursue.   With a single exception discussed below, each alleged contact or communication identified in the DPP-CAC involved no more than two of the 18 alleged co-conspirators.   Further, even accepting the DPP-CAC's allegations as true, the vast majority of those bi-lateral meetings amount to nothing more than lawful information exchanges.   *E.g.*, ¶¶ 100, 101, 104, 115, 119.   The mere exchange of information with a competitor does not run afoul of the antitrust laws and does not support an inference of a massive, unlawful conspiracy.   *See Williamson Oil Co.*, 346 F.3d at 1319 (mere "opportunity to fix prices without any showing that [defendants] actually conspired" is insufficient); *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 905 (6th Cir. 2009) (allegations that defendants' executives "met frequently during the period of cuts and caps…aver only an opportunity to conspire, which does not necessarily support an inference of illegal agreement"); *Ralph C. Wilson Indus., Inc. v. Chronicle Broad. Co.*, 794 F.2d 1359, 1365 (9th Cir. 1986).

With regard to those allegations in the DPP-CAC that use the language of "agreements" and understandings, they too fail to meet the *Twombly* pleading standards for the massive conspiracy alleged.   For example, Plaintiffs identify information allegedly shared in bi-lateral meetings between SDI and various individual Defendants based in Japan in March 2002.   ¶ 100.

Cooley LLP
Attorneys At Law

12.

Notice and MPA ISO Certain Defendants' Joint
MTD the Direct Purchaser Plaintiffs' CAC -
Case No. 4:13-MD-2420 YGR

1    Plaintiffs then conclude:  "As a result of these meetings, Samsung, Sony and Sanyo (and likely

2    other Defendants) agreed to refrain from extending their existing capacity in order to keep supply

3    tight."  *Id.*  The Court need not – and should not – accept as true allegations such as these which

4    "are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  *Gilead*

5    *Scis.*, 536 F.3d at 1055.

6            Further, the allegations in the DPP-CAC that at least approach the type of factual

7    allegations required by *Twombly* and *Iqbal*, still do not support the massive conspiracy claimed.

8    *See, e.g.*, ¶¶ 114, 117, 149 (alleging discrete agreements of limited duration, involving no more

9    than two of the Defendants).  Instead, these competitor contacts largely appear to correspond to

10   the allegations of the very limited plea agreements entered into by SANYO Electric Co., Ltd. and

11   LG Chem, Ltd.  For example, the lone meeting involving more than two Defendants is alleged to

12   have occurred in June 2007, seven and a half years *after* the conspiracy claimed to have started,

13   and appears to match the scope and time period of the two plea agreements concerning cylindrical

14   lithium ion battery cells for notebook computers.  ¶ 130.  Notably, of the roughly 50 fact-specific

15   allegations in the DPP-CAC (¶¶ 100-52), more than half (¶¶ 120-47) are dedicated to the 21-

16   month period between February 2007 and October 2008 that corresponds with the narrow

17   conspiracy described in the plea agreements.

18           Allegations of disparate conduct and discrete agreements among a subset of named

19   Defendants do not plausibly support the massive single conspiracy Plaintiffs seek to pursue.  As

20   Judge Seeborg explained under similar circumstances in *ODD*:

21                  [P]laintiffs' allegations of bid-rigging on three specifically-
                    identified occasions perhaps come closest to providing the requisite
22                  support for a conspiracy… As defendants point out, however, those
                    auctions involved only a small subset of defendants.  Even
23                  assuming those auctions, and perhaps others, were rigged, that is a
                    far cry from establishing plausibility for a broad six year continuing
24                  agreement among all defendants to fix the prices of all ODDs sold
                    through innumerable other channels.
25

26   2011 WL 3894376, at *9.  Simply put, "there must be a common agreement… Mere identity of

27   purpose, interconnected events, and shared participants… do not link separate conspiracies into

28   one overall, single conspiracy."  *In re Ins. Antitrust Litig.*, 723 F. Supp. 464, 483 (N.D. Cal. 1989)

Cooley LLP
Attorneys At Law

13.

Notice and MPA ISO Certain Defendants' Joint
MTD the Direct Purchaser Plaintiffs' CAC -
Case No. 4:13-MD-2420 YGR

1   *rev'd on other grounds*, 938 F.2d 919 (9th Cir. 1991). Here, just as in *ODD*, Plaintiffs repeatedly

2   rely on purported agreements that involve only narrow subsets of Defendants. Such allegations

3   are "a far cry from establishing plausibility for a broad…continuing agreement among all

4   defendants" to fix the prices of all lithium ion battery cells. *ODD*, 2011 WL 3894376, at *9.

### B.   Plaintiffs' Economic Allegations Fail to Support the Alleged Conspiracy.

6          Plaintiffs also rely heavily on inaccurate and incomplete economic allegations concerning

7   various price movements, capacity utilization, and industry characteristics which they contend

8   "render the conspiracy economically plausible." ¶ 170. Since *Twombly*, courts have repeatedly

9   dismissed antitrust conspiracy complaints that rely on the same type of allegations that Plaintiffs

10  assert here. *See, e.g.*, *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50-53 (2d Cir. 2007); *ODD*,

11  2011 WL 3894376, at *3-*4 (dismissing claims despite "highly concentrated" industry, "high

12  barriers to entry," "unnatural price stability and…upward trends," specific bid-rigging, and

13  opportunities to conspire). "Allegations of facts that could just as easily suggest rational, legal

14  business behavior by the defendants as they could suggest an illegal conspiracy are insufficient to

15  plead a violation of the antitrust laws." *Kendall*, 518 F.3d at 1049 (citation omitted). That is

16  precisely the case here. Indeed, the allegations presented are far more consistent with legitimate

17  competitive behavior than the massive conspiracy that has been claimed.

