United States District Court
Northern District of California

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: LITHIUM ION BATTERIES ANTITRUST LITIGATION | Case No.: 13-MD-2420 YGR |
| | ORDER RE: MOTIONS TO DISMISS |
| **This Order Relates to:** **All Indirect Purchaser and Direct Purchaser Actions** | |

In this antitrust case, two putative plaintiff classes allege a multi-year, international price-fixing conspiracy among Japanese and Korean manufacturers of lithium ion battery cells, as well as their American subsidiaries. The putative class representatives are denominated the Indirect Purchaser Plaintiffs ("IPPs") and the Direct Purchaser Plaintiffs ("DPPs"; collectively with the IPPs, "Plaintiffs"). Both putative classes have filed consolidated amended complaints. (Dkt. Nos. 256 ("IPP-CAC"), 257 ("DPP-CAC").) Each complaint names as defendants the same eighteen corporate entities, which Plaintiffs have grouped identically into corporate families.[1]

---

[1] Where convenient, the Court uses the nomenclature of the complaints to refer to subsets of the eighteen named defendants, who are: (1) LG Chem, Ltd., and (2) LG Chem America, Inc. (collectively, "LG" or "LG Chem"); (3) Samsung SDI Co., Ltd., and (4) Samsung SDI America, Inc. (collectively, "Samsung"); (5) Panasonic Corp. and (6) Panasonic Corp. of North America (collectively, "Panasonic"); (7) Sanyo Electric Co., Ltd., and (8) Sanyo North America Corp. (collectively, "Sanyo"); (9) Sony Corp., (10) Sony Energy Devices Corp., and (11) Sony Electronics, Inc. (collectively, "Sony"); (12) Hitachi Maxell, Ltd., and (13) Maxell Corp. of America (collectively, "Hitachi"); (14) GS Yuasa Corp. ("GS Yuasa"); (15) NEC Corp. and (16) NEC Tokin (collectively "NEC"); and (17) Toshiba Corp. and (18) Toshiba America Electronic Components, Inc. (collectively, "Toshiba"). The Court also follows the complaints in occasionally referring to LG and Samsung collectively as the "Korean Defendants," and the remaining defendants collectively as the "Japanese Defendants."

United States District Court
Northern District of California

Now before the Court are seven motions to dismiss the IPP-CAC and DPP-CAC.  Two of the motions were filed by certain defendants jointly.[2]  One joint motion challenges the IPP-CAC, the other the DPP-CAC.  (Dkt. Nos. 288 ("Joint MTD IPP-CAC"), 290 ("Joint MTD DPP-CAC").)  The remaining five motions to dismiss were filed by particular defendants seeking dismissal of both complaints on grounds which, the movants contend, are not addressed in the joint motions.  (Dkt. Nos. 284 (both Hitachi defendants ("Hitachi MTD")), 289 (Panasonic Corp. of North America and Sanyo North America Corp. ("Panasonic/Sanyo MTD"))[3], 291 (LG Chem America, Inc. ("LG MTD")), 293 (both Toshiba defendants ("Toshiba MTD")), 296 (all three Sony defendants ("Sony MTD")).  All seven motions are fully briefed and the Court heard oral argument on certain issues raised therein on December 6, 2013.

Defendants' challenge to the pleadings is essentially three-fold.  First, they contend that, while Plaintiffs can allege *some* conspiracy, the conspiracy they *have* alleged is overbroad.  Defendants take this stance in the shadow of criminal guilty pleas entered by Sanyo Electric Co., Ltd., and LG Chem, Ltd., wherein those defendants pled guilty to a conspiracy to fix the prices of one type of lithium ion battery during 2007 and 2008.  Defendants concede that the conspiracy alleged by Plaintiffs need not be limited to that covered by the guilty pleas, but argue that Plaintiffs overreach by alleging a conspiracy extending from 2000 to May 2011, covering every type of lithium ion battery, and implicating all eighteen named defendants.  Second, Defendants argue that the DPPs have failed to establish their standing to bring federal antitrust claims for damages under *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), and its progeny.  Finally, Defendants contend that both complaints fail to plead fraudulent concealment such that the Court may toll the applicable statutes of limitations to embrace the full class period claimed by Plaintiffs, which extends back to 2000.

---

[2] Neither GS Yuasa nor NEC join either motion.  GS Yuasa does not appear to have been served.  NEC waived service and the parties have stipulated to a later date for NEC to respond.  (Dkt. No. 349.)  For convenience, the Court refers to the jointly moving defendants as simply "Defendants."

[3] Panasonic and Sanyo share counsel and have filed a single motion to dismiss addressing issues particular to Panasonic Corp. of North America and Sanyo North America Corp.

Having fully considered the record and the arguments of the parties, the Court determines that Defendants' challenges to the scope of the conspiracy generally are misplaced.  The complaints contain voluminous, specific allegations of not only opportunities to collude, but certain defendants' actual agreements to refrain from competing on price.  These allegations, made with the benefit of documents produced to the grand jury and then turned over to Plaintiffs by some, but not all, Defendants, as well as criminal guilty pleas entered by two defendants, narrow the question before the Court.  The question in this case is not whether any conspiracy existed, only how far it reached.  That question is ultimately one of fact, and cannot be resolved in the present procedural posture, where the Court tests only the sufficiency of the pleadings.  The Court finds that the pleadings generally are adequate—which is to say, plausible—in their allegations of a conspiracy spanning most of the time period and all of the products alleged.  Further, both the IPP-CAC and DPP-CAC sufficiently allege fraudulent concealment of the conspiracy.

However, three deficiencies in the pleadings justify granting Defendants' motions and dismissing the complaints with leave to amend.  First, the DPPs fail to allege facts sufficient to support their claim to antitrust standing under *Royal Printing Co. v. Kimberly Clark Corp.*, 621 F.2d 323 (9th Cir. 1980)).  Second, while both the IPP-CAC and the DPP-CAC allege a plausible conspiracy, neither supports a plausible inference that the alleged conspiracy originated earlier than 2002.  Finally, while both complaints more than adequately allege conspiratorial conduct among the defendant Korean and Japanese parent companies, neither adequately alleges a conscious commitment to conspire on the parts of the defendant subsidiaries.  For these reasons, as set forth more fully below, the Court **GRANTS** all seven motions pending before it and **DISMISSES** both the IPP-CAC and the DPP-CAC.  The Court grants both the IPPs and DPPs **LEAVE TO AMEND** their respective complaints.

## I.   BACKGROUND

### A.   FACTUAL OVERVIEW

The Court draws its summary of the facts of the case from the allegations of Plaintiffs' operative complaints.  The Court provides only a high-level summary since the DPP-CAC and IPP-CAC, at 225 pages in total length, are voluminous enough to resist point-by-point recounting.

1  **1.      Lithium Ion Batteries, as Described in the Complaints**

2        Lithium ion batteries allegedly are the predominant form of rechargeable batteries used in

3   portable consumer electronics today, powering devices ranging from smartphones to laptop

4   computers to cameras to cordless power tools.  An important component of a lithium ion battery is

5   its "cell," which is the part of the battery that stores and releases electricity through chemical

6   means.  The cell, in turn, consists of four basic components: a cathode, an anode, electrolyte, and

7   separators.  Generally speaking, a cell discharges electrical current when lithium ions stored in the

8   cathode flow toward the anode through the electrolyte and separators.  Sending current into the

9   battery reverses this process and recharges the battery.

10        After manufacture, one or more cells are "packed" inside a casing, sometimes with

11   protective circuitry.  The casing makes the cell usable as a battery, or, in the case of multiple cells

12   in a single casing, as a battery pack.[4]  Both batteries and cells adhere to one of three general

13   formats: (i) cylindrical, (ii) prismatic, and (iii) polymer.  These formats differ in shape, electrical

14   properties, and, in the case of polymer batteries, composition.[5]  Further, their differing

15   characteristics allegedly make particular formats suitable for use in particular kinds of devices.  For

16   instance, cylindrical batteries lend themselves to use in laptop computers, while polymer batteries

17   lend themselves to use in cellular phones.  Lithium ion batteries reach the consumer market either

18   as components of consumer products or as standalone products, for example, replacement batteries.

19   Products are designed to use particular formats and types of batteries.

20        Lithium ion batteries are highly standardized.  Third-party standards organizations such as

21   the Institute of Electrical and Electronics Engineers (IEEE) have promulgated uniform

22   specifications for battery types, such that all batteries of a particular type are functionally

23   indistinguishable, regardless of manufacturer.  This standardization facilitates the design of

24   products which utilize lithium ion batteries.  It also, however, allegedly has contributed to the

25   _____

26   [4] Unless context requires a distinction, the Court refers interchangeably to batteries, battery packs, and another industry term for batteries, "modules."

