1   *Indirect Purchaser Plaintiffs*
    *Interim Co-Lead Class Counsel*

2

3   [All Counsel Identified on Signature Page]

4

5

6

7

8               UNITED STATES DISTRICT COURT

9              NORTHERN DISTRICT OF CALIFORNIA

10                   OAKLAND DIVISION

11  IN RE: LITHIUM ION BATTERIES          Case No. 13-md-02420-YGR (DMR)
    ANTITRUST LITIGATION
12                                         MDL No. 2420
13
                                           **INDIRECT PURCHASER PLAINTIFFS'**
14  _____   **OPPOSITION TO DEFENDANTS' JOINT**
    This Document Relates to:              **SUPPLEMENTAL MOTION TO DISMISS**
                                           **THE INDIRECT PURCHASER**
15  ALL INDIRECT PURCHASER                 **PLAINTIFFS' CONSOLIDATED**
    ACTIONS                                **AMENDED COMPLAINT (PHASE II)**
16
17                                         Date:       May 9, 2014
                                           Time:       9:30 a.m.
18                                         Judge:      Hon. Yvonne Gonzalez Rogers
                                           Location:   Courtroom 5
19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.    Introduction .................................................................................................................. 1

II.   Applying Federal Statutory Antitrust Standing Requirements Contravenes *Illinois Brick*
      Repealer Laws.............................................................................................................. 1

III.  Defendants' Price-Fixing Conspiracy Caused the Type of Antitrust Harm to Plaintiffs That
      Satisfies *AGC*. ............................................................................................................ 6

      A.    Plaintiffs Paid Supra-Competitive Prices Caused by the Conspiracy........................... 6

            1.   Plaintiffs Suffered Classic Antitrust Injury Under *AGC*. ........................................ 7

            2.   Consumers Are Market Participants....................................................................... 8

      B.    Consumer Plaintiffs Are the Parties Who Ultimately Pay the Overcharge, Making
            Their Injuries Sufficiently Direct. ........................................................................... 11

      C.    Plaintiffs Allege Economic Factors Making Injury Highly Probable......................... 14

      D.    The Risk of Duplicative Recovery Does Not Weigh Against Standing. .................... 16

      E.    Damages Can Be Reliably Estimated Through Regression Analyses. ....................... 16

IV.   Utah Plaintiff Sue Hiller Has Standing. ...................................................................... 17

V.    Plaintiffs Have Standing to Represent Class Members from Other States. ................... 17

      A.    Adequacy and Typicality Are Class Certification Issues.......................................... 18

      B.    Because the Proposed Subclasses Are Managerial, Not Compulsory, a Governmental
            Entity in Every State Is Not Required...................................................................... 21

            1.   Managerial Subclasses Need Not Meet Rule 23(a) Requirements........................ 21

            2.   No Conflicts Exist Between Class Members........................................................ 22

VI.   *Illinois Brick* Does Not Bar Plaintiffs' Claims Under Missouri or Montana Law............... 23

      A.    Missouri ................................................................................................................. 24

      B.    Montana ................................................................................................................. 24

VII.  State Procedural Rules Do Not Bar Antitrust Class Actions. ....................................... 26

VIII. Plaintiffs State a Claim Under New Hampshire Law. ................................................... 29

IX.   The Arkansas Deceptive Trade Practices Act Applies to Price Fixing.......................... 30

X.    Conclusion ................................................................................................................. 30

# TABLE OF AUTHORITIES

**Page**

## Cases

*Alexander v. City of Gretna*,
No. 06-5405, 2009 U.S. Dist. LEXIS 95177 (E.D. La. Sept. 28, 2009) .................................. 22

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co.*,
190 F.3d 1051 (9th Cir. 1999) ........................................................................ 6, 8, 15

*Am. Timber & Trading Co. v. First Nat'l Bank*,
690 F.2d 781 (9th Cir. 1982) ........................................................................ 21, 22

*Amarel v. Connell*,
102 F.3d 1494 (9th Cir. 1996) ................................................................................ 6

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997) ............................................................................................ 21

*Aryeh v. Canon Business Solutions, Inc.*,
55 Cal. 4th 1185 (2013) ........................................................................................ 5

*Association of Washington Public Hospital Districts v. Philip Morris, Inc.*,
241 F.3d 696 (9th Cir. 2001) ................................................................................. 6

*Barton & Pittinos, Inc. v. Smithkline Beecham Corp.*,
118 F.3d 178 (3d Cir. 1997) .................................................................................. 9

*Baumann v. Chase Inv. Servs. Corp.*,
No. 12-55644, 2014 U.S. App. LEXIS 4777 (9th Cir. Mar. 13, 2014) ........................... 28

*Bergstrom v. Noah*,
266 Kan. 829 (Kan. 1999) ..................................................................................... 4

*Bhan v. NME Hospitals, Inc.*,
772 F.2d 1467 (9th Cir. 1985) .......................................................................... 8, 11

*Bigelow v. RKO Radio Pictures, Inc.*,
327 U.S. 251 (1946) ............................................................................................ 14

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
429 U.S. 477 (1977) ............................................................................................. 8

*Bunker's Glass Co. v. Pilkington PLC*,
206 Ariz. 9 (2003) ................................................................................................ 4

*California v. ARC Am. Corp.*,
490 U.S. 93 (1989) ......................................................................................... 3, 16

*Casale v. Kelly*,
257 F.R.D. 396 (S.D.N.Y. 2009) ......................................................................... 22

**TABLE OF AUTHORITIES**
(continued)

Page

*Clayworth v. Pfizer, Inc.*,
  49 Cal. 4th 758 (2010) ................................................................................................. 5

*Cnty. of Cook v. Philip Morris, Inc.*,
  353 Ill. App. 3d 55 (2004) ............................................................................................ 4

*D.R. Ward Constr. Co. v. Rohm & Haas Co.*,
  470 F. Supp. 2d 485 (E.D. Pa. 2006) ....................................................................... 4, 5

*Dang v. S.F. Forty Niners*,
  No. 5:12-CV-5481 EJD, 2013 U.S. Dist. LEXIS 116699 (N.D. Cal. Aug. 2, 2013) ................ 12

*Datel Holdings Ltd. v. Microsoft Corp.*,
  712 F. Supp. 2d 974 (N.D. Cal. 2010) ......................................................................... 9

*Easter v. American West Financial*,
  381 F.3d 948 (9th Cir. 2004) ...................................................................................... 19

*Elkins v. Microsoft Corp.*,
  817 A.2d 9 (Vt. 2002) .................................................................................................. 4

*Environamics Corp. v. Ferguson Enterprises, Inc.*,
  No. 00-579-JD, 2001 U.S. Dist. LEXIS 25481 (D.N.H. Sept. 24, 2001) ................................. 30

*Forsyth v. Humana, Inc.*,
  114 F.3d 1467 (9th Cir. 1997) .................................................................................... 15

*Four B. Corp. v. Daicel Chem. Indus., Ltd.*,
  253 F. Supp. 2d 1147 (D. Kan. 2003) .......................................................................... 4

*Freeman Indus. v. Eastman Chem. Co.*,
  172 S.W.3d 512 (Tenn. 2005) ................................................................................. 4, 8

*Freund v. Nycomed Amersham*,
  347 F.3d 752 (9th Cir. 2003) ...................................................................................... 27

*FTC v. Ind. Fed. of Dentists*,
  476 U.S. 447 (1985) .................................................................................................... 25

*Fucile v. Visa U.S.A., Inc.*,
  No. S1560-03 Cnc, 2004 Vt. Super. LEXIS 42 (Dec. 27, 2004) ............................................ 16

*Gibbons v. J. Nuckolls, Inc.*,
  216 S.W.3d 667 (Mo. 2007) ................................................................................... 5, 24

*Glen Holly Entm't, Inc. v. Tektronix, Inc.*,
  352 F.3d 367 (9th Cir. 2003) .................................................................................... 7, 9

*Holder v. Archer Daniels Midland Co.*,
  No. 96-2975, 1998 D.C. Super. LEXIS 39 (Nov. 4, 1998) .................................................... 4

1

**TABLE OF AUTHORITIES**
(continued)

2
Page

3    *Howe v. Microsoft Corp.*,
4        656 N.W.2d 285 (N.D. 2003)...................................................................... 4

5    *In re Aftermarket Automotive Lighting Products Antitrust Litigation*,
        No. 09 MDL 2007-GW(PJWx), 2009 U.S. Dist. LEXIS 133088 (C.D. Cal. July 6, 2009) .... 7, 9

6    *In re Aftermarket Filters Antitrust Litig.*,
        No. 08 C 4883, 2009 U.S. Dist. LEXIS 104114 (N.D. Ill. Nov. 5, 2009) ............................ 7, 30
7
8    *In re Auto. Parts Antitrust Litig.*,
        No. 12-md-02311, 2013 U.S. Dist. LEXIS 80338 (E.D. Mich. June 6, 2013) .................. passim

9    *In re Bayer Corp. Comb. Aspirin Prods. Mktg. & Sales Practices Litig.*,
        701 F. Supp. 2d 356 (E.D.N.Y. 2010) ................................................................ 17, 19
10
11   *In re Buspirone Patent Litig.*,
        185 F. Supp. 2d 363 (S.D.N.Y. 2002)................................................................ 17, 19

12   *In re Cathode Ray Tube (CRT) Antitrust Litig.*,
        738 F. Supp. 2d 1011 (N.D. Cal. 2010) ....................................................... 2, 4, 13
13
14   *In re Cathode Ray Tube (CRT) Antitrust Litig.*,
        No. C-07-5944-SC, 2013 U.S. Dist. LEXIS 137946 (N.D. Cal. Sept. 24, 2013) .................... 17

15   *In re Chocolate Confectionary Antitrust Litig.*,
        749 F. Supp. 2d 224 (M.D. Pa. 2010) .......................................................... 29, 30
16
17   *In re DDAVP Indirect Purchaser Antitrust Litig. v. Ferring Pharms., Inc.*,
        903 F. Supp. 2d 198 (S.D.N.Y. 2012)...................................................................... 4

18   *In re Ditropan XL Antitrust Litigation*,
        529 F. Supp. 2d 1098 (N.D. Cal. 2007) ................................................................ 20
19
20   *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
        516 F. Supp. 2d 1072 (N.D. Cal. 2007) ................................................ 3, 20, 25, 29

21   *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
        536 F. Supp. 2d 1129 (N.D. Cal. 2008) ........................................................ 3, 9, 10
22
23   *In re Flash Memory Antitrust Litig.*,
        643 F. Supp. 2d 1133 (N.D. Cal. 2009) .......................................................... passim

24   *In re Flonase Antitrust Litig.*,
        692 F. Supp. 2d 524 (E.D. Pa. 2010) ........................................................... 19, 20
25
26   *In re G-Fees Antitrust Litig.*,
        584 F. Supp. 2d 26 (D.D.C. 2008) .................................................................... 4

27   *In re Grand Theft Auto Video Game Consumer Litig.*,
        No. 06 MD 1739, 2006 U.S. Dist. LEXIS 78064 (S.D.N.Y. Oct. 25, 2006)...................... 17, 20
28

PLS.' OPP. TO SUPPL. MOT. TO DISMISS
CONSOLIDATED AM. COMPLAINT (PHASE II)
13-MD-02420-YGR

**TABLE OF AUTHORITIES**
(continued)

Page

*In re Graphics Processing Units Antitrust Litig.*,
  527 F. Supp. 2d 1011 (N.D. Cal. 2007) ........................................................ 3, 18, 20

*In re Graphics Processing Units Antitrust Litig.*,
  540 F. Supp. 2d 1085 (N.D. Cal. 2007) ............................................................. passim

*In re Hydroxycut Mktg. & Sales Practices Litig.*,
  801 F. Supp. 2d 993 (S.D. Cal. 2011) ........................................................... 17, 18, 20

*In re Hydroxycut Mktg. & Sales Practices Litig.*,
  No. 09md2087 BTM (KSC), 2014 U.S. Dist. LEXIS 11750 (S.D. Cal. Jan. 27, 2014) 26, 27, 28

*In re Intel Corp. Microprocessor Antitrust Litig.*,
  496 F. Supp. 2d 404 (D. Del. 2007) .............................................................. 2, 13, 15

*In re Lorazepam & Clorazepate Antitrust Litig.*,
  289 F.3d 98 (D.C. Cir. 2002) ............................................................................. 25

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*,
  350 F. Supp. 2d 160 (D. Me. 2004) ................................................................. 24, 25

*In re Optical Disc Drive Antitrust Litig.*,
  No. 3:10-md-2143 RS, 2012 U.S. Dist. LEXIS 55300 (N.D. Cal. Apr. 19, 2012)............. 26, 27

*In re Optical Disk Drive Antitrust Litig.*,
  No. 10-MD-2143 RS, 2011 U.S. Dist. LEXIS 101763 (N.D. Cal. Aug. 3, 2011)......... 1, 2, 3, 10

*In re Pool Prods. Distrib. Mkt. Antitrust Litig.*,
  946 F. Supp. 2d 554 (E.D. La. 2013) ............................................................... 4, 5, 24

*In re Refrigerant Compressors Antitrust Litigation*,
  No. 2:09-md-02042, 2013 U.S. Dist. LEXIS 50737 (E.D. Mich. Apr. 9, 2013) ...................... 10

*In re Relafen Antitrust Litig.*,
  221 F.R.D. 260 (D. Mass. 2004), *potentially abrogated*
  *on other grounds Holster v. Gatco, Inc.*,
  559 U.S. 1060 (2010)........................................................................................ 19, 20

*In re Static Random Access Memory Antitrust Litig.*,
  264 F.R.D. 603 (N.D. Cal. 2009)....................................................................... 14, 15

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  586 F. Supp. 2d 1109 (N.D. Cal. 2008) ............................................................. passim

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  No. M 07-1827 SI, 2011 U.S. Dist. LEXIS 110635 (N.D. Cal. Sept. 28, 2011) ...................... 24

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  No. M 07-1827 SI, 2011 U.S. Dist. LEXIS 84476 (N.D. Cal. July 28, 2011).......................... 24

*In re TFT-LCD Antitrust Litig.*,
  267 F.R.D. 583 (N.D. Cal. 2010)..................................................................... 15, 17

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3       *In re United Energy Corp. Solar Power Modules Tax Shelter Inv. Sec. Litig.*,
            122 F.R.D. 251 (C.D. Cal. 1988) .................................................................................. 22

4

        *In re Wellbutrin XL Antitrust Litig.*,
5           260 F.R.D. 143 (E.D. Pa. 2009) ................................................................................. 4

6       *Ireland v. Microsoft Corp.*,
            No. 00CV-201515, 2001 Mo. App. LEXIS 2371 (Feb. 7, 2001) ............................ 24
7

        *Kandel v. Brother Int'l Corp.*,
8           No. CV 08-1040 DSF (RCx), 2009 U.S. Dist. LEXIS 105242 (C.D. Cal. May 12, 2009) ....... 20

