UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA          *ORIGINAL*


BEFORE THE HONORABLE YVONNE GONZALEZ ROGERS, JUDGE

IN RE: LITHIUM ION BATTERIES)          NO. 13-MD-2420 YGR (DMR)
ANTITRUST LITIGATION        )
                            )          MDL NO. 2420
_____)          PAGES 1 - 124

                                       OAKLAND, CALIFORNIA
                                       FRIDAY, AUGUST 8, 2014



**<u>REPORTER'S TRANSCRIPT OF PROCEEDINGS</u>**

APPEARANCES:

FOR DIRECT PURCHASER        PEARSON SIMON WARSHAW & PENNY LLP
PLAINTIFFS:                 44 MONTGOMERY STREET, SUITE 2450
                            SAN FRANCISCO, CALIFORNIA  94104
                   BY:      AARON M. SHEANIN,
                            BRUCE L. SIMON, ATTORNEYS AT LAW


                            BERMAN DEVALERIO
                            ONE CALIFORNIA STREET, SUITE 900
                            SAN FRANCISCO, CALIFORNIA  94111
                   BY:      JOSEPH J. TABACCO, JR.,
                            JESSICA MOY,
                            TODD A SEAVER, ATTORNEYS AT LAW


                            SAVERI & SAVERI, INC
                            706 SANSOME STREET
                            SAN FRANCISCO, CALIFORNIA  94111
                   BY:      CARL N. HAMMASKJOLD,
                            R. ALEXANDER SAVERI, ATTORNEYS AT LAW



              (APPEARANCES CONTINUED NEXT PAGE)

REPORTED BY:          RAYNEE H. MERCADO, CSR NO. 8258


    PROCEEDINGS REPORTED BY ELECTRONIC/MECHANICAL STENOGRAPHY;
TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION.

1                   **A P P E A R A N C E S (CONT'D.)**

2

3     FOR THE DIRECT            STEYER LOWENTHAL BOODROOKAS ALVAREZ &
      PURCHASER PLAINTIFFS:         SMITH LLP
4                               ONE CALIFORNIA STREET, THIRD FLOOR
                                SAN FRANCISCO, CALIFORNIA  94111
5                         BY:   ALLAN STEYER, ATTORNEY AT LAW

6                               ZELLE HOFFMAN
                                44 MONTGOMERY STREET, SUITE 3400
7                               SAN FRANCISCO, CALIFORNIA  94104
                          BY:   JUDITH A. ZAHID, ATTORNEY AT LAW
8

9                               PRITZKER LAW
                                633 BATTERY STREET, SUITE 110
10                              SAN FRANCISCO, CALIFORNIA  94111
                          BY:   ELIZABETH C. PRITZKER, ATTORNEY AT LAW
11
                                HAGENS BERMAN SOBOL SHAPIRO LLP
12                              715 HEARST AVENUE, SUITE 202
                                BERKELEY, CALIFORNIA  94710
13                        BY:   JEFF D. FRIEDMAN,
                                SHANA E. SCARLETT, ATTORNEYS AT LAW
14
                                COTCHETT, PITRE & MCCARTHY
15                              SAN FRANCISCO AIRPORT OFFICE CENTER
                                840 MALCOLM ROAD, STE. 200
16                              BURLINGAME, CALIFORNIA  94010
                          BY:   STEVEN N. WILLIAMS, ATTORNEY AT LAW
17
                                ANDRUS ANDERSON LLP
18                              155 MONTGOMERY STREET, SUITE 900
                                SAN FRANCISCO, CALIFORNIA  94104
19                        BY:   JENNIE LEE ANDERSON, ATTORNEY AT LAW

20                              LIEFF, CABRASER, HEIMANN &
                                BERNSTEIN
21                              275 BATTERY STREET, 30TH FLOOR
                                SAN FRANCISCO, CALIFORNIA  94111
22                        BY:   LIN Y. CHAN,
                                BRENDAN P. GLACKIN, ATTORNEY AT LAW
23

24

25

1                   **A P P E A R A N C E S (CONT'D.)**

2


3   FOR INDIRECT              SCOTT + SCOTT LLP
    PUCHASER PLAINTIFFS:      707 BROADWAY, SUITE 1000
4                             SAN DIEGO, CALIFORNIA  92101
                        BY:  JOHN JASNOCH, ATTORNEY AT LAW
5


6                             GREEN & NOBLIN PC
                              700 LARKSPUR LANDING CIRCLE, SUITE 275
7                             LARKSPUR, CALIFORNIA  94939
                        BY:  LESLEY E. WEAVER, ATTORNEY AT LAW
8


9   FOR HITACHI/MAXELL        VINSON & ELKINS LLP
    DEFENDANTS:               2200 PENNSYLVANIA AVENUE NW
10                            WASHINGTON, DC  20037
                        BY:  CRAIG P. SEEBALD,
11                            LINDSEY R. VAALA, ATTORNEYS AT LAW

12


13  FOR SAMSUNG DEFENDANTS:   SHEPPARD, MULLIN, RICHTER & HAMPTON
                              FOUR EMBARCADERO CENTER, 17TH FLOOR
14                            SAN FRANCISCO, CALIFORNIA  94111
                        BY:  MICHAEL W. SCARBOROUGH,
15                                ATTORNEY AT LAW

16


17  FOR PANASONIC             WINSTON & STRAWN LLP
    DEFENDANTS:               200 PARK AVENUE
18                            NEW YORK, NEW YORK
                        BY:  JEFFREY J. AMATO,
19                            JEFFREY L. KESSLER, ATTORNEYS AT LAW

20


21                            WINSTON & STRAWN
                              101 CALIFORNIA STREET
                              SAN FRANCISCO, CALIFORNIA  94111
22                       BY:  IAN L. PAPENDICK, ATTORNEY AT LAW

23                            MORRISON & FOERSTER
                              2000 PENNSYLVANIA AVENUE NW SUITE 6000
24                            WASHINGTON, DC  2006-1888
                        BY:  ROXANN E. HENRY, ATTORNEY AT LAW
25


*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

```
 1                  A P P E A R A N C E S  (CONT'D.)

 2

 3    FOR SONY DEFENDANTS:     COOLEY LLP
                              101 CALIFORNIA STREET, FIFTH FLOOR
                              SAN FRANCISCO, CALIFORNIA  94111-5800
 4                      BY:  SCOTT D. JOINER,
                              BEATRIZ MEJIA, ATTORNEYS AT LAW
 5

 6                              COOLEY GODWARD KRONISH, LLP
                              3175 HANOVER STREET
 7                              PALO ALTO CALIFORNIA 94304-1130
                        BY:  JOHN C. DWYER, ATTORNEY AT LAW
 8

 9    FOR LG CHEM DEFENDANTS: STEPTOE & JOHNSON LLP
                              1330 CONNECTICUT AVENUE NW
10                              WASHINGTON, DC  20036-1795
                        BY:  KENNETH P. EWING,
11                              ANDREW J. LEE, ATTORNEYS AT LAW

12

13    FOR NEC CORPORATION     WINSTON & STRAWN
      AND NEC TOKIN CORP.:    101 CALIFORNIA STREET, SUITE 3900
14                              SAN FRANCISCO, CALIFORNIA  94111-5802
                        BY:  SEAN D. MEENAN, ATTORNEY AT LAW
15

16    FOR TOSHIBA             WHITE & CASE, LLP
      CORPORATION:            701 THIRTEENTH STREET NW
17                              WASHINGTON, DC  20005
                        BY:  CHRISTOPHER M. CURRAN,
18                              J. FRANK HOGUE, ATTORNEYS AT LAW

19

20    FOR GS YUASA            HUNTON & WILLIAMS LLP
      CORPORATION:            2200 PENNSYLVANIA AVENUE, NW
21                              WASHINGTON, DC  20037
                        BY:  DJORDJE PETKOSKI, ATTORNEY AT LAW
22

23                              HUNTON & WILLIAMS LLP
                              RIVERFRONT PLAZA, EAST TOWER
24                              951 EAST BYRD STREET
                              RICHMOND, VIRGINIA  23219
25                      BY:  DOUGLAS M. GARROU, ATTORNEY AT LAW
```

```
 1    FRIDAY, AUGUST 8, 2014                          9:00 A.M.

 2                    P R O C E E D I N G S

 3         THE CLERK:  CALLING MDL ACTION 2420, IN RE: LITHIUM

 4    ION BATTERY ANTITRUST LITIGATION.

 5         THE COURT:  OKAY.

 6       OKAY.  AS WE'VE DONE IN THE PAST, WE HAVE A COMPLETE

 7    RECORD OF EVERYONE WHO IS APPEARING TODAY.  IF YOU DIDN'T SIGN

 8    UP, MAKE SURE TO CHECK IN WITH THE CLERK AT THE CONCLUSION OF

 9    THE PROCEEDINGS AND WE CAN HAVE A RECORD OF YOUR APPEARANCE.

10       LET'S START WITH THE JOINT MOTION.  WHO IS GOING TO --

11    USUAL SUSPECTS.

12       MR. KESSLER?

13         MR. KESSLER:  AFRAID SO, YOUR HONOR.

14         THE COURT:  MR. SIMON?

15         MR. SIMON:  YES, YOUR HONOR.

16         THE COURT:  FOR THE RECORD, YOUR NAMES.

17         MR. SIMON:  I DON'T LIKE BEING CALLED A "SUSPECT" IN

18    FEDERAL COURT, THOUGH.

19                        (LAUGHTER)

20         THE COURT:  ALL RIGHT.  WE'LL START WITH YOU,

21    MR. KESSLER.

22         MR. KESSLER:  YOUR HONOR, IF I MAY, I PREPARED A -- A

23    FEW DEMONSTRATIVES TO GO THROUGH IN THE ARGUMENT, AND I HAVE

24    THREE COPIES FOR THE COURT AND -- AND YOUR CLERKS; ONE FOR

25    COUNSEL.
```

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

```
 1        WE HAVE SOME OTHERS THAT WE CAN -- WE CAN GIVE OUT AS

 2   WELL.

 3                  (OFF-THE-RECORD DISCUSSION.)

 4            MR. KESSLER:  GOOD MORNING, YOUR HONOR.

 5            THE COURT:  OKAY.  YOU MAY PROCEED.

 6            MR. KESSLER:  THANK YOU.

 7        YOUR HONOR, THE LAST TIME WE WERE HERE ON THE ILLINOIS

 8   BRICK ISSUE, YOUR HONOR DISMISSED THE CASE AND WE BELIEVE GAVE

 9   RATHER CLEAR DIRECTIONS FOR WHAT WOULD BE REQUIRED IN ORDER

10   FOR THE PLAINTIFFS TO STATE THEIR STANDING UNDER THE ILLINOIS

11   BRICK DOCTRINE.

12        HAVING COME BACK NOW WITH ANOTHER COMPLAINT AND WITH

13   SUBSTANTIAL AMENDMENTS, WHAT WE FIND, YOUR HONOR, THAT THEY

14   HAVE ONLY FILLED A SMALL PORTION OF THE GAP IN THEIR PLEADINGS

15   FROM THE LAST TIME AND THERE STILL, YOUR HONOR, IS A RATHER

16   CAVERNOUS HOLE IN WHAT WE BELIEVE YOUR HONOR'S DECISION

17   REQUIRES IN ORDER FOR THEM TO QUALIFY.

18        THE -- THE REAL PROBLEM HERE, YOUR HONOR, WE BELIEVE IS

19   THAT WE HAVE ABLE CLASS COUNSEL WHO HAS NOT BEEN ABLE TO FIND

20   THE RIGHT PLAINTIFFS TO STATE A FEDERAL ANTITRUST CLAIM.

21   THESE -- THESE PLAINTIFFS MAY, IN FACT, AT LEAST FROM ILLINOIS

22   BRICK STANDPOINTS, BE ABLE TO AVOID THAT BY STATING INDIRECT

23   CLAIMS, AS OTHERS HAVE DONE, UNDER THE STATE LAWS.  BUT

24   THEY'RE NOT THE RIGHT DIRECT PLAINTIFFS.

25        WE CAN THINK OF WHO THE RIGHT DIRECT PLAINTIFFS ARE.  ONE
```

1   GROUP WOULD BE THE PACKERS WHO THERE'S NO DISPUTE THEY SAID IN

2   THEIR BRIEF ARE NOT OWNED OR CONTROLLED, ARE COMPLETELY

3   INDEPENDENT.

4       ANOTHER GROUP WOULD BE COMPANIES LIKE DELL OR HP OR A

5   TELEPHONE MANUFACTURER WHO MAY HAVE BOUGHT THE BATTERIES

6   DIRECTLY FROM ONE OF THE DEFENDANTS AND WHO KNOWS THE CHAIN OF

7   CONTROL FOR THE CELLS, AND THEY MIGHT BE THERE.  BUT THEY

8   DON'T HAVE ANY OF THOSE CORRECT DIRECT PLAINTIFFS.

9           **THE COURT:**  I WANT TO INTERRUPT YOU JUST FOR A SECOND

10  BECAUSE IN YOUR LAST STATEMENT, YOU USED TWO WORDS.  YOU USED

11  "BATTERIES" AND YOU USED "CELLS, "AND I WANT TO MAKE SURE THAT

12  WHEN YOU'RE MAKING YOUR ARGUMENT, WHEN ALL OF YOU ARE MAKE

13  YOUR ARGUMENT, YOU'RE MAKING DISTINCTIONS BETWEEN THE THREE

14  LEVELS THAT WE HAVE.

15      THE CELLS -- IF YOU WANT TO REFER TO "CELLS" SAY "CELLS."

16  IF YOU WANT TO REFER TO THE BATTERIES OR THE PACKS, THEN SAY

17  "BATTERIES."

18          **MR. KESSLER:**  THANK YOU, YOUR HONOR.

19          **THE COURT:**  AND "PRODUCTS" BEING THE LAST, BECAUSE

20  THE ANALYSIS IS DIFFERENT, AT LEAST FROM YOUR VANTAGE POINT

21  WITH RESPECT TO THE CELLS AND THE BATTERIES.

22          **MR. KESSLER:**  ABSOLUTELY, YOUR HONOR.

23      SO STARTING TALKING ABOUT THE CELLS, OBVIOUSLY EVERY

24  COMPANY WHO PURCHASED A CELL DIRECTLY, WHICH IS THE ALLEGEDLY

25  PRICE-FIXED PRODUCT, KNOWS WHO THEY ARE, COULD STATE THAT, AND

1    THEY WOULD BE CORRECT DIRECT PLAINTIFFS.

2        WHAT I WAS ALLUDING TO ABOUT BUYING A BATTERY IS THAT

3    THERE COULD BE THEORETICALLY AN OWNERSHIP OR CONTROL SITUATION

4    WHERE A COMPANY LIKE DELL MAY KNOW THAT IT BOUGHT A PACKED

5    BATTERY FROM ONE OF THE DEFENDANTS WHERE NO INTERMEDIARY WAS

6    USED SO THAT THERE WOULD BE AN OWNERSHIP OR CONTROL SITUATION

7    FOR THAT COMPANY AND THEY'D BE ABLE TO PLEAD FACTS SAYING, "I

8    BOUGHT THIS FROM PANASONIC CORPORATION WHO PACKED THE CELLS

9    ITSELF AND SOLD IT TO ME."

10       AND SO IT'S POSSIBLE YOU COULD HAVE A DIRECT PLAINTIFF WHO

11   WOULD BE ABLE TO PLEAD THE REQUIRED FACTS UNDER TWOMBLY AND

12   UNDER ILLINOIS BRICK.  SO THE -- THE PROBLEM HERE -- AND NOW

13   I'M GOING THROUGH THIS IS -- IS WHERE THE GAP IS.

14       AND, YOUR HONOR, IF YOU LOOK AT THE -- THE DEMONSTRATIVES

15   WE PUT OUT, SO THE FIRST DEMONSTRATIVE IS SIMPLY POINTING OUT

16   THAT ONCE AGAIN, THE ONLY ISSUE IS OWNERSHIP AND CONTROL.  IN

17   OTHER WORDS, THEY -- IT'S NOW CONCEDED THAT THEY ARE INDIRECT.

18   IT IS CONCEDED THEY MUST HAVE ONE OF THE THREE EXCEPTIONS, AND

19   IT'S CONCEDED THE ONLY EXCEPTION THEY ARE ARGUING FOR IS

20   OWNERSHIP AND CONTROL.  AND WE JUST PUT THE CITATIONS AS TO

21   WHERE THAT IS.

22       AND -- SO WE'RE TALKING SOLELY ABOUT OWNERSHIP OR CONTROL.

23           **THE COURT:**  AND THAT'S CORRECT, RIGHT, MR. SIMON?

24           **MR. SIMON:**  THAT'S CORRECT, YOUR HONOR, WITH ONE

25   CAVEAT.

1   WHEN MR. KESSLER SAYS VERY BROAD STATEMENTS LIKE CONCEDED

2   WE'RE INDIRECT, I WOULD REFER THE COURT TO, AND MR. KESSLER,

3   WHAT JUDGE SEEBORG SAID AND JUDGE CONTI SAID ABOUT THAT, WHICH

4   IS IT'S A MATTER OF NOMENCLATURE.  WE ARE THE DIRECT

5   PURCHASERS IN THE CASE BY VIRTUE OF THE ROYAL PRINTING

6   EXCEPTION.  AND THE FACT THAT THEY'RE TRYING TO CALL US

7   INDIRECT BECAUSE WE'RE OPERATING UNDER THE EXCEPTION IS WRONG.

8       SO HE'S -- CAN KEEP SAYING "INDIRECT," BUT WE ARE

9   OPERATING AS THE DIRECT PURCHASERS BECAUSE NOBODY ABOVE US

10  WILL BRING A LAWSUIT 'CAUSE THEY'RE ALL AFFILIATED WITH THE

11  DEFENDANTS.

12          **MR. KESSLER:**  ACTUALLY, YOUR HONOR, THIS COURT HAS

13  FOUND THAT THEY'RE INDIRECT IN YOUR LAST OPINION QUOTING FROM

14  AMONG, OTHER THINGS, ATM AND OTHERS.  SO I BELIEVE THE ISSUE

15  IS THEY'RE INDIRECT.

16          **THE COURT:**  BUT IT IS --

17          **MR. KESSLER:**  -- HAVE AN EXCEPTION.

18          **THE COURT:**  IT IS JUST AN ISSUE OF TERMINOLOGY.  I

19  THINK WE ALL UNDERSTAND WHAT THE FACTUAL CIRCUMSTANCES ARE AND

20  WHAT THE STATUS IS OF -- OF THESE INDIVIDUALS.

21          **MR. KESSLER:**  YES, YOUR HONOR.

22          **THE COURT:**  THE REASON THAT I ASKED MR. SIMON TO

23  RESPOND IS BECAUSE YOU HAVE NOW -- BOTH OF YOU GONE BACK AND

24  FORTH WHEN YOU QUOTE TO ARGUMENTS MADE THAT SAYS, WELL, THEY

25  CONCEDED AT ORAL ARGUMENT, AND THEN THE OTHER SAID SAYS, WELL,

1    NO, WE DIDN'T QUITE CONCEDE AT ORAL ARGUMENT, SO NOW I HAVE IT

2    ON THE RECORD.  YOU'VE ASKED -- YOU'VE INDICATED THAT THERE

3    WAS A CONCESSION; MR. SIMON'S INDICATED HIS POSITION.

4         YOU MAY CONTINUE.

5         **MR. KESSLER:**  SO, YOUR HONOR, LOOKING AT YOUR HONOR'S

6    OPINION ON PAGE 13 -- AND I -- I WON'T QUOTE BACK TO THE COURT

7    YOUR OWN WORDS -- WHAT WE GET FROM THAT WHERE YOU SAID WHAT

8    THEY MUST PROVE IS THREE THINGS, AS I UNDERSTAND IT.  IS THAT,

9    ONE, THERE HAS TO BE OWNERSHIP AND CONTROL THROUGH THE CHAIN

10   OF DISTRIBUTION.  IN OTHER WORDS, IT'S NOT SUFFICIENT TO JUST

11   HAVE IT AT THE BOTTOM.  IT HAS TO GO UP THROUGH THE TOP FROM

12   THE CELL MANUFACTURERS TRACING IT THROUGH.

13        NUMBER TWO, YOUR HONOR SAID IT CANNOT BE CONCLUSORY

14   ASSERTIONS.  THERE HAS TO BE FACTS ALLEGED WHICH THEN

15   PLAUSIBLY SUPPORT THE OWNERSHIP AND CONTROL AT EACH -- AT EACH

16   LEVEL.  SO IT'S NOT JUST ENOUGH TO SAY THAT MAYBE IT HAPPENED

17   OR JUST ALLEGE IT WITHOUT ANY FACTS TO DO IT.

18        AND THE THIRD THING IS -- AND I THINK THIS IS VERY

19   IMPORTANT -- IT HAS TO BE THESE PLAINTIFFS.  WHAT WE'RE NOT

20   DOING HERE IS -- IS ARGUING WHETHER THERE AREN'T HYPOTHETICAL

21   CLASS MEMBERS WHO MAY, IN FACT, HAVE A CLAIM AND CAN -- OTHERS

22   WHO DON'T HAVE A CLAIM BUT WHO COULD ESTABLISH IT, THE INQUIRY

23   HAS TO BE ONE BY ONE FOR THESE PLAINTIFFS NOW, HAVE THEY

24   ESTABLISHED THEIR ILLINOIS BRICK STANDING 'CAUSE WE DON'T HAVE

25   A CLASS.  THIS IS JUST A MOTION TO DISMISS THEIR INDIVIDUAL

1    CLAIMS, SO -- SO THAT'S THE FOCUS OF DOING THIS.

2         AND THE NEXT POINT I WOULD MAKE, YOUR HONOR, IS WHAT

3    CONTROLS IS THE COMPLAINT.  AND THE REASON I SAY THAT, AND I'M

4    GOING TO HAVE SOME DEMONSTRATIVES ABOUT THIS, PLAINTIFFS HAVE

5    TAKEN LIBERTY IN THEIR BRIEF OF MAKING SOME BROAD STATEMENTS.

6    AND THEN WHEN YOU GO BACK AND LOOK AT THE ACTUAL COMPLAINT

7    ALLEGATIONS, WHICH, OF COURSE, IS WHAT CONTROLS, THEY ARE NOT

8    NEARLY AS BROAD AS THE STATEMENTS IN THE -- IN THE BRIEFS.

9         SO WHAT I'M GOING TO FOCUS ON IS WHAT IS IT EXACTLY THAT

10   THEY ALLEGE PLAINTIFF BY PLAINTIFF AND DOES IT FILL THE

11   OWNERSHIP AND CONTROL GAP WITH PLAUSIBLE FACTS TO DO THAT AND

12   WE BELIEVE IT DOES NOT.

13        THE NEXT DEMONSTRATIVE I'D LIKE TO CALL YOUR HONOR'S

14   ATTENTION TO IS NO. 2.  AND WHAT THIS IS DOING IS GOING

15   THROUGH THE CASES, ILLUSTRATING WHAT THE PROBLEM IS HERE

16   BECAUSE I THINK THE CASES ARE VERY HELPFUL.

17        SO IN ROYAL PRINTING, IT'S VERY IMPORTANT NOT JUST FOR

18   WHERE ROYAL PRINTING SAID THERE WAS THE ILLINOIS BRICK

19   EXCEPTION BUT FOR WHERE ROYAL PRINTING SAID THERE WASN'T THE

20   ILLINOIS BRICK EXCEPTION, 'CAUSE IT DID NOT FIND ILLINOIS

21   BRICK STANDING FOR ALL OF THE SALES THAT WERE ALLEGED IN THAT

22   CASE.  THE CHAIN THAT WAS BROKEN, YOUR HONOR, IS -- WAS NOT

23   FOUND TO BE ILLINOIS BRICK AND ROYAL PRINTING WAS THE ONE ON

24   THE RIGHT WHERE THERE WERE THIRD-PARTY SELLERS WHO BOUGHT THE

25   PRICE-FIXED PAPER AND THEN DID SOMETHING WITH IT AND THEN

 1    MOVED IT ON.

 2        OKAY. THAT IS GOING TO BE THE EQUIVALENT OF THE

 3    INDEPENDENT PACKERS OR THE CONTRACTORS IN OUR CASE, AS WE'RE

 4    GOING TO SEE AND WHAT -- AND WHAT THE PROBLEM IS ABOUT THAT.

 5    SO WE THINK THAT THAT'S VERY IMPORTANT.

 6        SIMILARLY, IN ODD, WHICH IS THE NEXT CHART HERE, THERE

 7    WERE TWO TYPES OF PLAINTIFFS WERE FOUND TO HAVE ILLINOIS BRICK

 8    STANDING. ONE ON THE LEFT WERE THOSE WHO DIRECTLY PURCHASED

 9    IT FROM THE DEFENDANTS. AND THE ONE ON -- ONE OVER IN THE

10    MIDDLE WAS THE ONE WHO PREFERRED (SIC) IT FROM DEFENDANT-OWNED

11    OR CONTROLLED SELLERS OF THE PRODUCT SO THERE WAS AN UNBROKEN

12    CHAIN.

13        BUT, AGAIN, THE ONE IN ODD THAT WAS REJECTED WAS MADE BY

14    THIRD-PARTY MANUFACTURERS. AND THE DIFFERENCE IN THOSE CASES

15    WERE THEY WERE ABLE TO ALLEGE WHICH WAS WHICH, AND THAT'S WHAT

16    I'M GOING TO COME DOWN TO HERE IN A MOMENT.

17        SO WE GET NOW TO LITHIUM BATTERIES, WHICH IS WHERE ARE WE

18    NOW. AND WHAT WE'RE GOING TO FIND, YOUR HONOR, IS THAT LAST

19    TIME THERE WERE HOLES IN THE BOTTOM OF THE CHAIN IN ADDITION

20    TO THE TOP, 'CAUSE THIS LAST TIME, THEY DID NOT ALLEGE WHO DID

21    THEY BUY FROM, WHAT PRODUCTS DID THEY BUY -- IN OTHER WORDS,

22    YOU -- YOU COULDN'T TELL ANYTHING. THEY DIDN'T -- OTHER THAN

23    A CONCLUSORY ASSERTION THAT THEY BOUGHT FROM DEFENDANTS, THERE

24    WERE NO DETAILS.

25        SO THEY'VE GONE BACK AND THEY FILLED IN THE BOTTOM RUNG OF

```
 1    THE CHAIN, AND WE'RE NOT CONTESTING THE BOTTOM RUNG AT LEAST

 2    FOR THE ONES WHERE THEY'VE IDENTIFIED THE WHOLLY OWNED

 3    COMPANY, SO THEY -- THEY'VE ALLEGED PANASONIC, SONY, SANYO, A

 4    FEW WHERE THEY SAY THEY BOUGHT FROM IT A WHOLLY OWNED COMPANY.

 5    FOR THOSE, AT LEAST, WE'RE NOT CONTESTING THE BOTTOM OF THE

 6    CHAIN.

 7        I WOULD NOTE THEY STILL ALLEGE SOME, LIKE FROM HITACHI

 8    MAXELL AND FROM SAMSUNG, WHICH ARE NOT ANY OWNERSHIP AND

 9    CONTROL ALLEGATIONS MADE.  SO THEY HAVE SOME HOLES DOWN HERE,

10    BUT AT LEAST THEY HAVE SOME PRODUCTS THAT FILL IN THE BOTTOM

11    CHAIN, SO THAT'S NOT REALLY THE MOST IMPORTANT ISSUE IN THIS

12    MOTION.

13        WHAT THE PROBLEM IS, IS THAT THEY HAVEN'T FILLED IN THE

14    TOP PORTIONS OF THE CHAIN TO KNOW IF A PARTICULAR PLAINTIFF

15    BOUGHT A PRODUCT WHICH WAS PACKED BY A THIRD PARTY AND WHAT

16    THE RELATIONSHIP WAS BY THAT THIRD PARTY.

17        AND THIS IS VERY SIGNIFICANT NOW AS WE LOOK AT THE

18    COMPLAINT.  AND I WOULD DIRECT YOUR HONOR FIRST TO PARAGRAPH

19    97 OF THE COMPLAINT.  IN PARAGRAPH 97, THEY MAKE IT VERY CLEAR

20    FIRST THAT THEY'RE -- THAT THERE WERE STILL THESE THIRD-PARTY

21    PACKERS -- THEY ALLEGE THIS -- FOR ASSEMBLY AND FOR LITHIUM

22    ION BATTERIES, OKAY?

23        AND THEY SAY HERE, THAT THESE TRANSACTIONS TEND TO INVOLVE

24    OUR TRANSFER OF TITLE.  YOUR HONOR, I'D START OUT BY SAYING

25    THAT'S A TOTALLY CONCLUSORY ASSERTION.  WE DON'T KNOW WHAT
```

1    "TEND" MEANS, AND THERE'S NO WAY TO KNOW WHETHER ANY

2    PARTICULAR PLAINTIFF WAS IN THE TENDENCY OR OUTSIDE THE

3    TENDENCY, BUT THEY'VE THROWN IN THIS ASSERTION OF "TEND" TO

4    INVOLVE A TRANSFER TITLE.  EITHER THEY DID OR THEY DIDN'T, BUT

5    THEY DON'T ALLEGE THE FACTS ONE WAY OR THE OTHER ABOUT THAT.

6         BUT THEN THEY GO BASICALLY THESE PACKERS -- THEY JUST

7    REPEATED THE SAME ALLEGATIONS, THAT THEY'RE DEPENDENT FOR

8    THEIR BUSINESS AND MUST MAINTAIN A CLOSED RELATIONSHIP.

9         YOUR HONOR, THAT'S THE SAME ALLEGATION YOU HELD LAST TIME

10   WAS INSUFFICIENT.  SO WE STILL HAVE THIS PACKER ISSUE.

11        NOW, THEY THEN GO ON, YOUR HONOR, IF WE LOOK AT PARAGRAPH

12   99 TO SAY THE FOLLOWING:  THEY SAY -- AND THIS IS AT THE END

13   OF THE PARAGRAPH, "DEFENDANTS AND THEIR COCONSPIRATORS, AS

14   HEREIN ALLEGED, FIXED A PRICE OF LITHIUM ION BATTERY CELLS

15   THAT WENT INTO LITHIUM ION BATTERIES" -- SO WE'RE ONLY TALKING

16   ABOUT THE CELLS -- AND LITHIUM ION BATTERIES PURCHASED BY THE

17   PLAINTIFFS IN THE CLASS.

18        THE CLAIMS IN THIS COMPLAINT INCLUDE LITHIUM ION BATTERY

19   CELLS WHICH WERE PACKAGED BY DEFENDANTS AND THEIR

20   COCONSPIRATORS.  LITHIUM ION BATTERY CELLS THAT WERE PACKED BY

21   COMPANIES FOR THEIR DEFENDANTS AND THEIR COCONSPIRATORS WHERE

22   TITLE TO SAID CELLS DID NOT TRANSFER AND LITHIUM ION BATTERY

23   CELLS THAT WERE PACKED BY COMPANIES OWNED OR CONTROLLED BY

24   DEFENDANTS AND THEIR COCONSPIRATORS.

25        OKAY.  NOW, WHAT'S THE PROBLEM WITH THAT?  THE PROBLEM

1   WITH THAT IS WHEN YOU GO BACK TO THE PLAINTIFFS, WE HAVE NO

2   WAY OF KNOWING, THEY MAKE NO ALLEGATIONS TO KNOW WHETHER ANY

3   PLAINTIFF FITS INTO ANY OF THESE THREE CATEGORIES OR NOT.

4        IN OTHER WORDS, THE PLAINTIFFS EACH COULD HAVE PURCHASED A

5   PRODUCT WHICH WENT THROUGH A THIRD-PARTY PACKER WHERE TITLE

6   DID TRANSFER.  NOW, THEY'RE SAYING THEY'RE NOT CHALLENGING

7   THAT, BUT THERE'S NO CLAIM, THERE'S NO FACT TO PLAUSIBLY

8   ESTABLISH THAT THEY FIT INTO ONE OF THESE CATEGORIES BECAUSE

9   WHEN YOU LOOK AT THE PLAINTIFF-BY-PLAINTIFF ALLEGATIONS,

10  THERE'S NOTHING ALLEGED TO LET YOU KNOW.

11       SO WHAT THEY'VE DONE IS THEY'VE ESTABLISHED THAT THERE ARE

12  POSSIBLY SOME PLAINTIFFS OUT THERE WHO HAVE CLAIMS UNDER

13  ILLINOIS BRICK.  WE AGREE WITH THAT.  THAT'S WHAT I SAID AT

14  THE BEGINNING, YOUR HONOR.  THERE ARE CLEARLY SOME PLAINTIFFS

15  WHO POSSIBLY HAVE CLAIMS.  BUT THEIR BURDEN NOW UNDERSTANDING

16  IS TO SHOW THAT THESE PLAINTIFFS FIT INTO THOSE CATEGORIES,

17  AND THAT'S --

18            THE COURT:  ARE YOU GOING TO GET TO THE ISSUE WITH

19  RESPECT TO THE SERIAL NUMBERS OR THE STANDARDS THAT ALLOW FOR

20  THE TRACING TO OCCUR, 'CAUSE I DON'T SEE THAT, AT LEAST ON

21  THIS CHART.

22            MR. KESSLER:  OKAY.  THE SERIAL NUMBERS AND THE

23  STANDARDS DON'T SOLVE THE PROBLEM.  I'LL EXPLAIN WHY.  THEY

24  ALLEGE IN THE CASE ALSO IN THE -- AND I'LL FIND THE EXACT

25  PARAGRAPH IN A SECOND.  OKAY.

```
1        THEY ALLEGE THAT -- LOOK AT PARAGRAPH 96 -- IN PARAGRAPH
2    96, THEY ALLEGE AS FOLLOWS, OKAY?  WHEN DEFENDANT OR AN ENTITY
3    ACTING ON THE DEFENDANTS' BEHALF PACKS LITHIUM ION BATTERIES
4    FOR SALE BY THE DEFENDANT -- SO THAT COULD BE A PACKER, A
5    THIRD-PARTY PACKER ACTING ON THE DEFENDANT'S PACK (SIC) -- THE
6    PACKS BEAR MARKING IDENTIFYING THE DEFENDANT AS THE
7    MANUFACTURER.
8        SO WHAT THAT MEANS IS THERE ARE GOING TO BE SITUATIONS
9    WHERE EVEN IF YOU COULD SAY THAT THERE IS A BRAND THAT THE
10   MANUFACTURERS IDENTIFIED AS PANASONIC OR SONY, IF A
11   THIRD-PARTY PACKER WAS INVOLVED AND JUST PUT THAT BRAND ON, AS
12   THEY ALLEGE -- PUTTING THE BRAND ON DOESN'T TELL YOU ANYTHING
13   ABOUT WHEN TITLE MOVED OR NOT, OR WHETHER THERE WAS A SALE.
14   AND REMEMBER, I READ TO YOU THE ALLEGATION.  THEY SAID TITLE
15   TENDS TO PASS WHEN YOU'RE DEALING WITH THOSE COMPANIES.  SO
16   MERELY KNOWING THE BRAND AND -- DOESN'T HELP YOU.
17        THE OTHER POINT --
18                  (SIMULTANEOUS COLLOQUY.)
19        MR. SIMON:  MAY I MAKE ONE POINT BECAUSE -- IF YOU
20   DON'T, YOUR HONOR, TO RESPOND TO A POINT BECAUSE IT --
21        THE COURT:  MR. SIMON, WAIT.
22   FINISH UP.  AND THEN I'LL MOVE TO YOU.
23        MR. KESSLER:  OKAY.  THANK YOU.
24   THE -- THE STANDARDS, THE UL STANDARDS THEY SAT (SIC) --
25   CITE DON'T SOLVE THIS PROBLEM EITHER, BECAUSE DESPITE WHAT
```

1    THEY SAID ABOUT THOSE STANDARDS, THEY DO NOT REQUIRE THAT WHEN

2    YOU HAVE A BATTERY PACK, THAT THE INDIVIDUAL CELLS BE MARKED

3    WITH THE BRAND.  YOU STILL HAVE THAT PROBLEM.  ALL THEY

4    REQUIRE IS FOR PURPOSES OF RECALLING THE BATTERY BECAUSE THERE

5    COULD BE A -- A SAFETY HAZARD THAT YOU KNOW THERE'S A NAME ON

6    THE PACK.

7         AND SO IT'S -- SO IT'S A PROBLEM IN TWO THINGS.  ONE, IT

8    DOESN'T INDICATE WHOSE CELLS THEY ARE.  AND NUMBER TWO,

9    THERE'S -- NUMBER TWO, EVEN IF YOU KNEW WHOSE CELLS THEY WERE,

10   YOU STILL WOULDN'T KNOW IF THEY CAME THROUGH THIS THIRD-PARTY

11   PACKER WHO PUT THE BRAND NAME OF THE CELL MANUFACTURER ON THEM

12   FOR SOME REASON.

13        THERE'S JUST A FUNDAMENTAL GAP IN THE ALLEGATIONS.  AND,

14   IN FACT, OTHER THAN A GENERAL ALLEGATION, THESE TYPES OF

15   GENERAL ALLEGATIONS, THERE IS NO SPECIFIC ALLEGATION FOR ANY

16   PLAINTIFF, ONE BY ONE, THAT MY BATTERY WENT THROUGH THIS

17   CHANNEL THROUGH -- YOU KNOW, THAT AVOIDED THE PACKERS OR WENT

18   THROUGH THE PACKERS AND THERE WAS OWNERSHIP OR CONTROL OR

19   ANYTHING ELSE THAT WOULD ESTABLISH THIS ISSUE.

20        NOW, YOUR HONOR, WHAT --

21        **THE COURT:**  HOLD ON, MR. KESSLER.

