1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **IN RE: LITHIUM ION BATTERIES ANTITRUST LITIGATION** | **Case No.: 13-MD-2420 YGR**<br><br>**OMNIBUS ORDER RE: MOTIONS TO DISMISS THE SECOND CONSOLIDATED AMENDED COMPLAINTS OF DIRECT AND INDIRECT PURCHASER PLAINTIFFS**<br><br>**(DKT. NOS. 401, 424-31.)** |
| **This Order Relates to:**<br><br>**All Direct and Indirect Purchaser Actions** | |

**TABLE OF CONTENTS**

Introduction ................................................................................................................ 4

Part 1: Background ...................................................................................................... 6

Part 2: Phase 2 Motion to Dismiss the IPP-SCAC ..................................................... 8

   I.     Overview of Classes and Claims Asserted .................................................. 8

   II.    Analysis ..................................................................................................... 10

      A.   IPP Antitrust Standing Under *AGC* .................................................. 10

         1.    The Framework of Antitrust Standing ....................................... 10

         2.    Determining the Content of State-Law Antitrust Standing Doctrine ........................ 13

            a.    Framework for Ascertaining State Law ............................... 15

            b.    Review of Proffered Authorities .......................................... 16

         3.    Application of *AGC* to the IPP-SCAC .................................... 22

            a.    First Factor: Nature of Plaintiffs' Injuries and Market Participation ..................... 23

            b.    Second Factor: Directness of Injury .................................... 28

            c.    Third Factor: Speculative Nature of the Harm ..................... 29

            d.    Final Factors: Risk of Duplicative Recovery and Unduly Complex Apportionment of Damages ........................ 30

      B.   Article III Standing .......................................................................... 32

      C.   Application of *Illinois Brick* to Missouri Law ................................ 36

      D.   Class Action Claims in Illinois and  South Carolina ....................... 38

      E.   New Hampshire Claims .................................................................... 41

      F.   Price-Fixing under Arkansas's Deceptive Trade Practices Act ........ 42

   III.    Conclusion as to Phase 2 Motion .............................................................. 44

Part 3: Phase 3 Motion to Dismiss the DPP-SCAC .................................................. 44

   I.     DPP Antitrust Standing under *Illinois Brick* and *Royal Printing* ........ 46

   II.    DPP Antitrust Standing under *AGC* ...................................................... 51

      A.   Legal Standard ................................................................................. 52

United States District Court
Northern District of California

B.    DPP Antitrust Standing under *AGC* for Purchases of Batteries........................... 52

C.    DPP Antitrust Standing under *AGC* for Purchases of Battery Products ........................... 53

1.    Antitrust Injury...................................................................... 53

2.    Other *AGC* Factors .............................................................. 54

III.    Conclusion as to Phase 3 Motion ........................................................... 55

Part 4: Individual Motions to Dismiss ................................................................ 55

I.    Relevant Procedural Background .............................................................. 56

II.    Legal Standard ................................................................................. 56

III.    Analysis........................................................................................ 58

A.    Motion of MCA and HML (Dkt. No. 427) ............................................. 58

B.    Motion of LGCAI (Dkt. No. 425) ....................................................... 61

C.    Motion of NEC Corp. (Dkt. No. 426) .................................................. 62

D.    Motion of PNA and SNA (Dkt. No. 429) .............................................. 63

E.    Motion of GS Yuasa (Dkt. No. 424) ................................................... 65

1.    Pre-2004 Allegations ......................................................... 66

a.    Predecessor-in-Interest .............................................. 66

b.    Joint Ventures......................................................... 68

2.    Post-2004 Allegations ....................................................... 70

3.    Conclusion as to GS Yuasa ................................................. 71

F.    Motion of SEL and SEND (Dkt. No. 431)............................................ 71

1.    SEL ................................................................................ 71

2.    SEND ............................................................................ 72

G.    Motion of Toshiba Corp. (Dkt. No. 430) .............................................. 75

IV.    Conclusion as to Individual Motions .................................................... 76

Conclusion ................................................................................................ 77

United States District Court
Northern District of California

3

United States District Court
Northern District of California

# INTRODUCTION

This multidistrict litigation stems from allegations of a multi-year conspiracy among Japanese and Korean corporations and their U.S. subsidiaries to fix the prices of lithium ion battery cells, the chemical core of rechargeable batteries found ubiquitously in consumer electronics products. Two groups of plaintiffs, denominated the direct purchaser plaintiffs ("DPPs") and indirect purchaser plaintiffs ("IPPs"), seek to represent putative classes of persons, businesses, and, in the case of the IPPs, municipal and regional governments injured by the alleged overcharge. The DPPs sue for both injunctive relief and money damages under the federal antitrust laws, and seek to represent classes of purchasers who bought lithium ion batteries and products containing them for purposes of resale. The IPPs, by contrast, sue for injunctive relief under federal antitrust law, but seek money damages under *state* antitrust and consumer protection laws. The IPPs seek to represent classes of purchasers who bought lithium ion batteries and battery products for their own use.

The Court has instituted a phased approach to challenging the DPPs' and IPPs' pleadings. (Dkt. Nos. 276, 395.) The first phase has already transpired: on January 21, 2014, the Court issued a comprehensive order dismissing without prejudice the DPPs and IPPs' respective Consolidated Amended Complaints. (Dkt. No. 361 ("Jan. 21 Order").) Now before the Court are the second and third phases of motions to dismiss, which together comprise nine different motions attacking the sufficiency of the DPPs' and IPPs' second consolidated amended complaints on a variety of grounds. (Dkt. Nos. 415 ("DPP-SCAC"), 419 ("IPP-SCAC").) Two of the motions are jointly filed motions challenging, respectively, the IPP-SCAC (Phase 2) and the DPP-SCAC (Phase 3). The remaining seven motions, filed as part of Phase 3, raise issues pertaining to particular corporate "families" not addressed in the joint motions.[1]

---

[1] Where convenient, the Court uses the nomenclature of the complaints to refer to subsets of the seventeen named defendants, who are: (1) LG Chem, Ltd., and (2) LG Chem America, Inc. ("LGCAI") (collectively, "LG Chem"); (3) Samsung SDI Co., Ltd., and (4) Samsung SDI America, Inc. (collectively, "Samsung"); (5) Panasonic Corp. and (6) Panasonic Corp. of North America ("PNA") (collectively, "Panasonic"); (7) Sanyo Electric Co. Ltd. ("Sanyo Electric"), and (8) Sanyo North America Corp. ("SNA") (collectively, "Sanyo"); (9) Sony Corp., (10) Sony Energy Devices Corp., ("SEND") and (11) Sony Electronics, Inc. ("SEL") (collectively, "Sony"); (12) Hitachi

This Order has four parts.  In Part 1, the Court briefly sets forth the portions of this case's factual and procedural background that are essential to the motions at hand.  In Part 2, the Court considers defendants' fully briefed "Phase 2" joint motion to dismiss the IPP-SCAC.  (Dkt. Nos. 401 ("Phase 2 Motion"), 413 ("Phase 2 Opp'n"), 432 ("Phase 2 Reply").)[2]  The Phase 2 Motion raises six different issues of law, foremost among them questions of antitrust standing[3] related to *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519 (1983) ("*AGC*").  The Court heard oral argument on the Phase 2 Motion on May 9, 2014.  (Dkt. No. 449 ("May 9 Tr.").)  As set forth herein, the Court holds that the IPPs have satisfied the requirements of *AGC* for purposes of the pleading stage.  With respect to the remaining five sets of challenges (Sections B-F),  the IPP-SCAC survives three.  The Court dismisses without prejudice the IPP's proposed statewide damages class for Montana.  The Court also dismisses without prejudice the IPPs' proposed nationwide damages class of non-state and non-federal governments, and all but one of the IPPs' proposed statewide damages classes of such governments.  The California governmental class survives.  Further, the Court dismisses with prejudice the IPPs' claim under New Hampshire's Consumer Protection Act.  The motion is otherwise denied.  Accordingly, the Court **GRANTS IN PART AND DENIES IN PART** the Phase 2 Motion.

In Part 3, the Court turns to defendants' jointly filed Phase 3 motion, which raises antitrust standing challenges that overlap in some respects with those raised in their Phase 2 Motion, but this time target the DPP-SCAC.  (Dkt. Nos. 428 ("Phase 3 Motion"), 451 ("Phase 3 Opp'n"), 465

---

Maxell, Ltd., ("HML") and (13) Maxell Corp. of America ("MCA") (collectively, "Hitachi"); (14) GS Yuasa Corp. ("GS Yuasa"); (15) NEC Corp., and (16) NEC Tokin (collectively "NEC"); and (17) Toshiba Corp.

[2] Pursuant to the Court's phased approach, defendants filed their Phase 2 Motion in advance of the filing of the IPPs' SCAC.  The parties then stipulated, and the Court ordered, that the Phase 2 Motion would apply to the IPPs' SCAC.  (Dkt. No. 433.)

[3] "Antitrust standing is distinct from Article III standing.  A plaintiff who satisfies the constitutional requirement of injury in fact is not necessarily a proper party to bring a private antitrust action." *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of California*, 190 F.3d 1051, 1054 n.3 (9th Cir. 1999) (citing *AGC*, 459 U.S. at 535 n.31); *see also Amarel v. Connell*, 102 F.3d 1494, 1507 (9th Cir. 1996) (antitrust standing is a court-created doctrine designed to limit the number of persons affected by antitrust violations who may sue for their injuries).

United States District Court
Northern District of California

United States District Court
Northern District of California

1  ("Phase 3 Reply").)  Specifically, the Phase 3 Motion reprises an earlier challenge to the DPPs'

2  antitrust standing under *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977) and *Royal Printing Co. v.*

3  *Kimberly Clark Corp.*, 621 F.2d 323 (9th Cir. 1980), and challenges for the first time their standing

4  under *AGC*.  The Court took oral argument on the Phase 3 Motion on August 8, 2014.  (Dkt. No.

5  502 ("Aug. 8 Tr.").)  As set forth herein, the Court finds that the DPPs have adequately pleaded the

6  requirements of *Illinois Brick*, *Royal Printing*, and *AGC*, with the exception of purchases by Circuit

7  City of Hitachi-branded lithium ion batteries and camcorders containing those batteries.  The Court

8  excludes those purchases from the case but otherwise denies the motion.  Accordingly, the Court

9  **GRANTS IN PART** and **DENIES IN PART** the Phase 3 Motion.

10     In Part 4, the Court addresses seven motions to dismiss filed by certain defendants and, with

11  one exception, raising issues not addressed in the earlier joint motions.  As set forth herein, the

12  Court finds that the individual motions do not persuade, but that two of them—the motions of GS

13  Yuasa and Toshiba Corp.—raise issues that may warrant early summary judgment motions

14  following limited, tailored discovery.  With these caveats, the Court **DENIES** the individual motions.

15  ## PART 1: BACKGROUND

16     The basic facts and history of this case were detailed in the Jan. 21 Order.  *In re Lithium Ion*

17  *Batteries Antitrust Litig.*, 13-MD-2420 YGR, 2014 WL 309192, 2014 U.S. Dist. LEXIS 7516 (N.D.

18  Cal. Jan. 21, 2014).  The Court therefore provides only a short summary here.  Because the DPP-

19  SCAC and IPP-SCAC allege the same set of core facts, the Court distinguishes between them only

20  as necessary.

21     Plaintiffs allege that defendants participated in a multi-year, international conspiracy to fix

22  the price of lithium ion "cells."  This allegation warrants some explanation of the nature and

23  production of lithium ion batteries.  As alleged in the complaints, lithium ion cells are the chemical

24  core of a lithium ion battery.  Lithium ion cells are manufactured in a raw state, and then one or

25  more cells are "packed" into a casing that makes them suitable for use as lithium ion batteries

26  (sometimes called "packs" or "modules").  Cells have no practical use unless and until packed, and

27  the raw materials and manufacture of a cell comprise a substantial majority of the cost of a

28  completed battery.  (DPP-SCAC ¶ 89 ("Typically, the cost of materials that go into a cell accounts

for 80%–90% of the cost of a pack."); IPP-SCAC ¶ 31 ("[T]he raw cells in a finished battery or module make up the overwhelming cost of a finished lithium ion battery module.").)  Lithium ion batteries are the predominant form of rechargeable battery, competing successfully against a variety of other types of rechargeable chemical batteries, such as nickel-metal hydride or "NiMH" batteries.  Lithium ion batteries are lighter and more powerful, and suffer from no "memory effect" (the tendency of rechargeable batteries to lose capacity when repeatedly subjected to partial charging) and lower self-discharge rates (the rate at which batteries lose power while idle).

The DPPs allege that lithium ion cells manufactured by the defendants are packed in one of four ways.  A defendant may: (1) pack its own cells; (2) have its cells packed by another defendant; (3) provide its cells to "contract packers" who pack the cells on behalf of the defendant, labeling them with the defendant's brand; or (4) sell some of its cells to independent packers.  (DPP-SCAC ¶¶ 89-98.)  Regardless of how and by whom cells are packed, the resulting lithium ion batteries may then be sold either as stand-alone products or as a component part in, for example, portable consumer electronics such as laptop computers, camcorders, smart phones, or power tools (herein, "battery products").[4]  Critically, both the DPPs and IPPs allege that the conspiracy fixed the prices of cells only, not batteries or battery products.  Further, both the DPPs and IPPs purchased only batteries or battery products, not cells.

The Jan. 21 Order held that the plaintiffs' initial consolidated complaints plausibly alleged a conspiracy of significant scope.  The Court focused on allegations of express agreement to fix prices among certain defendants in specifically alleged meetings among specific persons.  The Court also observed that two defendants named in this civil action, Sanyo Electric and LG Chem, Ltd., had pled guilty to criminal charges stemming from the conspiratorial conduct alleged here.  Notably, plaintiffs crafted their initial consolidated amended complaints with the benefit of some, but not all, of the documents produced by these defendants to the grand juries in the criminal

---

[4] While the DPPs and IPPs both utilize the defined terms "Lithium Ion Battery" and "Lithium Ion Battery Products," they define those terms differently.  (*Compare* DPP-SCAC ¶¶ 2-4 *with* IPP-SCAC ¶¶ 1, 4.)  Because the differences between the two sets of definitions are immaterial for purposes of this Order, the Court, for convenience and concision, refers simply to cells, batteries, and battery products.

1   matters.  The remaining documents have since been produced to plaintiffs and, with some

2   exceptions (*see infra* note 30), are reflected in the pleadings now before the Court.

3          Notwithstanding the Court's determination in the Jan. 21 Order that plaintiffs had

4   adequately alleged a conspiracy of some scope, the Court dismissed the initial consolidated

5   amended complaints for three reasons.  First, the Court determined that both complaints plausibly

6   alleged a conspiracy extending back to 2002, but not, as claimed, 2000.  Second, the Court found

7   that neither complaint sufficed to implicate the U.S.-based defendants in the conspiracy, which, as

8   alleged, centered on the acts of Asian executives of Asian corporations in Asia.  Finally, with

9   respect to the DPPs alone, the Court found that they had failed to plead antitrust standing under the

10   *Royal Printing* exception to the rule of *Illinois Brick*, which rule generally bars indirect purchasers

11   from asserting claims for money damages under federal antitrust law.[5]

12          Though the Court addressed the antitrust standing of the DPPs in its Jan. 21 Order, pursuant

13   to the Court's phased approach to challenging the pleadings, the parties did not raise, and hence the

14   Court did not address, issues relating to the IPPs' antitrust standing.  The Court now turns for the

15   first time to consideration of the IPPs' antitrust standing, along with defendants' five other

16   challenges to the IPP-SCAC.

17          **PART 2: PHASE 2 MOTION TO DISMISS THE IPP-SCAC**

18   **I.   OVERVIEW OF CLASSES AND CLAIMS ASSERTED**

19          The IPPs plead their proposed classes in the alternative.  The IPPs' preferred class structure

20   consists of a nationwide class seeking injunctive relief under federal antitrust law, and a separate

21   but coextensive class seeking money damages and other relief under California law.  These

22   nationwide classes would encompass every "person" or "entit[y]" who "indirectly purchased *for*

23   *their own use and not for resale* either a Lithium Ion Battery manufactured by a Defendant and/or a

24   Lithium Ion Battery Product containing a Lithium Ion Battery manufactured by a Defendant" since

25   January 1, 2000 (emphasis supplied).  Further, the proposed nationwide damages class includes a

26

27          [5] The Court found that, despite the DPPs' moniker, they are, for *Illinois Brick* purposes, indirect purchasers because they purchased batteries and battery products as opposed to the
28   allegedly price-fixed cells themselves, and thus paid the alleged overcharge only as a pass-on.  Jan. 21 Order at 9-10.

8

subclass comprised of all "non-federal and non-state governmental entities in the United States."
(IPP-SCAC ¶¶ 478-80 (class structure); *see also id.* ¶¶ 492-526 (causes of action for (1) injunctive
relief under the federal Sherman Act, (2) damages under California's Cartwright Act, and (3)
restitution/disgorgement under California's Unfair Competition Law).)

Alternatively, if the Court holds that California law does not apply to the IPPs' proposed
nationwide damages class, the IPPs allege multiple jurisdiction-specific classes seeking relief
"under the antitrust statutes and/or consumer protection statutes" of their respective states.  (IPP-
SCAC ¶¶ 481-82 (class structure); *see also id.* ¶¶ 527-64 (causes of action for (4) violation of 21
states' antitrust and restraint of trade laws,[6] and (5) violation of 12 states' consumer protection and
unfair competition laws[7]).)  The states covered by these alternative classes and claims have passed
so-called "*Illinois Brick* repealer" statutes permitting indirect purchasers to sue for money damages
under state law.  Because the question of whether the IPPs may assert a nationwide damages class
proceeding under California law is not now before the Court, this Order addresses only the viability
of the IPPs' alternative, jurisdiction-specific damages classes.

The first phase of motions to dismiss, resolved by the Jan. 21 Order, addressed whether the
IPPs' initial consolidated amended complaint adequately alleged a conspiracy under *Bell Atlantic
Corp. v. Twombly*, 550 U.S. 544 (2007).  The Court, pursuant to its phased approach, did not give
defendants leave to challenge the IPPs' antitrust standing at that time.  The Phase 2 Motion
therefore represents defendants' first opportunity to brief that issue.  The Court also gave

---

[6] The IPPs' fourth cause of action asserts 21 claims under the antitrust and restraint of trade
laws of: (1) Arizona; (2) California; (3) the District of Columbia; (4) Illinois; (5) Kansas; (6)
Maine; (7) Michigan; (8) Minnesota; (9) Mississippi; (10) Nebraska; (11) Nevada; (12) New
Hampshire; (13) New Mexico; (14) New York; (15) North Carolina; (16) North Dakota; (17)
Oregon; (18) Tennessee; (19) Vermont; (20) West Virginia; and (21) Wisconsin.  (IPP-SCAC ¶¶
529-49.)  For convenience, the Court refers here to the District of Columbia as a "state."

[7] The IPPs' fifth cause of action asserts 12 claims under the consumer-protection and unfair-
competition laws of: (1) Arkansas; (2) California; (3) Florida; (4) Massachusetts; (5) Missouri; (6)
Montana; (7) Nebraska; (8) New Hampshire; (9) New York; (10) South Carolina; (11) Utah; and
(12) Vermont. (IPP-SCAC ¶¶ 553-64.)  The IPPs assert claims under California, Nebraska, New
Hampshire, New York, and Vermont law in both their fourth and fifth causes of action.  With this
overlap, the IPPs' fourth and fifth causes of actions assert a total of 33 claims under the laws of 28
jurisdictions—27 states and the District of Columbia.

United States District Court
Northern District of California

defendants leave to brief five purely legal issues amenable to resolution on the pleadings.  Thus, in total, the Phase 2 Motion presents the following six issues: (i) whether the Court must analyze the IPPs' standing to bring state-law claims using the test set forth in *AGC* in the context of federal antitrust law, and, if so, whether the IPPs' claims survive the pleading stage; (ii) whether it is appropriate to decide at the pleading stage whether the IPPs have Article III standing to assert claims on behalf of putative classes comprised of Montana residents and of municipal governments outside California and, if so, whether the IPPs have such standing; (iii) whether Missouri bars indirect purchaser claims pursuant to *Illinois Brick*;[8] (iv) whether Illinois, Montana, and South Carolina law authorize the IPPs to bring class-action claims, as opposed to individual claims; (v) whether the conduct pleaded, none of which is alleged to have occurred within the state of New Hampshire, states a claim under New Hampshire's consumer-protection law; and (vi) whether the Deceptive Trade Practices Act of Arkansas applies to price fixing like that alleged here.  The Court addresses these issues in order.

## II.     ANALYSIS

### A.     IPP ANTITRUST STANDING UNDER *AGC*

#### 1.     The Framework of Antitrust Standing

Section 1 of the Sherman Antitrust Act of 1890 declares illegal all conspiracies in restraint of trade.  15 U.S.C. § 1.  Section  4 of the Clayton Antitrust Act of 1914, passed by Congress to strengthen enforcement of the Sherman Act, provides a private right of action in federal court to "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws . . . without respect to the amount in controversy," and entitles successful litigants to trebled damages and attorney fees.  15 U.S.C. § 15(a).  Courts have long recognized that this language is broad enough that, read literally, it "could afford relief to all persons whose injuries are

---

[8] Defendants initially moved on the same basis to dismiss the IPPs' claims under Montana's Unfair Trade Practices and Consumer Protection Act, insofar as the IPPs sought relief under Part 2 of that statute. (Phase 2 Motion at 21-22; *see also* Phase 2 Reply at 15.)  The IPPs have since clarified that they seek relief only under Part 1 of the statute, and the parties concur that defendants' Motion as to Part 2 is moot.  (*See* May 9 Tr. at 70:18-20.)  That portion of the Motion is therefore **DENIED AS MOOT**.

causally related to an antitrust violation." *Lucas v. Bechtel Corp.*, 800 F.2d 839, 843 (9th Cir. 1986) (internal quotation marks omitted).

Courts have since read limitations into the language of Section 4 on the premise that "Congress did not intend [it] to have such an expansive scope." *Am. Ad Mgmt.*, 190 F.3d at 1054. The Supreme Court articulated one such limitation in *Illinois Brick,* stating that only a party who purchases a price-fixed good directly from a price-fixing conspiracy—a "direct purchaser" in antitrust nomenclature—has standing to sue for money damages under Section 4 of the Clayton Act. *Delaware Valley Surgical Supply Inc. v. Johnson & Johnson*, 523 F.3d 1116, 1120-21 (9th Cir. 2008) (describing "bright line rule" of antitrust standing that emerged from *Illinois Brick*); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1120 (N.D. Cal. 2008) ("*TFT-LCD I*"). Thus, the "so-called '*Illinois Brick* wall' . . . looms as an imposing barrier for antitrust plaintiffs" whose theory of damages rests on an overcharge "passed on" to them through a middleman or middlemen. *In re: Cathode Ray Tube (CRT) Antitrust Litig.*, 911 F. Supp. 2d 857, 865 (N.D. Cal. 2012) motion to certify appeal denied, 07-5944 SC, 2013 WL 567281 (N.D. Cal. Feb. 13, 2013) (citations omitted).[9]

The rule of *Illinois Brick* proved to be politically unpopular in certain quarters. *See* Ronald W. Davis, *Indirect Purchaser Litigation*, 65 ANTITRUST L.J. 375, 389-93 (1997) (describing failed efforts in Congress to pass "remedial legislation" after *Illinois Brick* and how differing "political calculus and legislative judgment" in some states led to passage of such legislation). Thus, "[i]n response to *Illinois Brick*, some states passed 'repealer' statutes expressly allowing indirect purchasers to recover money damages for antitrust violations under *state* law." *TFT-LCD I*, 586 F. Supp. 2d at 1120 (emphasis supplied). The Supreme Court has held that the policies embodied in *Illinois Brick* do not preempt such state laws. *See California v. ARC Am. Corp.*, 490 U.S. 93, 103-06 (1989).