### 1.   Plaintiffs' Pricing Allegations Are Inaccurate and Misleading.

19         Plaintiffs rely on inaccurate and misleading characterizations of the average price for

20  undifferentiated lithium batteries during the Class Period. As the DPP-CAC succinctly puts it:

21  "Basic economic principles support the notion that, in a competitive market, these increasing

22  volumes of production should have been associated with continuing price declines for Lithium

23  Ion Batteries." ¶ 159. While such an assertion might be true with all else being equal, it ignores

24  that demand for all three types of lithium ion battery cells exploded during the Class Period.

25  Plaintiffs' chart illustrates this point. ¶¶ 70-71. This is unsurprising, as the rapid proliferation of

26  mobile devices, such as cell phones and notebook PCs, was the most significant social, economic

27  and cultural change impacting the United States and the rest of the world during the past 15 years.

28  Where "output is expanding at the same time prices are increasing, rising prices are equally

COOLEY LLP
ATTORNEYS AT LAW

14.

NOTICE AND MPA ISO CERTAIN DEFENDANTS' JOINT
MTD THE DIRECT PURCHASER PLAINTIFFS' CAC -
CASE NO. 4:13-MD-2420 YGR

1   consistent with growing product demand…rising prices do not themselves permit an inference of

2   a collusive market dynamic." *Brooke Grp. Ltd.*, 509 U.S. at 237.  For this reason alone, the DPP-

3   CAC's allegations regarding battery prices are at least as consistent with competitive behavior in

4   a market with increasing demand as they are with the massive conspiracy alleged.

5       The price allegations advanced by Plaintiffs suffer from at least five other flaws.  ***First***,

6   the data relied upon does not support the allegations in the DPP-CAC.  Plaintiffs principally rely

7   upon average price data from a Bank of Korea ("BoK") index that is entirely based on domestic

8   Korean producers.  ¶ 156; Joiner Decl., **Exs. A, B.**  The domestic price index for Korea should

9   carry no weight in assessing the plausibility of a worldwide conspiracy allegedly affecting  U.S.

10  consumers.

11      ***Second***, and more troubling, the BoK Index included in the DPP-CAC appears to  have

12  been manipulated to fit Plaintiffs own desired interpretation of the data.  The fine print which

13  accompanies the chart indicates that the index was converted from Korean Won to U.S. Dollars

14  "using exchange rates in Bloomberg."  ¶ 156.  Since an index measures changes against a

15  specified baseline (in this case, the average price as of January 2002), there was no need to

16  convert the BoK Index from its original currency in order to identify trends.  The original

17  (unconverted) BoK Index does not reflect the increasing average prices reflected in Plaintiffs'

18  chart.[7]  Rather than a sinister price increase, Plaintiffs' chart instead depicts little more than a

19  reflection of changing currency exchange rates during a period when the Dollar was weakening

20  against the Won.

21      ***Third***, Plaintiffs' pricing allegations are based on average prices that fail to account for

22  improved technologies or changing product mixes over time.  Indeed, Plaintiffs acknowledge that

23  lithium ion batteries were being developed with "increasing energy density" (that is greater power

24  and storage ability as measured by AMP hours) throughout the Class Period.  ¶ 157.  For this and

25  other reasons, courts and economists alike  recognize that average price data like the BoK chart is

26  not a reliable indicator of specific industry-wide prices.  *See, e.g.*, *In re Baby Food*, 166 F.3d at

27

28  _____

7   *See* Joiner Decl., **Encl. 1** (original price index charted against conversion).

Cooley LLP
Attorneys At Law

15.

Notice and MPA ISO Certain Defendants' Joint
MTD the Direct Purchaser Plaintiffs' CAC -
Case No. 4:13-MD-2420 YGR

129 ("[T]rend lines of average prices are [not] a reliable indicator of transactional prices").

*Fourth*, Plaintiffs urge the Court to infer improper conduct based on the allegation that average prices "dropped significantly" after the disclosure of the Department of Justice ("DOJ") investigation in May 2011. ¶ 161.  Interestingly, to support this allegation, they discard the BoK Index in favor of a vaguely defined index from the Bank of Japan. *Id*.  Plaintiffs' abrupt change of tack is presumably due to the fact that, if they had continued to rely on the BoK Index, it would not have shown the sharp reduction in prices that Plaintiffs were hoping to find.  A review of the BoK Index (cited just four paragraphs before the Bank of Japan index) actually shows average prices increasing slightly, not decreasing, both before and after May 2011 and then promptly returning to 2010 levels.  ¶¶ 156, 160.  Given these unexplained contradictions, Plaintiffs' allegations based on either index are not a plausible basis for supporting their claims.  Plaintiffs also ignore widely known circumstances that more plausibly explain the alleged May 2011 price fluctuation.  In March 2011, Japan endured a massive earthquake and tsunami that devastated the Japanese economy and had a profound impact on the lithium ion battery industry.  According to the industry source cited by the DPP-CAC, notebook computer manufacturers, fearing battery cell shortages because of the earthquake, stocked up on inventory of battery cells.  This short-term demand would have placed upward pressure on notebook battery prices.[8]  By July 2011, the resulting excess inventory and slowing notebook demand exerted strong downward pressure on prices.[9]  Far from signaling the end of a cartel, the falling prices are just as easily explained as the natural and lawful result of independent market disruptions.