27
28   [5] Whereas cylindrical and prismatic batteries use a liquid or gel electrolyte, in polymer batteries the electrolyte is a solid, which allegedly confers benefits "in terms of fabrication and ruggedness." (IPP-CAC ¶ 33.)

United States District Court
Northern District of California

commoditization of lithium ion batteries.  (IPP-CAC ¶¶ 40-46; DPP-CAC ¶ 88.)  Commoditization, in turn, allegedly left Defendants with no basis for competition except cutting prices.  (IPP-CAC ¶ 7; DPP-CAC ¶ 88.)  Allegedly, this situation motivated Defendants to collude to stabilize pricing. The IPPs and DPPs allege similar means of price stabilization: exchanging business-sensitive information that normally would be kept confidential; limiting output and supply; setting price floors; agreeing on industry-wide pricing formulas tied to the price of battery inputs; and bid-rigging.  Both complaints allege that the means and methods of the conspiracy changed over the extensive, at least twelve-year period of the conspiracy.  The Court now summarizes Plaintiffs' narrative of that alleged conspiracy.

### 2.  Summary of Allegations

In 1991, Defendant Sony Corporation invented lithium ion batteries.  Japanese domination of the market for lithium ion batteries continued unabated until the millennium, when Korean manufacturers LG and Samsung entered the market in 1999 and 2000, respectively.  Both the DPPs and IPPs allege that, sometime in 2000, the Japanese Defendants and Korean Defendants stopped competing and began sharing information through high-level executive meetings in Asia.  (IPP-CAC ¶ 47; DPP-CAC ¶¶ 94, 96.)  These meetings began no later than March 2002 and continued in rough, semi-annual intervals for approximately two years.  These meetings were bilateral, but, as alleged in the consolidated amended complaints, generally clustered such that a particular defendant might meet with several alleged co-conspirators over the course of a few days.  Meetings typically involved representatives of a Korean Defendant visiting Japanese Defendants in Japan, either at the Japanese Defendant's offices or, sometimes, at an off-site locale such as a restaurant or hotel.  (IPP-CAC ¶¶ 52-60; DPP-CAC ¶¶ 96-104.)  In addition to the biannual meetings, Plaintiffs allege additional meetings in 2001, 2002, and 2003.  (IPP-CAC ¶¶ 65(a)-(b); DPP-CAC ¶ 96.)

Beginning in 2004 and continuing through 2006, the alleged co-conspirators met with increased frequency.  (IPP-CAC ¶¶ 64-101; DPP-CAC ¶¶ 105-19.)  Both complaints specifically allege in this period conscious acknowledgement among the Japanese and Korean Defendants that price competition would diminish the "health" of the entire lithium ion battery industry and allege specific agreements to refrain from doing so.  Plaintiffs allege particular meetings, particular

United States District Court
Northern District of California

attendees, particular times and places, and the content of particular conversations. Moreover, some documents memorializing these conversations allegedly were located in the files of Defendants who did not directly participate in the conversation, suggesting that, while many meetings were bilateral, Defendants updated each other on the content of meetings. (*E.g.*, IPP-CAC ¶¶ 69-70; *see also* DPP-CAC ¶ 121.)

February of 2007 allegedly saw the occurrence of a key event: the price of cobalt, an important input for lithium ion battery cells, increased sharply. In specifically alleged meetings, Defendants agreed on a formula for collectively raising the price of lithium ion batteries in response to this event, using the cobalt price increase as a pretext for an unwarranted price increase on their own products. (IPP-CAC ¶¶ 102-18; DPP-CAC ¶¶ 120-33.)

In the summer of 2008, cobalt prices allegedly began dropping and, by late 2008, the global economy began experiencing a worldwide downturn, with attendant reductions in demand for lithium ion batteries and battery products. Again, in specifically alleged meetings and contacts, Defendants collaborated on strategies for stabilizing and maintaining artificially high prices in this environment. (IPP-CAC ¶¶ 119-44; DPP-CAC ¶¶ 134-48.)

In 2009 through 2011, Defendants allegedly continued to exchange sensitive, non-public information, of which Plaintiffs identify numerous specific instances. (IPP-CAC ¶¶ 145-60; DPP-CAC ¶¶ 146-52.)

## B.   RELEVANT PROCEDURAL HISTORY

On February 6, 2013, the Judicial Panel on Multidistrict Litigation centralized litigation stemming from these alleged events by creating the multidistrict litigation ("MDL") now at bar. (Dkt. No. 1.) Since that time, over six dozen putative class actions have been joined to this MDL.

In parallel with these civil enforcement actions, the United States opened a criminal investigation and served grand jury subpoenas on Defendants. On May 21, 2013, the Court granted in part and denied in part Plaintiffs' request that Defendants produce to them documents already produced to the Department of Justice or to any grand jury. (Dkt. No. 200.) The production order granted the request as to both Samsung entities and both LG Chem entities, as well as Maxell Corporation of America, but excused Sony, Panasonic, and Sanyo from production. (*Id.* at 4-5.)

United States District Court
Northern District of California

The Court, however, placed the parties on notice that it would revisit the matter of document production after the filing of Defendants' motions to dismiss. (*Id.* at 5.)

On July 26, 2013, the IPPs and DPPs filed the IPP-CAC and DPP-CAC in the public record. These complaints were crafted with the benefit of the previously ordered document production.

On August 26, 2013, following a conference with the parties and letter briefing regarding the scope of Defendants' anticipated motions to dismiss, the Court limited the scope of those motions to the matters addressed in this Order: the standing of the DPPs to bring suit under *Illinois Brick* and its progeny; the sufficiency under *Twombly* of the allegations of conspiracy in the DPP-CAC and IPP-CAC; and the sufficiency of both complaints' allegations of fraudulent concealment. (Dkt. No. 276.) The Court reserved additional issues for later proceedings. (*Id.* at 1-2.) The Court set a briefing schedule for the motions now at bar, requiring opening briefs to be filed by September 16, 2013. (*Id.* at 3.)

On September 20, 2013, in a related criminal proceeding, the Court accepted the guilty plea of Defendant Sanyo Electric Co., Ltd. ("Sanyo Electric"). (Case No. 13-cr-472, Dkt. No. 32.) Sanyo Electric pled guilty to one count of conspiring to fix prices in violation of Section 1 of the Sherman Act. The conspiracy to which Sanyo Electric pled guilty was one to fix the prices of cylindrical lithium ion battery packs used in notebook computers, from about April 2007 to about September 2007. (Case No. 13-cr-472, Dkt. No. 1, ¶ 2.) Pursuant to its plea agreement, Sanyo Electric agreed to pay a criminal fine of $10,731,000. Sanyo Electric paid, however, no restitution, as the parties agreed that civil actions were the more appropriate forum to resolve that issue.

On October 10, 2013, in another related criminal proceeding, the Court accepted the guilty plea of Defendant LG Chem, Ltd. (Case No. 13-cr-473, Dkt. No. 28.) LG Chem, Ltd. pled guilty to one count of conspiring to fix prices in violation of Section 1 of the Sherman Act. The conspiracy to which LG Chem, Ltd. pled guilty was, like that to which Sanyo Electric pled guilty, a conspiracy to fix the prices of cylindrical lithium ion battery packs used in notebook computers, from about April 2007 to about September 2007. (Case No. 13-cr-473, Dkt. No. 1, ¶ 2.) Pursuant to its plea agreement, LG Chem, Ltd. agreed to pay a criminal fine of $1,056,000, and, as in Sanyo Electric's case, no restitution.

United States District Court
Northern District of California

The parties finished briefing the instant motions to dismiss on November 6, 2013, and the Court took oral argument on certain issues raised therein on December 6, 2013.  At the December 6 hearing, the Court orally ordered Sony, Panasonic, and Sanyo, through counsel, to produce to Plaintiffs the grand jury documents whose production the Court had earlier excused.  (*See* Dkt. No. 346 at 102:21-103:17.)[6]

## II.   DISCUSSION

Though the primary focus of the pending motions is the plausibility of the IPP-CAC and DPP-CAC's alleged conspiracies, the Court begins its analysis by examining the logically antecedent question of whether the DPPs have standing to pursue a treble-damages action under the federal antitrust laws.  The Court then turns to the parties' plausibility arguments, and lastly to the issue of whether the complaints sufficiently allege fraudulent concealment.