9       *Kanne v. Visa U.S.A. Inc.*,
            272 Neb. 489 (2006) ................................................................................................ 16
10

        *Knevelbaard Dairies v. Kraft Foods, Inc.*,
11          232 F.3d 979 (9th Cir. 2000)................................................................................. 7, 9

12      *Knowles v. Visa U.S.A.*,
            No. CV-03-707, 2004 Me. Super. LEXIS 227 (Oct. 20, 2004) ............................... 16
13

        *Krell v. Prudential Ins. Co. of Am.*,
14          148 F.3d 283 (3d Cir. 1998).................................................................................... 18

15      *LaChance v. US Smokeless Tobacco Co.*,
            156 N.H. 881 (2007) ...................................................................................... 4, 29, 30
16

        *Lair v. Bullock*,
17          697 F.3d 1200 (9th Cir. 2012).................................................................................. 28

18      *Laughlin v. Evanston Hosp.*,
            133 Ill. 2d 374 (1990) ............................................................................................... 4
19

        *Lewis v. Casey*,
20          518 U.S. 343 (1996)................................................................................................. 17

21      *Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
            No. 12-873, 2014 U.S. LEXIS 2214 (U.S. Mar. 25, 2014)........................................ 2
22

        *Lisk v. Lumber One Wood Preserving, LLC*,
23          3:13-cv-01402-AKK, 2014 U.S. Dist. LEXIS 1784 (N.D. Ala. Jan. 8, 2014) ......... 28

24      *Littlefield v. S.C. Forestry Comm'n*,
            337 S.C. 348 (2000) ................................................................................................. 27
25

        *Lorenzo v. Qualcomm, Inc.*,
26          603 F. Supp. 2d 1291 (S.D. Cal. 2009) .................................................................... 9

27      *Lorix v. Crompton*,
            736 N.W. 2d 619 (Minn. 2007)................................................................................ 5
28

**TABLE OF AUTHORITIES**
(continued)

Page

*Los Angeles Memorial Coliseum Commission v. NFL*,
  791 F.2d 1356 (9th Cir. 1986).................................................................................... 8

*Mack v. Bristol-Myers Squibb Co.*,
  673 So. 2d 100 (Fla. Ct. App. 1996) ......................................................................... 4

*Marks v. United States*,
  430 U.S. 188 (1977).................................................................................................. 28

*Mathias v. Daily News, L.P.*,
  152 F. Supp. 2d 465 (S.D.N.Y. 2001)........................................................................ 7

*Meijer, Inc. v. Abbott Laboratories*,
  No. C 07-5985 CW, 2008 U.S. Dist. LEXIS 78219 (N.D. Cal. Aug. 27, 2008) ...... 20

*Mueller Co. v. U.S. Pipe & Foundry Co.*,
  No. 03-170-JD, 2003 U.S. Dist. LEXIS 17448 (D.N.H. Oct. 2, 2003) .................... 30

*Murer v. Mont. State Comp. Mut. Ins. Fund*,
  257 Mont. 434 (1993) ............................................................................................... 27

*Olson v. Microsoft Corp.*,
  No. CDV-2000-219, 2001 Mont. Dist. LEXIS 2710 (Feb. 15, 2001) ...................... 25

*Orr v. Beamon*,
  77 F. Supp. 2d 1208 (D. Kan. 1999) ........................................................................... 4

*Ortiz v. Fibreboard Corp.*,
  527 U.S. 815 (1999).................................................................................................. 19

*Ostrofe v. H.S. Crocker Co.*,
  740 F.2d 739 (9th Cir. 1984)....................................................................................... 8

*Owens Corning v. R.J. Reynolds Tobacco Co.*,
  868 So. 2d 331 (Miss. 2004) ....................................................................................... 4

*Peterson v. Visa U.S.A. Inc.*,
  No. 03-8080, 2005 D.C. Super. LEXIS 17 (Apr. 22, 2005) ....................................... 4

*Plath v. Schonrock*,
  314 Mont. 101 (2003) ............................................................................................... 25

*Pomerantz v. Microsoft Corp.*,
  50 P.3d 929 (Colo. Ct. App. 2002) ........................................................................... 23

*R.C. Dick Geothermal Corp. v. Thermogenics, Inc.*,
  890 F.2d 139 (9th Cir. 1989)....................................................................................... 6

*Ramirez v. STi Prepaid LLC*,
  644 F. Supp. 2d 496 (D.N.J. 2009) ........................................................................... 17

**TABLE OF AUTHORITIES**
(continued)

Page

*Samsung Electronics Co. v. Panasonic Corp.*,
No. 12-15185, 2014 U.S. App. LEXIS 6256 (9th Cir. Apr. 4, 2014) .................................. 5, 11

*Shady Grove Orthopedic Associates v. Allstate Insurance Co.*,
559 U.S. 393 (2010) ................................................................................................ passim

*Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*,
737 F. Supp. 2d 380 (E.D. Pa. 2010) ............................................................... 24, 30

*Smith v. Ill. Cent. R.R. Co.*,
223 Ill. 2d 441 (2006) ................................................................................................. 27

*State ex rel. Bryant v. R & A Inv. Co.*,
336 Ark. 289 (1999) ................................................................................................. 30

*State of California ex rel. Van de Kamp v. Texaco, Inc.*,
46 Cal. 3d 1147 (1988) ............................................................................................... 5

*Steel Co. v. Citizens for a Better Env't*,
523 U.S. 83 (1998) ...................................................................................................... 2

*Tait v. BSH Home Appliance Corp.*,
No. SACV 10-711 DOC (ANx), 2011 U.S. Dist. LEXIS 54456 (C.D. Cal. May 12, 2011) 28, 29

*U.S. Gypsum Co. v. Ind. Gas. Co.*,
350 F.3d 623 (7th Cir. 2003) ...................................................................................... 7

*Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*,
540 U.S. 398 (2004) .................................................................................................... 6

*Westley v. Oclaro, Inc.*,
No. C-11-2448 EMC, 2012 U.S. Dist. LEXIS 42098 (N.D. Cal. Mar. 27, 2012) ................... 30

*Woodard v. Fid. Nat'l Title Ins. Co.*,
No. CIV 06-1170 RB/WDS, 2007 U.S. Dist. LEXIS 97455 (D.N.M. Dec. 4, 2007) .......... 19, 20

**Statutes**

15 U.S.C. § 45(a)(1) ......................................................................................................... 25

740 Ill. Comp. Stat. 10/7 ............................................................................................ 4, 26

Ark. Code Ann. § 4-88-107(a) ......................................................................................... 30

Colo. Rev. Statutes § 6-4-111 ......................................................................................... 23

D.C. Code § 28-4509(a) .................................................................................................... 4

Mont. Code Ann. § 30-14-104 ......................................................................................... 25

Mont. Code Ann. § 30-14-133 ................................................................................... 25, 26

**TABLE OF AUTHORITIES**
(continued)

Page

Mont. Code Ann. § 30-14-133(1) .................................................... 25

Mont. Code Ann. §§ 30-14-201, *et seq.* ............................................. 25

Mont. Code. Ann. § 30-14-102(1) .................................................. 25

Mont. Code. Ann. § 30-14-103 .................................................... 25

Mont. Const., Art. XIII § 1(2) ...................................................... 26

New Hampshire's Consumer Protection Act ................................... 29, 30

Or. Rev. Stat. § 646.715(2) ............................................................ 4

S.C. Code Ann. § 39-5-140(a) ...................................................... 26

W. Va. Code § 142-9-1.1 .............................................................. 4

W. Va. Code § 142-9-1.6 .............................................................. 4

**Rules**

Fed. R. Civ. P. 1 ......................................................................... 26

Fed. R. Civ. P. 23 ................................................................... xi, 27

Fed. R. Civ. P. 23(c)(5) .............................................................. 21

Fed. R. Civ. P. 23(d) ............................................................. 21, 22

Fed. R. Civ. P. 26(f) .................................................................. 14

Fed. R. Civ. P. 50 ...................................................................... 26

Mo. Sup. Ct. R. 84.16(b) ............................................................ 24

**Treatises**

Newberg on Class Actions § 7:29 (5th ed. 2010) .............................. 22

**Other Authorities**

4th Consol. Am. Class Action Compl., *In re Static Random Access Memory (SRAM) Antitrust Litig.*, No. M:07-md-01819-CW (N.D. Cal. Nov. 19, 2009), ECF No. 902 .............................. 13

Indirect Purchaser Pls.' & Attys' Gen.'s Jt. Appl. for Attys' Fees, *In re DRAM Antitrust Litig.*, No. M-02-1486-PJH (N.D. Cal. Feb. 28, 2014), ECF No. 2181 ................................. 10

Indirect Purchaser Pls.' 2d Am. Consol. Class Action Compl., *In re Graphics Processing Units Antitrust Litig.*, MDL No. 1826 (N.D. Cal. Nov. 7, 2007), ECF No. 248 ................................. 12

1

**TABLE OF AUTHORITIES**
(continued)

2

**Page**

3    Indirect Purchaser Pls.' 3d Consol. Am. Compl., *In re TFT-LCD (Flat Panel) Antitrust Litig.*,
       No. 3:07-MD-1827 SI (N.D. Cal. Apr. 29, 2011), ECF No. 2694............................................. 13

4

5    Susan Bisom-Rapp, *The Use of Subclasses in Class Action Suits under Title VII*,
       9 Indus. Rel. L.J. 116, 137 (1987)............................................................................................. 22

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## STATEMENT OF THE ISSUES TO BE DECIDED

2      1.      Whether the Court should apply the antitrust standing test from *Associated*

3  *General Contractors of California v. California State Council of Carpenters*, 459 U.S. 519

4  (1983) ("*AGC*"), when interpreting the substantive antitrust law of twenty-nine states.

5      2.      Whether, if *AGC* is applied, the Indirect Purchaser Plaintiffs nevertheless satisfy

6  *AGC*'s antitrust standing requirements.

7      3.      Whether questions of Indirect Purchaser Plaintiffs' ability to assert claims for

8  residents of states in which Plaintiffs do not reside should be decided at the time of class

9  certification rather than on a motion to dismiss.

10      4.      Whether Indirect Purchaser Plaintiffs nevertheless can assert claims for residents

11  of states in which Plaintiffs do not reside.

12      5.      Whether Missouri and Montana permit antitrust claims by indirect purchasers.

13      6.      Whether Federal Rule of Civil Procedure 23 permits the Indirect Purchaser

14  Plaintiffs to bring class actions under Illinois, Montana, and South Carolina law.

15      7.      Whether the Indirect Purchaser Plaintiffs sufficiently allege that Defendants'

16  anticompetitive conduct affected New Hampshire trade or commerce.

17      8.      Whether the Arkansas Deceptive Trade Practices Act applies to price fixing.

18

19

20

21

22

23

24

25

26

27

28

PLS.' OPP. TO SUPPL. MOT. TO DISMISS
CONSOLIDATED AM. COMPLAINT (PHASE II)
13-MD-02420-YGR

1    **I.    Introduction**

2          Defendants ask this Court to reject the majority of decisions that hold federal antitrust

3    standing requirements do not apply to substantive state laws absent a clear directive from those

4    states' legislatures or highest courts.  These decisions recognize indirect purchaser claims are just

5    that – indirect – so there is a category of plaintiffs expressly permitted by state law in addition to

6    those permitted under federal law.  It is this very difference in the law that Defendants purport to

7    attack via their antitrust standing argument, which would, in effect, "'repeal' the *Illinois Brick*

8    'repealers.'"  *In re Optical Disk Drive Antitrust Litig.* ("*ODDs I*"), No. 10-MD-2143 RS,

9    2011 U.S. Dist. LEXIS 101763, at *45 (N.D. Cal. Aug. 3, 2011) ("it is difficult to imagine an

10   indirect purchaser ever having antitrust standing under defendants' formulation").  Respectfully,

11   the Court should not depart from the majority position.  Moreover, even if the Court were to

12   consider federal antitrust standing requirements, Indirect Purchaser Plaintiffs' ("Plaintiffs")

13   Complaint more than satisfies them.

14         Next, Plaintiffs have standing to plead claims on behalf of class members in states in

15   which the named Plaintiffs do not reside because:  (1) each Plaintiff has pled the exact same type

16   of injury and has constitutional standing; (2) whether the named Plaintiffs adequately represent

17   absent class members is a class certification question, not a question of constitutional standing;

18   and (3) the individual state and government subclasses are managerial, not compulsory

19   subclasses, that are pled in the alternative to a nationwide class.

20         Defendants' remaining arguments about Plaintiffs' claims under certain states laws are

21   without merit because:  (1) under *Shady Grove Orthopedic Associates v. Allstate Insurance Co.*,

22   559 U.S. 393 (2010), Rule 23 permits Plaintiffs to bring class actions under Illinois, Montana, and

23   South Carolina law; (2) New Hampshire's Consumer Protection Act protects consumers who

24   purchased price-fixed products; and (3) the Arkansas Deceptive Trade Practices Act was intended

25   to protect the interests of consumers, including victims of price-fixing.

26   **II.    Applying Federal Statutory Antitrust Standing Requirements Contravenes *Illinois Brick* Repealer Laws.**

27

28         Article III standing is different from statutory standing, which asks whether "*this* plaintiff

1166630.13

1    has a cause of action under the statute." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 97

2    n.2 (1998) (emphasis in original).  Defendants challenge Plaintiffs' *statutory* standing under **state**

3    **law** by using the federal prudential standing analysis of *Associated General Contractors of*

4    *California v. California State Council of Carpenters* ("*AGC*"), 459 U.S. 519 (1983).  In *AGC*, the

5    Supreme Court interpreted the "scope of the private remedy created by" Congress in Section 4 of

6    the Clayton Act in order to understand the "class of persons who [could] maintain a private

7    damages action under" that legislatively conferred cause of action.  *Lexmark Int'l, Inc. v. Static*

8    *Control Components, Inc.*, No. 12-873, 2014 U.S. LEXIS 2214, at *15 (U.S. Mar. 25, 2014)

9    (clarifying that *AGC* concerns statutory, not constitutional or prudential standing).  *AGC* came

10   down after *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 737-38 (1977), which held that indirect

11   purchasers could not recover damages under the Clayton Act.  *AGC*, therefore, does not even

12   speak to the standing of indirect purchasers, who already cannot bring suit under federal law.