22   NOW, MR. SIMON.

23        **MR. KESSLER:**  YES.

24        **MR. SIMON:**  YOUR HONOR, THE PROBLEM WITH WHAT

25   MR. KESSLER IS SAYING IS, AS OFTENTIMES HAPPENS, HE TAKES ONE

```
 1    PARAGRAPH OUT OF CONTEXT.  IF YOU LOOK AT PARAGRAPHS 100, 101

 2    AND 102, WE SPECIFICALLY ALLEGE HOW YOU CAN TRACE THESE

 3    DISTINCT COMPONENTS BACK TO THE MANUFACTURERS, NOT ONLY OF

 4    BATTERIES BUT THE CELLS.  AND IF I MAY HAND YOU UP OUR

 5    POWERPOINT -- I HAVE TWO -- I CAN GIVE YOU THREE IF NECESSARY.

 6    AND I'LL REFER YOU TO A COUPLE SLIDES BECAUSE THIS IS REALLY

 7    THE IMPORTANT POINT.

 8            THE COURT:  HOLD ON.  I NEED ONE MORE OF THOSE.

 9         MR. SIMON:  ONE MORE?

10                (PAUSE IN THE PROCEEDINGS.)

11            THE COURT:  OKAY.  WHAT PAGE?

12         MR. SIMON:  AND IF I COULD DIRECT TO YOU PAGE 11 AND

13    12 OF THE POWERPOINT, AND, YOU KNOW, THE STANDARD THAT

14    MR. KESSLER IS TRYING TO HOLD US TO DOESN'T EVEN COMPORT WITH

15    YOUR HONOR'S ORDER THAT WE DON'T HAVE TO ESTABLISH EVERY LINK

16    IN THE CHAIN.  IT'S NEVER BEEN REQUIRED BY ANY COURT IN THE

17    DISTRICT THAT SUCH HAS TO HAPPEN.

18         WE'VE GIVEN YOU PLAUSIBLE INFERENCES, AND THIS -- THESE

19    TWO PICTURES GIVE YOU ALL THE PLAUSIBLE INFERENCES YOU NEED TO

20    KNOW ABOUT THE TRACEABILITY OF THESE PRODUCTS, NOT ONLY FROM

21    THE BATTERY BUT TO THE CELL BACK TO THESE DEFENDANTS.

22         THE FIRST PICTURE ON PAGE 11 IS A LAPTOP BATTERY.  AND AS

23    YOU CAN SEE, THE CELLS THAT GO INTO THAT LAPTOP BATTERY BEAR

24    THE NAME "SONY" ON IT.  IT, IN FACT, IS A SONY LAPTOP BATTERY.

25    YOU SEE THAT INFORMATION ON THE CELLS THEMSELVES.
```

1        NOW, MR. KESSLER'S POINT IS SIMPLY THAT YOU CAN'T TELL ME

2   THAT A SONY LAPTOP BATTERY HAS -- DOESN'T HAVE A THIRD-PARTY

3   PACKER'S CELLS IN IT.  FIRST OF ALL, IF IT HAS A THIRD-PARTY

4   PACKER'S CELLS, WE ARE NOT CLAIMING IT.  IT IS VERY CLEAR.

5        MORE IMPORTANTLY, THERE IS NO ALLEGATION COMPLAINT, NO

6   EVIDENCE OTHER THAN MR. KESSLER'S SPECULATION THAT A SITUATION

7   OCCURS WHERE A THIRD PARTY WHO ALWAYS PUT THEIR NAMES ON THEIR

8   OWN BATTERIES AFTER THEY PACK THEM ACTUALLY DID THIS FOR SONY.

9   AND HIS SPECULATION SHOULD NOT MAKE US GET DISMISSED IN THE

10  CASE, 'CAUSE THAT'S ALL IT IS, IS SPECULATION.

11       IF YOU LOOK AT THE NEXT PAGE, IT HAS ALL THE MARKINGS ON

12  THE BATTERIES.  AND I -- I DISAGREE WITH MR. KESSLER.  HE SAID

13  THIS IN HIS BRIEF, AND HE'S WRONG.

14       YOU CAN TRACE, BECAUSE OF THE UNDERWRITING LABORATORY

15  STANDARDS, ALL THE WAY BACK TO THE CELL.  AND THERE'S MULTIPLE

16  PIECES OF INFORMATION ON THIS BATTERY WHICH ARE DEPICTED HERE

17  WHICH ALLOW TRACEABILITY.  FROM --

18       NOW, WE'RE NOT ON SUMMARY JUDGMENT HERE.  THIS IS A

19  PLEADING STANDARD.  THE FIRST THING IS WE HAVE NAMES ON THERE,

20  AND THE BRANDING IS IMPORTANT.  THEY CHOOSE TO PUT THEIR NAME

21  ON THE PRODUCT, THAT SHOWS IT'S TRACEABLE TO THEM.  AND TRYING

22  TO PUT IN BARRIERS IN BETWEEN OF INTERMARY (PHONETIC) --

23  INTERMEDIARY COMPANIES, AS YOU SAID IN YOUR ORDER, AND TO RELY

24  ON THAT WOULD BE BASICALLY TO WIPE OUT THE ROYAL PRINTING

25  EXCEPTION.

```
1        WE HAVE MODEL DESIGNATIONS.  WE HAVE THE UNDERWRITING LAB
2   STANDARD, WHICH IS "UR" ON HERE BECAUSE THAT'S THE
3   INTERNATIONAL GLOBAL STANDARD.  WE HAVE A BAR CODE ON HERE.
4   AND LET ME TELL YOU MY EXPERIENCE WITH BAR CODES.  WE DON'T
5   HAVE DISCOVERY IN THIS CASE YET, BUT WE HAVE HAD DISCOVERY IN
6   ALMOST EVERY HIGH-TECH CASE IN THIS DISTRICT, AND I'VE BEEN
7   INVOLVED IN EVERY ONE OF THEM.  THERE ARE BAR CODES ON ALMOST
8   EVERY ONE OF THOSE.  AND WE'VE GOTTEN THE CODES -- THE KEYS TO
9   THOSE CODES IN MULTIPLE CASES, LCD, CRT, YOU CAN NAME THEM
10  ALL.
11       AND THOSE CODES TO A CODE SHOW YOU WHERE IT WAS
12  MANUFACTURED, WHAT FACTORY IT WAS MANUFACTURED IN, AND SHOW
13  YOU THE ENTIRE CHAIN OF CUSTODY GOING FORWARD TO WHERE THE
14  PRODUCT WAS SOLD.  I SUSPECT WHEN WE GET TO DISCOVERY IN THIS
15  CASE, WE WILL ASK FOR THE KEYS TO THIS BAR CODE, AND IT WILL
16  TELL US THE EXACT SAME THING.
17       THE OTHER THING IS, IS THAT THIS IS PLUGGED INTO A
18  COMPUTER.  AND THROUGH THE INTEGRATED CIRCUITS IN THE COMPUTER
19  AND THE INTERACTIVITY BETWEEN THE COMPUTER AND THE BATTERY,
20  YOU CAN TELL WHOSE BATTERY IS IN THERE.
21       SO I WOULD SUGGEST TO YOU, YOUR HONOR, THAT READING
22  EVERYTHING IN CONTEXT, NOT JUST THE ONE PARAGRAPH WHICH IS NOT
23  THE PARAGRAPH THAT ALLEGES ALL OF THIS, WE CAN TRACE -- AND
24  TRACEABILITY, AS YOUR HONOR POINTED OUT AND ASKED US TO DO, IS
25  IN THE COMPLAINT, TRACING BACK TO THE MANUFACTURER OF THE
```

1    CELL, ALL THE WAY DOWN TO WHO SOLD THE PRODUCT OR THE BATTERY.

2        AND BY THE WAY, WE DO HAVE PLAINTIFFS WHO BOUGHT

3    BATTERIES.  SO WHEN HE SAYS WE DON'T HAVE ANYBODY --

4    PLAINTIFFS WHO BOUGHT BATTERIES, WE HAVE SEVEN OF THE NINE

5    CLASS REPRESENTATIVES BOUGHT ACTUAL BATTERIES, SO THAT'S NOT A

6    TRUE STATEMENT EITHER.

7            **MR. KESSLER:**  WELL, I --

8            **THE COURT:**  MR. KESSLER?

9            **MR. KESSLER:**  FIRST, I DIDN'T SAY THAT, SO I WANT TO

10   BE CLEAR.  THEY DO HAVE PLAINTIFFS WHO BOUGHT BATTERIES, AND

11   I'LL TALK ABOUT THEM.

12       TAKE A LOOK, YOUR HONOR -- IT'S VERY INTERESTING --

13   NO. 12, PAGE 12 OF HIS DEMONSTRATIVE, OKAY?  SO LOOK AT THE

14   TOP RIGHT-HAND CORNER.  IT SAYS, "CELLS MADE IN JAPAN,

15   PROCESSED IN CHINA."  OKAY.

16           **THE COURT:**  I'M SORRY.  I DON'T KNOW WHAT YOU'RE

17   LOOKING AT.

18           **MR. KESSLER:**  IF YOU LOOK AT HIS NO. 12, AT THE VERY

19   TOP RIGHT-HAND CORNER, OKAY?

20           **THE COURT:**  YOU CAN READ THAT, MR. KESSLER?

21           **MR. KESSLER:**  IT'S VERY HARD TO READ IT.  OKAY?

22       IT SAYS, "CELLS MADE IN JAPAN."  THEN IT SAYS, "PROCESSED

23   IN CHINA."  OKAY?  WE DON'T KNOW ANYTHING ABOUT THE CONTRACT

24   MANUFACTURING, WHETHER OR NOT PACKERS IN CHINA WERE INVOLVED,

25   ANYTHING FROM THIS -- FROM THE MERE FACT THAT IT HAS SONY

1   IDENTIFIED.  THAT'S MY WHOLE POINT WHY BEING ABLE TO IDENTIFY

2   A BRAND NAME DOESN'T TELL YOU THIS BECAUSE IN PARAGRAPH 96 --

3   AND THIS IS THEIR ALLEGATION YOUR HONOR, AFTER THEY THOUGHT

4   ABOUT IT VERY CAREFULLY.  AND IT'S NOT OUT OF CONTEXT -- THEY

5   THOUGHT ABOUT THIS -- IN 96, THEY SAID, WHEN A DEFENDANT OR AN

6   ENTITY -- AN ENTITY ACTING ON THE DEFENDANT'S BEHALF PACKS

7   LITHIUM ION BATTERIES FOR SALE BY THE DEFENDANT, THE PACK

8   BEARS MARKINGS IDENTIFYING THE DEFENDANT AS THE MANUFACTURER.

9        SO THE CRITICAL PROBLEM IS WE DON'T KNOW WHICH PORTION FOR

10  THIS SPECIFIC PLAINTIFF -- AND I'D ALSO POINT OUT FOR THESE

11  PLAINTIFFS, THERE'S NO REPRESENTATION THAT THESE PICTURES ON

12  11 AND 12 ARE FOR A PRODUCT PURCHASED BY ANY OF THE SPECIFIC

13  PLAINTIFFS IN THESE CASE.  MAYBE THEY HAVE.  MAYBE NOT.

14                  (SIMULTANEOUS COLLOQUY.)

15           **MR. SIMON:**  THEY ARE.

16           **MR. KESSLER:**  -- THE POINT -- THE POINT, YOUR HONOR,

17  HERE IS THEY CAN'T ESTABLISH THE FACTS --

18           **THE COURT:**  WELL, THE PROBLEM THAT I HAVE WITH YOUR

19  ARGUMENT, MR. KESSLER, IS THAT WE'RE AT A 12(B)(6) STAGE.  AND

20  WHAT YOU'RE ASKING THE -- THE TEST THAT YOU'RE ASKING ME TO

21  APPLY TO THE PLAINTIFFS HERE REALLY SOUNDS LIKE A TEST THAT

22  SHOULD BE APPLIED AT SUMMARY JUDGMENT STAGE.

23       YOU MAY BE ULTIMATELY RIGHT.  YOU WANT ME TO -- YOU'RE

24  CREATING HYPOTHETICALS -- AND PERHAPS THEY'RE ACCURATE BECAUSE

25  YOU HAVE MORE INFORMATION THAN ANYBODY ELSE IN THIS COURTROOM

1    EXCLUSIVE OF THE DEFENDANTS.  BUT MY JOB ISN'T TO MAKE FACTUAL

2    DETERMINATIONS AT THIS POINT.  MY JOB IS TO DECIDE WHETHER

3    THERE IS ENOUGH HERE -- AND ENOUGH THAT'S PLAUSIBLE, NOT

4    ACTUAL BUT PLAUSIBLE --

5            **MR. KESSLER:**  UNDERSTOOD, YOUR HONOR.

6            **THE COURT:**  -- TO -- TO ALLOW THE CASE TO MOVE

7    FORWARD.

8        AND -- AND MOST OF THE CASES THAT YOU'VE CITED TO ME ARE

9    SUMMARY JUDGMENT CASES.  THEY ARE NOT 12(B)(6) CASES.  SO

10   THAT -- THAT IS A FUNDAMENTAL ISSUE THAT I'M HAVING WITH YOUR

11   ARGUMENT.

12           **MR. KESSLER:**  AND I -- AND I APPRECIATE THAT, YOUR

13   HONOR.  AND I GUESS WHAT I WOULD SAY IS THE FOLLOWING:

14   CLEARLY, THEY DON'T HAVE TO PROVE THEIR ALLEGATIONS AT THIS

15   STAGE.  THEY JUST HAVE TO MAKE ALLEGATIONS.  A HUNDRED PERCENT

16   AGREE WITH THAT.  WE'RE ON A MOTION TO DISMISS.  WE'RE NOT ON

17   A MOTION FOR SUMMARY JUDGMENT.

18       SECOND, BECAUSE THIS IS STANDING -- AND YOUR HONOR

19   YOURSELF HAS POINTED THIS OUT IN YOUR PRIOR ILLINOIS BRICK

20   RULINGS -- THERE IS A THRESHOLD BURDEN ON THE PLAINTIFFS TO

21   COME FORWARD WITH SPECIFIC ALLEGATIONS, JUST ALLEGATIONS, NOT

22   PROVING ANYTHING, WHICH WOULD SHOW THAT THEY HAVE THE

23   STANDING.

24       WHAT WE'RE CONTENDING HERE, IT'S NOT ENOUGH TO SAY, AS

25   THEY DO IN THE COMPLAINT, THAT SOMETIMES -- SO THEY GO -- IF

```
 1    YOU LOOK AT THEIR ALLEGATIONS, THEY'LL SAY IN ONE YEAR,

 2    SOMEONE SAID PANASONIC MADE 70 PERCENT OR SOMETHING OF ITS

 3    BATTERIES ITSELF.  OKAY?

 4         WELL, THE -- THAT'S AN ALLEGATION FOR THAT.  BUT THEN IF

 5    THEY WANTED TO -- TO PUT THAT THROUGH, THEY HAVE TO SAY THIS

 6    PLAINTIFF BOUGHT IN THAT YEAR AND CAN ALLEGE ON INFORMATION

 7    AND BELIEF THAT IT WAS ONE OF THOSE THAT CAME THROUGH THAT

 8    ROUTE THAT WOULD BE OWNED OR CONTROL -- IT'S MISSING THAT

 9    BURDEN FOR THEM TO SHOW THEIR STANDING.

10         SO WE DO THINK IT'S APPROPRIATE THAT THEY HAVE TO HAVE

11    FACTS WITH -- NOT ASSERTIONS.  WHAT THEY'VE DONE IS THEY'VE

12    MADE ALLEGATIONS ABOUT THE CLASS AS A WHOLE WITH NO CLASS.

13    AND SO WHAT THEY'VE SAID IS, HERE ARE FACTS -- AND THEY WANT

14    THE STANDARD TO BE AS IF THIS WERE A CLASS ISSUE, ARE THERE

15    PEOPLE OUT THERE WHO WOULD HAVE ILLINOIS BRICK STANDING?

16         AND AS I SAID, THERE ARE CLEARLY SUCH PEOPLE.  BUT ON A

17    MOTION TO DISMISS FOR STANDING, I BELIEVE THEY MUST HAVE THOSE

18    FACTS AND IT'S MISSING.

19         WHAT WE DID IN CHART NO. 3, IS WE WENT THROUGH THE

20    COMPLAINT PLAINTIFF BY PLAINTIFF, SO THERE'S A CHART FOR

21    EACH -- EACH PIECE OF -- AND WE BELIEVE THESE ARE THE -- THE

22    NECESSARY POINTS.  WHAT THIS DOES, THIS TAKES -- PLAINTIFFS

23    HAD AN APPENDIX WHICH DID THIS THEMSELVES.  WE ADDED IN RED

24    THE ALLEGATIONS WE THINK ARE MISSING.  OKAY?

25         AND IN YELLOW ARE THE ALLEGATIONS THAT THEY ADDED.  AND I
```

```
1    THINK IF YOUR HONOR LOOKS FOR THIS, YOU COULD EASILY IMAGINE

2    MANY PLAINTIFFS WHO COULD FILL IN THE RED.  AS I SAID, DELL

3    COULD FILL IN THE RED.  OKAY?  THE -- THE PACKERS COULD FILL

4    IN THE RED.  OTHERS COULD FILL IN THE RED.  AND THE POINT HERE

5    IS JUST BECAUSE IT'S DIFFICULT FOR THESE PLAINTIFFS TO FILL IN

6    THE RED, WHY ARE THEY NOW GOING TO GO FORWARD WITHOUT STATING

7    THEIR FACTS ESPECIALLY, YOUR HONOR, I WOULD NOTE, TO BE

8    PUTATIVE CLASS REPRESENTATIVES.

9        YOU KNOW, WHAT IF IT TURNS OUT THAT THEY ALL DON'T HAVE

10   STANDING AND WE'VE GONE THROUGH IN THIS CASE -- IN OTHER

11   WORDS, THEY SHOULD HAVE TO COME FORWARD WITH AT LEAST SOMEBODY

12   WHO IS AN APPROPRIATE PLAINTIFF TO PROCEED WITH THIS CASE THIS

13   WAY.  AND I'D ALSO POINT OUT, YOUR HONOR, THIS RAISES THE

14   SPECTER HOW THEY EVER COULD POSSIBLY CERTIFY A CLASS HERE

15   BASED ON THIS.

16             THE COURT:  WE'RE NOT EVEN --

17                  (SIMULTANEOUS COLLOQUY.)

18             THE COURT:  WE'RE NOT EVEN THERE YET, SO DON'T GET

19   OFF KILTER.

20             MR. KESSLER:  I KNOW.  I'M SORRY.

21             THE COURT:  YOU'VE MADE A COUPLE OF REFERENCES TO

22   DELL.  IS THERE A PARTICULAR REASON WHY?  IS THIS A

23   HYPOTHETICAL?  I DON'T -- JUST WANT TO KNOW IF I'M MISSING

24   SOMETHING.

25             MR. KESSLER:  THE REASON I'M MENTIONING DELL IS
```

```
1    BECAUSE THE ORIGINAL PLEA THAT YOUR HONOR IS FAMILIAR WITH,

2    THAT GAVE RISE TO THIS CASE, HAVE (SIC) TO DO WITH

3    CYLINDRICAL -- LITHIUM ION -- CELLS FOR CYLINDRICAL LITHIUM

4    ION BATTERIES FOR LAPTOP COMPUTERS, AND DELL IS A VERY

5    PROMINENT LAPTOP COMPUTER MANUFACTURER WHO WOULD HAVE

6    PURCHASED BATTERIES CERTAINLY FROM THE VARIOUS DEFENDANTS, AS

7    WOULD HP AND -- OR OTHERS OF THAT TYPE, AND -- AND CELLS.  SO

8    JUST -- THAT JUST HAPPENS TO BE A --

9              THE COURT:  OKAY.

10             MR. KESSLER:  -- WHAT WAS THE SUBJECT --

11             MR. SIMON:  AND, YOUR HONOR --

12             MR. KESSLER:  -- OF THAT PLEA, SO --

13             THE COURT:  ENOUGH.

14        MR. SIMON?

15             MR. SIMON:  OKAY.  FIRST OF ALL, WITH RESPECT TO DELL

16   AND HP, UNTIL THEY OTHERWISE INDICATE, THEY ARE PART OF THE

17   CLASS.  THEY BOUGHT BATTERIES, JUST LIKE SEVEN OF NINE

18   PLAINTIFFS, SO THEY MAY, AS THEY HAVE DONE IN OTHER CASES,

19   DECIDE TO PURSUE THEIR OWN INDIVIDUAL CASE, BUT THE FACT THAT

20   THERE IS A CLASS MEMBER OUT THERE WHO HAS NOT COME FORWARD TO

21   BRING A CASE DOES NOT DEPRIVE US OF STANDING.

22        THAT'S POINT ONE.  POINT TWO IS, AGAIN, MR. KESSLER IS

23   KIND OF PICKING AND CHOOSING WHICH ALLEGATIONS TO TALK TO YOU

24   ABOUT.

25        IF YOU COULD TURN TO OUR POWERPOINT FOR A MOMENT -- AND,
```

```
1    YOU KNOW, I APOLOGIZE FOR JUMPING IN, BUT I THINK THE BACK AND

2    FORTH ON THIS POINT ARE THE CRITICAL ISSUES.

3        STARTING ON PAGE 5, NOT SURPRISINGLY, DIFFERENT FROM HIS

4    CHART IS OUR FIRST CHART SHOWING EACH OF THE COMPANIES AND

5    INDIVIDUALS AND WHAT PRODUCTS THEY BOUGHT -- JUST WHAT YOU

6    ASKED US TO DO, WHO THEY BOUGHT IT FROM, WHICH IS THE FIRST

7    DEFENDANT, SONY ELECTRONICS, INC., WHO IS A CONSPIRATOR --

8    ALLEGED CONSPIRATOR, WHOLLY OWNED SUBSIDIARY RIGHT ABOVE THEM

9    AND GOING BACK TO THE CELL MANUFACTURER SONY CORPORATION,

10   WHO'S ALSO ALLEGED TO BE A CONSPIRATOR.  THERE IS NO BREAK IN

11   THE CHAIN.

12       BY THE WAY, THE WELL-PLED ALLEGATIONS OF THIS COMPLAINT,

13   WHICH THE COURT IS SUPPOSED TO ACCEPT ON THE MOTION TO

14   DISMISS, NOT MR. KESSLER'S SPECULATION OR DEFENDANT'S

15   SPECULATION, SAY THAT DURING PERIODS OF TIME, SONY PACKED 100

16   PERCENT OF THEIR BATTERIES FOR THEIR NOTEBOOK COMPUTERS FOR A

17   PERIOD OF TIME, I BELIEVE, BETWEEN 2008 AND 2010.

18       SO FOR PURPOSES OF PLAUSIBLE INFERENCE THAT WE CAN SHOW

19   TRACEABILITY AND BRING YOU ALL THE WAY BACK THROUGH THE CHAIN,

20   WE CAN, WITH WELL-PLED ALLEGATIONS IN THE COMPLAINT THAT

21   MR. KESSLER CHOOSES NOT TO TALK TO YOU ABOUT.

22       WE DO THE SAME THING ON THE NEXT SLIDE, WHICH IS

23   UNIVISIONS CRIMONS (PHONETIC) -- CRIMSON'S HOLDING.  THIS IS

24   PAGE 6.  WE TELL YOU THAT -- WHAT THEY BOUGHT.  WE HAVE THE

25   BRAND NUMBER, THE MODEL NUMBERS FOR THE MOST PART.  YOU KNOW,
```

1    THESE PLAINTIFFS, WHEN WE GET INTO DISCOVERY, WILL HAVE

2    INVOICES SHOWING THAT THEY PAID THE DEFENDANTS THAT ARE THE

3    DEFENDANTS IN THIS CASE.  AND THIS --

4        I COULD GO THROUGH EACH ONE OF THESE FOR YOU, BUT WE HAVE

5    DONE EXACTLY WHAT THE COURT ASKED US TO DO.  AND IN SLIDES 5

6    THROUGH 8, WE SET FORTH THE UNBROKEN CHAIN WITH PLAUSIBLE

7    INFERENCES AS TO WHY EACH OF THESE CONTROLLED ENTITIES ARE

8    INVOLVED IN THE DISTRIBUTION OF THESE PRODUCTS.

9        MR. KESSLER IS ASKING YOUR HONOR TO DO SOMETHING

10   UNPRECEDENTED IN THIS -- IN THIS COURT AND IN THIS DISTRICT.

11   AND HE DOESN'T HAVE A CASE AND THE DEFENDANTS DON'T HAVE A

12   CASE THAT SAY THAT WE HAVE TO DO WHAT HE IS SAYING WE HAVE TO

13   DO.

14       THAT IS WHY NO DIRECT PURCHASER CASE IN THIS DISTRICT,

15   GOING THROUGH MULTIPLE JUDGES, HAS BEEN DISMISSED ON THE BASIS

16   THAT MR. KESSLER AND THE DEFENDANTS ARE ASKING THIS COURT TO

17   DISMISS US.  NO OTHER JUDGE HAS DONE IT.  AND HE CAN'T DENY

18   THAT.  TWO COURTS HAVE ALREADY POINTED THAT OUT INCLUDING

19   JUDGE ILLSTON IN LCD.  IN LCD, AFTER WE TRIED OUR CASE, THERE

20   WERE ACTIONS BROUGHT BY DIRECT PURCHASERS WHO WERE INDIVIDUAL

21   CASES, THE DELLS, THE HP'S, AND THINGS LIKE THAT.

22       IT WENT ALL THE WAY TO SUMMARY JUDGMENT ON STANDING IN

23   FRONT OF JUDGE ILLSTON ON BEHALF OF SOME OF THOSE OEM'S.  THEY

24   OPTED OUT OF THE CLASS.  THEY BROUGHT THEIR OWN CASES.  WENT

25   ALL THE WAY TO SUMMARY JUDGMENT ON STANDING.  JUDGE ILLSTON

1    DENIED THE SUMMARY JUDGMENT ON STANDING.  IN THAT RULING, SHE

2    SAYS, IT IS A FACTUAL ISSUE AS TO WHETHER OR NOT SYSTEMS

3    INTEGRATORS, ODM'S," WHICH ARE ORIGINAL DEVICE -- DESIGN

4    MANUFACTURERS," AND THIRD PARTIES, HELPED ASSEMBLE THE

5    PRODUCT.

6        SHE SAID BASICALLY THAT DOESN'T MATTER TO ME ON STANDING.

7    IT'S A FACTUAL ISSUE.  AND THE FACTUAL ISSUE AS TO WHETHER

8    THEY DID ANYTHING OR THE TRANSACTION WOULD BREAK THE CHAIN AS

9    MR. KESSLER'S SAYING AND WHETHER THEY EVEN BOUGHT THE

10   PRODUCTS, 'CAUSE OFTENTIMES, IT'S BY A TRANSFER PRICE, WHICH

11   IS NOTHING MORE THAN ACCOUNTING ENTRY AND THERE IS NO ACTUAL

12   CHANGE OF TITLE.

13       WE ARE NOT ASKING IN THIS CASE THAT THE BATTERIES THAT

14   WERE PACKED BY THE THIRD PARTIES THAT PUT THEIR OWN NAME ON IT

15   ARE PART OF THIS CLASS.

16       WE ARE SAYING AS A FACTUAL MATTER, IT IS WELL PLED IN THIS

17   COMPLAINT THAT THE OTHER THREE CATEGORIES, DEFENDANTS PACKING

18   THE BATTERIES THEMSELVES, DEFENDANTS HAVING AN AGENT PACK THE

19   BATTERIES, THOSE CATEGORIES AND -- WHERE THEY IN EFFECT --

20   THERE'S NO TITLE TRANSFER, AND THE BATTERY HAS NOTHING DONE TO

21   IT, JUST LIKE IN LCD, THAT IS -- WOULD DO ANYTHING TO CHANGE

22   THE FACT THAT WE ARE THE FIRST PURCHASERS OUTSIDE OF THE

23   CARTEL.  AND THAT'S WHAT WE ARE.  WE ARE THE FIRST PURCHASERS

24   OUTSIDE THE CARTEL.

25       MR. KESSLER'S SPECULATION ABOUT WHAT MIGHT BE IN A PACKED

1  BATTERY OR NOT IS NOT –– UNDER THE STARR CASE, CANNOT HAVE

2  THIS CASE DISMISSED UNLESS HIS EXPLANATION WITH FACTS FROM THE

3  COMPLAINT –– NOT HIS SPECULATION –– IS SO CONVINCING THAT IT

4  RENDERS OUR WELL-PLED ALLEGATIONS IMPLAUSIBLE.

5      HE CANNOT FULFILL THAT STANDARD.

6          **THE COURT:**  OKAY.

7          **MR. KESSLER:**  YOUR HONOR, IF I MAY?

8          **THE COURT:**  NO.  HOLD ON.  YOU NEED TO MOVE ON,

9  BECAUSE I HAVE A REQUEST BY ALL OF THE DEFENDANTS TO BE ABLE

10  TO ARGUE THEIR INDIVIDUAL MOTIONS, AND I THINK I'VE HEARD

11  ENOUGH ON THIS.

12          **MR. KESSLER:**  YOUR HONOR, COULD I JUST HAVE ONE

13  MINUTE MORE ––

14          **THE COURT:**  YOU'RE ON THE CLOCK.

15          **MR. KESSLER:**  –– ON ILLINOIS BRICK AND THEN I'LL MOVE

16  TO AGC?

17          **THE COURT:**  YOU'RE ON THE CLOCK.

18          **MR. KESSLER:**  OKAY.  THIS IS A GOOD ILLUSTRATION WHY

19  YOU HAVE TO LOOK AT THE COMPLAINTS AND NOT WHAT ANY OF THE

20  LAWYERS SAY.

21      IF YOU LOOK AT PARAGRAPHS 90 AND 91, YOU WILL FIND THERE'S

22  NO ALLEGATION, AS MR. SIMON SAID, THAT SONY PACKED A HUNDRED

23  PERCENT OF ITS BATTERIES IN 2008 TO 2010.  DOESN'T EXIST.

24      WHAT EXISTS IS A REFERENCE TO ONE TIME ON MARCH 12 TO

25  16TH, 2002, AND ONE TIME IN JULY 2005.  AND WHAT HE DOESN'T DO

```
 1    IS FOR ANY OF THE OTHER 11 YEARS OF THE CONSPIRACY OR FOR ANY

 2    OF THE OTHER PERIODS HAVE ANY ALLEGATION THAT THESE SPECIFIC

 3    PLAINTIFFS BOUGHT AT THESE SPECIFIC TWO PINPOINTS IN A 12-YEAR

 4    CONSPIRACY --

 5              THE COURT:  MR. KESSLER?

 6              MR. KESSLER:  THAT'S THE PROBLEM.

 7              THE COURT:  MOVE ON.

 8                   (SIMULTANEOUS COLLOQUY.)

 9              THE COURT:  AND I'M SAYING IS THAT BECAUSE IT IS

10    INCONCEIVABLE TO ME THAT SONY ON ONE DAY COULD PACK A HUNDRED

11    PERCENT OR THAT THERE'S SOME REASONABLE BASIS FOR MAKING THAT

12    ALLEGATION, AND THEN A DAY LATER IS NOT.  OR TWO WEEK -- DAYS

13    LATER OR MAYBE A WEEK LATER.  WE AREN'T -- WE DON'T HAVE ALL

14    OF THE FACTS IN FRONT OF US RIGHT NOW.  I GET YOUR POINT.

15    MOVE ON.

16              MR. KESSLER:  OKAY.  YOUR HONOR.  I'M GOING TO MOVE

17    ON TO THE AGC ARGUMENT.

18         SO WITH RESPECT TO AGC, THIS IS GOING TO BE A FAMILIAR

19    ARGUMENT TO YOUR HONOR BECAUSE IT'S VERY SIMILAR TO WHAT WAS

20    COVERED IN THE INDIRECT MOTION.  AND SO I'M NOT GOING TO

21    BELABOR THIS AT ALL.  I'M JUST GOING TO MAKE THE FOLLOWING TWO

22    POINTS:  THAT FIRST, THIS IS A CELL CASE AND BECAUSE THEY ARE

23    DEALING WITH PLAINTIFFS WHO BOUGHT FINISHED PRODUCTS OR

24    BATTERIES, EITHER ONE, THEY ARE SOME -- THERE'S BATTERIES,

25    TOO -- NEITHER OF THOSE PRODUCTS ARE IN THE SAME MARKET.  WE
```

1    BELIEVE THAT'S DISABLING UNDER THE ANTITRUST INJURY

2    REQUIREMENT OF THE NINTH CIRCUIT.

3        WE BELIEVE -- WE HAVE NOT CONCEDED, BY THE WAY, THEY'RE IN

4    THE SAME MARKET.  I DON'T KNOW WHY THEY'VE SAID THAT SO, I'LL

5    MAKE THAT VERY CLEAR, THAT BATTERIES ARE NOT IN THE SAME

6    MARKET.  THE TEST IS INTERCHANGEABILITY AS SET FORTH BY BOND

7    IT'S NOT THERE.

8        OTHER PEOPLE ARE IN THAT MARKET OF -- OF THE CELL

9    CONSPIRACY AND COULD -- LIKE THE PACKERS AND COULD ASSERT

10   ANTITRUST INJURY WE BELIEVE --

11           **THE COURT:**  NOW, ONE OF THE THINGS THAT YOU --

12   NEITHER OF YOU REALLY TALKED ABOUT AND PERHAPS IT HAS NO

13   RELEVANCE BUT I'LL ASK SINCE YOU ARE BOTH THE EXPERTS:  IN --

14   IN FIGURING OUT MARKETS, INTERCHANGEABILITY IS ONE ISSUE, BUT

15   SO IS CROSS-ELASTICITY.

16           **MR. SIMON:**  YOUR HONOR, I WOULD SAY NO.  TWO COURTS,

17   JUDGE HAMILTON IN DRAM AND JUDGE ILLSTON IN LCD SAID THAT

18   THOSE ARE NOT REQUIREMENTS.  IN FACT, IT'S THE MINORITY THAT

19   TALKS ABOUT CROSS-ELASTICITY AND INTERCHANGEABILITY.

20       WHAT THE MAJORITY OF CASES SAY, LCD, CRT, ODD, FLASH, GPU,

21   IS THAT IT -- THE PRODUCT IS A SEPARATE COMPONENT AND IT'S

22   TRACEABLE.  THOSE ARE THE -- THOSE ARE THE BIG FACTORS AS TO

23   WHETHER OR NOT IT'S IN ONE MARKET FOR AGC PURPOSES.  IT'S AN

24   ABSOLUTE FACT.  YOUR HONOR SAID IT AT THE HEARING ON THE IPP

25   AGC ARGUMENT, THAT THE BATTERY DOES NOT WORK WITHOUT THE CELL.

1    IN FACT, THE CELL IS DANGEROUS AND CAN BLOW UP UNLESS IT'S IN

2    A BATTERY PACK.  THEY ARE INEXTRICABLY TIED TO EACH OTHER, SO

3    IS THE BATTERY TO THE PRODUCTS.  IT'S THE POWER SOURCE.  A

4    PORTABLE COMPUTER, YOU CAN PLUG IT IN, BUT WHO WANTS A

5    PORTABLE COMPUTER THAT YOU HAVE TO FIND A PLUG ALL THE TIME.

6    IT'S THE BATTERY THAT IS CRITICAL.

7         SO THE ANSWER TO YOUR QUESTION IS REALITY AND ECONOMIC

8    REALITY AND THE HOLDINGS IN ALL THE CASES THAT DO NOT REQUIRE

9    CROSS-ELASTICITY OR INTERCHANGEABILITY BUT SIMPLY TRACEABILITY

10   AND SEPARATENESS OF THE COMPONENT PRODUCT.

11             **THE COURT:**  MR. --

12        **MR. KESSLER:**  YOUR HONOR?