_____

[9] "While the Supreme Court has expressed reluctance in carving out exceptions to the *Illinois Brick* rule, limited exceptions do exist." *In re ATM Fee Antitrust Litig.*, 686 F.3d 741, 749 (9th Cir. 2012) cert. denied, 134 S. Ct. 257 (U.S. 2013) (compiling and explaining the exceptions recognized by the Ninth Circuit). The Court applies one such exception in Part 3, Section 1, *infra*.

United States District Court
Northern District of California

In the case at bar, as in multiple computer-component cases previously litigated in this District,[10] the IPPs' claims for money damages arise under the laws of states that have passed repealer statutes.  Here, as in the other cases, defendants ask the Court to rule that a significant number of those states either apply, or would apply, *AGC* to indirect purchaser claims to limit the scope of antitrust standing to a narrower set of indirect purchasers.  In *AGC*, the Supreme Court reasoned that "[a]n antitrust violation may be expected to cause ripples of harm to flow through the Nation's economy; but despite the broad wording of § 4 there is a point beyond which the wrongdoer should not be held liable."'  *AGC*, 459 U.S. at 534 (quoting *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 476-77 (1982)) (internal quotation marks omitted).  To determine where that point lies in a particular case, courts must "evaluate the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them."  *Id.* at 535.  To guide this evaluation, the court set forth a five-factor balancing test for ascertaining whether plaintiffs suing for damages under Section 4 of the Clayton Act, despite having been injured in their business or property by reason of something forbidden in the antitrust laws, are nevertheless too "remote" from the alleged cause of the injury for federal law to countenance a recovery.  *Id.* at 530-35; *see also Am. Ad Mgmt.*, 190 F.3d at 1054 (summarizing *AGC*).

Defendants contend that 19 of the jurisdictions under whose laws the IPPs bring claims—18 states plus the District of Columbia—have adopted the *AGC* test to limit antitrust standing in their states, notwithstanding their antitrust laws having been passed with the legislative intent of

---

[10] The parties extensively cite orders issued in those cases that analyzed, in the context of Rule 12 motions, the same issues raised here.  The Court lists them in order of decision: *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 516 F. Supp. 2d 1072 (N.D. Cal. 2007) ("*DRAM I*"); *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011 (N.D. Cal. 2007) ("*GPU I*"); *In re Graphics Processing Units Antitrust Litig.*, 540 F. Supp. 2d 1085 (N.D. Cal. 2007) ("*GPU II*"); *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 536 F. Supp. 2d 1129 (N.D. Cal. 2008) ("*DRAM II*"); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896 (N.D. Cal. 2008) ("*SRAM*"); *TFT-LCD I*, 586 F. Supp. 2d at 1120-24; *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 599 F. Supp. 2d 1179 (N.D. Cal. 2009) ("*TFT-LCD II*"); *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133 (N.D. Cal. 2009) ("*Flash*"); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 738 F. Supp. 2d 1011 (N.D. Cal. 2010) ("*CRT*"); *In re Optical Disk Drive Antitrust Litig.*, 3:10-MD-2143 RS, 2011 WL 3894376 (N.D. Cal. Aug. 3, 2011) ("*ODD I*"); *In re Optical Disk Drive Antitrust Litig.*, 3:10-MD-2143 RS, 2012 WL 1366718 (N.D. Cal. Apr. 19, 2012) ("*ODD II*").

United States District Court
Northern District of California

1  "repealing" *Illinois Brick* by supplying indirect purchasers with a state-law damages remedy.  In

2  essence, defendants frame two broad issues with respect to *AGC*: first, whether *AGC*'s five-factor

3  test *applies* to a particular state-law claim asserted here, and second, if *AGC* does apply, whether its

4  application *bars* the state-law claim.  Defendants claim that, once applied, *AGC* will bar the IPPs'

5  claims under the law of those jurisdictions because, under *AGC*'s first factor, the IPPs purchased

6  battery products rather than the allegedly price-fixed raw battery cells, and thus they are not

7  participants in the relevant market (Phase 2 Motion at 6-8), and, under AGC's remaining factors,

8  the low cost of a lithium ion battery cell relative to the price of a battery product makes any injury

9  too remote and speculative, and apportionment of any damages too difficult, to satisfy *AGC* (*id.* at

10  9-11).

11          The Court believes that defendants' framing of the issues elides an important consideration,

12  which may be roughly and preliminarily stated: if *AGC* applies, *how*.  That is, defendants give short

13  shrift to the notion that states may set *some* limits on indirect-purchaser standing without

14  necessarily importing *AGC* wholesale into their laws.  The authorities cited do not resolve this

15  fundamental issue.

16                **2.      Determining the Content of State-Law Antitrust Standing Doctrine**

17          This Court's approach to determining whether and how to apply antitrust standing principles

18  to state antitrust statutes rests on two premises.  The first is that antitrust standing under state law is

19  just that, a matter of *state* law.  *See*, *e.g.*, *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979,

20  987-91 (9th Cir. 2000); *GPU I*, 527 F. Supp. 2d at 1026; *Flash*, 643 F. Supp. 2d at 1151; *D.R.*

21  *Ward Const. Co. v. Rohm & Haas Co.*, 470 F. Supp. 2d 485, 494-96 (E.D. Pa. 2006).  Thus, "[t]he

22  *AGC* factors apply to standing inquiries under state antitrust laws only to the extent that a state has

23  adopted them."  *In re Pool Products Distribution Mkt. Antitrust Litig.*, 946 F. Supp. 2d 554, 564

24  (E.D. La. 2013) ("*Pool Products*") (citing *ARC Am. Corp.*, 490 U.S. at 105).  The second premise is

25  that the approach to antitrust standing articulated in *AGC* is neither the only conceivable approach,

26  nor a default approach that should be assumed to apply.  *See*, *e.g.*, *Illinois Brick*, 431 U.S. at 760-61

27  (Brennan, J., dissenting) (before *AGC*, discerning in federal antitrust precedents a "target area" test

28  for antitrust standing and a more restrictive test that "focuses on the directness of the injury");

*Knowles v. Visa U.S.A., Inc.*, CIV.A. CV-03-707, 2004 WL 2475284, at *4 (Me. Super. Oct. 20, 2004) (Maine trial court weighing whether Maine has adopted the "target area" test or *AGC*); *see also McCarthy v. Recordex Serv., Inc.*, 80 F.3d 842, 859, 859 n.13 (3d Cir. 1996) ("The *AGC* five-factor framework was an attempt by the Court to synthesize and clarify the confusing collection of the then-extant [federal] antitrust-standing rules."); Jonathan T. Tomlin, Dale J. Giali, *Federalism and the Indirect Purchaser Mess*, 11 GEO. MASON L. REV. 157, 159 (2002) ("In a federal system of government, where the federal and state governments coexist, the federal answer is not necessarily the only answer.").  States are free to expand antitrust standing under their laws beyond what federal law permits.  *See Lorix v. Crompton Corp.*, 736 N.W.2d 619, 627 (Minn. 2007) (Minnesota Supreme Court ruling "that the *AGC* factors do not provide the benchmark for antitrust standing in Minnesota"); *cf. ARC Am. Corp.*, 490 U.S. at 105-06 (*Illinois Brick* does not preempt state laws providing indirect purchasers with antitrust causes of action).  While some opinions have commented upon the perceived folly of states broadly expanding indirect-purchaser standing, that is a policy decision committed to the states, not federal judges.  *E.g.*, *In re Refrigerant Compressors Antitrust Litig.*, 2:09-MD-02042, 2013 WL 1431756, at *10 (E.D. Mich. Apr. 9, 2013) motion to certify appeal denied, 2:09-MD-02042, 2013 WL 4009023 (E.D. Mich. Aug. 5, 2013) and appeal dismissed, 731 F.3d 586 (6th Cir. 2013) ("*Compressors*") (opining why indirect purchasers' broad standing argument "should" be rejected as a matter of policy).

These two premises substantially complicate defendants' binary framing of the issue of state-law antitrust standing.  The issue ultimately is not whether to apply the principles of *AGC*.  The critical issue, rather, is *how* repealer states have chosen to limit indirect-purchaser standing.  The principles of *AGC* represent one policy choice; others are possible and have been selected in some jurisdictions.  The Court therefore declines to engage with the issue of antitrust standing on the defendants' terms.  The enterprise of this Court when sitting in diversity is to ascertain the content of state law and apply it.  This duty stems from a federal policy against forum-shopping: by applying a state's law as the state itself would apply it, federal courts promote uniformity in the law and reduce the possibility that similar lawsuits may achieve different results solely by virtue of having been filed in the courts of different sovereigns.

a.      *Framework for Ascertaining State Law*

Though the Court's objective is to identify the content of state law, it is federal law that provides the framework for accomplishing the task.  This framework is well-settled.  Because the ultimate object of the Court's inquiry is determining state law, if a state statute speaks directly to the issue at hand, it controls.  Similarly, if the state's highest court, as the ultimate arbiter of what state statutes mean, has decided the issue, this Court's inquiry into the content of state law ends.  Where the state high court has not so decided, however, the matter becomes more difficult.  In such circumstances, this Court's task is to "predict" how the state high court would rule.  *E.g.*, *Hayes v. Cnty. of San Diego*, 658 F.3d 867, 871 (9th Cir. 2011); *Lewis v. Tel. Employees Credit Union*, 87 F.3d 1537, 1545 (9th Cir. 1996); *In re Kirkland*, 915 F.2d 1236, 1239 (9th Cir. 1990).  In performing this task, the Court should consider the available reliable evidence, which may include "intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements."  *Vestar Dev. II, LLC v. Gen. Dynamics Corp.*, 249 F.3d 958, 960 (9th Cir. 2001) (quoting *Lewis*, 87 F.3d at 1545).  Further, where a state's intermediate appellate court has addressed an issue, the Court is required to follow the intermediate appellate ruling "unless the federal court finds convincing evidence that the state's supreme court likely would not follow it." *Ryman v. Sears, Roebuck & Co.*, 505 F.3d 993, 994 (9th Cir. 2007).  Non-precedential (i.e., unpublished) opinions of state appellate courts may be considered but may have less weight.  *See Beeman v. Anthem Prescription Mgmt., LLC*, 689 F.3d 1002, 1008 n.2 (9th Cir. 2012); *see also Molsbergen v. United States*, 757 F.2d 1016, 1020 (9th Cir. 1985) (specifying that "published" decisions may be used in determining state law in the absence of a high court opinion on point).  Some federal courts have looked to the opinions of state trial courts for guidance.  *E.g.*, *DRAM I*, 516 F. Supp. 2d at 1094-95; *Compressors*, 2013 WL 1431756, at *9-10.

Consistent with these rules, a leading treatise counsels that "a responsible determination of state law involves something more than checking the digests for state court decisions on point[.]"  Wright, Miller & Cooper, 19 FED. PRAC. & PROC. JURIS., § 4507 (2d ed.).  Specifically, it cautions against imputing an "unrealistic stasis to state law and an equally unrealistic sanctity to the decisions of inferior state courts."  *Id.*  "In other words, the federal court must determine issues of

15

state law as it believes the highest court of the state would determine them, not necessarily (although usually this will be the case) as they have been decided by other state courts in the past." *Id.* Thus, the Court should not treat the decisions of a state's lower courts as definitive pronouncements of that state's law simply by virtue of the fact that they emanated from within the borders of that state. Rather, the Court must regard the decisions of lower state courts as it believes the high court would, taking into account, for instance, relevant statutory amendments, changes in doctrine over time, considered dicta from the high court suggesting it might abandon a stale precedent, or the quality and persuasive value of the lower court's opinion. *See generally id.* Failure to do so may simply

> substitute[] one kind of forum-shopping for another. The lawyer whose case was dependent on an ancient or shaky state court decision that might no longer be followed within the state would have a strong incentive to bring the suit in or remove it to federal court, hoping that the state decision could not be impeached under the mechanical application of existing precedents that the *Erie* doctrine once was thought to require.

*Id.* (construing *Erie R. Co. v. Tompkins*, 304 U.S. 64, 71 (1938) ("*Erie*")). The Court's task, in sum, is to make a conscientious prediction of what rule a state high court would adopt in the case before it, without regard to the Court's own view of what the best rule may be. *Cf. Ryman*, 505 F.3d at 995 n.2 ("The opinions of other federal judges on a question of state law do not constitute 'convincing evidence that the state supreme court would decide an issue differently,' nor do those opinions contain any relevant 'convincing evidence.'") (quoting *Vestar*, 249 F.3d at 960) (brackets omitted).

### b.  Review of Proffered Authorities

Defendants offer a broad range of cases to address the laws of the 19 jurisdictions in question, which they characterize as: 5 state high court opinions (California, Mississippi, Nebraska, New Mexico, and West Virginia); 3 state intermediate appellate court opinions (Illinois, New York, Tennessee); 8 trial court opinions from the relevant jurisdictions, two of them unpublished (Arizona, District of Columbia, Kansas, Maine, Michigan (unpublished), North Dakota, Vermont (unpublished), and Wisconsin); and 3 federal court decisions (Nevada, New Hampshire, and

Oregon).  (*See* Phase 2 Motion at 4 n.4, 5 n.6 (citing cases.))[11]  Defendants argue that each of these cases shows that the state in question has adopted *AGC* as a limitation on indirect-purchaser standing.

The Court's review of the cited cases persuades it that the task at hand is more complex than defendants' arguments reflect and that defendants greatly overstate the force of their authorities.  Of the cases cited by defendants, one high court, one intermediate appellate court, and one trial court—the last from the District of Columbia, which has only a single level of appellate courts— affirmatively announce after a reasoned analysis that their high courts do or would apply *AGC* as applied in the federal courts.  *Kanne v. Visa U.S.A. Inc.*, 272 Neb. 489, 494-95 (2006) (Nebraska high court); *Nass-Romero*, 279 P.3d at 778-81 (New Mexico intermediate appellate court); *Peterson v. Visa U.S.A., Inc.*, CIV.A. 03-8080, 2005 WL 1403761, at *2-6 (D.C. Super. Apr. 22, 2005) (D.C. trial court).  The remainder of defendants' cases fall well short of that mark.  Many speak only to general notions of "remoteness" or proximate cause which, although consistent with *AGC*, are more expansive concepts than *AGC*'s five carefully delineated factors.  *E.g.*, *Owens Corning v. R.J. Reynolds Tobacco Co.*, 868 So.2d 331, 343-44 (Miss. 2004) (remoteness); *Cnty. of Cook v. Philip Morris, Inc.*, 353 Ill. App. 3d 55, 66 (Ill. 2004) (same); *Tennessee Med. Ass'n v. BlueCross BlueShield of Tennessee, Inc.*, 229 S.W.3d 304, 310-11 (Tenn. Ct. App. 2007) (proximate cause); *see also Ho*, 787 N.Y.S.2d 677, at *5; *Clayworth v. Pfizer, Inc.*, 49 Cal. 4th 758, 774 (2010).  It is one thing for a court to observe the existence of *some* limit to indirect-purchaser standing; it is quite another to say that a state has affirmatively adopted the particular calibration of limits embodied in *AGC*.  *Cf. Illinois Brick*, 431 U.S. at 760 (Brennan, J., dissenting) (in arguing

_____

[11] Some of these characterizations are inapt.  As set forth in more detail herein, of the two New Mexico cases cited, one is from the state high court and the other from the intermediate appellate court.  *Romero v. Philip Morris Inc.*, 148 N.M. 713, 724 (N.M. 2010); *Nass-Romero v. Visa U.S.A., Inc.*, 279 P.3d 772, 778-81 (N.M. Ct. App. 2012).  The decision squarely addressing antitrust standing is from the latter, yet defendants count New Mexico among their high-court authorities.  Similarly, the cited New York decisions are a reasoned but unpublished trial court opinion endorsing application of *AGC* principles and a three-paragraph, unpublished intermediate appellate disposition that does not mention *AGC*.  *Ho v. Visa U.S.A., Inc.*, 787 N.Y.S.2d 677, at *5 (N.Y. Sup. Ct. 2004) (unreported), *aff'd*, 793 N.Y.S.2d 8 (N.Y. App. Div. 2005).  Defendants count these among their intermediate appellate authorities.

United States District Court
Northern District of California

against direct-purchaser rule, "conced[ing] that despite the broad wording of § 4 there is a point beyond which the wrongdoer should not be held liable"); *Pool Products*, 946 F. Supp. 2d at 564 ("The *AGC* factors apply to standing inquiries under state antitrust laws only to the extent that a state has adopted them.").  Defendants do not establish that merely invoking general notions of antitrust standing is tantamount to a wholesale adoption of *AGC*.

Further, even where some states' courts have specifically invoked *AGC*, they have perceived in their respective legislatures' passage of *Illinois Brick* repealer statutes an intent to extend antitrust standing to indirect purchasers and, accordingly, modified, or indicated they would modify, their application of *AGC* principles to accommodate indirect-purchaser suits more readily.  *Bunker's Glass Co. v. Pilkington PLC*, 206 Ariz. 9, 17 (Ariz. 2003); *Luscher v. Bayer AG*, No. CV 2004-014835, 2005 WL 6959406 (Ariz. Super. Ct. Sept. 14, 2005); *Knowles*, 2004 WL 2475284, at *3-9; *Wrobel v. Avery Dennison Corp.*, No. 05-cv-1296, 2006 WL 7130617 (Kan. Dist. Ct. Feb. 1, 2006); *Fucile v. Visa U.S.A., Inc.*, S1560-03 CNC, 2004 WL 3030037, at *2-4 (Vt. Super. Dec. 27, 2004) (unpublished).  One reasoned trial court opinion concluded that its high court would merely "look to" *AGC*, which is not the same thing as applying it without modification.  *Strang v. Visa U.S.A., Inc.*, 03 CV 011323, 2005 WL 1403769, at *3-5 (Wis. Cir. Ct. Feb. 8, 2005).  Such modification may consist of, for example, a loosening of requirements of directness, a greater tolerance for the existence of other parties who may bring suit, or lessened concern over duplicative recoveries (the risk of "a little slopover on the shoulders of the wrongdoers" that *Illinois Brick* famously found unacceptable, 431 U.S. at 731 n.11).

At least one case defendants cite does not engage meaningfully with the question of antitrust standing at all.  *Princeton Ins. Agency, Inc. v. Erie Ins. Co.*, 225 W.Va. 178, 189-90 (W. Va. 2009) (stating the unremarkable principle that personal economic injury without injury to competition does not suffice as "antitrust injury"—a question distinct from identifying a proper plaintiff when competition *is* injured).  Such authority does not support the unwavering application of *AGC* urged by defendants here.

Defendants rely, in some instances, on the passage of so-called "harmonization" statutes in some of the jurisdictions identified.  Their reliance is misplaced.  Those harmonization statutes,

while treated monolithically by defendants, differ substantially from each other in their wording and effect.  The Court agrees that some states' harmonization statutes *do* appear to require their courts to reconcile entirely state antitrust law with federal antitrust precedents.  *E.g.*, N.M. Stat. Ann. § 57-1-15 (New Mexico statute requiring that state law be construed in such a manner as to "achieve uniform application" of state and federal antitrust law); *Romero*, 148 N.M. at 724 (New Mexico high court: "It is therefore the duty of the courts to ensure that New Mexico antitrust law does not deviate substantially from federal interpretations of antitrust law."); Nev. Rev. Stat. Ann. § 598A.050 (Nevada: "The provisions of this chapter shall be construed in harmony with prevailing judicial interpretations of the federal antitrust statutes.").  That said, even state antitrust statutes closely patterned on Section 4 of the Clayton Act have been construed, in light of robust harmonization statutes, to permit indirect purchaser suits.  *Comes v. Microsoft Corp.*, 646 N.W.2d 440, 445 (Iowa 2002) ("Given the clear, broad language of the state antitrust law, we conclude the Iowa Competition Law creates a cause of action for all consumers, regardless of one's technical status as a direct or indirect purchaser.").

        Other states' statutes, though capable of characterization as "harmonization" statutes, *do not* in fact require harmony, and merely express a legislative intent for state courts to consult federal precedent as persuasive or guiding authority.  *E.g.*, Or. Rev. Stat. § 646.715 ("The decisions of federal courts in construction of federal law relating to the same subject shall be *persuasive authority* in the construction of" Oregon's antitrust laws. (emphasis supplied)); N.H. Rev. Stat. Ann. § 356:14 ("In any action or prosecution under this chapter, the courts *may* be *guided* by interpretations of the United States' antitrust laws." (emphases supplied)); *Donovan v. Digital Equip. Corp.*, 883 F. Supp. 775, 785 (D.N.H. 1994) (New Hampshire harmonization statute's "language is permissive and, thus, the court is entitled to diverge from federal antitrust law when considering a state antitrust claim").  Some courts, relying on these more permissive harmonization statutes, have found that their jurisdictions would apply AGC in accordance with federal precedents; some have not.  *Compare Peterson*, 2005 WL 1403761, at *2-6 (adopting *AGC* in light of harmonization statute encouraging it to be guided by federal precedents); *Donovan v. Digital Equip. Corp.*, 883 F. Supp. at 785 (same) *with Bunker's Glass*, 206 Ariz. at 13-14 (applying

United States District Court
Northern District of California

1    Arizona's own test for antitrust standing notwithstanding comparable harmonization statute).

2    Nothing now before the Court convincingly establishes that simply "looking to" federal law for

3    guidance, even citing to *AGC* itself, means an *Illinois Brick* repealer state will apply *AGC* in

4    lockstep with federal precedents.  Ultimately, the question of how harmonious with federal antitrust

5    law a state's harmonization statute requires state antitrust law to be is, itself, a complex question of

6    state law not addressed by the parties.  *See, e.g., Bunker's Glass Co. v. Pilkington PLC*, 206 Ariz. 9

7    (Ariz. 2003) (wrestling with complexities of uniform application of antitrust law in view of

8    differing federal and state regimes).  In the absence of briefing on that question, the Court leaves it

9    untouched.

10         In sum, simply because a state statute encourages reference to federal law does not impose a

11   mandate on state courts to conform in fact to federal law.  *Accord GPU II*, 540 F. Supp. 2d at 1097

12   ("Not all [harmonization] statutes are equivalent in language or in application[.]").  Similarly, an

13   inferior court's mere citation in passing to *AGC*, or reference to concepts that may be divined in the

14   text of *AGC*, does not, without more, persuade that the high court of that state would adopt *AGC* in

15   every particular—let alone adopt a restrictive reading of *AGC*.  *See id.* ("'[F]avorable citations' and

16   references to federal antitrust standing are not sufficient to mandate that the *AGC* test applies.").

17         The parties' arguments with respect to California illustrate these points.  As to

18   harmonization, California's Cartwright Act includes a harmonization statute of sorts, California

19   Business and Professions Code section 16721.6.  That statute, however, applies to Sections 16721

20   and 16721.5 of the Cartwright Act.  The provision of the Cartwright Act corresponding to Section 4

21   of the Clayton Act, however—and the provision under which the IPPs bring suit—is Section

22   16720.  Further, the harmonization statute does not require true harmonization; rather, it only states,

23   in pertinent part, that the California Legislature intended the specified code sections to "be

24   interpreted and applied *so as not to conflict* with federal law . . . ."  Cal. Bus. & Prof. Code §

25   16721.6 (emphasis supplied).  Not to conflict is one thing; to harmonize is another.

26         As to the use of uncertain authority, defendants cite *Clayworth* to demonstrate that *AGC*

27   applies in California.  The case could bear that reading, and at least one federal district judge has

28   found in it support for reading *AGC* into California law.  *Compressors*, 2013 WL 1431756, at *10.

United States District Court
Northern District of California

20

However, at least one other has come to the opposite conclusion. *Pool Products*, 946 F. Supp. 2d at 563-64. A recent case from the California Supreme Court substantially weakens any inference that California law requires application of *AGC*. In *Aryeh v. Canon Business Solutions, Inc.*, the California high court observed: "Interpretations of federal antitrust law are at most instructive, not conclusive, when construing the Cartwright Act, given that the Cartwright Act was modeled not on federal antitrust statutes but instead on statutes enacted by California's sister states around the turn of the 20th century." *Aryeh v. Canon Bus. Solutions, Inc.*, 55 Cal. 4th 1185, 1195 (2013) (citing *State of California ex rel. Van de Kamp v. Texaco, Inc.*, 46 Cal. 3d 1147, 1164 (1988)). The Ninth Circuit has recognized that after *Aryeh* it "is no longer the law in California" that the Cartwright Act is "coextensive with the Sherman Act." *Samsung Electronics Co., Ltd. v. Panasonic Corp.*, 747 F.3d 1199, 1205 n.4 (9th Cir. 2014)).