And *fifth*, Plaintiffs cite a single analyst report to claim that battery prices defied industry expectations.  ¶¶ 155, 157-58.  Inexplicably, the report cited by Plaintiffs focuses on rechargeable

---

[8]  Joiner Decl., **Ex. E** at I-4 ("Taking into consideration the fact that the impact of the earthquake will emerge a month or two later, large users stocked up on large volumes of cells and packs in March and April."); **Ex. F** at IV-1 ("LIB intake [in Q2] was up 14%, because of PC manufacturers expanding their inventories in fear of the impact of the earthquake.")

[9]  Joiner Decl., **Ex. F** at IV-1 ("Neither the expected results for Q3, nor the outlook for Q4, will exceed single-digit growth. The slowdown in the notebook computer market is having its impact."); **Ex. G** at VII-4 ("Prices for cells of 2.6Ah and above are falling across the board. There is no way to make profits in the PC cell business.… Even top-ranked SDI have, for the time being, frozen plans for investment in lines after the MP10 line in their Ulsan factory.").

COOLEY LLP
ATTORNEYS AT LAW

16.

NOTICE AND MPA ISO CERTAIN DEFENDANTS' JOINT
MTD THE DIRECT PURCHASER PLAINTIFFS' CAC -
CASE NO. 4:13-MD-2420 YGR

batteries for hybrid electric vehicles – one of the few product applications which Plaintiffs do not include in their definition of the products at issue.

### 2. Plaintiffs' Other Economic Allegations Are Equally Unavailing.

**Production Capacity**:   Plaintiffs also allege that, after expanding capacity to meet increasing demand in early 2008, Defendants "cut production in a coordinated fashion" in response to the global recession that began in 2008 and after battery shipments "dropped significantly" in the first quarter of 2009.   ¶¶ 163-64.   According to Plaintiffs, this reduction in capacity was collusively achieved in order "[t]o stem…price decline due to capacity expansion during an economic crisis."   ¶ 165.   As an initial point, it is worth noting that Plaintiffs' allegations that some of the Defendants intended to expand their production capacity in early 2008 seems far more consistent with lawful, competitive activity than collusion.   More importantly, however, stabilizing prices by limiting production is an expected response by individual competitors  to either falling demand (as Plaintiffs allege occurred after the worldwide recession) or an oversupply.   Such conduct does not support the existence of an agreement in violation of  Section 1 of the Sherman Act even if multiple competitors, responding to the same economic circumstances, act in parallel.   *Twombly*, 550 U.S. at 554 ("parallel conduct" is insufficient when "just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market.").

**Market Concentration**:   Plaintiffs also claim that, because the lithium ion battery industry is highly concentrated, the claimed conspiracy is more plausible.   ¶ 178.   However, as courts have repeatedly recognized, market concentration is as consistent with lawful, parallel independent action as it is with collusion.   *See, e.g.*, *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1023 n.6 (N.D. Cal. 2007) ("*GPU*").   Moreover, by simply referencing the total market share of the 18 named Defendants, the DPP-CAC ignores the fact that the individual market shares of the Defendants were significantly changing throughout the Class Period.   For example, as reflected in the IPP-CAC, LG Chem's alleged share of the "Lithium Ion Battery Industry" increased from 1.3% in 2000 (at the beginning of the Class Period) to 6.5% in 2005 to 16.0% in 2011 (at the end of the Class Period).   IPP-CAC ¶ 200.   SDI

COOLEY LLP
ATTORNEYS AT LAW

17.

NOTICE AND MPA ISO CERTAIN DEFENDANTS' JOINT
MTD THE DIRECT PURCHASER PLAINTIFFS' CAC -
CASE NO. 4:13-MD-2420 YGR

1    enjoyed even greater growth during the Class Period, growing its share of the market from 0.4%

2    to 24.0%. *Id.* At the same time, Sony saw its share erode from 21.0% in 2000 to 13.0% in 2005

3    and finally to 8.0% at the end of the Class Period. *Id.* In fact, contrary to the DPP-CAC's

4    allegations regarding barriers to entry, total market share of new entrants and other non-

5    Defendants accounted for 25% by 2011. *Id.* Dramatically shifting market shares are a hallmark

6    of competition not an industry-wide, 11-year conspiracy. *See Williamson Oil*, 346 F.3d at 1318

7    ("significant market share shifts during this period of alleged industry-wide collusion strongly

8    undermines appellants' [alleged] conspiracy").