### A.   DIRECT PURCHASER STANDING

The DPP-CAC asserts a single claim for violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, which proscribes conspiracies that unreasonably restrain trade.  (DPP-CAC ¶¶ 224-234.)  Section 4 of the Clayton Act confers standing to sue for treble damages on "any person . . . injured in his business or property by reason of anything forbidden in the antitrust laws."  15 U.S.C. § 15(a).  In *Illinois Brick*, the Supreme Court held that, under Section 4, indirect purchasers of price-fixed products—that is, persons who pay an overcharge only after it has been passed on to them through middlemen—suffer no antitrust injury and thus lack standing to sue.  *See Illinois Brick*, 431 U.S. at 745-46; *State of Ariz. v. Shamrock Foods Co.*, 729 F.2d 1208, 1211-12 (9th Cir. 1984) (citing *Illinois Brick*, 431 U.S. at 746).  "[A] bright line rule emerged from *Illinois Brick*: only direct purchasers have standing under [Section] 4 of the Clayton Act to seek damages for antitrust violations."  *Delaware Valley Surgical Supply Inc. v. Johnson & Johnson*, 523 F.3d 1116, 1120-21 (9th Cir. 2008) (citing *Illinois Brick*, 431 U.S. at 735).  "The underlying purposes for the [*Illinois Brick*] rule are (1) 'to eliminate the complications of apportioning overcharges between direct and indirect purchasers'; (2) 'to eliminate multiple recoveries'; and (3) to 'promote the

---

[6] The minute order for the December 6, 2013 hearing inaccurately reflects that the Court ordered only Sony and Panasonic to produce.  (Dkt. No. 337.)  The inaccuracy apparently stems from the fact that Panasonic and Sanyo share counsel.

United States District Court
Northern District of California

vigorous enforcement of the antitrust laws.'"  *Somers v. Apple, Inc.*, 729 F.3d 953, 961-62 (9th Cir. 2013) (quoting *In re ATM Fee Antitrust Litig.*, 686 F.3d 741, 748 (9th Cir. 2012) cert. denied, 134 S. Ct. 257 (U.S. 2013)).

The Supreme Court has cautioned against carving out exceptions to the direct-purchaser rule "for different kinds of markets," even though the purposes underlying the rule may not apply "with equal force in all cases." *Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199, 216-17 (1990). Notwithstanding this cautionary note, "limited exceptions do exist." *ATM Fee*, 686 F.3d at 749. Recently, in *ATM Fee*, the Ninth Circuit summarized the three exceptions to *Illinois Brick* that it has recognized.  First, indirect purchasers have standing when they have "a preexisting cost-plus contract with the direct purchaser . . . ." *Id.* (citing *Illinois Brick*, 431 U.S. at 736; *UtiliCorp*, 497 U.S. at 217-18).  "Second, indirect purchasers may have standing under a 'co-conspirator' exception." *Id.* (citing 2A Phillip E. Areeda *et al.*, *Antitrust Law* ¶ 346h (3d ed. 2007)).  Under this exception, "an indirect purchaser may bring suit where he establishes a price-fixing conspiracy between the manufacturer and the middleman." *Id.* (quoting *Delaware Valley*, 523 F.3d at 1123 n.1).  "However, for the indirect purchaser to merit standing under this exception, the conspiracy must fix the price paid by the plaintiffs." *Id.* (citing *Shamrock Foods*, 729 F.2d at 1211).  Third, and finally, "indirect purchasers may sue when customers of the direct purchaser own or control the direct purchaser . . . or when a conspiring seller owns or controls the direct purchaser . . . ." *Id.* (citing *Illinois Brick*, 431 U.S. at 736 n.16; *Royal Printing Co. v. Kimberly Clark Corp.*, 621 F.2d 323, 326 (9th Cir. 1980)).  "For example, an indirect purchaser may sue if the direct purchaser is a division or subsidiary of the price-fixing seller." *Id.*

In this case, the DPPs rely solely upon the third, "ownership or control" exception, originally recognized in *Royal Printing*.  (Dkt. No. 307 ("Opp'n to Joint MTD DPP-CAC") at 2, 19-21.)  In doing so, the DPPs effectively concede that, notwithstanding their "direct purchaser" moniker, they are indirect purchasers for purposes of the *Illinois Brick* framework.  *See ATM Fee*, 686 F.3d at 756 (ownership or control exception "allow[s] indirect purchasers to sue"); *In re Optical Disk Drive Antitrust Litig.*, 3:10-MD-2143 RS, 2011 WL 3894376, at *6 (N.D. Cal. Aug. 3, 2011) (*"ODD I"*) (same; *Royal Printing* "does not somehow transform indirect purchasers into

United States District Court
Northern District of California

direct purchasers").  The allegations of the DPP-CAC bear out this categorization.  As the DPPs'

counsel acknowledged at oral argument, the DPPs allege a conspiracy that fixed the prices of

lithium ion battery *cells* only, as opposed to the batteries themselves or products containing the

batteries.  (*See* DPP-CAC ¶ 3.)  The DPPs further acknowledged that none of them purchased a

lithium ion battery cell itself; they purchased only batteries and/or products.  (*Id.* ¶¶ 16-24.)

Because the DPPs proceed solely under the ownership or control exception, they must

adequately plead standing under that exception.  "Paradigmatic examples of 'situations where an

ownership or control relationship between an indirect purchaser and a direct purchaser' may exist

include parent-subsidiary relationships or one company's stock ownership of another."  *In re TFT-*

*LCD (Flat Panel) Antitrust Litig.*, C 12-3802 SI, 2013 WL 1164897, at *2 (N.D. Cal. Mar. 20,

2013) (*"TFT-LCD VIII"*) (quoting *Jewish Hosp. Ass'n of Louisville, Ky., Inc. v. Stewart Mech.*

*Enterprises, Inc.*, 628 F.2d 971, 975 (6th Cir. 1980)).   Minority stock ownership is not by itself

sufficient to satisfy *Royal Printing* and its progeny.  Rather, the gravamen of the inquiry is control.

The *ATM Fee* court gave "control" its "ordinary, contemporary, and common meaning," that

is, "to exercise restraint or direction over; dominate, regulate, or command, . . . or to have the

power or authority to guide or manage . . . ."  *Id.* (citations and internal quotation marks omitted).

While *ATM Fee* analyzed control in terms of stock ownership, it did not look merely, or

mechanically, at the quantity of stock owned.  Rather, it examined "the nature" or context of the

ownership, finding in that case that a 10 percent minority ownership was insufficient to establish

control where ownership in the company was "widely disbursed."  *Accord In re TFT-LCD (Flat*

*Panel) Antitrust Litig.*, M 07-1827 SI, 2013 WL 6174683, at *3-4 (N.D. Cal. Nov. 20, 2013)

(*"TFT-LCD IX"*); *see also In re TFT-LCD (Flat Panel) Antitrust Litig.*, M 07-1827 SI, 2012 WL

5869588, at *4 (N.D. Cal. Nov. 19, 2012) (*"TFT-LCD VII"*) (applying *ATM Fee*, finding standing);

*TFT-LCD VIII*, 2013 WL 1164897, at *2-3 (applying *ATM Fee*, finding no standing).  The *ATM*

*Fee* panel paid particular attention to the ability of the accused conspirators to "set . . . fees or to

control [the] board" of the allegedly owned and controlled entity, and observed that mere "input on

policies and pricing issues by interested members does not constitute the type of control necessary

to meet the exception to *Illinois Brick*."  686 F.3d at 758; *cf. Illinois Brick*, 431 U.S. at 746

United States District Court
Northern District of California

1    (recognizing "that direct purchasers sometimes may refrain from bringing a treble-damages suit for

2    fear of disrupting relations with their suppliers" but adopting direct-purchaser rule regardless).  Pre-

3    *ATM Fee* cases identified other factors that may also be relevant to demonstrating control.  *E.g.*,

4    *Sun Microsystems Inc. v. Hynix Semiconductor Inc.*, 608 F. Supp. 2d 1166, 1180 (N.D. Cal. 2009)

5    (examples of pertinent facts include "interlocking directorates, minority stock ownership, loan

6    agreements that subject the wholesalers to the manufacturers' operating control, trust agreements, or

7    other modes of control separate from ownership of a majority of the wholesalers' common stock")

8    (quoting *In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599, 606 (7th Cir. 1997)).