13   Rather, it addresses the standing of other categories of plaintiffs even more remote from the

14   original direct transaction.  For example, *AGC* itself concerned the standing of a carpenters' union

15   (not the carpenters themselves) to bring a Sherman Act claim arising from defendant contractor

16   associations' alleged coercion of landowners and general contractors to give some of their

17   business to nonunion contracting firms.  *AGC*, 459 U.S. 527-28.  So it is no surprise that virtually

18   every court evaluating standing under state laws that have repealed *Illinois Brick* has rejected

19   *AGC* challenges to indirect purchaser actions, including courts in this District.[1]

20           And so, *AGC* at most applies to only those state statutes where there is "a clear directive

21   from those states' legislatures or highest courts" to apply it.[2]  Otherwise, federal law should not

---

22   [1] *See, e.g.*, *ODDs I*,  2011 U.S. Dist. LEXIS 101763, at *44-46 (*AGC* test met at pleading stage);
23   *In re Cathode Ray Tube (CRT) Antitrust Litig.* ("*CRTs*"), 738 F. Supp. 2d 1011, 1023-24 (N.D.
     Cal. 2010) (same); *In re TFT-LCD (Flat Panel) Antitrust Litig.* ("*LCDs I*"), 586 F. Supp. 2d 1109,
24   1123 (N.D. Cal. 2008) (same); *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1156
     (N.D. Cal. 2009) (same); *In re Graphics Processing Units Antitrust Litig.* ("*GPUs II*"), 540 F.
25   Supp. 2d 1085, 1099 (N.D. Cal. 2007) (same); *In re Auto. Parts Antitrust Litig.* ("*Auto Parts*"),
     No. 12-md-02311, 2013 U.S. Dist. LEXIS 80338, at *63-66 (E.D. Mich. June 6, 2013) (car
26   purchasers in price-fixing conspiracy of automotive wire harness systems); *In re Intel Corp.*
     *Microprocessor Antitrust Litig.*, 496 F. Supp. 2d 404, 410 (D. Del. 2007) (purchasers of
27   computers containing a price-fixed computer chip).
     [2] *See, e.g.*, *LCDs I*, 586 F. Supp. 2d at 1123 (citing *In re Graphics Processing Units Antitrust*
28   *Litig.* ("*GPUs I*"), 527 F. Supp. 2d 1011, 1097 (N.D. Cal. 2007)); *ODDs I*, 2011 U.S. Dist.

*Footnote continued on next page*

1   be read into substantive state antitrust law.  *GPUs I*, 527 F. Supp. 2d at 1025; *see also*

2   *California v. ARC Am. Corp.*, 490 U.S. 93, 105 (1989) (*AGC* did not impose a federal standard on

3   state causes of action).  Defendants rely primarily on Judge Hamilton's opinions in *In re Dynamic*

4   *Random Access Memory (DRAM) Antitrust Litig.* ("*DRAM I*"), 516 F. Supp. 2d 1072 (N.D. Cal.

5   2007), and *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.* ("*DRAM II*"), 536 F.

6   Supp. 2d 1129 (N.D. Cal. 2008), the first post-CAFA case to consider the application of *AGC* to

7   state indirect purchaser statutes.  Judge Hamilton recognized her ruling was not without

8   controversy, *DRAM II*, 536 F. Supp. 2d at 1142, and certified it for interlocutory appeal.  The

9   Ninth Circuit never ruled on the appeal because the case settled.  Other judges in this district,

10  including Judges Illston, Alsup, and Seeborg, have considered and rejected the applicability of

11  *AGC*.  *See GPUs I*, 527 F. Supp. 2d at 1026; *LCDs I*, 586 F. Supp. 2d 1122; *ODDs I*, 2011 U.S.

12  Dist. LEXIS at 101763.  As explained by Judge Alsup in *GPUs I*, 527 F. Supp. 2d at 1026:

13
> Standing under each state's antitrust statute is a matter of that state's law.  It would
14
> be wrong for a district judge, in *ipse dixit* style, to bypass all state legislatures and
> all state appellate courts and to pronounce a blanket and nationwide revision of all
15
> state antitrust laws.  The rule urged by the defense may (or may not) be sound
> policy but that is a matter for the state policy makers to decide, not for a federal
16
> judge to impose by fiat.

17  All of the state laws under which Plaintiffs bring their claims permit indirect purchasers to

18  recover damages for state antitrust law violations.[3]  Defendants improperly seek to "'repeal' the

19  *Illinois Brick* 'repealers.'"  *ODDs I*, 2011 U.S. Dist. LEXIS 101763, at *45 ("it is difficult to

20  imagine an indirect purchaser ever having antitrust standing under defendants' formulation").

21          Applying *AGC* would contradict the legislative intent behind *Illinois Brick* repealer

22  statutes and would conflict with the substantive state antitrust laws under which Plaintiffs are

23  suing.  Except Nebraska, courts in the other twenty-eight states at issue either have not adopted

24  _____

*Footnote continued from previous page*
25  LEXIS 101763, at *44-46 (same).

[3] Defendants concede this as to the majority of state laws under which Plaintiffs bring their claims
26  by raising the *Illinois Brick* issue only for Montana and Missouri.  (Mot. at 20-23.)  Defendants
did not address applicability of *AGC* factors in Arkansas, Massachusetts, Minnesota, Missouri,
27  North Carolina, South Carolina, South Dakota, and Utah (Mot. at 4-5), implicitly conceding that
*AGC* does not apply to the substantive antitrust laws of those states.  Plaintiffs therefore do not
28  address the applicability of *AGC* to those states here.

PLS.' OPP. TO SUPPL. MOT. TO DISMISS
CONSOLIDATED AM. COMPLAINT (PHASE II)
13-MD-02420-YGR

1    the *AGC* factors or maintain laws that conflict with *AGC* standing requirements.[4]  For instance,

2    the Minnesota and Missouri Supreme Courts have held that *AGC* does *not* apply to claims

3

4    [4] *See* **Arizona**:  *Bunker's Glass Co. v. Pilkington PLC*, 206 Ariz. 9, 16 (2003) (no cases showed "Arizona courts look to the federal courts for guidance on the threshold issue of who may bring a state-law-based claim in state court"); *In re Pool Prods. Distrib. Mkt. Antitrust Litig.*, 946 F.

5    Supp. 2d 554, 567-68 (E.D. La. 2013); *In re G-Fees Antitrust Litig.*, 584 F. Supp. 2d 26, 38 (D.D.C. 2008); *Flash Memory*, 643 F. Supp. 2d at 1153; **District of Columbia**:  D.C. Code § 28-

6    4509(a) ("*Any* indirect purchaser in the chain of . . . distribution . . . upon proof of payment of . . . any . . . overcharge . . . *shall be deemed to be injured* . . . ." (emphasis added)); *Holder v. Archer*

7    *Daniels Midland Co.*, No. 96-2975, 1998 D.C. Super. LEXIS 39, at *4-13 (Nov. 4, 1998) (applying *Illinois Brick* dissent's standing test); *Peterson v. Visa U.S.A. Inc.*, No. 03-8080, 2005

8    D.C. Super. LEXIS 17, at *5-9 (Apr. 22, 2005) (not applying *AGC* factors); *GPUs II*, 540 F. Supp. 2d at 1097; **Florida**:  *Pool Prods.*, 946 F. Supp. 2d at 568-69 (no "Florida case in which a

9    court applied the *AGC* factors to determine standing under the FDUTPA"); *In re Wellbutrin XL Antitrust Litig.*, 260 F.R.D. 143, 158-60 (E.D. Pa. 2009) (permitting suit by indirect purchasers

10    under the FDUTPA without applying *AGC* factors); *Mack v. Bristol-Myers Squibb Co.*, 673 So. 2d 100, 107 (Fla. Ct. App. 1996); **Illinois**:  740 Ill. Comp. Stat. 10/7 ("No provision of this Act

11    shall deny any person who is an indirect purchaser the right to sue for damages."); *Laughlin v. Evanston Hosp.*, 133 Ill. 2d 374, 386-88 (1990) (did not apply *AGC*); *Cnty. of Cook v. Philip*

12    *Morris, Inc.*, 353 Ill. App. 3d 55, 60-64 (2004); **Kansas**:  *Bergstrom v. Noah*, 266 Kan. 829, 845 (Kan. 1999) (federal "authority is not binding upon any court in Kansas interpreting Kansas

13    antitrust laws."); *Orr v. Beamon*, 77 F. Supp. 2d 1208, 1211-12 (D. Kan. 1999); *Flash Memory*, 643 F. Supp. 2d at 1152; *Four B. Corp. v. Daicel Chem. Indus., Ltd.*, 253 F. Supp. 2d 1147, 1151-

14    53 (D. Kan. 2003); *GPUs II*, 540 F. Supp. 2d at 1097 ("antitrust statute[] of . . . Kansas do[es] not contain [a] harmonization provision[]"); **Maine**:  *Flash Memory*, 643 F. Supp. 2d at 1152 (not

15    applying *AGC* to Maine antitrust law); *GPUs II*, 540 F. Supp. 2d at 1097; **Michigan**:  *Flash Memory*, 643 F. Supp. 2d at 1152-53 (not applying *AGC* to Michigan antitrust claims); *GPUs II*,

16    540 F. Supp. 2d at 1097; **Mississippi**:  *Owens Corning v. R.J. Reynolds Tobacco Co.*, 868 So. 2d 331, 343-44 (Miss. 2004) (not applying *AGC* factors); *Flash Memory*, 643 F. Supp. 2d at 1152-

17    53; *GPUs II*, 540 F. Supp. 2d at 1097; **Nevada**:  *Flash Memory*, 643 F. Supp. 2d at 1153 (not applying *AGC* to Nevada antitrust law); *CRTs*, 738 F. Supp. 2d at 1023; **New Hampshire**:

18    *LaChance v. US Smokeless Tobacco Co.*, 156 N.H. 881 (2007) (not applying *AGC*); *In re DDAVP Indirect Purchaser Antitrust Litig. v. Ferring Pharms., Inc.*, 903 F. Supp. 2d 198, 231 (S.D.N.Y.

19    2012) (New Hampshire legislature intended for indirect purchasers to have standing); **New Mexico**:  *LCDs I*, 586 F. Supp. 2d at 1123; *Romero v. Philip Morris, Inc.*, 148 N.M. 713, 724

20    (2010) (not examining the issue of standing); **New York**:  *LCDs I*, 586 F. Supp. 2d at 1123; **North Dakota**:  *Howe v. Microsoft Corp.*, 656 N.W.2d 285 (N.D. 2003) (not applying *AGC*

21    factors); *CRTs*, 738 F. Supp. 2d at 1023; **Oregon**:  Or. Rev. Stat. § 646.715(2) ("federal decisions interpreting the analogous Sherman Act provision" "not binding"); **Tennessee**:  *Freeman Indus.*

22    *v. Eastman Chem. Co.*, 172 S.W.3d 512, 519-20 (Tenn. 2005) ("Tennessee does not have a statutory 'harmony clause'"); *D.R. Ward Constr. Co. v. Rohm & Haas Co.*, 470 F. Supp. 2d 485,

23    499-500 (E.D. Pa. 2006) (Tennessee Supreme Court would not apply *AGC*); *In re Auto. Parts Antitrust Litig.*, No. 12-md-02311, 2013 U.S. Dist. LEXIS 80338, at *77-78 (E.D. Mich. June 6,

24    2013); *GPUs II*, 540 F. Supp. 2d at 1097; **Vermont**:  *Elkins v. Microsoft Corp.*, 817 A.2d 9, 17 (Vt. 2002) (rejecting argument "that the definition of who may sue under the Act [VCFA] must

25    be consistent with the definition of who may sue under federal antitrust law."); *D.R. Ward Constr.*, 470 F. Supp. 2d at 501; *CRTs*, 738 F. Supp. 2d at 1023; **West Virginia**:  W. Va. Code

26    § 142-9-1.1 ("The purpose of this rule is to allow persons who are indirectly injured by violations of the West Virginia Antitrust Act to maintain an action for damages . . . ."); W. Va. Code § 142-

27    9-1.6 ("Construction. --  This rule shall be liberally construed to effectuate the beneficial purposes of the West Virginia Antitrust Act."); *GPUs II*, 540 F. Supp. 2d at 1097; *LCDs I*, 586 F. Supp. 2d

28    at 1122-23; *CRTs*, 738 F. Supp. 2d at 1023.

- 4 -

1    brought under those states' laws.[5]  California also has not adopted the *AGC* test.  As the Ninth

2    Circuit noted in *Samsung Electronics Co. v. Panasonic Corp.*, No. 12-15185, 2014 U.S. App.

3    LEXIS 6256, at *15 n.4 (9th Cir. Apr. 4, 2014), it is "no longer the law in California" "that the

4    interpretation of California's antitrust statute [i]s coextensive with the Sherman Act."  The

5    California Supreme Court in *Aryeh v. Canon Business Solutions, Inc.*, 55 Cal. 4th 1185, 1195

6    (2013), found:  "Interpretations of federal antitrust law are at most instructive, not conclusive,

7    when construing the Cartwright Act, given that the Cartwright Act was modeled not on federal

8    antitrust statutes but instead on statutes enacted by California's sister states around the turn of the

9    20th century." (citing *State of California ex rel. Van de Kamp v. Texaco, Inc.*, 46 Cal. 3d 1147

10   (1988)).  *See also Pool Prods.*, 946 F. Supp. 2d at 564 (*AGC* does not apply to the Cartwright Act

11   given *Clayworth v. Pfizer, Inc.*, 49 Cal. 4th 758, 781-87 (2010)).

12           Defendants rely on "harmonization" to support their arguments, but these provisions

13   cannot be applied to override the explicit intent of the state legislatures.  *See GPUs II*, 540 F.

14   Supp. 2d at 1097 (harmonization provisions do not mean that *AGC* factors apply).  The reasons

15   are two-fold.  First, harmonization clauses do not require consistency between the construction of

16   state law and the construction of federal antitrust law.  *See D.R. Ward Constr.*, 470 F. Supp. 2d

17   at 485.  Second, imposing an *AGC* standard to state laws permitting indirect purchaser actions

18   "would severely limit the number of indirect purchasers who can bring suit under the statutory

19   scheme, thereby rewriting the language of [the *Illinois Brick* repealer] and undermining the [state

20   statute's] overarching remedial goal of reaching as broadly as possible to best protect consumers

21   against antitrust violations."  *Id.*  Consequently, nationwide application of *AGC*'s statutory

22   standing analysis to various states' laws is inappropriate.  *See Flash Memory*, 643 F. Supp. 2d at

23   1153 (no across-the-board approach to antitrust standing).

24

25   _____

     [5] *Lorix v. Crompton*, 736 N.W. 2d 619, 627-28 (Minn. 2007); *Pool Prods.*, 946 F. Supp. 2d at 571
26   ("Because the legislature [in *Gibbons v. J. Nuckolls, Inc.*, 216 S.W.3d 667, 699 (Mo. 2007)] has
     expressed no intent to incorporate federal antitrust standing limits into the [Missouri
27   Merchandising Practices Act] (MMPA) and the Missouri Supreme Court has expressly allowed
     suit by indirect purchasers under the MMPA, . . . [indirect purchaser plaintiffs'] MMPA suit is
28   not barred under *Illinois Brick* and *AGC*.").

1    **III.    Defendants' Price-Fixing Conspiracy Caused the Type of Antitrust Harm to Plaintiffs That Satisfies *AGC*.**

2

3       Even if this Court were to apply *AGC*, Plaintiffs' Consolidated Amended Class Action

4   Complaint (ECF No. 256) ("Compl.") satisfies each factor.  Under *AGC*, courts consider (1) the

5   nature of plaintiffs' injuries and whether plaintiffs were "participants" in the relevant markets;

6   (2) the directness of the alleged injury; (3) the speculative nature of the alleged harm; (4) the risk

7   of duplicative recovery; and (5) the complexity in apportioning damages.  *AGC*, 459 U.S. at 538.