13             **THE COURT:**  -- KESSLER?

14        **MR. KESSLER:**  OKAY.  IN -- IT IS CORRECT THAT JUDGE

15   ILLSTON SAID "INEXTRICABLY ENTWINED" COULD IN THAT CASE

16   PROVIDE THE LINK FOR THE MARKETS.  BUT WHAT WAS DIFFERENT IN

17   LCD AND WHAT WAS DIFFERENT IN CRT AND WHAT WAS DIFFERENT IN

18   ODD, AS I ARGUED LAST TIME, WAS THE COMPONENT WAS, LIKE, 60,

19   70 PERCENT OF THE COST OF THE FINISHED PRODUCT SO THAT THE

20   COURTS WERE ABLE TO FIND IN EFFECT THE TWO WOULD MOVE TOGETHER

21   BECAUSE OF THE SIGNIFICANCE (SIC) AMOUNT OF THE COST.

22        HERE, BECAUSE THEY'RE AT CELL LEVEL OF THE CONSPIRACY --

23   AND WE POINTED THIS OUT IN YOUR (SIC) BRIEF, YOUR HONOR --

24   THEY'RE TALKING ABOUT CELLS THAT COST 16 CENTS A CELL OR LESS.

25   SO NOW YOU'RE A PURCHASER OF A $500 LAPTOP COMPUTER.  HOW IS

```
1    THE MARKET FOR LAPTOP COMPUTERS INEXTRICABLY LINKED WITH A

2    CELL THAT COSTS 15 -- THIS IS IN THEIR COMPLAINT

3    ALLEGATIONS -- PARAGRAPH 167 TALKS ABOUT A -- THE CELL OF 16

4    CENTS.  PARAGRAPH 179 TALKS ABOUT THE WHO WILL BATTERY, THE

5    WHOLE BATTERY, COSTING 50 CENTS.  AND SO THE POINT HERE IS IF

6    YOU'RE THE END FINISHED PRODUCT PURCHASER, HOW COULD THAT

7    POSSIBLY BE INEXTRICABLY LINKED.

8        IT WOULD BE AS IF IN THIS LCD CASE, THE CONSPIRACY WAS

9    ALLEGED TO BE JUST OF A WIRE THAT WENT SOMEHOW INTO THE GLASS

10   THAT MADE THE LCD.  WE SUBMIT JUDGE ILLSTON WOULD NOT FIND

11   THOSE MARKETS INEXTRICABLY LINKED.

12            MR. SIMON:  YOU MEAN -- I'M SORRY --

13            MR. KESSLER:  I'M SORRY, YOUR HONOR.

14            MR. SIMON:  I'M SORRY TO INTERRUPT YOU.

15            MR. KESSLER:  SECOND DEFECT, YOUR HONOR, IS THE

16   DIRECTNESS POINT.  AND, AGAIN, I WOULD JUST REITERATE LAST

17   TIME, IT'S TOO MANY LEVELS.

18            THE COURT:  AND I DON'T NEED YOU TO TOTALLY REARGUE

19   IT.  IT'S ALWAYS HELPFUL TO GET THE BIG PICTURE, BUT I THINK

20   THE POINT LAST TIME AND THE ALLEGED CONCESSION THAT WAS

21   DISCUSSED WAS WHEN I ASKED YOU IF I DON'T FIND ANY FUNDAMENTAL

22   DIFFERENCE BETWEEN YOUR FIRST TWO LEVELS, THEN WHERE DOES THAT

23   ANALYSIS LEAD.

24        THAT'S WHERE THE CONCESSION PIECE CAME IN.

25            MR. KESSLER:  OKAY.
```

1      **THE COURT:**  AND -- AND THAT WILL -- THAT WOULD END UP

2  GETTING RESOLVED, BUT IT IS A DISTINCTION YOU ARE MAKING.  IT

3  IS A DISTINCTION I HAVE NOT YET --

4      **MR. KESSLER:**  OKAY.

5      **THE COURT:**  -- MADE.

6      **MR. KESSLER:**  SO WHAT I WOULD SAY, YOUR HONOR, IF THE

7  LEVELS NUMBER DOESN'T MATTER, WE STILL HAVE THE SAME TWO

8  FUNDAMENTAL PROBLEMS SO THERE'S NO CONCESSION.

9      THE FIRST PROBLEM IS -- AND THIS GOES EVEN FOR HIS BATTERY

10  PURCHASERS, SO THERE'S ONLY ONE LEVEL BETWEEN THE BATTERY

11  PURCHASE AND THE CELL, SO I COULD DEAL WITH IT THAT WAY.

12  OKAY.

13      IT'S DIFFERENT PRODUCTS IN DIFFERENT MARKETS.  IT'S NOT

14  INTERCHANGEABLE.  THERE'S NO CROSS-ELASTICITY.  HE HAS A

15  PROBLEM FOR (SIC) THAT.

16      OKAY.

17      **THE COURT:**  WELL, ISSUES OF CROSS-ELASTICITY -- AND I

18  UNDERSTAND THAT YOU'RE NOT CONCEDING THAT THAT'S THE TEST, BUT

19  I -- BUT, AGAIN, IT SEEMS TO ME THAT THE STAGE IS IMPORTANT,

20  THE PROCEDURAL POSTURE IS IMPORTANT.

21      ISSUES OF DEFINING MARKETS IN TODAY'S GLOBAL ENVIRONMENT

22  ARE DIFFICULT.  WE ARE NOT IN A -- IN AN ENVIRONMENT WHEN

23  ILLINOIS BRICK WAS WRITTEN.  MARKETS ARE -- ARE COMPLICATED.

24  AND I'VE GOT A -- GOT A CASE COMING IN NEXT WEEK, AN ANTITRUST

25  CASE, WHERE THE -- WHERE THE REPORTS FROM THE ECONOMISTS, YOU

1   KNOW, ARE SIX TO NINE INCHES LONG BECAUSE IT'S NOT EASY, ALL

2   SORTS OF COMPLICATED MATHEMATICAL ANALYSES ARE DONE IN ORDER

3   TO FIGURE OUT AND DEFINE WHAT MARKETS ARE.  AND THEY DO NOT

4   SEEM TO ME TO BE -- TO REST ON PLANES ANYMORE.  THAT IS --

5   THEY'RE -- IT'S NOT A VERTICAL LINE, A MARKET.

6          **MR. KESSLER:**  YOUR HONOR, IF I MAY.

7          **THE COURT:**  SO -- NO, SO I WANT YOU TO ADDRESS, THEN,

8   THE CROSS-ELASTICITY IN THAT KIND OF CONTEXT.  IF THAT WAS THE

9   RULE, WHAT -- WHAT WOULD YOUR POSITION BE?

10         **MR. SIMON:**  IT -- WHAT I WOULD SAY, YOUR HONOR, IS

11  CROSS-ELASTICITY AND INTERCHANGEABILITY, AS YOU POINTED OUT,

12  ARE ECONOMIC TERMS.  THEY COME FROM BHAN, WHICH IS A CASE THAT

13  INVOLVED A NURSE ANESTHESIOLOGIST AND A DOCTOR.  AND -- AND IT

14  WAS AN ISSUE AS TO WHETHER OR NOT THE NURSE ANESTHESIOLOGIST

15  WAS BEING FREEZED (PHONETIC) OUT OF THE HOSPITAL BECAUSE THEY

16  WOULD ONLY LET DOCTORS APPLY THE ANESTHESIA.

17      IT'S A TOTALLY DIFFERENT CONTEXT.  NOT IN ONE DIRECT

18  PURCHASER PRICE-FIXING CASE, A SECTION 1 PRICE FIXING CASE IN

19  THE DIRECT PURCHASER SIDE, HAS CROSS-ELASTICITY OR

20  INTERCHANGEABILITY BEEN APPLIED.  AND, YOU KNOW, YOU CAN GO

21  BACK AND LOOK AT THE CASES.  WE DO HAVE A FEW SLIDES ON IT.

22  IT'S 22, 23 -- ARE TWO OF THE SLIDES, AND I WAS IN LCD, LIKE

23  MR. GLACKIN.  I WAS COLEAD COUNSEL WITH MR. GLACKIN.  I LIVED

24  AND BREATHED LCD FOR FIVE AND A HALF YEARS.

25      EVERY PERMUTATION OF IT AND EVERY ARGUMENT THAT IS BEING

1    MADE HERE WAS BEING MADE THERE.  SLIDE 22 TELLS YOU JUST LIKE

2    IN BATTERIES, IN LCD AND CRT, THEY -- THE PRODUCT HAS TO BE

3    ASSEMBLED TO BE USEFUL.  USEFULNESS, REALITY, ECONOMIC REALITY

4    IS WHAT I WOULD ASK YOUR HONOR TO CONSIDER IN DETERMINING

5    WHETHER IT'S A MARKET.

6         TO TAKE OUT US ON A STANDING BASIS FROM THIS CASE WILL

7    CREATE A GIGANTIC HOLE WHICH WE DEPICTED ON PAGE 2 AS THE

8    GAPING HOLE REFERRED TO IN SUGAR -- TAKE OUT A WHOLE SWATH OF

9    PURCHASERS IN THIS CASE.

10        NOW, MR. KESSLER MAKES THE POINT, WELL, IT'S ONLY A FEW

11   CENTS HERE, FEW CENTS THERE, WHAT'S THE BIG DEAL?  WELL, WE'RE

12   TALKING ABOUT, BY THE WAY, LAPTOP COMPUTERS ALMOST EVERY

13   COMPONENT OF WHICH IS WAS PRICE-FIXED BY THESE VERY SAME

14   DEFENDANTS, NUMBER ONE, SO IT IS A BIG DEAL.

15        THESE DEFENDANTS PRICE FIXED, YOU KNOW, THE DRAM, THE LCD

16   SCREEN, YOU KNOW, ALL -- ALL SORTS OF THINGS.  IT'S A

17   CONTINUING PATTERN OF GLOBAL COMPANIES PRICE FIXING AND THEN

18   TRYING TO STAND BEHIND AN IMMUNITY BY SAYING WE DON'T HAVE

19   STANDING.  AND THAT'S JUST NOT RIGHT.

20        THE FACT OF THE MATTER IN LCD, AS JUDGE ILLSTON SAID IN A

21   RULING, THERE ARE -- THERE WERE SYSTEM ASSEMBLERS,

22   INTEGRATORS, AND OTHERS WHO ASSEMBLED THE PRODUCTS.  SHE FOUND

23   THAT NOT TO BE ANY DIFFERENCE.

24        IN CRT, THERE'S A YOLK THAT HAS TO GO ON THE TUBE.  DOES

25   THAT REALLY CHANGE THE MARKET?  NO, IT DOESN'T CHANGE THE

1    MARKET.

2         YOU KNOW, YOU COULD TAKE -- I COULD BRING MY LAPTOP UP

3    HERE, I COULD POP THE SCREEN OFF AND I COULD SHOW YOU WHAT THE

4    MODULE LOOKS LIKE.  THE MODULE IN THE LCD IS WAY MORE

5    COMPLICATED THAN THE BATTERY PACK IN THIS CASE.  IN FACT, LCD

6    PROBABLY WAS A HARDER CASE THAN THIS CASE.  NOT -- NOT THE WAY

7    THAT MR. KESSLER IS TELLING YOU.

8         AND IF YOU LOOK AT SLIDE 23, YOUR HONOR, THIS WHOLE IDEA

9    THAT, YOU KNOW, THE PRICE IS DE MINIMIS, WHICH IS THEIR

10   ARGUMENT, YOU HAVE TO TAKE THAT INTO CONSIDERATION OF THE

11   HUNDREDS OF MILLIONS OF DOLLARS THAT THESE DEFENDANTS MADE ON

12   EACH AND EVERY ONE OF THESE PRODUCTS BY THESE INCREMENTAL

13   AMOUNTS.  AND THEY DID.  WE'RE TALKING ABOUT HUNDREDS OF

14   MILLIONS OF BATTERIES AND FINISHED PRODUCTS.

15        AND ON THIS CHART, YOU CAN SEE THAT THE -- THE DECIDING

16   FACTOR IS NOT THE PERCENTAGE, AS MR. KESSLER POINTS OUT.  IT

17   IS A FACTOR, AND IT IS ALSO A FACTUAL ISSUE THAT WE NEED TO GO

18   TO ON A FULLER RECORD.  BUT IF YOU LOOK AT THE TOP ON LCD, THE

19   COMPUTER MONITOR, THE SCREEN IS ABOUT 75 PERCENT OF IT; THE

20   TELEVISION, 47 PERCENT; THE NOTEBOOK COMPUTER, 15 PERCENT.  SO

21   THERE'S A WIDE VARIETY OF WHAT PERCENTAGE THE COMPONENT WAS OF

22   THE FINISHED PRODUCT PRICE.

23        AND HE'S WRONG ABOUT ODD BECAUSE IF YOU LOOK AT THE BOTTOM

24   ABOUT ODD AND YOU LOOK AT A COMPUTER -- A NOTEBOOK COMPUTER,

25   THE ODD IS BELOW 10 PERCENT OF THE TOTAL PRICE OF THE

```
1    COMPUTER, AND JUDGE SEEBORG FOUND THAT NOT TO BE A DISABLING

2    FACTOR ON STANDING.  AND WE'RE TALKING ABOUT THE PLEADING

3    STAGE HERE.

4         THIS WILL ALL COME OUT IN DISCOVERY.  WE HAVE ASKED THE

5    DEFENDANTS FOR THEIR TRANSACTIONAL DATA, WHICH THEY ARE

6    FIGHTING US ON.  AND IN THE TRANSACTIONAL DATA IN EVERY ONE OF

7    THESE CASES, YOU WILL FIND OUT WHETHER WHAT HE'S SAYING IS

8    RIGHT IS PROVABLE OR NOT.  AND THIS IS NOT THE STAGE TO TEST

9    IT.

10             THE COURT:  ALL RIGHT.  MR. KESSLER.

11             MR. KESSLER:  YOUR HONOR, WHAT MR. SIMON DIDN'T DO

12   WAS ANSWER YOUR QUESTION.  YOUR QUESTION WAS IF

13   INTERCHANGEABILITY IS -- OR CROSS-ELASTICITY, YOUR HONOR SAID,

14   IS THE TEST, HOW WOULD THAT BE APPLIED HERE.

15        THE REASON HE DIDN'T ANSWER IT IS BECAUSE IT CAN'T BE

16   CROSS ELA- -- ANY CROSS-ELASTICITY, AND I'LL EXPLAIN WHY.

17        AND I'LL ALSO EXPLAIN, YOUR HONOR, WHY THE BIG EXPERT

18   REPORT YOU HAVE ON RELEVANT MARKET WILL -- IF YOUR HONOR READS

19   THAT IN THAT CASE, WILL, I THINK, ILLUSTRATE THIS TO YOU.

20        THE ISSUE IN RELEVANT MARKET THAT FREQUENTLY GETS

21   LITIGATED AND YOU GET VOLUMINOUS REPORTS ABOUT IS ESTABLISHING

22   WHAT PRODUCTS COMPETE --

23             THE COURT:  STAY IN FRONT OF THE MIC.

24             MR. KESSLER:  SORRY.

25        -- WHAT PRODUCTS COMPETE WITH EACH OTHER.  THAT'S THE
```

1    ISSUE.  AND YOU COULD HAVE GREAT ECONOMIC DEBATES.  DOES IT --

2    DOES THIS TYPE OF PRODUCT -- DOES JUICE COMPETE WITH MILK?

3    DOES COKE GO IN THE PRODUCT?

4        YOU ALSO COULD HAVE A GEOGRAPHIC THING.  DO PRODUCTS IN

5    SWEDEN COMPETE WITH THE UNITED STATES?  EVERYTHING ABOUT

6    CROSS-ELASTICITY IS DO THEY COMPETE WITH EACH OTHER SO THEY

7    AFFECT THE PRICE.  AND YOU'LL FIND REGRESSION ANALYSES ABOUT

8    THAT, ET CETERA.

9        WHAT YOU WON'T EVER FIND BECAUSE HE CAN'T ALLEGE IT IS

10   THAT A COMPONENT COMPETES WITH ITS PRODUCT.  IN OTHER WORDS,

11   THERE'S NO ARGUMENT HERE.  THERE'S NO ECONOMIST THEY EVER WILL

12   PRODUCE -- SO I UNDERSTAND THAT'S WHY -- AND HE CAN'T ALLEGE

13   IN THE COMPLAINT -- THAT'S THE IMPORTANT POINT FOR YOUR HONOR

14   HERE -- THAT A COMPONENT, A CELL, COMPETES WITH A BATTERY.

15   WHY?  BECAUSE THERE'S NO CONCEIVABLE WAY THAT ONE COULD EVER

16   REPLACE THE OTHER, SO THERE COULD BE NO CROSS-ELASTICITY.

17       CERTAINLY IT DOESN'T COMPETE WITH A CELL PHONE OR A LAPTOP

18   COMPUTER OR ANYTHING ELSE.  SO THE PROBLEM HE HAS AND THE TEST

19   COMES NOT JUST IN THE DISTRICT COURTS.  IT COMES FROM THE

20   UNITED STATES SUPREME COURT, WHICH SAID YOU MUST BE IN THE

21   SAME MARKET.  IT'S ANTITRUST INJURY.  AND NO, WE'RE NOT

22   CONDEMNING THESE PEOPLE NOT TO BRING CLAIMS.

23       AGAIN, I SAID THE ISSUE IS THEY MAY HAVE CLAIMS, BUT THEY

24   DON'T HAVE THESE CLAIMS.  THAT'S -- THAT'S THE FUNDAMENTAL

25   PROBLEM.  THERE ARE PEOPLE WHO HAVE FEDERAL ANTITRUST CLAIMS.

 1    THESE PEOPLE DON'T.

 2        THE SECOND THING, YOUR HONOR, IF I MAY, WE -- I HEAR A LOT

 3    ABOUT LCD, AND I CONFESS I WASN'T IN LCD, BUT I CAN READ THE

 4    DECISIONS.  AND WHAT TELLS US AS LAWYERS AND JUDGES WHAT THE

 5    CASE MEANS IS WHAT THE DECISIONS SAY.

 6        IN THE MARCH -- I'M SORRY.  IN THE AUGUST 25TH, 2008

 7    DECISION IN LCD -- BECAUSE THERE ARE MANY, MANY DECISIONS,

 8    YOUR HONOR -- IN THAT ONE, WHEN YOU READ -- AND THIS IS THE

 9    ONE THAT GRANTED AGC.  WHAT JUDGE ILLSTON ACTUALLY SAID IS

10    WHAT MOVED HER NOT TO DENY AGC IN THIS THING WAS BECAUSE THE

11    PLAINTIFFS IN THAT CASE -- AND SHE WAS LOOKING JUST AT THE

12    INDIVIDUAL PLAINTIFFS, OKAY, PURCHASED DIRECTLY FROM A CARTEL

13    MEMBER, PART OF THE CARTEL THAT WAS THERE.  SHE WAS LOOKING AT

14    IT THAT WAY.  THE PROBLEM THEY HAVE HERE, YOUR HONOR, IS THE

15    CELL COMPANIES ARE THE CARTEL MEMBERS ALLEGED THAT'S HERE.

16        WHEN THEY SAY THEY'RE PURCHASING, FOR EXAMPLE, FROM

17    SONY.COM, A SALES COMPANY TRACED DOWN UNDER SONY THING (SIC),

18    THAT'S NOT TO CARTEL MEMBER BECAUSE WHEN THEY'RE -- WHEN

19    THEY'RE BUYING A LAPTOP COMPUTER FROM THEM, IT'S A COMPLETELY

20    DIFFERENT PRODUCT.  SONY.COM, WHO SELLS LAPTOP COMPUTERS -- IT

21    DOESN'T SELL CELLS.  IT DOESN'T -- IN OTHER WORDS, IT WOULDN'T

22    SELL A CELL TO ANYBODY, IS NOT A PARTICIPANT THE WAY THAT

23    JUDGE ILLSTON FOUND HERE.

24        THAT'S JUST WHAT THE DECISION SAYS.

25            THE COURT:  WELL, WHO SOLD --

```
 1                    (SIMULTANEOUS COLLOQUY.)

 2          THE COURT:  WHO SOLD THAT TO THE -- TO THE ONLINE

 3   COMPANY.  THEY AREN'T -- THE ONLINE COMPANY ISN'T GOING TO SUE

 4   THE SUPPLIER.

 5          MR. KESSLER:  YOUR HONOR, THAT'S THE ILLINOIS BRICK

 6   ISSUE.  OKAY?  IT'S NOT THE AGC ISSUE.  THAT'S WHY THEY'RE

 7   DIFFERENT.  THE ANTITRUST INJURY ISSUE IS FATAL WHEN YOU'RE

 8   TALKING ABOUT SOMEONE BUYING A LAPTOP, OKAY, WAY DOWN -- AND,

 9   IN FACT, SOMEONE BUYING A LAPTOP WAY DOWN IN A LAPTOP MARKET

10   OR WHATEVER LAPTOP COMPETES WITH -- CROSS-ELASTICITY ISSUE IS

11   MAYBE THEY COMPETE WITH TABLETS.  THEY PROBABLY DO.  MAYBE

12   THEY COMPETE WITH OTHER KINDS OF PRODUCTS THAT DO THOSE

13   THINGS.  BUT THEY DON'T COMPETE WITH CELLS FOR BATTERIES.

14   THAT'S THE ANTITRUST INJURY ISSUE THAT WE'RE -- THAT WE'RE

15   DEBATING HERE ABOUT THAT.

16       SO, YOUR HONOR, I JUST WANTED -- YOU KNOW, I BELIEVE --

17          THE COURT:  WELL, THERE ARE A NUMBER OF FACTORS THAT

18   THE COURT LOOKS TO --

19          MR. SIMON:  RIGHT.

20          THE COURT:  -- NOT -- NOT ANY OF WHICH IS

21   DISPOSITIVE.  SO THERE IS A WEIGHING AND A BALANCING THAT MUST

22   EXIST AND THAT MUST BE -- THAT MUST BE DEALT WITH.  SO -- SO

23   IT IS ONE OF FIVE FACTORS.

24          MR. KESSLER:  HERE'S, YOUR HONOR, HOW I WILL SUM UP

25   'CAUSE I KNOW YOU'VE HEARD A LOT OF THIS.  YOU'VE PROBABLY
```

```
 1   HEARD ENOUGH.

 2       IF YOU LOOK AT THE CASES, I BELIEVE YOU WILL FIND THE

 3   FACTORS HERE FOR ALL THE REASONS WE ARGUE LOOK MUCH LIKE --

 4   MUCH MORE LIKE DRAM WHERE AGC WAS FOUND TO BAR THE ACTION

 5   BECAUSE IT WAS A TINY DRAM GOING THROUGH INTO A COMPUTER AT A

 6   REMOTE LEVEL, AND JUDGE HAMILTON SAID AGC BARS, THEN IT DOES

 7   LIKE LOOKING ALL THE FACTORS LIKE LCD OR CRT.

 8       AND I'M QUITE CONFIDENT IF YOUR HONOR WEIGHS THOSE FACTORS

 9   AND SAYS, BECAUSE IT -- IT HAS TO BE THAT SOME WEIGHING OF THE

10   FACTORS MEANS THAT YOU DENY.  AND WHAT WE WOULD SUGGEST IS THE

11   TINY COST -- THE REMOTE LEVELS TOGETHER IN COMBINATION, THE

12   DIFFERENT MARKETS BETWEEN THE CELL, THE FACT THAT IT'S

13   DIFFERENT, THE WHOLE COMPLICATED CHAIN, ALL THOSE THINGS

14   TOGETHER, MAKE THIS LOOK MUCH MORE LIKE DRAM THAN THEY DO LCD.

15   AND I'D REST ON YOUR HONOR REVIEWING THAT RECORD AND MAKING

16   THAT DETERMINATION.

17           MR. SIMON:  CAN I -- TWO QUICK POINTS.

18       NUMBER ONE, DRAM, JUDGE HAMILTON'S DECISION WAS IN THE

19   INDIRECT PURCHASER CASE, TOTALLY DIFFERENT SET OF

20   CIRCUMSTANCES THAN WHAT MR. KESSLER'S ARGUING HERE.  NO DIRECT

21   PURCHASER CASE HAS HELD THE SAME IN (SIC) ANY JUDGE IN THIS

22   COURTHOUSE, AND HE CAN'T TELL YOU ONE.

23       NUMBER TWO, HE CITED THE 2008 OPINION, WELL, AFTER THE

24   CASE WAS TRIED, OUR CASE WAS TRIED, AND AFTER THE DIRECT

25   PURCHASERS WHEN -- WHO BROUGHT INDIVIDUAL ACTIONS WENT ALL THE
```

1    WAY TO SUMMARY JUDGMENT 2012, I WOULD HAVE THE COURT LOOK AT

2    WHAT JUDGE ILLSTON SAYS ABOUT HER OWN 2008 OPINION IN THIS

3    OPINION IN 2012.

4        AND SHE GOES -- SHE SAYS, ONE THING IS -- IS THAT IT IS

5    UNNECESSARY, QUOTING HER OWN OPINION, THE OPINION MR. KESSLER

6    WAS REFERRING TO -- IT IS, THEREFORE, UNNECESSARY FOR

7    PLAINTIFFS TO PROVIDE EVIDENCE OF A PANEL-BY-PANEL IMPACT.

8    RATHER, PLAINTIFFS MAY RESORT TO GENERALIZED METHODS OF PROOF.

9        THAT WAS ON SUMMARY JUDGMENT.  HE WOULD HAVE US GO PANEL

10   BY PANEL ON THE PLEADINGS.  IT'S JUST AN ABSURD STANDARD,

11   WHICH HAS NOT BEEN ACCEPTED BY ANY COURT.

12       AND LASTLY, AND I'LL END, ON OUR POWERPOINT PRESENTATION,

13   PAGES 20 AND 21, YOUR HONOR -- I ALWAYS COME BACK, WHAT DID

14   THE DEFENDANTS THINK ABOUT CELLS AND BATTERIES?  WELL, LOOK AT

15   THE DOCUMENTS ON PAGES 20 AND 21 WHICH ARE ALLEGED IN THE

16   COMPLAINT, THE COMPLAINT CITATIONS ARE IN THERE.  AND WHAT

17   THEY THOUGHT ABOUT CELLS AND PACKS IS THAT THEY WERE

18   INEXTRICABLY LINKED BECAUSE THESE ARE DOCUMENTS THAT TALK

19   ABOUT THE CELL PRICE GOING UP AND THE PACK PRICE GOING UP AT

20   THE SAME TIME.

21       AND THE BEST DOCUMENT IS AT THE END OF PAGE 21, WHERE THEY

22   ARE SAYING -- THIS IS MICHAEL, WHO IS AT SDI, TALKING TO

23   SOMEBODY AT LG CHEM, COMPETITORS TALKING.  AND THE VERY LAST

24   BULLET POINT SAID, MICHAEL SAYS PRICES WERE RAISED TOGETHER

25   DUE TO SDI SUGGESTION OF A JOINT PACK PRICE INCREASES.

1    I WOULD SUGGEST, YOUR HONOR, THAT THE REALITY OF THIS CASE

2    BASED ON THE DOCUMENTS AND THE ALLEGATIONS IN THIS COMPLAINT,

3    THAT THE DEFENDANTS WHEN THEY CONSPIRED MADE NO DISTINCTION

4    BETWEEN CELLS AND BATTERIES.

5         **MR. KESSLER:**  YOUR HONOR, IN 2000 -- I'M SORRY.

6         **THE COURT:**  ONE QUESTION ABOUT THE 2012 ILLSTON -- DO

7    YOU HAVE A CITE FOR THAT?

8         **MR. SIMON:**  YES, I DO.  IT IS 2012 WESTLAW 586-9588.

9    AND THE SECTION STARTS AT ONE OF THE STAR NUMBERS.  I THINK

10   IT'S STAR 4 AND STAR 5 YOU WANT TO LOOK AT, YOUR HONOR.

11        **THE COURT:**  THANK YOU.

12        **MR. KESSLER:**  YOUR HONOR, WHEN YOU READ THAT OPINION,

13   YOU'LL FIND IN 2012 THE CLASS WAS ALREADY CERTIFIED AND THE

14   ISSUE WAS HOW THEY HAD TO PROVE CLASS-WIDE IMPACT AND INJURY.

15   OF COURSE, THAT WAS NOT INDIVIDUAL AT THAT TIME WHEN THEY WERE

16   LOOKING AT THAT ISSUE.

17       THE 2008 OPINION I CITED IS PARALLEL IN PROCEDURAL CONTEXT

18   TO RIGHT NOW WHEN YOU HAVE TO LOOK PLAINTIFF BY PLAINTIFF

19   RIGHT NOW, YOUR HONOR.

20       SO I BELIEVE THAT EXPLAINS IT.

21        **THE COURT:**  OKAY.  ANYTHING ELSE ON THIS MOTION?

22        **MR. SIMON:**  NO.  THANK YOU, YOUR HONOR.

23        **MR. KESSLER:**  NOTHING ELSE, YOUR HONOR.  THANK YOU

24   FOR YOUR TIME ON THIS.

25        **THE COURT:**  ALL RIGHT.  I UNDERSTAND THAT THERE WOULD

```
 1    LIKE -- PARTIES WOULD LIKE TO ARGUE THE INDIVIDUAL MOTIONS.

 2    WE WILL BEGIN WITH GS -- I DON'T KNOW THAT I'M SAYING IT YUASA

 3    CORP.?

 4              MR. GARROU:  GOOD MORNING, JUDGE.

 5              THE CLERK:  WOULD YOU JUST FOR THE COURT REPORTER

 6    IDENTIFY YOURSELF.

 7              MR. GARROU:  ABOUT TO GET THERE.

 8        DOUG GARROU FOR GS YUASA, AND ALONG WITH MR. PETKOSKI,

 9    WE'RE MAKING OUR FIRST PRESENTATION IN THIS CASE.

10              THE COURT:  DOUG GARROU?

11              MR. GARROU:  GARROU, YES, MA'AM.

12              MR. FRIEDMAN:  GOOD MORNING, YOUR HONOR.  JEFF

13    FRIEDMAN FROM HAGENS BERMAN ON BEHALF OF THE INDIRECT

14    PURCHASER PLAINTIFFS.

15        WE WERE GOING TO SEGMENT THE ARGUMENTS WHERE I WILL ALSO

16    ARGUE ON A DEFENDANT-BY-DEFENDANT BASIS FOR THE DIRECTS, AS

17    WELL AS MR. SEAVER FOR THE DIRECTS WILL ARGUE FOR CERTAIN OF

18    THE DEFENDANTS.

19                   (PAUSE IN THE PROCEEDINGS.)

20              THE COURT:  MR. GARROU, WHAT LAW FIRM --

21              MR. GARROU:  I'M SORRY?

22              THE COURT:  YOUR LAW FIRM.

23              MR. GARROU:  HUNTON & WILLIAMS, YOUR HONOR.

24              THE COURT:  DID YOU SIGN IN TODAY.

25              MR. GARROU:  EXCUSE ME?
```

1      **THE COURT:**  DID YOU SIGN IN?

2          **MR. GARROU:**  YES, YOUR HONOR.  WE DID.  MR. PETKOWSKY

3   AND I BOTH DID.  HE WAS THE LAST NAME ON THE LIST, I THINK.

4   AND I WAS PAGE 2.

5              (OFF-THE-RECORD DISCUSSION.)

6      **THE COURT:**  OH, I SEE.  OKAY.  I GOT IT.

7      OKAY.  MR. GARROU, YOU MAY PROCEED.

8          **MR. GARROU:**  THANK YOU, YOUR HONOR.