Defendants cite a decision of the California Court of Appeal and insist that the Court must follow it unless strong evidence demonstrates it would not be followed. *See Vinci v. Waste Mgmt., Inc.*, 36 Cal. App. 4th 1811, 1814 (1995). But *Aryeh* casts a significant shade over the reasoning of *Vinci,* which based its application of *AGC* to Cartwright Act claims on the fact that the Cartwright Act and federal antitrust law have "similar language." *Id.* As *Aryeh* makes plain, similarity of phrasing is not a sound reason to conclude that the Cartwright Act follows federal antitrust law. Further, *Vinci* merely cited *AGC* for the proposition that "antitrust causation" may limit indirect-purchaser standing, and concluded—without engaging in an explicit, factor-by-factor *AGC* analysis—that the plaintiff lacked standing. The Court respectfully disagrees with other district courts that have found this kind of generalized invocation sufficient to conclude that *Illinois Brick* repealer states would curtail indirect-purchaser standing using the precise five-factor test set forth in *AGC*. Thus, the Court cannot conclude on the authorities now before it that California applies *AGC* in the manner urged by defendants.

Having surveyed the proffered authorities, the Court can conclude conscientiously that three states apply, or would apply, *AGC* without significant modification: Nebraska (*Kanne*, 272 Neb. at 494-95); New Mexico (N.M. Stat. Ann. § 57-1-15; *Romero*, 148 N.M. at 724; *Nass-Romero*, 279

P.3d at 778-81); and Nevada (Nev. Rev. Stat. Ann. § 598A.050).[12]  For the remaining states, the authority is too uncertain to conclude that they would apply *AGC* without any modification, making indirect-purchaser standing more readily available.  The intermediate appellate opinions offered by defendants do not squarely address the issue.  *Cnty. of Cook*, 353 Ill. App. 3d at 60-66; *Ho*, 793 N.Y.S.2d at 8-9; *Tenn. Med. Ass'n*, 229 S.W.3d at 311.  The state trial court and federal opinions cited either do not address the issue; merely assume *AGC* applies; are not closely reasoned; indicate that their state's high court would apply a modified form of *AGC* more accommodating to indirect-purchaser actions; or some combination thereof.

### 3.    Application of *AGC* to the IPP-SCAC

Even assuming arguendo that each state identified by defendants were to apply *AGC*, the Court concludes, as have numerous other rulings addressing similar allegations, that the IPPs have adequately alleged facts that satisfy *AGC* for pleading purposes.[13]  *TFT-LCD I*, 586 F. Supp. 2d at

---

[12] The Court does not include the District of Columbia among these jurisdictions, notwithstanding the *Peterson* opinion previously noted, because that jurisdiction's courts have only thrice had occasion to interpret its harmonization statute and, in three trial-court but no appellate opinions, have come to conclusions that are not obviously reconciled.  *Compare Peterson*, 2005 WL 1403761, at *4 (following federal precedents in view of statutory language similar to Clayton Act and weak harmonization statute) *with Holder v. Archer Daniels Midland Co.*, 96-2975, 1998 WL 1469620 (D.C. Super. Nov. 4, 1998) ("a broad application of the District of Columbia's antitrust statute seems particularly important to effectuate the purpose of the statute"); *see also Goda v. Abbott Labs.*, CIV. A. 01445-96, 1997 WL 156541 (D.C. Super. Feb. 3, 1997) (certifying class of indirect purchasers over an *Illinois Brick* objection).

[13] The Court is aware that authority on the "complex issue" of whether and how *AGC* applies in the context of state antitrust statutes is, at best, "splintered."  *Compressors*, 2013 WL 1431756, at *8 (quoting Kellen S. Dwyer, *With the Illinois Brick Wall Down, What's Left?: Determining Antitrust Standing Under State Law*, 3 J. Bus. Entrepreneurship & L. 255 (2010)).  Given the difficulties inherent in this area of the law, the Court clarifies that, while the sufficiency of the IPPs' bare pleading of antitrust standing under *AGC* minimizes the *Erie* issue here, the Court has not heeded the IPPs' call for a "clear directive" from a state's legislature or highest court before applying *AGC* to that state's antitrust laws.  (Phase 2 Opp'n at 2-3.)  The Court is cognizant that several judges have adverted to the need for such a "clear directive."  *E.g.*, *TFT-LCD I*, 586 F. Supp. 2d at 1123; *GPU II*, 540 F. Supp. 2d at 1097; *ODD I*, 2011 WL 3894376, at *12.  And the Court is sensitive to concerns about federal district judges declaring "in *ipse dixit* style" what state law is.  *GPU I*, 527 F. Supp. 2d at 1026.  However, it is well settled that "[a] state is not without law save as its highest court has declared it."  *W. v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 236 (1940).  There is a balance to be struck between, on the one hand, fabricating state law from whole cloth and, on the other, imposing an artificial uncertainty until a state's high court happens to speak

United States District Court
Northern District of California

1123-24; *CRT*, 738 F. Supp. 2d at 1023-24; *Flash*, 643 F. Supp. 2d at 1153-56; *ODD II*, 2012 WL 1366718, at *5-6; *but see DRAM II*, 536 F. Supp. 2d at 1134-42 (concluding that, while "neither side provide[d] a convincing answer to what types of allegations satisfy the 'same market' requirement," plaintiff indirect purchasers "failed to adequately allege antitrust standing for plaintiffs' claims based on purchases of DRAM as a component in computers" because plaintiffs did not persuade that components and finished products resided in the "same market"). Under *AGC*, courts consider (1) the nature of plaintiffs' injuries and whether plaintiffs were participants in the relevant markets; (2) the directness of the alleged injury; (3) the speculative nature of the alleged harm; (4) the risk of duplicative recovery; and (5) the complexity in apportioning damages. *Am. Ad Mgmt.*, 190 F.3d at 1054. No single factor is decisive and courts are to balance the factors, giving "great weight" to the first factor. *Id.* at 1055. That said, "the Supreme Court has noted that '[a] showing of antitrust injury is necessary, but not always sufficient, to establish standing under § 4.'" *Id.* (quoting *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 110 n.5 (1986)).

> a.     *First Factor: Nature of Plaintiffs' Injuries and Market Participation*

"The first factor—the 'nature of the plaintiff's alleged injury'—requires a showing of 'antitrust injury,' i.e., 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" *Knevelbaard*, 232 F.3d at 987 (quoting *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990)). The Ninth Circuit has identified four requirements of antitrust injury: "(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent." *Am. Ad Mgmt.*, 190 F.3d at 1055. Here, defendants do not challenge the IPPs' pleading of the first three requirements.

As to the fourth requirement, courts have held that the type of injury the antitrust laws were intended to prevent consist of injuries suffered in the restrained market, such that plaintiff must "participate" in that market. *Am. Ad Mgmt.,* 190 F.3d at 1057; *Bhan v. NME Hospitals, Inc.*, 772 F.2d 1467, 1470 (9th Cir. 1985). "Parties whose injuries, though flowing from that which makes

---

clearly on an issue. The Court's duty is to chart a middle course, ascertaining state law by applying the interpretive guidelines set forth by superior federal courts to state-court authority marshalled by able counsel.

the defendant's conduct unlawful, are experienced in another market do not suffer antitrust injury." *Am. Ad Mgmt.*, 190 F.3d at 1057.  Consumers and competitors in the allegedly restrained markets exemplify the sort of market participants who may suffer the requisite injury.  *DRAM I*, 516 F. Supp. 2d at 1090; *DRAM II*, 536 F. Supp. 2d at 1140 n.5.  However, being a consumer or competitor in the allegedly restrained market is not strictly required.  *See generally Am. Ad Mgmt.*, 190 F.3d at 1057 ("While consumers and competitors are most likely to suffer antitrust injury, there are situations in which other market participants can suffer antitrust injury.").

Here, the IPPs allege facts sufficient to conclude, for pleading purposes, that battery cells, batteries, and battery products reside in the same market, or inextricably linked markets.  Multiple opinions have weighed an allegation of "inextricably linked" markets for component and finished-product markets and found that it satisfied *AGC*'s market-participation requirement, even for indirect purchasers.  *Flash*, 643 F. Supp. 2d at 1154 (finding allegations of "inextricably intertwined" markets with "inherent cross-elasticity of demand" sufficient "at this stage of the proceedings" and that the question of "whether indirect purchasers are 'participants' in the same 'relevant market' for purposes of antitrust standing is better suited to resolution upon a fuller record"); *TFT-LCD II*, 586 F. Supp. 2d at 1123 (finding sufficient allegations that component market was inextricably linked to finished-product market because the former "served" the latter); *CRT*, 738 F. Supp. 2d at 1023-24 (finding standing where complaint alleged that markets for components and finished products were "inextricably interlinked" and their prices "directly correlated"); *see also GPU II*, 540 F. Supp. 2d at 1098 (finding market participation sufficiently alleged in part because a "graphics card having certain speed and performance characteristics can be a selling point to a consumer").  The cases, though not explicit on this point, appear to rest on the tacit premise that allegations which, if true, plausibly suggest cross-elasticity of demand between the component and finished-product markets, such that the two are economic complements, survive the pleadings stage.  To be clear, the Court finds in the cases no support for the proposition that merely reciting in a conclusory manner that markets are "inextricably

intertwined"[14] or that cross-elasticity of demand exists will suffice to survive the pleading stage. Rather, the cases hinge on the plausibility of the markets alleged being linked in light of the nature of the components and finished products alleged.

Such is the case for the markets (or market) alleged here. The IPPs adequately plead markets for battery cells, batteries, and battery products which, if they are distinct in the first instance, are plausibly pled to be inextricably intertwined. Plaintiffs purchased batteries and battery products with cells allegedly traceable to defendants. (IPP-SCAC ¶¶ 335-36.) The batteries in which they are incorporated "do not undergo any physical alterations as they move through the chain of distribution." (*Id.* ¶ 335.) The battery cell is allegedly a "substantial part of a [battery] product" (*id.* ¶ 335) that comprises a "substantial component cost" of such products (*id.* ¶ 339), such that the retail price of the product "is determined in substantial part by the cost of the [battery] it contains" (*id.*). As alleged in the IPP-SCAC, that is because the direct-purchaser manufacturers of battery products are subject to vigorous price competition and thin net margins such that any increase in the price of components, such as batteries, "lead[s] to corresponding increases in prices for [products] at the consumer level." (*Id.* ¶ 343.) The IPPs further allege that such price increases can be, and commonly are, isolated through regression analyses such that the impact of the overcharge "can be measured and quantified." (*Id.* ¶¶ 347-48.) Similar allegations have been deemed sufficient for pleading purposes. *E.g.*, *CRT*, 738 F. Supp. 2d at 1023-24; *TFT-LCD II*, 586

_____

[14] The Court is cognizant that when courts confer antitrust standing on market *non-participants* on the basis of an injury suffered in an "inextricably intertwined" market, they are applying a "narrow exception" to the usual rule of market participation. *Dang v. San Francisco Forty Niners*, 964 F. Supp. 2d 1097, 1111 (N.D. Cal. 2013); *Lorenzo v. Qualcomm Inc.*, 603 F. Supp. 2d 1291, 1300 (S.D. Cal. 2009) (citing *Am. Ad. Mgmt.*, 190 F.3d at 1057 n.5); *see also DRAM II*, 536 F. Supp. 2d at 1139-41 (examining "inextricably interlinked" exception in the context of a computer components case). "This exception applies when the claimant can be considered the 'direct victim' of a conspiracy or the 'necessary means' by which the conspiracy was carried out." *Lorenzo*, 603 F. Supp. 2d at 1300-01 (quoting *Ostrofe v. H.S. Crocker Co., Inc.*, 740 F.2d 739, 744-47 (9th Cir. 1984)). Simply invoking the phrases "inextricably linked" or "inextricably intertwined," without facts supporting that conclusion, will not suffice. *See id.* at 1301 (quoting *Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d 912, 926 n.8 (3d Cir. 1999)). However, it *is* possible to plead inextricably intertwined markets. *Dang*, 964 F. Supp. 2d at 1112-13 (deeming sufficient plaintiff's allegation that "the retail market for apparel bearing NFL-related intellectual property" was inextricably intertwined "with the market for the licensing of that intellectual property").

United States District Court
Northern District of California

F. Supp. 2d at 1123; *Flash*, 643 F. Supp. 2d at 1154.  Testing whether the purportedly separate markets are *in fact* the same or inextricably intertwined likely will require sophisticated economic analysis and is a factual matter not amenable to resolution at the pleadings stage.  *See*, *e.g.*, *Flash*, 643 F. Supp. 2d at 1154 (on a motion to dismiss, finding that "inherent cross-elasticity" of allegedly inextricable markets was well-pled but amenable to challenge "upon a fuller record"); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, C 10-0117 SI, 2012 WL 4808447, at *2 (N.D. Cal. Oct. 9, 2012) (on summary judgment, finding markets were inextricably linked).  All that pleading requires are facts sufficient to lend plausibility to a plaintiff's legal conclusions, aided by the reasonable inferences drawn therefrom.  The IPPs have provided that much.  The Court finds it plausible that the alleged markets for battery cells and battery products, if they are distinct, are inextricably intertwined, and that the allegations satisfy the market-participation requirement of *AGC* for pleading purposes, even assuming, without deciding, that the state laws under which plaintiffs bring suit would apply *AGC* to limit antitrust standing under their own laws.

  In arguing to the contrary, defendants lean heavily on *DRAM II*.  The Court declines to follow that case.  In so doing, the Court observes that, while *DRAM II* is the sole computer-components case from this District to reject *AGC* standing for purchasers of finished products, it is not entirely accurate to say, as plaintiffs do, that its reasoning has been "rejected."  (Phase 2 Opp'n at 10; Phase 3 Opp'n at .)  Truer to say that some cases from outside this District have followed it (*e.g.*, *Compressors*), and some other cases have declined to engage with its reasoning, which is extensive, learned, and careful.  *DRAM II*, 536 F. Supp. 2d at 1134-42.  However, as the *DRAM II* court itself acknowledged, its ruling was "not without controversy or uncertainty."  *Id.* at 1142.  Ultimately, *DRAM II* rested on a concern that finding antitrust standing for purchasers of finished products incorporating price-fixed components runs

> the risk of opening the floodgates to potential litigation.  In today's current business climate, and with increasingly globalized markets, nearly all markets that service one another can be said to be "related" to such a degree that the impact of one upon another could allegedly be "proven" with the use of econometrics.  If such is the standard for market participation, it is difficult to imagine a scenario in which any two markets would not serve as the platform for a lawsuit similar to the instant one in the event of anticompetitive conduct, regardless whether the ultimately injured plaintiffs themselves have tenuous ties

United States District Court
Northern District of California

1           with the alleged malefactors and even the allegedly restrained market
itself.

2   *Id.* at 1141.

3         By contrast, this Court perceives that any concern about opening floodgates may be allayed

4 by inquiry into the directness of injury and the other *AGC* factors. *Cf. AGC*, 459 U.S. at 540-41

5 (where complaint alleged that "defendants applied coercion against certain landowners and other

6 contracting parties in order to cause them to divert business from certain union contractors to

7 nonunion contractors," plaintiff union's alleged injuries "were only an indirect result of whatever

8 harm may have been suffered by 'certain' construction contractors and subcontractors"); *Oregon*

9 *Laborers-Employers Health & Welfare Trust Fund v. Philip Morris Inc.*, 185 F.3d 957, 963-64 (9th

10 Cir. 1999) (finding to be too indirect the injury of employee health and welfare benefit trusts who

11 sued tobacco companies to recover costs incurred treating their participants' and beneficiaries'

12 smoking-related illnesses). These factors safeguard against the parade of horribles sometimes used

13 to justify sharp curtailment of indirect purchaser standing. *E.g.*, *Strang*, 2005 WL 1403769, at *3

14 (literal application of Wisconsin's *Illinois Brick* repealer statute "would grant standing to the

15 purchaser of a used bicycle asserting that the purchase price of the twice-sold bicycle was inflated

16 due to a price fixing conspiracy of a rubber manufacturer whose product was used to manufacture

17 the tires of the bike"). Indeed, *DRAM II* itself was not necessarily a case implicating such concerns.

18 *DRAM II*, 536 F. Supp. 2d at 1141 ("readily acknowledg[ing] that, if ever there were a situation in

19 which two related markets should be declared tantamount to the same market, this is likely it").

20 Further, while *DRAM II* focused intently on the market-participant requirement of the first *AGC*

21 factor, the nature of the plaintiff's injury, it did not supply an equally fulsome discussion of the

22 other *AGC* factors and, in fact, avoided ruling on them. *Id.* at 1142. The slippery slope of *DRAM II*

23 was never adequately tested.[15]

24         Finally, the Court notes that the issue of market participation necessarily raises the question

25 of proper market definition. The Court finds that, here, "there are factual questions about the

26 relevant market." *TFT-LCD II*, 586 F. Supp. 2d at 1123 ("[I]t may be, as plaintiffs allege, that the

27

28        [15] The Court notes that, while *DRAM II* was on appeal, the parties settled prior to argument before the Ninth Circuit.

1   indirect purchaser plaintiffs have participated in the market for LCD panels through their purchases

2   of products containing such panels. . . .  Or, it may be that indirect purchasers have participated in

3   an analytically distinct market for finished products.").  These factual questions further counsel

4   away from dismissing the challenged claims at this time.  Further evidentiary development may

5   reveal—or disprove—that the IPPs participate in a market that either is the same as, or at least

6   "cannot be severed" from, the market for battery products.  *See In re TFT-LCD (Flat Panel)*

7   *Antitrust Litig.*, M 07-1827 SI, 2011 WL 6148677 (N.D. Cal. Dec. 7, 2011) (denying defense

8   motion for summary judgment against indirect purchaser plaintiff class because "[t]he IPPs' factual

9   submissions largely confirm the allegations the Court found persuasive in its ruling on defendants'

10  earlier motion to dismiss").

11       The Court finds that the nature of the alleged injury is of the type intended to be redressed

12  by antitrust laws and that the factor of antitrust injury therefore leans in favor of concluding that

13  these plaintiffs have antitrust standing.

14               *b.       Second Factor: Directness of Injury*

15       "Directness in the antitrust context means 'close in the chain of causation.'"  *R.C. Dick*

16  *Geothermal Corp. v. Thermogenics, Inc.*, 890 F.2d 139, 147 (9th Cir. 1989) (citing *AGC*, 459 U.S.

17  at 540).  In assessing the directness of a purported antitrust injury, the Court "look[s] to the chain of

18  causation between [the] injury and the alleged restraint in the market . . . ." *Am. Ad Mgmt.*, 190 F.3d

19  at 1058 (citing *AGC*, 459 U.S. at 540; *Yellow Pages Cost Consultants, Inc. v. GTE Directories*

20  *Corp.*, 951 F.2d 1158, 1162 (9th Cir. 1991)).  This factor generally does not favor antitrust standing

21  for persons whose injuries, while real, flowed from injuries sustained by a third, unrelated person.

22  *See AGC*, 459 U.S. at 540-41; *Oregon Laborers-Employers*, 185 F.3d at 963; *see also Am. Ad*

23  *Mgmt.*, 190 F.3d at 1058-59.  However, courts have determined that discrete injuries traceable

24  through a distribution chain tilt this factor in favor of antitrust standing.  *TFT–LCD I,* 586 F. Supp.

25  2d at 1123; *GPU II,* 540 F. Supp. 2d at 1098; *Flash*, 643 F. Supp. 2d at 1155.

26       Here, the IPPs' alleged injury is a supracompetitive overcharge on the price of lithium ion

27  battery products they purchased.  They allegedly paid the overcharge because it was "passed on to

28  them by direct purchaser manufacturers, distributors and retailers."  (IPP-SCAC ¶ 340.)  The

28

mechanism of the pass-through, as alleged in the complaint, is that vigorous price competition and thin net margins at successive layers of distribution require increased input prices to be passed on quickly and in an amount corresponding to price increases in the inputs—in this case, battery cells. (IPP-SCAC ¶¶ 1, 337, 343.)  The chain alleged is one that moves a distinct and identifiable overcharge nearly automatically through layers of a distribution structure to consumer IPPs.  The Court finds that this is not too indirect to favor standing under *AGC*.

Defendants argue that the IPPs' allegation of traceable cost impacts are controverted by other allegations in the pleading.  (Phase 2 Motion at 9-10.)  The Court disagrees.  Defendants seek to negate the IPPs' allegations that the battery cells remain physically unaltered through the chain of distribution on the basis that the IPPs also plead that raw battery cells are packed and used in different types of consumer electronic devices.  Defendants contend that the range of devices that use batteries puts the lie to the IPPs' allegation that cells remain unchanged, since, "for example, a Dell notebook computer is not compatible with a mobile telephone or a power tool." (*Id.* at 9.)  The argument overlooks the IPP-SCAC's allegation that raw battery cells are manufactured in different types, forms, and chemical compositions, with different types of cells, once packed, lending themselves to use in different products. (*See* IPP-SCAC ¶¶ 32-35, 41-44.)  There is no contradiction evident in allegations of different types of cells that make their way through the distribution chain into a variety of different products substantially unchanged, though different from each other.

> c.      *Third Factor: Speculative Nature of the Harm*

This factor focuses attention on the possibility that an antitrust plaintiff's damages theory is mere speculation because the claimed damages are too indirect and may have been produced by factors independent from any alleged overcharge.  *Eagle v. Star-Kist Foods, Inc.*, 812 F.2d 538, 542 (9th Cir. 1987); *Am. Ad Mgmt.*, 190 F.3d at 1059.  This concern may arise in a particularly acute form where the price-fixed product or service is but one among many factors used in determining the price paid by the plaintiff.  *See*, *e.g.*, *DRAM I*, 516 F. Supp. 2d 1092-93.  However, Ninth Circuit precedent requires courts inquiring into this factor to avoid substituting defendants' "speculation for the complaint's allegations of causation."  *Mendoza v. Zirkle Fruit Co.*, 301 F.3d

United States District Court
Northern District of California

1163, 1171 (9th Cir. 2002); *see also Knevelbaard*, 232 F.3d at 991 (rejecting argument that possibility that "other factors" determine price of good makes harm to plaintiffs speculative where plaintiffs alleged that a particular factor determined the price and where plaintiffs claimed experts would be able to measure the impact of the alleged antitrust violation).