9          **C.**    **Government Investigations and Lawsuits Involving Other Products Are Irrelevant.**

10         Plaintiffs also rely on allegations of government investigations to support the plausibility

11   of the alleged conspiracy. ¶¶ 180-84. Similarly, Plaintiffs claim that Defendants have engaged in

12   a "history of colluding" (¶ 185) and cite a series of disconnected government investigations and

13   lawsuits that involved a Defendant, or an affiliate of a Defendant, regardless of whether the

14   investigations or lawsuits led to findings of liability, whether they related in any way to the

15   markets at issue here, or whether they involved anyone with any authority over any product in

16   this litigation. Such allegations are irrelevant and "carr[y] no weight in pleading an antitrust

17   conspiracy claim." *GPU*, 527 F. Supp. 2d at 1024; *see also In re Tableware Antitrust Litig.*, 363

18   F. Supp. 2d 1203, 1205 (N.D. Cal. 2005).

19         For all of these reasons, whether viewed separately or together, Plaintiffs have failed to set

20   forth facts capable of plausibly supporting the massive, 11-year, boundless product conspiracy

21   that they have chosen to claim. The only proper course for the Court in this situation is to grant

22   Defendants' motion to dismiss, with leave to amend, to determine whether a far more narrow and

23   plausible conspiracy claim against some of the Defendants can be pled.

24   **II.**    **PLAINTIFFS ARE INDIRECT PURCHASERS AND THUS LACK STANDING UNDER *ILLINOIS BRICK* AND *ASSOCIATED GENERAL CONTRACTORS*.**

25   

26       **A.**    **Plaintiffs Did Not Purchase Battery Cells from Any Defendant.**

27         The only products that are the subject of the alleged conspiracy here are lithium ion

28   battery cells – not lithium ion battery packs, and not finished products containing lithium ion

battery packs.  ¶ 3; ¶ 138 (price increase "by US$0.16/Cell"); Hr'g Tr. at 34, July 12, 2013 ("The cells, which are part of these batteries which conduct electricity, are really what the fix is on").[10] But not a single Plaintiff alleges that it was a direct purchaser of a lithium ion battery cell from any of the Defendants.  Nor could they.  As alleged, the direct purchasers of lithium ion battery cells are companies, such as so-called "packers," that purchase cells and assemble them with other components into finished lithium ion battery packs.  ¶¶ 3, 80-82.  Not a single packer or other analogous company is a named plaintiff.  Accordingly, Plaintiffs cannot qualify for standing under *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977).  *See ODD*, 2011 WL 3894376, at *5 ("[W]hile the complaint presently attempts to encompass ODD devices manufactured and sold by non-defendant companies, plaintiffs simply are not direct purchasers" under *Illinois Brick*).

Plaintiffs instead contend that they are direct purchasers of either "Lithium Ion Batteries" or "Lithium Ion Battery Products."  But as defined, both constitute finished products that merely contain lithium ion battery cells as a component.[11]  ¶¶ 2-3 ("Lithium Ion Batteries" are "assembled product[s]" in which "[i]ndividual or multiple [battery] cells are assembled or 'packed' inside an enclosure" containing protection circuitry); ¶ 4 ("Lithium Ion Battery Products" are finished consumer electronics products, such as notebook computers, that contain assembled lithium ion battery packs "that contain one or more Lithium Ion Battery Cells.").  In other words, "Lithium Ion Batteries," as used in the DPP-CAC, refer to finished lithium ion battery "packs" that are ready for use in finished Lithium Ion Battery Products.  The allegedly price-fixed cells integrated into such battery packs, however, are not purchased by the Plaintiffs.

### B.  Plaintiffs Lack Direct Purchaser Standing Under *Illinois Brick*.

As the landmark decision of *Illinois Brick* made clear, "only direct [not indirect] purchasers have standing under § 4 of the Clayton Act to seek damages for antitrust violations."

---

[10]  Consistent with the narrow criminal information filed against two of the Defendants, Plaintiffs expressly disclaim a conspiracy to fix the prices of Lithium Ion Battery Products.  ¶ 11 n.3; *see* Decl., **Exs. H, I** (charges limited to cylindrical cells for notebook computer battery packs).

[11]  Although the DPP-CAC makes clear that the alleged conspiracy was directed at cell prices, the DPP-CAC attempts to conflate battery cells (not purchased by plaintiffs) with finished battery packs (which were purchased by certain Plaintiffs).  *E.g.*, ¶ 3.  The Court should not accept such confusing nomenclature.  *ODD*, 2011 WL 3894376, at *3.

Cooley LLP
Attorneys At Law

19.

Notice and MPA ISO Certain Defendants' Joint
MTD the Direct Purchaser Plaintiffs' CAC -
Case No. 4:13-MD-2420 YGR

1    *Del. Valley Surgical Supply Inc. v. Johnson & Johnson*, 523 F.3d 1116, 1120-21 (9th Cir. 2008).

2    This means that "only the first party in the chain of distribution to purchase a price-fixed product

3    has standing to sue." *In re Apple iPhone Antitrust Litig.*, No. 11-cv-6714, 2013 WL 4425720, at

4    *9 (N.D. Cal. Aug. 15, 2013).  This rule is enforced in a bright-line fashion.  *See Kansas v.*

5    *UtiliCorp United, Inc.*, 497 U.S. 199, 216-17 (1990) (refusing to create an exception to the rule

6    even in cases where policy concerns do not apply with equal force).  Put simply, a plaintiff who

7    does not purchase and pay for the specific product or service that is the subject of the alleged

8    price-fixing agreement is not a "direct purchaser" within the meaning of the Clayton Act.