9         Here, the DPP-CAC fails to engage with the ownership or control inquiry to a meaningful

10    degree.  The DPPs argue that merely alleging that they purchased lithium ion batteries or products

11    "from one or more named Defendants, their divisions, subsidiaries or affiliates, or their co-

12    conspirators," along with allegations of "parent/subsidiary relationships for each of the defendant

13    families," is "sufficient to confer antitrust standing."  (Opp'n to Joint MTD DPP-CAC at 20.)

14    Assuming that purchases made through a chain of distribution linked entirely by parent-subsidiary

15    relationships would support standing under *Royal Printing*, the DPPs still fail to plead their

16    standing adequately, because the DPP-CAC itself alleges that not all battery cells manufactured by

17    Defendants are sold through the "parent/subsidiary relationships" that the DPPs invoke.

18    Accordingly, even under the DPPs' own theory, it is impossible to ascertain whether their purchases

19    constitute an antitrust injury under *Royal Printing*.

20         Specifically, the DPP-CAC alleges that while Defendants pack some of their own cells into

21    batteries, they also "provide some of their battery cells to" so-called "packers," entities in the

22    business of turning raw battery cells into batteries by placing them in the necessary casing.  (DPP-

23    CAC ¶ 81.)  The DPP-CAC notably refrains from alleging that these packers are subsidiaries of any

24    Defendant.  On the contrary, the DPP-CAC specifically identifies three Taiwanese packers, Simplo

25    Technology, Inc., Celxpert Energy Corporation, and Dynapack International Technology

26    Corporation.  (*Id.* ¶ 82.)  The DPP-CAC further alleges that some of the batteries assembled by

27    packers are sold under the packer's own name, while some are sold under the defendant's name, the

28    defendant allegedly having used the packer as an agent in these cases.  (*Id.*)  The DPPs allege that

they have standing to sue for overcharges on batteries and battery packs assembled by packers, provided that the batteries and packs were assembled at a defendant's direction and sold under a defendant's name.  (DPP-CAC ¶ 83.)[7]

What the DPP-CAC does not allege, however, is whether the batteries purchased by the DPPs, either individually or as part of a lithium ion battery product, were sold under the name of a Defendant or under that of a packer.  Accordingly, the Court cannot ascertain from the facts alleged whether DPPs have standing, even under their own theory.  The DPPs may well have purchased a Defendant's batteries, but they also may have purchased a packer's batteries.  There is no way to tell from the DPP-CAC.

Further, it is not obvious from the allegations and argument now before the Court that a DPP would have standing under the ownership or control exception if he or she purchased batteries packed by a packer, as opposed to a Defendant, for it is not apparent that the packers are either owned or controlled by an alleged conspirator.  The DPPs apparently acknowledge that the packers are not owned subsidiaries of Defendants by addressing themselves solely to the "control" aspect of the ownership or control exception.  In that vein, the DPP-CAC alleges that Defendants exert a measure of influence over the packers.  The packers allegedly "do not manufacture their own battery cells," and thus "are dependent upon Defendants for their business and must maintain a close relationship with Defendants to keep the supply chain intact."  (DPP-CAC ¶ 82; *see also* Opp'n to Joint MTD DPP-CAC at 20-21 (packers are "financially beholden to Defendants," "depend upon Defendants for their own business," and "act as agents on Defendants' behalf")).)

However, mere influence by itself is not enough to establish control within the meaning of the exception.  *ATM Fee*, 686 F.3d at 758.  Neither is a direct purchaser's fear that bringing suit may disrupt relations with a supplier.  *Illinois Brick*, 431 U.S. at 746.  Nor does a conclusory recitation that one entity "acts as an agent" for another suffice to plead the requisite control, if unsupported by factual allegations bearing out the assertion of agency.  *See TFT-LCD VIII*, 2013

---

[7] Interim lead counsel for the DPPs clarified at oral argument their theory that batteries sold under a defendant's own name are properly part of the DPP case, while batteries and packs sold under a packer's name come within the ambit of the IPP case.  The bases for this distinction are not obvious and should be clarified in the DPPs' next iteration of their complaint.

1   WL 1164897, at *3.  The DPP-CAC fails to allege the sort of facts that could lead to a plausible

2   conclusion that Defendants exert "control" over the packers within the meaning of *Royal Printing*

3   and its progeny.

4        To avail themselves of the ownership or control exception, the DPPs must allege facts that

5   lead to a plausible inference that they have suffered an antitrust injury traceable to a  purchase from

6   an entity owned or controlled by an alleged conspirator.  Further, the DPPs must articulate a

7   cognizable theory of ownership or control, coupled with plausible, non-conclusory evidentiary facts

8   supporting that theory.  The DPP-CAC as presently framed accomplishes neither task.  It alleges in

9   conclusory fashion that lithium ion batteries "are traceable and identifiable throughout the chain of

10  distribution" (DPP-CAC ¶ 84), but does not identify the batteries purchased by the DPPs so that

11  those batteries—or, more pertinently, battery cells—may be traced to an entity owned or controlled

12  by a Defendant.[8]  Further, to the extent that the DPPs intend to rely on the purchases of batteries

13  finished by the Taiwanese packers, the DPP-CAC fails to articulate a cognizable theory of control

14  over the packers, as opposed to mere influence.  These defects warrant dismissal of the DPP-CAC.

15       Defendants raise the specter of futility of amendment by arguing that even if the DPPs

16  amend to allege specific products purchased through a distribution chain entirely owned or

17  controlled by defendants, the DPPs still could not qualify for the *Royal Printing* exception unless

18  they were to allege the purchase of a lithium ion battery *cell*, as opposed to a "finished product"

19  incorporating such a cell, such as a lithium ion battery or a lithium ion battery product which

20  included the battery, and hence battery cell, as a component part.  (Dkt. No. 329 ("Reply ISO Joint

21  MTD DPP-CAC") at 3-4.)  Defendants argue that, under *Royal Printing* and *ATM Fee*, purchasers

22  who pay only a passed-through overcharge lack standing to sue, unless they purchase the actual

23  price-fixed product itself.  According to Defendants, if the "allegedly price-fixed product has been

24  transformed into a different finished product," purchasers of the finished product lack standing.

25  (*Id.* at 4; Joint MTD DPP-CAC at 22.)

26  _____

27  [8] The DPPs need not establish each and every link in the chain of standing for pleading purposes,
    but they do need to allege specific facts which, aided by reasonable inferences, allow the Court to

28  draw a plausible conclusion that these named DPPs have suffered an antitrust injury traceable to
    these Defendants.

The Court disagrees.  It finds nothing in *Royal Printing* or *ATM Fee* that bars standing for an indirect purchaser who has purchased a price-fixed component as part of a finished product, provided the plaintiff bought the finished product from an entity owned or controlled by a conspirator.  Turning first to *Royal Printing*, that case involved a product (paper) which apparently was already in finished form when it passed from the price-fixing manufacturers into the relevant chain of distribution.  621 F.2d at 324.  Defendants argue that, because the alleged price-fixed component of lithium ion battery cells are, unlike the paper in *Royal Printing*, "transformed into a different finished product," finding indirect-purchaser standing here would expand the ownership or control exception in a manner "that has never been authorized by the Ninth Circuit," in contravention of the Supreme Court's warning in *UtiliCorp*, 497 U.S. at 217, against creating further exceptions to *Illinois Brick*.  (Reply ISO Joint MTD DPP-CAC at 3-4.)  Defendants' argument misses the mark.  If accepted, Defendants' view would limit the application of *Royal Printing* to cases where the price-fixed "product" is either a simple product like paper or a fee like that considered in *ATM Fee*.  But nothing in *Royal Printing* is inconsistent with application to complex products with multiple components.  The *Royal Printing* court's overriding concern was preventing antitrust conspirators from immunizing themselves from liability simply by selling their price-fixed goods through corporate subsidiaries.  *See* 621 F.2d at 326, 326 n.7.  That concern applies equally whether the price-fixed "product" in question is a simple, already-finished good like the paper in *Royal Printing*; a service, like the fees in *ATM Fee*; or, as here, an alleged component in a complex finished good.  Defendants' interpretation of *Royal Printing* would erase the exception set forth therein, unless the alleged conspiracy happened to be one that fixed the price of a service or an already-finished product.  Price-fixers of components of complex goods, on the other hand, would be immunized.[9]  Neither *Royal Printing* nor other cases Defendants cite supply a reason to draw that simplistic distinction.  Defendants submitted at oral argument that application of *Royal*

---

[9] At least two other judges in this District, confronted with the same question, have come to the same conclusion.  (Reply ISO Joint MTD DPP-CAC at 3-4 (citing *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 911 F. Supp. 2d 857, 870 (N.D. Cal. 2012) motion to certify appeal denied, 07-5944 SC, 2013 WL 567281 (N.D. Cal. Feb. 13, 2013) (Conti, J.) (*"CRT II"*) & *TFT-LCD VII*, 2012 WL 5869588 (Illston, J.).)