8   "To conclude that there is antitrust standing, a court need not find in favor of the plaintiff on each

9   factor."  *Am. Ad Mgmt., Inc. v. Gen. Tel. Co.*, 190 F.3d 1051, 1055 (9th Cir. 1999) (citing

10  *Amarel v. Connell*, 102 F.3d 1494, 1507 (9th Cir. 1996)).  "[N]o single factor is decisive."  *Id.*

11  (quoting *R.C. Dick Geothermal Corp. v. Thermogenics, Inc.*, 890 F.2d 139, 146 (9th Cir. 1989)).

12  "Instead, [courts] balance the factors."[6]  *Id.*  Plaintiffs satisfy all five factors.

13      **A.    Plaintiffs Paid Supra-Competitive Prices Caused by the Conspiracy.**

14      The first *AGC* factor evaluates whether plaintiffs have pled "(1) unlawful conduct,

15  (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful,

16  and (4) that is of the type the antitrust laws were intended to prevent."  *Id.* at 1055.  Defendants

17  do not contest (nor can they) that Plaintiffs have pled a price-fixing conspiracy – the

18  quintessential unlawful conduct that the antitrust laws were intended to prevent.  *See Verizon*

19  *Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP,* 540 U.S. 398, 408 (2004) (collusion is

20  the "supreme evil of antitrust").  Defendants instead focus on a "market participation" test that

21  they claim supports a "common-sense conclusion that retail purchasers of finished consumer

22  electronics products, such as Plaintiffs here, do not participate in the component market for

23  _____

24  [6] Defendants assert that the "failure to allege facts to establish antitrust injury is an 'independent ground' for dismissal."  (Mot. at 9.)  There is some tension regarding whether the first *AGC* factor

25  is dispositive or must be balanced along with the other factors.  *AGC* does not resolve this tension.  459 U.S. at 538 ("A number of . . . factors may be controlling.").  However, the Ninth

26  Circuit in *American Ad Management* stated that no single factor is decisive.  190 F.3d at 1055; *see also R.C. Dick Geothermal*, 890 F.2d at 146 (en banc).  *Association of Washington Public*

27  *Hospital Districts v. Philip Morris, Inc.*, 241 F.3d 696 (9th Cir. 2001), separated the "directness of the injury" and "antitrust injury" requirements as analytically distinct, thereby calling them "independent."  *Id.* at 704.  It did *not* say that the *AGC* factors should not be balanced.  In either

28  case, Plaintiffs satisfy the requirement of antitrust injury.

PLS.' OPP. TO SUPPL. MOT. TO DISMISS
CONSOLIDATED AM. COMPLAINT (PHASE II)
13-MD-02420-YGR

1    products" and therefore have no antitrust injury.  (Mot. at 6.)  Defendants' position has been

2    repeatedly rejected by courts in this District, and it is not the law.  If it were, then every single

3    indirect purchaser price-fixing case in this District – and in the United States – involving claims

4    for products containing price-fixed components would have been dismissed.  The purpose of

5    requiring antitrust injury is to "filter out complaints by competitors and others who may be hurt

6    by productive efficiencies, higher output, and lower prices, all of which the antitrust laws are

7    designed to encourage."  *U.S. Gypsum Co. v. Ind. Gas. Co.*, 350 F.3d 623, 626-27 (7th Cir. 2003).

8    That is not a concern here.

9                    **1.     Plaintiffs Suffered Classic Antitrust Injury Under *AGC*.**

10              The supracompetitive prices that Plaintiffs paid constitute "antitrust injury" as defined by

11   *AGC*.  "When horizontal price fixing causes buyers to pay more . . . than the prices that would

12   prevail in a market free of the unlawful trade restraint, *antitrust injury occurs*.  This is seen *most*

13   *often* in claims by overcharged buyers . . . ."[7]  *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d

14   979, 988 (9th Cir. 2000) (emphasis added).[8]  Here, the Complaint alleges claims based on

15   consumer purchases of batteries and battery products, the cells of which were price-fixed by

16   Defendants.  (Compl. ¶ 253.)  The Complaint also alleges that the "purpose of the conspiratorial

17   conduct of the Defendants and their co-conspirators was to raise, fix, rig or stabilize the price of

18   Lithium Ion Batteries and as a direct and foreseeable result, the price of Lithium Ion Battery

19   products."  (Compl. ¶ 267.)  This harm to consumers in the form of supra-competitive prices

20   flowing from Defendants' collusion is exactly the type of core injury that antitrust laws,

---

21   [7] The *Knevelbaard Dairies* defendants also drew fine distinctions between different purported
22   markets to invoke the market participation argument—to no avail.  232 F.3d at 989 ("defendants
     here contend that they are in one market (cheese) while the plaintiffs are in another (fluid milk).
23   But the complaint's allegations unmistakably place all parties in the milk market, the defendants
     as buyers and the plaintiffs as sellers-and even have them transacting business with each other.").
24   [8] *See also AGC*, 459 U.S. at 538 ("the Sherman Act was enacted to assure customers the benefits
     of price competition"); *Glen Holly Entm't, Inc. v. Tektronix, Inc.*, 352 F.3d 367, 375-76 (9th Cir.
25   2003) (consumers are within the area of the economy endangered by the breakdown of
     competitive conditions); *In re Aftermarket Filters Antitrust Litig.*, No. 08 C 4883, 2009 U.S. Dist.
26   LEXIS 104114, at *31 (N.D. Ill. Nov. 5, 2009) ("*AGC* was obviously never intended to apply to
     the instant situation involving claims of price fixing down a chain of distribution . . . .");
27   *Mathias v. Daily News, L.P.*, 152 F. Supp. 2d 465, 478 (S.D.N.Y. 2001) ("the prototypical
     example of antitrust injury is an allegation by consumers that they have had to pay higher prices .
28   . . as a result of a defendant's anticompetitive conduct.").

1   particularly those state laws permitting indirect purchaser actions, were designed to remedy.[9]

2              **2.**        **Consumers Are Market Participants.**

3         Defendants' argument that consumers are not market participants has no legal support.

4   The Ninth Circuit decisions referring to market participation as a prerequisite to antitrust standing

5   address only those claims that are *peripheral* to the challenged conduct and its economic effects.

6   No case has held that a consumer who has paid an overcharge has not suffered antitrust injury.

7   And, in fact, the requirement of "market participation" has been liberally construed even as to

8   those peripheral claims.  For example, in *Bhan v. NME Hospitals, Inc.*, 772 F.2d 1467 (9th Cir.

9   1985), the Ninth Circuit found a nurse-anesthetist had standing to challenge an exclusive dealing

10  arrangement between a hospital and an anesthesiologist because he participated sufficiently in the

11  market, despite doubts about whether he could even lawfully "compete" in the same market.

12  Similarly, in *American Ad Management*, 190 F.3d at 1058, an advertising broker had standing to

13  challenge a boycott by publishers of yellow pages.  In *Ostrofe v. H.S. Crocker Co.*, 740 F.2d 739,

14  745-46 (9th Cir. 1984), the court extended standing to an *employee* who blew the whistle on a

15  bid-rigging scheme.  The employee could not only seek redress for his own termination, but for

16  the effects of the bid-rigging itself, even though he "was not a competitor or consumer in the

17  [rigged] market."  *Id.*  In *Los Angeles Memorial Coliseum Commission v. NFL*, 791 F.2d 1356,

18  1363 (9th Cir. 1986), the Ninth Circuit held that a *venue* for sporting events could bring an

19  antitrust challenge to a sports league rule regarding league members.

20        Consistent with permitting those who may be *tangentially* affected by anticompetitive

21  behavior to bring antitrust claims, the Ninth Circuit has *never* denied standing to those who

22  bought products at supra-competitive prices due to price-fixing of their component parts.  As the

23  Ninth Circuit observed, "consumers and competitors are the market participants *most* likely to

24  suffer injury" from antitrust violations and are "presumptively the proper plaintiffs to allege

25  antitrust injury."  *Am. Ad Mgmt.*, 190 F.3d at 1057 (rejecting limitation that "only" consumers and

26  [9] *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977) (The "injury should
27  reflect the anticompetitive effect . . . of the violation or of anticompetitive acts made possible by
    the violation[,] . . . . the type of loss that the claimed violations . . . would be likely to cause.");
    *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1144 (9th Cir. 2003) ("no antitrust
28  violation is more abominated than the agreement to fix prices.").

PLS.' OPP. TO SUPPL. MOT. TO DISMISS
CONSOLIDATED AM.  COMPLAINT (PHASE II)
13-MD-02420-YGR

competitors qualify as "market participants"); *Glen Holly*, 352 F.3d at 372.  Plaintiffs' allegations more than meet the standard for market participation:

- Plaintiffs participated in the Lithium Ion Battery market by purchasing battery and battery products.  (Compl. ¶¶ 253, 255.)

- "A Lithium Ion Battery is purchased by a consumer as a stand-alone product, or as a substantial part of a [battery] product."  (Compl. ¶ 255.)

- Lithium Ion Batteries "do not undergo any physical alterations as they move through the chain of distribution."[10]  (Compl. ¶ 255.)

- The inflated battery prices are quickly passed on to indirect purchasers due to the vigorous price competition and thin net margins of direct purchaser original equipment manufacturers.  (Compl. ¶¶ 257-258, 260, 263-266.)

- Lithium Ion Batteries "make up a substantial component cost of Lithium Ion Battery products.  The retail price of a Lithium Ion Battery product is determined in substantial part by the cost of the Lithium Ion Battery it contains."  (Compl. ¶ 259.)

- Defendants' conspiratorial conduct was directed at and foreseeably resulted in supracompetitive prices for Lithium Ion Battery products.  (Compl. ¶ 267.)

In other words, Plaintiffs have alleged that they purchased finished products that incorporated price-fixed Lithium Ion Battery cells, and that the markets for these cells and finished products are inextricably intertwined.  Virtually all courts in this District and beyond have held under similar circumstances that *AGC* poses no bar to indirect purchasers asserting state law antitrust claims for products containing price-fixed products.  *See* note 1, *supra*.

Defendants' reliance on *DRAM II*, 536 F. Supp. 2d 1129, is unwarranted.[11]  First,

---

[10] Defendants' argument that this allegation is contradicted by the batteries' use in a variety of products (Mot. at 9) is misplaced.  Plaintiffs alleged that the *cells* were not altered as they moved through the chain of distribution.  The specific form of the cells' exterior packaging is irrelevant.

[11] The other cases Defendants cite as examples of market analysis (Mot. at 8 n.7) are inapposite.  Many involved third parties who did not buy or sell at any point in the chain of distribution.  *See Barton & Pittinos, Inc. v. Smithkline Beecham Corp.*, 118 F.3d 178, 184 (3d Cir. 1997) (provider of informational *services* relating to a vaccine lacked standing because it did not buy or sell in the market for the vaccine itself); *Lorenzo v. Qualcomm, Inc.*, 603 F. Supp. 2d 1291, 1302-03 (S.D. Cal. 2009) (consumer plaintiff did not buy or sell defendant mobile phone chip company's *licenses*, which were subjected to defendant's anticompetitive licensing practices).  This case also does not involve monopolization claims by competitors as in *Datel Holdings Ltd. v. Microsoft Corp.*, 712 F. Supp. 2d 974 (N.D. Cal. 2010).  *See Knevelbaard Dairies*, 232 F.3d at 988 ("claims by competitors [are] a category much different from that of claims between buyers and sellers" who have antitrust standing).  Nor have Plaintiffs, as happened in *In re Aftermarket Automotive Lighting Products Antitrust Litigation*, No. 09 MDL 2007-GW(PJWx), 2009 U.S. Dist. LEXIS 133088, at *17 (C.D. Cal. July 6, 2009), made *no* "effort to demonstrate that standing exists under

*Footnote continued on next page*

1    *DRAM II* is not the majority rule, and its analysis has been rejected by other courts.[12]  Second, the

2    issue of antitrust standing for indirect purchasers in *DRAM II* was never fully resolved.  Judge

3    Hamilton certified the decision for interlocutory appeal, and noted in the decision that the ruling

4    "is not without controversy or uncertainty, given the state of the law on the issues raised herein

5    with respect to antitrust injury."  *Id.* at 1142.   While that appeal was pending, the case settled for

6    $310,720,000.  *See* Indirect Purchaser Pls.' & Attys' Gen.'s Jt. Appl. for Attys' Fees, *In re DRAM*

7    *Antitrust Litig.*, No. M-02-1486-PJH (N.D. Cal. Feb. 28, 2014), ECF No. 2181.  Third, the *DRAM*

8    *II* court also gave substantial weight to the market participation factor under *AGC* even though the

9    Ninth Circuit has said no single standing factor is dispositive.  536 F. Supp. 2d at 1136-42.

10           Defendants argue that Plaintiffs have not shown market participation because they fail to

11    show the products are "reasonably interchangeable" or exhibit "cross-elasticity of demand

12    between the finished products that [Plaintiffs] purchased  and the raw Lithium Ion Battery cells

13    themselves."  (Mot. at 8.)  "Cross-elasticity of demand" means that an increase in price of one

14    product affects demand for a second, separate, product.  If raising the price of product A causes

15    demand for B to go up, the products are substitutable or "interchangeable" to some degree (the

16    opposite effect—demand for B goes down—implies they are economic "complements").  The

17    question usually comes up in cases where a court has to decide whether two distinct products,

18    such as tin foil and Saran Wrap, are in the same "market" for antitrust purposes.  Plaintiffs,

19    however, do not contend that batteries and laptops are substitutes or "reasonably

20    interchangeable"—rather, batteries are a component of laptops.  Likewise, Plaintiffs are not

21    saying they bought tin foil that was somehow affected by an antitrust violation with respect to

22    Saran Wrap.  Rather, they bought batteries in laptops at prices that were increased due to a

23    _____

*Footnote continued from previous page*
24    *AGC*."  *In re Refrigerant Compressors Antitrust Litigation*, No. 2:09-md-02042, 2013 U.S. Dist.
     LEXIS 50737 (E.D. Mich. Apr. 9, 2013), relied almost exclusively on *DRAM II* and is an outlier
25    opinion that is not persuasive relative to the reasoned approach taken by other courts in this
     District and the policy decisions made by state legislatures to expressly permit indirect purchaser
26    actions.
     [12] *See ODDs I*, 2011 U.S. Dist. LEXIS 101763, at *46 (choosing instead to rely on *LCDs* as the
27    more "careful and persuasive analysis"); *Flash Memory*, 643 F. Supp. 2d at 1153 (declining to
     follow *DRAM II*); *Auto Parts*, 2013 U.S. Dist. LEXIS 80338, at *63-66 (noting *DRAM*, but
28    applying a more lenient approach).