9      YOUR HONOR, THE COMPLAINTS IN THIS CASE SAY VERY LITTLE

10  ABOUT GS YUASA CORPORATION GENERALLY.  THEY DO SAY ONE THING

11  QUITE IMPORTANT.  THE -- THE INDIRECT PURCHASERS AT 465 AND

12  THE DIRECT PURCHASERS AT 51 BOTH SAY THAT WE WERE FORMED IN

13  APRIL 2004 AS A HOLDING COMPANY.  THAT ALLEGATION DIVIDES THE

14  ANALYSIS OF THE COMPLAINT IN -- INTO TWO BUCKETS ESSENTIALLY.

15     ONE IS HAVE PLAINTIFFS PLEADED SUFFICIENT FACTS TO MAKE US

16  LIABLE FOR CONDUCT THAT OCCURRED PRIOR TO 2004, PRIOR TO

17  OUR -- OUR FORMATION, AND WE THINK THEY HAVEN'T.

18     AND THE SECOND QUESTION IS WITH THE VERY BARE ALLEGATIONS

19  THAT ARE MADE OF GS YUASA'S ACTIVITIES AFTER 2004, AFTER IT

20  CAME INTO EXISTENCE, ARE THOSE ALLEGATIONS SUFFICIENT?  AND WE

21  THINK THEY'RE NOT.

22     MOVING TO THE -- THE FIRST POINT, THERE IS NO ALLEGATION

23  THAT GS YUASA IS A SUCCESSOR TO ANY ENTITY THAT ENGAGED IN ANY

24  ALLEGEDLY UNLAWFUL ACTIVITY PRIOR TO GS YUASA'S FORMATION.

25     WHAT IS PLEADED IS THAT GS YUASA WAS A HOLDING COMPANY SET

1    UP IN THE NORMAL COURSE OF BUSINESS BY TWO OTHER COMPANIES AND

2    THROUGH A -- A TRANSFER OF STOCK.

3        THE PLAINTIFFS TRY TO CAST THAT INTO SOMETHING THAT WOULD

4    GIVE LIABILITY TO GS YUASA IN TWO WAYS.  THEY SAY FIRST OF

5    ALL, THAT THEY'VE PLEADED A DE FACTO MERGER IN WHICH GS YUASA

6    WOULD HAVE SOMEHOW ASSUMED LIABILITY FOR ACTIONS OF

7    CORPORATIONS EXISTING PRIOR TO THEM.  THEY HAVEN'T PLEADED

8    THAT AT ALL, AND -- AND THAT'S THE SCHWARTZ CASE.

9        THEY WOULD NEED TO ACTUALLY PLEAD SOME SORT OF --

10   ESSENTIALLY A CORPORATE FRAUD, SUCH AS AN -- AN ASSET SALE

11   THAT WAS -- THAT WAS MERELY A SUBTERFUGE FOR -- FOR A

12   CORPORATE FRAUD.

13       SECONDLY, THEY CLAIM THAT THE FACT THAT THEY CALL US A

14   JOINT VENTURE PARTICIPANT IS SUFFICIENT TO MAKE US LIABLE FOR

15   THIS -- THIS PRECEDING 2004 CONDUCT.  AGAIN, THAT'S -- THAT'S

16   SIMPLY NOT THE CASE.  ALL THEY'VE ALLEGED IS THAT WE HAVE AN

17   OWNERSHIP INTEREST IN THE ENTITY THAT THEY SAID ENGAGED IN --

18   IN THIS BAD BEHAVIOR.

19       THE DIGITAL CASE ON VERY SIMILAR FACTS FOUND QUITE SIMPLY

20   THAT UNLESS AND UNTIL THEY MAKE ALLEGATIONS SUFFICIENT TO SHOW

21   CORPORATE DISREGARD, THAT THAT'S NOT A -- A SUFFICIENT BASIS

22   TO MAKE US LIABLE FOR THAT EARLIER CONDUCT.

23       REALLY, MOST OF THESE ARGUMENTS PARALLEL YOUR FINDINGS

24   ABOUT THE -- THE U.S. SUBSIDIARIES OF THE FOREIGN COMPANIES

25   IN -- IN YOUR PREVIOUS ORDER.  IT'S THE SAME CORPORATE LAW

```
1    THAT APPLIES THERE.

2        NOW, MOVING TO THE -- THE POST-2004 CONDUCT, LET'S START

3    FIRST WITH THE --

4            THE COURT:  WELL, I'M GOING TO INTERRUPT YOU.

5        MR. FRIEDMAN, WHY DON'T YOU ADDRESS THAT.  THE ATCHISON

6    (PHONETIC) CASE -- I THINK I'VE SAID THAT CORRECTLY -- ONLY

7    CAME UP IN THE CONTEXT OF THE REPLY, SO I DON'T HAVE ANY

8    BRIEFING ON THAT ISSUE FROM THE PLAINTIFFS.

9            MR. FRIEDMAN:  YOUR HONOR, SO THE SHORT ANSWER IS THE

10   WE THINK IT'S A FACTUAL ISSUE IN TERMS OF THE ACTUAL CORPORATE

11   ENTITIES AND HOW -- HOW IT WAS FORMED AND EXACTLY WHAT IS THE

12   CORPORATE STRUCTURE.  WE DON'T HAVE THE DISCOVERY.  WE'VE

13   GIVEN YOU OUR BEST DESCRIPTION FROM THE DOCUMENTS YOU HAVE,

14   AND --

15           THE COURT:  SO IF I GAVE -- IF I GRANTED THE MOTION

16   WITH LEAVE TO AMEND, THERE'S NOTHING ELSE YOU COULD DO?

17           MR. FRIEDMAN:  ON THAT BASIS, CORRECT, YOUR HONOR.

18           THE COURT:  OKAY.

19       ANYTHING ELSE ON THAT ISSUE?

20           MR. FRIEDMAN:  NO, YOUR HONOR.

21           THE COURT:  NEXT?

22           MR. GARROU:  ALL RIGHT.  MOVING TO THE POST-2004

23   CONDUCT, THERE ARE EXTREMELY SPARSE ALLEGATIONS ABOUT GS

24   YUASA.  I THINK THEY ARE -- THEY STAND IN DISTINCTION EVEN TO

25   THE SPARSE ALLEGATIONS MADE ABOUT CERTAIN OTHER DEFENDANTS.
```

1      LOOKING AT THE INDIRECT PURCHASERS' COMPLAINT, THEIR

2   OPPOSITION TO OUR MOTION CITES TWO PARAGRAPHS IN THEIR

3   COMPLAINT ONLY FOR WHAT WE DID AFTER 2004, AFTER WE CAME IN --

4   INTO BEING.  THOSE ARE PARAGRAPHS 112 AND 121.  AND THOSE

5   PARAGRAPHS, THE SUM TOTAL OF THOSE PARAGRAPHS, WHICH ARE

6   ESSENTIALLY IDENTICAL -- IS THAT WE MET WITH SANYO TO -- WITH

7   SAMSUNG, RATHER, TO DISCUSS CONFIDENTIAL BUSINESS MATTERS,

8   PERIOD.

9      THOSE ARE QUINTESSENTIALLY INSUFFICIENT ALLEGATIONS UNDER

10   TWOMBLY AND UNDER A HOST OF OTHER -- OF OTHER AUTHORITY.

11      WHAT HAPPENS, THEN, WITH THE DIRECT PURCHASERS IS THEY

12   TAKE THAT SAME -- IN A SAME INNOCUOUS CONDUCT, AND THEY TRY TO

13   FORCE INTO IT A CONSPIRACY NARRATIVE BY SAYING IT'S SIMILAR TO

14   THESE OTHER MEETINGS THAT THESE OTHER DEFENDANTS HAD, AND SO

15   YOU CAN JUST LUMP THEM ALL -- ALL TOGETHER.

16      WHAT I -- I WOULD CHALLENGE THE PLAINTIFFS TO SHOW YOU IN

17   THE COMPLAINT, YOUR HONOR, IS THE EVIDENCE THAT GS YUASA

18   ENTERED -- MADE A CONSCIOUS COMMITMENT TO ENTER INTO A

19   CONSPIRACY, THE EVIDENCE THAT GS YUASA EVER DISCUSSED THE

20   PRICE OF -- OF BATTERIES WITH ANYONE, WITH -- THE OUTPUT WITH

21   ANYONE.

22          **THE COURT:**  MR. GARROU, YOU'RE TALKING TOO FAST FOR

23   THE COURT REPORTER.

24          **MR. GARROU:**  I APOLOGIZE, YOUR HONOR.  I'LL TRY TO

25   SLOW MYSELF DOWN, ALTHOUGH I THINK MY POINT IS BASICALLY MADE

1    THERE.

2         THE -- THE ALLEGATIONS ARE ONLY THAT WE MET WITH SAMSUNG.

3    NOW, IT MAY WELL BE THE CASE THAT THESE ALLEGATIONS ARE SO

4    SPARSE BECAUSE WE DON'T COMPETE WITH THESE OTHER DEFENDANTS IN

5    THE TYPES OF BATTERIES THAT THE PLAINTIFFS ARE TALKING ABOUT.

6    UNFORTUNATELY, AT -- AT THE PLEADING STAGE, WE HAVE TO LIVE IN

7    THIS -- IN THE LAND OF UNREALITY WHERE THE ALLEGATIONS ARE --

8    ARE TAKEN AS TRUE.

9         THE REASON THEY DON'T HAVE ANY EVIDENCE OF -- OF US HAVING

10   THESE CONVERSATIONS IS BECAUSE THERE'S NO REASON WE EVER

11   WOULD.  BUT HOLDING THAT TO ONE SIDE, LET'S LOOK JUST AT -- AT

12   THE PLEADING ITSELF.  WE HAD -- WE HAD MEETINGS WITH SAMSUNG,

13   PERIOD.

14        THEY THEN TRY TO -- THE DIRECT PURCHASERS THEN TRY TO

15   CHARACTERIZE THOSE MEETINGS AS FITTING INTO THEIR NARRATIVE

16   BUT WITHOUT EVER GIVING ANY CONTENT TO WHAT WAS ACTUALLY DONE

17   OR SAID BY GS YUASA.  WE ARE AN OUTLIER.  WE ARE NOT A -- A

18   PROPER DEFENDANT IN THIS CASE, AND FOR THAT REASON, THEY

19   CANNOT MAKE DETAILED FACTUAL ALLEGATIONS SUFFICIENT IN EVEN

20   THE BAREST SENSE UNDER TWOMBLY.

21             THE COURT:  MR. FRIEDMAN.

22             MR. FRIEDMAN:  YOUR HONOR, FIRST, MAY I HAND TO THE

23   COURTROOM DEPUTY THREE COPIES OF -- SUBMISSION FOR THE COURT?

24                  (PAUSE IN THE PROCEEDINGS.)

25             MR. FRIEDMAN:  YOUR HONOR, THE FIRST THING WE HAD IS

```
 1   WE WANTED TO CONDENSE AND FOCUS THE COURT WHEN IT GOES BACK

 2   AND ANALYZES THE ISSUES BY PROVIDING THE SPECIFIC PARAGRAPH

 3   REFERENCES, BOTH THE DIRECTS AND INDIRECT PURCHASERS RELY ON

 4   IN THEIR COMPLAINTS IN ORDER SO THAT THE COURT DOES NOT HAVE

 5   TO GO SEARCHING THROUGH THE COMPLAINT OR FOR THE PAPERS.  SO

 6   THAT -- SO WE'VE PROVIDED THAT TO THE COURT.

 7           THE COURT:  IT'S ALWAYS APPRECIATED.

 8           MR. FRIEDMAN:  SO, YOUR HONOR, I'D LIKE TO MAKE A --

 9   A GENERAL POINT FIRST THAT WILL APPLY THROUGHOUT AS TO -- AS

10   EACH ONE OF THE DEFENDANTS STANDS UP BEFORE YOU AND TRIES TO

11   ARGUE ON A PARAGRAPH-BY-PARAGRAPH BASIS WHY YOU SHOULD DISMISS

12   THE COMPLAINT AGAINST THEM.

13       AND THEN I WILL DEAL DIRECTLY WITH YUASA AND WHOMEVER

14   WANTS TO COME, IF THE COURT WANTS TO GO PARAGRAPH BY PARAGRAPH

15   IN RESPONSE.  BUT I'M DOING THIS TO TRY AND USE THE COURT'S

16   TIME EFFICIENTLY.

17       THE COURT HIT CORRECTLY THE NAIL RIGHT ON THE HEAD IN

18   RESPONSE TO MR. KESSLER WHEN THE COURT SAID, LOOK, WE'RE AT

19   THE PLEADING STAGE.  AND THE FACT OF THE MATTER IS WE'RE

20   LOOKING AT PLAUSIBILITY.  AND THE IDEA -- AND IN ITS -- IN THE

21   COURT'S ORDER ON PAGE 20, I BELIEVE, YOU REMARKED THAT AT THIS

22   STAGE -- AND EVEN AT TRIAL, YOUR HONOR -- WE'RE NOT REQUIRED

23   TO PROVE BACK-ROOM MEETINGS AND DISCUSSIONS THAT HAPPENED IN

24   BACK-ROOM MEETINGS.

25       SO EVEN WHEN WE GET TO THE TRIAL STAGE, YOUR HONOR, WE'RE
```

```
 1   NOT REQUIRED TO PROVE IT, LET ALONE ALLEGE IT AT THIS STAGE.

 2       SO WHAT WE HAVE IS THE INTERPLAY BETWEEN NOTICE PLEADING

 3   UNDER RULE 8.  WE HAVE TWOMBLY THAT SAYS THERE NEEDS TO BE

 4   SOMETHING BEYOND BARE-NAKED ALLEGATIONS, BARE BONES.  AND THEN

 5   WE HAVE THE THIRD OPERATIVE PRINCIPLE AT PLAY, WHICH IS

 6   CONSPIRACY LAW.  AND THIS IS (SIC) THE THREE FACTORS THAT WILL

 7   RUN THROUGHOUT, NOT JUST ALLEGATIONS IN THE COMPLAINTS BUT

 8   SUMMARY JUDGMENT AND TRIAL HERE, EXCEPT FOR THE TWOMBLY PART

 9   AND THE NOTICE PART, BUT PARTICULARLY THE CONSPIRACY PART.

10       AND SO WE HAVE ON ONE END OF THE SPECTRUM, YOUR HONOR,

11   THIS NOTION THAT THERE'S NOTICE PLEADING, AND THEN YOU HAVE

12   OVERARCHING ON THAT IS THE SUPREME COURT SAYING, YOUR HONOR,

13   YOU NEED TO LOOK AT SOME FACTUAL MATERIAL THAT NUDGES THE

14   COMPLAINT TO PLAUSIBLE.

15       AND THE COURT NOTED IT'S NOT A PROBABLE TEST.  IT'S

16   WHETHER OR NOT THE COURT, USING THE CONTEXT WHICH WE'VE (SIC)

17   PROVIDE WITH FACTS, ALLOWS FAIR INFERENCES.  SO HERE'S WHAT I

18   WOULD SAY IN TERMS OF THE CONSPIRACY LAW, AND THIS IS WHAT --

19   THIS IS GOING TO RUN THROUGHOUT THEIR ARGUMENTS.

20       THE STANDARD DOES NOT REQUIRE US UNDER A CONSCIOUS

21   COMMITMENT TO A COMMON SCHEME OR PLAN TO PROVE EXPRESS

22   AGREEMENTS.  IT DOES NOT REQUIRE US TO PROVE THAT THERE WAS

23   ANY STATEMENTS MADE, IN FACT.  IT CAN BE CONDUCT ALONE TO

24   DEMONSTRATE PARTICIPATION.

25       AND THAT'S WHAT WE'RE ANALYZING HERE TODAY, IS HAVE WE
```

```
 1   ALLEGED FACTS THAT INFER PARTICIPATION?  WE CAN INFER

 2   PARTICIPATION FROM STATEMENTS, FROM CONTEXT, FROM CONDUCT, AND

 3   SO ALL OF THOSE THINGS, YOUR HONOR, WE'RE ALLOWED TO POINT TO

 4   AT THE PLEADING STAGE TO SAY, WE MAY INFER A TACIT

 5   UNDERSTANDING THAT AN ILLICIT AGREEMENT EXISTED THAT THEY

 6   PARTICIPATED IN.

 7        SO WHAT I WOULD SAY TO YOUR HONOR IS WITH THAT BACKDROP,

 8   IT'S IMPORTANT, THEN, FOR US TO THEN LOOK AT EACH ONE OF THE

 9   DEFENDANTS.  AND WE, IN FACT, DROPPED ONE DEFENDANT WHERE WE

10   HAD NO OBJECTIVE OBSERVABLE FACT FROM WHICH TO INFER

11   PARTICIPATION.  EVERY OTHER DEFENDANT THAT'S GOING TO GET UP

12   HERE TODAY, WE HAVE AN OBJECTIVE OBSERVABLE FACT TO INFER

13   PARTICIPATION.

14        NOW, HERE'S THE INTERPLAY, FIRST OF ALL, WITH WHAT

15   COUNSEL'S SAYING.  NOW, THE RELEVANCE HERE, YOUR HONOR, IN

16   TERMS OF THEIR ATTEMPT TO BIFURCATE THE 2004 AWAY FROM

17   ANYTHING AFTER THE 2004 PERIOD COMES SORT OF IN TWO

18   DIMENSIONS.

19        THE FIRST DIMENSION IS THEY DON'T WANT YOU -- OR THEY WANT

20   YOU TO MINIMIZE THE INFERENCES THAT YOU CAN DRAW FROM, FOR

21   EXAMPLE, ALLEGATION IN PARAGRAPH 57, YOUR HONOR, OF THE

22   INDIRECT PURCHASER COMPLAINT.

23        IN PARAGRAPH 57 OF THE IN- -- THE INDIRECT PURCHASERS

24   COMPLAINT, WHICH IS A PRE-2004 EVENT, IS WHERE A YUASA

25   INDIVIDUAL -- THERE IS A REFLECTION OF MEETINGS IN WHICH YUASA
```

1    AND SDI -- WHICH IS WHERE WE GET A LOT OF THE INCRIMINATING

2    DOCUMENTS FROM, IS FROM SDI, YOUR HONOR -- RECOUNT THAT THE

3    PARTIES DISCUSSED THE IDEA -- QUOTE, THE IDEA THAT THE TWO

4    COMPANIES CAN WIN/WIN AS LONG AS WE MAINTAIN COOPERATION, NOT

5    THE COMPETITION.

6        SO YOU HAVE YUASA PARTICIPATING CLEARLY WHERE WE HAVE

7    OBJECTIVE FACTS AND STATEMENTS OF COOPERATION.  AND WHAT THEY

8    WANT YOU TO DO IS SAY, WELL, EVEN THOUGH THERE'S SOME YUASA

9    EMPLOYEE THAT'S PARTICIPATING, WHEN YUASA CHANGES AND MORPHS

10   ITS CORPORATE STRUCTURE, THAT WHEN A YUASA EMPLOYEE IN 2006

11   AND 2007 IS MEETING WITH THE CONSPIRATORS, THEY'RE

12   COMPETITORS, AND HAVING CONFIDENTIAL COMMUNICATIONS, THAT YOU

13   MAY NOT INFER THAT THIS IS A CONTINUATION OF THE TYPE OF

14   DISCUSSIONS THAT WERE GOING ON THAT PREDATED 2004.

15       AND SO WHAT I'D SAY TO YOUR HONOR IS THAT YOU HAVE THAT

16   INFORMATION CONTEXTUALLY, WHICH WE THINK GIVES US AN

17   INFERENCE -- ALLOWABLE INFERENCE AT THIS STAGE THAT WHEN YUASA

18   IS MEETING WITH A CONSPIRATOR IN THE FOLLOWING CONTEXT:  IT

19   WAS MEETINGS IN WHICH SDI, SAMSUNG, IS GOING TO JAPAN IN

20   AUGUST OF 2006 AND MEETING SEQUENTIALLY WITH ITS COMPETITORS

21   AND HAVING DETAILED EXCHANGE OF INFORMATION ABOUT PRICING

22   CAPACITY, FUTURE PLANS, WHICH THE COURT RECOGNIZED IN THIS

23   CONTEXT, CLEARLY THERE'S AN INFERENCE THAT THOSE DISCUSSIONS

24   ARE IN FURTHERANCE OF THE OBJECTIVE TO ELEVATE PRICES.

25       SO WE'RE NOT TALKING ABOUT A FREE-STANDING MEETING THAT

```
 1    YUASA HAS WITH SAMSUNG THAT'S UNTETHERED TO ANY CONTEXT HERE.

 2    AND WE'RE NOT TALKING ABOUT THIS OUTLIER THAT WE ONLY HAVE ONE

 3    INCIDENCE WHERE WE DON'T HAVE THE SPECIFIC DETAILED NOTES OF

 4    EXACTLY WHAT WAS SAID ON A TAPE-RECORDING.

 5        BUT, INSTEAD, WHAT WE HAVE, YOUR HONOR, IS CONTEXTUALLY

 6    DETAILED CONSPIRATORIAL NEGOTIATIONS THAT WERE NOTED PRE-2004

 7    BY A YUASA EMPLOYEE, A MORPHING OF ENTITY THAT OCCURS, AND

 8    THEN A CONTINUATION OF THESE SEQUENTIAL MEETINGS BACK TO BACK

 9    TO BACK AMONGST THE CONSPIRATORS THAT ARE CLEARLY GOING ON IN

10    THE CONTEXT OF CARRYING OUT THE CONSPIRACY.

11        AND SO -- I'M ABOUT TO FINISH, YOUR HONOR.  I WOULD ONLY

12    SAY THAT IN THIS CONTEXT, AT THE PLEADING STAGE, WE CERTAINLY

13    HAVE GONE PAST BARE CONCLUSORY ALLEGATIONS.  THERE'S -- THIS

14    CAN BE NO DISPUTE ABOUT THAT.  AND THE FACT THAT WE'RE NOW

15    ARGUING BY DEFINITION INFERENCES DRAWN FROM THE FACTS THAT WE

16    ALLEGE, WE THINK JUST BY DEFINITION AT THAT POINT IN TIME,

17    YOUR HONOR, WE GET TO PLAUSIBILITY, AND WE MEET THE STANDARD.

18        BUT I'D EVEN GO ONE STEP FURTHER, AND THAT IS TO SAY THAT

19    EVEN WHEN YOU START TALKING ABOUT THE INFERENCES THAT CAN BE

20    DRAWN, THAT WE'RE NOW TALKING ABOUT SUCH SPECIFICITY THAT

21    WE'RE GOING BEYOND THE CONSPIRACY STANDARD FOR SUMMARY

22    JUDGMENT AND TRIAL, AND THAT THE CONSCIOUS COMMITMENT IS ONE

23    IN WHICH WE'RE TALKING ABOUT THE MENS REA.  AND MENS REA AT

24    TRIAL WE WILL BE ALLOWED TO PROVE EVEN IF IT WAS PURELY A

25    TACIT UNDERSTANDING DEMONSTRATED BY CONDUCT.
```

```
 1         AND SO --

 2              THE COURT:  BUT IT HAS TO BE -- THAT IS, LET'S --

 3    LET'S LOOK AT YOUR ALLEGATIONS.

 4              MR. FRIEDMAN:  SURE, YOUR HONOR.

 5              THE COURT:  THE INDIVIDUAL WHO'S AT ISSUE WHO HAD THE

 6    MEETING, WHO IS THAT PERSON?

 7              MR. FRIEDMAN:  WHO HAD THE MEETING IN -- BEFORE 2004?

 8              THE COURT:  FOR THE -- I WAS LOOKING AT 54.  I DIDN'T

 9    SEE --

10              MR. FRIEDMAN:  AT 54 OR 57, YOUR HONOR?

11                   (PAUSE IN THE PROCEEDINGS.)

12              MR. FRIEDMAN:  SO IF YOU LOOK AT 56, YOUR HONOR,

13    PARAGRAPH 56, THE INDIRECT PURCHASER COMPLAINT --

14                   (PAUSE IN THE PROCEEDINGS.)

15              MR. FRIEDMAN:  TELL ME WHEN THE COURT'S --

16              THE COURT:  NO, I HAD ACTUALLY THE WRONG COMPLAINT

17    OPEN.  OKAY.  NOW I'M SEEING IT.

18              MR. FRIEDMAN:  OKAY.  SO AT 56, YOUR HONOR, WE DETAIL

19    DATE, THAT THIS MEETING OCCURRED AT THE YUASA ODAWARA FACTORY

20    IN JAPAN.  WE DETAIL THAT -- HERE'S THE SAMSUNG EMPLOYEES.  WE

21    DETAIL THE YUASA EMPLOYEES, YOUR HONOR.  AND THAT -- AND THAT

22    IS IN THE CONTEXT OF, THEN, ALSO PARAGRAPH 57, WHICH DETAILS

23    THE DISCUSSION -- AT LEAST PART OF THE DISCUSSIONS.  WE DON'T,

24    OF COURSE, KNOW ALL OF THE DISCUSSIONS THAT IS GOING ON.

25         AND WHERE WE HAVE NOTATIONS OF SOME OF THE DISCUSSIONS
```

1   WHICH WE BELIEVE STRONGLY SUPPORT THE FACT THAT THERE WERE

2   COLLUSIVE DISCUSSIONS GOING ON.

3       NOW, SAMSUNG, YOUR HONOR, AS WE SAID, IS ALL OVER THE

4   DOCUMENTS, JUST LIKE LG IS ALL OVER THE DOCUMENTS NOTING

5   COLLUSIVE DISCUSSIONS.  AND SO WHAT I'M SAYING, YOUR HONOR, IS

6   THAT WE HAVE THIS CONTEXT THAT IS SPECIFICITY BEYOND WHAT WE

7   THINK WE OBVIOUSLY NEED AT THIS POINT, BUT WE'VE PLED IT.

8       AND THEN WHAT WE HAVE, YOUR HONOR, IS LATER MEETINGS THAT

9   ARE OCCURRING THAT WE'RE DETAILING FOR YOU.  ALSO WITH THE

10  YUASA ENTITY THAT'S IN THE CONTEXT OF SDI MAKING ITS ROUND

11  TRIPS TO DISCUSS COLLUSIVE ACTIONS WITH THEIR COMPETITORS.

12  AND IN THE MIDDLE OF THIS THREE-TO-FOUR-DAY MEETING THAT'S

13  GOING ON, I BELIEVE, IN AUGUST OF 2006 -- MEETINGS -- THEY'RE

14  MEETING WITH YUASA.

15          **THE COURT:**  THERE IS A INDICATION BY MR. GARROU THAT

16  THERE WAS NO -- THAT THEY'RE NOT -- THAT THEY'RE NOT

17  COMPETING.  THEY'RE NOT IN -- I SEE HERE THE REFERENCE TO

18  DIFFERENT KINDS OF BATTERIES.  WE -- WHAT IS THE PERSPECTIVE

19  ON THAT ISSUE?

20          **MR. FRIEDMAN:**  WELL, FIRST OF ALL, YOUR HONOR,

21  GETTING AN ARGUMENT WHETHER OR NOT THEY'RE COMPETING OR NOT, I

22  DON'T THINK IS AT THIS POINT TO BE RESOLVED.  THAT'S ONE.

23      NUMBER TWO --

24          **THE COURT:**  I UNDERSTAND THAT.  I JUST -- I'M LOOKING

25  FOR THE REFERENCE TO THIS COMPANY PRODUCING LITHIUM ION

1    BATTERIES OR BATTERY CELLS OR SOMETHING TO THAT EFFECT.

2          **MR. FRIEDMAN:**  SO IF -- IF THE ARGUMENT, YOUR HONOR,

3    IS THEY WERE NOT IN THE LITHIUM ION BATTERY BUSINESS, I'M

4    HAPPY TO PROVIDE -- I DON'T HAVE SPECIFIC PIN CITES FOR YOU.

5    I'M HAPPY TO GO AND LOOK AT PIN CITES IF WE MAKE THAT

6    ALLEGATION.

7         I CAN TELL YOU THAT WE CERTAINLY HAVE -- I DON'T WANT TO

8    SAY THINGS THAT ARE OUTSIDE THE COMPLAINT, YOUR HONOR, SO

9    THAT'S WHY I DON'T KNOW FOR CERTAIN.

10         **THE COURT:**  SO YOU DON'T KNOW IF THAT ALLEGATION IS

11   IN THE COMPLAINT.

12         **MR. FRIEDMAN:**  WHETHER THEY'RE AT ALL INVOLVED IN THE

13   LITHIUM ION BUSINESS?

14         **THE COURT:**  YES.

15         **MR. FRIEDMAN:**  I DON'T HAVE THE PIN CITE, AND I DON'T

16   KNOW SPECIFICALLY SO WE WILL LOOK.

17         **THE COURT:**  MR. SEAVER, DO YOU KNOW?

18              (SIMULTANEOUS COLLOQUY.)

19         **MR. GARROU:**  AND, JUDGE, I MAY BE ABLE TO -- I HAVE

20   SOME KNOWLEDGE ON THIS AREA.  WE MAY BE ABLE TO SHORT CIRCUIT

21   THIS.  GS YUASA DOES NOT MAKE THE TYPES OF LITHIUM ION

22   BATTERIES THAT, FOR EXAMPLE, THE PLAINTIFFS JUST SERVED US

23   DISCOVERY ON.  WE MAKE LARGE LITHIUM ION BATTERIES FOR

24   SPECIALTY APPLICATIONS -- OUR SUBSIDIARIES MAKE LARGE LITHIUM

25   ION BATTERIES FOR SPECIALTY APPLICATIONS LIKE SATELLITES AND

```
 1    AIRCRAFT.

 2         THEY'RE -- I MEAN, THEY'RE LITERALLY THE SIZE OF CASE

 3    BOOKS IN -- IN MANY INSTANCES.  I AGREE THAT THAT'S OUTSIDE

 4    THE PLEADINGS.  MY MESSAGE FOR THE COURT, THOUGH, IS THAT FACT

 5    IS WHAT IS INFORMING THE PLEADINGS.  IT IS THAT FACT THAT

 6    CAUSES THE PLAINTIFFS SUCH DIFFICULTY IN DESCRIBING WHAT IT

 7    WAS WE DID TO JOIN THIS CONSPIRACY.  THAT'S -- THAT'S THE

 8    BACKDROP FOR WHAT'S HAPPENING HERE.

 9         SO WE ARE ESSENTIALLY -- WE'RE IN A FICTIONAL WORLD, BUT

10    I'M -- I'M READY TO LIVE IN THAT FICTIONAL WORLD, AND I -- I'D

11    LIKE TO RESPOND JUST BRIEFLY --

12              MR. FRIEDMAN:  WELL --

13              MR. GARROU:  -- IF I COULD, TO WHAT'S BEEN SAID.

14              THE COURT:  LET ME -- LET ME -- CAN YOU FINISH OFF

15    WHAT YOUR -- BECAUSE I UNDERSTAND, MR. FRIEDMAN, WHAT YOU'RE

16    SAYING IN TERMS OF ALL OF THE VARIOUS DEFENDANTS GLOBALLY, BIG

17    PICTURE.  AND I -- AND I WILL TAKE YOUR COMMENTS WITH RESPECT

18    TO THIS ARGUMENT AND APPLY THEM ACROSS THE BOARD.

19         BUT WITH RESPECT TO THIS PARTICULAR DEFENDANT, I AM TRYING

20    TO UNDERSTAND THE THEORY SPECIFICALLY TO THE CONSPIRACY THAT'S

21    ALLEGED HERE IN 200 PAGES.

22              MR. FRIEDMAN:  SO -- SO, YOUR HONOR, I WANTED TO -- I

23    WANT TO NOT STAND ON FORMALITY 'CAUSE I THINK THE COURT'S VERY

24    PRAGMATIC, AND I DON'T LIKE WASTING -- AND BEING INEFFICIENT.

25    SO I APPRECIATE THAT COUNSEL MAKES STATEMENTS OUTSIDE THE
```

1    COMPLAINT JUST LIKE I WILL NOW DO.

2        SO WE HAVE NOTES WITHIN THE VERY NOTES THAT WE ALLEGE IN

3    THE COMPLAINT SO WE REFERENCE -- THIS IS FROM THE MEETINGS --

4    IN WHICH I AGREE THAT YUASA PRIMARILY WAS DEALING IN NICKEL

5    BATTERIES AND OTHERWISE.

6            MR. GARROU:  JUDGE, WE NEED TO BE CAREFUL IN THE USE

7    OF THE WORD "YUASA" HERE.  IT IS A COMMON JAPANESE NAME.  IT

8    WAS THE NAME OF YUASA CORPORATION.  YUASA CORPORATION WAS ONE

9    OF THE ENTITIES THAT FORMED GS YUASA, AS THE PLAINTIFFS

10   THEMSELVES SAY, AS A NEW COMPANY IN APRIL OF 2004.

11           MR. FRIEDMAN:  SO --

12               (SIMULTANEOUS COLLOQUY.)

13           MR. GARROU:  -- STOP -- BEFORE 2004 IS NEITHER HERE

14   NOR THERE.

15           MR. FRIEDMAN:  THIS IS 2006, YOUR HONOR, GS YUASA

16   DURING THE AUGUST MEETINGS THAT WE'RE TALKING ABOUT, SO WE CAN

17   BE CLEAR, ALL RIGHT, SO WE'RE TALKING ABOUT THE ENTITY ON THE

18   COMPLAINT.  AND WE HAVE THE NOTES.  AND THE NOTES INCLUDE A

19   COMMENT THAT THERE'S A GS YUASA AT LEAST A 45 PERCENT

20   INVESTMENT IN SANYO GS, A JAPANESE BATTERY MAKER, SO IT IS

21   SAID TO CONDUCT THE LITHIUM ION BATTERY BUSINESS.  THAT IS

22   REFERRING TO GS YUASA.

23       THERE'S ALSO FURTHER NOTES WHERE IN THIS SAME 2006-2007

24   TIME PERIOD, THERE'S DISCUSSION OF GS YUASA MAKING A MOVE INTO

25   LITHIUM ION BATTERIES FOR POWER TOOLS, WHICH ARE PRODUCTS

1    ALLEGED IN THE INDIRECT PURCHASER COMPLAINT.

2        AND SO WE HAVE BOTH A REFERENCE TO THE FACT -- THEY ARE

3    SELF-REFERENCING THEIR PARTICIPATION IN THE LITHIUM ION

4    BATTERY BUSINESS, AS WELL AS MOVING INTO THE LITHIUM ION

5    BATTERY BUSINESS.  DID THEY OR DID THEY NOT?  TO WHAT EXTENT

6    TO, YOUR HONOR?  THIS IS GOES BACK TO MY OVERALL POINT.

7            **THE COURT:**  SO WHAT I HEAR YOU SAYING IS THAT YOU

8    COULD AMEND THE COMPLAINT TO MAKE THOSE EXPLICIT REFERENCES,

9    THOSE EXPLICIT REFERENCES DO NOT CURRENTLY EXIST IN THE

10   COMPLAINT.

11           **MR. FRIEDMAN:**  I CAN TELL YOU -- CORRECT.  CORRECT.

12   AND I'D ALSO REFER YOU TO PARAGRAPH 51 OF THE DIRECT PURCHASER

13   COMPLAINT, IS WHERE THEIR ALLEGATIONS ARE FOR THE YUASA

14   PARTICIPATION IN LITHIUM ION INDUSTRY.

15           **THE COURT:**  51?  THAT'S NOT ON YOUR CHART.

16           **MR. FRIEDMAN:**  IT IS NOT BECAUSE WE WERE TRYING TO

17   FOCUS YOU ON INFERENCES OF CONSPIRATORIAL ACTIVITY, OPPOSED TO

18   WHETHER THEY WERE AT ALL INVOLVED IN THE BUSINESS, WHICH IS

19   WHAT I THINK COUNSEL'S ARGUMENT IS, IS THEY WEREN'T EVEN

20   INVOLVED IN LITHIUM ION BATTERIES.

21           **MR. GARROU:**  I DID -- I DID NOT SAY THAT --

22           **MR. FRIEDMAN:**  OH.

23           **MR. GARROU:**  WE --

24           **THE COURT:**  ALL RIGHT.  I HAVE MORE CLARIFICATION.