Here, the IPPs allege harm from the alleged price-fixing conspiracy in the form of supra-competitive prices paid for batteries and products.  (IPP-SCAC ¶ 340.)  They allege that the price of the physically distinct price-fixed battery cell can "be traced to show that changes in the prices paid by direct purchaser of [batteries] affect prices paid by indirect purchasers of [batteries] and [battery products]."  (*Id.* ¶ 342.)  Defendants merely argue that it will be difficult to disentangle the alleged overcharge from other pricing factors.  That may be so, but it is a problem of proof and, for two reasons, it does not lean against finding antitrust standing here.  First, "[c]omplex antitrust cases . . . invariably involve complicated questions of causation and damages."  *Am. Ad Mgmt.*, 190 F.3d at 1059 (internal quotation marks and ellipsis omitted).  That is not necessarily a reason to dismiss a case.  *See id.*  Merely to say that complicated questions are presented here, too, as they have been in numerous cases of recent vintage litigated in this very District, even through trial, is to raise an artificial impediment to adjudication on the merits.  This is particularly so where, as here, "defendants have failed to articulate, *with specificity*, why the measurement of plaintiffs' damages would be unascertainable and why this Court would lack the capacity to scrutinize the evidence and resolve complex issues of damages apportionment."  *D.R. Ward*, 470 F. Supp. 2d at 504 (emphasis added).  Second, "it is important to distinguish between uncertainty in the fact of damage and in the amount of damage."  *Mendoza*, 301 F.3d at 1171.  The IPPs' allegation that they have suffered *some* damage, along with a method of demonstrating the fact of their damage, satisfies the Court that this factor tips in favor of standing for purposes of the pleading stage.  *See id.*

> d.    *Final Factors: Risk of Duplicative Recovery and Unduly Complex Apportionment of Damages*

The fourth and fifth factors "can be condensed and considered alongside each other."  *In re Cathode Ray Tube (CRT) Antitrust Litig.*, MDL 1917, 2013 WL 4505701, at *11 (N.D. Cal. Aug. 21, 2013) (citing *AGC*, 459 U.S. at 544).  In short, these factors are two sides of the same coin: in

United States District Court
Northern District of California

light of treble damages awards available to plaintiffs under Section 4 of the Clayton Act, federal precedents consistently express concern about Section 4 claims subjecting antitrust defendants to windfall damages by permitting both direct and indirect purchasers to recover damages based on a single overcharge.  Thus, *AGC* "stresse[s] the importance of avoiding *either* the risk of duplicate recoveries on the one hand, *or* the danger of complex apportionment of damages on the other."  459 U.S. at 543-44 (emphasis supplied).  That is, *AGC* suggests that, if duplicate recovery were to occur, damages should be apportioned such that recovery by both direct and indirect purchasers would not yield *duplicative* recovery, subject to the normal degree of estimation inherent in but-for damages calculations.  The risk of complex apportionment, then, refers to the difficulty in ascertaining *what portion* of an overcharge was passed on from direct purchasers to downstream links in a distribution chain, such as indirect purchasers.

Here, defendants do not address the risk of duplicative recovery.  (*See* Phase 2 Motion at 9-11; Phase 2 Reply at 9-11; *see generally* May 9 Tr.)[16]  Defendants focus instead on the risk of undue complexity in the apportionment of damages.  The Court finds that this factor does not weigh against standing.  As the Court explained in the previous section, defendants do not explain why damages could not be apportioned in this case, as they have been in other complex antitrust cases, such that the case should be dismissed on the pleadings alone.  It is a rule of long standing "that in complicated antitrust cases plaintiffs are permitted to use estimates and analysis to calculate a reasonable approximation of their damages."  *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 493 (7th Cir. 2002).

---

[16] The Court finds that the risk of duplicative recovery, to the extent it should be considered separately, weighs in favor of antitrust standing, notwithstanding the presence of the DPP class.  As the *DRAM I* court explained: *Illinois Brick* repealer states "have necessarily made the policy decision that duplicative recovery may permissibly occur.  Duplicative recovery is, in many if not all cases alleging a nationwide conspiracy with both direct and indirect purchaser classes, a necessary consequence that flows from indirect purchaser recovery.  Accordingly, it is no bar against standing, and this factor does not weigh against standing."  516 F. Supp. 2d at 1093; *see also Flash*, 643 F. Supp. 2d at 1155-56 (same, and collecting cases); *In re Auto. Parts Antitrust Litig.*, 12-MD-02311, 2013 WL 2456612, at *8 (E.D. Mich. June 6, 2013).  The Court perceives no other indirect purchasers standing ready to sue under state law, nor have defendants identified any.

United States District Court
Northern District of California

1    The Court finds that these last two factors weigh in favor of the IPPs' antitrust standing.  As

2    all five factors tilt in favor of the IPPs having antitrust standing, the Court **DENIES** defendants'

3    Motion to the extent it seeks dismissal of the IPP-SCAC on the basis of *AGC*.

### B.    ARTICLE III STANDING

5    The Court now shifts from defendants' challenges to the IPPs' antitrust standing, a statutory

6    matter, to their challenges to the IPPs' Article III standing, a constitutional matter.  Defendants

7    challenge the IPPs' standing under Article III to assert claims on behalf of proposed sub-classes of

8    which no named IPP is a member.  (Phase 2 Motion at 13-20; Phase 2 Reply at 11-15.)

9    Specifically, defendants challenge (1) the proposed Montana Damages Class (IPP-SCAC ¶¶ 481,

10   491(n), 558), of which no named IPP is a member,[17] and (2) the standing of the three

11   "Governmental Plaintiffs," which are two California charter cities and a California community

12   college district (IPP-SCAC ¶¶ 441-44), to assert claims on behalf of either a "Nationwide

13   Governmental Damages Class" proceeding under California law and comprised of all "non-federal

14   and non-state" governments (IPP-SCAC ¶ 480), or, alternatively, 29 state-specific "State

15   Governmental Damages Subclasses" proceeding under the laws of their respective jurisdictions

16   (IPP-SCAC ¶ 482).  Defendants concede that no defect of Article III standing bars the

17   Governmental Plaintiffs from bringing a claim under California law on behalf of California

18   municipal governments, but insist that the Governmental Plaintiffs may not assert claims under the

19   laws of non-California states on behalf of non-California governments.  (May 9 Tr. at 38:15-21.)

20   Relying on the general and uncontroversial principle that an "Article III court must be sure of its

21   own jurisdiction before getting to the merits," *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 831 (1999),

22   defendants urge immediate resolution of the IPPs' purported lack of standing to assert claims on

23   behalf of well-pleaded subclasses of which no named IPP is a member.

24   The IPPs respond that the issue presented is not properly one of *standing* but rather one of

25   adequacy of representation and typicality, and thus one more appropriately addressed under the

26   rubric of Rule 23 (not Article III) at the class certification stage (not the pleadings stage).  (Phase 2

27   ────────────────

28   [17] Defendants originally challenged the IPPs' proposed Utah Damages Class but concede in their reply brief that the IPP-SCAC cures the deficiency asserted earlier.  (Phase 2 Reply at 11 n.14.)

United States District Court
Northern District of California

Opp'n at 17-21; May 9 Tr. at 42:1-23.)  The IPPs further urge the Court to preserve the challenged

classes of governmental entities as "managerial subclasses" pursuant to the broad administrative

powers conferred on the Court by Rule 23(d).  (Phase 2 Opp'n at 21-23; May 9 Tr. at 45:20-46:19.)

As a threshold matter, the Court observes that the question of whether a plaintiff may

represent a class of another state's residents is not necessarily, or at least not only, an issue of

standing.  Rather, it is amenable to analysis as a matter of *either* standing *or* class representation.

*E.g.*, *In re Hydroxycut Marketing & Sales Practices Litigation*, 801 F. Supp. 2d 993, 1104-05 (S.D.

Cal. 2011) ("*Hydroxycut I*") ("The constitutional issue of standing should not be conflated with

Rule 23 class action requirements.  The relevant question . . . is not whether the Named Plaintiffs

have standing to sue Defendants—they most certainly do—but whether their injuries are

sufficiently similar to those of the purported Class to justify the prosecution of a nationwide class

action." (internal quotation marks omitted)); *Newberg on Class Actions* § 2:6 (5th ed. 2013).  The

authorities presented here stand only for the proposition that class certification *may* be considered

before standing if the class certification issue is "logically antecedent" to the standing issue.

*Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 612 (1997); *Ortiz*, 527 U.S. at 831; *see also*

*Easter v. Am. W. Fin.*, 381 F.3d 948, 962 (9th Cir. 2004) (holding that district courts are "not

require[d] . . . to consider class certification before standing"); *GPU I*, 527 F. Supp. 2d at 1026-27

(citing *Easter* for proposition that "standing *can* be addressed before class certification where, as

here, the court is not considering a global class settlement" (emphasis supplied)).  Here, the Court

perceives nothing *requiring* it to adjudicate any standing issues before class certification.  The

constitutional minima are satisfied by the named plaintiffs' alleged injuries and thus the Court's

subject-matter jurisdiction is secure.

However, regardless of whether the issue is characterized as one of "standing" or adequacy

and typicality, this District consistently has applied the principle that "[a] class cannot assert a

claim on behalf of an individual that they cannot represent."  *GPU I*, 527 F. Supp. 2d at 1026; *see*

*also In re Ditropan XL Antitrust Litig.*, 529 F. Supp. 2d 1098, 1107 (N.D. Cal. 2007) (same); *Flash*,

643 F. Supp. 2d at 1163-64 (same); *In re Apple & AT & TM Antitrust Litig.*, 596 F. Supp. 2d 1288,

1309 (N.D. Cal. 2008) (same, following *GPU I* and *Ditropan*); *DRAM I*, 516 F. Supp. 2d at 1104

United States District Court<br>Northern District of California

United States District Court
Northern District of California

1  (dismissing claims under three state laws where "[n]o named plaintiff is a resident of any of the

2  three states in question"); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. 3:07-cv-05944-SC,

3  MDL No. 1917 (N.D. Cal. Sept. 30, 2010)), Dkt. No. 768, at 6 (Special Master Ret. J. Legge),

4  adopted with modifications not relevant here at Dkt. No. 799 (dismissing claims under the laws of

5  states where no plaintiff resided while noting, but not resolving, the "overlap of standing issues and

6  class issues").  Here, in view of this principle and its consistent application in this District, the

7  Court concludes that the IPPs' claim under Montana's Unfair Trade Practices and Consumer

8  Protection Act, Mont. Code, §§ 30-14-103 *et seq.*, must be dismissed without prejudice.  (IPP-

9  SCAC ¶ 558.)  Should the IPPs at a later date acquire a willing Montana plaintiff, they may, as is

10  their right, seek leave to amend under Rule 15 to reinstate their Montana claim.  Defendants' Phase

11  2 Motion is therefore **GRANTED** insofar as it seeks dismissal of the IPPs' claim under Montana law.

12  This same principle counsels dismissal of the IPP-SCAC to the extent it seeks to assert

13  either a nationwide class of municipal governments or state-specific classes of such governments

14  for states outside California.  Moreover, none of the authorities cited to the Court adequately

15  address the potentially sensitive issues that may arise in the context of municipal government

16  plaintiffs.  The IPPs have not fulsomely explored those issues.  (*See* Phase 2 Opp'n at 23 (stating

17  that the IPPs "proposed local government entity subclasses *to handle any issues that come up with*

18  *such entities*" (emphasis supplied)); *see also* May 9 Tr. 48:19-49:7 (explaining that subclasses were

19  pled "to give the Court flexibility down the road in managing the case" and need not meet all the

20  requirements of Rule 23).)  The Court is not persuaded that it should permit to go forward

21  potentially massive discovery concerning a class comprised of every municipal and regional

22  government in the nation without further indication of foresight on the part of the purported

23  representatives of those absent class members.  *Cf. AGC*, 459 U.S. 528 n.17 ("Certainly in a case of

24  this magnitude, a district court must retain the power to insist upon some specificity in pleading

25  before allowing a potentially massive factual controversy to proceed.").  Lacking specificity about

26

27

28

United States District Court
Northern District of California

1   how the IPPs' proposed classes of every governmental body in the United States except the state

2   and federal sovereigns would or even *could* proceed, their dismissal is warranted.[18]

3          The Court acknowledges that the IPPs characterize their proposed State Governmental

4   Damages Classes as "managerial" classes authorized by Federal Rule of Civil Procedure 23(d).

5   However, it does not necessarily follow from the fact that Rule 23(d) confers upon this Court

6   "broad power . . . to adopt procedural innovations to facilitate management of the class action,"

7   *American Timber & Trading Co. v. First National Bank of Oregon*, 690 F.2d 781, 786 (9th Cir.

8   1982), that natural persons and businesses may represent classes of municipal and regional

9   governments of which no Governmental Plaintiff is a part.  Rather, Rule 23(d) provides yet another

10  basis for dismissing the governmental classes except insofar as they cover California: Rule

11  23(d)(1)(D) authorizes courts presiding over putative class actions to "require that the pleadings be

12  amended to eliminate allegations about representation of absent persons and that the action proceed

13  accordingly."  Fed. R. Civ. P. 23(d)(1)(D).  This rule merely codifies the Court's inherent power to

14  manage class actions effectively.  *See* Wright, Miller & Cooper, 7B FED. PRAC. & PROC. CIV. §

15  1792 (3d ed.)  Here, the Court perceives that the most efficient and fairest course is to **GRANT**

16  defendants' Phase 2 Motion as to the governmental plaintiffs without prejudice to the IPPs later

17  seeking to amend their pleading if additional governmental entities wish to join the litigation,

18  subject to Rule 15 and standards applicable thereto.

19         In summary, defendants' Phase 2 Motion is **GRANTED** as to the IPPs' claim under Montana

20  law (IPP-SCAC ¶ 558) and as to the proposed Nationwide Governmental Damages Subclass (IPP-

21

22         [18] For instance, if the Court eventually were to certify one of the IPPs' proposed classes of
23  non-California governmental plaintiffs, it would be responsible for safeguarding the interests of
    absent class members.  Given that such class members would, in this proposed class, consist of
24  political subdivisions of states, with their own obligations to their own citizens, their own specific
    relationships to their states (and any *parens patriae* actions their states may bring), their own
25  organizing charters (or lack thereof), and additional complexities that may yet disclose themselves,
    the Court lacks information regarding how the Court could discharge its duties to the purported
26  governmental class members.
27         The Court makes no comment on the parties' choice-of-law arguments regarding the
    proposed governmental classes.  Those matters are best addressed on a fuller record, development
28  of which the Court anticipates in connection with any motion challenging the IPPs' purported
    nationwide damages class proceeding under California law.

1    SCAC ¶ 480) and all of the State Governmental Damages Classes (IPP-SCAC ¶ 482) except

2    California's.  That claim and those classes are **DISMISSED WITHOUT PREJUDICE**.

3          **C.      APPLICATION OF *ILLINOIS BRICK* TO MISSOURI LAW**

4          The IPPs, in the portion of their complaint devoted to violations of state consumer

5    protection and unfair competition laws (IPP-SCAC ¶¶ 550 *et seq.*), assert a claim under Missouri's

6    Merchandising Practices Act, Mo. Ann. Stat. § 407.020 ("MMPA").  (IPP-SCAC ¶ 557.)  In

7    pertinent part, that statute declares unlawful:

8                     The act, use or employment by any person of any deception, fraud,
                      false pretense, false promise, misrepresentation, unfair practice or the
9                     concealment, suppression, or omission of any material fact in
                      connection with the sale . . . of any merchandise in trade or
10                    commerce . . . in or from the state of Missouri[.]

11   Mo. Ann. Stat. § 407.020.  Notably, while the IPPs allege that the sole plaintiff from Missouri

12   suffered injury "[a]s a result of the *antitrust violations* alleged in this complaint" (IPP-SCAC ¶ 420

13   (emphasis supplied)), they do not bring their claim under Missouri's antitrust statute, Mo. Ann. Stat.

14   § 416.031.  Doubtless this is because "Missouri's antitrust laws follow *Illinois Brick* and prohibit

15   recovery by indirect purchasers."  *Pool Products*, 946 F. Supp. 2d at 570 (citing  Mo. Ann. Stat. §

16   416.141 (strict harmonization statute) and *Duvall v. Silvers, Asher, Sher & McLaren, M.D.'s*, 998

17   S.W.2d 821, 824 (Mo. Ct. App. 1999)).  The question presented here is whether the IPPs may assert

18   claims under the MMPA despite their indirect purchaser status.  Defendants argue that the IPPs

19   merely seek to plead around Missouri's bar on indirect-purchaser antitrust standing by asserting,

20   instead, a consumer protection claim arising from the same alleged conduct.  The IPPs respond by

21   marshaling case law authorizing such claims.

22          The Court concludes that the IPPs' indirect-purchaser status alone presents no bar to their

23   bringing a claim under the MMPA.  In so ruling, the Court follows the well-reasoned decision of

24   the *Pool Products* court.  As *Pool Products* explained, Missouri's Supreme Court "has not directly

25   addressed whether the *Illinois Brick* prohibition on indirect plaintiffs applies to claims based on

26   allegations of antitrust conspiracies brought under the MMPA."  946 F. Supp. 2d at 570.  However,

27   this Court agrees that, "if faced with the issue today, the Missouri Supreme Court would allow

28   indirect suits under the MMPA when a plaintiff has otherwise made out an MMPA claim."  *Id.* at

United States District Court
Northern District of California

36

571.  "To reach the opposite conclusion would be inconsistent with the Missouri Supreme Court's

holding in [*Gibbons v. J. Nuckolls, Inc.*, 216 S.W.3d 667, 669 (Mo. 2007)] that the MMPA

'contemplates that other parties, besides the direct purchasers or contracting party, who suffer

damages resulting from the violator's prohibited conduct under the Act are included in those

eligible to receive restitution.'" *Id.* (quoting *Gibbons*, 216 S.W.3d at 669).  Additionally, the *Duvall*

court's holding that *Illinois Brick* and *AGC* barred indirect-purchaser suits under Missouri's antitrust

statute relied on the strict harmonization requirement embodied in § 416.141, but, in contrast, "[t]he

MMPA lacks a federal harmonization clause."  *Id.*

Defendants rely primarily on an unpublished decision of a Missouri trial court for the

sweeping proposition that the MMPA is subject to the strictures of *Illinois Brick*.  *Ireland v.

Microsoft Corp.*, 00CV-201515, 2001 WL 1868946 (Mo. Cir. Ct. Jan. 24, 2001).  The markedly

terse, four-paragraph memorandum opinion in *Ireland*, assuming it is citable in the first instance

under the trial court's rules, did not reduce to writing any analysis supporting its conclusion that

*Illinois Brick* applied to both Missouri's antitrust laws *and* the MMPA.  As such, it supplies

negligible evidence of how the Missouri Supreme Court would rule on the issue.  Neither does the

Court follow a pre-*Gibbons* decision relied upon by defendants, *In re New Motor Vehicles

Canadian Exp. Antitrust Litig.*, 350 F. Supp. 2d 160, 192 (D. Me. 2004) ("*Motor Vehicles*").  The

Court is persuaded instead by the careful reasoning in *Pool Products*.  The post-*Gibbons* cases cited

to the Court have been uniform in reaching the same conclusion that indirect-purchaser status alone

does not bar Missouri consumers from bringing claims under the MMPA.  *In re TFT-LCD (Flat

Panel) Antitrust Litig.*, M 07-1827 SI, 2011 WL 4501223, at *15 (N.D. Cal. Sept. 28, 2011) (citing

*Gibbons*); *Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, 737 F.

Supp. 2d 380, 414 (E.D. Pa. 2010) (citing *Gibbons* and severely criticizing *Ireland*); *see also In re

TFT-LCD Antitrust Litig.*, 2011 U.S. Dist. LEXIS 84476, at *29-30 (N.D. Cal. July 28, 2011)

(certifying class of indirect purchasers under the MMPA).

Defendants' Phase 2 Motion is **DENIED** insofar as it seeks dismissal of the IPPs' claims

under Missouri's Merchandising Practices Act.

///

United States District Court
Northern District of California

### D.   CLASS ACTION CLAIMS IN ILLINOIS AND SOUTH CAROLINA

The IPPs assert claims under laws of Illinois, Montana, and South Carolina which provide a private right of action for individuals only, not classes.  Having already dismissed the Montana claim for lack of a plaintiff from that state (*supra* Part 2, Section II.B), the Court focuses solely on Illinois and South Carolina.[19]

Claims under the relevant provisions of those states' laws may only be brought, at least in the courts of those states, as individual actions, not as class actions.  Defendants urge the Court to construe the class-action bans in question as part of the substantive law of the state and thus, under the *Erie* doctrine, to apply it here, while the IPPs contend that the class-action bans are paradigmatic examples of procedural rules which, thus, are trumped by Rule 23.

---

[19] The IPPs assert claims under the Illinois Antitrust Act, 740 Ill. Comp. Stat. §§ 10/1, *et seq.*, and South Carolina's Unfair Trade Practices Act, S.C. Code Ann. §§ 39-5-10, *et seq.* (IPP-SCAC ¶¶ 532 (Illinois), 562 (South Carolina).)  The Illinois Antitrust Act provides, in pertinent part:

> No provision of this Act shall deny any person who is an indirect purchaser the right to sue for damages. Provided, however, that in any case in which claims are asserted against a defendant by both direct and indirect purchasers, the court shall take all steps necessary to avoid duplicate liability for the same injury including transfer and consolidation of all actions. Provided further that *no person shall be authorized to maintain a class action in any court of this State* for indirect purchasers asserting claims under this Act, with the sole exception of this State's Attorney General, who may maintain an action *parens patriae* as provided in this subsection.

740 Ill. Comp. Stat. § 10/7(2) (emphasis supplied).

South Carolina's Unfair Trade Practices Act provides, in pertinent part:

> Any person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of an unfair or deceptive method, act or practice declared unlawful by § 39-5-20 may bring an action individually, *but not in a representative capacity*, to recover actual damages.

S.C. Code Ann. § 39-5-140(a) (emphasis supplied).

1    Though in their briefing the parties hotly disputed the *derivation* of the applicable test, at

2    oral argument they agreed that the test is simply whether the class-action bans in question are

3    procedural or substantive and that the Ninth Circuit enunciates this test in *Freund v. Nycomed*

4    *Amersham*, 347 F.3d 752, 761-62 (9th Cir. 2003).[20]  As *Freund* explained, the *Erie* doctrine

5    requires federal courts sitting in diversity, as this Court is, to "apply state substantive law and

6    federal procedural law."  *Freund*, 347 F.3d at 761 (quoting *Gasperini v. Ctr. for Humanities, Inc.*,

7    518 U.S. 415, 416 (1996)).  Moreover, "[a] special case arises when the federal law is embodied in

8    a Federal Rule of Civil Procedure."  *Id.*  "In that situation, the federal rule must be applied if it does

9    not 'abridge, enlarge, or modify any substantive right' in violation of the Rules Enabling Act."  *Id.*

10   (citing 28 U.S.C. § 2072; *Hanna v. Plumer*, 380 U.S. 460, 471 (1965)).

11   In *Freund*, the Ninth Circuit reversed a district court's decision to grant a defendant's post-

12   trial motion for judgment as a matter of law where the defendant argued that the evidence presented

13   at trial was insufficient to support the jury's award of punitive damages, despite the defendant

14   having failed to move for judgment as a matter of law *before* the case was submitted to the jury, as

15   required by Federal Rule of Civil Procedure 50.  *Id.* at 760-61.  The district court reached (and

16   granted) the defendant's post-trial motion notwithstanding defendant's apparent waiver because it

17   determined that a California point of law making the appealability of punitive damages non-

18   waivable was substantive, not procedural.  The Ninth Circuit reversed.  It found that California's

19   "no-waiver rule . . . [did] not in itself create any substantive right."  *Id.* at 761.  "It does not add,

20   subtract, or define any of the elements necessary to justify punitive damages; it merely establishes

21   when and how those pre-existing substantive rules can be reviewed."  *Id.* at 761-62.  For these

22

23   [20] The Court concurs with Judge Moskowitz's reasoning in *In re Hydroxycut Mktg. & Sales Practices Litig.*, --- F.R.D. ---, 2014 WL 295302, at *2-4 (S.D. Cal. Jan. 27, 2014) ("*Hydroxycut II*"), and shares his conclusion that Justice Stevens's concurrence in the Supreme Court's fractured decision in *Shady Grove Orthopedic Associates, P.A. v. Allstate Ins. Co.*, 559 U.S. 393 (2010), is not the controlling opinion of that case because it cannot be meaningfully regarded as both narrower than another and a common denominator of the Court's reasoning.  *Lair v. Bullock*, 697 F.3d 1200, 1205 (9th Cir. 2012).  "Because the Ninth Circuit has not yet voiced an opinion on how to apply *Shady Grove*, the Court looks to pre-*Shady Grove* Ninth Circuit cases analyzing whether the application of federal rules in certain situations would violate the Rules Enabling Act."  *Hydroxycut II*, 2014 WL 295302, at *3.  The parties and the Court concur that *Freund* articulates the proper test under pre-*Shady Grove* Ninth Circuit law.

United States District Court
Northern District of California

1    reasons, the *Freund* court held that Rule 50 did "not run afoul of the Rules Enabling Act, because

2    its application affects only the process of enforcing litigants' rights and not the rights themselves."

3    *Id.* at 762 (internal citations omitted).