9         Indeed, in *In re ATM Fee Antitrust Litig.* ("*ATM*"), the Ninth Circuit recently confirmed

10   the mandate for strict application of *Illinois Brick*.  *See* 686 F.3d 741, 748 (9th Cir. 2012)

11   ("indirect purchasers may not use a pass-on theory to recover damages [under federal laws] and

12   thus have no standing to sue.").  In doing so, the Ninth Circuit took care to emphasize that the

13   "Supreme Court has interpreted [§ 4 of the Clayton Act]…narrowly, thereby constraining the

14   class of parties that have statutory standing to recover damages…" *Id.* (quoting *Del. Valley*

15   *Surgical Supply*, 523 F.3d at 1119).

16        It follows that a purchaser of a finished product containing an allegedly price-fixed

17   component – such as the Plaintiffs here – are not direct purchasers for purposes of *Illinois Brick*.

18   *See In re Cathode Ray Tube (CRT) Antitrust Litig.*, 911 F. Supp. 2d 857, 864 (N.D. Cal. 2012)

19   ("*CRT*")) ("Named DDPs [who] purchased [finished products] containing the allegedly price-

20   fixed CRTs but did not directly purchase CRTs themselves…are in fact indirect purchasers…");

21   *Kendall*, 518 F.3d at 1048-50 (affirming dismissal of indirect claims against credit card

22   companies for fixing merchant interchange fees); *Stanislaus Food Prods. Co. v. USS-POSCO*

23   *Indus.*, No. 09-cv-0560, 2010 WL 3521979, at *7-8 (E.D. Cal. Sept. 3, 2010).

24        Plaintiffs effectively concede that their claims depend on the same pass-through theory

25   rejected by *Illinois Brick*.  As noted in the DPP-CAC, Lithium Ion Battery "[C]ells…have no

26   practical use on their own" (¶ 83), and 10-20% of the cost of the finished lithium ion battery pack

27   results from the intricate process of adding circuitry, controls for charge levels, and

28   interconnections to permit specific powering of devices.  ¶ 80.  As such, Plaintiffs who purchased

Lithium Ion Batteries or Lithium Ion Battery Products must therefore prove how any increased cell price was passed on to them in the price of a finished Lithium Ion Battery or Lithium Ion Battery Product. But a price-fixed component, like a battery cell (with an alleged price increase of, for example, "16 cents") will not necessarily have *any* effect on the price of a downstream finished product, like a notebook computer, that contains hundreds of components and costs hundreds (if not thousands) of dollars. This is precisely the complex pass-through analysis that the *Illinois Brick* doctrine is intended to avoid.

### C.     Plaintiffs Do Not Satisfy Any Exception to the *Illinois Brick* Doctrine.

There are three narrow exceptions to the *Illinois Brick* doctrine recognized in the Ninth Circuit. Indirect purchasers may bring suit when (i) there is a preexisting "cost-plus" contract between the indirect and direct purchaser, (ii) the indirect purchaser establishes that it purchased from a co-conspirator such as a "middleman," or (iii) under an "ownership or control" exception, the indirect purchaser establishes that "a conspiring seller owns or controls the direct purchaser." *See CRT*, 911 F. Supp. 2d at 865-66; *see also Royal Printing Co. v. Kimberly Clark Corp.*, 621 F.2d 323, 326 (9th Cir. 1980). In the present case, only the latter two exceptions are at issue.

As the Ninth Circuit recently made clear, in order to fall within the co-conspirator exception, "the price paid by a plaintiff must be set by the conspiracy and not merely affected by the setting of another price." *ATM*, 686 F.3d at 754. But that is precisely the case here. Plaintiffs allege that the prices they paid (for battery packs and finished electronics products) were only indirectly affected by the prices allegedly set by the conspiracy. Accordingly, Plaintiffs cannot rely on the co-conspirator exception to sustain their claims.

Nor can Plaintiffs take refuge in the "ownership or control" exception. In this regard, the DPP-CAC is subject to two fatal flaws. ***First***, Plaintiffs do not plead the facts necessary to establish that any of the Plaintiffs purchased a battery cell directly from an entity owned or controlled by a Defendant. Indeed, the DPP-CAC does not identify any specific company that any Plaintiff purchased a product from, let alone the facts necessary to establish ownership or control of such entity by one of the Defendants. *Apple iPhone*, 2013 WL 4425720, at *6, 12 (dismissing for lack of Article III standing and for failure "to allege the theory and facts upon

Cooley LLP
Attorneys At Law

21.

Notice and MPA ISO Certain Defendants' Joint
MTD the Direct Purchaser Plaintiffs' CAC -
Case No. 4:13-MD-2420 YGR

which [plaintiffs] are proceeding" under *Illinois Brick*).  Moreover, Plaintiffs do not provide specific allegations establishing that Defendants had "ownership or control" over the third-party packers.  ¶¶ 81-83.  *See Sun Microsys. v. Hynix Semiconductors, Inc.*, 608 F. Supp. 2d 1166, 1177-80 (N.D. Cal. 2009) (rejecting purported direct purchaser claims where plaintiff was not a direct purchaser of price-fixed DRAM and failed to show that it qualified for exception).  Indeed, although Plaintiffs contend that unspecified Defendants held some sway over the packers during unspecified periods, allegations of mere influence are insufficient to invoke the exception.  *See ATM*, 686 F. 3d at 757-58 (influence deficient; defendant must have ownership).