*Printing* in this case would involve the risk of multiple liability and the type of complex damages analysis and that *Illinois Brick* sought to forestall. Not so. With respect to the former, *Royal Printing* minimizes the risk of multiple liability by limiting standing to entities whose litigation decisions are controlled by a conspirator, who is unlikely to authorize an entity under its control to sue it. *See Royal Printing*, 621 F.2d at 326. With respect to the latter, *Royal Printing* eliminates the complexity of damages calculations feared by the *Illinois Brick* court by permitting plaintiffs to recover the entire overcharge without resort to a showing of passed-through damages. *Id.* at 327.

Turning to *ATM Fee*, that decision merely declined "to extend the exception noted in *Royal Printing* . . . to situations where the seller does not own or control the direct purchasers . . . ." *ATM Fee*, 686 F.3d at 757. Defendants cite footnote 7 of *ATM Fee*, which criticized the reasoning of cases that had found that plaintiffs who paid an overcharge only after it had been passed through were "direct purchasers" by virtue of their having paid the passed-through overcharge to an alleged conspirator. *Id.* at 755 n.7. Defendants ask the Court to derive from this footnote a blanket prohibition on federal antitrust standing for any purchaser of finished products containing a price-fixed component. The Court declines. The footnote on which Defendants rely centers on the application of the co-conspirator exception to the direct purchaser rule. The same footnote, however, carefully identifies and preserves the ownership or control exception. And, as the Court has already acknowledged, consistent with *Royal Printing* and *ATM Fee*, the ownership or control exception confers federal antitrust standing on *indirect* purchasers, provided the direct purchaser to whom they pay the passed-on overcharge is owned or controlled by a conspirator. This rule does not suggest that paying an overcharge *destroys* standing; rather, it cabins standing to only those situations where the overcharge is paid to an entity owned or controlled by a conspirator. Defendants' interpretation of *ATM Fee* would eliminate, in effect, the very exception for indirect purchasers that the case clarified and applied. Because that interpretation cannot be squared with the binding and precedential nature of both *ATM Fee* and *Royal Printing*, it supplies no reason to determine that permitting amendment of the DPP-CAC to replead standing would be futile.

For the foregoing reasons, the Court **GRANTS** Defendants' joint motion to dismiss the DPP-CAC for failure to allege standing to bring a treble-damages suit under the federal antitrust laws.[10] The DPP-CAC is hereby **DISMISSED WITHOUT PREJUDICE**.  The DPPs have **LEAVE TO AMEND** their complaint to replead standing, consistent with this Order and the precedents cited herein.

### B.   SUFFICIENCY OF ALLEGATIONS OF CONSPIRACY

#### 1.   Legal Standard

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the claims alleged in the complaint.  *Ileto v. Glock, Inc.*, 349 F.3d 1191, 1199-1200 (9th Cir. 2003).  "Dismissal can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory."  *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). All of a plaintiff's well-pleaded allegations of material fact are taken as true and construed in the light most favorable to the plaintiff.  *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010).  The court need not, however, "accept as true allegations that contradict exhibits attached to the Complaint or matters properly subject to judicial notice, or allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  *Id.*

To withstand a motion to dismiss, a plaintiff must not merely allege conduct that is conceivable but must instead allege "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (citing *Twombly*, 550 U.S. at 556).  In the antitrust context, plausibility is evaluated "in light of basic economic principles."  *William O. Gilley Enters., Inc. v. Atl. Richfield Co.*, 588 F.3d 659, 662 (9th Cir. 2009) (citing *Twombly*, 550 U.S. at 556).

---

[10] Because the Court dismisses for failure to allege standing under *Illinois Brick* and its progeny, the Court need not and does not reach the issue of whether *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519 (1983) ("*AGC*"), also compels dismissal.  The Court notes that it did not grant Defendants leave to brief the issue of *AGC* standing, which supplies a separate, independent ground not to reach it.

United States District Court
Northern District of California

Pleading an antitrust conspiracy further "requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made." *Kendall v. Visa U.S.A., Inc.,* 518 F.3d 1042, 1047 (9th Cir. 2008) (quoting *Twombly,* 550 U.S. at 556-57).  For purposes of Section 1 of the Sherman Act, an unlawful agreement consists of a "conscious commitment to a common scheme designed to achieve an unlawful objective." *Toscano v. Prof'l Golfers Ass'n,* 258 F.3d 978, 983 (9th Cir. 2001) (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)). "Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of illegal agreement . . . .  [A]n allegation of parallel conduct and a bare assertion of conspiracy will not suffice." *Kendall,* 518 F.3d at 1047 (quoting *Twombly,* 550 U.S. at 556-57).  Rather, a complaint must state facts "plausibly suggesting (not merely consistent with) agreement" among the purported co-conspirators. *See Twombly*, 550 U.S. at 557.  "[T]he complaint must allege facts such as a 'specific time, place, or person involved in the alleged conspiracies' to give a defendant seeking to respond to allegations of a conspiracy an idea of where to begin." *Kendall*, 518 F.3d at 1047 (quoting *Twombly*, 550 U.S. at 565 n.10).  The expense of antitrust discovery authorizes district courts "to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." *Twombly*, 550 U.S. at 558 (quoting *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 528 n.17 (1983)).

### 2.      Analysis

Both complaints allege a conspiracy that began sometime in 2000 and continued through at least May 2011, that fixed prices for battery cells used in all three major formats of lithium ion battery, and that extended to all eighteen defendants.  The complaints are further similar in the two-pronged approach they take to demonstrating the conspiracy.  *First*, they identify over a hundred alleged contacts between Defendants during which the participants allegedly shared sensitive business information.  Having drafted their consolidated amended complaints with the benefit of five Defendants' grand jury productions, Plaintiffs allege specific meetings, name alleged attendees, identify alleged locations and times of meetings, and, in many instances, quote from alleged

United States District Court
Northern District of California

memoranda of such meetings, such as an agenda, minutes, or a participant's notes.  Some of these alleged documents memorialize express agreements among defendants to cooperate to maintain price stability.  Some alleged documents contain express instructions to dispose of the document after reading and/or utilize an apparent code to conceal the identities of participants or the topic of discussion (e.g., asking for a meeting on "safety" when the purpose was to discuss lithium ion battery pricing).  Plaintiffs further allege that some documents, though they address a meeting between only two defendants, were located in the files of a third, non-attendee defendant, plausibly suggesting that the alleged co-conspirators exchanged sensitive business information amongst themselves, including memoranda of alleged agreements.

*Second*, having alleged the particulars of numerous face-to-face meetings and electronic communications, Plaintiffs address conditions in the lithium ion battery market itself which, they say, corroborate the existence of unlawful agreements.  Both complaints allege that the structure and characteristics of the lithium ion battery market plausibly support the alleged conspiracy, inasmuch as it has high barriers to entry (which allegedly insulate the cartel from competition by discouraging new entrants who would undercut its supracompetitive prices) and is concentrated (Defendants collectively control roughly 75 to 95 percent of market share throughout the asserted class period).  Both plaintiff groups point to the existence of government investigations into anticompetitive conduct in the lithium ion battery market (which, as the Court already noted, have resulted in two guilty pleas), as well as an alleged history between these Defendants of colluding to fix prices for critical components of consumer electronics.  The DPPs and IPPs both allege Defendants' membership in trade associations which they allegedly used to facilitate industry-wide cooperation.  Lastly, both the IPP-CAC and DPP-CAC contain charts and graphs marshaling economic data that purportedly bear indicia of price-fixing, such as price stability when fluctuations in the price of inputs would suggest a decrease was warranted, or lower-than-expected output.

In their joint motions to dismiss and at oral argument, Defendants have not asserted that the complaints fail to allege *any* plausible conspiracy.  Rather, they contend that the complaints, as lengthy and detailed as they are, fail to allege facts rendering every aspect of the alleged conspiracy plausible.  With respect to the allegations of specific contacts, Defendants contend that the facts

United States District Court
Northern District of California

alleged in the IPP-CAC and DPP-CAC do not plausibly plead a conspiracy of the temporal scope alleged (that is, beginning in 2000 and continuing through May 2011), implicating all the products alleged, and involving all the named defendants.  As to the allegations of market conditions, Defendants contend that Plaintiffs' economic data are factually incorrect or unreliable, and that their allegations of individual aspects of the lithium ion battery market—e.g., high barriers to entry, the existence of trade organizations—do not by themselves imply the existence of a conspiracy.