1   conspiracy to fix the price of batteries.  Defendants' position makes no sense, so it is unsurprising

2   that interchangeability and cross-elasticity between a product and its price-fixed component has

3   not been accepted as a requirement for showing market participation by any of the legion of

4   decisions approving standing for indirect purchasers in comparable cases.  *See* note 1, *supra*; *see*

5   *also LCDs I*, 586 F. Supp. 2d at 1118 ("there is 'no subsequent Ninth Circuit authority that

6   affirmatively endorses a general rule applying *Bhan's* reasonably interchangeable and cross-

7   elastic requirements to the market participant inquiry in section 1 cases'" and noting that

8   "reasonable interchangeability of use and cross-elasticity of demand are concepts traditionally

9   important in section 2 cases where 'definition of the 'relevant market' is key'").  Defendants' only

10  authority, *Bhan*, concerned the question of the relationship of a nurse-anesthetist to the market for

11  anesthesiologists—a question of the tin foil and Saran Wrap variety.  772 F.2d at 1471.  In any

12  event, regardless of how framed, this kind of factual question cannot possibly be resolved at the

13  pleadings stage.  *See LCDs I*, 586 F. Supp. 2d at 1123 (finding similar arguments were factual

14  questions to be determined at a later stage).

15          Finally, allegations that price-fixed components are physically traceable to end purchasers

16  are an *independent basis* for finding antitrust standing *regardless* of whether indirect plaintiffs

17  were market participants.  *LCDs I*, 586 F. Supp. 2d at 1123 (in the alternative, traceability

18  supported a finding of antitrust injury); *GPUs II*, 540 F. Supp. 2d at 1098 (same).  Here, Plaintiffs

19  have alleged that battery cells are physically traceable to the finished products that Plaintiffs

20  purchased.  (Compl. ¶¶ 255-256, 261-262.)  Such allegations weigh in favor of standing.

21          **B.      Consumer Plaintiffs Are the Parties Who Ultimately Pay the Overcharge,**
            **Making Their Injuries Sufficiently Direct.**

22

23          Plaintiffs have pled a sufficiently direct antitrust injury (the second factor) by alleging that

24  they ultimately are the parties in the distribution chain who pay the overcharge.  The direct chain

25  is:  (1) Plaintiffs purchased Lithium Ion Battery products; (2) the batteries were a substantial and

26  measurable part of the component cost of finished products; and (3) Defendants' collusion

27  foreseeably resulted in supra-competitive prices for battery products.  (Compl. ¶¶ 255-267.)  For

28  instance, the Complaint states that on December 1, 2010, LG and Samsung agreed to "raise the

1   price [of Lithium Ion Batteries for Apple's iPads] at least by 10% from the existing price."

2   (Compl. ¶ 15.)  This measurable price increase was part of the component cost of the finished

3   Apple iPad that Plaintiffs then purchased.  These allegations directly link Defendants' collusion

4   to Plaintiffs' antitrust injury.  As noted above, virtually all courts evaluating indirect purchaser

5   actions for price-fixed components of a finished product have found plaintiffs' injuries

6   sufficiently direct.  *See* note 1, *supra*.

7        Defendants, however, draw from these cases a pleading standard that does not exist.

8   (Mot. at 11-13.)  Plaintiffs are not required to plead that the price of a price-fixed component

9   comprised a majority or a specific percentage of the total cost of the finished product.  First,

10  whether the overcharge was passed on to consumers is an empirical economic question.  It will be

11  tested and demonstrated by economic evidence in discovery, just as it has been in similar indirect

12  purchaser claims in this District and elsewhere.  Second, this attack on the pleadings has been

13  rejected by other courts.  *See Dang v. S.F. Forty Niners*, No. 5:12-CV-5481 EJD, 2013 U.S. Dist.

14  LEXIS 116699, at *39 (N.D. Cal. Aug. 2, 2013) (defendant claimed the costs of producing NFL-

15  branded apparel included numerous elements beyond licensing costs, but "while this may be so,

16  such a determination would be better suited upon a fuller record"); *Auto Parts*, 2013 U.S. Dist.

17  LEXIS 80338, at *44-47 (whether "Indirect Purchaser[s] . . . meet their pleadings burden because

18  they do not include allegations as to whether an identifiable portion of the overcharges resulting

19  from price-fixing was passed on at each step of the chain" should be considered at class

20  certification or the summary judgment).

21        In other components cases, indirect purchasers have not pled specific, large percentages of

22  the cost of finished products that correspond to the price of the price-fixed component.  In *GPUs*,

23  plaintiffs did not plead that the price-fixed GPU comprised a large percentage of the price of the

24  finished product.  *See* Indirect Purchaser Pls.' 2d Am. Consol. Class Action Compl., *In re*

25  *Graphics Processing Units Antitrust Litig.*, MDL No. 1826 (N.D. Cal. Nov. 7, 2007), ECF

26  No. 248.   The *GPUs* court found that it sufficed to plead that the overcharge was *traceable*

27  through the chain of distribution.  *GPUs II*, 540 F. Supp. 2d at 1098.  In *SRAM*, the plaintiffs

28  never pled that the SRAM component comprised a majority or large percentage of the price of the

PLS.' OPP. TO SUPPL. MOT. TO DISMISS
CONSOLIDATED AM.  COMPLAINT (PHASE II)
13-MD-02420-YGR

1166630.13

1    finished product.  *See* 4th Consol. Am. Class Action Compl., *In re Static Random Access Memory*

2    *(SRAM) Antitrust Litig.*, No. M:07-md-01819-CW (N.D. Cal. Nov. 19, 2009), ECF No. 902.

3    Similarly, in *Auto Parts*, 2013 U.S. Dist. LEXIS 80338, at *67-69, indirect purchasers alleged

4    only that the price-fixed auto parts were discrete and traceable, not that they represented a

5    specific percentage of the total vehicle cost.

6          In *LCDs*, indirect purchasers *never* alleged that the cost of the LCD panels comprised a

7    large percentage of the cost of all finished LCD products at issue.  *See* Indirect Purchaser Pls.' 3d

8    Consol. Am. Compl. ¶ 214, *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 3:07-MD-1827 SI

9    (N.D. Cal. Apr. 29, 2011), ECF No. 2694 ("LCD panels typically comprise roughly 10% of the

10   retail cost of a laptop computer").  Yet, the court still found that indirect purchasers had

11   sufficiently alleged that the price of LCD panels was traceable.  *LCDs I*, 586 F. Supp. 2d at 1124.

12   Moreover, in *CRTs*, the allegation that a price-fixed component constituted a large percentage of

13   the finished product was just one of many that helped show that the price-fixed components were

14   "discrete components that can easily be traced."  *CRTs*, 738 F. Supp. 2d at 1024.  Indeed,

15   Defendants' position here would create the absurd result that Defendants could immunize

16   themselves from liability to indirect purchasers by fixing the prices of only those components that

17   comprise a small fraction of the total price of a finished product.

18         Further, the Complaint states that "Lithium Ion Batteries make up a *substantial component*

19   *cost* of Lithium Ion Battery products," and that "[t]he retail price of a Lithium Ion Battery product

20   is determined in *substantial part* by the cost of the Lithium Ion Battery it contains."  (Compl.

21   ¶ 259 (emphasis added).)  *Compare SRAM*, ECF No. 902 ¶ 154 ("SRAM is a significant cost

22   component of end-use electronic products") (indirect purchaser complaint).  Defendants'

23   argument that Plaintiffs are required to plead a specific percentage for which the cost of the cell is

24   attributable is not supported by any authority.  Requiring such specificity at the pleading stage is

25   inconsistent with the principles of notice pleading.  *LCDs I*, 586 F. Supp. 2d at 1124

26   ("inappropriate to determine 'complex and intensely factual' damages issues without 'a more

27   fully developed factual record'" (quoting *Intel*, 496 F. Supp. 2d at 410)).  Moreover, Defendants

28   cannot on the one hand require Plaintiffs to plead that which can only be determined through

1    discovery, and on the other hand, vigorously oppose the commencement of even a Rule 26(f)

2    conference.  (*See* Jt. Statement Regarding Meet & Confer at 5-8 (N.D. Cal. Feb. 28, 2014), ECF

3    No. 396.)

4          **C.**      **Plaintiffs Allege Economic Factors Making Injury Highly Probable.**

5          The Complaint satisfies the third *AGC* factor because Plaintiffs' alleged harm is not

6    speculative.  Plaintiffs allege that battery prices are traceable, that such traceability shows how

7    much the prices paid by indirect purchasers changed, that the majority (or all) of the overcharges

8    due to price-fixing were passed on to indirect purchasers, and that statistical regression analysis

9    can "isolate how changes in the price of Lithium Ion Batteries impact the price of Lithium Ion

10   Battery products." (Compl. ¶¶ 255-269.)  Indeed, "California courts routinely recognize a

11   presumption of class-wide impact for indirect purchaser antitrust price-fixing claims."  *In re*

12   *Static Random Access Memory Antitrust Litig.* ("*SRAM*"), 264 F.R.D. 603, 612 (N.D. Cal. 2009).

13   Other courts in this District and beyond have found, under almost identical circumstances, that

14   such allegations satisfy the third *AGC* factor.  *See* note 1, *supra*.

15         Yet Defendants call the task of proving damages "daunting" because Plaintiffs "have

16   purchased an extremely broad array of consumer products, from notebook computers to power

17   tools," making proof of damages "unduly speculative."  (Mot. at 10.)  The issue of *calculation* of

18   damages is a different concept from *whether* Plaintiffs were harmed.  And Plaintiffs need only

19   calculate a fair and reasonable estimate of damages, not the precision Defendants suggest.

20   *Bigelow v. RKO Radio Pictures, Inc*., 327 U.S. 251, 265-66 (1946).  Regardless, how damages

21   are calculated is a much different question than whether Plaintiffs have suffered injury from

22   Defendants' anticompetitive conduct.  *Id*. at 266 ("Difficulty in ascertainment is [not to be]

23   confused with right to recovery").

24         *SRAM* is instructive.  In *SRAM*, the indirect purchaser action involved three types of

25   SRAM that were used in a variety of product markets, including:  (1) the communications market

26   in cell phones and Voice Over Internet Protocol technology; (2) the computer market in servers,

27   mainframes, high-end computer work stations, and personal digital assistants and smart phones;

28   and (3) the networking communications market in routers, switches, proxy and gateway devices,

modems, storage area networks and firewalls.  264 F.R.D. at 606.  Original equipment

manufacturers sold SRAM directly to consumers and incorporated them into products that were

eventually purchased by end users.  *Id.*  The defendants argued that the distribution chain was too

complex to discern evidence of pass-through damages.  *Id.* at 614.  The court rejected that

argument, holding that "divergent pricing and sales practices are not necessarily an impediment to

measuring pass-through."  *Id.*  Moreover, the court stressed that "contentions of infinite diversity

of product, marketing practices, and pricing have been made in numerous cases and rejected" and

"identical products, uniform prices, and unitary distribution patterns are not indispensable."  *Id.*

(citation and quotation marks omitted).

        In *LCDs*, indirect purchasers bought notebook computers, desktop monitors, and

televisions.  The *LCDs* defendants also raised concerns about the "complexity and heterogeneity

of the TFT-LCD market," including the "customized nature of some TFT-LCD panels," claiming

that "pass-through decisions differ by customer, model, stage of distribution, and over time[.]"  *In

re TFT-LCD Antitrust Litig.* ("*LCDs II*"), 267 F.R.D. 583, 603 (N.D. Cal. 2010).  The court,

however, found on class certification that the complexity of the LCDs market did not render

assessing harm speculative or infeasible.  *Id.* at 604.

        Such a result is consistent with the standards applied to the third *AGC* factor.  For

instance, in *American Ad Management*, the Ninth Circuit found that even where the plaintiff's

damages were "complicated by the fact that discounts given to customers were negotiated on a

*case-by-case* basis and the fact that discounts varied over time," harm was not too speculative.

190 F.3d at 1059 (emphasis added).  The Ninth Circuit recognized that "[c]omplex antitrust

cases . . . invariably involve complicated questions of causation and damages."  190 F.3d at 1059

(quoting *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1478 (9th Cir. 1997)).  This complexity is

common to antitrust cases and not a ground for finding the measure of harm too speculative.

Further, "it would be inappropriate to determine 'complex and intensely factual' damages issues

without 'a more fully developed factual record.'"[13]  Plaintiffs have met their pleading burden.

---

[13] *LCDs I*, 586 F. Supp. 2d at 1124 (quoting *Intel*, 496 F. Supp. 2d at 410); *see also GPUs II*,
540 F. Supp. 2d at 1098; *Auto Parts*, 2013 U.S. Dist. LEXIS 80338, at *70-71 ("Although it may
prove to be impossible to calculate and apportion damages for IPPs," their allegations "have met

*Footnote continued on next page*

1

### D.    The Risk of Duplicative Recovery Does Not Weigh Against Standing.

2        The fourth *AGC* factor examines the risk of duplicative recovery, but this test cannot

3   apply to claims brought under *Illinois Brick* repealer statutes whose very purpose is to permit

4   recoveries by indirect purchasers.  As *ARC America* explained, 490 U.S. at 105:

5        *Illinois Brick*, as well as *Associated General Contractors* . . . were cases
         construing § 4 of the Clayton Act; in none of those cases did the Court identify a
6        federal policy against States imposing liability in addition to that imposed by
         federal law. . . .  [S]tate causes of action are not pre-empted solely because they
7        impose liability over and above that authorized by federal law, . . . and no clear
         purpose of Congress indicates that we should decide otherwise in this case.
8

9   *See also Flash Memory*, 643 F. Supp. 2d at 1156 (concern "that a duplicative recovery 'is a near

10  certainty' given that the Direct Purchasers' claims also are before the Court" "generally is

11  inapposite in the context of indirect purchaser state law antitrust claims"); *Auto Parts*, 2013 U.S.

12  Dist. LEXIS 80338, at *71 (same).  *Illinois Brick* did not preempt state law.  Liability under both

13  federal and state antitrust laws is simply the consequence of a price-fixing conspiracy and

14  principles of federalism and respect for state laws.

15       ### E.    Damages Can Be Reliably Estimated Through Regression Analyses.

16       The fifth *AGC* factor examines the complexity in apportioning damages.  To the extent

17  that this factor relates to apportioning damages between direct and indirect purchasers, this factor

18  does not apply because indirect purchasers bring claims under state law.  State law provides a

19  separate right to damages and does not require apportioning damages between direct and indirect

20  purchasers.  *ARC Am.*, 490 U.S. at 105 (*AGC* construed federal law and did not impose a federal

21  standard on state causes of action).  In any case, Plaintiffs allege damages are traceable, the cost

22  of the batteries comprised a substantial portion of the cost of the finished product, and that

23  regression analysis could determine the amount of overcharge.[14]  *See* Section III.C, *supra.*  Such

24  _____

25  *Footnote continued from previous page*
    their pleading burden.").