25   OKAY.

1    NEXT ISSUE.  ANYTHING ELSE?

2        **MR. GARROU:**  JUDGE, I THINK I'VE COVERED WHAT I HAD

3    TO SAY.  THE -- THE IMPORTANT POINT ABOUT THE PRE-2004

4    CONDUCT, HOWEVER, IS THAT WE'VE NOW HEARD THREE THINGS FROM

5    PLAINTIFFS ABOUT WHY WE'RE RESPONSIBLE FOR IT.

6        THEY TOLD US THAT WE'RE RESPONSIBLE BECAUSE WE OWNED A

7    JOINT VENTURE, PART OF A JOINT VENTURE, WHICH WE DID.  SANYO

8    GS SOFT ENERGY, CORRECT.  WE HAD A MINORITY STAKE IN THAT

9    VENTURE.  AND WE CITED YOU THE CASES, INCLUDING DIGITAL, THAT

10   SHOW WHY THAT DOESN'T GENERATE LIABILITY FOR US.

11       THEY'VE SAID THAT THERE WAS A DE FACTO MERGER.  THEY'VE

12   ALLEGED NO FACTS TO SUPPORT THAT.  AND, IN FACT, WHAT THEY DO

13   ALLEGE IS TOTALLY CONTRARY TO SOME ILLEGAL CORPORATE

14   SHENANIGANS.

15       FINALLY, WE'RE HEARING THE WORD "MORPHED."  YUASA MORPHED

16   INTO GS YUASA, INC.  I DON'T KNOW WHAT THAT MEANS.  IT

17   CERTAINLY ISN'T PLEADED.  THERE IS NO BASIS IN THIS COMPLAINT

18   TO HOLD US LIABLE FOR ACTIONS TAKEN BEFORE WE WERE

19   INCORPORATED.  THEY DO NOT USE THE WORD "SUCCESSOR."  THEY

20   DON'T USE THE WORD "MERGE."  THEY DON'T SAY ANYTHING LIKE

21   THAT.  THEY SAY THAT WE CAME INTO BEING IN 2004.

22       FOR THE POST-2004 CONDUCT, YOU KNOW, THE -- IF I WERE

23   ARGUING THEIR SIDE OF THIS MOTION, I WOULD ALSO WANT TO GROUP

24   US IN WITH THE OTHER DEFENDANTS, AND I -- I WOULD ALSO WANT

25   TO, YOU KNOW, PUSH THE TIME PERIODS TOGETHER.

```
 1         THE FACT IS 112 AND 121 ARE THE ONLY ALLEGATIONS OF WHAT
 2    WE DID IN THE INDIRECT PURCHASER COMPLAINT, AND THEY ARE
 3    INNOCUOUS CONDUCT.  AND -- AND THERE IS -- I THINK YOU WILL
 4    SEARCH THE COMPLAINT IN VAIN FOR ANY STATEMENT OF -- OR ANY
 5    ACTION OR ANY REFERENCE, ANY ELLIPTICAL REFERENCE TO A GS
 6    YUASA ACTION OR STATEMENT THAT EVIDENCED ANYTHING LIKE JOINING
 7    THIS CONSPIRACY.
 8         AND THERE ARE REASONS FOR THAT.
 9         MR. FRIEDMAN:  YOUR -- YOUR HONOR, VERY BRIEFLY,
10    'CAUSE I THINK MR. GARROU SKIPPED OVER A SIGNIFICANT POINT
11    THAT WE DO ARGUE, AND I UNDERSTAND WHY HE DID.  BUT, YOUR
12    HONOR, UNDER -- BACK TO THE 310 POST.  UNDER CONSPIRACY LAW,
13    YOUR HONOR, THEY'RE LIABLE FOR -- IF YOU GO AND JOIN A
14    CONSPIRACY, YOU'RE LIABLE FOR THE ACTS OF THE CONSPIRACY.  AND
15    THE ONE CAVEAT TO THAT, YOUR HONOR, IS IF THEY WERE TO AT SOME
16    POINT DOWN THE ROAD, MAKE THE ARGUMENT THERE'S CASE LAW THAT
17    SAYS, WELL, DEFENDANT CAN TURN AROUND AND ARGUE, WELL, WE'RE
18    ONLY LIABLE TO THE EXTENT WE HAD REASON TO BELIEVE OF SOME OF
19    THE PRIOR CONDUCT.
20         WELL, YOUR HONOR, WE ALLEGE PARAGRAPHS OF EMPLOYEES AND
21    THAT WE WILL GO AND FIND OUT IF THESE EMPLOYEES IN 2000,
22    ET CETERA, WERE -- CONTINUED ON IN THEIR EMPLOYMENT WITH THE
23    MORPHED COMPANY OR NOT.  THESE ARE ALL ARGUMENTS THAT WILL BE
24    RIPE FOR THEM TO MAKE, TO TRY AND SAY, WELL, MAYBE THERE'S
25    EVIDENCE WE DID JOIN IN 2006 AND 2007, BUT WE SHOULD BE CUT
```

```
1    OFF FROM LIABILITY FOR OUR CONDUCT IN 2000 AND 2002 BECAUSE NO

2    ONE AT GS YUASA IS KNOWLEDGEABLE OR HAD REASON TO BELIEVE OF

3    CONSPIRATORIAL ACTS PRIOR TO THE DATE THEY JOINED.

4        AND WE'LL HEAR THAT ARGUMENT.

5            MR. GARROU:  JUDGE, THESE ARGUMENTS ARE ONLY RELEVANT

6    IF THEY WOULD ALLEGE THAT WE JOINED THE CONSPIRACY.  THEY

7    DON'T MAKE THAT ALLEGATION.  THERE IS NO SUFFICIENT ALLEGATION

8    UNDER TWOMBLY THAT WE PARTICIPATED IN THIS CONSPIRACY AT ANY

9    POINT.

10           THE COURT:  NEXT --

11           MR. GARROU:  THANK YOU, JUDGE.

12           MR. FRIEDMAN:  WHO WOULD YOU LIKE NEXT, YOUR HONOR?

13           THE COURT:  NEXT WILL BE HITACHI MAXELL CORPORATION.

14               (PAUSE IN THE PROCEEDINGS.)

15           THE COURT:  SIR.

16           MR. SEEBALD:  GOOD MORNING.  CRAIG SEEBALD OF

17    VINSON & ELKINS FOR MAXELL CORPORATION OF AMERICA.

18           MR. SEAVER:  AND TODD SEAVER FROM BERMAN DE VALERIO

19    ON BEHALF OF THE DIRECT PURCHASER PLAINTIFFS.  AND AS

20    MR. FRIEDMAN MENTIONED EARLIER, I'LL ALSO BE ADDRESSING

21    ARGUMENTS ON BEHALF OF THE INDIRECT PURCHASER PLAINTIFFS ON

22    THIS MOTION.

23           MR. SEEBALD:  YOUR HONOR HAD PREVIOUSLY DISMISSED

24    MAXELL CORPORATION AMERICA, WHICH IS THE U.S. SALES SUBSIDIARY

25    OF HITACHI MAXELL, LIMITED.  PLAINTIFFS RE-PLED, AND THE
```

1    SIMPLE FACT IS THEY HAVE NOT SUFFICIENTLY ALLEGED A NEXUS

2    TYING MAXELL CORPORATION OF AMERICA TO THE CONDUCT IN THIS

3    COMPLAINT.  THERE'S JUST VERY, VERY LITTLE IN TERMS OF

4    ALLEGATIONS TO DISCUSS, SO WE CAN KEEP THIS SHORT.

5         PLAINTIFFS TRY TO OBSCURE THE ISSUE AND SAY, OH, YOU HAVE

6    TO TAKE A HOLISTIC VIEW OF THE COMPLAINT TO UNDERSTAND WHY

7    MAXELL CORPORATION OF AMERICA SHOULD BE IN THIS CASE.

8         THE SIMPLE FACT IS THERE'S JUST A LOT OF HOLES IN THE

9    PLAINTIFFS' HOLISTIC THEORY.

10             **THE COURT:**  WELL, YOU DON'T AGREE THAT I HAVE TO TAKE

11   HOLISTIC --

12                       (SIMULTANEOUS COLLOQUY.)

13            **MR. SEEBALD:**  -- I DON'T DISAGREE, AND YOU MADE THAT

14   VERY CLEAR IN YOUR FIRST ORDER.  I GUESS MY WHOLE POINT IS

15   THERE'S LIMIT -- THERE'S THREE THINGS IN PARTICULAR THAT I

16   THINK ARE HOLES IN THEIR APPROACH.  ONE IS YOU SAID VERY

17   CLEARLY THAT THEY HAVE TO SHOW THAT THERE WAS SOME KIND OF

18   CONSCIOUSNESS IN TERMS OF JOINING THIS CONSPIRACY.

19        AND LOOKING AT THIS ENTIRE COMPLAINT, WE JUST DON'T SEE

20   THAT AT ALL.  NONE OF THE THINGS THAT THEY ALLEGE GET TO THAT.

21   THE ONE THING THAT THEY ALLEGE IS THAT THERE'S A 2010 EMAIL

22   WHERE -- SOMEONE AT THE COMPANY ALLEGEDLY RECEIVED.  I DON'T

23   THINK GETTING A COPY OF AN EMAIL IN 2010 IS SUFFICIENT

24   ALLEGATIONS TO TIE MAXELL CORPORATION OF AMERICA TO THIS

25   CONSPIRACY.

1         ANOTHER THEORY OF THEIRS IN THIS HOLISTIC APPROACH THAT

2    JUST DOESN'T WORK HERE IS THAT THEY SAY, WELL, OTHER U.S.

3    SUBSIDIARIES OF OTHER DEFENDANTS CONSPIRED, YOU SO MUST HAVE.

4         WELL, THAT JUST DIDN'T WORK HERE.  I MEAN, YOU HAVE TO

5    IN -- YOUR PRIOR ORDER SAID THAT YOU HAD TO SHOW, YOU KNOW,

6    CONSCIOUS DECISION.  WELL, IT'S NOT A CONSCIOUS DECISION TO

7    JOIN A CONSPIRACY IF YOUR ONLY EVIDENCE IS THAT ALLEGEDLY

8    OTHERS IN THE INDUSTRY JOINED.

9         AND THEN LASTLY, THE PLAINTIFFS DO THE GAME OF DEFINING

10   MAXELL VERY LOOSELY.  THEY SAY, OH, HITACHI MAXELL, MAXELL

11   CORPORATION OF AMERICA, WHAT'S THE DIFFERENCE?  WE'LL JUST TRY

12   TO ALL PAINT IT AS MAXELL.  WELL, AS JUDGE ILLSTON MAKES CLEAR

13   THE LCD AND SEVERAL OTHER COURTS MAKE CLEAR, YOU CAN'T DO

14   THAT.  YOU HAVE TO HAVE SPECIFIC ALLEGATIONS AS TO THE

15   DEFENDANT, AND THERE'S JUST NOTHING IN THIS COMPLAINT THAT

16   SHOULD CHANGE THE PRIOR DECISION.  THERE'S JUST NOTHING THAT

17   TIES MAXELL CORPORATION OF AMERICA, THE U.S. SALES SUBSIDIARY,

18   TO THIS -- TO THIS CONSPIRACY.

19              **THE COURT:**  ALL RIGHT.  MR. SEAVER?

20              **MR. SEAVER:**  GOOD MORNING.  THE -- YOUR HONOR'S

21   CORRECT, IT'S -- IT IS THE LAW TO TAKE THE HOLISTIC VIEW OF

22   THE COMPLAINT, SO THAT'S -- THAT'S WHAT WE'LL DO.

23        FIRST, TO BE CLEAR, THE COMPLAINTS ARE NOT ALLEGING AND

24   WE'RE NOT ARGUING THAT JUST BECAUSE MAXELL CORPORATION OF

25   AMERICA IS A WHOLLY OWNED SUBSIDIARY OF HITACHI MAXELL LIMITED

1    OF JAPAN WHO HAS NOT CONTESTED THE CONSPIRACY ON PLAUSIBILITY

2    GROUNDS, WE'RE NOT SAYING JUST BECAUSE THEY'RE SUB, THEY'RE

3    IN.

4         SO LET'S LOOK AT WHAT WE ARE ALLEGING.

5         THE EMAIL MR. SEEBALD REFERENCES IS FOUND AT PARAGRAPHS --

6    PARAGRAPH 238 OF THE DIRECT PURCHASER COMPLAINT, THE --

7    SUBSTANTIALLY THE SAME PARAGRAPHS 237, 232, THE INDIRECT

8    COMPLAINT.  IT SHOWS KNOWLEDGE.  WHAT DO WE HAVE HERE?

9         WE HAVE IN JANUARY 2010, THE JAPANESE PARENT COMPANY,

10   HITACHI MAXELL LIMITED, TELLS FOLKS AT MAXELL CORPORATION OF

11   AMERICA, THAT HITACHI MAXELL, THE JAPANESE PARENT, IS

12   EXCHANGING INFORMATION WITH LG.

13        AND FOR US, THIS AMOUNTS TO A FACT ALLEGATION THAT MAKES

14   IT PLAUSIBLE THAT MAXELL CORPORATION OF AMERICA HAS KNOWLEDGE

15   OF A CONSPIRACY INVOLVING AT LEAST HITACHI AND LG.  AND THIS

16   IS WHERE THE CONTEXT COMES IN.  AND I WON'T REPEAT EVERYTHING

17   WE HAVE SAID, BUT THESE TYPES OF INFORMATION EXCHANGES BY

18   THEMSELVES -- THEY'RE NOT TO BE LOOKED AT BY THEMSELVES IN

19   ISOLATION.

20        AS YOUR HONOR'S ALREADY FOUND IN THE COURT'S PRIOR ORDER

21   ON MOTIONS TO DISMISS, IN WHAT WE'VE ALLEGED AS THIS

22   CONSPIRACY, PRICE-FIXING, BID-RIGGING, SUPPLY RESTRICTIONS,

23   CARRIED OUT THROUGH BILATERAL MEETINGS FOR THE MOST PART,

24   BILATERAL COMMUNICATIONS AND INFORMATION EXCHANGES ABOUT

25   PRICE, SUPPLY, YOU KNOW, BID STRATEGIES, AND SO FORTH, THAT

1    VIEWED IN -- IN -- HOLISTICALLY, THAT THIS JANUARY 2010 EMAIL,

2    WE CAN SAY MAXELL CORPORATION OF AMERICA KNOWS SOMETHING IS

3    AFOOT, AT LEAST BETWEEN ITS PARENT JAPANESE -- THE JAPANESE

4    PARENT HITACHI MAXELL AND LG.

5         OKAY.  SO SOMETHING -- SOME CONSCIOUSNESS THERE.  NOW,

6    WHAT DO THEY DO?  WELL, THEY DO SOMETHING.

7         MAXELL CORPORATION OF AMERICA, WE ALLEGE -- THIS IS THE

8    OTHER -- THE OTHER ALLEGATION THAT MY COLLEAGUE REFERENCED.

9    AT THE DIRECT PURCHASER COMPLAINT, IT'S 237.  INDIRECTS, IT'S

10   PARAGRAPH 232.  WHAT DO THEY DO?

11        SOME SANYO EXECUTIVES, A FELLOW NAMED IGUCHI, HE GIVES

12   PRICE INFORMATION TO AN EXECUTIVE AT A DIFFERENT SANYO ENTITY

13   NAMED MATSUMUTO (PHONETIC) -- THAT'S THE GUY'S NAME, NOT

14   THE -- THE COMPANY'S NAME -- IN WHICH IGUCHI SAYS HE GOT THIS

15   INFORMATION FROM MAXELL, JUST MAXELL, NOT HITACHI MAXELL

16   LIMITED, NOT HITACHI, IT'S MAXELL.

17        SO, YOU KNOW, WE'RE NOT PLAYING GAMES.  THE SUGGESTION IS

18   THAT WE'RE PLAYING GAMES WITH AN ARTIFICE OF HOW WE DEFINE

19   CORPORATIONS.  THIS COMES FROM ANOTHER CORPORATION'S DOCUMENT.

20   THEY SAY IT'S MAXELL.  THE INFERENCE -- THE REASONABLE

21   INFERENCE THE PLAINTIFFS ASK THE COURT TO DRAW AND TO AGREE

22   WITH US IS THAT THIS IS A REFERENCE TO MAXELL CORPORATION OF

23   AMERICA.

24        AND SO WHAT YOU HAVE IS THE CONSCIOUSNESS, THE KNOWLEDGE,

25   AND DOING SOMETHING.  IT'S FAIR TO INFER THAT THE -- THE

```
 1    COMMUNICATIONS AMONG THE SANYO EXECUTIVES IS THAT THEY GOT
 2    COMPETITIVE INFORMATION FROM MAXELL.  AND I'M NOT GOING TO
 3    STAND HERE AND SAY THAT THAT'S A HUNDRED PERCENT A LOCK THAT
 4    THAT'S MAXELL CORPORATION OF AMERICA.  WE DIDN'T DEFINE IT AS
 5    MAXELL.  THAT COMES FROM THE DOCUMENT, FROM THE COMPETITORS'
 6    FILES.  AND SO THE INFERENCE WE ASK THE COURT AGREE WITH US
 7    THAT IT'S REASONABLE TO DRAW -- IT'S A PLAUSIBLE INFERENCE;
 8    DOESN'T HAVE TO BE THE ONLY ONE -- IS THAT IT'S MAXELL
 9    CORPORATION OF AMERICA.  AND -- NOT THAT YOU WANT A FEEDBACK
10    LOOP, BUT IT MAKES SOME SENSE THAT MAXELL CORPORATION OF
11    AMERICA IS AT LEAST PRIVY TO CONSPIRATORIAL COMMUNICATIONS AND
12    THAT GOES BACK TO THE -- THE FIRST EMAIL WE DISCUSSED, WHICH
13    IS THAT THEY KNOW AT LEAST HITACHI MAXELL LIMITED IN JAPAN,
14    ITS PARENT, AND LG ARE UP TO SOMETHING.
15        AND NOTHING FURTHER ON THAT, YOUR HONOR.
16            MR. SEEBALD:  JUST -- JUST ON THAT, YOUR HONOR, IF I
17    HAVE A -- ONE MORE SECOND, YOU KNOW, WE'RE TALKING ABOUT AN
18    EMAIL -- ONE EMAIL IN THE CONTEXT OF A DEFENDANT THAT PRODUCED
19    ITS ENTIRE GRAND JURY PRODUCTION.  AND ALL THEY CAN DO IS
20    POINT TO A 2010 EMAIL THAT SOMEONE RECEIVED AT MAXELL
21    CORPORATION OF AMERICA RELATING TO SOME COMMUNICATION WITH LG.
22    IT'S NOT EVEN CLEAR THAT THE COMMUNICATION WITH LG WAS AS A
23    COMPETITOR.  THEY'RE A CUSTOMER OF OURS.  YOU JUST CAN'T TELL.
24        SO THAT ONE ALLEGATION JUST CANNOT BE ENOUGH TO TIE MAXELL
25    CORPORATION OF AMERICA TO THIS DECADE-PLUS-LONG CONSPIRACY.
```

1   THAT JUST DIDN'T GET THEM OVER THE HUMP.

2           **THE COURT:**  WELL, IS THERE ANY REQUIREMENT IN THE LAW

3   THAT THE INFERENCE OR REFERENCE TO A PARTICIPATION IN THE

4   CONSPIRACY BE FOR THE ENTIRE PERIOD?

5           **MR. SEEBALD:**  I DON'T THINK THERE IS, BUT ALL WE'RE

6   TALKING ABOUT IS REALLY ONE EMAIL AND SOMEONE GETTING COPIED

7   AND YOU'RE -- YOUR DECISION TALKED ABOUT A CONSCIOUS DECISION

8   TO ENTER.  I GET 300 EMAILS A DAY.  I MEAN, JUST THE FACT THAT

9   YOU'RE LITERALLY COPIED ON AN EMAIL -- ONE PERSON OF THE

10  COMPANY COPIED ON A EMAIL ABOUT A CONVERSATION WITH LG --

11  AGAIN, WE DON'T KNOW WHETHER IT'S AS A COMPETITOR OR AS A

12  CUSTOMER -- THAT THAT JUST CANNOT BE ENOUGH TO CONSTITUTE A

13  CONSCIOUS DECISION TO ENTER INTO THIS ALLEGED CONSPIRACY.

14          **MR. SEAVER:**  AND IF I MAY, YOUR HONOR, ON THE POINT

15  ABOUT THE TIMING, WE HAVE REALLY A PLAUSIBLE CONSPIRACY

16  ALLEGED FROM 2000 TO 2011.  IT DOESN'T MATTER IF -- IF A

17  COMPANY ENTERS IT AT THE TAIL END, COULD BE THE LAST WEEK,

18  COULD BE THE LAST THREE YEARS, DOESN'T MATTER.  THAT'S THE

19  OPERATION OF CONSPIRACY LAW, THAT THEY'RE ON THE HOOK FOR THE

20  WHOLE THING.

21          **THE COURT:**  THAT WAS A RHETORICAL QUESTION,

22  MR. SEAVER.

23          **MR. SEAVER:**  I DON'T THINK --

24                      (LAUGHTER.)

25          **MR. SEAVER:**  THANK YOU, YOUR HONOR.

1          **THE COURT:**  OKAY.

2          **MR. SEEBALD:**  WE JUST -- THERE WAS ONE OTHER ISSUE

3    THAT WE RAISED IN OUR INDIVIDUAL BRIEF THAT I'LL JUST MENTION,

4    AND IT DOVETAILS TO WHAT MR. KESSLER SAID.  YOU KNOW, IN THE

5    COMPLAINT, IT'S ALLEGED AND ONLY ALLEGED THAT MAXELL --

6    HITACHI MAXELL, THE PARENT CORPORATION, USES THIRD-PARTY

7    PACKERS.  THE -- THE COMPLAINT TALKS ABOUT EMPLOYING

8    THIRD-PARTY PACKERS.

9         THERE'S NO ALLEGATIONS THAT WE ACTUALLY HAD A SUBSIDIARY

10    THAT WAS PACKING THE BATTERIES, BUT THEY SAY "THIRD-PARTY

11    PACKERS," AND THAT'S ALL THEY SAY.

12         AND OUR POINT IS THIS:  IS THAT, YOU KNOW, WE FULLY

13    SUPPORT MR. KESSLER'S ARGUMENTS, BUT WE WOULD SAY AT A

14    MINIMUM, THE MAXELL SALES SHOULD NOT BE PART OF THIS CASE

15    BECAUSE YOU HAVE A VERY CLEAR BREAK IN THE CHAIN.  THEIR

16    COMPLAINT SAYS THAT WE USE -- EMPLOYED THIRD-PARTY PACKERS.

17    WE DIDN'T DO IT OURSELVES.  WE HAD THIRD-PARTY PACKERS THAT,

18    QUITE FRANKLY, ARE FOREIGN THIRD-PARTY PACKERS.

19         AND SO WE'RE JUST -- THE POINT IN THE LAST PART OF THE

20    COMPLAINT IS NOT AN ISSUE OF JOINT-AND-SEVERAL LIABILITY FOR

21    THE -- THE SALES THAT MAY REMAIN IN THIS CASE.  BUT THE POINT

22    IS, THERE WAS A BREAK IN OUR SALES ACCORDING TO THEIR

23    COMPLAINT.  AND, THEREFORE, THOSE SALES REALLY SHOULD NOT BE

24    PART OF THIS CASE IF IT GOES FORWARD.

25          **THE COURT:**  YOU WANT TO ADDRESS THAT POINT?

1          **MR. SEAVER:**  WE DIVIDED THIS ISSUE AMONGST US, SO IF

2     THE COURT WILL PERMIT MR. SIMON TO ADDRESS YOUR HONOR.

3          **MR. SIMON:**  I'LL BE VERY SHORT, YOUR HONOR.

4          THEIR ARGUMENT, WHICH IS IDENTICAL TO WHAT TOSHIBA IS

5     MAKING ON STANDING, JUST IS THE OPPOSITE OF WHAT ROYAL

6     PRINTING SAYS.  ROYAL PRINTING, THE PLAINTIFF PURCHASER BOUGHT

7     FROM A WHOLESALER THAT WAS WHOLLY OWNED BY ONE OF THE

8     MANUFACTURERS AND DIDN'T EVEN BUY THAT MANUFACTURER'S PAPER.

9     SO -- AND ROYAL PRINTING SAYS BOTH UNDER JOINT AND SEVERAL AND

10    UNDER THE PERCEPTION TO ROYAL PRINTING THAT YOU CAN SUE ALL,

11    EVEN IF YOU DIDN'T BUY FROM ONE.

12         SO THEY'RE WRONG ON THE POINT.  AND I, FRANKLY, DON'T EVEN

13    UNDERSTAND THEIR ARGUMENT BECAUSE IT'S AT ODDS WITH ROYAL

14    PRINTING.

15         **THE COURT:**  RESPONSE?

16         **MR. SEEBALD:**  WE THINK IT'S COMPLETELY IN LINE WITH

17    ROYAL PRINTING.  THE POINT IS WHEN YOU HAVE A BROKEN CHAIN,

18    THOSE SALES CAN'T BE PART OF THE CASE.  THERE MAY BE SALES

19    THAT ARE PART OF THE CASE.  WE'LL SEE IF THAT IS OR NOT.  AND

20    WE MAY BE JOINTLY AND SEVERALLY LIABLE THEORETICALLY, BUT MY

21    WHOLE POINT IS THE SALES THAT -- WHERE THERE IS A CLEAR BREAK

22    IN THE CHAIN, THEY JUST CAN'T BE PART OF THIS CASE.

23         **MR. FRIEDMAN:**  YOUR HONOR, JEFF FRIEDMAN FOR INDIRECT

24    PURCHASER PLAINTIFF.  I JUST WANT TO MAKE SURE THAT THE LAST

25    ARGUMENT THAT'S BEING RAISED ON THIS IS DIRECTED TOWARDS THE

```
1    DIRECT PURCHASER COMPLAINT, NOT AGAINST THE INDIRECT PURCHASER

2    COMPLAINT.

3         MR. SEEBALD:  CORRECT.

4         MR. FRIEDMAN:  THANK YOU, YOUR HONOR.

5         MR. SIMON:  AND THE ONLY REFERENCE I WOULD GIVE YOU,

6    YOUR HONOR, IS THIS:  IF YOU LOOK AT NIPPON PAPER, SEVENTH

7    CIRCUIT OPINION, WRITTEN BY JUDGE EASTERBROOK ON THIS POINT,

8    WHICH IS AS CITED IN SOME OF THE CASES IN THIS DISTRICT, 281

9    F.3D. 629, 2002, THERE'S LANGUAGE ON JOINT AND SEVERAL WHICH

10   JUST BLOWS HIS ARGUMENT OUT OF THE WATER.

11        THE COURT:  DO YOU WANT TO ADDRESS THAT CASE?

12        MR. SEEBALD:  WELL, AGAIN, I JUST WOULD POINT BACK TO

13   ROYAL PRINTING.  WE DO THINK THAT WE ARE ON FIRM GROUNDS WITH

14   ROYAL PRINTING.

15        THE COURT:  SO THE ANSWER IS NO?

16        MR. SEEBALD:  YES, THAT'S CORRECT.

17        THE COURT:  OKAY.  ANYTHING ELSE ON THIS?

18        MR. SEEBALD:  NOTHING, YOUR HONOR.

19        MR. SEAVER:  NONE FROM PLAINTIFFS, YOUR HONOR.

20        THE COURT:  OKAY.

21     LG CHEM?

22        MR. FRIEDMAN:  GOOD MORNING AGAIN, YOUR HONOR.  JEFF

23   FRIEDMAN FOR THE INDIRECT PURCHASER PLAINTIFFS, ALSO ARGUING

24   ON BEHALF OF THE DIRECT PURCHASERS.

25        MR. EWING:  MORNING, YOUR HONOR.  KENNETH EWING OF
```

1    STEPTOE & JOHNSON FOR LG CHEM AND LG CHEM AMERICA, INC.

2        YOUR HONOR, I THINK OUR -- OUR POINT'S FAIRLY

3    STRAIGHTFORWARD.  OUR ARGUMENT IS ESSENTIALLY THAT, AGAIN, THE

4    U.S. SUBSIDIARY HERE HAS NOT BEEN ADEQUATELY TIED TO --

5        **THE COURT:**  YOU'RE GOING TO NEED TO SPEAK UP,

6    MR. EWING.

7        **MR. EWING:**  I APOLOGIZE.

8        YOUR HONOR, THE -- THE ARGUMENT HERE IS THAT THE U.S.

9    SUBSIDIARY LG CHEM AMERICA, INC. HAS NOT BEEN ADEQUATELY TIED

10    TO THIS CONSPIRACY.  THE DIFFERENCE -- THE CHANGE FROM THE

11    FIRST COMPLAINT WHICH YOUR HONOR DISMISSED AS TO LG CHEM

12    AMERICA, INC. AND THE ONE WE HAD -- THE ONES WE HAVE NOW FOR

13    THE DPP'S AND THE IPP'S, IS AN ADDITION OF -- OF SEVERAL

14    ALLEGATIONS WHICH REALLY AMOUNT TO THE FOLLOWING:

15        FIRST, THERE ARE NO ALLEGATIONS AS TO CONDUCT BY LG CHEM

16    AMERICA BEFORE 2005.  FOR THE PERIOD 2005 AND -- TO 2009,

17    THERE ARE ALLEGATIONS THAT ESSENTIALLY ARE RECEIPT OF

18    INFORMATION FROM THE PARENT IN KOREA ABOUT ACTIVITIES GOING ON

19    ELSEWHERE.

20        BUT WE SUBMIT, YOUR HONOR, IF ONE LOOKS AT THE SPECIFIC

21    ALLEGATIONS IN THE COMPLAINT, THE -- THERE ARE NO ALLEGATIONS

22    OF CONDUCT BY LG CHEM AMERICA, INC. THAT ACTUALLY FURTHER THIS

23    CONSPIRACY THAT HAS BEEN ALLEGED IN THE OTHER PARAGRAPHS.

24        TO -- WHAT WE DO SEE ARE REFERENCES TO EMAIL

25    COMMUNICATIONS, SOME OF THEM TO -- COMMUNICATIONS THAT WERE

1    MERELY RECEIVED AS -- AS COPIES INDICATED IN THE COMPLAINTS --

2    IN THE ALLEGATIONS THEMSELVES.

3        OTHERS WERE ALLEGEDLY COMMUNICATIONS DIRECTED TO SEVERAL

4    ENTITIES, FOREIGN SALES ENTITIES.  BUT EVEN THOSE REFERENCES,

5    YOUR HONOR, DO NOT DO ANYTHING MORE THAN COMMUNICATE

6    INFORMATION ABOUT WHAT WAS GOING ON ELSEWHERE.  THERE ARE NO

7    ACTUAL ALLEGATIONS THAT LG CHEM AMERICA, INC. DID ANYTHING TO

8    FURTHER THE CONSPIRACY HERE.

9        AND WE SUBMIT, YOUR HONOR, THAT, THEREFORE, THOSE

10   ALLEGATIONS ARE NOT SUFFICIENT TO REACH THE STANDARD THAT YOUR

11   HONOR RECOGNIZED IN YOUR ORIGINAL ORDER HERE DISMISSING LG

12   CHEM AMERICA, INC. THAT THERE BE A CONSCIOUS DECISION TO

13   PARTICIPATE.

14       KNOWLEDGE OF WHAT'S GOING ON IS NOT THE SAME AS CONSCIOUS

15   DECISION TO PARTICIPATE.  FUNDAMENTALLY, THAT'S OUR -- OUR

16   POSITION HERE, THAT THERE HASN'T BEEN AN ADDITION TO THESE

17   COMPLAINTS THAT IS SUFFICIENT TO -- TO REACH THAT STANDARD.

18   AND -- AND FOR THAT BASIS, WE'RE ASKING THAT THE COMPLAINTS BE

19   NARROWED DOWN.

20       NOW, I WILL POINT OUT TO YOU, I AM NOT SAYING THE SAME

21   THING WITH RESPECT TO ALLEGATIONS RELATING TO AN EVENT IN

22   2010.