4            The Court finds the same is true of the Illinois and South Carolina class-action bans.  Those

5    states' antitrust laws merely forbid procedural aggregation of individual claims; they do not change

6    how a court decides whether such claims prevail or, importantly, the nature of any one individual's

7    right to relief.  Notably, they are not statutes that provide minimum statutory damages in lieu of a

8    right to aggregate *de minimis* damages claims in a class actions.  *E.g.*, Mont. Code Ann. § 30-14-

9    133(1) (permitting individual actions "to recover actual damages or $500, whichever is greater").

10   Nothing before the Court suggests that the class-action bans of Illinois and South Carolina alter the

11   elements of their respective causes of action, the methods of proving those elements, or the relief

12   available under them.  Rather, like the no-waiver rule considered in *Freund*, Illinois and South

13   Carolina's class-action bans merely determine *how* substantive rights may be asserted, that is, "the

14   process of enforcing litigants' rights and not the rights themselves."  *Id.*  Said another way, "a rule

15   barring class actions does not prevent individuals who would otherwise be members of the class

16   from bringing their own separate suits or joining in a preexisting lawsuit."  *Hydroxycut II*, 2014 WL

17   295302, at *4.  "The substantive rights of these individuals are not affected."  *Id.*  "The prohibitions

18   against class actions only affect 'how the claims are processed.'"  *Id.* (quoting *Shady Grove*, 559

19   U.S. at 408 (plurality op.) (Scalia, J.)).

20          The Court concludes that the class-action bans challenged here are procedural, not

21   substantive, and that application of Rule 23 to them would not modify any substantive right.  Rule

22   23 therefore governs and the challenged claims may be asserted on a representative basis in this

23   federal court.  Defendants' motion to dismiss the IPPs' claims under Illinois and South Carolina law

24   on the ground that the IPPs assert them as class claims instead of individual claims is **DENIED**.  The

25   IPPs may assert their Illinois and South Carolina claims on a representative basis, subject to the

26   requirements of Rule 23.

27   ///

28   ///

United States District Court
Northern District of California

40

1

### E.     NEW HAMPSHIRE CLAIMS

2

The IPPs assert claims under both New Hampshire's antitrust law and under its Consumer

3

Protection Act on behalf of New Hampshire consumers and local governments.  (IPP-SCAC ¶¶ 424

4

(alleging purchases of battery products by New Hampshire resident), 481-82 (defining New

5

Hampshire Damages Class and New Hampshire Governmental Damages Class), 540 (asserting

6

violation of New Hampshire's antitrust law, N.H. Rev. Stat. Ann. §§ 356:1, *et seq.*), 560 (asserting

7

violation of New Hampshire's Consumer Protection Act, N.H. Rev. Stat. Ann. §§ 358-A:2, *et seq*.

8

("CPA")).  Defendants move for dismissal of the CPA claim (but not the antitrust claim) on the

9

basis that the CPA proscribes only conspiratorial conduct occurring within the territorial limits of

10

New Hampshire.  (Phase 2 Motion at 26-28.)

11

Defendants are correct.  The CPA makes it "unlawful for any person to use any unfair

12

method of competition or any unfair or deceptive act or practice in the conduct of any trade or

13

commerce *within this state*."  N.H. Rev. Stat. Ann. § 358-A:2 (emphasis supplied).  Neither side

14

cites New Hampshire state case law squarely addressing this point, but numerous federal district

15

courts seated within and without New Hampshire have acknowledged that the CPA requires the

16

proscribed conduct to occur within the state; merely selling a good in New Hampshire is not

17

enough when the proscribed conduct occurs elsewhere.  *Precourt v. Fairbank Reconstruction*

18

*Corp.*, 856 F. Supp. 2d 327, 342-44 (D.N.H. 2012); *Pacamor Bearings, Inc. v. Minebea Co., Ltd.*,

19

918 F. Supp. 491, 504 (D.N.H. 1996); *Flash*, 643 F. Supp. 2d at 1159; *Compressors*, 2013 WL

20

1431756, at *17-18; *Motor Vehicles*, 350 F. Supp. 2d at 193.

21

The IPPs' assertion that the broad remedial purpose of the CPA renders their claim

22

cognizable has been rejected on multiple occasions by these same opinions, as has their argument

23

that an inapposite opinion of the New Hampshire Supreme Court, *LaChance v. U.S. Smokeless*

24

*Tobacco Co.*, 156 N.H. 88 (2007), authorizes a claim under the CPA even where the conduct

25

complained of occurs extraterritorially.  The question presented in *LaChance* was whether

26

consumers were required to bring "antitrust-type actions" under New Hampshire's antitrust statute

27

rather than under the CPA, a question the *LaChance* court answered in the negative.  156 N.H. at

28

United States District Court
Northern District of California

United States District Court
Northern District of California

93-94.  The *LaChance* court did not say, nor does its suggest, that the CPA applies to proscribed

conduct occurring out of state.  *Accord Flash*, 643 F. Supp. 2d at 1159.

No more availing is the IPPs' reliance on *In re Chocolate Confectionary Antitrust Litigation*,

749 F. Supp. 2d 224, 234-35 (M.D. Pa. 2010) ("*Chocolate Confectionary*").  While that case has

been cited by at least one district court for the proposition that "courts disagree" whether New

Hampshire sales alone suffice to satisfy the CPA's requirement of intrastate conduct, *In re Ductile

Iron Pipe Fittings (DIPF) Indirect Purchaser Antitrust Litig.*, CIV. 12-169, 2013 WL 5503308, *22

(D.N.J. Oct. 2, 2013), this Court is not persuaded that the purported disagreement consists of

anything more than a single outlying decision set against a backdrop of otherwise uniform

authority.  In any event, the Court finds *Chocolate Confectionary* unpersuasive: it reached its

holding in reliance on *LaChance*, which this Court has already determined to be inapposite.

The Court **GRANTS** defendants' motion as to the IPP's claim under New Hampshire's CPA.

Because the IPPs suggest no further allegation that could be made to cure this defect, nor is any

apparent, the claim is **DISMISSED WITH PREJUDICE**.

F.    **PRICE-FIXING UNDER ARKANSAS'S DECEPTIVE TRADE PRACTICES ACT**

The IPPs seek to assert on behalf of a putative class of Arkansas residents a claim arising

under Arkansas's Deceptive Trade Practices Act, Ark. Code Ann. § 4-88-107 ("ADTPA") (IPP-

SCAC ¶ 553).  The ADTPA makes unlawful "[d]eceptive and unconscionable trade practices," an

extensive but not exclusive list of which it provides.  Ark. Code Ann. § 4-88-107(a).  Not listed

among the statute's exceedingly specific exemplars (which outlaw, for instance, "bait-and-switch

advertising consisting of an attractive but insincere offer to sell a product or service which the seller

in truth does not intend or desire to sell") is any conduct recognizable as an antitrust violation, e.g.,

price-fixing.  However, the statute does contain a catch-all provision which proscribes "[e]ngaging

in any other unconscionable, false, or deceptive act or practice in business, commerce, or trade[.]"

*Id.* § 4-88-107(a)(10).  The question presented here is whether the horizontal conspiracy to fix

prices alleged in the IPPs' complaint is the type of conduct prohibited by ADTPA.

The Court concludes it is.  The statute does not define what sort of "unconscionable" trade

practices it prohibits, but the Court agrees with defendants, as a general matter, that the appropriate

United States District Court
Northern District of California

1    place to begin looking for such a definition is in the opinions of Arkansas's high court.  That court,

2    in *State ex rel. Bryant v. R & A Inv. Co., Inc.*, 336 Ark. 289, 295-96 (1999) ("*Bryant*"), imported

3    into the ADTPA a definition of "unconscionable" established by Arkansas contract law, which

4    definition focused on "gross inequality of bargaining power between the parties to the contract and

5    whether the aggrieved party was made aware of and comprehended the provision in question."

6    Defendants seize upon this to argue, in essence, that this definition is the *only* cognizable definition

7    of unconscionability for ADTPA purposes.

8           Case law does not support that proposition.  The Arkansas Supreme Court itself, quite apart

9    from any general allusions to "liberal construction" like those relied upon by the IPPs and some

10   federal court opinions cited in their brief, has in the ADTPA context defined an unconscionable act

11   as that which "affront[s] the sense of justice, decency, or reasonableness," *Baptist Health v.

12   Murphy*, 365 Ark. 115, 128 n.6 (2006) (quoting BLACK'S LAW DICTIONARY 1561 (8th ed. 2004)),

13   and which specifically "includes conduct violative of public policy or statute," *id.* at 128.  In light

14   of this broad, competing definition of unconscionability, which has been frequently cited by

15   Arkansas and other courts, the Court is not persuaded that the definition advanced in *Bryant* is

16   Arkansas's sole and exclusive definition.  Further, the Court notes that *Bryant*, on which defendants

17   primarily rely, addressed a challenge that the ADTPA was "too vague for enforcement."  *Bryant*,

18   336 Ark. at 295.  It is an odd case to cite, then, for the notion that the ADTPA carefully

19   circumscribes the conduct actionable under it.  Rather, the statute's "catch-all provision was, no

20   doubt, included because the General Assembly could not be expected to envision every conceivable

21   violation under the [A]DTPA."  *Id.*  Defendants supply no persuasive reason to dismiss the IPPs'

22   ADTPA claim, and the conduct alleged in the IPP-SCAC does not obviously fall outside the

23   broader definition advanced in *Baptist Health*, as it encompasses acts that violate a statute or public

24   policy.  The Court therefore **DENIES** defendants' motion as to the IPPs' ADTPA claim.[21]

25

26           [21] The Court is cognizant that other rulings, including some from this District, have reached
     the opposite conclusion.  *E.g.*, *SRAM*, 2010 WL 5094289, at *8; *TFT-LCD I*, 586 F. Supp. 2d at
27   1125; *GPU I*, 527 F. Supp. 2d at 1029-30.  The Court declines to follow those cases because they
     limited their examination of ADTPA's notion of unconscionability to that expressed in *Bryant*,
28   which, as the Court has explained, is too narrow.

United States District Court
Northern District of California

### III.     CONCLUSION AS TO PHASE 2 MOTION

For the foregoing reasons, the Court: **DENIES** the motion as to antitrust standing (Section A); **GRANTS** the motion as to the IPPs' alleged damages class of Montana consumers, and **DISMISSES WITHOUT PREJUDICE** the IPP-SCAC's Montana claim; **GRANTS** the motion as to the IPP-SCAC's alleged nationwide damages class of non-state and non-federal governments and alternative state-specific subclasses of such governments, and **DISMISSES WITHOUT PREJUDICE** the IPP-SCAC to the extent it seeks to assert said nationwide class and said alternative state-specific subclasses but for California's (Section B); **DENIES** the motion as to the IPP-SCAC's claim under Missouri's Merchandising Practices Act (Section C); **DENIES** the motion as to the IPP-SCAC's claims under the Illinois Antitrust Act and the South Carolina Unfair Trade Practices Act law (Section D); **GRANTS** the motion as to the IPP's claim under the New Hampshire Consumer Protection Act and **DISMISSES** that claim **WITH PREJUDICE** (Section E); and **DENIES** the motion as to the IPPs' Arkansas Deceptive Trade Practices Act claim (Section F).

### PART 3: PHASE 3 MOTION TO DISMISS THE DPP-SCAC

The Court turns its attention now from the IPP case to the DPP case.  The DPPs purport to represent persons and businesses that purchased lithium ion batteries and battery products (but not cells) "from a member of a Defendant's corporate family, rather than through an unaffiliated distributor or reseller," as the IPPs allegedly did.  (DPP-SCAC ¶ 6.)  The Court, in its Jan. 21 Order, dismissed the DPPs' initial Consolidated Amended Complaint in part because the DPPs failed to allege antitrust standing under *Illinois Brick* and, yet more specifically, under the ownership-or-control exception to *Illinois Brick*'s direct-purchaser rule recognized in *Royal Printing*.  As the Court explained in Part 1, Section II.A.1, *supra*, the rule of *Illinois Brick*, stated simply, is that only direct purchasers have standing to sue for money damages under Section 4 of the federal Clayton Act.  *See Delaware Valley*, 523 F.3d at 1120-21.  Under the Ninth Circuit's *Royal Printing* decision, however, indirect purchasers may sue for purchases made from any direct purchaser that "is a division or subsidiary of a co-conspirator."  *ATM Fee*, 686 F.3d at 756 (quoting *Royal Printing*, 621 F.2d at 326).  The rationale for the exception to the bright-line rule of *Illinois Brick* is that a co-conspirator parent company will forbid any direct purchaser under its control to

bring a lawsuit that would reveal the parent's role in the conspiracy.  *Id.*  Mechanically applying *Illinois Brick* in such circumstances would have the unacceptable effect of insulating such conspirators from private enforcement of the federal antitrust laws.  *Id.*

The Court dismissed the DPPs' earlier complaint in part because it "fail[ed] to engage with the ownership or control inquiry to a meaningful degree."  Jan. 21 Order at 11.  That is, the DPPs alleged that they purchased batteries, either as stand-alone products or as components of battery products, from a defendant or its subsidiary, but the DPPs failed to account for the possibility that the batteries they purchased may have been packed by an independent packer.  *Id.*  The Court rejected the DPPs' suggestion that they had alleged defendants' control of the independent packers merely by alleging that defendants exerted some influence over the packers.  *Id.* at 12 (citing *ATM Fee*, 686 F.3d at 758; *Illinois Brick*, 431 U.S. at 746).  The Court explained that it could not ascertain whether the DPPs had standing under *Royal Printing* in the absence of allegations specifying "whether the batteries purchased by the DPPs, either individually or as part of a lithium ion battery product, were sold under the name of a Defendant or under that of a packer."  *Id.*  The Court instructed: "To avail themselves of the ownership or control exception, the DPPs . . . must articulate a cognizable theory of ownership or control, coupled with plausible, non-conclusory evidentiary facts supporting that theory."  *Id.* at 13.  "The DPPs need not establish each and every link in the chain of standing for pleading purposes, but they do need to allege specific facts which, aided by reasonable inferences, allow the Court to draw a plausible conclusion that these named DPPs have suffered an antitrust injury traceable to these Defendants."  *Id.* at 13 n.8.

Though the Court dismissed the DPPs' complaint on these (and other) grounds, the Court rejected several of defendants' proffered reasons for dismissal.  The Court, for example, rejected defendants' argument that the DPPs lacked standing because they alleged purchases of finished products that contained a price-fixed component, that is, of a battery or battery product as opposed to a raw lithium ion battery cell.  Jan. 21 Order at 13-15.  The Court also declined to reach defendants' argument that the DPPs' complaint should be dismissed for lack of standing under *AGC*, which denies antitrust standing where the relationship between a purchaser's injury and a defendant's unlawful conduct is too remote.  *Id.* at 16 n.10.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    The Phase 3 Motion now before the Court reprises the questions of antitrust standing raised

2    in the first phase of motions to dismiss.  Defendants jointly move to dismiss the DPP-SCAC for

3    failure to plead antitrust standing under *Royal Printing* and *AGC*.[22]  As set forth below, the Court

4    **DENIES** the Phase 3 Motion.

5    **I.    DPP ANTITRUST STANDING UNDER *ILLINOIS BRICK* AND *ROYAL PRINTING***

6    The DPP-SCAC cures the previously identified deficiencies in the DPPs' allegations of

7    antitrust standing under *Illinois Brick* and *Royal Printing*.  The Court begins with the requirement

8    that "the DPPs must allege facts that lead to a plausible inference that they have suffered an

9    antitrust injury traceable to a purchase from an entity owned or controlled by an alleged

10   conspirator."  Jan. 21 Order at 13.  The DPP-SCAC does so.

11   Unlike the DPPs' original complaint, the DPP-SCAC alleges the particular batteries and

12   battery products purchased by each DPP, specifying type, brand, and, frequently, model number.

13   (DPP-SCAC ¶¶ 19-28.)  All of the purchased batteries and battery products allegedly bear the

14   distinctive markings of a defendant.  (*Id.*)  But for a few immaterial exceptions,[23] where the

15   purchase of a battery product is alleged, the product is alleged to contain batteries bearing

16   defendant markings that match those on the product.  (*Id.*)  While the DPPs' earlier complaint left

17   open the possibility that one or more DPPs' purchases involved batteries sold first to third-party

18   packers outside the ownership or control of any conspirator (Jan. 21 Order at 12-13), the DPP-

---

19

20   [22] Defendants' opening brief also argues that the DPPs lack standing under the co-
conspirator exception recognized by Ninth Circuit law.  *ATM Fee*, 686 F.3d at 749; *Del. Valley*,

21   523 F.3d at 1123 n.1; *State of Ariz. v. Shamrock Foods Co.*, 729 F.2d 1208, 1211-14 (9th Cir.
1984).  The DPPs, however, disclaim reliance on that exception (*see* Phase 3 Opp'n (no mention of

22   co-conspirator exception)), as defendants acknowledge (Phase 3 Reply at 2).  The Court therefore
need not address that exception.

23

24   [23] Plaintiff First Choice Marketing, Inc. ("First Choice") allegedly purchased "Sony high-
definition camcorders," but the DPP-SCAC does not specify that those camcorders contained

25   defendant-branded lithium ion batteries.  (DPP-SCAC ¶ 22.)  Similarly, plaintiff The Stereo Shop
allegedly purchased a Sony camcorder but the camcorder's battery is not identified.  (DPP-SCAC ¶

26   25.)  These omissions are notable in light of the DPP-SCAC 's careful specificity with respect to the
batteries contained in other battery products.  (*E.g.*, DPP-SCAC ¶¶ 21, 23.)  In light of the other

27   allegations in the DPP-SCAC, however, they are not ultimately fatal for purposes of pleading the
DPPs' antitrust standing.  It is eminently plausible that those devices carried Sony batteries, and the

28   contrary inference is impermissible at the pleading stage.

United States District Court
Northern District of California

SCAC forecloses that possibility, at least for pleading purposes, by alleging that batteries with a defendant's markings were packed by a defendant or an entity under a defendant's control acting on a defendant's behalf.  (DPP-SCAC ¶ 96.)  The DPP-SCAC expressly limits the DPPs' claims to only those purchases involving battery cells packed by: a defendant or its co-conspirator; a separate company on a defendant's behalf "where title to said cells did not transfer"; or by companies owned or controlled by defendants or their co-conspirators.  (DPP-SCAC ¶ 99.)  That is, the DPP-SCAC disclaims standing to bring claims based on battery cells sold to parties outside either (1) the conspiracy itself or (2) the ownership or control of a conspirator.  The DPP-SCAC identifies purchases traceable to entities allegedly so owned or controlled.

In addition to requiring the DPPs to link their purchases to the alleged conspiracy, the Jan. 23 Order instructed the DPPs to articulate a cognizable theory of ownership or control and supporting facts.  Jan. 21 Order at 13.  The DPPs have corrected this defect.  The DPP-SCAC alleges each particular seller from whom a DPP made a purchase, and alleges with specificity the corporate relationships linking that seller to an allegedly conspiring defendant.  ((DPP-SCAC ¶¶ 19-28 (DPP purchases); *id.* ¶¶ 29-58 (defendants' corporate relationships)).)  With the exceptions noted below, the entities in those chains are wholly owned subsidiaries or divisions of each other.  Such relationships are "[p]aradigmatic examples" of situations that satisfy *Royal Printing*.[24]  *In re TFT-LCD (Flat Panel) Antitrust Litig.*, C 12-3802 SI, 2013 WL 1164897, at *2 (N.D. Cal. Mar. 20,

---

[24] The DPP-SCAC identifies other relationships between corporate entities beside complete ownership.  (*See* DPP-SCAC ¶ 21 (Circuit City allegedly purchased Samsung battery products containing Samsung batteries from non-defendant "Samsung Electronics America, Inc., which is a wholly-owned subsidiary of Samsung Electronics Ltd., which in turn is the *single largest shareholder* of Defendant Samsung SDI Co., Ltd." (emphasis supplied)); DPP-SCAC ¶ 24 (Ritz Camera allegedly purchased Panasonic battery products containing Panasonic batteries from non-defendants "Panasonic Company and Panasonic Company East," both of which allegedly are "regional sales companies of [non-defendant] Panasonic Consumer Electronics Company, which is a division of Defendant Panasonic Corporation of North America, which in turn is a wholly-owned subsidiary of Defendant Panasonic Corporation").)  These allegations satisfy *Royal Printing* for purposes of pleading.  *ATM Fee*, 686 F.3d at 749 ("an indirect purchaser may sue if the direct purchaser is a division or subsidiary of the price-fixing seller"); *Sun Microsystems Inc. v. Hynix Semiconductor Inc.*, 608 F. Supp. 2d 1166, 1180 (N.D. Cal. 2009) (minority stock ownership may support inference of control)).

United States District Court
Northern District of California

2013).  The DPPs allege, in essence, the beginning and the end of a chain that links the price-fixed good to their purchase, plus, critically, facts that plausibly link the ends of the chain through entities owned and controlled by the alleged conspiracy.  The DPPs allege facts which, if true, would tend to exclude the possibility that their purchases flowed through independent, direct-purchaser packers not owned or controlled by any conspirator.  While it is an open question whether such facts would suffice at a later stage of the proceedings, they do suffice merely to *plead* standing under *Royal Printing*.[25]

Defendants' arguments to the contrary are misplaced.  Defendants fault the DPPs for failing to negate any possibility that the products they purchased did not contain battery cells that passed "in a continuous chain of ownership or control."  (Phase 3 Reply at 4.)  The argument rests on a faulty premise, i.e., that the DPPs must allege each link in a "continuous" chain to survive the pleading stage.  *See* Jan. 21 Order at 13 n.8.  The DPPs need only meet a plausibility standard at this phase of the litigation, to which they are entitled to the benefit of reasonable inferences.

Defendants further contest the DPPs' standing on the basis that the DPP-SCAC fails to support adequately the DPPs' contention that Sony, Panasonic, and Sanyo packed their own battery cells.  (Phase 3 Reply at 5-6, 7-8.)  In essence, defendants contend that the specific allegations in the DPP-SCAC that Sony, Panasonic, and Sanyo packed all or substantially all of the cells they manufactured are not sufficiently probative to warrant the conclusion that those entities actually did so.  The argument merely raises a question of fact not amenable to resolution on the pleadings, i.e., whether the DPPs' allegation is true and whether it suffices to establish how many and what kinds of Sony, Panasonic, and Sanyo's batteries they packed themselves, and for how long.  That inquiry strays far afield from the task at hand, which is determining the legal sufficiency of the DPP-SCAC

---

[25] The SCAC adds new allegations concerning international marking standards for lithium ion batteries.  These standards allegedly require each cell "to be marked with the manufacturer's name, trade name, or trademark and model designation."  (¶ 101.)  The DPPs also allege that lithium ion batteries and battery cells bear barcodes or other markings that identify the cell manufacturer and may be used, in at least some instances, to identify the manufacturer of the battery cell "and other components of the pack."  (¶ 102.)  The DPPs allege that these markings and barcodes allow a cell to be traced through the chain of manufacture, including through the packing phase.  (*Id.*)  Be that as it may, the DPPs do not allege that they have used the barcodes to trace their particular purchases, which undercuts the probative value of the allegations somewhat.

United States District Court
Northern District of California

1    *while taking its non-conclusory allegations as true*.  The adverse inference defendants ask the Court

2    to draw is not permissible at this stage or on these allegations.

3           Defendants also take issue with the DPPs' assertion that Samsung and Hitachi Maxell

4    employed or contracted third-party businesses as its agents for packing battery cells, cells to which

5    Samsung and Hitachi Maxell "typically" retained title.  (DPP-SCAC ¶ 96; Phase 3 Reply at 8.)

6    Relying on *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 424 F.3d 363 (3d Cir. 2005),

7    defendants insist that the DPP-SCAC may not simply allege a contractor/employee relationship and

8    instead must explain the "economic substance" of any relationship with the contract packers.  The

9    Court disagrees.  Defendants seek more than what Federal Rule of Civil Procedure 8(a) requires,

10   and the portion of *Hess* on which they rely addressed an appeal from a summary judgment order.