**Second**, the "ownership or control" exception should have no application where, as here, the alleged price-fixing conspiracy involves components like lithium ion battery cells, and the Plaintiffs merely claim to have purchased finished products containing those components.  Unlike in *Royal Printing*, where the plaintiffs bought the price-fixed paper directly from a controlled wholesaler subsidiary of the company that allegedly fixed the price of the paper, the Plaintiffs here do not claim to have purchased the price fixed product – battery cells – from any company at all.  621 F.2d at 324-25.[12]

### D.     Plaintiffs Also Lack Antitrust Standing Under *AGC*.

Because the DPP-CAC reveals that Plaintiffs never purchased allegedly price-fixed lithium ion battery cells themselves, Plaintiffs also lack antitrust standing under the principles articulated in *Associated General Contractors*.  *AGC*, 459 U.S. at 535.  Failure to allege facts sufficient to demonstrate antitrust standing, which is an analytically distinct requirement from *Illinois Brick*, is grounds for dismissal.  *Id.* at 520-21; *see also Or. Laborers-Emp'rs Health & Welfare Trust Fund v. Philip Morris Inc.*, 185 F.3d 957, 962–66 (9th Cir. 1999).  In *AGC*, the Supreme Court instructed courts to use a multi-factor balancing test to evaluate antitrust standing,

---

[12] While the court in *CRT* permitted an ownership or control claim to proceed where the plaintiffs purchased televisions containing the allegedly price-fixed CRTs, *see* 911 F. Supp. 2d at 869, it is submitted that this aspect of the *CRT* decision was wrongly decided and is inconsistent with the ruling in *ATM*, in which the Ninth Circuit made clear that only the purchasers of the product or service that was the object of the alleged price-fix could have standing to bring a federal antitrust claim.  *See ATM*, 686 F.3d at 754 & n.4; *cf. Royal Printing*, 621 F.2d at 324 (plaintiff purchased the actual price-fixed paper products).

COOLEY LLP
ATTORNEYS AT LAW

22.

NOTICE AND MPA ISO CERTAIN DEFENDANTS' JOINT
MTD THE DIRECT PURCHASER PLAINTIFFS' CAC -
CASE NO. 4:13-MD-2420 YGR

1  described by the Ninth Circuit as:  (1) the nature of the injury; (2) the directness of the injury; (3)

2  the risk of duplicative recovery and complexity in apportioning damages; and (4) the speculative

3  nature of the harm.  *Exhibitors' Serv., Inc. v. Am. Multi-Cinema, Inc.*, 788 F.2d 574, 578 (9th Cir.

4  1986) (citing *AGC*, 459 U.S. at 545).

5       The first of the factors – antitrust injury – is of "tremendous significance."  *R.C. Dick

6  Geothermal Corp. v. Thermogenics, Inc.*, 890 F.2d 139, 148 (9th Cir. 1989) (citation omitted).

7  Failure to allege antitrust injury is thus, by itself, an "independent ground" for dismissal.  *Ass'n of

8  Wash. Pub. Hosp. Dists. v. Philip Morris Inc.*, 241 F.3d 696, 704 (9th Cir. 2001).  Because the

9  antitrust laws were created to "protect[] the economic freedom of participants in the *relevant

10  market*," *AGC*, 459 U.S. at 538 (emphasis added), "the injured party [must] be a participant in the

11  same market" where the alleged anticompetitive conduct occurred.  *R.C. Dick Geothermal*, 890

12  F.2d at 148 (quotation omitted).  "Parties whose injuries, though flowing from that which makes

13  the defendant's conduct unlawful, are experienced in another market do not suffer antitrust

14  injury."  *Ass'n of Wash. Pub. Hosp. Dists.*, 241 F.3d at 705 (quoting *Am. Ad. Mgmt., Inc. v. Gen.

15  Tel. Co.*, 190 F.3d 1051, 1057 (9th Cir. 1999)).

16       Here, Plaintiffs fail to allege that they have suffered an injury in – or even participated in

17  – the market they allege for lithium ion battery cells.  They have thus failed to plead the required

18  antitrust injury, and their claims should be dismissed.  *See, e.g.*, *In re Ditropan XL Antitrust

19  Litig.*, 529 F. Supp. 2d 1098, 1107 (N.D. Cal. 2007); *R.C. Dick Geothermal*, 890 F.2d at 148;

20  *Datel Holdings Ltd. v. Microsoft Corp.*, 712 F. Supp. 2d 974, 994 (N.D. Cal. 2010) (no antitrust

21  standing where plaintiffs' "allegations center on its injury in the secondary market"); *Lorenzo v.

22  Qualcomm Inc.*, 603 F. Supp. 2d 1291, 1302-03 (S.D. Cal. 2009) (same).

23       Plaintiffs' conclusory allegation that "cells and batteries are essentially the same from an

24  economic standpoint so that a price fix on the cells is a price fix on the batteries" is unavailing.

25  ¶ 3.  The DPP-CAC makes clear that the alleged market for lithium ion battery cells is the only

26  market where any price-fixing allegedly occurred.  *E.g.*, ¶ 138 (alleging price increase

27  "approximately by US$0.16/Cell"); ¶ 198 (alleging that Defendants conspired to prevent new

28  "cell makers" from entering the market and therefore "helping the cell makers receive premium

Cooley LLP
Attorneys At Law

23.