As set forth more fully below, two of Defendants' arguments warrant dismissal with leave to amend.  However, the remainder of Defendants' attacks do little more than highlight potential problems of proof that may face the IPPs and, if they successfully replead standing, the DPPs.  Though the Court must analyze the complaints "holistically," *In re Optical Disk Drive Antitrust Litig.*, 3:10-MD-2143 RS, 2012 WL 1366718, at *3 (N.D. Cal. Apr. 19, 2012) (*"ODD II"*), Defendants' analysis focuses on individual components of the alleged conspiracy as if they had been alleged in isolation.  For example, Defendants argue that Plaintiffs' claims of conspiracy are rendered implausible because some meetings alleged by Plaintiff involved no more than an exchange of price information, which, Defendants say, is not necessarily unlawful by itself.  (Joint MTD IPP-CAC at 13-14; Joint MTD DPP-CAC at 12.)  The argument would have more force if the complaints lacked specific allegations of actual agreements to engage in price-fixing, or in a context where certain defendants had not pleaded guilty to such activities.  In such a context, however, it is Defendants' claim that the alleged information exchanges were innocent that is implausible, not Plaintiffs' claims that the information exchanges furthered the claimed conspiracy.

Ultimately, Defendants' atomizing approach is inconsistent with the principle that "the 'character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole.'"  *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 738 F. Supp. 2d 1011, 1019 (N.D. Cal. 2010) (*"CRT I"*) (quoting *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962)); *see also ODD II*, 2012 WL 1366718, at *3 (finding that "[w]hile defendants have pointed to certain gaps, arguable inconsistencies, and potentially differing inferences that could be drawn across the whole spectrum of allegations plaintiffs have offered, viewed holistically," the complaint sufficed).  Though not a pleading

standards case, *Continental Ore* warns against "tightly compartmentalizing the various factual components" of a plaintiff's case "and wiping the slate clean after scrutiny of each." *In re High-Tech Employee Antitrust Litig.*, 856 F. Supp. 2d 1103, 1118 (N.D. Cal. 2012) (quoting *Cont'l Ore*, 370 U.S. at 699). Particular details in the pleading must be construed as parts of a whole.

Further, Plaintiffs need not allege every link in the chain to survive the pleading stage. The *Twombly* plausibility standard requires only "facts *such as* a 'specific time, place, or person involved in the alleged conspiracies.'" *Kendall*, 518 F.3d at 1047 (quoting *Twombly*, 550 U.S. at 565 n.10) (emphasis supplied). The purpose of this requirement is "to give a defendant seeking to respond to allegations of a conspiracy an idea of where to begin," *id.*, not to force a plaintiff to limn the entirety of the conspiracy before discovery. Accordingly, antitrust plaintiffs need not "plead specific back-room meetings between specific actors at which specific decisions were made" in order to survive a motion to dismiss. *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1024 (N.D. Cal. 2007). Yet Plaintiffs have done just that here. With the benefit of limited discovery prior to the filing of their consolidated complaints, Plaintiffs allege not only numerous opportunities to collude but actual agreements memorialized by the alleged co-conspirators themselves.[11] In this procedural posture, such allegations more than suffice. *Cf. Kendall*, 518 F.3d at 1051-52 (affirming district court's dismissal of complaint with prejudice after plaintiff's amended complaint failed to cure pleading defects despite having been granted leave to take limited discovery after dismissal of initial complaint). Both complaints here allege a conspiracy of at least some scope involving at least some defendants and covering all three accused battery cell formats (cylindrical, prismatic, and polymer).[12]

---

[11] To select a single representative example, both complaints allege the existence of an internal LG document summarizing meetings between LG and Sony on March 2-3, 2004. (IPP-CAC ¶ 67; DPP-CAC ¶ 106.) The document allegedly memorializes conversations in which LG and Sony executives discussed Sony's desire to raise prices on lithium ion batteries, solicited agreement from its competitors to join in the price hikes, and apparently received from them commitments of "cooperation."

[12] By alleging a conspiracy to raise the prices of all three formats of battery cell, the IPP-CAC and DPP-CAC, for pleading purposes, implicate all the lithium ion battery products alleged. Given the high degree of standardization among battery cell formats and types, the Court perceives no reason to distinguish among consumer products at the pleading stage. The conspiracy alleged here fixed

United States District Court
Northern District of California

1      That being said, both the IPP-CAC and DPP-CAC falter in two ways.  Both complaints

2 allege an overly long class period, and fail to allege an agreement to conspire by the American

3 subsidiaries of the defendant Korean and Japanese parent corporations.  Both defects warrant

4 dismissal with leave to amend.  The Court addresses them in order.

5                    a.    *Length of Class Period*

6      Both the IPPs and DPPs allege a class period beginning in 2000, when the Korean

7 Defendants entered the previously Japanese-dominated market for lithium ion batteries, and lasting

8 at least until May 2011, when the Justice Department's investigation of these Defendants was made

9 public.  The Court concludes for the reasons below that, as presently framed, the allegations of the

10 complaints do not support a class period extending back to the years 2000 and 2001.  The Court

11 perceives no principled reason to conclude, even for pleading purposes, that the alleged conspiracy

12 sprang into existence the moment the Korean Defendants entered the lithium ion battery market in

13 2000.  The implausibility of this proposition is reflected in the dearth of meetings alleged by either

14 complaint in the years 2000 and 2001, despite both pleadings having been drafted with the benefit

15 of substantial document production.  The DPP-CAC identifies no specific meetings in either 2000

16 or 2001, alleging only in conclusory fashion that meetings occurred in those years.  The first

17 specifically alleged meeting, however, transpired in March 2002.  (*See* DPP-CAC ¶¶ 94-101.)  As

18 for the IPP-CAC, it alleges no specific 2000 meetings and only two 2001 meetings where certain

19 executives met each other and "asked for cooperation."  (IPP-CAC ¶¶ 65(a)(i), 65(a)(ii).)  Though

20 these alleged 2001 meetings may have sown the seeds of later agreements, they do not plead the

21 critical act of agreeing, let alone an extant agreement.  The Court finds that neither complaint

22 adequately pleads a conspiracy operating during 2000 or 2001.

23      Both complaints do, however, contain ample specific allegations covering the years 2002

24 through 2008.  In attacking this portion of the alleged class period, Defendants merely highlight

25 _____

26 the prices of battery cells of all three formats, and those cells allegedly made their way into all
manner of lithium ion battery products. For example, the complaints allege a conspiracy to fix the

27 prices of cylindrical battery cells, without distinguishing whether the cylindrical battery cells are
destined for use in, on the one hand, notebook computers, or on the other, digital cameras.  In

28 challenging the pleadings on a product-by-product basis rather than format-by-format basis,
Defendants impose a layer of granularity not supported by the pleadings themselves.

arguable gaps in the alleged meetings where particular Defendants or formats of battery are not mentioned for periods of time.  These gaps reflect, at most, problems of proof that Plaintiffs may face at a later stage of these proceedings.  For pleading purposes, the allegations suffice.

Turning to the end of the class period, the years 2009 through 2011, the Court observes that the allegations in this portion of the class period grow sparse.  For instance, the DPP-CAC alleges a single bid-rigging incident involving two defendants in 2009, and another in 2010.  However, in this later period, unlike in the years 2000 and 2001, the relative paucity of allegations is plausibly explained by increased care and efficiency in the operation of the conspiracy.  Nothing in the pleadings requires the Court to conclude that the alleged conspiracy abruptly ceased to operate in this period.  The Court concludes that the allegations concerning the years 2009, 2010, and 2011 suffice to survive the pleading stage.

The Court **GRANTS** Defendants' motions to the extent they seek to limit the class periods alleged in the IPP-CAC and DPP-CAC to the period January 1, 2002, to May 31, 2011.  Plaintiffs have leave to amend their class allegations consistent with this Order.

b.      *Involvement of Subsidiaries in the Conspiracy*

Defendants challenge the complaints' factual support for their contention that each named Defendant participated in the alleged conspiracy, highlighting the paucity of allegations as to certain Defendants, as distinct from the "corporate families" identified and labeled in the pleadings. Defendants' joint motions criticize both complaints for failing to identify the role of particular companies in the conspiracy.  The five individual motions now before the Court largely center on this same issue.  The Court determines that, while the IPP-CAC and DPP-CAC generally meet the requirement of plausibly pleading a conspiracy amongst the Korean and Japanese parent companies named as defendants, they do not adequately allege conscious participation in the conspiracy by those defendants' American subsidiaries.