26  [14] In *Knowles v. Visa U.S.A.*, No. CV-03-707, 2004 Me. Super. LEXIS 227 (Oct. 20, 2004),
    *Kanne v. Visa U.S.A. Inc.*, 272 Neb. 489 (2006), and *Fucile v. Visa U.S.A., Inc.*, No. S1560-03
27  Cnc, 2004 Vt. Super. LEXIS 42 (Dec. 27, 2004) (cited at Mot. at 10-11), the plaintiffs were
    neither direct nor indirect purchasers.  Instead, they asserted a derivative injury based on a theory
    that merchants passed on the cost of a tying of debit processing services to increase the prices of
28  thousands of unrelated retail goods the merchants sold to consumers.

1166630.13

1  allegations are sufficient to satisfy the fifth *AGC* factor. *LCDs I*, 586 F. Supp. 2d at 1124; *GPUs*

2  *II*, 540 F. Supp. 2d at 1098 (pleading that damages are traceable is sufficient to find that

3  apportioning damages and accounting for duplicative recoveries could be done). Indeed,

4  regression analyses have been approved as a common method of showing class injuries in other

5  electronic component indirect purchaser cases. *See In re Cathode Ray Tube (CRT) Antitrust*

6  *Litig.*, No. C-07-5944-SC, 2013 U.S. Dist. LEXIS 137946, at *79-80 (N.D. Cal. Sept. 24, 2013)

7  (regression analysis sufficient to show common impact to support class certification for indirect

8  purchasers of CRTs); *LCDs II*, 267 F.R.D. at 601-04 (same). Here, apportioning damages would

9  rely on well-established regression analysis that has been used in similar electronic component

10 cases involving indirect purchasers. This factor weighs in favor of antitrust standing.

11 **IV.    Utah Plaintiff Sue Hiller Has Standing.**

12        Utah Plaintiff Sue Hiller is a former resident of Utah who purchased a Lithium Ion Battery

13 product *in Utah*. (2d Consol. Am. Compl. ¶ 437 (N.D. Cal. Mar. 26, 2013), ECF No. 407-3.)

14 Therefore, even under Defendants' version of constitutional standing that requires the plaintiff "to

15 have purchased a lithium ion battery product in . . . Utah while a resident of [that] state[]" (Mot.

16 at 13), Plaintiff Hiller has constitutional standing.

17 **V.    Plaintiffs Have Standing to Represent Class Members from Other States.**

18        Courts regularly refuse to dismiss state law class claims on the ground that a named

19 plaintiff did not reside in or suffer harm in those states, recognizing that this issue, if relevant at

20 all, should be resolved at the class certification stage.[15] Defendants correctly note that, in a class

21 action, each named plaintiff "must allege and show that they personally have been injured,"

22 *Lewis v. Casey*, 518 U.S. 343, 357 (1996) (citation and quotation marks omitted). Here, each

23 named Plaintiff has done that by alleging that they purchased Lithium Ion Battery products

24 _____

25 [15] *See, e.g.*, *In re Hydroxycut Mktg. & Sales Practices Litig.* ("*Hydroxycut I*"), 801 F. Supp. 2d 993, 1005 (S.D. Cal. 2011) (declining "to dismiss the claims brought under the laws of states in which the named Plaintiffs do not reside"); *In re Bayer Corp. Comb. Aspirin Prods. Mktg. &*

26 *Sales Practices Litig.*, 701 F. Supp. 2d 356 (E.D.N.Y. 2010); *Ramirez v. STi Prepaid LLC*, 644 F. Supp. 2d 496, 505 (D.N.J. 2009) (deferring issue to "class certification stage"); *In re Grand Theft*

27 *Auto Video Game Consumer Litig.*, No. 06 MD 1739, 2006 U.S. Dist. LEXIS 78064, at *6-8 (S.D.N.Y. Oct. 25, 2006) (same); *In re Buspirone Patent Litig.*, 185 F. Supp. 2d 363, 377

28 (S.D.N.Y. 2002) (same); *Auto Parts*, 2013 U.S. Dist. LEXIS 80338, at *53-54 (same).

PLS.' OPP. TO SUPPL. MOT. TO DISMISS
CONSOLIDATED AM. COMPLAINT (PHASE II)
13-MD-02420-YGR

1   containing price-fixed Lithium Ion Battery cells, thereby suffering injury.  (Compl. ¶¶ 312-365.)

2   "Once threshold individual standing by the class representative is met, a proper party to raise a

3   particular issue is before the court, and there remains no further separate class standing

4   requirement in the constitutional sense."  *Krell v. Prudential Ins. Co. of Am.*, 148 F.3d 283, 306-

5   07 (3d Cir. 1998) (citation and quotation marks omitted).

6   ### A.        Adequacy and Typicality Are Class Certification Issues.

7         Defendants seek to impose an extra requirement at the pleading stage: the presence of a

8   named Plaintiff from each state at issue – an issue that Defendants contend is one of

9   "constitutional standing."  Defendants conflate Article III standing with whether the named class

10  representatives have sufficiently similar injuries and claims to absent class members from other

11  states.  This inquiry involves the adequacy and typicality requirements under Federal Rule of

12  Civil Procedure 23.  As the court explained in *Hydroxycut I*, "the issue of individual standing is

13  separate and distinct from the inquiry of whether named plaintiffs can meet the requirements to

14  certify a class under Rule 23."  801 F. Supp. 2d at 1005.  In *Hydroxycut I*, defendants argued in a

15  motion to dismiss that a plaintiff class asserting that product misrepresentations violated the

16  consumer protection statutes of numerous states must be dismissed for lack of standing as to each

17  state for which there was no resident named plaintiff.  *Id.* at 1004-05.  *Hydroxycut I*

18  acknowledged that "[c]ourts are in disagreement over this issue" and took note of *GPUs I*, upon

19  which defendants relied.  *Id.* at 1004.  The *Hydroxycut I* court ruled, however, that the issue of the

20  relationship between the named plaintiffs and the state laws asserted was best addressed at class

21  certification:

22        Defendants' argument appears to conflate the issue of whether the named Plaintiffs
          have standing to bring their individual claims with the secondary issue of whether
23        they can meet the requirements to certify a class under Rule 23.  Defendants do not
          contest the fact that the named Plaintiffs have standing to bring their individual
24        claims. The Complaint makes clear that the so-called "sister state" consumer
          protection laws are only implicated by members of the putative class . . . .  Hence,
25        *the fact that the named Plaintiffs may not have individual standing to allege
          violations of consumer protection laws in states* other than those in which they
26        purchased Defendants' calling cards *is immaterial*.  The issue Defendants raise is
          one of predominance-whether "questions of law or fact common to class members
27        predominate over any questions affecting only individual members."

28  *Id.* at 1004-05 (citation omitted) (emphasis added).

1    Many other courts have followed the same reasoning. As explained in *Bayer*, where the

2    defendants made similar arguments:

3        The relevant question . . . is not whether the Named Plaintiffs have standing to sue
         Defendants – they most certainly do – but whether their injuries are sufficiently
4        similar to those of the purported Class to justify the prosecution of a nationwide
         class action. *This question is . . . appropriately answered through the class
5        certification process.*

6    701 F. Supp. 2d at 377 (emphasis added) (citation omitted).[16] Thus, the absence of a class

7    representative for a given state does not warrant dismissal of claims under that state's laws at the

8    pleadings stage.

9    Defendants' reliance on *Easter v. American West Financial*, 381 F.3d 948, 962 (9th Cir.

10   2004), is misplaced. In *Easter*, plaintiffs alleged that various defendants violated Washington's

11   consumer protection and usury laws in making loans. *Id.* at 954-56. The court concluded that

12   plaintiffs did not have standing to sue all of the defendant banks because (1) the named plaintiffs

13   had not taken loans from some of those defendants, and (2) plaintiffs could not demonstrate a

14   conspiracy between the banks from which they had obtained loans and those from which they had

15   not. *Id.* at 962-63. That is patently not the case here, where each Defendant – through their

16   collusion – is alleged to have harmed the Plaintiffs.

17   Defendants claim that *Easter* "expressly limited [*Ortiz v. Fibreboard Corp.*, 527 U.S. 815

18   (1999)] to its facts" and noted that "*Fibreboard* does not require courts to consider class

19   certification before standing." (Mot. at 17 (quoting *Easter*, 381 F.3d at 961-62).) But

20   recognizing that standing *may* be considered at any point is a far cry from Defendants' insistence

21   that whether there is a named plaintiff in each separate state is a standing question that *must* be

22   resolved now. *Easter* gave district courts discretion to handle the issues of standing and class

23   certification in whichever order best suits the circumstances.[17] Here, where the subclasses are

---

[16] *Accord Auto Parts*, 2013 U.S. Dist. LEXIS 80338, at *48-55; *In re Flonase Antitrust Litig.*, 692 F. Supp. 2d 524, 534 (E.D. Pa. 2010); *Woodard v. Fid. Nat'l Title Ins. Co.*, No. CIV 06-1170 RB/WDS, 2007 U.S. Dist. LEXIS 97455, at *11-13 (D.N.M. Dec. 4, 2007); *In re Relafen Antitrust Litig.*, 221 F.R.D. 260, 268-70 (D. Mass. 2004), *potentially abrogated on other grounds Holster v. Gatco, Inc.*, 559 U.S. 1060, 1062 (2010) (Scalia, J. concurring); *In re Buspirone Patent Litig.*, 185 F. Supp. 2d 363, 377 (S.D.N.Y. 2002).

[17] Defendants' remaining authority rely on *Easter*, but *Easter* did not mandate pleading a class representative in each state whose law is being asserted as a matter of constitutional standing.

PLS.' OPP. TO SUPPL. MOT. TO DISMISS
CONSOLIDATED AM. COMPLAINT (PHASE II)
13-MD-02420-YGR

1   managerial, not compulsory, the issue is best addressed at class certification.

2         Defendants' cases also include little analysis.[18] They never address the point made in

3   *Hydroxycut I* that constitutional standing is established by the class representatives, and that the

4   question of class representative adequacy for representing class members in other states is

5   inherently a question of certifiability, not constitutional standing.[19]  *Meijer, Inc. v. Abbott*

6   *Laboratories*, No. C 07-5985 CW, 2008 U.S. Dist. LEXIS 78219, at *12 (N.D. Cal. Aug. 27,

7   2008), strays far afield.  The passage quoted by Defendants in *Meijer* (Mot. at 16) pertained to a

8   discussion about whether a named plaintiff's assignment of claim was valid.  Obviously, such

9   assignments have nothing to do with the present inquiry.

10         Lastly, Defendants' purported distinction between (1) cases that deferred questions of

11   adequacy for class certification because plaintiffs pled a nationwide class and (2) cases that

12   involved state classes only (Mot. at 18) *undercuts*, rather than advances, Defendants' argument.

13   First, the Complaint alleges a nationwide class, with state subclasses pled only in the alternative.

14   (Compl. ¶¶ 399, 401.)  Thus, under Defendants' own distinction, the issue of adequacy should be

15   handled at class certification, not on a motion to dismiss.  Further, many of the authorities that

16   deferred this issue concern the exact situation here, where indirect purchasers invoked the state

17   antitrust and consumer protection laws of a variety of different states: *Hydroxycut I*, *Auto Parts*,

18   *Flonase*, *Relafen*, and *Buisprone*, *supra*.  Similarly, *Grand Theft Auto* and *Woodard*, *supra*,

19   involved numerous state classes.  In those cases, the courts properly ruled that whether named

20   plaintiffs could adequately assert the claims of class members in other states was a question best

21   addressed at certification, when the court can consider facts, not hypotheticals.  Thus,

22

23   [18] *LCDs I* and *Flash Memory* never decided this issue because plaintiffs added new plaintiffs from
     other states. 586 F. Supp. 2d at 1125; 643 F. Supp. 2d at 1164.  *GPUs I* acknowledged that this
24   issue could be addressed at class certification, but chose, in its discretion, to address it earlier.
     527 F. Supp. 2d at 1026-27.

25   [19] Some of Defendants' authorities have other infirmities.  *DRAM I*, 516 F. Supp. 2d at 1103-04,
     was criticized for its use of authority that has been overruled.  *See Kandel v. Brother Int'l Corp.*,
26   No. CV 08-1040 DSF (RCx), 2009 U.S. Dist. LEXIS 105242, at *5 n.5 (C.D. Cal. May 12, 2009)
     (*DRAM I* relied on a decision on tolling of statute of limitations later effectively overruled by
27   Ninth Circuit).  The ruling in *In re Ditropan XL Antitrust Litigation*, 529 F. Supp. 2d 1098, 1108
     (N.D. Cal. 2007), that no class actions were available on New York Donnelly Act claims was
28   abrogated by *Shady Grove*, 559 U.S. 393.

1    determination of the suitability of state subclasses is premature.

2          **B.      Because the Proposed Subclasses Are Managerial, Not Compulsory, a**
             **Governmental Entity in Every State Is Not Required.**
3

4          Defendants' argument against "state-specific governmental 'subclasses'" (Mot. at 19) is

5    also misplaced because Plaintiffs' governmental subclasses are managerial, not compulsory.

6    Plaintiffs proactively plead alternative governmental subclasses to demonstrate to the Court the

7    availability of various managerial tools that could be used later in this case if needed, *i.e.*, at the

8    class certification phase and beyond.  Defendants improperly seize upon Plaintiffs' forward-

9    thinking pleading as a defect.  As discussed below, where a subclass is managerial, it is not

10   necessary to have a named plaintiff representing each such subclass.

11         **1.      Managerial Subclasses Need Not Meet Rule 23(a) Requirements.**

12         It is only necessary to have a government subclass if there are conflicts with other class

13   members, a fact not yet shown.  When members of the entire class have conflicts amongst

14   themselves, it is compulsory to divide the class into subclasses, each with its own distinct and

15   adequate representative and counsel.  *See, e.g.*, *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591,

16   625 (1997).

17         But where, as here, no conflict of interest exists among class members, division into

18   subclasses is a managerial device employed at the discretion of the district court under Rule 23(d)

19   rather than Rule 23(c)(5).  Such subclasses need not independently meet the Rule 23(a)

20   requirements of commonality, numerosity, typicality, and adequacy of representation.  *See Am.*

21   *Timber & Trading Co. v. First Nat'l Bank*, 690 F.2d 781, 786-87 (9th Cir. 1982).  In *American*

22   *Timber*, plaintiffs alleged that a bank had committed usury in two ways: by using the 365/360

23   method of calculating interest and by requiring compensating balances.  *Id.* at 783-84.  The

24   district court created a subclass of members who were affected by the compensating balance

25   calculation.  Defendants objected that the class did not meet Rule 23's requirements of

26   commonality, numerosity, typicality, and adequacy of representation.  *Id.* at 785 n.5.  However,

27   the Ninth Circuit disagreed:  "The creation of [the] subclass was within the district court's broad

28   power under Fed. R. Civ. P. 23(d) to adopt procedural innovations to facilitate management of the

1  class action." *Id.* at 786.   Consequently, meeting Rule 23(a) class elements was not required. *Id.*

2  at 786-87.