23       AND TO JUMP TO ONE OF THE ARGUMENTS THAT PLAINTIFFS HAVE

24   MADE AND INDICATED EARLIER AS WELL, WE'RE NOT TAKING THE

25   POSITION, YOUR HONOR, THAT A -- A LATE JOINER TO A CONSPIRACY

```
 1   IS NOT POTENTIALLY LIABLE FOR CONDUCT THAT IT KNEW ABOUT WHEN

 2   IT JOINED, THAT PREDATED THE JOINING.

 3       WHAT WE'RE ARGUING IS THAT WHATEVER HAPPENED IN 2010, WHAT

 4   HAS BEEN ALLEGED TO OCCUR IS NOT AT ALL LIKE THE CONDUCT THAT

 5   HAS BEEN ALLEGED ELSEWHERE IN THIS CONSPIRACY.  IT IS A

 6   BILATERAL EXCHANGE OF INFORMATION AND -- AND AGREEMENT OR

 7   DISCUSSION OF -- OF TRYING TO --

 8           THE COURT:  YOU KNOW, I DON'T UNDERSTAND WHY I WOULD

 9   AT THIS JUNCTURE, IF IT -- IF THERE IS SUFFICIENT ALLEGATIONS

10   AT ONE PERIOD IN TIME IN THE CONSPIRACY, WHY I WOULD MAKE THE

11   KINDS OF, QUOTE, UNQUOTE, PRUNING RECOMMENDATIONS THAT YOU ARE

12   REQUESTING.

13       CONSPIRACIES BY THEIR NATURE ARE SECRETIVE.  THAT'S THE

14   NATURE OF -- IT'S FUNDAMENTAL.  IF -- IF THEY WANTED EVERYBODY

15   TO KNOW, THESE WOULD BE EASY CASES.  WHEN THERE IS SUFFICIENT

16   ALLEGATION THAT THERE IS PARTICIPATION AT SOME POINT IN TIME

17   IN THE CONSPIRACY, WHAT YOU'RE ASKING ME TO DO REALLY SUGGESTS

18   THAT YOU WANT ME TO MAKE SOME FACTUAL DETERMINATIONS ON AN

19   INCOMPLETE RECORD OR AT LEAST GIVE YOU COVER -- YOUR CLIENT

20   COVER BECAUSE THEY'VE NOT YET UNEARTHED THE -- WHETHER THERE

21   WAS ANY PARTICIPATION PRIOR TO THAT TIME.

22       AND I DON'T THINK THAT IT IS PRUDENT.  I DON'T THINK THAT

23   IT IS PROCEDURALLY PROPER.

24           MR. EWING:  YOUR HONOR, IN GENERAL, I WOULD AGREE

25   WITH YOU.  IF THIS COMPLAINT HAD SUFFICIENTLY ALLEGED
```

1     PARTICIPATION, I WOULD AGREE WITH YOU.

2         OUR CONTENTION, YOUR HONOR, IS THAT WHATEVER THEY HAVE

3     ALLEGED WITH RESPECT -- WHAT THEY HAVE ALLEGED WITH RESPECT TO

4     2010 IS NOT SUFFICIENT TO LINK LG CHEM AMERICA, INC. TO THE

5     VERY BROAD CONSPIRACY THAT HAS BEEN ALLEGED HERE.  AND I'M NOT

6     TALKING ABOUT TIME PERIODS PER SE, TALKING ABOUT THE NATURE OF

7     THE ACTUAL ALLEGATIONS COMPARED TO THE REST OF THE ALLEGATIONS

8     IN THIS COMPLAINT AND THIS -- THE KINDS OF ACTIVITIES THAT

9     WERE GOING ON.

10        THESE ARE FUNDAMENTALLY DIFFERENT KINDS OF -- OF

11    COMMUNICATIONS, FUNDAMENTALLY DIFFERENT KINDS OF OBJECTIVES.

12        THE ALLEGATIONS WITH RESPECT TO 2010 RELATE TO A SINGLE

13    ENTITY, APPLE.  THEY RELATE TO A SINGLE EVENT, SINGLE END

14    PRODUCT, AND MOREOVER, CLEARLY ARE -- ARE ONLY AS BETWEEN TWO

15    PARTICULAR COMPANIES.  THEY DO NOT INVOLVE ANY OF THE OTHER

16    ENTITIES INVOLVED IN THIS CASE.

17        THE PLAINTIFFS HAVE MADE REPEATED REFERENCES TO THE FACT

18    THAT LG CHEM, THE PARENT COMPANY, HAS PLED GUILTY.  THE PARENT

19    COMPANY HAS PLED GUILTY, AS YOUR HONOR VERY WELL KNOWS, AS DO

20    I.

21        THERE'S A REASON THAT THAT PLEADING DID NOT INCLUDE 2010.

22    THERE'S ALSO A REASON WHY THAT PLEAD -- PLEADING GUILTY DIDN'T

23    INCLUDE LG CHEM AMERICA, INC.  THE PLAINTIFFS ALREADY HAVE

24    THIS POINT -- AT THIS PROCEDURAL JUNCTURE ALL OF THE DOCUMENTS

25    THAT LG CHEM AND LG CHEM AMERICA PROVIDED TO THE DEPARTMENT OF

```
 1    JUSTICE.

 2         IF THERE WERE A BASIS TO TIE LG CHEM AMERICA, INC. TO THIS

 3    BROAD CONSPIRACY, THEY WOULD HAVE IT.  THEY COULD HAVE PLED

 4    IT, BUT THEY DIDN'T.  THAT'S OUR POINT OF VIEW.

 5              THE COURT:  YOU KNOW, THAT -- THIS ISSUE OF DISCOVERY

 6    HAS COME UP A NUMBER OF TIMES AND WHAT'S BEEN PRODUCED AND

 7    HASN'T BEEN PRODUCED.  I DON'T THINK I'VE EVER RECEIVED A COPY

 8    OF THE SUBPOENA TO WHICH ALL OF THESE DEFENDANTS REPLIED.  SO

 9    I DON'T KNOW WHAT IT IS THAT THEY ACTUALLY PRODUCED, AND IF

10    THEY'VE PRODUCED EVERYTHING, WHY IS IT THAT MAGISTRATE RYU HAS

11    HAD DISCOVERY DISPUTES ALREADY IN TERMS OF PRODUCTION OF MORE

12    DOCUMENTS.  ARE THERE --

13              MR. FRIEDMAN:  SO --

14              THE COURT:  SO ARE THERE MORE DOCUMENTS OR NOT?  HAVE

15    THE DEFENDANTS PRODUCED THE ENTIRETY OR NOT?

16              MR. FRIEDMAN:  SO -- GREAT QUESTION.  AND -- YOU MAY

17    HEAR MORE THAN YOU WANT TO, SO CUT ME OFF.

18              THE COURT:  I WILL.  DON'T WORRY.

19              MR. FRIEDMAN:  I KNOW YOU WILL.

20         SO LET ME MAKE A COUPLE OF COMMENTS ON THAT.

21         THEY WON'T TELL US SPECIFICALLY THE SCOPE OF THE

22    PRODUCTION, THE AGREEMENTS.  FREQUENTLY, AS THE COURT MAY VERY

23    WELL KNOW, DEPARTMENT OF JUSTICE AND DEFENDANTS WILL ENTER

24    NEGOTIATIONS AS TO THE SCOPE OF PRODUCTION.  DEPARTMENT OF

25    JUSTICE DOES NOT HAVE LEGAL AUTHORITY TO SUBPOENA DOCUMENTS
```

```
 1    ABROAD, SO FREQUENTLY WHAT ENDS UP HAPPENING IS, IS THAT THERE

 2    IS A NEGOTIATED CORPUS OF INFORMATION THAT IS OBTAINED.

 3        WE, MUCH TO THEIR CHAGRIN AND, I'M SURE, YOURS AND

 4    MAGISTRATE RYU'S, BELIEVE TYPICALLY THAT THAT CORPUS IS A

 5    SUBSET THAT NEEDS TO BE BROADENED.

 6        ONE OF THE WAYS THAT CORPUS IS SHRUNK IS THE WAY IN WHICH

 7    SEARCH TERMS ARE APPLIED.  FREQUENTLY IN CASES THAT WE'VE

 8    HAD -- OPTICAL DISK DRIVE BEING MOST RECENT -- WE GO IN AND

 9    SAY, WE WANT TO SEE THE SEARCH TERMS YOU USED.  THEY'RE

10    USUALLY RESISTANT, BUT THE TIMES WE GET THEM, WE FIND THEY ARE

11    FAR DIFFERENT -- AND THERE'S -- FAR DIFFERENT PROCESS THAT

12    GOES ON IN TERMS OF BACK AND FORTH ON WHAT THE SEARCH TERMS

13    ARE.

14        AND WE, FOR EXAMPLE IN THE OPTICAL DISK DRIVES ULTIMATELY

15    WERE ABLE TO GET BROADER SEARCH TERMS, AND LO AND BEHOLD, WE

16    GOT MORE INCRIMINATING DOCUMENTS.

17        SO THAT'S WHAT HAPPENS, YOUR HONOR, SO THE ANSWER IS, ARE

18    ALL OF THEM PRODUCED, OF COURSE NOT.  NOW --

19            THE COURT:  SO LET ME JUST -- LET ME JUST --

20            MR. FRIEDMAN:  SURE.

21            THE COURT:  -- ASK --

22            MR. EWING:  LET ME PUT MY NAME IN YOUR MOUTH,

23    MR. EWING.

24            THE COURT:  MR. EWING, YEAH, SORRY.  EWING.

25        HAS MR. FRIEDMAN DESCRIBED GENERALLY THE PROCESS
```

1    WITHOUT -- YOU DON'T HAVE TO TELL ME WHETHER OR NOT THAT

2    HAPPENED IN THIS PARTICULAR CASE, BUT GENERALLY, IS THAT

3    ACCURATE FROM YOUR PERSPECTIVE?

4        OR IS IT YOUR POSITION, I GUESS, THAT YOU'VE PRODUCED

5    EVERYTHING THAT THERE IS TO BE PRODUCED.

6            **MR. EWING:**  YOUR HONOR, AS YOU WELL KNOW, WE'RE IN

7    THE PROCESS RIGHT NOW OF WORKING THROUGH THE DISCOVERY PROCESS

8    HERE.  ALTHOUGH MR. FRIEDMAN HAS MADE REFERENCES TO OTHER

9    CASES WHICH DID NOT INCLUDE MYSELF OR LG CHEM, ABOUT

10   RESISTANCE AND -- AND DIFFICULTIES.  IT SEEMS TO ME WE'RE

11   WORKING VERY AMICABLY TOGETHER TO WORK THROUGH THAT PROCESS,

12   INCLUDING ESI AND THE DEPOSITION --

13           **MR. FRIEDMAN:**  I WASN'T CRITICIZING.

14           **MR. EWING:**  AND I JUST WANT TO BE CLEAR, THAT --

15           **THE COURT:**  AND I DID NOT --

16                   (SIMULTANEOUS COLLOQUY.)

17           **MR. EWING:**  THIS IS A PROCESS --

18           **THE COURT:**  I DID NOT MEAN TO SUGGEST THAT MAGISTRATE

19   JUDGE RYU WAS COMPLAINING THAT THERE WAS UNPROFESSIONAL

20   CONDUCT HAPPENING.  THAT'S -- THAT WASN'T MY SUGGESTION.

21   MY -- I WAS REALLY TRYING TO UNDERSTAND THE SCOPE OF THE CLAIM

22   THAT IT'S ALL THERE, WHICH IS ESSENTIALLY AN ARGUMENT THAT

23   I'VE HEARD FROM THE DEFENDANTS, THAT IF THEY -- YOU KNOW, THEY

24   HAVE SO MUCH, IF IT WAS THERE, WE'D KNOW IT BY NOW OR THE

25   COMPLAINT COULD BE MORE DEVELOPED.  BUT I DON'T KNOW THAT.

1          **MR. EWING:**  YOUR HONOR, I THINK THE CLAIM THAT I HAVE

2     BEEN MAKING AND I THINK THE OTHERS ON THE DEFENSE SIDE HAVE

3     BEEN MAKING, IT'S NOT THAT ABSOLUTELY EVERYTHING UNDER THE SUN

4     THAT COULD CONCEIVABLY BE CALLED FOR IN DISCOVERY BY

5     PLAINTIFFS IN THIS CASE HAS ALREADY BEEN TURNED OVER TO THE

6     DOJ AND THEN TO THEM.  IT WILL ALWAYS BE POSSIBLE TO ASK FOR

7     MORE.

8          **THE COURT:**  WELL, HAVE YOU THEN --

9          **MR. EWING:**  SO I --

10         **THE COURT:**  HAVE YOU SHARED WITH THE PLAINTIFFS

11    THE -- THE EXTENT OF THE PRODUCTION THAT HAS BEEN MADE?

12         **MR. EWING:**  YOUR HONOR, WE HAVE A SCHEDULE IN WHICH

13    WE WILL DO EXACTLY THAT, I THINK, BY THE 15TH OF AUGUST, IF I

14    REMEMBER THE DATES CORRECTLY.  WE WILL BE CHARACTERIZING WHAT

15    HAS BEEN TURNED OVER TO THE DOJ.  THAT WAS WORKED OUT WITH

16    MAGISTRATE RYU'S ASSISTANCE.  SO WE'RE IN PROCESS OF DOING

17    THIS.  IT'S NOT A SITUATION OF HOLDING ANYTHING BACK.  WE'RE

18    JUST WORKING THROUGH THE PROCESS.

19         MY POINT, YOUR HONOR, EARLIER ABOUT TURNING EVERYTHING

20    OVER THAT HAD BEEN TURNED OVER TO THE DOJ IS THAT WE HAVE

21    TURNED OVER EVERYTHING -- WE, OTHERS IN THE DEFENSE GROUP --

22    HAVE TURNED OVER AN ENORMOUS AMOUNT OF INFORMATION, LARGE

23    NUMBERS OF DOCUMENTS THAT WERE TURNED OVER TO DOJ AND MADE

24    AVAILABLE AT THIS VERY EARLY STAGE IN THE PROCESS.

25         THIS IS UNUSUAL.

1     **THE COURT:**  WELL, NOT ACCORDING TO ALL THE DISTRICT

2   JUDGES I SPOKE TO AT THE LAST MDL CONFERENCE, BUT GO AHEAD.

3     **MR. EWING:**  WELL, YOUR HONOR, I -- I RESPECTFULLY

4   SUGGEST THAT THERE ARE PLENTY OF CASES IN WHICH THIS HAS NOT

5   HAPPENED.  THE USUALNESS AND UNUSUALNESS PERHAPS I SHOULDN'T

6   HAVE MENTIONED THAT.  THE KEY POINT IS THAT THEY ACTUALLY HAVE

7   THIS INFORMATION AND HAVE HAD IT WHEN THEY CONSTRUCTED THEIR

8   FIRST COMPLAINT AND THIS SECOND SET OF COMPLAINTS.

9     ALL I'M TRYING TO SAY, YOUR HONOR, IS THAT WITH RESPECT TO

10  LG CHEM AMERICA, INC., THE ALLEGATIONS THAT THEY HAVE MADE ARE

11  BASED ON A FAIRLY EXTENSIVE SET OF DOCUMENTATION.

12    WE HEARD EARLIER FROM ONE OF MR. FRIEDMAN'S CO-COUNSEL

13  HERE THAT LG -- LG CHEM IS ALL OVER THE DOCUMENTS.  WELL,

14  THAT'S BECAUSE THERE ARE A LOT OF DOCUMENTS FROM LG CHEM THAT

15  HAVE BEEN TURNED OVER.  THAT'S A FAIRLY SOLID BASIS.

16    IS IT EVERYTHING?  PROBABLY NOT.  WE HAVEN'T YET RECEIVED

17  DISCOVERY REQUESTS FROM THEM, YOUR HONOR.  AND IT'S ALWAYS

18  POSSIBLE TO ASK FOR MORE.

19    **MR. FRIEDMAN:**  YOUR HONOR, JUST A FEW THINGS.  FIRST

20  OF ALL, I WILL ALWAYS -- AS A PLEDGE TO YOU, I WILL TRY TO

21  DIRECTLY ANSWER YOUR QUESTIONS.  I MAY NOT DO IT

22  SATISFACTORILY, BUT I WILL ALWAYS TRY AND BE DIRECT TO GIVE

23  YOU THE DIRECT ANSWER AND THEN EXPLAIN IF I DISAGREE WITH THE

24  COURT.

25    I BELIEVE YOU ASKED COUNSEL WHETHER OR NOT MY

 1   REPRESENTATION OF THE PROCESS IN GENERAL IS ACCURATE, AND I

 2   DIDN'T HEAR A "YES" OR A "NO," BUT SETTING THAT ASIDE, I CAN

 3   REPRESENT DIRECTLY TO YOU THAT THAT IS A PROCESS THAT I'VE

 4   DESCRIBED TO YOU THAT IS ONGOING.  IT IS -- HAPPENS IN ALL

 5   THESE CASES, AND NOTHING THAT I'VE DESCRIBED DO I HEAR A

 6   DISAGREEMENT WITH.  I'VE HEARD WE'RE WORKING THROUGH THE

 7   PROCESS, WHICH THAT I AGREE WITH.

 8       SECOND POINT, YOUR HONOR, IS I HOPE THAT WE DO NOT FIGHT

 9   OVER SEARCH TERMS AND WE DON'T GET ARGUMENTS WHICH WE SEE IN

10   OTHER CASES THAT THEY'RE PRIVILEGED AND WE GET IN ALL THESE

11   ARGUMENTS.  I HOPE WE DON'T.  WE FREQUENTLY DO.

12       SETTING THAT ALL ASIDE, LG CHEMICAL AMERICA, I WAS

13   SURPRISED THAT THEY FILED A MOTION TO DISMISS.  I REALLY WAS.

14   I SEE A LOT OF MOTIONS TO DISMISS IN A LOT OF SITUATIONS, BUT

15   IF YOU -- WE GAVE YOU THE CHART.  I'M NOT GOING TO BELABOR IT,

16   BUT I WILL TELL YOU THIS IN THE BROADER CONTEXT:  IF YOU LOOK

17   AT, FOR EXAMPLE, PARAGRAPHS (SIC) 180, JUST FOR EXAMPLE, WHERE

18   YOU HAVE AN OCTOBER 25TH, 2005 DETAILING OF MR. OH TELLING AN

19   LG CHEM AMERICA, INC. EMPLOYEE YOUNG SUNG KIM THAT IT WAS,

20   QUOTE, IMPORTANT TO COLLABORATE WITH DEFENDANT SDI IN

21   NEGOTIATING PRICES TO PACKER SIMPLO AND THAT THEY, QUOTE, HAVE

22   TO WATCH SDI OFFER PRICES IN NEGOTIATING WITH SIMPLO.

23       NOW, WE -- WE HAVE BASICALLY ALMOST, I THINK, A DOZEN

24   DETAILED ALLEGATIONS COVERING THE U.S. SUBSIDIARY.  AND SO

25   THE -- THE ARGUMENT HERE TO ME IS A LITTLE FAR WHEN IT COMES

 1    TO LG AMERICA.

 2         AND THEN I WANT TO MAKE THIS LAST FINAL, BROADER POINT,

 3    YOUR HONOR, SO -- AND YOU HEARD ME ABOUT -- AND I THINK THE

 4    COURT UNDERSTANDS CONSPIRACY LAW PROBABLY BETTER THAN I DO,

 5    BUT -- BUT I WILL SAY THIS SO I DON'T WANT TO SORT OF GILD THE

 6    LILY ON IT, BUT YOU CAN LOOK AT CONDUCT AND INFERENCES THAT

 7    REQUIRE -- THAT ARE REQUIRED OR IMPORTANT TO HAVE A CONSPIRACY

 8    OPERATIONALIZED AND SUCCESSFUL.

 9         SO I WOULD JUST ASK THE COURT IN ITS CONTEXTUALLY LOOKING

10    AT ALL OF WHAT'S BEING ARGUED TO YOU ABOUT THESE INDIVIDUAL

11    DEFENDANTS, THE IDEA THAT THEY'RE PUTTING FORTH IS THAT YOU

12    HAVE A PARENT THAT IS ENGAGING IN A HORIZONTAL CONSPIRACY OVER

13    PRICING AND THAT THEY ARE SUBSIDIARY, THAT IS, RESPONSIBLE IN

14    PART, YOUR HONOR, IN NEGOTIATING PRICES, ARE CABINED FROM THE

15    CONSPIRACY AND CABINED FROM BEING ABLE TO -- AND PRACTICALLY

16    SPEAKING, BUSINESS-WISE, YOUR HONOR.

17         SO NOW I'M AN LG CHEM AMERICA, INC. EMPLOYEE THAT'S

18    DEALING WITH THE U.S. OEM'S.  AND I'M DEALING WITH SELLING,

19    AND I'M DEALING WITH PRICING ISSUES.  AND I NEED TO THINK

20    ABOUT MY COMPETITOR SO -- BECAUSE I'M COMPETING IF I WASN'T

21    RESTRAINING THE MARKET.  AND SO IF I'M COMPETING TO GET YOUR

22    BUSINESS AND I'M GOING TO GO AND SAY, I'M GOING TO LOWER

23    PRICES TO YOU, BECAUSE I'M AFRAID HE'S GOING LOWER PRICES TO

24    YOU, AND I'M THE U.S. REP HERE GETTING YOUR BUSINESS, AND WHAT

25    INSTEAD IS GOING ON IS HIS PARENT AND MY PARENT ARE SAYING,

1    LET'S RESTRAIN PRICES, AND I DON'T KNOW THAT, AND I'M NOT

2    OPERATIONALIZING THE RESTRAINT TO YOU.

3        THE CONSPIRACY DOESN'T WORK.  IT'S NONSENSICAL.  THEY KNOW

4    IT'S NONSENSICAL.  YOU HAVE TO HAVE THE INTEROPERABILITY

5    BETWEEN CORPORATE ENTITIES IN ORDER TO SUCCEED IN THEIR GOAL

6    WHICH IS TO RESTRAIN COMPETITION, SO I JUST OFFER THAT

7    CONTEXTUALLY.

8                    (SIMULTANEOUS COLLOQUY.)

9        **THE COURT:**  LET ME ASK A QUESTION CONTEXTUALLY.  THE

10   UNITED STATES ISN'T THE ONLY MARKET.

11       **MR. FRIEDMAN:**  CORRECT.

12       **THE COURT:**  SO ARE YOU SUGGESTING THAT PERHAPS,

13   THEORETICALLY, PERHAPS THE CONSPIRACY WORKS IN ALL MARKETS BUT

14   THE UNITED STATES MARKET BECAUSE THE UNITED STATES

15   CORPORATIONS KNOW BETTER?

16       **MR. FRIEDMAN:**  YES.  IT NEEDS TO.

17       **THE COURT:**  WHY?

18       **MR. FRIEDMAN:**  BECAUSE, YOUR HONOR, IT'S GLOBAL

19   PRICING THAT GOES ON.

20       SO I'M DELL, AND WE KNOW THIS NOW FROM THESE OTHER CASES.

21   WHAT HAPPENS IS DELL LOOKS TO SET PRICES.  AND YOU'RE GOING TO

22   HEAR THESE ARGUMENTS DOWN THE ROAD.  THERE'S ALL THESE

23   ARGUMENTS THAT YOU'RE GOING TO HEAR DOWN THE ROAD.  I'M SORRY

24   THAT WE OPENED THIS --

25       **THE COURT:**  NO.

1    **MR. FRIEDMAN:**  I APOLOGIZE, BUT I'M GOING TO GIVE YOU

2    THE ANSWER, MAYBE MORE THAN YOU WANT, SO WHAT HAPPENS IS DELL

3    ONE OF THE LARGEST WORLDWIDE COMPUTER SALES, OKAY?  DELL AND

4    HP IN THE UNITED STATES MAKE UP APPROXIMATELY, LET'S SAY, 50

5    PERCENT GIVE OR TAKE OVER THE YEARS IN THE U.S.

6    IN THE WORLD, THEY CAN MAKE UP ANYWHERE, DEPENDING UPON

7    THE YEAR, 20 TO 30 PERCENT OF THE MARKET.  THESE TWO U.S.

8    COMPANIES -- AND THEN APPLE BECAME A GREATER AND GREATER

9    PERCENTAGE OF THE MARKET ESPECIALLY WHEN YOU'RE NOW TALKING

10   ABOUT FIXING THINGS THAT GO INTO IPHONES AND IPADS, WHICH MAKE

11   UP A LARGE SHARE OF THE GLOBAL MARKET.

12   SO YOU HAVE OEM'S IN THE UNITED STATES THAT MAKE UP A VERY

13   SIGNIFICANT SHARE OF WORLDWIDE SALES, CLEARLY OF U.S. SALES,

14   BUT ARE MATERIAL IN WORLDWIDE SALES.  AND SO WHAT YOU HAVE IS

15   A LOT, YOUR HONOR, THAT GOES INTO ANALYZING, SAYING, WHEN YOU

16   SET PRICES FOR HP, DELL, APPLE, WHICH ARE U.S. COMPANIES,

17   YOU'RE DRIVING THE PRICES FOR THE WORLD.

18   AND SO IT BECOMES EXTREMELY IMPORTANT IN OPERATIONALIZING

19   THE CONSPIRACY THAT IS NOT GOING TO JUST IMPACT JUST U.S.

20   SALES BUT ARE GOING TO BE EFFECTIVE GLOBALLY BECAUSE DELL

21   ISN'T GOING TO BUY A BATTERY FOR SOMETHING -- THEY'RE BUYING

22   EN MASSE BATTERIES, AND THEN THEY ARE GOING TO DISTRIBUTE

23   THEIR PRODUCTS THROUGHOUT THE WORLD.  AND SO THEY DON'T COME

24   UP WITH A DIFFERENT PRICE FOR EACH ONE OF THEM.  THEY MAY HAVE

25   SHIPPING ISSUES OR THINGS LIKE THAT.  BUT CORE PRICING,

```
1   THEY'RE NOT DOING -- CORE PRICING IS WORLDWIDE.  THEY'RE

2   GLOBAL PRICES.

3            MR. EWING:  YOUR HONOR, IF I MAY --

4            THE COURT:  MR. EWING, I'M GOING TO ALLOW YOU JUST TO

5   RESPOND BRIEFLY AND THEN WE'LL TAKE A QUICK BREAK BECAUSE I'VE

6   NOT GIVEN MY COURT REPORTER A BREAK YET.

7            MR. EWING:  YOUR HONOR, TWO POINTS.  YOU'VE JUST

8   HEARD A LOT OF ASSUMPTIONS ABOUT HOW THE MARKETS WORK, ABOUT

9   ENTITIES, DELL, HP, ABOUT ODM'S, ALL OF WHICH ARE, OF COURSE,

10  NOT IN THE COMPLAINTS, OKAY?

11           THE COURT:  NO, I UNDERSTAND.

12           MR. EWING:  AND -- AND I THINK THAT'S VERY IMPORTANT

13  HERE, BECAUSE WE ALSO DON'T HAVE ALLEGATIONS ABOUT LG CHEM

14  AMERICA, INC.'S ACTUAL NEGOTIATIONS WITH ANY OF THESE

15  PURCHASERS.  WE DON'T KNOW ANYTHING ABOUT THAT FROM THE

16  COMPLAINT.

17      INFERENCES ABOUT THE ROLE OF LG CHEM AMERICA IN

18  IMPLEMENTING ARE NOT BASED ON FACTS OR ALLEGATIONS IN THIS

19  COMPLAINT, RATHER.  THEY'RE JUST SPECULATION BEING OFFERED BY

20  MR. FRIEDMAN HERE.

21      THE COMPLAINT IS THE TOUCHSTONE.  YOU'LL BE LOOKING AT THE

22  THIS VERY CLOSELY.  I UNDERSTAND THAT, YOUR HONOR, AND I

23  APPRECIATE THE TIME.

24           THE COURT:  WE'LL JUST TAKE -- HOW MUCH DO YOU NEED?

25  FIVE?  TEN MINUTES?
```

1    THE REPORTER:  IS TEN OKAY?

2    THE COURT:  TEN MINUTES.

3    (RECESS TAKEN AT 11:04 A.M.; PROCEEDINGS RESUMED AT 11:15

4    A.M.)

5    THE COURT:  NEXT, NEC CORPORATION.

6    WE'RE BACK ON THE RECORD.  THE RECORD WILL REFLECT THAT

7    ALL THE PARTIES ARE HERE AND/OR FILING INTO THE COURTROOM.

8    MOTION TO DISMISS, NEC CORP.

9    SIR, GOOD MORNING.

10    MR. MEENAN:  GOOD MORNING, YOUR HONOR.  SEAN MEENAN

11    OF WINSTON & STRAWN, COUNSEL FOR NEC CORPORATION AND NEC TOKIN

12    CORPORATION.

13    MR. SEAVER:  GOOD MORNING, AGAIN.  TODD SEAVER OF

14    BEHALF OF PLAINTIFFS.

15    THE COURT:  OKAY.  MR. MEAN -- MEENAN.

16    MR. MEENAN:  YES.

17    IN THIS COURT'S PREVIOUS ORDER ON THE LAST ROUND OF

18    MOTIONS TO DISMISS, THE ORDER MADE CLEAR THAT PLAINTIFFS ARE

19    REQUIRED TO ALLEGE THAT EACH INDIVIDUAL DEFENDANT JOIN THE

20    CONSPIRACY AND PLAYED SOME ROLE IN IT.

21    NONETHELESS, BOTH DPP'S AND IPP'S DEFINED NEC CORPORATION

22    AND NEC TOKIN CORPORATION COLLECTIVELY AS, QUOTE, UNQUOTE,

23    NEC.

24    PLAINTIFFS NOW ASK THIS COURT TO INFER THAT ALLEGATIONS

25    AGAINST, QUOTE, UNQUOTE, NEC SHOULD BE INTERPRETED TO RELATE

```
1    TO NEC CORPORATION, BUT --

2         THE COURT:  SO CAN -- I'M GOING TO STOP YOU.

3         MR. MEENAN:  YES.

4         THE COURT:  GENTLEMEN, THIS IS THE FOURTH OF THESE

5    INDIVIDUAL MOTIONS THAT I HAVE.  GIVEN THE MILLIONS OF DOLLARS

6    THAT HAVE ALREADY BEEN SPENT ON THE CASE, I DECIDED TO ALLOW

7    YOU TO ARGUE.  I DON'T WANT TO RE-HEAR THE SAME DARNED THING

8    TIME AND TIME AGAIN.  I UNDERSTAND THE STANDARD.  I UNDERSTAND

9    MY DUTY.  TALK ABOUT YOUR CLIENT, AND THAT'S IT.  THAT'S ALL

10   YOU'RE GETTING, BECAUSE, FRANKLY, IF IT WERE UP TO ME -- AND I

11   GUESS IT IS UP TO ME -- I WOULD SAY NO, YOU COULDN'T HAVE ANY

12   ARGUMENT WHATSOEVER.  I'M DONE AT THIS POINT, SO I'M GOING TO

13   GIVE YOU A FEW MINUTES AND --

14      GO AHEAD.  YOU CAN CONTINUE, BUT FOCUS ON YOUR CLIENT AND

15   THAT IS ALL.

16        MR. MEENAN:  YES, YOUR HONOR.

17      LIKE TO TAKE A LOOK AT SOME OF THE ALLEGATIONS THAT

18   PLAINTIFFS PRESENTED IN THEIR DEMONSTRATIVE.  FOR EXAMPLE, IPP

19   ALLEGATION PARAGRAPH 87, 92, 110, AS WELL AS DPP PARAGRAPH

20   111, EACH ALLEGE CONDUCT RELATING TO NEC TOKIN CORPORATION,

21   NOT NEC CORPORATION.

22      SIMILARLY, DPP PARAGRAPH 139 ALLEGES INFORMATION THAT

23   RELATES TO, QUOTE, UNQUOTE, NEC.  BUT WHEN READ IN CONJUNCTION

24   WITH IPP PARAGRAPH 92, IT'S CLEAR THAT THAT ALLEGATION

25   RELATING TO, QUOTE, UNQUOTE, NEC, IN FACT, RELATES TO NEC
```

1    TOKIN CORPORATION.

2        SPECIFICALLY DPP PARAGRAPH 139 RELATES TO MEETINGS FROM --

3    ALLEGED MEETINGS FROM FEBRUARY 21ST TO FEBRUARY 25TH, 2005,

4    ALLEGEDLY INVOLVING NEC.  IPP PARAGRAPH 92 ALLEGES MEETINGS

5    FROM FEBRUARY 21 TO 25, 2005, INVOLVING NEC TOKIN CORPORATION.

6        SIMILARLY, DPP PARAGRAPH 177 ALLEGES A MEETING ON DECEMBER

7    5TH, 2008 INVOLVING, QUOTE, UNQUOTE, NEC.

8        **THE COURT:**  OKAY.  SLOW DOWN, MR. MEAN -- MEENAN.

9    SORRY.

10       GO AHEAD.  I'M JUST LOOKING AT THE COURT REPORTER'S TAPE,

11   SO I'M JUST SUGGESTING YOU SLOW DOWN.

12       KEEP GOING.

13       **MR. MEENAN:**  WHEREAS IPP PARAGRAPH 155 SIMILARLY

14   RELATES TO A MEETING ON DECEMBER 5TH, 2008, BUT ALLEGES THAT

15   NEC TOKIN CORPORATION WAS THE INVOLVED ENTITY.

16       **THE COURT:**  AND THEREFORE...?

17       **MR. MEENAN:**  THEREFORE, WHEREAS PLAINTIFFS ASK THIS

18   COURT TO INFER THAT -- THAT ALLEGATIONS RELATING TO NEC SHOULD

19   BE INTERPRETED TO RELATE TO NEC TOKIN CORPORATION, I WOULD

20   SUBMIT THAT THAT WOULD BE AN UNREASONABLE INFERENCE AND THAT

21   COURT SHOULD NOT DO SO.

22       **THE COURT:**  OKAY.  RESPONSE?

23       **MR. SEAVER:**  THANK YOU, YOUR HONOR.

24       I'LL FOCUS ON ONE -- ONE ALLEGATION ABOUT ONE EVENT.  IT'S

25   FOUND AT THE INDIRECT PURCHASER COMPLAINT AT PARAGRAPH 110.

1   AND JUST SO WE'RE CLEAR, WE'RE TALKING ABOUT NEC CORPORATION'S

2   MOTION.  THEY STAND A LITTLE BIT APART.  THEY'RE THE ACTUAL

3   PARENT CORPORATION.  THE SUBSIDIARY NEC TOKIN IS NOT

4   CONTESTING PLAUSIBILITY OF CONSPIRACY.

5       NEC CORPORATION IS HEADQUARTERED IN TOKYO.  THAT'S

6   IMPORTANT.  I'LL GET BACK TO THAT IN ONE SECOND.  EXCUSE ME.

7   NEC CORPORATION, IF I MISSPOKE, IS IN TOKYO.  NEC TOKIN IS

8   IN -- IN MIYAGI, JAPAN.  THAT'S AT DIRECT PURCHASER COMPLAINT

9   PARAGRAPHS 53 TO 54.  AND NEITHER OF THESE NEC ENTITIES HAVE

10  PRODUCED ANY DOCUMENTS TO THE DOJ OR TO PLAINTIFFS, SO, YOU

11  KNOW, WE'RE KIND OF BATTLING THIS MOTION WITH ONE HAND TIED

12  BEHIND OUR BACKS, SO IT'S OBVIOUS I'M THE GUY TO ARGUE THIS.

13          **UNIDENTIFIED SPEAKER:**  NO PUN INTENDED.

14                  (LAUGHTER.)

15      **MR. SEAVER:**  SO PARAGRAPH 110, LET'S GET RIGHT TO

16  THAT.  THAT'S A SAMSUNG DOCUMENT.  IT'S MEMORANDA (SIC) FROM

17  SAMSUNG, PRODUCED BY THEM.  IT'S MINUTES OF A MEETING -- WE

18  SAY -- WE CLAIM -- ALLEGE THAT IT'S WITH NEC EXECUTIVES.  AND

19  THIS ISN'T A PLEADING ARTIFICE.  THIS ISN'T A DEFINITIONAL

20  GAME.  THAT'S WHAT THE DOCUMENT SAYS.  NEC.

21      THAT -- IT DOES OPEN THE QUESTION, WHICH -- WHICH NEC?  IS

22  IT THE PARENT CORPORATION IN TOKYO?  OR AS IT NEC TOKIN, WHICH

23  IS LOCATED IN MIYAGI, JAPAN.

24      WELL, WE THINK IT'S IMPORTANT.  THE DOCUMENT SAYS THE

25  MEETING TAKES PLACE IN TOKYO, NOT MIYAGI.  AND THE DOCUMENT

1   REFERS TO SALES THAT ARE GOING TO BE MADE THROUGH NEC

2   CORPORATION.  AGAIN, THAT'S PARAGRAPH 110 OF THE IPP

3   COMPLAINT.

4       IT'S NOT A HUNDRED PERCENT SURE.  WE RECOGNIZE THAT.  ALL

5   WE'RE ASKING FOR IS THAT THE INFERENCE GO OUR WAY, AS IT

6   SHOULD, AND THE SOLUTION HERE ISN'T TO DISMISS NEC

7   CORPORATION.  IT'S TO ALLOW US TO GET TO DISCOVERY AS PART AND

8   PARCEL OF DISCOVERY IN THE CASE.  IT WILL CERTAINLY GET TO THE

9   BOTTOM OF NEC CORPORATION'S KNOWING PARTICIPATION OR LACK

10  THEREOF.  THANK YOU.

11      AND -- AND ON THIS BASIS WE ASK THAT THE COURT DENY NEC'S

12  MOTION.

13          **THE COURT:**  SO I TAKE IT AGAIN, IF AT THIS JUNCTURE,

14  I GRANTED WITH LEAVE TO AMEND, YOU DON'T HAVE ANY OTHER

15  ALLEGATIONS THAT YOU'D BE ABLE TO ALLEGE WITH RESPECT TO THIS

16  ISSUE.

17          **MR. SEAVER:**  THAT'S TRUE, YOUR HONOR.

18          **MR. MEENAN:**  YOUR HONOR, I WOULD LIKE -- EXCUSE ME.

19          **THE COURT:**  AND WHEN IS THE PRODUCTION, IF ANY, FROM

20  NEC TOKIN TO OCCUR?

21          **MR. SEAVER:**  TO MY KNOWLEDGE, THERE'S NONE TEED UP.

22  I THINK THEY'VE SAID THAT THEY DIDN'T -- THEY DIDN'T RECEIVE A

23  SUBPOENA.  IF -- I DON'T WANT TO -- THE WORDING IS MAYBE NOT

24  EXACT, BUT IT'S TO THAT EFFECT.

25      BUT AS MY COLLEAGUE MR. FRIEDMAN MENTIONED, THEY WOULDN'T

1  RECEIVE A SUBPOENA SO IT'S A BIT -- IT'S A BIT OF A STRATEGIC

2  STATEMENT TO SAY THEY DIDN'T RECEIVE A SUBPOENA IN THIS CASE

3  TO IMPLY THEY WERE NEVER OF INTEREST TO THE DEPARTMENT OF

4  JUSTICE.  WE DON'T KNOW THAT.  MAYBE THEY WEREN'T, BUT THEY WE

5  THINK THEY WOULD HAVE BEEN, JUST THEY CAN'T BE SUBPOENAED.

6           **THE COURT:**  ALL RIGHT.  MR. MEENAN?