11   424 F.3d at 369, 371-73.  *Hess* does not support the imposition of an exacting "economic

12   substance" test at the pleading stage, before the DPPs have taken discovery on defendants'

13   relationship to the packers.  Moreover, the Court is not persuaded by the argument of Hitachi

14   Maxell that an allegation that it "employ[ed]" third-party agents to pack its cells (DPP-SCAC ¶ 95)

15   fails to allege "control" in "its ordinary, contemporary, and common meaning," *ATM Fee*, 686 F.3d

16   at 757.  (Dkt. No. 427 at 4-5.)  To suggest that employment does not entail some amount of

17   "control" of one's employees in the ordinary sense of that term ignores the long-standing legal

18   standards used to measure the same.  *See, e.g.,* RESTATEMENT (THIRD) OF EMPLOYMENT LAW §

19   1.01 cmt. d (Proposed Final Draft, 2014).

20          Finally, the Court rejects the argument that the DPPs only have standing to sue for damages

21   stemming from purchases made from a particular defendant if the DPP-SCAC alleges that that

22   defendant owned or controlled a seller.  (Phase 3 Reply at 6; Dkt. No. 427 at 4-5; Dkt. No. 430 at 1-

23   2.)  *Royal Printing* permits indirect purchasers who buy from *any* seller owned or controlled by *any*

24   conspirator to sue *all* of the conspirators on a theory of joint and several liability.  *See* 621 F.2d at

25   324, 327-28 (authorizing suit against all ten manufacturers of paper products though plaintiffs

26   purchased from subsidiary and division of only two defendants).

27          There is one exception to the DPP-SCAC's otherwise adequate pleading of purchases of

28   price-fixed components through a chain of co-conspirators or entities under their ownership or

49

United States District Court
Northern District of California

control.  Plaintiff Alfred H. Siegel sues in his capacity as the liquidating trustee for the Circuit City

Stores, Inc. Liquidating Trust, established in connection with the bankruptcy proceedings of Circuit

City Stores, Inc. and its affiliates ("Circuit City").  The DPP-SCAC alleges that Circuit City

purchased, among many other batteries and battery products, Hitachi-branded lithium ion batteries,

as well as Hitachi-branded camcorders containing Hitachi's lithium ion batteries, from non-party

"Hitachi America Ltd., a wholly-owned subsidiary of [non-party] Hitachi Ltd., the parent of

Defendant Hitachi Maxell Ltd."  (DPP-SCAC ¶ 21.)  As defendants point out (Phase 3 Motion at 6-

7), the DPP-SCAC alleges that Circuit City purchased from the corporate *sibling* of a conspirator.

That is, Hitachi America Ltd. (a U.S. company from whom Circuit City made the allegedly

damaging purchases) and defendant Hitachi Maxell Ltd. (a Japanese company) share a common

corporate parent, Hitachi Ltd., but neither the seller Hitachi America Ltd. nor the common parent

Hitachi Ltd. is a party or alleged conspirator.  (*See* DPP-SCAC ¶¶ 48-49 (alleging participation in

the conspiracy by defendants Hitachi Maxell, Ltd. and Maxell Corporation of America, but not by

non-party common parent Hitachi Ltd. or non-party seller Hitachi America Ltd.).)  The DPP-SCAC

does not admit of the inference that defendant Hitachi Maxell Ltd. could control the litigation

decisions of its parent company Hitachi Ltd. such that Hitachi Ltd. would forbid seller Hitachi

America Ltd. from bringing a lawsuit that would reveal the participation of Hitachi Maxell Ltd. in

the conspiracy.[26]  As such, the DPPs fail to satisfy *Royal Printing* with respect to Circuit City's

---

[26] The DPPs argue that "[c]ommon ownership of a conspirator and direct purchaser satisfies *Royal Printing*," and cite for support two rulings in tagalong actions in the *TFT-LCD* case.  (Phase 2 Opp'n at 9-10 (citing *In re TFT-LCD (Flat Panel) Antitrust Litig.*, M 07-1827 SI, 2010 WL 1264230, at *1 (N.D. Cal. Mar. 28, 2010); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, M 07-1827 SI, 2011 WL 5357906, at *1-2 (N.D. Cal. Nov. 7, 2011)).)  In the first of those rulings, the Court relied on allegations that the common owner would not authorize suit of the conspiring subsidiary by the direct-purchaser subsidiary.  2010 WL 1264230, at *1 ("Plaintiffs have alleged, and the record contains evidence in support, that [direct-purchaser] Tatung America . . . is unlikely to sue [parent company and alleged conspirator] Tatung Taiwan for Sherman Act violations.").  The DPP-SCAC does not so allege.  Further, this ruling issued before *ATM Fee* clarified that the absence of a realistic possibility of suit is not, by itself, sufficient to support antitrust standing under the ownership-and-control exception; rather, "whether a realistic possibility of suit exists[] depends on the existence of ownership or control between the direct purchaser and the seller."  686 F.3d at 756.  In the second ruling, the Court relied on evidence that the common owner "participated in the conspiracy."  2011 WL 5357906, at *2.  The DPP-SCAC does not allege that common owner Hitachi Ltd. participated in the alleged conspiracy.

alleged purchases of Hitachi batteries and camcorders from Hitachi America Ltd.  Those purchases therefore must be excluded from the DPP case.  *See Royal Printing*, 621 F.2d at 327-28 (permitting plaintiff to sue all conspirators on theory of joint and several liability for purchases made from the subsidiary or division of any conspirator, but excluding purchases "made through independent wholesalers," as to whom plaintiffs were "truly indirect purchasers . . . barred by *Illinois Brick*").

Aside from those purchases, the Court finds the DPP-SCAC cures, for pleading purposes, the deficiencies of antitrust standing identified in the earlier complaint.  The Court therefore **GRANTS** the Phase 3 Motion insofar as it challenges the DPPs' standing as to Circuit City's alleged purchases of Hitachi batteries from Hitachi America Ltd., but otherwise **DENIES** the Phase 3 Motion's request to dismiss the DPP-SCAC for failure to plead facts sufficient to invoke the *Royal Printing* exception to *Illinois Brick*.

## II.    DPP ANTITRUST STANDING UNDER *AGC*

In addition to their challenge to the DPPs' standing under *Illinois Brick* and *Royal Printing*, defendants challenge the DPPs' standing under *AGC*.  *Illinois Brick* and *AGC* address different issues and therefore require distinct analyses.  *See Illinois Brick*, 431 U.S. at 728 n.7; *see also Loeb Indus*, 306 F.3d at 475 (plaintiffs for whom *Illinois Brick* presented no bar lacked standing under *AGC*).  As a threshold matter, the Court acknowledges the DPPs' argument that, because they are situated "higher up" than the IPPs in the distribution chain that flows "downward" from the manufacture of cells to the sale of consumer electronics products containing those cells, "if the Court holds that IPPs have antitrust standing under *AGC*, DPPs do as well."  (Phase 3 Opp'n at 15 n.8.)  The DPPs' argument possesses some commonsense appeal, at least on the facts of this case. Nevertheless, the Court turns to the required analysis.

As it was with the IPPs, defendants' primary *AGC* argument as to the DPPs is that any injury suffered by the DPPs was suffered outside the allegedly restrained market because the DPPs, as purchasers of batteries and battery products, did not participate in the allegedly restrained market for battery cells.  Given that defendants' Phase 3 Motion treats batteries and battery products as markets distinct both from each other and from the market for battery cells, the Court analyzes the DPPs' purchases of batteries and battery products separately.

United States District Court
Northern District of California

**A.    LEGAL STANDARD**

As the Court explained in Part 2, Section II.A.3, *supra*, the Clayton Act permits recovery of treble damages and attorney fees by "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws . . . ."  15 U.S.C. § 15(a).  To limit the potentially expansive reach of this language, "courts have constructed the concept of antitrust standing, under which they 'evaluate the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them' . . . to determine whether a plaintiff is a proper party to bring an antitrust claim." *Am. Ad Mgmt.*, 190 F.3d at 1054 (quoting *AGC*, 459 U.S. at 535).  This analysis requires the Court to consider the nature of the plaintiff's alleged injury (i.e., whether it is an "antitrust injury"), the directness of the injury, the speculative measure of the harm, the risk of duplicative recovery, and the risk of undue complexity in apportioning damages.  *Id.* at 1054-55.  With respect to the antitrust injury factor, here, as with the IPP-SCAC, defendants raise no challenge to the four requirements of antitrust injury except the market-participation requirement. *See Am. Ad Mgmt.*, 190 F.3d at 1055, 1057.

**B.    DPP ANTITRUST STANDING UNDER *AGC* FOR PURCHASES OF BATTERIES**

Defendants present no serious challenge to the DPPs' pleading of their antitrust standing under *AGC* for purchases of batteries containing price-fixed cells.  (*See* Phase 3 Motion at 12-15 (arguing that purchasers of battery products are not participants in the market for battery cells but silent as to purchasers of batteries).)  Defendants offer no compelling reason why alleged purchases of batteries containing allegedly price-fixed battery cells fail to satisfy *AGC*.  (*See* Phase 2 Opp'n at 16; Phase 2 Reply at 11-12.)  As the DPPs point out, the DPP-SCAC alleges that a lithium ion battery's cell accounts for over 80 percent of the cost of the battery itself; that assembling cells into batteries does not change the cell itself; that raw cells have no practical use; and that cells and batteries are essentially economic equivalents "so that a price fix on the cells is a price fix on the batteries." (DPP-SCAC ¶ 3.)  Defendants argue that these allegations actually support dismissal because they characterize batteries as finished products that merely incorporate the allegedly price-fixed cells as components.  (Phase 2 Reply at 11-12.)  Not so.  The relevant consideration is whether the alleged injury is suffered in the restrained market.  Defendants' argument does not

demonstrate that cells and batteries reside in different markets.  The mere fact that battery cells require "an additional input" to be saleable as batteries does not automatically exclude them from the batteries market.  *Cf. Bhan*, 772 F.2d at 1471 (holding that services provided by nurse-anesthetists might be reasonable substitutes and thus part of the market for similar services provided by medical doctors notwithstanding that nurse-anesthetists could only administer services with the "additional input" of supervision by a physician).  Further, as the Court explained in Part 2, Section II.A.3.a, factual questions about market definition counsel against granting defendants' motion in the context of a Rule 12(b)(6) motion.  Defendants offer no persuasive reason to conclude that the DPPs lack standing under *AGC* for their alleged purchases of batteries containing price-fixed cells.

### C.  DPP ANTITRUST STANDING UNDER *AGC* FOR PURCHASES OF BATTERY PRODUCTS

#### 1.  Antitrust Injury

The first of the five *AGC* factors is antitrust injury.  Defendants contend that the DPPs' purchases of battery products are not one but two markets removed from the allegedly restrained market for battery cells, insofar as cells are a component of batteries which in turn are components of battery products, and that the DPPs' purchases of battery products therefore do not constitute participation in the relevant market.  Relying on *Bhan*, 772 F.2d at 1470-71, and *DRAM II*, 536 F. Supp. 2d at 1137-41, defendants argue that the DPPs "must allege facts to show that the finished products that they purchased were either in the component market where competition was allegedly restrained, or at a minimum, reasonably interchangeable with the products in that component market."  (Phase 3 Motion at 13.)

Defendants ask for more than is required.  In the computer-component cartel cases filed in this District, precise market definitions and identification of economic substitutes generally have not been required at the pleading stage where plaintiffs allege facts sufficient to draw a plausible inference of inextricably linked markets.  *Flash*, 643 F. Supp. 2d at 1154; *CRT*, 738 F. Supp. 2d at 1023-24; *TFT-LCD II*, 586 F. Supp. 2d at 1123; *GPU II*, 540 F. Supp. 2d at 1098.  Here, the DPP-SCAC plausibly alleges intertwined markets with a requisite degree of specificity.  (*See* DPP-SCAC ¶¶ 88-90, 93, 99.)  The DPP-SCAC alleges finished products designed and built to take

53

United States District Court
Northern District of California

1  advantage of the unique characteristics of lithium ion batteries, characteristics which inhere in the

2  cells of those batteries.  Further, the cells allegedly have no use other than functioning as

3  components in batteries, which in turn have no use other than functioning as components in lithium

4  ion battery products.  From these allegations, one reasonably may infer a direct relationship

5  between the demand for finished products incorporating lithium ion batteries (and hence cells) and

6  for the cells themselves.  In other words, the DPP-SCAC alleges at least the rudiments of cross-

7  elasticity of demand.  In light of those allegations, defendants' argument that *Bhan* requires the

8  DPPs to allege "reasonable interchangeability" or "cross-elasticity of demand" is moot, as the DPP-

9  SCAC adequately alleges the latter.  As with the IPP-SCAC, the Court finds that the DPP-SCAC

10  sufficiently alleges antitrust injury and that factual questions about the relevant markets counsel

11  against dismissal at this stage.

        ## 2.     Other *AGC* Factors

13        The Court addresses the four remaining *AGC* factors at once: directness of injury; the

14  speculative nature of the alleged harm; any risk of duplicative recovery; and any risk of undue

15  complexity in apportioning damages.  *Am. Ad Mgmt.*, 190 F.3d at 1054-55.  The Court concludes

16  that, for the reasons discussed in Part 2, Section II.A.3.b, these factors tilt in favor of standing.

17  Indeed, they favor standing rather more strongly in the DPP case than in the IPP case.  For instance,

18  with respect to directness of injury, the DPPs allegedly suffered their alleged injuries directly at the

19  hands of the alleged conspiracy's owned or controlled affiliates and, for the purchases for which

20  they claim damages, stand as the first purchaser outside the conspiracy.[27]  As to the risk of undue

_____

22  [27] Defendants point to the DPP-SCAC's allegations of the existence of other third parties
who purchased directly from the conspiracy, that is, the independent packers located in Taiwan.
23  Taking those allegations as true, the existence of another party with a more direct injury than the
present plaintiffs does not conclusively establish that the present plaintiffs lack a *sufficiently* direct
24  injury.  *Am. Ad Mgmt.*, 190 F.3d at 1055 (courts must balance the *AGC* factors, no single factor of
which is decisive).  Moreover, though the Taiwanese packers are an "identifiable class of persons,"
25  *AGC*, 459 U.S. at 542, nothing in the DPP-SCAC supports an inference that their "self-interest
would normally motivate them to vindicate the public interest in antitrust enforcement," *id*.  On the
26  contrary, the DPP-SCAC alleges that the Taiwanese packers are beholden to defendants for their
supply of raw cells to pack and are unlikely to sue.  (DPP-SCAC ¶ 97.)  While that is no reason to
27  confer antitrust standing under *Illinois Brick*'s ownership or control exception, *see ATM Fee*, 686
F.3d at 756, 756 n.8, no authority has been presented to the Court suggesting that it is forbidden to

complexity in apportionment of damages, a conspiracy which passed its price-fixed good through its members' vertically integrated manufacturing and distribution chain, like that alleged in the DPP-SCAC, presumably passed along any overcharge.  *Cf. LCD I*, 586 F. Supp. 2d at 1124 (speculative harm factor favored standing where complaint alleged "that overcharges are passed on to consumers, and that such overcharges can be traced through the relatively short distribution chain"); *ODD II*, 2012 WL 1366718, at *6 (questioning whether pass-through concerns of *Illinois Brick* were implicated by allegations of conspirators' vertically-integrated distribution chains because "subsidiaries and affiliates in conspiracy with and/or controlled by alleged price-fixers presumably would pass on all of the inflated cost").  Because all five factors favor standing, the Court finds that the DPPs have standing to pursue their claims and **DENIES** defendants' joint motion to dismiss on standing grounds.[28]

## III.    CONCLUSION AS TO PHASE 3 MOTION

For the foregoing reasons, the Court **GRANTS IN PART AND DENIES IN PART** the Phase 3 Motion.  The DPP-SCAC is **DISMISSED WITH PREJUDICE** insofar as it asserts claims based on Circuit City's alleged purchases of Hitachi batteries and camcorders from Hitachi America Ltd., but the Court otherwise **DENIES** the Phase 3 Motion.

## <u>PART 4: INDIVIDUAL MOTIONS TO DISMISS</u>

In addition to the jointly filed motions to dismiss addressed above, several defendants have filed a total of seven "individualized" motions to dismiss the DPP and IPP complaints, raising grounds for dismissal which, these defendants say, are unique to them.  The individual motions are fully briefed and the Court heard oral argument on them on August 8, 2014.[29]  The Court finds that

---

account for the lack of a realistic possibility of suit by any identifiable class of more direct purchasers under the analytically distinct inquiry mandated by *AGC*.

[28] Having determined that the DPPs have standing to sue for damages under federal antitrust law, the Court declines to reach defendants' attack on the DPPs' request for injunctive relief, which defendants frame as a request to dismiss the DPP-SCAC with prejudice.  (Phase 3 Motion at 17-18; Phase 3 Reply at 14.)

[29] The defendants who filed individual motions are listed here, along with the docket numbers of the corresponding motion, opposition, and reply briefs: (1) MCA and HML (Dkt. Nos. 427, 454, 463); (2) LGCAI (Dkt. Nos. 425, 453, 461); (3) NEC Corp. (Dkt. Nos. 426, 455, 466); (4) PNA and SNA (Dkt. Nos. 429, 456, 467); (5) GS Yuasa (Dkt. Nos. 424, 452, 462); (6) SEL and

1   none of the motions offer persuasive reasons to dismiss any defendant from the case.  However, the

2   motions of GS Yuasa and Toshiba Corp. raise questions which, though they range outside the

3   pleadings, may warrant early summary judgment motions following limited, tailored discovery to

4   be overseen by Magistrate Judge Ryu.

5   **I.       RELEVANT PROCEDURAL BACKGROUND**

6          In its Jan. 21 Order, the Court held that plaintiffs had adequately alleged a conspiracy

7   among the Japanese and Korean defendants but not among the U.S. subsidiaries also named as

8   defendants.  Jan. 21 Order at 22-24.  The Court found that Plaintiffs had alleged that the U.S.

9   subsidiaries acted as agents for their Asian parent companies only "in generic, conclusory terms"

10  and that such allegations did not suffice to plead conspiracy among the U.S. subsidiaries.  *Id.* at 23.

11  The Court explained that, while Plaintiffs were "not required to identify exactly how, when, and

12  through whom each Defendant joined the conspiracy," they nevertheless *were* "required to allege

13  'that each individual defendant joined the conspiracy and played some role in it because, at the

14  heart of an antitrust conspiracy is an agreement and a conscious decision by each defendant to join

15  it.'"  *Id.* (quoting *TFT-LCD I*, 586 F. Supp. 2d at 1117).

16         The Court rejected the requests of certain U.S. subsidiaries and other individual defendants

17  to be released from the case on a variety of grounds.  Jan. 21 Order at 24-26.  The Court noted that,

18  at that time, the DPPs and IPPs had received from some, but not all, defendants the documents

19  produced to the grand jury during the criminal antitrust enforcement action that preceded this civil

20  case.  *Id.* at 24.  Now, substantially all of the grand jury production is complete.  Finally, neither GS

21  Yuasa nor NEC participated in the briefing leading up to the Jan. 21 Order.  *Id.* at 2 n.2.  Their

22  separate motions now before the Court therefore represent their first opportunities to raise

23  individualized issues.

24  **II.      LEGAL STANDARD**

25         When determining whether a defendant's participation in an antitrust conspiracy is

26  adequately pled for purposes of Federal Rule 8(a), the salient question is whether the facts alleged

27

28  SEND (Dkt. Nos. 431, 457, 468); and (7) Toshiba Corp. (Dkt. Nos. 430, 458, 464).  The Court
    addresses the individual motions in that order.

United States District Court
Northern District of California

plausibly suggest that the defendant made a "conscious commitment to a common scheme designed to achieve an unlawful objective." *See Toscano v. Prof'l Golfers Ass'n*, 258 F.3d 978, 983 (9th Cir. 2001) (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)). At the pleading stage, the facts alleged need not be "true or even probable." *Starr v. Baca*, 652 F.3d 1202, 1217 (9th Cir. 2011). "As the [Supreme] Court wrote in *Twombly*, Rule 8(a) 'does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence' to support the allegations." *Id.* (quoting *Twombly*, 550 U.S. at 556); *accord Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008). To be sure, antitrust "[p]laintiffs must allege something more than parallel conduct and a conclusory allegation of agreement at some unidentified point." *In re High-Tech Employee Antitrust Litig.*, 856 F. Supp. 2d 1103, 1118 (N.D. Cal. 2012) ("*High-Tech*"). But it is sufficient to allege non-conclusory "facts such as a 'specific time, place, or person involved in the alleged conspiracies' to give a defendant seeking to respond to allegations of a conspiracy an idea of where to begin." *Kendall*, 518 F.3d at 1047. Further, "[i]f there are two alternative explanations [of the facts alleged], one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6)." *Starr*, 652 F.3d at 1216. The "complaint may be dismissed only when defendant's plausible alternative explanation is so convincing that plaintiff's explanation is *im*plausible." *Id.* (emphasis in original). Moreover, "[i]n antitrust conspiracy cases, 'plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each." *High-Tech*, 856 F. Supp. 2d at 1118 (quoting *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962)). "[T]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Id.* (internal quotation marks omitted); *accord ODD II*, 2012 WL 1366718, at *3; *CRT*, 738 F. Supp. 2d at 1019.

There are limits, of course, to this type of holistic evaluation. For instance, an allegation that individual members of a corporate group "joined the alleged conspiracies through their corporate affiliation" alone would be "precisely the sort of 'legal conclusion couched as a factual

1    allegation' that *Twombly* and *Iqbal* deemed insufficient to state a claim." *Precision Assocs., Inc. v.*

2    *Panalpina World Transp. (Holding) Ltd.*, 08-CV-42 JG VVP, 2011 WL 7053807, at *15 (E.D.N.Y.

3    Jan. 4, 2011) report and recommendation adopted, 08-CV-00042 JG VVP, 2012 WL 3307486

4    (E.D.N.Y. Aug. 13, 2012).  Additionally, while "the complaint need not contain detailed 'defendant

5    by defendant' allegations," it "must allege that each individual defendant joined the conspiracy and

6    played some role in it . . . ."  *TFT-LCD I*, 586 F. Supp. 2d at 1117 (internal quotation marks

7    omitted).  Finally, the expense of antitrust discovery authorizes district courts "to insist upon some

8    specificity in pleading before allowing a potentially massive factual controversy to proceed."

9    *Twombly*, 550 U.S. at 558 (quoting *AGC*, 459 U.S. at 528 n.17).

10   **III.    ANALYSIS**

11       **A.    MOTION OF MCA AND HML (DKT. NO. 427)**

12        This motion presents two issues.  The first is whether the DPP-SCAC sufficiently alleges

13   the DPPs' standing to sue HML under *Illinois Brick*.  The Court resolved that issue in Part 3,

14   Section I.  Accordingly, the Court here addresses only the second issue presented by the motion:

15   whether the complaints adequately allege MCA's participation in the alleged conspiracy.  The Court

16   concludes that, while the question is close, particularly in light of the extensive pre-discovery

17   documentary production to which plaintiffs had access in drafting the DPP-SCAC and IPP-SCAC,

18   the facts alleged plausibly suggest MCA's participation in the alleged conspiracy.  No more is

19   required, and the fact that an innocent interpretation of the facts alleged is also plausible does not,

20   without more, support dismissal.  *See Starr*, 652 F.3d at 1216-17.

21        MCA's primary argument is that it should be dismissed from this action because the

22   allegations against it are too few—"too thin to survive," as MCA would have it. (Dkt. No. 463 at 2).

23   The Court declines to dismiss the DPP-SCAC or IPP-SCAC on that ground.  Ultimately it is not the

24   length or number of the allegations by which a plaintiff's pleading of an antitrust conspiracy is

25   measured.  Indeed, to treat the number and length of a complaint's allegations as a proxy for their

26   legal sufficiency would run against the grain of the Federal Rules.  *See* Fed. R. Civ. P. 8(a)(2)

27   (requiring a "short" statement of the pleader's entitlement to relief).  In the right context, a single,

28   "smoking-gun" allegation might suffice.