Notice and MPA ISO Certain Defendants' Joint
MTD the Direct Purchaser Plaintiffs' CAC -
Case No. 4:13-MD-2420 YGR

prices for the technologies").  But Plaintiffs cannot demonstrate any antitrust injury where the alleged conspiracy occurred in a different upstream component market than the one where plaintiffs purchase finished products.  *See, e.g.*, *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 536 F. Supp. 2d 1129, 1136-41 (N.D. Cal. 2008); *In re Refrigerant Compressors Antitrust Litig.*, No. 09-md-2042, 2013 WL 1431756, at *11-13 (E.D. Mich. Apr. 9, 2013).[13]

### III.   CLAIMS FOR DAMAGES INCURRED PRIOR TO OCTOBER 11, 2008 ARE TIME BARRED.

Finally, the Clayton Act bars Plaintiffs' damages claims based on sales occurring more than four years before their initial complaint on October 11, 2012.[14]  15 U.S.C. § 15b.  Time-barred claims are ripe for dismissal where the running of the statute of limitation is apparent on the complaint's face.  *Jablon v. Dean Witter & Co.*, 614 F.2d 677, 682 (9th Cir. 1980).  Here, Plaintiffs allege damages starting in 2000, many years earlier than the statute of limitations permits.

Plaintiffs attempt to overcome the statute of limitations by alleging fraudulent concealment.  Their attempt fails, however, as they have not pleaded with particularity facts sufficient to establish the required elements of fraudulent concealment.  *See* Fed. R. Civ. P. 9(b); *Conmar Corp. v. Mitsui & Co. (U.S.A.)*, 858 F.2d 499, 502 (9th Cir. 1988) (circumstances of concealment and facts supporting due diligence must be pled with particularity); *Rutledge v. Boston Woven Hose and Rubber Co.*, 576 F.2d 248, 249-50 (9th Cir. 1978) (same); *In re Transpac. Passenger Air Transp. Antitrust Litig.*, No. 07-cv-5634, 2011 WL 1753738 (N.D. Cal. May 9, 2011) (same).  To toll the statute of limitations through fraudulent concealment, Plaintiffs must prove *both* that (1) Defendants affirmatively misled Plaintiffs regarding the existence of actions giving rise to their claims; and (2) Plaintiffs had neither actual nor constructive

---

[13]   The allegations of the DPP-CAC also fail to satisfy the remaining *AGC* factors.  459 U.S. at 540-44; *Exhibitors' Serv.*, 788 F.2d at 578.  Plaintiffs themselves identify more immediate victims of the alleged conspiracy (packers who purchase the cells).  ¶ 82.  And, because Plaintiffs' alleged injury occurred only *after* the battery cells were combined with other components and assembled by packers, determining the extent of Plaintiffs' remote injury in a downstream market involving entirely different finished products would necessarily be speculative.  *See Lorenzo*, 603 F. Supp. 2d at 1301 (injury too remote where it must be "disaggregated from a multitude of other manufacturing and component factors").

[14]   The Toshiba Defendants, who join in this motion, were first named by Plaintiffs when the DPP-CAC was filed July 2, 2013.

COOLEY LLP
ATTORNEYS AT LAW

24.

NOTICE AND MPA ISO CERTAIN DEFENDANTS' JOINT
MTD THE DIRECT PURCHASER PLAINTIFFS' CAC -
CASE NO. 4:13-MD-2420 YGR

1    knowledge of the facts underlying their claims despite exercising due diligence to discover those

2    facts.  *Conmar*, 858 F.2d at 502.

3          Plaintiffs' due diligence allegations fall well short of Rule 9(b)'s standards.  Plaintiffs

4    offer no details about any acts of due diligence, but instead simply conclude that "[p]laintiffs

5    exercised reasonable diligence" and "could not have discovered the alleged conspiracy at an

6    earlier date…because of the deceptive practices and…secrecy employed by Defendants…"  ¶

7    222.  This single, conclusory allegation does not meet the burden for pleading the elements of

8    fraudulent concealment.  *Conmar Corp.*, 858 F.2d at 502.

9          Furthermore, Plaintiffs' claim is belied by the dozens of paragraphs in the DPP-CAC

10   devoted to showing that the Defendants' alleged collusion was obvious and readily gleaned from

11   industry characteristics.   ¶¶ 154-78.   Such information was publicly available to Plaintiffs,

12   however, long before they filed their initial complaint in October 2012.  Plaintiffs also point to

13   other cases and government investigations in technology-related markets which they contend

14   enhanced the plausibility of the alleged conspiracy.  ¶¶ 185-93.  Plaintiffs conveniently argue that

15   these purportedly obvious allegations support their claims, yet fail to explain why the same

16   information did not prompt them to conduct any due diligence of any kind.  *See, e.g., Conerly v.*

17   *Westinghouse Elec. Corp.*, 623 F.2d 117, 120-21 (9th Cir. 1980) (inadequate due diligence where

18   patterns should have led to discovery of claims).  Accordingly, Plaintiffs' claims arising before

19   October 11, 2008 should be dismissed.

20   **IV.    CONCLUSION**

21          For the reasons set forth above, Defendants respectfully request that the Court dismiss the

22   Direct Purchaser Plaintiffs' Consolidated Amended Complaint in its entirety, without prejudice.

23   Dated: September 16, 2013                     Respectfully submitted,

24

25                                        By: /s/ John C. Dwyer

26                                        John C. Dwyer (136533)
                                          Stephen C. Neal (170085)
27                                        Bennett S. Miller (254368)
                                          **COOLEY LLP**
28

COOLEY LLP
ATTORNEYS AT LAW

25.