The IPP-CAC and DPP-CAC, in identical terms, allege that their references to corporate families or companies by a single name signifies that "employees or agents of entities within that corporate family engaged in conspiratorial acts on behalf of every company in that family," and that such employees or agents operated without regard to corporate affiliation, representing rather their

United States District Court
Northern District of California

corporate "family."  (IPP-CAC ¶ 395; DPP-CAC ¶ 56.)  Further, both complaints allege in generic, conclusory terms that defendant subsidiaries participated in the conspiracy by acting as agent for their defendant Korean or Japanese parent company.  (IPP-CAC ¶¶ 367, 370, 374, 377, 381, 384, 386; DPP-CAC ¶¶ 26, 29, 33, 37, 40, 43, 45, 51.)  In their briefing and at oral argument, Plaintiffs argued that these allegations establish the participation of the subsidiaries in an alleged conspiracy which, viewing the allegations of the complaint *in toto*, appears to have been undertaken in Korea and Japan by the executives of Korean and Japanese corporations.

Plaintiffs' theory fails because it conflates agency with conspiracy.  Nothing in either complaint suggests that the defendant subsidiaries consciously agreed to participate in, or could be charged with knowledge of, an alleged price-fixing conspiracy conceived and undertaken in Korea and Japan.  While Plaintiffs are not required to identify exactly how, when, and through whom each Defendant joined the conspiracy, Plaintiffs are required to allege "that each individual defendant joined the conspiracy and played some role in it because, at the heart of an antitrust conspiracy is an agreement and a conscious decision by each defendant to join it."  *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1117 (N.D. Cal. 2008) (*"TFT-LCD I"*) (quoting *In re Elec. Carbon Prods. Antitrust Litig.*, 333 F. Supp. 2d 303, 311–12 (D.N.J. 2004)).  Here, both complaints offer only boilerplate assertions of an agency relationship with the parties whose participation in the conspiracy is more directly alleged.  That does not suffice to demonstrate that the American subsidiaries *themselves* made a conscious decision to conspire with their Korean or Japanese parents.  Lacking plausible allegations of such a decision, the defendant subsidiaries are not properly part of the case.[13]

---

[13] Both the IPPs and DPPs suggest that, once the existence of a conspiracy is established—or, here, alleged—only a "slight connection" is required to establish a particular defendant's participation. (Dkt. No. 307 ("Opp'n to Joint MTD IPP-CAC") at 8; Opp'n to Joint MTD DPP-CAC at 3-4.)  The Court disagrees for two reasons.  First, to the extent that Plaintiffs urge that a slight connection need not include a conscious decision to join the conspiracy, their position is at odds with binding precedent.  *E.g.*, *Monsanto*, 465 U.S. at 764; *Toscano*, 258 F.3d at 983.  Second, the proffered "slight connection" or "slight evidence" rule has been disapproved as a standard for determining whether a defendant has joined a conspiracy in the first instance, and indeed as a standard applicable in district courts at all.  *United States v. Dunn*, 564 F.2d 348, 357 n.21 (9th Cir. 1977) ("[A]fter much reflection we are of the mind that the slight evidence rule may be of doubtful *appellate* application when the issue for review concerns whether the defendant was connected with

For the foregoing reasons, the Court **GRANTS** both (1) Certain Defendants' Joint Motion to Dismiss the Indirect Purchaser Plaintiffs' Consolidated Amended Complaint (Dkt. No. 288) and (2) Certain Defendants' Joint Motion to Dismiss the Direct Purchaser Plaintiffs' Consolidated Amended Complaint (Dkt. No. 290).  Both the IPPs and DPPs have **LEAVE TO AMEND** consistent with the guidance in this Order.

### 3.    Individual Defendants' Motions

In addition to Defendants' joint motions to dismiss, eight individual defendants have brought a total of five motions to dismiss.  Though these individual motions to dismiss purport to raise issues unique to each movant, to a large extent the principles discussed in Section II.B.2 resolve them. Four issues raised in the individual motions, however, are not resolved by the foregoing analysis and warrant a brief analysis here.

First, Maxell Corporation of America ("MCA") contends that Plaintiffs fail to state a claim against it despite their access to MCA's entire grand jury production.  (Dkt. No. 284 ("Hitachi MTD") at 3.)  The Court has already determined that Plaintiffs' theory implicating the defendant American subsidiaries in the alleged conspiracy is untenable as alleged.  Accordingly, in the present posture, MCA's argument ultimately asserts the futility of further amendment.  The Court declines to find, however, that further amendment would be futile, given that both complaints support the inference that documents concerning certain defendants were discovered in the files of a third defendant not named in the document itself.  MCA's grand jury production therefore does not comprise the entire set of documents that may pertain to MCA's involvement.[14]

---

the conspiracy at all.") (emphasis added); *United States v. Grasso*, 724 F.3d 1077, 1096-97 (9th Cir. 2013) cert. denied, 134 S. Ct. 484 (U.S. 2013) (Berzon, J., concurring in part, dissenting in part) (observing that slight evidence rule "is ultimately best understood to mean that if someone joins the conspiracy, 'slight' activity to accomplish its objectives is enough") (internal quotation marks omitted); *see also In re Citric Acid Litig.*, 996 F. Supp. 951, 955 (N.D. Cal. 1998) aff'd, 191 F.3d 1090 (9th Cir. 1999) (holding that slight evidence rule was a rule of criminal appellate procedure not applicable by a district court considering summary judgment because the rule would supplant the normal summary judgment standard).

[14] Hitachi requests that the Court take judicial notice of a letter between counsel which the IPP-CAC purportedly quotes at paragraph 227.  (Dkt. No. 285.)  The letter plays no part in the Court's

United States District Court
Northern District of California

United States District Court
Northern District of California

Second, both Hitachi entities argue that the LG Chem and Sanyo plea agreements support their dismissal from the case because the pleas (purportedly) establish that the focus of the conspiracy "was the sale of cylindrical [LI Batteries] sold from 2007 through 2008 for notebook computers" and the last allegations in the complaint concerning Hitachi were in 2005—so Hitachi "was not and could not have been a participant in the conduct at issue in the pleas, let alone the more expansive conspiracy alleged by the Plaintiffs."  (Hitachi MTD at 5-6.)  The argument rests on an unsound premise, namely, that the scope of criminal plea agreements establishes the scope of civil liability.  The government operates under a different burden of proof than do private litigants.  The reasonable doubt standard faced by the government makes criminal guilty pleas in antitrust cases like this one at once a strong indicator of the existence of a conspiracy but a weak indicator of the scope of that conspiracy.  *See TFT-LCD II*, 599 F. Supp. 2d at 1185 (difference in burdens of proof supports civil antitrust plaintiffs' allegation of a conspiracy exceeding that pled to in related criminal action); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 903 (N.D. Cal. 2008) (entry of guilty pleas supports inference of antitrust conspiracy for purpose of pleading civil antitrust conspiracy); *ODD II*, 2012 WL 1366718, at *2 (entry of guilty pleas between dismissal of original complaints and filing of amended complaints "serve[d] to tip the DOJ investigation from a 'non-factor,' as it was described in the prior order, to an item of relevance as to the plausibility of plaintiffs' conspiracy claims, albeit well short of dispositive on the breadth of the claimed conspiracy").

Third, Sony argues that it is improperly named as a defendant because it "disappears from the narrative" for long stretches of time.  (Dkt. No. 296 at 3-4.)  The objection is not well-taken. With Sony having been implicated in numerous alleged contacts and documents (*e.g.*, IPP-CAC ¶¶ 53-54, 64-68, 78, 92, 109-110, 119, 146, 150, 165; DPP-CAC ¶¶ 100-01, 103, 106-11, 115, 118, 131-32, 139) even without Sony itself yet having produced to Plaintiffs the documents it produced for the grand jury, the mere fact that the complaints contain gaps as to the Sony entities supplies no reason for dismissal at this stage.

---

analysis of the sufficiency of the IPP-CAC, and accordingly Hitachi's request for judicial notice is **DENIED AS MOOT**.