3          Many other courts have adopted the *American Timber* approach to managerial subclasses.

4  For example, *Casale v. Kelly*, 257 F.R.D. 396, 408-09 (S.D.N.Y. 2009), created a managerial

5  subclass explaining, "[a] case-management subclass may be 'created solely to expedite resolution

6  of the case by segregating a distinct legal issue that is common to some members of the existing

7  class.'"  The court reasoned, "[w]hen 'the subclassification is appropriate under Rule 23(d), it is

8  unnecessary to evaluate it under Rule 23 for commonality, numerosity, typicality, and adequacy

9  of representation.'"  *Id.* at 409 & n.99 (a court may craft subclasses to confront factual

10  distinctions even with only one named plaintiff, which would necessitate disregarding the formal

11  Rule 23 adequacy requirement).

12          Similarly, *Alexander v. City of Gretna*, No. 06-5405, 2009 U.S. Dist. LEXIS 95177, at

13  *16 (E.D. La. Sept. 28, 2009), addressed the certifiability of three managerial subclasses.

14  Defendants attacked numerosity.  The court rejected that argument because Subclass C was a

15  managerial subclass, not a compulsory one. *Id.*  "[T]he court may in its discretion certify subclass

16  C, even if [it] does not strictly meet the criteria[,] if the court finds that it will facilitate the

17  management of the case." *Id.*; *see also In re United Energy Corp. Solar Power Modules Tax*

18  *Shelter Inv. Sec. Litig.*, 122 F.R.D. 251, 253-54 (C.D. Cal. 1988) (citing *American Timber*) ("A

19  subclass generally must independently meet all Rule 23(a) requirements. . . .   However, a smaller

20  subclass is appropriate where the subclass is created by the court for increased manageability, and

21  where there is no antagonism between members of the subclass and members of the class at

22  large."); *see generally* Newberg on Class Actions § 7:29 (5th ed. 2010) (distinguishing between

23  compulsory and managerial subclasses, which do not require adequate representatives distinct

24  from the larger class).  In such situations, the subclasses effectively do not constitute independent

25  classes, but are "treated informally."  Susan Bisom-Rapp, *The Use of Subclasses in Class Action*

26  *Suits under Title VII*, 9 Indus. Rel. L.J. 116, 137 (1987).

27                          **2.       No Conflicts Exist Between Class Members.**

28          The subclasses proposed here involve no conflict among class members, and Defendants

- 22 -

1   do not (and cannot) identify such a conflict.  Individual natural persons, private entities,

2   businesses, and local government entities are all end payors who share a common interest in

3   establishing liability.  Further, their damages will all be calculated in a similar manner, via the

4   amount of overcharge they paid for batteries.  (*See* Compl. ¶¶ 253-268.)  Consequently, as

5   established by the authorities above, the proposed subclass is managerial, and not subject to the

6   requirements of Rule 23(a).  Whether named Plaintiffs can adequately represent those proposed

7   subclasses is an issue for class certification, after discovery, not for a motion to dismiss.

8          Defendants contend without support that a New York consumer who purchased a laptop

9   cannot conceivably represent a local governmental entity that also bought laptops from the same

10  vendor.  (Mot. at 20.)  A laptop is a laptop; in each instance, a purchaser paid too much as a result

11  of Defendants' alleged misconduct.  Defendants draw irrelevant distinctions between purchasers

12  to prevent public entities – including school districts – from suing.

13         Additionally, Defendants' assertion that the creation of a local government entity subclass

14  is an "implicit acknowledge[ment]" of conflicts" (Mot. at 20) is incorrect.[20]  Plaintiffs proposed

15  local government entity subclasses to handle any issues that come up with such entities.  At class

16  certification, this Court may determine that such managerial subclasses are unnecessary or that

17  subclasses would be convenient with respect to some states but not others.  In sum, the decision

18  on whether breaking out such subclasses would make it easier to manage this class action is a

19  decision best made at class certification.

20  **VI.**    ***Illinois Brick* Does Not Bar Plaintiffs' Claims Under Missouri or Montana Law.**

21         Defendants contend that *Illinois Brick* bars Plaintiffs' claims under Missouri and Montana

22  law.  (Mot. at 20-23.)  To the contrary, a controlling decision by the Missouri Supreme Court and

23  the plain language of the Montana Unfair Trade Practices and Consumer Protection Act

---

24  [20] Defendants' argument that governmental entities in New York are "typically" represented by
    the New York Attorney General is irrelevant.  States know how to adopt provisions specifying
25  that only the state's attorney general may represent local government entities in cases under their
    state's antitrust laws. *See, e.g.*, *Pomerantz v. Microsoft Corp.*, 50 P.3d 929, 936 (Colo. Ct. App.
26  2002) (Colo. Rev. Statutes § 6-4-111 makes the attorney general sole plaintiff with standing to
    assert Colorado Antitrust Act on behalf of indirect purchasers for damages, including
27  municipalities).  New York has adopted no such provision, and Defendants have cited no
    authority that New York law precludes its local government entities from being represented by
28  private counsel.

1    (MUTPA) allow indirect purchasers to bring claims under each respective state's laws.

2        A.    **Missouri**

3        The Missouri Supreme Court in *Gibbons v. Nuckolls, Inc.*, 216 S.W.3d 667 (Mo. 2007),

4    held that the Missouri Merchandising Practices Act ("MMPA") does not require privity between a

5    consumer and a defendant who sold the product upstream.  *Id.* at 668.   The court explained:

6        [The] statute's broad language of "any person who has suffered any ascertainable
         loss" contemplates that other parties, *besides the direct purchaser or contracting*
7        *party*, who suffer damages resulting from the violator's prohibited conduct under
         the Act are included among those eligible to receive restitution.
8

9    *Id.* at 669 (internal citation omitted) (emphasis added).[21]  Consequently, federal courts, including

10   *LCDs*, have held that indirect purchasers may assert MMPA claims.[22]  Defendants rely on

11   *Ireland v. Microsoft Corp.*, No. 00CV-201515, 2001 Mo. App. LEXIS 2371 (Feb. 7, 2001), a

12   non-precedential state appellate court decision that *Gibbons* abrogated.[23]  Furthermore, *Ireland*

13   "contains no reasoning supporting the court's conclusion that *Illinois Brick* barred the claims of

14   the indirect purchaser plaintiffs[.]"  *Sheet Metal Workers Local 441 Health & Welfare Plan v.*

15   *GlaxoSmithKline, PLC*, 737 F. Supp. 2d 380, 415 (E.D. Pa. 2010).

16       B.    **Montana**

17       The MUTPA's plain language permits Plaintiffs to assert claims under it.  Part 1 of the

18   ────────────────

19   [21] That Plaintiffs allege misconduct that violates both Missouri's antitrust laws and the MMPA is
     no basis for dismissal.  *See, e.g.*, *In re TFT-LCD (Flat Panel) Antitrust Litig.* ("*LCDs III*"), No. M
20   07-1827 SI, 2011 U.S. Dist. LEXIS 110635, at *57 (N.D. Cal. Sept. 28, 2011) (indirect
     purchasers could bring claims under either Missouri's antitrust laws or the MMPA).  Although it
21   enacted a harmonization statute, "the Missouri legislature has expressed no intent to incorporate
     federal antitrust standing limits into the MMPA[.]"  *Pool Prods.*, 946 F. Supp. 2d at 571.
22   [22] *See LCDs III*, 2011 U.S. Dist. LEXIS 110635, at *55-57 (citing *Gibbons*, indirect purchasers
     may bring claims under the MMPA); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M 07-1827
23   SI, 2011 U.S. Dist. LEXIS 84476, at *24-30 (N.D. Cal. July 28, 2011) (certifying indirect
     purchaser class with MMPA claims); *see also Pool Prods.*, 946 F. Supp. 2d at 570-71 ("[T]he
24   Court finds that IPPs' MMPA suit is not barred under *Illinois Brick* and *AGC*.") (citing *Gibbons*);
     *Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, 737 F. Supp.
25   2d 380, 415 (E.D. Pa. 2010) (MMPA permits indirect purchaser claims) (citing *Gibbons*).
     [23] *Ireland* was a state appellate court memorandum decision.  Under Missouri's rules of civil
26   procedure, memorandum decisions are used to dispose of cases "where all judges agree to affirm
     and further believe that an opinion would have no precedential value."  Mo. Sup. Ct. R. 84.16(b).
27   *See also In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 350 F. Supp. 2d 160, 192 (D.
     Me. 2004) (citing *Ireland*); *Sheet Metal Workers*, 737 F. Supp. 2d at 415 (concluding that
28   plaintiffs are correct that *Gibbons* "abrogated *Ireland*").

MUTPA prohibits "[u]nfair methods of competition and unfair . . . acts or practices in the conduct of any trade or commerce." Mont. Code. Ann. § 30-14-103. It expressly provides a right of action for "consumers" who lose money based on violations of the statute. Mont. Code Ann. § 30-14-133(1); *see also id.* § 30-14-102(1) (consumer is "a person who purchases or leases goods, services, real property, or information primarily for personal, family, or household purposes"). The statute "closely resembles" section 5(a) of the Federal Trade Commission ("FTC") Act, 15 U.S.C. § 45(a)(1), and expressly requires courts to give "due consideration and weight" to FTC and federal court interpretations of the FTC Act. *See, e.g.*, *Plath v. Schonrock*, 314 Mont. 101, 107 (2003); Mont. Code Ann. § 30-14-104. The FTC Act prohibits various forms of unfair competition, including Sherman Act violations. *See, e.g.*, *FTC v. Ind. Fed. of Dentists*, 476 U.S. 447, 454 (1985) (FTC Act encompasses "practices that violate the Sherman Act"). Nothing in the FTC Act restricts its applicability to direct purchasers, and Defendants have identified no case applying *Illinois Brick* to the FTC Act. *See, e.g.*, *In re Lorazepam & Clorazepate Antitrust Litig.*, 289 F.3d 98, 106 (D.C. Cir. 2002) ("FTC . . . brought suit and obtained a settlement on behalf of a class of consumer indirect purchasers"). Against this backdrop, courts permit indirect purchasers to assert claims under part 1 of the MUTPA.[24]

　　　　Defendants cite no cases holding that *Illinois Brick* bars Plaintiffs' MUTPA claim, which would eliminate the MUTPA's express private right of action for "consumers," like Plaintiffs. Mont. Code Ann. § 30-14-133(1). Instead, Defendants rely entirely on cases concerning part 2 of the MUTPA, Mont. Code Ann. §§ 30-14-201, *et seq.*, which specifically proscribes anticompetitive conduct. (*See* Mot. at 21-22.) However, even as to part 2, *Illinois Brick* does not pose a bar. In *Olson v. Microsoft Corp.*, the Montana state court "conclude[d] that the *Illinois Brick* rule does not apply to the Montana UTPA." No. CDV-2000-219, 2001 Mont. Dist. LEXIS 2710, at *11 (Feb. 15, 2001). The state court explained that the Montana Constitution embodies "a strong policy favoring access to the courts," and that "nothing in [part 2 of the MUTPA] . . . limits or restricts an injured person to a direct purchaser." *Id.* at *11. Moreover, the Montana

---

[24] *See, e.g.*, *New Motor Vehicles*, 350 F. Supp. 2d at 192-93 (declining to dismiss indirect purchaser MUTPA claim); *Auto Parts*, 2013 U.S. Dist. LEXIS 80338, at *101-02; *DRAM I*, 516 F. Supp. 2d at 1112 (indirect purchasers may bring claims under part 1 of the MUTPA).

1    Constitution expressly requires the state legislature to provide for the "protection . . . for the

2    people against harmful and unfair practices by either foreign or domestic corporations."  Mont.

3    Const., Art. XIII § 1(2).

4    **VII.    State Procedural Rules Do Not Bar Antitrust Class Actions.**

5              "Rule 23 unambiguously authorizes *any* plaintiff, in *any* federal civil proceeding, to

6    maintain a class action if the Rule's prerequisites are met."  *Shady Grove*, 559 U.S. at 406

7    (emphasis in original).  Defendants insist that Illinois, Montana and South Carolina laws barring

8    class actions override Rule 23.  Numerous courts, including the *ODDs* court, have rejected such a

9    result, which would turn the Federal Rules on their head.[25]

10             *Shady Grove* provides a two-step analysis to determine whether the state law conflicts

11   with Rule 23:   (1) whether the state law and Rule 23 attempt to answer the same question; and

12   (2) whether Rule 23 complied with its "statutory authorization" under the Rules Enabling Act,

13   which if Rule 23 complied would trump state law.  *Id.* at 398.  Under step one of *Shady Grove*,

14   Rule 23 conflicts with Illinois', Montana's, and South Carolina's class action bars, which are

15   materially identical to the New York statute.[26]  Thus, under step two of *Shady Grove*, this Court

16   must analyze whether Rule 23 violates the Rules Enabling Act.

17             Because *Shady Grove* did not result in a controlling decision regarding how to judge

18   whether a Federal Rule violates the Rules Enabling Act, this Court must apply prevailing Ninth

19   Circuit precedent on this point.  *See, e.g.*, *Hydroxycut II*, 2014 U.S. Dist. LEXIS 11750, at *66

20   (applying Ninth Circuit precedent in light of fractured *Shady Grove* plurality).  In *Freund v.*

21   *Nycomed Amersham*, the Ninth Circuit considered whether Federal Rule of Civil Procedure 50

22

23   [25] *See, e.g.*, *In re Hydroxycut Mktg. & Sales Practices Litig.* ("*Hydroxycut II*"), No. 09md2087
     BTM (KSC), 2014 U.S. Dist. LEXIS 11750, at *61-70 (S.D. Cal. Jan. 27, 2014) (post-*Shady*

24   *Grove*, Montana and South Carolina class action bars did not trump Rule 23); *Auto Parts*, 2013
     U.S. Dist. LEXIS 80338, at *106 (same); *In re Optical Disc Drive Antitrust Litig.* ("*ODDs II*"),

25   No. 3:10-md-2143 RS, 2012 U.S. Dist. LEXIS 55300, at *39 (N.D. Cal. Apr. 19, 2012) (same
     with respect to South Carolina); *see also* Fed. R. Civ. P. 1 (Federal Rules "govern the procedure

26   in all civil actions and proceedings in the United States district courts").
     [26] *See* Ill. Comp. Stat. § 10/7(2) ("no person shall be authorized to maintain a class action");

27   Mont. Code Ann. § 30-14-133 (providing that plaintiff "may bring an individual but not a class
     action under the rules of civil procedure"); S.C. Code Ann. § 39-5-140(a) (plaintiff "may bring an

28   action individually, but not in a representative capacity, to recover actual damages").