7           **MR. MEENAN:**  TWO POINTS, YOUR HONOR.  THE FIRST WITH

8  RESPECT TO THEIR PRODUCTION OF DOCUMENTS, MR. SEAVER'S CORRECT

9  THAT NEITHER NEC CORPORATION NOR NEC TOKIN CORPORATION

10 RECEIVED A SUBPOENA FROM THE DOJ OR PARTICIPATED IN THE GRAND

11 JURY INVESTIGATION.

12      NEC TOKIN AMERICA INCORPORATION, HOWEVER, DID RECEIVE A

13 SUBPOENA, DID PRODUCE DOCUMENTS.  WE -- NEC CORPORATION AND

14 NEC TOKIN CORPORATION RECEIVED A REQUEST FOR PRODUCTION OF

15 DOCUMENTS, AND NEC CORPORATION AND TOKIN CORPORATION HAVE

16 COMPLETED THEIR PRODUCTION OF RELEVANT DOCUMENTS THAT NEC

17 TOKIN OF AMERICA PRODUCED TO THE DEPARTMENT OF JUSTICE.

18      MY SECOND POINT, YOUR HONOR, IS WITH RESPECT TO THE

19 PARAGRAPH THAT MR. SEAVER DREW THIS COURT'S ATTENTION TO,

20 PARAGRAPH 110 OF THE IPP COMPLAINT.  MY READING IS A LITTLE

21 BIT DIFFERENT.

22      I'M LOOKING AT PAGE 44, LINE 16, WHICH, IN FACT, STATES

23 THAT, QUOTE, THEY MET FROM 1:00 O'CLOCK TO 2:40 P.M. ON THE

24 TENTH FLOOR OF THE NEC TOKIN CONFERENCE ROOM IN CHIYODA,

25 TOKYO.  I BELIEVE THAT STATEMENT MAKES CLEAR THAT THE -- THAT

```
 1    THE MEETING TOOK PLACE AT NEC TOKIN OFFICES, AND ANY INFERENCE

 2    TO THE CONTRARY WOULD BE UNREASONABLE.

 3            MR. SEAVER:  JUST ON THAT POINT, I DON'T KNOW WHY

 4    THEY NAME THEIR CONFERENCE ROOM "NEC TOKIN."  LOTS OF PEOPLE

 5    NAME THEIR CONFERENCE ROOMS DIFFERENT THINGS.  BUT IT DOES SAY

 6    IT'S IN TOKYO, WHERE, AS WE ALLEGE, THAT'S WHERE NEC

 7    CORPORATION IS, AND NOT IN THE OTHER JAPANESE CITY, MIYAGI.

 8        AGAIN, IT'S COMPETING INTERESTS, SO I WON'T BELABOR THAT

 9    POINT.

10            THE COURT:  OKAY.  ANYTHING ELSE ON THIS MOTION?

11            MR. MEENAN:  NO, YOUR HONOR.  THANK YOU FOR YOUR

12    TIME.

13            MR. SEAVER:  NO, THANK YOU.

14            THE COURT:  PANASONIC.

15        ARE WE GOING TO HAVE ANY WOMEN ARGUE THESE MOTIONS AT SOME

16    POINT, GENTLEMEN?

17            MS. MEJIA:  I AM, YOUR HONOR.

18            THE COURT:  THANK YOU, MS. MEJIA.

19        ALL RIGHT.  COME ON.  PANASONIC.

20            MR. AMATO:  JEFFREY AMATO FROM WINSTON & STRAWN FOR

21    PANASONIC CORPORATION OF NORTH AMERICA AND SANYO NORTH AMERICA

22    CORPORATION.

23            THE COURT:  ALL RIGHT.  AND WE HAVE MR. FRIEDMAN

24    AGAIN.

25        GO AHEAD, MR. AMATO.
```

```
1              MR. AMATO:  YOUR HONOR, I'VE PRODUCED SOME SLIDES
2     THAT WOULD FACILITATE THE ARGUMENT.  HOPE TO BE BRIEF.  AND
3     I -- I DON'T WANT TO BELABOR THE POINTS THAT HAVE BEEN
4     REPEATED BY THE OTHER DEFENDANTS, BUT I DO WANT TO RESPOND TO
5     SOME OF THE THINGS THAT THE PLAINTIFFS MENTIONED IN THEIR
6     ARGUMENTS THAT APPLY GENERALLY.
7              THE COURT:  WHY IS THAT?
8              MR. AMATO:  BECAUSE --
9              THE COURT:  I'M HERE TO HEAR ABOUT PANASONIC,
10    PANASONIC ONLY.  MR. KESSLER DID A FINE JOB ON BEHALF OF THE
11    JOINT MOTIONS.
12             MR. AMATO:  THANK YOU, YOUR HONOR.
13             THE COURT:  SO WHY DO I WANTED TO HEAR IT AGAIN?
14             MR. AMATO:  YOUR HONOR, I JUST WANTED TO DIRECT YOUR
15    ATTENTION TO YOUR -- YOUR ORDER OF LAST TIME THAT DISMISSED
16    THE AMERICAN SUBSIDIARIES AND --
17                     (SIMULTANEOUS COLLOQUY.)
18             THE COURT:  I WROTE IT.  I WILL READ IT AGAIN.
19             MR. AMATO:  -- AT FOOTNOTE 13 --
20             THE COURT:  OKAY.
21             MR. AMATO:  -- THE PLAINTIFFS HAD ARGUED THAT THEY
22    JUST NEED TO ALLEGE A SLIGHT CONNECTION FOR THE AMERICAN
23    SUBSIDIARIES BECAUSE OF THE REST OF CONSPIRACY WAS PLAUSIBLE.
24    AND YOU HAD FOUND THAT THAT WAS FUNDAMENTALLY WRONG AND
25    AGAINST PRECEDENT.  AND I SUGGEST THAT THEY'RE MAKING THE SAME
```

 1  ARGUMENTS HERE AND THAT THE ALLEGATIONS THEY HAVE PLED AGAINST

 2  PANASONIC NORTH AMERICA AND SANYO NORTH AMERICA DO NOT SHOW A

 3  CONSCIOUS AGREEMENT TO JOIN THE CONSPIRACY.

 4      AND --

 5          **THE COURT:**  OKAY.  SO FOCUS ON THE ALLEGATIONS.

 6  FOCUS.

 7          **MR. AMATO:**  YES, YOUR HONOR, I WILL.

 8          **THE COURT:**  FOCUS, FOCUS.

 9          **MR. AMATO:**  AND HERE, IT IS GOOD TO CONTRAST WHAT WAS

10  ALLEGED IN LCD AND CRT THAT WAS FOUND SUFFICIENT AND COMPARE

11  IT TO WHAT HAS BEEN ALLEGED AGAINST PNA AND SNA HERE.

12      IN LCD AND CRT, THERE WERE --

13          **THE COURT:**  MR. AMATO, DID YOU LITIGATE THAT CASE --

14  THOSE CASES?

15          **MR. AMATO:**  YOUR HONOR, WE'RE COUNSEL OF RECORD FOR

16  PANASONIC IN CRT.

17          **THE COURT:**  ALL RIGHT.  THANK YOU.

18          **MR. AMATO:**  AND I'VE GONE AND I'VE LOOKED THROUGH THE

19  COMPLAINTS IN BOTH CASES.  AND IN THERE, THERE ARE NUMEROUS

20  ALLEGATIONS OF AMERICAN SUBSIDIARIES PARTICIPATING IN MEETINGS

21  IN THE U.S.  THERE ARE DISCUSSIONS OF COLLUSIVE MEETINGS AMONG

22  THE U.S. SUBSIDIARIES.  THERE'S ALLEGATIONS THAT THE U.S.

23  SUBSIDIARIES KNOWINGLY IMPLEMENTED THE CONSPIRATORIAL PRICING.

24      THAT'S MARKET CONTRAST TO WHAT WE HAVE IN THIS COMPLAINT

25  AGAINST PANASONIC NORTH AMERICA AND SANYO NORTH AMERICA.

1    THERE ARE SCATTERED SNIPPETS OF ISOLATED EVENTS THROUGHOUT A

2    DECADE THAT HAVE BEEN TOOK (SIC) OUT OF THE 74,000 DOCUMENTS

3    PRODUCED BY PNA AND SNA.  AND THE ALLEGATIONS REALLY REFLECT

4    CONFUSION ABOUT WHAT WAS GOING ON, IF ANYTHING, OVER IN ASIA.

5        IT DOESN'T SHOW ANYTHING ABOUT CONSCIOUS DECISION TO

6    PARTICIPATE IN THAT CONSPIRACY.  IT SHOWS, FOR EXAMPLE, A

7    SOJOURNING EMPLOYEE OF SANYO ELECTRIC COMING TO AMERICA AND

8    GOING BACK TO ASIA AND MEETING WITH A DRINKING BUDDY TO GET

9    INFORMATION.

10       THE --

11           **THE COURT:**  AND YOU'RE SUGGESTING THAT --

12                   (SIMULTANEOUS COLLOQUY.)

13           **THE COURT:**  YOU'RE SUGGESTING THAT CONSPIRATORIAL

14   CONDUCT CANNOT OCCUR OVER DRINKS IN A BAR, PERHAPS ON A GOLF

15   COURSE, OR PERHAPS IN OTHER KINDS OF SOCIAL ARENAS?

16           **MR. AMATO:**  IT CAN CERTAINLY OCCUR AT ALL THOSE

17   ARENAS, BUT THE NOTES THAT REFLECT WHAT HAPPENED IN THE

18   MEETINGS HE HAD SHOW THAT HE HAD NO KNOWLEDGE OF WHAT WAS

19   GOING ON IN THE VERY INSTITUTIONALIZED MEETINGS THAT HAVE BEEN

20   ALLEGED TO FORM THE HEART OF THE CONSPIRACY HERE, AND I THINK

21   THAT MR. FRIEDMAN REFERENCED BEFORE THE SERIAL MEETINGS WITH

22   SDI.

23       ALL OF THE ALLEGATIONS AGAINST SANYO NORTH AMERICA AND

24   PANASONIC NORTH AMERICA DO NOT EVEN COME CLOSE TO ALLEGING

25   KNOWLEDGE OR PARTICIPATION IN THESE MEETINGS.

1        **MR. FRIEDMAN:**  YOUR HONOR, JEFF FRIEDMAN.  VERY

2   BRIEFLY, 'CAUSE THE COURT'S HEARD A LOT, SO I'M NOT GOING TO

3   REPEAT, BUT I WOULD JUST -- AGAIN, WE'LL POINT TO THE CHART.

4   THE COURT AND THE STAFF CAN -- CAN READ THE PARAGRAPHS, BUT I

5   DO WANT TO HIGHLIGHT 218 IN THE INDIRECT PURCHASER COMPLAINT

6   FOR A REASON.  AND -- AND I'LL JUST GIVE YOU THE REASON, AND

7   THAT IS IT -- IT SHOWS YOU, YOUR HONOR, OF THE

8   OPERATIONALIZING THAT I DISCUSSED WITH THE COURT.

9        IT JUST ANOTHER PRIME EXAMPLE.  IT'S SOUND LIKE

10   MR. AMATO'S SAYING IN ORDER TO PARTICIPATE, YOU HAVE TO PUT

11   EACH DEFENDANT IN A ROOM CONSPIRING, WHICH WE ALL KNOW -- AND

12   THE COURT KNOWS ITS OWN ORDER, KNOWS THE LAW.  THAT'S NOT

13   REQUIRED.

14        THERE'S -- DIFFERENT COMPONENT PARTS CONSTITUTE A

15   CONSPIRACY.  AND SO YOU HAVE IN 218 -- AGAIN, WE'RE GIVING YOU

16   DETAILS OF A JULY 7, 2010 PANASONIC NORTH AMERICA

17   COMMUNICATION ABOUT GETTING CONFIDENTIAL PRICING INFORMATION

18   FROM COMPETITOR SONY.  AND THEY'RE GOING TO USE THAT

19   INFORMATION, YOUR HONOR, WITH RESPECT TO NEGOTIATIONS WITH A

20   VENDOR BLACK AND DECKER.  AND SO -- A CUSTOMER.  EXCUSE ME.

21        AND SO THIS IS -- THIS IS THE SAMPLE BEFORE THE BREAK THAT

22   I TALKED TO YOU ABOUT.  THERE'S A LOT OF OTHER ALLEGATIONS YOU

23   CAN SEE BUT I JUST WANTED TO HIGHLIGHT THAT TO -- TO

24   ILLUSTRATE THE POINT I MADE EARLIER.

25        THANK YOU, YOUR HONOR.  WE'D SUBMIT.

```
 1              MR. AMATO:  VERY BRIEFLY IN RESPONSE, THIS IS A GOOD

 2    EXAMPLE OF HOW MERE INFERENCES OF THE RECEIPT OF INFORMATION

 3    FROM THE PARENTS DOES NOT SHOW THAT THE SUBSIDIARY ACTUALLY

 4    AFFIRMATIVELY AGREED TO JOIN IN IT BECAUSE IT'S WRONG WHEN

 5    YOU'RE TALKING ABOUT A CELL CONSPIRACY OVER -- AT THE CELL

 6    MANUFACTURERS LOCATED IN JAPAN AND KOREA.  WHEN THEY ARE

 7    SETTING PRICES ALLEGEDLY IN A CONSPIRATORIAL AND CARTEL

 8    FASHION, THERE'S NO NEED FOR THE U.S. SALES SUBSIDIARIES TO

 9    PARTICIPATE IN THAT.

10              THE COURT:  WEREN'T THEY --

11              MR. AMATO:  THEY ONLY NEED TO RECEIVE THE PRICING

12    FROM THE PARENTS.

13              THE COURT:  AND THEN ACT ON IT.  AND THEN ACT ON IT.

14              MR. AMATO:  BUT THAT DOESN'T --

15                     (SIMULTANEOUS COLLOQUY.)

16              MR. AMATO:  -- DOESN'T MEAN THEY JOINED THE

17    CONSPIRACY.

18              THE COURT:  ANYTHING ELSE?

19              MR. AMATO:  NO, YOUR HONOR.  THANK YOU.

20              MR. FRIEDMAN:  SUBMITTED, YOUR HONOR.

21              THE COURT:  SONY ENERGY DEVICES.

22                     (PAUSE IN THE PROCEEDINGS.)

23              THE COURT:  MS. MEJIA, YOU MAY PROCEED.

24              MS. MEJIA:  GOOD MORNING, YOUR HONOR.  BEATRICE MEJIA

25    ON BEHALF OF SONY ELECTRONICS AND SONY ENERGY DEVICES.
```

1    YOUR HONOR, WE'VE HEARD A LOT OF ARGUMENT THIS MORNING AND

2    IN THE INTEREST OF TIME, WE WILL SUBMIT OUR ARGUMENT ON SONY

3    ELECTRONICS ON THE PAPER -- ON THE PAPERS.

4    I BRIEFLY WANT TO ADDRESS, HOWEVER, THE ALLEGATIONS AS TO

5    SONY ENERGY -- ENERGY DEVICES.  WE JUST WANT TO HIGHLIGHT A

6    FEW IMPORTANT FACTS THAT SHOULD BE TAKEN INTO ACCOUNT IN

7    EVALUATING PLAINTIFFS' ALLEGATIONS.

8    ONE, SONY -- SONY ENERGY DEVICES -- I'LL REFER TO AS

9    "SEND" FROM HERE ON -- DID NOT COME INTO EXISTENCE UNTIL 2004,

10   SO ANY ALLEGATIONS PRIOR TO THAT POINT ARE IRRELEVANT.

11   THEY'RE -- BETWEEN 2004 AND 2009, SEND WAS RESPONSIBLE FOR

12   MANUFACTURING CELLS IN PACKS.  AFTER -- AFTER 2009, THE

13   REMAINDER OF THE -- OF BATTERY BUSINESS WAS -- WAS TAKEN OVER

14   BY SEND.  THERE ARE NO SUBSTANTIVE ALLEGATIONS WITH RESPECT TO

15   SEND AFTER 2004.

16   THE ONLY ONE IS DATED AFTER 2009, AND I WANT TO DRAW THE

17   COURT'S ATTENTION TO IT BECAUSE I THINK IT'S IMPORTANT TO

18   FOCUS ON THE ACTUAL ALLEGATION.  AND I'D LIKE TO REFER TO

19   PARAGRAPH 229 OF THE IPP COMPLAINT.  THE ALLEGATION SAYS, ON

20   MAY 9TH, 2010, ROBERT MCCAUL, SONY ELECTRONICS SAN JOSE,

21   CALIFORNIA WROTE TO KOICHI FUKATA, MANAGER OF SONY ENERGY

22   DEVICES OF JAPAN, REGARDING THE CUSTOMER RIM THAT WE -- THAT,

23   QUOTE, WE REQUEST THAT YOU CONSIDER A PRICE COMPETITIVE WITH

24   SANYO.  SANYO PRICE EQUALS BELOW THREE FIFTY, END QUOTE.

25   YOUR HONOR, THAT'S MERELY A COMMUNICATION WITH RESPECT TO

1   OBTAINING A PRICE COMPETITIVE TO SANYO.  NO EVIDENCE OF ANY

2   CONSPIRATAL (PHONETIC) ACTIVITY, MUCH LESS A CONSCIOUS

3   DECISION TO PARTICIPATE IN THE CONSPIRACY.

4          **THE COURT:**  RESPONSE.

5          **MR. SEAVER:**  ALL RIGHT.  WE'LL -- DOING BOTH -- TODD

6   SEAVER FOR PLAINTIFFS, DOING BOTH SONY ELECTRONICS

7   INCORPORATED AND SONY ENERGY DEVICES.

8      PLAINTIFFS WILL ALSO SUBMIT ON SONY ELECTRONICS

9   INCORPORATED.  AND OF THE ALLEGATIONS WE'VE PROVIDED THAT

10  WE'VE HIGHLIGHTED IN THE CHART, I WOULD IN PARTICULAR JUST

11  FOCUS ON DIRECT PURCHASERS, PARAGRAPH 226; INDIRECT

12  PURCHASERS, 220.  IT'S THE -- THE SAME EVENT BEING ALLEGED IN

13  BOTH COMPLAINTS.  AND THEN ALSO THE DIRECT PARAGRAPH -- DIRECT

14  PURCHASER PLAINTIFFS PARAGRAPHS 230 THROUGH 233.

15     OF ALL THE DIFFERENT PARAGRAPHS -- AND THERE'S QUITE -- WE

16  THINK QUITE A BIT OF MEAT FOR SONY ELECTRONICS INCORPORATED,

17  THOSE ARE THE ONES WE'D ASK THE COURT TO FOCUS ON IN

18  PARTICULAR.

19     SO SONY ENERGY DEVICE DEVICES, THIS IS A JAPANESE COMPANY.

20  IT'S WHOLLY OWNED BY THE PARENT SONY CORPORATION IN JAPAN.

21  HERE, NEITHER -- BEARS NOTING THAT NEITHER SONY ENERGY DEVICE

22  NOR SONY CORPORATION HAVE PRODUCED DOCUMENTS TO THE DOJ OR THE

23  PLAINTIFFS, SO I GO BACK TO MY FIGHT WITH ONE ARM ANALOGY, BUT

24  WE'D LIKE TO FOCUS ON AN EVENT INVOLVING SONY -- WHAT WE

25  BELIEVE IS SONY ENERGY DEVICES.  IT'S IN THE DIRECT COMPLAINT

1    AT 131.  AND IT'S THE SAME EVENT DESCRIBED IN THE INDIRECT

2    COMPLAINT AT PARAGRAPH 79(B)(II).

3        THESE ARE ALLEGATIONS -- IT COMES -- THEY COME FROM LG,

4    SANYO, AND SAMSUNG DOCUMENTS.  AND THE ALLEGATIONS -- IT DOES

5    SAY "SONY."  IT DOESN'T SAY "SONY CORPORATION."  DOESN'T SAY

6    "SONY ENERGY DEVICES."  AT THIS STAGE, WE THINK THE REFERENCES

7    TO "SONY" HERE INCLUDE SONY ENERGY DEVICES.  AND THIS GETS US

8    TO SOME CONFUSION ABOUT SONY ENERGY DEVICES AND WHEN IT -- IT

9    WAS CREATED OR CAME INTO EXISTENCE OR BEGAN ITS OPERATIONS.

10       THE PLEADING -- THE DIRECT PURCHASER COMPLAINT, PARAGRAPH

11   45, SAYS THAT -- IT DOESN'T SAY ANYTHING ABOUT WHEN THE

12   COMPANY WAS CREATED OR FOUNDED OR CAME INTO EXISTENCE.  IT

13   DOES SAY THAT AS OF SOME POINT IN 2009, SONY CORPORATION, THE

14   PARENT, CONCENTRATED THE BULK, IF NOT ALL OF THE LITHIUM ION

15   BATTERY BUSINESS INTO ITS SUBSIDIARY SONY ENERGY DEVICES IN

16   JAPAN.

17       WE FIND OURSELVES WITH QUITE A BIT OF EXTRINSIC

18   INFORMATION, EXTRINSIC TO THE COMPLAINT THAT'S -- MY

19   COLLEAGUES AT SONY HAVE PROVIDED THE COURT MOST -- IN

20   PARTICULAR ON THEIR REPLY BRIEF, WHICH WE DIDN'T HAVE A CHANCE

21   TO RESPOND TO, AT FOOTNOTE 1, IT CITES A WEBSITE.  AND IT'S

22   NOT SONY ENERGY DEVICES WEBSITE, BUT IT CITES A WEBSITE AND

23   ASKS THE COURT TO CONSIDER THIS AS A FACT.

24       WE DON'T THINK THAT'S PROPER, BUT IF I COULD ADDRESS IT,

25   IT -- THEY SAY THAT BASED ON THIS CITE -- AND I HAVE IT.  I

1    CAN HAND IT UP IF YOUR HONOR WISHES -- THAT THE COMPANY, AS WE

2    HEARD IS -- DIDN'T EXIST UNTIL 2004.  AND IN THEIR REPLY

3    BRIEF, THEY SAY IT DIDN'T EXIST UNTIL 2004 AND THEN THEY BACK

4    AWAY FROM THAT A LITTLE BIT AND SAY, WELL, IT DIDN'T BEGIN

5    OPERATIONS UNTIL 2004.  YOU COULD IMAGINE -- WE SEE THIS REPLY

6    BRIEF.  PIQUED OUR INTEREST.  SO WE WENT TO THE SONY ENERGY

7    DEVICES WEBSITE, AND THIS -- AGAIN, THIS IS NOT IN THE

8    PLEADINGS.  AND I HAVE THAT HERE FOR YOU AND IT SAYS THE

9    COMPANY'S FOUNDED IN 1975.  WHAT DOES ALL THIS MEAN?

10       WELL, I THINK WE SHOULD JUST GO BACK TO THE PLEADING,

11   WHICH IS SILENT ON THE CREATION OF THE COMPANY, BUT WHAT IT

12   MEANS IS, AS WE'VE SEEN ALREADY, IS THAT WE THINK WE GET THAT

13   INFERENCE.  THE COMPANY'S IN EXISTENCE AT LEAST ON THE FACE OF

14   OUR PLEADINGS, IT EXISTS.  AND SO THE -- THE ALLEGATIONS THAT

15   ARE DESCRIBED AT THE PARAGRAPHS I HIGHLIGHTED ARE -- APPLY TO

16   AND DESCRIBE THE CONDUCT OF SONY ENERGY DEVICES.

17       AND SO IT'S A -- REALLY, IT'S A CONSPIRATORIAL MEETING,

18   COMES PRIMARILY FROM LG DOCUMENTS, AND IT SAYS, QUOTE, SONY

19   AND LG AGREED, NOT --" JUST QUOTES IS "SONY."  THE REST OF

20   THIS, I'M PARAPHRASING.  THEY AGREED NOT TO ENGAGE IN PRICE

21   COMPETITION, AND LG PLEDGED TO FOLLOW SONY'S FORTHCOMING PRICE

22   INCREASES.  THAT'S WHAT WE HAVE FOR SONY ENERGY DEVICES.

23       I'M HAPPY TO -- I WILL AT LEAST SHARE IT WITH MY

24   COLLEAGUE, THE WEBSITES I'M REFERRING TO.  AND IF YOUR HONOR

25   LIKES, I'LL HAND THEM UP AS WELL.

1        **THE COURT:**  RESPONSE?

2          **MS. MEJIA:**  YES, YOUR HONOR.

3      OUR -- OUR REPRESENTATION TO THE COURT IS THAT SONY ENERGY

4    DEVICES CAME INTO OPERATION IN 2004.  THERE WERE PREDECESSOR

5    ENTITIES PRIOR TO THAT POINT.  THERE'S NO ALLEGATION OF

6    SUCCESSOR LIABILITY HERE AT ALL.  BUT EVEN FOCUSING ON THE

7    2002 ALLEGATIONS THAT PLAINTIFFS RELY ON, IF YOU LOOK AT THE

8    INDIRECT PURCHASER COMPLAINT, 79(B) ROMAN AT II, WHICH IS I

9    BELIEVE ONE OF THE ALLEGATIONS THAT COUNSEL REFERRED TO,

10   THE -- THE MEETING THERE OR -- THE ALLEGATION OR THE QUOTE IS

11   THAT THERE WAS A MEETING AT WHICH A PROPOSAL FOR THE

12   ACQUISITION OF SONY PRISMATIC K5 LINE AND REGARDING K5EBP

13   HONG, CAME TO JAPAN AGAIN AND MET PEOPLE SUCH AS MR. KATAYAMA.

14       SO THERE'S NOTHING THERE ABOUT A CONSPIRACY, AN AGREEMENT,

15   OR EVEN A MENTION OF PRICES.  IT'S SIMPLY A DISCUSSION ABOUT

16   ACQUIRING CERTAIN ASSETS.

17      THE OTHER PRE-2004 ALLEGATION THAT I BELIEVE COUNSEL

18   REFERRED TO, IF THE COURT WILL GIVE ME A SECOND HERE --

19                    (PAUSE IN THE PROCEEDINGS.)

20         **MS. MEJIA:**  -- IS AT PARAGRAPH 131 OF THE DPP

21   COMPLAINT.  AND, AGAIN, THERE ARE, THERE'S AN ALLEGATION OF A

22   MEETING BETWEEN SONY AND LG.  THERE IS NO MENTION OF SONY

23   ENERGY DEVICES, WHATSOEVER.

24      THERE'S A REFERENCE TO MEETING -- PERSONNEL FROM SONY

25   CORPORATION CORE TECHNOLOGY AND NETWORK COMPANY AND VARIOUS

1     EMPLOYEES OF THAT COMPANY.

2          THERE IS NO MENTION WHATSOEVER OF SONY ENERGY DEVICES.

3               **THE COURT:**  YOU WANT TO RESPOND TO THAT, MR. SEAVER?

4               **MR. SEAVER:**  NO.  WE'LL REST ON OUR PAPERS, YOUR

5     HONOR.

6                    (PAUSE IN THE PROCEEDINGS.)

7               **MR. SEAVER:**  YOUR HONOR JUST --

8               **THE COURT:**  DO YOU WANT TO -- TO RESPOND TO THE NOTE

9     BY MR. SEAVER, MS. MEJIA, THAT THE SONY WEBSITE FOR SONY

10    ENERGY DEVICES INDICATES IT WAS FOUNDED IN 1975?

11              **MS. MEJIA:**  I THINK, YOUR HONOR, THAT REFERS TO

12    PREDECESSOR ENTITIES NOT SONY ENERGY DEVICES.

13              **MR. SEAVER:**  AND, YOUR HONOR, PLAINTIFFS REALLY CAN'T

14    RESPOND TO THAT WITHOUT DISCOVERY.

15              **MS. MEJIA:**  BUT, AGAIN, YOUR HONOR, TO ELABORATE A

16    LITTLE BIT, THERE IS NO MENTION OF SONY ENERGY DEVICES PRIOR

17    TO 2004 OR ANY PREDECESSOR OF SONY ENERGY DEVICES ASSUMING

18    THAT ANY LIABILITY -- THERE WOULD BE ANY SUCCESSOR LIABILITY.

19              **MR. SEAVER:**  UH-HUH.  AND ON THAT, THE PARAGRAPH I

20    HIGHLIGHTED, WE BELIEVE IS REFERRING TO SONY ENERGY DEVICES

21    FOR THE REASONS I --

22              **THE COURT:**  I UNDERSTAND.  AND I ALSO SEE HERE THAT

23    THE HISTORY RIGHT ON THE FACE OF THE DOCUMENT INDICATES THAT

24    THE MERGER FROM PRIOR ENTITIES TO SEND WAS IN 2004.

25              **MR. SEAVER:**  CORRECT.  I -- I PROVIDED THE ACTUAL

1   PRINTOUT OF THE SITE THAT MY COLLEAGUES AT SONY HAD REFERRED

2   YOUR HONOR, JUST IN FAIRNESS, SO THEY HAD BOTH IF -- I DON'T

3   THINK THIS IS -- EXTRINSIC MATERIAL MEANS ANYTHING, BUT IT --

4   I THINK ALL IT MEANS IS WE STICK WITH THE PLEADINGS AND THEY

5   AREN'T IN THERE, THOSE FACTS, SO THE INFERENCE WE'VE ASKED

6   YOUR -- YOUR HONOR TO AGREE WITH US SHOULD BE DRAWN, WE ASKED

7   THAT YOUR HONOR DO SO AND THE DENY MOTION OF SONY ENERGY

8   DEVICES.

9           **THE COURT:**  OKAY.  ANYTHING ELSE?

10          **MS. MEJIA:**  ONE FINAL COMMENT, YOUR HONOR.  TAKING --

11  ASSUMING YOU TAKE THE PLEADINGS AS THEY ARE, THERE IS STILL

12  NOTHING WITH RESPECT TO SONY ENERGY DEVICES THAT WOULD

13  ESTABLISH THAT THEY MADE A CONSCIOUS DECISION TO PARTICIPATE

14  IN THE CONSPIRACY AT ANY POINT.

15          **MR. SEAVER:**  THANK YOU.

16          **THE COURT:**  ALL RIGHT.  SUBMITTED.