United States District Court
Northern District of California

58

Here, plaintiffs' operative complaints set forth only four paragraphs directly referring to

MCA:

- In a March 2007 email, an employee of Sanyo Energy (USA) Corporation named "Matsumoto" wrote to an employee at Sanyo Mobile Energy in Japan that an employee of Sanyo GS Soft Energy Co., Ltd. named "Iguchi" had been "contacting [Hitachi Maxell] underneath the surface."  (DPP-SCAC ¶ 220; IPP-SCAC ¶ 231.)

- In an email sent June 4, 2007, Iguchi passed to Matsumoto information Iguchi had acquired from "Maxell," including "production capacity, packing process, price negotiations with customers, shipping routes and future purchasing plans."  (DPP-SCAC ¶¶ 237; IPP-SCAC ¶ 232; *see also* DPP-SCAC ¶ 221 (same).)

- "In January 2010, Hitachi Maxell, Ltd. met with Motorola, a customer of Hitachi Maxell and several of its competitors.  Following the meeting, Hitachi Maxell's Hiroshi Miyaji advised both Hitachi Maxell and Maxell Corporation of America employees that he will confirm the information he received from Motorola with LG."  (DPP-SCAC ¶¶ 238; IPP-SCAC ¶ 233.)

- "[O]n January 26, 2007, Akitaka Yamamoto (Manager of America & Europe Business Planning Department of Hitachi Maxell in Japan) reported via email that the subsidiary [MCA] had been requested by Markiv, believed to be a customer, to lower its price offer.  After pricing discussion among the Japanese parent company employees, Yamamoto of Japan sent the pricing decision to Tatsuya Shigeno and Stan Takao of Maxell Corporation of America stating 'Below is the response.'"  (IPP-SCAC ¶ 234.)

Few as they are, these allegations plausibly suggest MCA's direct and independent

participation in the alleged conspiracy.  Matsumoto allegedly stated in March 2007 that Iguchi had

been contacting "Hitachi Maxell"—in what the Court takes to be a translated idiom—"under the

surface."  This suggests covert contact.  Then, in June 2007, Iguchi passed to Matsumoto the

information obtained from "Hitachi Maxell," which included sensitive business information,

including pricing information.  The IPPs then allege that Matsumoto shared this information with

defendant Sanyo Electric.  Plaintiffs allege, and the Court takes judicial notice of the fact, that

Sanyo Electric pled guilty to criminal charges of conspiring to fix prices of lithium ion battery cells.

(DPP-SCAC ¶ 9; IPP-SCAC ¶ 303; *U.S. v. Sanyo Electric Co. Ltd.*, N.D. Cal. Case No. 13-cr-0472

YGR, Dkt. No. 35.)  The allegations raise the question of why "Hitachi Maxell" was sharing

information thusly if *not* to conspire.

MCA does not offer a competing interpretation.  Instead, it dismisses these allegations

because they do not refer to MCA using its full corporate name.  (Dkt. No. 415 at 1 n.1.)  The mere

failure to observe fine distinctions among corporate entities, in emails no less, does not, however,

59

render implausible the suggestion of collusion.  *See TFT-LCD II*, 599 F. Supp. 2d at 1184-85 (denying motion to dismiss notwithstanding complaints' reference to corporate families where each member of family was alleged to have individually joined the alleged conspiracy); *CRT*, 738 F. Supp. 2d at 1019 (same).  This is so particularly where, as here, plaintiffs draw their allegations from documents produced by defendants themselves, and allege, plausibly, that defendants may not have distinguished with care between the particular corporate entities comprising a corporate family or brand.  Further, to conclude that the conversations alleged do not implicate MCA unless they identify MCA by its correct corporate name would require giving MCA rather than plaintiffs the benefit of reasonable inferences.  That is not appropriate at the pleadings stage.

The same problem plagues MCA's argument as to the alleged 2010 meeting between HML and its customer Motorola, a third party to this litigation.  (DPP-SCAC ¶¶ 238; IPP-SCAC ¶ 233.)  MCA argues that this allegation "says nothing" about its alleged participation in the conspiracy because it does not "allege that the information received from Motorola even related to lithium ion batteries" nor "that the 'LG' entity referenced was a competitor, rather than a customer, or that it referred to one of the LG Chem defendants in this litigation."  (Dkt. No. 415 at 3.)  MCA argues that the "allegation is as consistent—if not more so—with legitimate business activity as it is with a conspiratorial communication."  (*Id.* (citing *Twombly*, 550 U.S. at 556).)  This argument is unavailing because it does not supply an explanation of the facts that is so convincing as to render plaintiffs' competing interpretation implausible.  *Starr*, 652 F.3d at 1216.  MCA's citation to *Twombly* is inapposite, because *Twombly* addressed the situation where plaintiffs alleged nothing but parallel activity between defendants that was consistent with legal activity.  That is not the case here, where Plaintiffs have alleged many dozens of discrete contacts, including actual agreements to fix prices.  *Twombly* controls here, of course, in that it sets forth the plausibility pleading standard that is now the law of the land.  But *Twombly* does not support the notion that *each and every* allegation of a complaint must be inconsistent with legitimate business activity.  Rather, individual allegations must be interpreted in light of the entirety of the complaint.  Other courts have articulated this same principle to similar results.  *CRT*, 738 F. Supp. 2d at 1019; *High-Tech*, 856 F. Supp. 2d at 1118.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    For the foregoing reasons, the Court **DENIES** the motion of MCA and HML to dismiss the

2    DPP-SCAC and IPP-SCAC.  (Dkt. No. 427.)  The allegations of the DPP-SCAC and IPP-SCAC

3    plausibly allege MCA's participation in the alleged conspiracy.  "Whether Plaintiffs will be able to

4    prove these allegations against [MCA] is another matter entirely."  *CRT*, 738 F. Supp. 2d at 1022.

5    ### B.    MOTION OF LGCAI (DKT. NO. 425)

6    The issue presented in the motion of LGCAI is whether plaintiffs' complaints should be

7    dismissed insofar as they make claims against LGCAI for conduct prior to 2010.  As LGCAI puts

8    it: "Plaintiffs have not included any specific facts in their complaints indicating that LGCAI entered

9    into or promoted the purported conspiracy before 2010.  Indeed, Plaintiffs have not alleged any

10   facts suggesting that LGCAI even knew about the purported conspiracy before late 2005."  (Dkt.

11   No. 425 at 1.)  Thus, LGCAI does not challenge the sufficiency of the complaints' allegation that

12   LGCAI participated in the conspiracy, only the temporal scope of the discovery to which LGCAI

13   will, it acknowledges, eventually be subjected.  (*See id.*)  LGCAI concedes that the complaints

14   adequately allege that it "affirmatively agreed to fix prices" in 2010.  (*Id.* at 2.)  Nevertheless,

15   LGCAI asks the Court to "narrow the temporal scope of Plaintiffs' claims against" it, that is, to

16   "prune Plaintiffs' claims . . . ."  (*Id.* at 3.)

17   The motion is **DENIED**.  As LGCAI acknowledges, plaintiffs need only provide a plausible

18   basis for asserting a particular defendant's initial involvement in the conspiracy.  (*Id.* at 4 (citing

19   Jan. 21 Order at 21-23).)  LGCAI concedes that the complaints do so.  Nothing more is required.

20   Once a defendant's participation in the conspiracy is adequately alleged, questions about the scope

21   of their participation are better decided on a complete factual record.

22   LGCAI's reliance on *In re Urethane Antitrust Litigation*, 663 F. Supp. 2d 1067 (D. Kan.

23   2009), is misplaced.  The cited portion of that case holds only that antitrust plaintiffs alleging a

24   conspiracy are required to allege "allege facts to support the existence of a conspiracy during the

25   entire period" alleged and "provide a factual basis" for their claims that the conspiracy began at a

26   particular time.  *Id.* at 1077.  The case does not, as LGCAI suggests, require Plaintiffs to engage in

27   elaborate fact pleading identifying the moment *each and every* defendant joined the conspiracy.

28

LGCAI provides no persuasive reason for the Court to "prune" their allegations on a defendant-by-defendant basis.

The Court **DENIES** the motion of LGCAI to dismiss the DPP-SCAC and IPP-SCAC.  (Dkt. No. 425.)

### C.    MOTION OF NEC CORP. (DKT. NO. 426)

The issue presented in the motion of NEC Corp. is whether plaintiffs adequately allege the participation of NEC Corp., as opposed to co-defendant NEC Tokin Corporation ("NEC Tokin"), in the alleged price-fixing conspiracy.  Plaintiffs allege that both NEC Corp. and NEC Tokin are business entities based in and organized under the laws of Japan, and that NEC Tokin is a wholly owned subsidiary of NEC Corp.  (DPP-SCAC ¶¶ 53-54; IPP-SCAC ¶¶ 466-67.)  NEC Corp. argues that the complaints improperly group it with NEC Tokin under the label "NEC" and thus obscure the identity of the alleged conspirator.  This motion is unusual among the individual motions in three ways.  First, while the instant motion is made pursuant to Rule 12(b)(6), NEC Corp. appears also, perhaps primarily, to move for a more definite statement pursuant to Rule 12(e).  (Dkt. No. 466 at 1.)  Second, the motion tacitly concedes that Plaintiffs have stated a claim as to NEC Tokin.  Finally, the motion seeks dismissal *with* leave to amend.

While the Court appreciates the moderate approach adopted by NEC Corp., the Court nevertheless **DENIES** its motion.  Where an antitrust complaint names multiple members of a corporate "family," adequately pleading a conspiracy claim against a particular corporate defendant does not require "detailed 'defendant by defendant' allegations," only enough to draw a plausible conclusion that the "individual defendant joined the conspiracy and played some role in it . . . ." *LCD I*, 586 F. Supp. 2d at 1117; *accord* Jan. 21 Order at 23; *ODD II*, 2012 WL 1366718, at *7; *CRT*, 738 F. Supp. 2d at 1019; *SRAM*, 580 F. Supp. 2d at 904.  "In complex, multinational, conspiracy cases, courts in this district review specific allegations in the context of the complaint taken as a whole."  *CRT*, 738 F. Supp. 2d at 1019.  Thus, judges in this District have repeatedly found sufficient allegations that: the conspiracy was "organized at the highest level of the defendant organizations and carried out by both executives and subordinate employees"; it was "implemented by subsidiaries and distributors within a corporate family"; "individual participants entered into

1   agreements on behalf of, and reported these meetings and discussions to, their respective corporate

2   families"; and "the individual participants in conspiratorial meetings and discussions did not always

3   know the corporate affiliation of their counterparts, nor did they distinguish between the entities

4   within a corporate family." *LCD II*, 599 F. Supp. 2d at 1184-85.

5         So it is here.  The complaints allege multiple instances of "NEC" engaging in collusive

6   meetings but only sometimes identify NEC Tokin in particular.  (*E.g.*, DPP-SCAC ¶ 139 (alleging

7   that NEC Tokin met with competitors and agreed to "reduce supply and thus stabilize prices").)

8   However, they also directly quote documents where defendants themselves allegedly referred

9   simply to "NEC."  Viewing the complaints as a whole, the Court finds that dismissal of NEC Corp.

10  is unwarranted.  "Although Plaintiffs will need to provide evidence of each Defendants'

11  participation in any conspiracy, they now only need to make allegations that plausibly suggest that

12  each Defendant participated in the alleged conspiracy."  *SRAM*, 580 F. Supp. 2d at 904.  The Court

13  finds the complaints do so with respect to both NEC Corp. and NEC Tokin.  The inference

14  plaintiffs ask the Court to draw—that generic references to NEC in documents generated by

15  defendants themselves implicate both NEC Corp. and NEC Tokin—is plausible, and the competing

16  inference, that in informal communication defendants' employees carefully delineated between

17  similarly branded corporate entities in the manner that an attorney might, is not.

18        The Court **DENIES** the motion of NEC Corp. to dismiss the DPP-SCAC and IPP-SCAC.

19  (Dkt. No. 426.)[30]

20        **D.    MOTION OF PNA AND SNA (DKT. NO. 429)**

21        The issue presented in the motion of PNA and SNA is whether the complaints sufficiently

22  allege their own participation in the conspiracy, as opposed to that of their parent corporations.  For

23  the reasons set forth below, many of which the Court has already articulated, the Court **DENIES** the

24  motion.

25

26        _____

27        [30] In so ruling, the Court is cognizant that plaintiffs state they received access to NEC Corp.
    and NEC Tokin's grand jury productions only after they filed their current complaints and a few
    days before filing their opposition to NEC Corp.'s motion, and that many of the documents are in

28  Japanese and thus require translation.  (Dkt. No. 455 at 6.)

United States District Court
Northern District of California

1    Turning first to PNA, that defendant argues that the contacts described therein are

2   innocuous and, at most, opportunities to conspire or instances where PNA was the passive recipient

3   of competitive information passed along by others.  Defendants accurately state the law in saying

4   that these types of allegations, considered individually and without more, are not necessarily

5   indicative of conspiratorial conduct.  Here, however, there is "more."  The Court has already

6   discussed plus factors such as the properly alleged conspiracy in Asia and the guilty pleas of two

7   defendants, including Sanyo Electric. [31]   The Court has already found that conduct which, on its

8   own, might not suffice to establish a conspiracy does suffice in light of those plus factors.  *See* Jan.

9   21 Order at 19.  PNA's arguments to the contrary merely examine the allegations in a vacuum and

10   thus merely highlight "potentially differing inferences that could be drawn across the whole

11   spectrum of allegations."  *ODD II*, 2012 WL 1366718, *3.  Those inferences may augur future

12   problems of proof, but such problems are for resolution at a later date.  *Cf. Mendocino Envtl. Ctr. v.*

13   *Mendocino Cnty.*, 192 F.3d 1283, 1301 (9th Cir. 1999) (collusive agreements "need not be overt,

14   and may be inferred on the basis of circumstantial evidence such as the actions of the defendants,"

15   and their existence "is generally a factual issue").

16    The same reasoning applies to SNA.  It is true that many of the allegations against SNA do

17   not suggest conspiracy—for instance, preferring a meeting over dinner rather than in a factory (IPP-

18   SCAC ¶ 203), or getting competitors drunk to obtain sensitive information from them rather than

19   sharing it deliberately (DPP-SCAC ¶ 220).  However, some of the allegations do support a

20   plausible inference of conspiratorial conduct, for instance, emails sent in June 2007[32] suggesting a

21   common purpose to share customer pricing information.  Those allegations connect SNA to the

22   conspiracy in that SNA and the other parties alleged to have shared information were the U.S. sales

---

24   [31] Plaintiffs allege that Sanyo Electric is the parent of SNA, that Panasonic Corp. is the
25   parent of PNA, and that Sanyo Electric became a wholly owned subsidiary of Panasonic Corp.
   (though they allege markedly different dates on which this occurred).  (DPP-SCAC ¶ 41 ("on April
   1, 2011"); IPP-SCAC ¶ 455 ("[a]s of December 9, 2009").)

26   [32] A June 4, 2007 email shows SNA receiving pricing information from an employee of
27   Sanyo GS Soft Energy reporting after requesting and receiving information from "Maxell."  (DPP-
   SCAC ¶ 221; *see also id.* ¶ 237.)  Takanao Matsumoto of Sanyo Energy relayed this information
28   (including production capacity, packing process, price negotiations with customers, shipping routes
   and future purchasing plans) to Sanyo.  (*See* DPP-SCAC ¶¶ 221-222; IPP-SCAC ¶ 232.)

1    arms of the Asian parent/manufacturing defendants.  The allegations are consistent with the alleged

2    role of the U.S. subsidiaries as the means of selling the price-fixed cells as part of batteries and

3    battery products placed in the U.S. market.  Allegations that employees of Japanese parent

4    company defendant Sanyo Electric "sojourn" with SNA strengthen the inference of a fully

5    integrated corporate conspiracy.

6         Altogether, the allegations adequately suggest participation in the conspiracy.  PNA and

7    SNA's arguments to the contrary essentially ask the Court to engage in the sort of weighing of

8    circumstances that is inappropriate at the pleading stage.  The Court **DENIES** the motion of PNA

9    and SNA to dismiss the DPP-SCAC and IPP-SCAC.  (Dkt. No. 429.)

10         **E.    MOTION OF GS YUASA (DKT. NO. 424)**

11         GS Yuasa entered this case after the first phase of motions to dismiss.  (*See* Jan. 21 Order at

12    2 n.2; Dkt. No. 365.)  The motion at bar is therefore GS Yuasa's first individual challenge to the

13    complaints.  GS Yuasa seeks to be dismissed from this case with prejudice on the grounds that the

14    DPP-SCAC and IPP-SCAC insufficiently allege its participation in the conspiracy.  GS Yuasa

15    points out that it was not formed until April 1, 2004, several years into the life of the alleged

16    conspiracy, a fact the complaints themselves acknowledge.  (DPP-SCAC ¶¶ 41, 51; IPP-SCAC ¶

17    465 n.96.)[33]  Thus, the allegations on which plaintiffs rely to state their claim that GS Yuasa

18    consciously participated in the conspiracy draw a natural line through April 1, 2004, and straddle

19    both sides of it.  (*See generally* DPP-SCAC ¶¶ 51, 119, 121, 123 (pre-2004) & ¶¶ 148, 158, 160

20    (post-2004); IPP-SCAC ¶¶ 54, 56, 57, 63, 64 (pre-2004) & ¶¶ 112, 121 (post-2004).)

21         GS Yuasa contends: (1) the pre-2004 allegations cannot state a claim against it because they

22    describe the acts of other corporate entities, specifically, GS Yuasa's alleged predecessors-in-

23    interest and joint ventures, and (2) the post-2004 allegations cannot state a claim against it because,

24    though they describe GS Yuasa's own actions, the allegations are both sparse and entirely

25    innocuous.  In addition, and looking outside the pleadings, GS Yuasa stresses that it does not "make

26    or sell the small lithium ion batteries that are the subject of the alleged conspiracy."  (Dkt. No. 462

27    _____

28         [33] The IPP-SCAC alleges this fact via a footnote that links to a website containing GS
     Yuasa's date of incorporation.  Plaintiffs concede that the fact is part of the IPP-SCAC.  (*See* Dkt.
     No. 452 at 3.)

United States District Court
Northern District of California

at 4.)  GS Yuasa represents that it is "a pure holding company with a subsidiary selling large (casebook-sized) lithium-ion battery cells for satellites and airplanes[.]"  (*Id.* at 3; *see also* Dkt. No. 424 at 1, 5; Aug. 8 Tr. at 59:19-60:8.)

As set forth below, the Court agrees with GS Yuasa with respect to the pre-2004 allegations, but not as to the post-2004 allegations.  Regarding the latter, the complaints adequately allege conspiratorial conduct for which GS Yuasa itself may be held liable.  The Court addresses each set in turn.

### 1.      Pre-2004 Allegations

The Court turns first to the question of whether plaintiffs' allegations pertaining to other corporate entities may be imputed to GS Yuasa for purposes of this Rule 12(b)(6) motion. Plaintiffs' allegations in the period before GS Yuasa's April 2004 formation center on (1) GS Yuasa's alleged predecessor-in-interest Yuasa Corporation ("Yuasa") and (2) entities called Sanyo GS Soft Energy Co., Ltd. ("GS Soft Energy"), allegedly both a joint venture of defendants Sanyo Electric and GS Yuasa *and* the successor-in-interest to GS-Melcotec Co. ("GS-Melcotec") (DPP-SCAC ¶¶ 41, 51; IPP-SCAC ¶ 465).

#### a.      Predecessor-in-Interest

Plaintiffs contend that GS Yuasa may be held liable for the acts of its alleged predecessor-in-interest, Yuasa.  The DPPs allege that GS Yuasa "was founded in April 2004 as a holding company through the implementation of a joint share transfer of two Japanese storage battery manufacturers: Japan Storage Battery Co., Ltd. (GS) and" Yuasa.  (DPP-SCAC ¶ 51.)  Plaintiffs argue that these facts, aided by reasonable inferences in their favor, satisfy the test for successor liability set forth in the Ninth Circuit's *Atchison* opinion:

> [A]sset purchasers are not liable as successor corporations unless:
>
> (1) The purchasing corporation expressly or impliedly agrees to assume the liability;
>
> *(2) The transaction amounts to a "de-facto" consolidation or merger;*
>
> (3) The purchasing corporation is merely a continuation of the selling corporation; or

66

(4) The transaction was fraudulently entered into in order to escape liability.

*Atchison, Topeka & Santa Fe Ry. Co. v. Brown & Bryant, Inc.*, 159 F.3d 358, 361 (9th Cir. 1997) (emphasis supplied).[34]  Plaintiffs assert that the formation of GS Yuasa implicates the second situation described in *Atchison*, de-facto consolidation or merger.  They characterize their complaints as alleging that GS Yuasa was formed by "consolidation or merger" when given the benefit of reasonable inferences, as required in the case's present posture, and suffice to establish GS Yuasa's liability for the acts of Yuasa.

The Court disagrees with that conclusion for two reasons.  First, plaintiffs' characterization of their complaints is inaccurate.  The complaints do not mention "consolidation or merger." (*Compare* Dkt. No. 452 at 3 *with* DPP-SCAC ¶ 51 & IPP-SCAC ¶ 465 n.96.)  The IPP-SCAC and the website incorporated therein by reference are silent as to the means of GS Yuasa's formation. The DPP-SCAC refers to a "joint transfer of stock."  The statements in the complaints are vague

---

[34] *Atchison* is a CERCLA case that overruled a prior Ninth Circuit decision, *Louisiana-Pacific Corp. v. Asarco, Inc.*, 909 F.2d 1260 (9th Cir. 1990).  *Louisiana-Pacific* held that, in CERCLA actions, due to a perceived need for uniformity, federal courts were to analyze questions of successor liability under CERCLA-specific federal common law rather than state laws of general application.  The test that plaintiffs cite is the federal common law test which, technically, *Atchison* disapproved.  *See Atchison*, 159 F.3d at 361 (citing *Louisiana-Pac.*, 909 F.2d at 1263).  The holding of *Atchison* is that *state* law, not federal common law, governs successor liability in CERCLA actions, as state law *generally* supplies decisional rules unless use of state law would substantially conflict with a specific and concrete federal policy or interest in an area where uniformity is needed.  *See id.* at 362-64; *see also United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 728-29 (1979).

*Atchison* also teaches, however, that the four-pronged test from *Louisiana-Pacific*, relied upon by plaintiffs here, "mirror[s] the traditional successor liability rules of most states, including California."  159 F.3d at 362.  No party has identified which body of state successor-liability law applies to the question now before the Court, but neither is any potential conflict apparent (unlike, for example, the potential conflicts apparent in various states' application of antitrust standing principles, *see supra* Part II, Section II.A.2.b).  Accordingly, this Court applies the substantive corporate law of California.  *Patton v. Cox*, 276 F.3d 493, 495 (9th Cir. 2002) ("When a federal court sits in diversity, it must look to the forum state's choice of law rules to determine the controlling substantive law."); *Hatfield v. Halifax PLC*, 564 F.3d 1177, 1184 (9th Cir. 2009) ("Under California's choice of law rules, a California court will apply its own rule of decision unless a party litigant timely invokes the law of a foreign state." (internal quotation marks omitted)).  That law, as provided by the parties, appears to be coextensive with the test quoted from *Atchison*.  *See Daniell v. Riverside Partners I, L.P.*, 206 Cal. App. 4th 1292, 1300 (Cal. Ct. App. 2012), reh'g denied (July 11, 2012).

and insufficiently aligned with plaintiffs' characterization of them.  Second, an allegation that a

consolidation or merger has been effected is a legal conclusion, not a fact.  Plaintiffs do not plead

facts rendering plausible the conclusion that GS Yuasa formed in the sort of de-facto merger or

consolidation contemplated by successor-liability law.  Under California law, for example, a de-

facto merger or consolidation occurs

> when "one corporation takes all of another's assets without providing
> any consideration that could be made available to meet claims of the
> other's creditors" or when "the consideration consists wholly of
> shares of the purchaser's stock which are promptly distributed to the
> seller's shareholders in conjunction with the seller's liquidation."

*Schwartz v. Pillsbury Inc.*, 969 F.2d 840, 846 (9th Cir. 1992) (quoting *Ray v. Alad Corp.*, 19 Cal.