NOTICE AND MPA ISO CERTAIN DEFENDANTS' JOINT
MTD THE DIRECT PURCHASER PLAINTIFFS' CAC -
CASE NO. 4:13-MD-2420 YGR

1     Five Palo Alto Square
3000 El Camino Real
2     Palo Alto, CA 94306
Telephone:   (650) 843-5000
3     Facsimile:    (650) 857-0663

4

5     Beatriz Mejia (190948)
Scott D. Joiner (223313)
6     **COOLEY LLP**
101 California Street, 5th Floor
7     San Francisco, CA 94111-5800
Telephone:   (415) 693-2000
8     Facsimile:    (415) 693-2222

9     *Counsel for Defendants Sony Corporation, Sony*
*Energy Devices Corporation, and Sony*
10    *Electronics Inc.*

11

12    By:/s/ Kenneth P. Ewing

13    Kenneth P. Ewing (*pro hac vice*)
Robert W. Fleishman (*pro hac vice*)
14    Andrew J. Sloniewsky (*pro hac vice*)
**STEPTOE & JOHNSON LLP**
15    1330 Connecticut Ave., N.W.
Washington D.C., 20036
16    Tel: (202) 429-3000
Fax: (202) 429-3902
17

18    *Counsel for Defendants LG Chem, Ltd. and*
*LG Chem America, Inc.*
19

20

21    By: /s/ Jeffrey L. Kessler

22    Jeffrey L. Kessler (pro hac vice)
A. Paul Victor (pro hac vice)
Eva W. Cole (pro hac vice)
23    Jeffrey J. Amato (pro hac vice)
**WINSTON & STRAWN LLP**
24    200 Park Avenue
New York, NY 10166-4193
25    Telephone: (212) 294-4601
Facsimile: (212) 294-4700
26

27    Ian L. Papendick
Diana L. Hughes
28    **WINSTON & STRAWN LLP**

26.

1  101 California Street
2  San Francisco, CA 94111
   Telephone: (415) 591-6904
3  Facsimile: (415) 591-1400

4  Roxann E. Henry (*pro hac vice*)
   **MORRISON & FOERSTER LLP**
5  2000 Pennsylvania Avenue, NW
   Suite 6000
6  Washington, DC 20006
7  Telephone: (202) 887-1500
   Facsimile: (202) 887-0763
8
9  *Counsel for Panasonic Corporation,*
   *Panasonic Corporation of North America,*
   *SANYO Electric Co., Ltd., and*
10 *SANYO North America Corporation*
11
12 By: /s/ Craig P. Seebald
13 Craig P. Seebald (pro hac vice)
   Lindsey R. Vaala (*pro hac vice*)
14 Hannah C. Wilson (*pro hac vice*)
   **VINSON & ELKINS LLP**
15 2200 Pennsylvania Avenue NW
   Suite 500 West
16 Washington, D.C. 20037
17 Telephone: (202) 639-6585
   Facsimile: (202) 879-8995
18
19 Matthew J. Jacobs (SBN 171149)
   **VINSON & ELKINS LLP**
20 525 Market Street, Suite 2750
   San Francisco, California 94105
21 Telephone: (415) 979-6990
   Facsimile: (415) 651-8786
22
23 *Counsel for Maxell Corporation of America,*
   *and Hitachi Maxell, Ltd.*
24
25 By: /s/ James L. McGinnis
26 Gary L. Halling
   James L. McGinnis
27 Michael W. Scarborough
   **SHEPPARD MULLIN RICHTER &**
28

Cooley LLP
Attorneys At Law

27.

Notice and MPA ISO Certain Defendants' Joint
MTD the Direct Purchaser Plaintiffs' CAC -
Case No. 4:13-MD-2420 YGR

**HAMPTON**
4 Embarcadero Center, 17th Floor
San Francisco, CA 94111
Telephone: (415) 774-3294
Facsimile: (415) 434-3947

*Counsel for Samsung SDI Co., Ltd. and*
*Samsung SDI America, Inc.*


By: /s/ Christopher M. Curran_____
Christopher M. Curran
**WHITE & CASE**
White & Case
701 Thirteenth Street N.W.
Washington, DC 20005
Telephone: (202) 626-3600
Facsimile:  (202) 639-9355 (fax)

*Counsel for Toshiba Corporation and*
*Toshiba America Electronic Components Inc.*


### FILER'S ATTESTATION

Pursuant to Local Rule 5-1(i)(3), I attest under penalty of perjury that concurrence in the filing of this document has been obtained from each of the signatories.

By:    /s/ John C. Dwyer_____
John C. Dwyer

Cooley LLP
Attorneys At Law

28.

Notice and MPA ISO Certain Defendants' Joint
MTD the Direct Purchaser Plaintiffs' CAC -
Case No. 4:13-MD-2420 YGR