United States District Court
Northern District of California

Fourth, Toshiba contends that the implication of other companies beside Toshiba in DOJ's ongoing investigations, and Toshiba's presumed exclusion from that investigation, renders Toshiba's participation in the conspiracy implausible.  (Dkt. No. 293 at 6.)  Though the existence of guilty pleas is a substantial (but by no means necessary) factor in determining the plausibility of an alleged antitrust conspiracy, civil enforcement of the antitrust laws does not ultimately hinge on the charging decisions of the U.S. Attorney's office, whose burden is proof beyond a reasonable doubt, as opposed to the civil preponderance burden.  It is axiomatic that the purpose of a Rule 12(b)(6) motion is to test the legal sufficiency of the pleadings, supplemented where proper by extrinsic matters properly incorporated by reference or subject to judicial notice.  The investigative decisions of the Justice Department are not dispositive of the question of the legal sufficiency of either complaint.  Accordingly, Toshiba's argument supplies no further reason for dismissal.

### C.   FRAUDULENT CONCEALMENT

Defendants contend that both Plaintiff classes' claims for damages from the period before October 2008 are time-barred.  (Joint MTD IPP-CAC at 19-22; Joint MTD DPP-CAC at 24-25.)[15] The Court determines that, for pleading purposes, both consolidated complaints adequately allege fraudulent concealment, such that the Court will not dismiss any claims as time-barred.

Federal antitrust claims must be commenced within four years of the date the cause of action accrues.  15 U.S.C. § 15b.[16]  "Generally, a cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff. . . .  'In the context of a continuing conspiracy to violate the antitrust laws . . . this has usually been understood to mean that each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and that, as to those damages, the statute of limitations runs from the commission of the act.'"  *ODD II*, 2012 WL 1366718, at *7 (quoting *Zenith Radio Corp. v.*

---

[15] Defendants identify slightly different cutoff dates for each Plaintiff class: October 3, 2008 for the IPPs and October 11, 2008 for the DPPs.

[16] The IPPs, in addition to asserting a single federal antitrust claim for injunctive relief (IPP-CAC ¶¶ 412-422), proceed under the antitrust laws of 29 individual states, some of which have statutes of limitations that differ from the four-year federal limitations period.  The differences in limitations being irrelevant for present purposes, the Court focuses on the federal four-year period.

*Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971)).  The Ninth Circuit "do[es] not require a plaintiff to actually [*sic*] discover its antitrust claims before the statute of limitations begins to run." *Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1060 (9th Cir. 2012) (citing *Beneficial Standard Life Ins., Co. v. Madariaga*, 851 F.2d 271, 274-75 (9th Cir. 1988)).

Nevertheless, the limitations period "is subject to tolling by fraudulent concealment, which is the plaintiff's burden to plead and prove."  *ODD II*, 2012 WL 1366718, at *7 (citing *Conmar Corp. v. Mitsui & Co. (U.S.A.), Inc.*, 858 F.2d 499, 505 (1988)).  A plaintiff proceeding under this theory "must plead facts showing that [the defendant] affirmatively misled it, and that [the plaintiff] had neither actual nor constructive knowledge of the facts giving rise to its claim despite its diligence in trying to uncover those facts."  *Conmar*, 858 F.2d at 502 (citing *Rutledge v. Boston Woven Hose & Rubber Co.*, 576 F.2d 248, 249-50 (9th Cir. 1978)).  The plaintiff "must plead with particularity the circumstances of the concealment and the facts supporting its due diligence."  *Id.* "The requirement of diligence is only meaningful, however, when facts exist that would excite the inquiry of a reasonable person."  *Id.* at 504 (citing *Volk v. D.A. Davidson & Co.*, 816 F.2d 1406, 1416 (9th Cir. 1987)).  As to the concealment requirement, unless the parties' relationship imposes a duty of disclosure, mere passive concealment does not suffice; an affirmative misrepresentation or denial of wrongdoing is required.  *Thorman v. Am. Seafoods Co.*, 421 F.3d 1090, 1095-96 (9th Cir. 2005); *Conmar*, 858 F.2d at 505; *Rutledge*, 576 F.2d at 250.  Further, a plaintiff's reliance on any misstatement must be reasonable under the circumstances.  *Conmar*, 858 F.2d at 505; *Rutledge*, 576 F.2d at 250.  The fact-intensive nature of fraudulent concealment makes disposition of that issue "generally inappropriate" on the pleadings alone, "particularly when the proof relating to the extent of the fraudulent concealment is alleged to be largely in the hands of the alleged conspirators."  *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 738 F. Supp. 2d 1011, 1024 (N.D. Cal. 2010) (quoting *In re Rubber Chemicals Antitrust Litig.*, 504 F. Supp. 2d 777, 789 (N.D. Cal. 2007).

Here, Plaintiffs' allegations suffice for purposes of the pleading stage.  The complaints allege public, putatively false statements by various defendants affirming their compliance with applicable antitrust laws (IPP-CAC ¶ 273), as well as the existence of vigorous price competition in

the lithium ion battery market (DPP-CAC ¶ 214).  Nothing in either complaint suggests that it would have been unreasonable for Plaintiffs to take these statements at face value prior to the May 2011 disclosure of the Justice Department's investigation into alleged price-fixing in Defendants' industry.  Nor are any other facts alleged which should have excited further inquiry by Plaintiffs.  Indeed, Plaintiffs allege with particularity a variety of mechanisms by which Defendants kept secret their allegedly collusive meetings and other contacts, such as: instructing the recipient of documents or emails to destroy, delete, or discard them after reading (*e.g.*, IPP-CAC ¶¶ 66, 111, 121; DPP-CAC ¶¶ 215-16), instructing personnel to refrain from memorializing conversations (*e.g.*, DPP-CAC ¶¶ 217), and using code to refer to particular entities or topics (*e.g.*, IPP-CAC ¶ 109 (asking a competitor for a meeting on "safety" when the true topic was pricing), DPP-CAC ¶ 123 (same); IPP-CAC ¶ 110 (email referring to "P Company" for Panasonic), DPP-CAC ¶ 217 (email referring to "D Company" for Samsung), among others.  Plaintiffs' allegations of fraudulent concealment are sufficient to survive the pleading stage.

Defendants erroneously contend that Plaintiffs were required to undertake a searching inquiry because economic data and market characteristics alleged in the complaints—price curves, for example, or the high degree of concentration in the lithium ion battery industry—were matters of public record, and therefore should have prompted an inquiry sufficient to overcome the Defendants' various methods of alleged subterfuge.  That argument is nothing but a straw man.  It takes the complaints' marshalling of abstruse economic analysis and characterizes it, in the case of the DPP-CAC, as alleging an "obvious" conspiracy.  (Joint MTD DPP-CAC at 25; *see also* Dkt. No. 325 (Joint Reply IPP-CAC at 15 (arguing IPPs "fail[] to reconcile" allegations of economic data with purported failure to investigate their claims).)  The Court notes, first, that the DPP-CAC never uses the word "obvious," a word Defendants themselves have advanced.  Neither does the DPP-CAC or the IPP-CAC allege a conspiracy that could have been or should have been obvious.  On the contrary, as the Court has already noted, the complaints allege a conspiracy that went to great lengths to avoid detection.  Moreover, the alleged conspiracy's aim was to increase the rise of already-rising prices, and to suppress the fall of already-falling prices.  The Court declines to hold on the facts alleged that such subtleties should have been detected.  The failure of, for instance,

United States District Court
Northern District of California

28

North Dakota electronics shops or iPhone buyers (DPP-CAC ¶ 22; IPP-CAC ¶ 351) to engage in active monitoring of Korean and Japanese lithium ion battery market conditions does not, as Defendants would have it here, automatically amount to a failure of due diligence on the part of those plaintiffs.

For the reasons set forth above, the Court **DENIES** the pending motions to dismiss to the extent they seek to dismiss any portion of Plaintiffs' claims as time-barred.  This denial is without prejudice to Defendants, jointly or individually, later bringing motions based on the statute of limitations periods, upon a more complete evidentiary record.

## III.    CONCLUSION

For the reasons set forth herein, the Court **GRANTS** the seven pending motions to dismiss in this case, and **DISMISSES** the consolidated amended complaints of both the Indirect Purchaser Plaintiff putative class and Direct Purchaser Plaintiff putative class.  Both the IPPs and DPPs have **LEAVE TO AMEND** consistent with the guidance in this Order.

This Order terminates Dkt. Nos. 284, 288, 289, 290, 291, 293, and 296.

**IT IS SO ORDERED**.

Dated: January 21, 2014

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**

United States District Court
Northern District of California