1166630.13

1    violated the Rules Enabling Act in light of a conflict with California law governing waiver.  347

2    F.3d 752, 761-62 (9th Cir. 2003).  Concluding that the California rule did not "add, subtract, or

3    define any of the elements" to define violations of state law, the Ninth Circuit held the state rule

4    was "not a substantive rule that would be modified by the application of the federal rule."  *Id.* at

5    761-62.  Like the *Shady Grove* plurality, the Ninth Circuit looked to whether Rule 50 "affects

6    only the process of enforcing litigants' rights and not the rights themselves."  *Id.* at 762 (citation

7    and quotations omitted); *see also Shady Grove*, 559 U.S. at 407 ("We have long held that this

8    limitation means that the Rule 'must really regulat[e] procedure, -- the judicial process for

9    enforcing rights and duties recognized by substantive law and for justly administering remedy and

10    redress for disregard of infraction of them.'") (plurality op.).  Holding that it did, the Ninth

11    Circuit found that Rule 50 preempted the California rule.

12        Thus, Rule 23 displaces class action bars in Illinois, Montana, and South Carolina.  As in

13    *Freund*, these bars do not define substantive state rights; rather, they dictate whether rights

14    afforded by each state's antitrust or consumer protection laws may be enforced through a class

15    action.[27]  The class action bars do not "add, subtract, or define any of the elements" of violations

16    of these states' laws.  *Freund*, 347 F.3d at 762.  Thus, because Rule 23 impacts only the process

17    of enforcing litigants' rights (*i.e.*, permitting law enforcement through class actions), and not the

18    rights themselves, Rule 23 trumps these state class action bars.  *See, e.g.*, *Hydroxycut II*, 2014

19    U.S. Dist. LEXIS 11750, at *69-70 (Rule 23 trumped Montana and South Carolina class action

20    bars); *ODDs II*, 2012 U.S. Dist. LEXIS 55300, at *39 (same with respect to South Carolina).

21        Defendants contend that Justice Stevens' concurrence silently overruled Ninth Circuit

22    precedent, which applies a standard consistent with the *Shady Grove* plurality.  But Justice

23    Stevens wrote only for himself.[28]  Defendants rely on *Marks v. United States*, 430 U.S. 188, 193

---

[27] *See Shady Grove*, 559 U.S. at 401 (state law addresses "whether a class action may proceed for a given suit") (majority op.); *see also Smith v. Ill. Cent. R.R. Co.*, 223 Ill. 2d 441, 451 (2006) ("class action is a procedural device . . . [that] is not meant to alter the parties burdens of proof, right to a jury trial, or the substantive prerequisites to recovery") (citation omitted); *Murer v. Mont. State Comp. Mut. Ins. Fund*, 257 Mont. 434, 436 (1993) (class action is a "procedural device" for resolving controversies); *Littlefield v. S.C. Forestry Comm'n*, 337 S.C. 348, 355 (2000) (class action procedure allows resolution of "issues which affect large groups of citizens").

[28] The Ninth Circuit has not yet addressed whether *Shady Grove* overruled, in any way, its

*Footnote continued on next page*

1    (1977), to argue that Justice Stevens' concurrence is the holding of the Court.  Defendants'

2    reliance on *Marks* is flawed.  "[T]he *Marks* standard is not always helpful, and should only be

3    applied where one opinion can be meaningfully regarded as narrower than another *and* can

4    represent a common denominator of the Court's reasoning."  *Lair v. Bullock*, 697 F.3d 1200,

5    1205 (9th Cir. 2012) (emphasis in original) (citation and quotation marks omitted).  Applying

6    *Marks* requires that "the narrowest opinion is actually the *logical subset* of other, broader

7    opinions, such that it embod[ies] a position *implicitly approved* by at least five Justices who

8    support the judgment."  *Id.* (emphasis added) (citation and quotation marks omitted).  Here, the

9    plurality and Justice Stevens differed markedly in their reasoning.  The plurality held that

10   resolving Rules Enabling Act conflicts requires looking to the Federal Rule, whereas Justice

11   Stevens contended that an analysis of the state rule was necessary.  In light of these diametrically

12   opposed views, Justice Stevens' opinion is not a "logical subset" of the plurality's opinion.  Thus,

13   it is not the controlling opinion.[29]

14         Defendants argue that these class action bans are substantive (overriding Rule 23) because

15   they are adjacent in each state's statute books to substantive state rights.  (Mot. at 25-26.)

16   However, Defendants identify no authoritative case law adopting this simplistic rule.  The *Shady*

17   *Grove* majority disavowed such an elementary test.  *Shady Grove*, 559 U.S. at 401 ("the way New

18   York has structured its statute is immaterial") (majority op.).  These states' courts recognize that

19   the class action device is procedural in nature focusing on how a court manages litigation.  As a

20   _____

*Footnote continued from previous page*
precedent on Rules Enabling Act analysis.  *See Hydroxycut II*, 2014 U.S. Dist. LEXIS 11750, at
21   *66; *see also Baumann v. Chase Inv. Servs. Corp.*, No. 12-55644, 2014 U.S. App. LEXIS 4777,
at *17 (9th Cir. Mar. 13, 2014) (citing both plurality and Justice Stevens' opinion).
22   [29] Defendants cite various out-of-circuit decisions that cite Justice Stevens' opinion as "the
narrowest . . . opinion'" because it "'would permit some state law provisions addressing class
23   actions – whereas [the plurality opinion] would broadly prohibit any state law that conflicted with
Rule 23.'"  *Lisk v. Lumber One Wood Preserving, LLC*, 3:13-cv-01402-AKK, 2014 U.S. Dist.
24   LEXIS 1784, at *19-20 n.5 (N.D. Ala. Jan. 8, 2014) (citation omitted).  However, this conclusion
contravenes the Ninth Circuit interpretation of *Marks*, which requires the purported controlling
25   opinion to be both "narrower than another *and* . . . a common denominator of the Court's
reasoning."  *Lair*, 697 F.3d at 1205.  *Tait v. BSH Home Appliance Corp.*, No. SACV 10-711
26   DOC (ANx), 2011 U.S. Dist. LEXIS 54456 (C.D. Cal. May 12, 2011), inexplicably found Justice
Stevens' opinion controlling because it rejected the analysis "offered by the plurality and the
27   dissenters" and thus found "common ground with both groups."  *Id.* at *24.  However, by
rejecting positions taken by the other Justices, it is unclear how his position would have been
28   "implicitly approved by at least five Justices who support the judgment."  *Lair*, 697 F.3d at 1205.

1    result, Rule 23 cannot possibly "abridge, enlarge, or modify" any substantive right afforded under

2    these state statutes.

3           Defendants also rely on *DRAM I*, which was decided three years before *Shady Grove* and

4    did not undertake a Rules Enabling Act analysis, as *Shady Grove* requires.  *See* 516 F. Supp. 2d at

5    1103-04.  And, as mentioned above, *Tait* improperly applied Justice Stevens' concurrence as the

6    controlling opinion.  *See* note 29, *supra*.  The remaining cases on which Defendants rely are out-

7    of-circuit cases, none of which apply the Ninth Circuit's Rules Enabling Act analysis.  State

8    procedural law does not preempt Rule 23.

9    **VIII.    Plaintiffs State a Claim Under New Hampshire Law.**

10          Defendants attempt to confine New Hampshire's Consumer Protection Act ("NHCPA") to

11   conduct that occurs solely within the state's territory.  Such a territorial limit conflicts with the

12   remedial purpose of the NHPCA.  The NHCPA's purpose "is to provide broad protection for

13   consumers."  *LaChance*, 156 N.H. at 97 (citation omitted).  Plaintiffs' claim arises under a

14   portion of the NHCPA that evinces "the legislature's clear desire to promote the consumer

15   protection policy of competitive pricing."  *Id.*  A plaintiff states a claim under the NHCPA if his

16   or her "allegations encompass conduct which was part of trade or commerce that had direct or

17   indirect effects on the people of" New Hampshire.  *Id.* at 96.

18          Defendants' position is also inconsistent with New Hampshire jurisprudence.  In

19   *LaChance*, the court held that indirect purchasers could assert antitrust claims under the NHCPA

20   against U.S. Tobacco, an out-of-state defendant.  *Id.* at 101 ("indirect purchasers may bring

21   claims under the CPA").  In line with *LaChance*, federal courts have declined to dismiss claims

22   based on alleged price fixing of products introduced into New Hampshire.  *See, e.g.*, *In re*

23   *Chocolate Confectionary Antitrust Litig.*, 749 F. Supp. 2d 224, 235 (M.D. Pa. 2010) (denying

24   motion to dismiss where plaintiffs alleged that "defendants colluded to fix the price of chocolate

25   products that were then introduced into the New Hampshire market").

26          Here, Plaintiffs allege that Defendants' anticompetitive conduct had numerous in-state

27   effects, including restraining price competition for batteries in the state; raising, fixing,

28   maintaining, and stabilizing battery prices in the state; depriving New Hampshire residents of free

1    and open competition; and requiring New Hampshire residents to pay "supra-competitive,

2    artificially inflated prices for . . . Lithium Ion Battery products." (Compl. ¶ 481.a.) Because

3    Defendants' alleged misconduct has "had direct or indirect effects on the people of" New

4    Hampshire, Plaintiffs have state a cognizable NHCPA claim. *LaChance*, 156 N.H. at 96.[30]

5    **IX.    The Arkansas Deceptive Trade Practices Act Applies to Price Fixing.**

6        The Arkansas Deceptive Trade Practices Act ("ADTPA") prohibits "[d]eceptive and

7    unconscionable trade practices" and "any other unconscionable, false, or deceptive act or practice

8    in business, commerce, or trade." Ark. Code Ann. § 4-88-107(a). Its purpose is to "to protect the

9    interests of both the consumer public and the legitimate business community." *State ex rel.*

10    *Bryant v. R & A Inv. Co.*, 336 Ark. 289, 295 (1999). The Arkansas Supreme Court determined

11    that "liberal construction of the DTPA is appropriate." *Id.* Giving the statute the liberal

12    construction it demands, federal courts have found that the ADTPA proscribes price fixing.[31]

13    **X.    Conclusion**

14        For the foregoing reasons, Defendants' Motion should be denied. In the event that the

15    Court is inclined to grant any portion of Defendants' Motion, Plaintiffs respectfully request leave

16    to file an amended Complaint to address any of the Court's concerns.

17

18

19

20

21

22    [30] Defendants rely on *Environamics Corp. v. Ferguson Enterprises, Inc.*, No. 00-579-JD, 2001
U.S. Dist. LEXIS 25481 (D.N.H. Sept. 24, 2001), and *Mueller Co. v. U.S. Pipe & Foundry Co.*,
23    No. 03-170-JD, 2003 U.S. Dist. LEXIS 17448 (D.N.H. Oct. 2, 2003). These cases do not govern
here because they were decided at least three years before the New Hampshire Supreme Court's
24    decision in *LaChance*. Second, both of these cases were designated "NOT FOR
PUBLICATION" and therefore lack any persuasive authority. N.D. Cal. L.R. 3-4(e) (prohibiting
25    citation of orders designated "NOT FOR CITATION"). *See Westley v. Oclaro, Inc.*, No. C-11-
2448 EMC, 2012 U.S. Dist. LEXIS 42098, at *7 (N.D. Cal. Mar. 27, 2012) (concluding that
26    decision "designated 'NOT FOR PUBLICATION' . . . may not be cited as persuasive authority").
[31] *See, e.g.*, *Auto Parts*, 2013 U.S. Dist. LEXIS 80338, at *94-96; *Chocolate*, 602 F. Supp. 2d at
27    583; *Flash*, 643 F. Supp. 2d at 1156-57; *In re Aftermarket Filters Antitrust Litig.*, No. 08 C 4883,
2009 U.S. Dist. LEXIS 104114, at *35 (N.D. Ill. Nov. 5, 2009); *Sheet Metal Workers*, 737 F.
28    Supp. 2d at 404-05 (ADTPA has "broad reach" and encompasses attempted monopolization).

PLS.' OPP. TO SUPPL. MOT. TO DISMISS
CONSOLIDATED AM. COMPLAINT (PHASE II)
13-MD-02420-YGR

1    DATED:  April 7, 2014                    Respectfully submitted,

2    By: ____/s/ Lin Y. Chan                  By: ____/s/ Steven N. Williams
         LIN Y. CHAN                              STEVEN N. WILLIAMS
3
     Elizabeth J. Cabraser (083151)           Joseph W. Cotchett (36324)
4    Richard M. Heimann (63607)               Steven N. Williams (175489)
     Eric B. Fastiff (182260)                 Nancy L. Fineman (124870)
5    Joy A. Kruse (142799)                    Joanna W. LiCalsi (288771)
     Brendan P. Glackin (199643)              COTCHETT, PITRE & McCARTHY, LLP
6    Marc A. Pilotin (266369)                 840 Malcolm Road
     Lin Y. Chan (255027)                     Burlingame, CA 94010
7    LIEFF CABRASER HEIMANN &                 Telephone: (650) 697-6000
     BERNSTEIN, LLP                           Facsimile: (650) 697-0577
8    275 Battery Street, 29th Floor           jcotchett@cpmlegal.com
     San Francisco, CA 94111-3339             nfineman@cpmlegal.com
9    Telephone: (415) 956-1000                swilliams@cpmlegal.com
     Facsimile: (415) 956-1008
10   ecabraser@lchb.com

11

12
     By: ____/s/ Steve W. Berman
13       STEVE W. BERMAN

14   Jeff D. Friedman (173886
     Shana Scarlett (217895)
15   Jon T. King (205073)
     HAGENS BERMAN SOBOL SHAPIRO LLP
16   715 Hearst Avenue, Suite 202
     Berkeley, CA 94710
17   Telephone: (510) 725-3000
     Facsimile: (510) 725-3001
18   steve@hbsslaw.com
     jefff@hbsslaw.com
19   shanas@hbsslaw.com
     jonk@hbsslaw.com
20
     George W. Sampson (*Pro Hac Vice*)
21   HAGENS BERMAN SOBOL SHAPIRO LLP
     1918 Eighth Avenue, Suite 3300
22   Seattle, WA 98101
     Telephone: (206) 623-7292
23   Facsimile: (206) 623-0594
     george@hbsslaw.com
24
     *Indirect Purchaser Plaintiffs*
25   *Interim Co-Lead Class Counsel*

26

27

28

1166630.13

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ATTESTATION**

I, Lin Y. Chan, hereby attest, pursuant to Northern District of California, Local Rule 5-1(i)(3), that concurrence to the filing of this document has been obtained from each signatory hereto.

By:  /s/ Lin Y. Chan
LIN Y. CHAN

1

**CERTIFICATE OF SERVICE**

2       I hereby certify that on April 7, 2014, I electronically filed the foregoing document using

3   the CM/ECF system which will send notification of such filing to the e-mail addresses registered

4   in the CM/ECF system, as denoted on the Electronic Mail Notice List, and I hereby certify that I

5   have caused to be mailed a paper copy of the foregoing document via the United States Postal

6   Service to the non-CM/ECF participants indicated on the Manual Notice List generated by the

7   CM/ECF system.

8                                                              */s/ Lin Y. Chan*
                                                                Lin Y. Chan

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28