17     LAST, TOSHIBA.

18          **MR. CURRAN:**  GOOD MORNING, YOUR HONOR.  I'M

19  CHRISTOPHER CURRAN FROM WHITE AND CASE FOR TOSHIBA

20  CORPORATION.

21          **MR. FRIEDMAN:**  JEFF FRIEDMAN ON BEHALF OF THE

22  INDIRECT PURCHASER PLAINTIFFS, YOUR HONOR.

23          **MR. CURRAN:**  YOUR HONOR, TOSHIBA RAISED TWO POINTS IN

24  ITS MOTION TO DISMISS.  I PROPOSE STARTING WITH THE TWOMBLY

25  ISSUE.

1        YOUR HONOR, THE CLAIM AGAINST TOSHIBA CORPORATION RESTS

2   UPON ALLEGATIONS OF FIVE BILATERAL MEETINGS; FOUR, WITH

3   SAMSUNG; ONE WITH LG.  AND THE PLAINTIFFS ASK YOUR HONOR TO

4   INFER THAT THOSE MEETINGS SUPPORT A CLAIM AGAINST TOSHIBA AS A

5   MEMBER OF THE CONSPIRACY.

6        THERE IS NOT AN ALLEGATION, YOUR HONOR, OF AGREEMENT IN

7   ANY OF THOSE FIVE MEETINGS SO THE PLAINTIFFS ARE RESTING ON AN

8   INFERENCE.  I SUGGEST THAT IN LIGHT OF THE RELEVANT STANDARD

9   AND THE WORD "HOLISTIC," WHICH HAS BEEN BANDIED ABOUT A LOT

10  TODAY, THAT THAT INFERENCE IS UNREASONABLE AND THAT THERE ARE

11  MORE COMPELLING AND MORE APPROPRIATE INFERENCES TO BE DRAWN.

12  AND LET ME BE PRECISE.

13       READING THE COMPLAINTS AS A WHOLE, I -- I DIRECT YOUR

14  HONOR'S ATTENTION TO PARAGRAPH 76 OF THE IPP COMPLAINT.  AND

15  THERE, THE IPP'S ACKNOWLEDGE THAT ONE OF THE MEETING WITH

16  SAMSUNG, THE LAST ONE IN 2003, THE LAST OF THE FIVE MEETINGS,

17  WAS A MEETING AT WHICH TOSHIBA WAS TRYING TO SELL ITS BATTERY

18  BUSINESS.  AND THERE'S A LENGTHY PARAGRAPH THERE, AND I SUBMIT

19  TO YOUR HONOR, THAT THERE'S NOTHING IN THAT PARAGRAPH THAT IS

20  INCONSISTENT WITH AN ARM'S LENGTH TRANSACTION.  TOSHIBA TRYING

21  TO SELL ITS BATTERY BUSINESS TO SAMSUNG.

22       THIS, AGAIN, IS THE LAST OF THE FIVE.  AND IN THIS

23  PARAGRAPH, 76, THE IPP'S ACKNOWLEDGE THAT TOSHIBA WAS SPEAKING

24  NOT ONLY TO SAMSUNG BUT TO LG, WHO, OF COURSE, IS THE ONLY

25  OTHER PARTY THAT TOSHIBA'S ALLEGED TO HAVE BILATERAL MEETINGS

```
 1   WITH.

 2        SO THIS ALLEGATION IS ONE ALLEGATION IN THE COMPLAINT THAT

 3   READ HOLISTICALLY GIVES -- SHEDS DIFFERENT LIGHT ON THE

 4   MEETINGS THAT THE COMPLAINT -- THAT THE PLAINTIFFS REST UPON.

 5        ANOTHER PARAGRAPH -- AND THIS IS A NEW ONE IN THE DPP

 6   COMPLAINT, PARAGRAPH 93 -- THAT'S WHERE THE DPP'S NOW

 7   ACKNOWLEDGE THAT TOSHIBA WAS A CUSTOMER OF MOST OF THE OTHER

 8   DEFENDANTS IN THIS CASE, INCLUDING SAMSUNG AND LG.

 9        AND IN FACT, THE DPP'S ACKNOWLEDGE THAT ULTIMATELY IN

10   THE -- IN THE ALLEGED CONSPIRACY PERIOD, TOSHIBA WAS BUYING A

11   HUNDRED PERCENT OF ITS NEEDS FROM SAMSUNG, LG, AND OTHER

12   DEFENDANTS.

13        I SUBMIT TO YOUR HONOR, THAT, OF COURSE, TOSHIBA WAS

14   MEETING WITH THESE COMPANIES BECAUSE IT WAS A CUSTOMER.  AND

15   THE ACKNOWLEDGMENT IN THE COMPLAINTS HERE AGAIN SHEDS A

16   DIFFERENT LIGHT ON THE FIVE BILATERAL MEETINGS THAT THE

17   PLAINTIFFS POINT TO.

18        AND, AGAIN, EVERYONE ONE OF THOSE FIVE, FOUR OF THEM ARE

19   WITH SAMSUNG; ONE IS WITH LG.  THEY WERE BOTH COUNTER-PARTIES

20   TO PROPOSED SALES TRANSACTIONS, AND THEY WERE BOTH SUPPLIERS

21   OF TOSHIBA.

22        SO IN LIGHT OF THE HOLISTIC READING OF THE COMPLAINTS, I

23   SUBMIT THAT IT'S UNREASONABLE TO REACH THE NEFARIOUS

24   CONCLUSION THAT THESE FIVE BILATERAL MEETINGS SUPPORT THE

25   INCLUSION OF TOSHIBA IN THE CONSPIRACY.
```

```
1        I -- I ALSO ADD, YOUR HONOR, AS BACKGROUND, TOSHIBA WAS

2   NOT NAMED IN THE ORIGINAL CLASS ACTIONS THAT LED TO THIS MDL.

3   IT WAS ADDED ONLY AS A LATE-COMER IN THE CONSOLIDATED AMENDED

4   COMPLAINTS.  TOSHIBA HAS NO CONVICTION, NO INDICTMENT, NO

5   INFORMATION, AND NO -- NO ENTITY OF TOSHIBA RECEIVED ANY

6   SUBPOENA FROM THE U.S. GOVERNMENT.

7            THE COURT:  RESPONSE.

8            MR. FRIEDMAN:  YOUR HONOR, I DON'T BELIEVE YOU CAN

9   CLAIM HOLISTIC READING WITHOUT HOLISTICALLY READING.

10       SO FIRST OF ALL, YOUR HONOR, IF -- WE'LL TAKE MR. CURRAN'S

11  FOCUS ON PARAGRAPH 76 OF THE IPP COMPLAINT, AND HE LEFT OUT OF

12  HIS HOLISTIC READING THAT THE ALLEGATION INCLUDES SAMSUNG

13  STATED DURING THIS MEETING BETWEEN TOSHIBA AND SAMSUNG, THAT,

14  QUOTE, WE HAVE FORMED A CONNECTION FOR A LONG TIME THROUGH

15  LIAISON CONFERENCES WITH TOSHIBA.  AND THAT IN ADDITION DURING

16  THIS MEETING, TOSHIBA COMMUNICATED DETAIL CAPACITY AND

17  OPERATING INFORMATION.

18       NOW, HE MAY ARGUE A -- INNOCUOUS INFERENCES THAT THAT WAS

19  PART AND PARCEL TO A SALE NEGOTIATION.  AND AS A SIDE, IT

20  SEEMS LIKE MR. CURRAN'S RELYING ON THE FACT THAT TOSHIBA

21  PURCHASED A LARGE PERCENTAGE OF ITS SHARES OF CELLS FROM OTHER

22  COMPANIES WHILE AT THE SAME TIME IS SELLING ITS BATTERY

23  BUSINESS.  I DON'T THINK THAT'S INCONSISTENT WITH THE TIME

24  PREDATING THE SALE OR LATER IN THE CONSPIRACY WHERE THEY ARE

25  BUYING CELLS FROM OTHER PARTICIPANTS.
```

```
1          BUT I'LL MAKE THIS FURTHER POINT, YOUR HONOR.  THAT WAS

2     JULY 15TH, 2003.

3          IF YOU GO BACK HOLISTICALLY AND LOOK AT PARAGRAPH 79,

4     WHICH IS A DISCUSSION WHERE LG, I BELIEVE, IS RELATING THE

5     HISTORY BETWEEN LG AND SONY'S CONSPIRATORIAL COMMUNICATIONS,

6     IT INCLUDES IN, I BELIEVE, 79 -- 79(B)(I), THE DISCUSSION,

7     YOUR HONOR, THAT IS REFERENCING THE SERIES OF MEETINGS THAT

8     WERE OCCURRING -- AGAIN, THIS IS PREDATING THE JULY 15TH

9     MEETING, AND THIS IS IN JULY 2002 -- WHERE IT'S RECOUNTING THE

10    SEQUENTIAL MEETINGS WITH COMPETITORS WHICH WAS FOR THE PURPOSE

11    OF ASKING FOR COOPERATION IN THE BUSINESS.

12         AND SO WHAT YOU HAVE, YOUR HONOR, IS WHAT MR. CURRAN

13    SPINS, AN INFERENCE OF THE 2003 MEETING IS THAT, ONE, HE

14    LEAVES OUT THERE'S HISTORY BETWEEN THESE TWO COMPANIES; TWO,

15    THE HISTORY INCLUDES INFERENCES THAT THE PRIOR MEETINGS THAT

16    THEY ACKNOWLEDGE WERE LONG-STANDING, WERE WITHIN HOLISTICALLY

17    SEQUENTIAL MEETINGS THAT WERE GOING ON AMONGST TOSHIBA, THE

18    COMPETITORS, TO FIX PRICES.

19         AND SO THE OTHER THING I WILL ALSO POINT OUT TO THE COURT

20    HOLISTICALLY AND MR. CURRAN LEAVES OUT IN THAT COMMENT IS THAT

21    WE ALSO PLEAD IN PARAGRAPH 71 THAT BETWEEN OCTOBER 22ND, 2002

22    AND OCTOBER 25TH, 2002, SAMSUNG CONDUCTED ANOTHER ROUND OF

23    MEETINGS.  I DON'T NEED TO TAKE THE COURT THROUGH IT ALL.

24         BUT IN THIS, IT'S DETAILED, YOUR HONOR, WHERE SAMSUNG AND

25    TOSHIBA HAVE A MEETING IN WHICH THERE'S DISCUSSIONS OF 2003
```

1    FUTURE PRICES, CLASSIC DISCUSSIONS THAT WE BELIEVE ARE

2    EVIDENCE OF AN ANTI-COMPETITIVE MEETINGS OF MINDS TO RESTRAIN

3    THOSE FUTURE PRICES.

4        SO I WOULD SIMPLY SAY, YOUR HONOR, THAT THAT'S SUFFICIENT.

5    WE'D SUBMIT ON THAT WITH RESPECT TO THAT PART OF THE ARGUMENT.

6            **MR. CURRAN:**   TO RESPOND TO THAT, YOUR HONOR, I'LL

7    ADDRESS THE THREE PARAGRAPHS THAT MR. FRIEDMAN RELIES UPON.

8    76, EVERYTHING IN THERE IS CONSISTENT WITH AN ARM'S LENGTH

9    SALE OF A BUSINESS.  AND I GUESS HE'S INFERRING WITH A

10   JAUNDICED EYE SOMETHING FROM THAT LAST QUOTE ABOUT WE HAVE

11   FORMED A CONNECTION FOR A LONG TIME THROUGH LIAISON

12   CONFERENCES WITH TOSHIBA.

13       YOUR HONOR, BUSINESSES HAVE A LOT OF RELATIONSHIPS,

14   INCLUDING, AS WE'VE ALREADY ESTABLISHED FROM THESE COMPLAINTS,

15   SALES TRANSACTIONS BETWEEN THEM.  COMPANIES LIKE TOSHIBA AND

16   SAMSUNG DO BUSINESS ON A LOT OF DIFFERENT LEVELS, HUNDREDS OF

17   TRANSACTIONS EVERY YEAR.  SO THERE'S NOTHING NEFARIOUS OR TO

18   BE INFERRED FROM -- FROM THAT PARAGRAPH.

19       AS TO -- AS TO PARAGRAPH 79, WHICH MR. FRIEDMAN

20   SURPRISINGLY REFERRED TO, THAT -- THAT (B)(I) REFERS TO A

21   MEETING BETWEEN LG AND SONY, AND IT HAPPENS TO MENTION IN

22   PASSING THAT THOSE TWO DISCUSSED COOPERATION WHEN THE --

23   APPARENTLY THE LG PERSON WAS ON A BUSINESS TRIP WHERE HE MET

24   WITH TOSHIBA.

25       SO I GUESS -- I GUESS MR. FRIEDMAN IS SUGGESTING THAT IF

1    SOMEONE ENGAGES IN A COLLUSIVE DISCUSSION AND MEETS WITH YOU

2    ON THE SAME BUSINESS, WELL, THEN YOU'RE KIND OF ROPED IN.  I

3    DON'T THINK THAT'S A SUPPORTABLE OR REASONABLE INFERENCE TO --

4    TO USE TWOMBLY.

5         AND THEN UNDER 70 -- UNDER -- I THINK HE -- THE FINAL WAS

6    PARAGRAPH 71, OF COURSE, THERE'S GOING TO BE DISCUSSION OF

7    THAT -- SOME LEVEL OF PRICING WHEN SAMSUNG IS A SUPPLIER TO

8    TOSHIBA.

9         CUSTOMERS AND SUPPLIERS DISCUSS PRICING.  THAT'S PART AND

10   PARCEL OF THE RELATIONSHIP, SO THERE'S NOTHING TO BE INFERRED

11   THERE.

12        THE PLAINTIFFS -- AND -- AND MR. FRIEDMAN SEEMED TO BE

13   USING THE WORD "HOLISTIC" AS THOUGH HE'S DISTANCING HIMSELF

14   FROM IT.  I THINK THAT IT'S UNEQUIVOCALLY THE STANDARD HERE,

15   THE HOLISTIC READING.  THE "HOLISTIC" PART, WHICH THE -- WHICH

16   THE PLAINTIFFS OFTEN CHIME -- CHIME ABOUT IN ORDER TO PROTECT

17   THEIR PLEADINGS, THAT CAN BE TURNED AGAINST THEM.

18        THE HOLISTIC READING OFTEN GIVES THEM SHELTER, BUT

19   SOMETIMES IT UNDERMINES THEIR ALLEGATIONS, AND I SUBMIT THAT'S

20   WHAT'S HAPPENING HERE.

21        THE OTHER POINT WE RAISE IN OUR MOTION TO DISMISS WAS

22   TOUCHED UPON DURING THE HITACHI ARGUMENT, YOUR HONOR, BUT I

23   THINK IT NEEDS TO BE CLARIFIED A LITTLE BIT.

24        IN -- OUR ARGUMENT HERE IS THAT THE COMPLAINT -- AND THIS

25   ONE ONLY DEALS WITH THE DIRECT PURCHASER COMPLAINT BECAUSE

 1    IT'S AN ILLINOIS BRICK ISSUE.  THE DIRECT PURCHASER COMPLAINT

 2    CONTAINS NO ALLEGATIONS ABOUT ANY COMPANY BEING OWNED OR

 3    CONTROLLED BY TOSHIBA.  OKAY.  SO THE -- THE QUESTION IS WHAT

 4    ARE THE LEGAL IMPLICATIONS OF THAT ABSENCE.  AND BY THE WAY, I

 5    DON'T THINK THE DPP'S QUARREL WITH THAT CHARACTERIZATION.

 6        FIRST OF ALL, I THINK IT'S EMPIRICALLY PROVABLE.  AND

 7    SECONDLY, THE CHART THAT THE DPP'S ATTACH TO THEIR JOINT

 8    MOTION OPPOSITION CATALOGS ALL OF THEIR ALLEGATIONS OF

 9    OWNERSHIP OR CONTROL.  AND YOU'LL NOTICE THE CONSPICUOUS

10    ABSENCE OF ANY REFERENCE TO TOSHIBA THERE.

11        SO, FIRST OF ALL, I THINK IT'S INDISPUTABLE THAT THERE'S

12    NO ALLEGATIONS ABOUT ANY COMPANY BEING OWNED OR CONTROLLED BY

13    TOSHIBA.  THE REAL ISSUE IS WHAT ARE THE LEGAL IMPLICATIONS

14    FROM THAT.  AND MR. SIMON, WHO CAME UP BEFORE TO ADDRESS THIS

15    POINT, PREFACED HIS COMMENTS BY SAYING, I DON'T EVEN

16    UNDERSTAND THIS POINT.  I DON'T KNOW WHY THEY'RE MAKING IT.  I

17    AGREE WITH HIM, HE DOESN'T UNDERSTAND THE POINT, BECAUSE HE --

18    HE READ THAT AS AN EFFORT ON THE PART OF THE DEFENDANTS TO BE

19    DISMISSED ENTIRELY BECAUSE OF THE ABSENCE OF SUCH ALLEGATIONS.

20    THAT IS NOT THE CASE.

21        WE RECOGNIZE WE CAN STILL BE KEPT IN THE CASE FOR

22    JOINT-AND-SEVERAL LIABILITY, BUT -- BUT, YOUR HONOR -- AND

23    THIS IS IMPORTANT -- IF -- IF THERE'S NO ENTITY OWNED OR

24    CONTROLLED BY TOSHIBA, THAT MEANS THAT THE PRODUCTS SOLD BY

25    TOSHIBA CANNOT RESULT IN A DIRECT PURCHASE BY THE DIRECT

1    PURCHASER CLASS.  THEY HAVE NO BASIS FOR CLAIMING TO BE A

2    DIRECT PURCHASER OF TOSHIBA, CELLS, BATTERIES, OR PRODUCTS.

3        SO ALL WE'RE SAYING IS THE ABSENCE OF THOSE ALLEGATIONS

4    MEANS THAT TOSHIBA'S TRANSACTION, ITS COMMERCE IS OUT OF THE

5    CASE.  AND THAT'S IMPORTANT HERE, PARTICULARLY FOR TOSHIBA,

6    BECAUSE WE ARE ONE OF THE BIGGEST LAPTOP SELLERS IN THE

7    RELEVANT PERIOD.  HUGE COMMERCE.  THAT COMMERCE DOES NOT

8    BELONG IN THE DPP CASE BECAUSE OF THE ABSENCE OF THOSE

9    OWNERSHIP OR CONTROL ALLEGATIONS.

10        **MR. SIMON:**  YOUR HONOR, BRIEFLY, I HAVE THE HIGHEST

11   RESPECT FOR MR. CURRAN, AND WHEN HE SAYS I DON'T UNDERSTAND

12   SOMETHING, I -- THAT'S BELOW THE STANDARD I USUALLY EXPECT OF

13   HIM.

14        I'LL READ FROM THERE THREE THINGS, AND I WON'T EVEN ARGUE

15   BECAUSE THEY SPEAK FOR THEMSELVES.  FROM THEIR REPLY BRIEF,

16   THE NINTH CIRCUIT CONCLUDED THAT ROYAL PRINTING COULD PROCEED

17   AS A DIRECT PURCHASER ON THE TRANSACTIONS IT MADE WITH THE

18   SUBSIDIARY AND A DIVISION OF TWO OF THE DEFENDANT

19   MANUFACTURERS, MR. CURRAN'S WORDS IN HIS REPLY BRIEF.

20        JUDGE ILLSTON ON ROYAL PRINTING, ROYAL PRINTING WAS NOT

21   CONCERNED WITH THE RELATIONSHIP BETWEEN THE MANUFACTURER OF

22   THE PRICE-FIXED PRODUCT AND THE DIRECT PURCHASER.  RATHER, IT

23   WAS CONCERNED WITH THE RELATIONSHIP BETWEEN THE CONSPIRATOR

24   AND THE DIRECT PURCHASER.  INDEED, THE FACTS IN ROYAL PRINTING

25   CONFIRMED THIS.  ROYAL PRINTING SOUGHT DAMAGES FOR ITS

 1   PURCHASES FROM A COCONSPIRATOR'S WHOLESALING DECISION BUT HAD

 2   NEVER BOUGHT ANY OF THE PARENT COMPANY'S PRODUCTS FROM THAT

 3   DIVISION.  IT HAD ONLY BOUGHT PRODUCTS OF THE OTHER DEFENDANT

 4   MANUFACTURERS.

 5       AND, LASTLY, NIPPON PAPER, WHICH SAYS AT THE END IN

 6   CONCLUSION, IF NIPPON PAPER PARTICIPATED IN A CARTEL OF

 7   THERMAL FAX PAPER, SOMETHING THAT REMAINS TO BE DETERMINED,

 8   THEN IT IS JOINTLY AND SEVERALLY LIABLE FOR THE CARTEL'S

 9   ENTIRE OVERCHARGE.  THAT THE PLAINTIFFS DID NOT BUY FROM

10   NIPPON PAPER DIRECTLY OR ALL DOES NOT MATTER.

11       IN FORM OR SUBSTANCE, THAT MEANS IT DOESN'T MATTER WHAT

12   MR. CURRAN IS ARGUING.  HE IS WRONG ON THE LAW AND WRONG ON

13   THE EFFECT OF ROYAL PRINTING.  AND HE IS ACTUALLY ARGUING TO

14   YOU THAT ROYAL PRINTING SHOULD BE ELIMINATED.  HE CAN GO ARGUE

15   THAT TO THE NINTH CIRCUIT.

16           MR. CURRAN:  YOUR HONOR, WE'RE STILL SHIPS PASSING IN

17   THE NIGHT, AND I DON'T MEAN THAT PEJORATIVELY.  AND I DIDN'T

18   MEAN THE EARLIER COMMENT PEJORATIVELY.

19       MAYBE THERE'S A GENUINE FAILURE TO JOIN ISSUE HERE.  WE

20   ARE NOT CLAIMING WE GET DISMISSED BECAUSE OF THEIR ABSENCE OF

21   ALLEGATIONS.

22               (SIMULTANEOUS COLLOQUY.)

23           MR. CURRAN:  WE ARE STILL ON THE HOOK --

24           THE COURT:  LET ME ASK THIS QUESTION:  WHAT ARE YOU

25   ASKING THE COURT TO DO WITH RESPECT TO THE EFFECT OF YOUR

1    ARGUMENT?

2         **MR. CURRAN:**  WE ASK THAT YOUR HONOR ISSUE AN ORDER IN

3    TO RESPONSE TO OUR MOTION -- PUTTING ASIDE THE TWOMBLY ISSUE,

4    RIGHT, WHICH IS SEPARATE -- BUT IN RESPONSE TO THIS ISSUE,

5    YOUR HONOR SHOULD HAVE AN ORDER SAYING THAT THE -- THE DPP

6    CLASS MAY NOT CLAIM DAMAGES BASED ON SALES BY TOSHIBA BECAUSE

7    THE COMPLAINTS CONTAIN NO ALLEGATIONS THAT ANYBODY WHO SOLD

8    PRODUCT TO THE DPP'S WAS OWNED OR CONTROLLED BY TOSHIBA.

9         **MR. SIMON:**  AND THAT'S JUST WRONG AS A MATTER OF LAW,

10   AND THAT'S A MOTION TO STRIKE DAMAGE CLAIMS WHICH DOESN'T

11   HAPPEN AT THE TIME OF THE PLEADINGS.  THERE'S BEEN NO

12   DISCOVERY ON THIS.  AND IT'S EFFECTIVELY SAYING CARVE

13   SOMETHING OUT, WHICH IS A CLASS CERT ISSUE.  IT'S ALL

14   PREMATURE, ASIDE FROM BEING LEGALLY WRONG, YOUR HONOR.  IT

15   JUST IS NOT A PROPER READING OF ROYAL PRINTING.

16      IF YOU DID WHAT MR. CURRAN SUGGESTS UNDER ROYAL PRINTING,

17   YOU WOULD BE EFFECTIVELY VITIATING THE EXCEPTION BECAUSE HE'S

18   TRYING TO READ SOMETHING INTO IT THAT DOESN'T EXIST IN THAT

19   CASE.

20         **THE COURT:**  LET ME ASK PROCEDURALLY, IS IT

21   APPROPRIATE TO -- TO BE ASKING FOR THAT ORDER UNDER A 12(B)(6)

22   MOTION?

23         **MR. CURRAN:**  I THINK IT IS, YOUR HONOR.  I MEAN --

24         **THE COURT:**  HOW IS IT?  IT'S NOT FAILURE TO STATE A

25   CLAIM.

| | |
|---|---|
| 1 | **MR. CURRAN:** I THINK IT IS A CLAIM. I THINK IT'S |
| 2 | FAILURE TO STATE A CLAIM. IT'S -- IT'S NOT A COMPLETE |
| 3 | DISMISSAL BASED ON STANDING, BUT IT -- IT'S A STANDING ISSUE. |
| 4 | WHETHER YOU WANT TO CALL THAT 12(B)(6) OR 12(B)(1), YOU KNOW, |
| 5 | IT'S -- THE DPP'S DO NOT HAVE STANDING TO -- TO CLAIM THOSE |
| 6 | DAMAGES. AND IF THEY ARE CLAIMING THOSE DAMAGES, I SUBMIT |
| 7 | THEN WE'VE GOT A DUPLICATIVE DAMAGES ISSUE BECAUSE THE IPP -- |
| 8 | THOSE CLAIMS BELONG IN THE IPP CASE. |
| 9 | AND THIS KIND OF THING HAS TO BE SORTED OUT EARLY; |
| 10 | OTHERWISE, IT'S GOING TO COMPLICATE THINGS AT THE CLASS CERT |
| 11 | STAGE AND AT THE EXPERT STAGE. AND THERE HAS TO BE CLARITY AS |
| 12 | TO WHAT IS IN THE CASE, AS TO WHO IS A RELEVANT WITNESS FOR |
| 13 | DEPOSITIONS AND OTHER THINGS. |
| 14 | **MR. SIMON:** WE DISAGREE, YOUR HONOR. IT'S -- |
| 15 | **THE COURT:** LET ME ASK -- |
| 16 | **MR. SIMON:** -- MOTION TO STRIKE. |
| 17 | **THE COURT:** WELL, I THINK PROCEDURALLY, IT MAY NOT BE |
| 18 | PROPER, BUT I DON'T HAVE A PERSPECTIVE ON WHETHER OR NOT IT'S |
| 19 | ACCURATE IN TERMS OF LAW YET. |
| 20 | **MR. CURRAN:** YEAH. AND, YOUR HONOR -- |
| 21 | **THE COURT:** LET ME -- LET ME ASK THIS. YOU RAISE AN |
| 22 | ISSUE THAT NO ONE HAS REALLY ADDRESSED YET, AND THAT IS -- |
| 23 | MAYBE IT REALLY JUST GOES BACK TO THE ARGUMENT FROM MAY. |
| 24 | THE ISSUE OF DUPLICITY IN TERMS OF THE FIVE-FACTOR TEST |
| 25 | THAT THE COURT WILL HAVE TO GO THROUGH -- AND I DON'T KNOW IF |

```
 1   ANYONE WANTS TO SAY ANYTHING WITH RESPECT TO THAT GLOBALLY OR

 2   NOT -- ONE OF THE REASONS AN ORDER HAS NOT ISSUED WITH RESPECT

 3   TO THE FIRST CONSOLIDATED COMPLAINT IS I WANT TO MAKE SURE

 4   THAT I'M DOING ALL OF THESE AT ONCE SO THAT IT DOES MAKE

 5   SENSE.

 6            MR. SIMON:  WHICH FACTOR ARE YOU -- DID YOU WANT

 7   TO --

 8            THE COURT:  WITH RESPECT TO --

 9            MR. SIMON:  IF THERE'S DUPLICATION?

10            THE COURT:  DUPLICATION --

11            MR. SIMON:  THERE IS NONE.  THERE'S NO OVERLAP

12   BETWEEN THE DIRECT PURCHASER CLASS AND THE INDIRECT, AS

13   DEFINED INTERPRETED PROPERLY UNDER THE LAW.  WE GAVE YOU A

14   SLIDE ON THAT IN OUR PACKET.

15            THE COURT:  WHICH PAGE IS THAT?

16            MR. SIMON:  IN FACT, WE SHOW YOU --

17            MR. KESSLER:  ACTUALLY, YOUR HONOR, WE DO --

18            MR. SIMON:  EXCUSE ME, SIR.

19            THE COURT:  HOLD ON, MR. KESSLER.

20            MR. KESSLER:  SORRY.

21            THE COURT:  WHAT PAGE, MR. SIMON?

22            MR. SIMON:  IT'S PAGE 24 AND PAGE 25.  THE IPP'S

23   BOUGHT THROUGH INTERMEDIARIES AND WE SHOW YOU A STORE FRONT

24   LIKE COSTCO -- THAT'S WHO THEY BOUGHT THROUGH.  AND WHEN WE

25   BOUGHT THROUGH A STORE FRONT, IT WAS A SONY STORE FRONT, FOR
```

1    EXAMPLE, AND WE BOUGHT DIRECTLY.

2        THERE'S NO OVERLAP.  THERE'S NO DUPLICATION OF EFFORT.

3    THERE'S NO DUPLICATION OF DAMAGES.  YOU KNOW, IN LCD, WHICH

4    MR. CURRAN WAS IN, THERE WAS A CONVERSATION ABOUT THIS AFTER

5    CLASS CERTIFICATION.

6        CERTAIN CLASS MEMBERS MAY OVERLAP 'CAUSE THEY MIGHT HAVE

7    DIRECT AND INDIRECT, BUT PURCHASES NEVER OVERLAP.  THEY'RE

8    EITHER DIRECT OR INDIRECT.  AND IF THERE'S ANY SORT OF

9    AMBIGUITY ABOUT THAT AFTER CLASS IS CERTIFIED, IT IS HANDLED

10   AS IT WAS IN LCD, AS A CLAIMS ADMINISTRATION ISSUE, AND NOBODY

11   IN LCD GOT PAID TWICE FOR BEING DIRECT AND INDIRECT.  IT JUST

12   DOESN'T HAPPEN.  IT'S NOT THE WAY IT PROCEEDS.  SO I -- I

13   THINK IT'S SOMETHING THAT JUST -- IT IS A RED HERRING.

14       NO. 2 IS UNDER ROYAL PRINTING, OF COURSE, THE LAW IS WE

15   GET 100 PERCENT OF THE OVERCHARGE BECAUSE ROYAL PRINTING

16   DIDN'T WANT TO GO THROUGH ANY SORT OF APPORTIONMENT AND SAID

17   IT WOULD BE BETTER TO -- TO GIVE A HUNDRED PERCENT OF

18   OVERCHARGE THAN TO ELIMINATE THIS GROUP OF PLAINTIFFS THAT WE

19   REPRESENT COMPLETELY.

20       SO I THINK IT'S A RED HERRING.  AND I THINK THAT

21   MR. CURRAN AND MR. KESSLER, TO THE EXTENT THEY ARGUE IT, ARE

22   WRONG ON THE LAW AGAIN.

23           **MR. KESSLER:**  YOUR HONOR, WE DO DISAGREE THAT THERE'S

24   NOT AN OVERLAP, AND I'LL EXPLAIN WHY.  IT HAS TO DO WITH THE

25   CONSUMERS WHO THEY'RE CLAIMING ARE DIRECT PURCHASERS WHO

1    PURCHASED A BATTERY, FOR EXAMPLE.

2        THAT CONSUMER IS ALSO IN THE IPP CLASS DEFINITION.  HE'S

3    TRYING TO SAY THEY'RE NOT BECAUSE THE IPP CLASS DEFINITION

4    USES THE WORD "INDIRECT."  BUT, IN FACT, YOUR HONOR, THIS IS

5    BACK TO WHERE WE STARTED OUR ARGUMENT THIS MORNING.

6        HIS CALLING THEM DIRECT IS JUST SAYING, WELL, HE THINKS

7    THEY HAVE ILLINOIS BRICK STANDING.  SO HE'S CALLING THEM

8    DIRECT.  AS YOUR HONOR AND THE COURTS HAVE RECOGNIZED, THEY'RE

9    THE SAME INDIRECT PURCHASERS BECAUSE THEY'RE NOT BUYING THE

10   CELLS DIRECTLY.  SO I AM QUITE CONFIDENT THAT CONSUMER IS IN

11   BOTH CLASSES AND WILL TO BE SORTED OUT AT SOME TIME ABOUT

12   THAT.

13       MR. CURRAN:  AND, YOUR HONOR, IF I CAN TIE THIS INTO

14   THE TOSHIBA THING, MR. SIMON, I THINK, SAID 24, BUT I THINK

15   YOU MEANT 25, RIGHT?  SLIDE 25?

16       MR. SIMON:  I SAID 24 AND 25.

17       MR. CURRAN:  OKAY.  25 ILLUSTRATES THE POINT I'M

18   TRYING TO MAKE, YOUR HONOR.  TOSHIBA IS ON THE RIGHT SIDE

19   BECAUSE THE DPP COMPLAINT SAYS NOTHING ABOUT THE DPP'S

20   PURCHASING FROM ANYONE OWNED OR CONTROLLED BY TOSHIBA.  SO

21   IF -- IF THERE WERE -- IF THERE WERE SUCH ALLEGATIONS, WE'D BE

22   ON THE LEFT SIDE, LIKE SONY IS HERE.  BUT BECAUSE THERE ARE NO

23   SUCH ALLEGATIONS, WE'RE ON THE RIGHT SIDE.  THE -- OUR --

24   OUR -- OUR COMMERCE BELONGS IN THE INDIRECT CASE, NOT IN THE

25   DIRECT CASE.  THIS ILLUSTRATES IT.

1        **MR. SIMON:**  THIS -- WE'RE GOING BACK OVER THINGS.

2  I'M JUST GOING TO SAY ONE THING.  THE ISSUE BEFORE YOUR HONOR

3  ON STANDING IS THE CLASS REPRESENTATIVES.  AND AS I JUST READ

4  IN <u>NIPPON PAPER</u> AND AS IS THE LAW IN THIS DISTRICT, YOU DON'T

5  HAVE TO HAVE A PLAINTIFF WHO BOUGHT FROM EVERY DEFENDANT.

6  THAT -- IT HASN'T BEEN THE WAY IN 34 YEARS THAT I'VE BEEN

7  DOING THESE ANTITRUST CASES.  YOU HAVE A NUMBER OF PLAINTIFFS

8  WHO BOUGHT FROM CERTAIN DEFENDANTS, AND IF THEY'RE IN A

9  CONSPIRACY, THEY'RE IN THE CASE.  MR. CURRAN AND MR. KESSLER

10  ARE TRYING TO CARVE OUT SOMETHING THAT IS WRONG AS A MATTER OF

11  LAW.

12       AND WE WILL STAND ON THE LAW AND OUR PRESENTATION OF THE

13  LAW.  TO SAY WHAT HE'S SAYING -- HE MIGHT SAY IT TO THE NINTH

14  CIRCUIT SOME DAY, WHO KNOWS, AND THAT'S WHAT THEY (SIC) BEEN

15  TRYING TO DO IN THESE CASES UP TILL NOW, IS CREATE THIS <u>ROYAL</u>

16  <u>PRINTING</u> ISSUE.  BUT AS THE LAW STANDS TODAY, HE IS NOT RIGHT

17  ON THE LAW.

18        **MR. CURRAN:**  WE'RE SHIPS PASSING IN THE NIGHT BECAUSE

19  I'M NOT QUARRELING WITH THE LAW.

20        **THE COURT:**  WELL, YOU'VE SAID THAT THREE TIMES.  ALL

21  RIGHT.

22     ANYTHING ELSE?

23        **MR. CURRAN:**  THANK YOU FOR YOUR PATIENCE, YOUR HONOR.

24        **MR. SIMON:**  THANK YOU, YOUR HONOR.

25        **MR. KESSLER:**  THANK YOU VERY MUCH, YOUR HONOR.

1          **THE COURT:**  OKAY.

2          **MR. SIMON:**  CASE MANAGEMENT AT ALL OR --

3          **THE COURT:**  YEAH, I THINK -- I THINK SO.  ONE -- I DO

4    WANT TO THANK YOU ALL FOR A COUPLE OF THINGS.  ONE, FOR

5    GETTING ME THE REVISED COMPLAINT WITH TRACKED CHANGES THAT WAS

6    VERY HELPFUL; FOR COMBINING THE BRIEFS, VERY HELPFUL; SO I

7    APPRECIATE THAT, THAT EXTRA AMOUNT OF EFFORT.

8          **MR. SIMON:**  CAN WE ON THE DIRECT SIDE GIVE A

9    SHOUT-OUT TO LIAISON COUNSEL, BOTH OF WHOM WERE INSTRUMENTAL

10   IN PUTTING THAT TOGETHER FOR YOUR HONOR WITH THE HELP OF A LOT

11   OF PEOPLE, SO THEY DESERVE A LOT OF CREDIT.

12         **THE COURT:**  WELL, I APPRECIATE IT, 'CAUSE IT DID

13   MAKE -- IT DID STREAMLINE IT.  AND I -- I THINK THE OTHER

14   THING THAT HAPPENS AND I MENTIONED THIS BEFORE IS THAT

15   SOMETIMES ATTORNEYS DO TALK PAST EACH OTHER.  AND BY HAVING TO

16   CREATE A COMBINED BRIEF, YOU'RE KIND OF FORCED TO MAKE SURE

17   THAT YOU'VE ADDRESSED ARGUMENTS.

18      OKAY.  I START A LONG PATENT TRIAL AT THE END OF THE

19   MONTH.  SO IF I DON'T HAVE ORDERS OUT BEFORE THEN, THEN YOU'RE

20   GOING TO JUST HAVE TO WAIT BECAUSE THAT PATENT TRIAL WILL TAKE

21   UP SIGNIFICANT AMOUNT OF TIME.

22      ANY ISSUES YOU WANT TO RAISE?  START WITH YOU, MR. SIMON.

23         **MR. SIMON:**  I THINK THE NEXT STEP IS TO GET YOUR

24   HONOR'S ORDERS AND THEN TO HAVE A STATUS CONFERENCE SHORTLY

25   THEREAFTER.  AND THEN WE CAN RAISE ANY ISSUES THEN.  IN THE

1  MEANTIME, DISCOVERY CAN PROCEED WITH THE MAGISTRATE JUDGE.

2          **THE COURT:**  THAT WAS MY THOUGHT.

3      MR. KESSLER, DO YOU WANT TO SPEAK FOR THE DEFENDANTS?

4          **MR. KESSLER:**  YEAH, WE DON'T HAVE ANY PENDING ISSUE,

5  YOUR HONOR.  WE'LL WAIT TO READ YOUR HONOR'S OPINIONS, AND WE

6  ARE PROCEEDING WITH THE MAGISTRATE ON THE ISSUES THAT YOUR

7  HONOR CERTIFIED SHOULD GO FORWARD BEFORE THE MAGISTRATE.

8          **THE COURT:**  COUNSEL?

9          **MR. WILLIAMS:**  GOOD AFTERNOON.  STEVE WILLIAMS.  JUST

10  BRIEFLY, WE'RE GOING BACK TO SEE MAGISTRATE JUDGE RYU IN

11  MID-SEPTEMBER.  SHE'S CARVED OUT FOUR ISSUES FOR US TO WORK ON

12  WITH DEFENDANTS.  AND WE'RE GOING TO REPORT BACK TO HER, AND I

13  THINK THAT WILL BE THE NEXT TIME WE'RE IN COURT SEEKING ANY

14  SORT OF PROCEDURAL THINGS.

15          **THE COURT:**  OKAY.  SO IT SOUNDS LIKE NOTHING ELSE,

16  THEN, TO DEAL WITH?

17      EVERYBODY ENJOY THE REST OF YOUR SUMMER.  IT IS QUICKLY

18  COMING TO A CLOSE.  IT HAS COME TO CLOSE ALREADY FOR ME,

19  BUT --

20          **MR. SIMON:**  SCHOOL NEXT WEEK.

21          **MR. KESSLER:**  THANK YOU, YOUR HONOR.

22          (PROCEEDINGS WERE CONCLUDED AT 12:07 P.M.)

23                          --OOO--

24

25

1

2                    **CERTIFICATE OF REPORTER**

3

4              I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT

5     FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

6     I FURTHER CERTIFY THAT I AM NEITHER COUNSEL FOR, RELATED TO,

7     NOR EMPLOYED BY ANY OF THE PARTIES TO THE ACTION IN WHICH THIS

8     HEARING WAS TAKEN, AND FURTHER THAT I AM NOT FINANCIALLY NOR

9     OTHERWISE INTERESTED IN THE OUTCOME OF THE ACTION.

10

11

12              RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR

13                   THURSDAY, AUGUST 14, 2014

14

15

16

17

18

19

20

21

22

23

24

25

**RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530**