3d 22, 28 (Cal. 1977)).  The DPPs' allegation of a joint stock transfer perhaps seeks to address the

second set of circumstances, but vaguely at best.  Plaintiffs are of course entitled to all reasonable

inferences from the facts they alleged, but they must allege facts in the first instance.  The present

allegations do not trigger application of the de-facto merger doctrine.  Accordingly, the Court will

not impute to GS Yuasa the actions of its alleged predecessor-in-interest Yuasa.

### b.    Joint Ventures

Plaintiffs argue that their complaints allege facts sufficient to justify imputing to GS Yuasa

the acts of GS Soft Energy, allegedly a joint venture of GS Yuasa and defendant Sanyo Electric

(the latter of whom pled guilty to criminal antitrust charges), as well as the successor-in-interest to

GS-Melcotec.  Plaintiffs contend that merely alleging that entities collaborated in a joint venture

suffices to allege an agency relationship making all the members of a joint venture liable for the

acts of their co-venturers.  (Dkt. No. 452 at 3.)

Plaintiffs' authorities do not support setting the bar so low.  First, as GS Yuasa points out

(Dkt. No. 462 at 2 n.8), the cases plaintiffs cite were decided on grounds other than joint-venture

liability and the passages relied upon by plaintiffs are dicta.  Second, even assuming those passages

were not dicta, they are not helpful to Plaintiffs.  Plaintiffs rely primarily on *CutCo Industries, Inc.*

*v. Naughton*, 806 F.2d 361, 366 (2d Cir. 1986), but quote it only selectively, omitting its statement

that "joint control of a business enterprise" suffices to show "enough control . . . to establish prima

facie this particular element of agency" for purposes of long-arm jurisdiction.  Even leaving aside

United States District Court
Northern District of California

68

United States District Court
Northern District of California

the distinguishable procedural context, as GS Yuasa points out, the complaints do not allege "joint control," and the purported joint venture has its own corporate form.  In the absence of something more than a bare allegation of a joint venture relationship, the Court will not impute the acts of GS Soft Energy to GS Yuasa.  Third, plaintiffs strain again citing a district court case which, in dicta discovered in a footnote, quotes to a concurrence in which Judge Reinhardt stated: "It is well-established as a federal common law principle that a member of a joint venture is liable for the acts of a co-venturer."  *Mujica v. Occidental Petroleum Corp.*, 381 F. Supp. 2d 1164, 1172 n.3 (C.D. Cal. 2005) (quoting *Doe I v. Unocal Corp.*, 395 F.3d 932, 970 (9th Cir. 2002) (Reinhardt, J., concurring), on reh'g en banc sub nom. *John Doe I v. Unocal Corp.*, 403 F.3d 708 (9th Cir. 2005)).  The quote begs the question of how a principle so well-established could be so well hidden.  Even taking Judge Reinhardt's quotation at face value, it would only establish GS Yuasa's liability for the conduct of its "co-venturer" Sanyo Electric.  As such, it is inapposite to the question presented here, which is GS Yuasa's liability for the conduct of GS Soft Energy.  Also unclear is plaintiff's basis for imputing to GS Yuasa the acts of GS-Melcotec, which allegedly was a predecessor-in-interest to GS Yuasa's joint venture GS Soft Energy.  Nothing in the complaints satisfies the test for imputing to GS Soft Energy the acts of GS-Melcotec, nor does anything suggest that GS Yuasa and GS-Melcotec undertook any joint venture or partnership as between themselves.  The only apparent link between these entities appears to be that they and GS Soft Energy all participate in some sector of the chemical battery business—not necessarily the *lithium ion* sector—and have the letters "GS" in their names.  That is not enough.

For the reasons set forth above, the Court, in deciding this motion, declines to impute to GS Yuasa the alleged acts of other entities undertaken in the years prior to GS Yuasa's formation on April 1, 2004.[35]

---

[35] The Court previously ruled that plaintiffs had failed to allege the existence of a conspiracy during the years 2000 and 2001.  Jan. 21 Order at 21-22.  Nothing in this ruling should be deemed to comment on whether the present complaints adequately allege a conspiracy operating in the years 2000 and 2001 which Yuasa, GS-Melcotec, or GS Soft Energy could have participated.  That question is not now before the Court.

## 2.   Post-2004 Allegations

If plaintiffs state a claim against GS Yuasa, it must be on the strength of their allegations of GS Yuasa's own acts.  Those allegations are, as GS Yuasa points out, exceedingly few.  (DPP-SCAC ¶¶ 148, 158, 160; IPP-SCAC ¶¶ 112, 121.)  However, as the Court previously explained, length and number are not the relevant considerations.  The relevant inquiry is whether the allegations render plausible the notion that the defendant consciously participated in the alleged conspiracy.

When viewed in context, the allegations here do so as to GS Yuasa.  The Court has already held that the complaints adequately allege a horizontal price-fixing conspiracy of at least some scope.  The complaints further allege that defendants coordinated this conspiracy in a number of ways, including more-or-less regularly scheduled bilateral "meetings often occurring in back-to-back days, with Samsung visiting numerous Japanese companies in Japan to facilitate collusion." (IPP-SCAC ¶ 63; *see also* DPP-SCAC ¶ 132 (alleging "pattern of semi-annual collusive meetings").)  Viewed in light of this pattern, the sufficiency of the allegations against GS Yuasa becomes apparent.  Plaintiffs point to their allegations of GS Yuasa's participation in a cluster of meetings held August 6-8, 2006.  (DPP-SCAC ¶ 148 (bilateral meeting between Samsung and GS Yuasa on August 8 and between Samsung and Panasonic on August 9); IPP-SCAC ¶¶ 111-13 (bilateral meeting between Samsung and Sanyo on August 7, at which Samsung and Sanyo discussed hope that "Sanyo, SONY, SDI" would "refuse competition based on sales price," and bilateral meetings between Samsung and GS Yuasa on August 8 and between Samsung and Panasonic on August 9).)  The DPPs further allege the existence of "[a] set of notes summarizing Samsung's semi-annual meetings" in July 2007 with NEC, Sony, Sanyo, GS Yuasa, and Panasonic: "An upward trend in market sales price continues due to cobalt price increase and the common view on shortage in supply of cylindrical type."  (DPP-SCAC ¶ 158.)  The DPPs also allege the existence of summary notes from "a round of meetings" between Samsung and "Sony, Sanyo, GS Yuasa, and Panasonic in March 2007" which, reading the allegations in the light most favorable to plaintiffs, state both a motive to conspire (declining profitability in the nickel-hydride sector that increased the need for profitability in the lithium ion sector) and the means of doing so

("conservative plant expansion," i.e., a restriction on output, and "adjustment on market price," i.e.,

price-fixing).  (DPP-SCAC ¶ 160.)  These allegations suffice to tie GS Yuasa to the alleged

conspiracy.  GS Yuasa's detailed arguments to the contrary (Dkt. No. 424 at 5-6) merely read the

allegations with a jaundiced eye, drawing every inference against rather than in favor of plaintiffs.

The Court may not, and does not, do the same.

### 3.      Conclusion as to GS Yuasa

The Court **DENIES** the motion of GS Yuasa.  (Dkt. No. 424.)  However, the Court is not

insensitive to GS Yuasa's representation that it alone amongst the defendants does not manufacture

the type of small lithium ion batteries upon which plaintiffs' allegations of price-fixing center.

Again the Court notes that the more prudent course would be to allow appropriately tailored

discovery to be managed by Magistrate Judge Ryu followed, if supported, by an early summary

judgment motion.

### F.      MOTION OF SEL AND SEND (DKT. NO. 431)

The legal issue presented in SEL and SEND's motion is, as with the others previously

considered, whether the DPP-SCAC and IPP-SCAC adequately plead participation in the

conspiracy.  (DPP-SCAC ¶¶ 225-35; IPP-SCAC ¶¶ 220-30.)  Both companies allegedly are wholly

owned subsidiaries of defendant Sony Corp., SEL being based in the U.S. and SEND in Japan.

(DPP-SCAC ¶¶ 45-46; IPP-SCAC ¶¶ 459-60.)  Plaintiffs characterize SEL and SEND as occupying

different roles within the Sony group of companies, with SEL being Sony Corp.'s "U.S. sales and

marketing arm" and "intimately involved in pricing," while Japan-based SEND was its "lithium ion

battery manufacturing arm."  (Dkt. No. 457 at 6, 7.)  The Court considers the two defendants

separately.

### 1.      SEL

The bases for SEL's motion consist of arguments this Court has already rejected, i.e., that

the meetings and communications alleged in the complaints are innocuous exchanges of

information, that any prices exchanged were not necessarily exchanged pursuant to an illegal

arrangement, and that the allegations are just as amenable to interpretation as innocent conduct as

liable conduct.  The Court rejects them in this context as well.  The allegations sufficiently tie SEL

United States District Court
Northern District of California

to the already-pled conspiracy in Asia, for example, by alleging instances of direct price control by Sony in Japan (DPP-SCAC ¶ 234; IPP-SCAC ¶¶ 221, 224-226, 229-230).  The allegations also supply specific facts that, if true, would constitute circumstantial evidence of SEL's conscious participation in the conspiracy and which give SEL "an idea of where to begin" responding to plaintiffs' claims, *Kendall*, 518 F.3d at 1047, for example, an email indicating that defendant Sony Corp. expected to receive pricing information from its competitors, and expected to receive that information through a SEL employee (DPP-SCAC ¶ 232).  To be sure, competing inferences may be drawn.  (*E.g.*, IPP-SCAC ¶ 229 (SEL employee asks SEND in Japan to set a price "competitive with Sanyo").)  However, when the allegations concerning SEL are viewed in context against the entirety of the allegations, the competing inferences are not so strong as to dispel the plausibility of SEL's alleged participation in the claimed conspiracy.  *See Starr*, 652 F.3d at 1216; *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 189-90 (2d Cir. 2012) cert. denied, 133 S. Ct. 846 (U.S. 2013) ("[T]he plausibility standard is lower than a probability standard, and there may therefore be more than one plausible interpretation of a defendant's words, gestures, or conduct.  Consequently, although an innocuous interpretation of the defendants' conduct may be plausible, that does not mean that the plaintiff's allegation that that conduct was culpable is not also plausible.").  The Court **DENIES** the motion as to SEL.

### 2.    SEND

The complaints allege, with differing levels of specificity, that SEND is a Japanese corporation and wholly owned subsidiary of defendant Sony Corp., and that Sony Corp. manufactures lithium ion batteries through SEND.  (*See* DPP-SCAC ¶ 45 (alleging that in 2009 Sony Corp. reorganized its energy business, including manufacturing of lithium ion batteries, under SEND); IPP-SCAC ¶ 459 (alleging that Sony Corp. manufactures its lithium ion batteries through SEND).)

Plaintiff's theory of SEND's participation is fourfold: (1) conspirators from other Sony entities joined SEND and continued their conspiratorial activities there; (2) once Sony Corp. reorganized its lithium ion battery and cell business under the auspices of SEND in 2009, SEND's requirement in the conspiracy became necessary; (3) SEND, as Sony Corp.'s manufacturing arm,

United States District Court
Northern District of California

1  manufactured the price-fixed cells and therefore must have participated in the conspiracy "[t]o the

2  extent [it] related to supply reduction"; and (4) SEND is liable for any predecessors' participation in

3  the conspiracy.  (Dkt. No. 457 at 4-6.)  The Court addresses each aspect of this theory separately

4  and then considers whether, taken together, they suffice to plead SEND's conscious commitment to

5  having joined the alleged conspiracy.

6          The Court rejects the fourth element of plaintiffs' theory as insufficiently pled, for the same

7  reasons applicable to their allegations concerning the successor liability of GS Yuasa.  (*See supra*

8  Part IV, Section III.E.1.a.)[36]  However, the other three elements of their theory and the allegations

9  supporting them, taken together and viewed as a whole, suffice to raise their claim of SEND's

10  participation above the merely conceivable to the plausible.  The Court readily acknowledges that it

11  is a close case, depending on numerous favorable inferences.  For instance, the consolidation of

12  Sony Corp.'s lithium ion battery business under SEND in 2009 is amenable to interpretation as a

13  type of housecleaning.  The movement of executives from Sony Corp. or SEL to SEND relies for

14  any probative effect on the inference that they moved to advance the conspiracy, rather than to

15  leave it.  And, as SEND points out, allegations that a corporate affiliate was *used* by an antitrust

16  conspiracy—for example, as here, to manufacture a price-fixed product—do not, without more,

17  suffice to plead the affiliate's having *joined* the conspiracy.  *See*, *e.g.*, *Precision Assocs.*, 2011 WL

18  7053807, at *15.

19          Nevertheless, viewing plaintiffs' allegations in their totality, they suffice.  SEND's role as a

20  manufacturer, combined with concrete allegations supporting the proposition that one of the

21  conspiracy's specific aims was to restrain production to lower supply and hence increase prices,

22  supports an inference that SEND participated in the conspiracy at least to that extent.  (*E.g.*, DPP-

23  SCAC ¶¶ 126, 127, 139, 160 (allegations pertaining to plans to restrain production); IPP-SCAC ¶¶

24          [36] As they did with respect to GS Yuasa, plaintiffs rely on *Atchison*.  Here, however, and

25  unlike in their argument as to GS Yuasa, they fail to identify which of the four circumstances where
    successor liability may obtain—assumption of liability, de-facto merger, mere continuation, or

26  fraud—that they believe applies to SEND.  *See Atchison*, 159 F.3d at 361.  This vagueness alone
    would be reason enough to decline their invitation to impute successor liability here.  As it stands,

27  the paucity of allegations concerning any successor liability theory makes the failure to identify a
    cognizable theory of such liability beside the point.

28

13, 68 (same).)  Further, the Court rejects SEND's characterization of the complaints as containing only a few passing references to it.  SEND counts only those allegations mentioning it by name, excluding itself from any of the documents' generic mentions of "Sony."  Though SEND draws sharp lines between corporate entities *post hoc*, it is not at all apparent that defendants' employees observed such lines whilst producing the informal communications that form the basis of many of the complaints' allegations.  Consistent with its ruling as to other defendants, the Court finds that a failure to delineate between legally distinct but similarly branded defendants in allegations drawn directly from documents produced by defendants themselves does not support dismissal.  (*See supra* Part 4, Section III.C.)[37]

SEND also argues that plaintiffs cannot rely on allegations that in 2010 "Sony" sent pricing information concerning a mutual customer to persons employed by a Panasonic affiliate.  (Dkt. No. 468 at 2 (citing DPP-SCAC ¶ 215; IPP-SCAC ¶ 218).)  SEND contends that "nothing suggests" the information sent by "Sony" actually came from SEND.  Not so.  Given the allegation that Sony Corp. placed its battery business under SEND in 2009, a reference to "Sony" in 2010, in the context of price negotiations with a maker of battery products, quite plausibly refers to SEND.  Contrary inferences are possible, certainly.  Discovery may reveal the correctness of defendants' position that

---

[37] Though the Court is tolerant of imprecision inherent in the documents relied upon by plaintiffs, the imprecision created by the Plaintiffs themselves unnecessarily confuses a reader.  For example, the IPP-SCAC refers, unhelpfully, to "Sony North America," which is not a party to this case (or, according to defendants, an entity at all).  Though defendants argue that the reference is so vague as to warrant dismissal (Dkt. No. 431 at 6 n.4), given that SEL is the only Sony defendant based in North America, the parties—including defendants—appear to understand the term to refer to SEL.  (*See id.* (presuming that the allegations are "directed at SEL and SEND").)  SEND and SEL nevertheless have a point: the allegations of the IPP-SCAC are inconsistent and unclear in their delineation of corporate defendants and third parties.  (*E.g.*, IPP-SCAC ¶ 229 (referring to parties as "Sony Electronics – San Jose, California" and "Sony Energy Devices of Japan").)  Given the scope of this litigation, clarity is required.

The IPPs request leave to amend to add allegations unique to the DPPs' complaint.  (Dkt. No. 457 at 2 n.2.)   In the interest of efficiency, the Court reviews the allegations of both complaints for now.  However, the Court also **GRANTS** to both the IPPs *and* the DPPs leave to amend for the limited purpose of adopting a consistent nomenclature for both parties and third parties, and, consistent with Rule 11, adding allegations present in the other's complaint.  This Order permits but does not require such amendment.

United States District Court
Northern District of California

1   this and similar communications do not implicate SEND, but that is a factual matter.  Plaintiffs

2   adequately plead SEND's participation in the conspiracy.

3          The Court concludes that dismissal is warranted for neither SEL nor SEND.  Accordingly,

4   their motion is **DENIED** as to both defendants.  (Dkt. No. 431.)

5          **G.   MOTION OF TOSHIBA CORP. (DKT. NO. 430)**

6          The motion of Toshiba Corp. states two issues.  The first is whether the DPP-SCAC

7   sufficiently alleges the DPPs' standing to sue Toshiba Corp. under *Illinois Brick*.  The Court

8   resolved that issue in Part 3, Section I, where the Court affirmed that the DPPs have adequately

9   pled their antitrust standing (with one exception not related to Toshiba Corp.) and rejected the

10  argument of Toshiba Corp. that the DPPs only have standing to sue for damages stemming from

11  purchases made from a particular defendant if the DPP-SCAC alleges that that defendant owned or

12  controlled a seller.  Accordingly, the Court here addresses only the second issue presented by

13  Toshiba Corp.'s individual motion: whether the complaints adequately allege Toshiba Corp.'s

14  participation in the alleged conspiracy.

15         This is the second time Toshiba Corp. has filed an individual Rule 12(b)(6) motion.  The

16  first time, Toshiba Corp., along with former defendant Toshiba America Electronic Components,

17  Inc. ("TAEC") moved to dismiss on grounds which, to the extent they overlapped with a jointly

18  made argument that the U.S.-subsidiary defendants' participation in the conspiracy was

19  insufficiently alleged, the Court accepted, and, to the extent they raised issues specific to Toshiba

20  Corp. and TAEC, the Court rejected.  Jan. 21 Order at 22-24, 26.  The Court also, as the parties are

21  well aware, held that the participation in the conspiracy of defendants based in Japan and Korea, of

22  which Toshiba Corp. is one, had been adequately alleged.  *Id.* at 17-20.  In amending their

23  complaints following the Jan. 21 Order, both the DPPs and IPPs voluntarily dismissed TAEC,

24  leaving Toshiba Corp. as the only Toshiba entity in the case.

25         Toshiba Corp. now moves again for dismissal.  In doing so, it raises the same arguments the

26  Court rejected in its earlier-filed individual motion.  (*Compare* Dkt. No. 293 at 4:9-10 (arguing that

27  allegations concerning a particular July 2003 meeting do not include an allegation of agreement to

28  fix prices) *with* Dkt. No. 430 at 3:20-22 (same argument on basis of same allegations); *compare*

75

United States District Court
Northern District of California

1  Dkt. No. 293 at 4:23-24 (arguing that Toshiba exited the lithium ion business after 2004 on basis of

2  chart showing no market share for Toshiba after that date) *with* Dkt. No. 430 at 5:28 (same

3  argument on basis of same chart); *compare* Dkt. No. 293 at 5:21-22 (arguing that Toshiba's

4  participation in conspiracy is implausible because, as producer of notebook computers, it also

5  would be a consumer of price-fixed batteries) *with* Dkt. No. 5:24 (same argument on basis of same

6  facts).)  Plaintiffs object to the repetition of argument in their opposition brief.  (Dkt. No. 458 at 2-

7  3).  Toshiba Corp.'s reply ignores the matter, thereby conceding that it has repeated earlier

8  arguments that the Court has already rejected.  (*See generally* Dkt. No. 464.)

9        The Court's decision to implement phased briefing is not a license to re-litigate issues upon

10  which a reasoned decision already has issued.  Both local rule and federal statute provide

11  procedures for reviewing the rulings of this Court in a principled way.  *See* Civ. L.R. 7-9; 28 U.S.C.

12  § 1292 (appeal from final decisions); 28 U.S.C. § 1292 (appeal from interlocutory decisions).  The

13  Court fully expects that, at some point in this far-reaching litigation, it may eventually issue a

14  decision that one or more parties will greet with something less than unqualified approval.  Should

15  that grim day arrive, the parties have tools at their disposal to seek reconsideration or appellate

16  review.  They do not, however, have leave to re-argue a point under the cover of phased briefing—

17  the purpose of which is to present issues to this Court (which has somewhat fewer attorneys at its

18  disposal than do the parties) in a manageable way.[38]

19        The Court **DENIES** the second individual motion to dismiss of defendant Toshiba Corp.

20  (Dkt. No. 430.)  However, as with GS Yuasa (*see supra* Part 4, Section III.E.3), Toshiba Corp.

21  raises an issue unique to itself—its supposed exit from the lithium ion battery industry in 2005.  If

22  appropriate, here too, limited discovery may suggest an early summary judgment motion.

23  **IV.        CONCLUSION AS TO INDIVIDUAL MOTIONS**

24        For the foregoing reasons, the Court **DENIES** all of the individually filed motions.  (Dkt.

25  Nos. 424-27, 429-31.)

26

27

28        _____

          [38] As to the merits of Toshiba Corp.'s arguments, were the Court to consider them, suffice it
          to say that the amended complaints allege no *less* than did the earlier iterations.

76

United States District Court
Northern District of California

## **CONCLUSION**

For the foregoing reasons, the Court,

1. as to the joint motion of defendants to dismiss the IPP-SCAC:

    a. **DENIES** the motion as to antitrust standing;

    b. **GRANTS** the motion as to the IPPs' claim under Montana law, and **DISMISSES WITHOUT PREJUDICE** the IPP-SCAC to the extent it asserts such claim;

    c. **GRANTS** the motion as to the IPP-SCAC's alleged nationwide damages class of non-state and non-federal governments and alternative state-specific subclasses of such governments, and **DISMISSES WITHOUT PREJUDICE** the IPP-SCAC to the extent it seeks to assert said nationwide class and said alternative state-specific subclasses, but for California's;

    d. **DENIES** the motion as to the IPP-SCAC's claim under Missouri's Merchandising Practices Act;

    e. **DENIES** the motion as to the IPP-SCAC's claims under the Illinois Antitrust Act and the South Carolina Unfair Trade Practices Act law;

    f. **GRANTS** the motion as to the IPP's claim under the New Hampshire Consumer Protection Act, and **DISMISSES** that claim **WITH PREJUDICE**; and

    g. **DENIES** the motion as to the IPPs' Arkansas Deceptive Trade Practices Act claim; and

2. as to the joint motion of defendants to dismiss the DPP-SCAC:

    a. **GRANTS** the motion as to Circuit City's alleged purchases of Hitachi batteries and camcorders from Hitachi America Ltd., **DISMISSING** the DPP-SCAC **WITH PREJUDICE** as to those purchases, and otherwise **DENIES** the motion; and

3. as to the individual motions to dismiss the DPP-SCAC and IPP-SCAC:

    a. **DENIES** the motion of MCA and HML;

    b. **DENIES** the motion of LGCAI;

    c. **DENIES** the motion of NEC Corp.;

    d. **DENIES** the motion of PNA and SNA;

    e. **DENIES** the motion of GS Yuasa, but will consider the appropriateness of authorizing GS Yuasa to bring an early summary judgment motion following limited discovery overseen by the assigned Magistrate Judge;

    f. **DENIES** the motion of SEL and SEND; and

    g. **DENIES** the motion of Toshiba Corp., but will consider the appropriateness of authorizing Toshiba Corp. to bring an early summary judgment motion following limited discovery overseen by the assigned Magistrate Judge; and

4.   as to both the DPP-SCAC and IPP-SCAC, on the Court's own motion:

    a.   **GRANTS** leave to amend for the limited purpose of standardizing the nomenclature used to refer to individual defendants and third parties, and to supplement each complaint with allegations present in the other, consistent with counsel's Rule 11 obligations.

This Order terminates Dkt. No. 401, 424, 425, 426, 427, 428, 429, 430, and 431.

**IT IS SO ORDERED**.

Dated: October 2, 2014

                                   **YVONNE GONZALEZ ROGERS**
                             **UNITED STATES DISTRICT COURT JUDGE**

United States District Court
Northern District of California

78