1  Michael P. Kenny (*pro hac vice* pending)
     mike.kenny@alston.com
2  Debra D. Bernstein (*pro hac vice* pending)
     debra.bernstein@alston.com
3  Rodney J. Ganske (*pro hac vice* pending)
     rod.ganske@alston.com
4  **ALSTON & BIRD LLP**
   1201 West Peachtree Street
5  Atlanta, Georgia  30309-3424
   Tel: (404) 881-7000
6  Facsimile: (404) 881-7777

7  Douglas R. Young (State Bar No. 073248)
     dyoung@fbm.com
8  **FARELLA BRAUN + MARTEL LLP**
   235 Montgomery Street, 17th Floor
9  San Francisco, CA  94104
   Telephone:  (415) 954-4400
10 Facsimile:  (415) 954-4480

11 Attorneys for Plaintiffs
   DELL INC. and DELL PRODUCTS L.P.

12 [Additional Counsel listed in Signature Block]

13

14

15                **UNITED STATES DISTRICT COURT**

16             **NORTHERN DISTRICT OF CALIFORNIA**

17                      **OAKLAND DIVISION**

18 | DELL INC. and DELL PRODUCTS L.P.,

19 |               Plaintiffs,              **CASE NO.:**
   |        v.                              **COMPLAINT**
20 |                                        **DEMAND FOR JURY TRIAL**
   | LG CHEM, LTD.; LG CHEM AMERICA, INC.;
21 | PANASONIC CORPORATION; PANASONIC       **UNREDACTED VERSION**
   | CORPORATION OF NORTH AMERICA; SANYO
22 | ELECTRIC CO., LTD.; SANYO NORTH
   | AMERICA CORPORATION; GS YUASA
23 | CORPORATION; TOSHIBA CORPORATION;
   | SONY CORPORATION; SONY ENERGY
24 | DEVICES CORPORATION; SONY
   | ELECTRONICS, INC.; SAMSUNG SDI CO. LTD.;
25 | and SAMSUNG SDI AMERICA INC.,

26 |               Defendants.

27

28
                              1

**COMPLAINT**

Plaintiffs Dell Inc. and Dell Products L.P. ("Dell") bring this action for damages and injunctive relief under Sections 4 and 16 of the Clayton Act for the Defendants' violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and for breach of contract. Numerous other persons injured by the Defendants' and their co-conspirators' price-fixing conspiracy have filed Section 1 Sherman Act claims, and those lawsuits have been joined for pretrial purposes in *In re Lithium Ion Batteries Antitrust Litigation*, Case No. 13-md-02420, in this Court.

/ / /

## I.    INTRODUCTION

1.    Defendants,[1] some of the world's largest suppliers of Lithium Ion Batteries globally and in the United States, engaged in a conspiracy to fix, raise, stabilize, and maintain the prices of Lithium Ion Battery Cells from at least January 1, 2000 through at least May 31, 2011 (the "Relevant Period"). The conspiracy artificially inflated the prices of Lithium Ion Battery Cells and Lithium Ion Battery Packs into which Lithium Ion Battery Cells are incorporated. Dell has been harmed because it purchased significant volumes of Lithium Ion Batteries directly from Defendants and their co-conspirators at supra-competitive prices.

2.    "Lithium Ion Batteries" or "Batteries," as used in this Complaint, are cylindrical, prismatic, or polymer batteries that are rechargeable and use lithium ion technology. Lithium Ion Batteries are used in many products, such as notebook computers, mobile phones, digital cameras, camcorders, power tools, and other devices. For purposes of this Complaint, "Lithium Ion Batteries" and "Batteries" include both Lithium Ion Battery Cells and Lithium Ion Battery Packs.

3.    "Lithium Ion Battery Cells," as used in this Complaint, are the main components of Lithium Ion Batteries. A cell includes the cathode, anode, and electrolyte.

4.    "Lithium Ion Battery Packs," as used in this Complaint, refer to individual or

---

[1] LG Chem, Ltd., LG Chem America, Inc., Samsung SDI Co., Ltd., Samsung SDI America, Inc., Panasonic Corporation, Panasonic Corporation of North America, Sanyo Electric Co., Ltd., Sanyo North America Corporation, GS Yuasa Corporation, Toshiba Corporation, Sony Corporation, Sony Energy Devices Corporation, and Sony Electronics, Inc. (collectively "Defendants").

2

DELL COMPLAINT

multiple Lithium Ion Battery Cells that have been assembled or "packed" inside an enclosure. In some cases, certain protection circuitry is also added inside the enclosure. The Lithium Ion Battery Pack is placed inside a device, such as a notebook or laptop computer to supply power. Lithium Ion Battery Cells account for the majority of the cost of the Lithium Ion Battery Pack. The assembly of Lithium Ion Battery Cells into Lithium Ion Battery Packs does not change the essential character of the cells.[2] Packing simply allows the Lithium Ion *Battery* Cells to operate as a battery for use in various devices, such as laptop computers. In general, Lithium Ion Battery Cells have no practical use on their own and, with few exceptions, Lithium Ion Battery Cells and Lithium Ion Battery Packs are essentially the same from an economic standpoint, so that a price fix on the Lithium Ion Battery Cells is a price fix on the Lithium Ion Battery Packs.

5.     During the Relevant Period, Defendants manufactured, marketed, and/or sold Lithium Ion Batteries throughout the United States and the world. Defendants collectively controlled a majority of the worldwide market for Lithium Ion Batteries at different points during the Relevant Period.

6.     Dell purchased Lithium Ion Batteries directly from Defendants, their divisions, subsidiaries or affiliates, or their co-conspirators during the Relevant Period.

7.     As alleged in more detail below, and in violation of the United States antitrust laws, Defendants took various acts in furtherance of their conspiracy including engaging in continuous communications about confidential business matters that enabled them to set prices collusively, reaching customer and product-specific agreements on price, setting price targets and bottom prices, coordinating output restrictions, implementing price formulas tied to battery inputs, and devising mechanisms to nullify competition in procurements by their customers, among other conduct. As part of this illegal conduct, Defendants specifically targeted Dell and its purchases of Lithium Ion Batteries.

8.     Defendants and co-conspirators initially began meeting with each other in or around 1999 with a common goal of cooperating to avoid price competition. At these meetings, Defendants

---

[2]   U.S. International Trade Commission Rulings And Harmonized Tariff Schedule, HQ 563045 (http://www.faqs.org/rulings/rulings2004HQ563045.html) (last accessed June 25, 2015).

DELL COMPLAINT

and co-conspirators discussed confidential and competitively sensitive information regarding, among other things, supply and demand, market trends, capacity, sales forecasts, and pricing for Lithium Ion Batteries. These semi-annual meetings typically occurred in February/March and July/August and lasted several hours. Defendants and co-conspirators also participated in other meetings, telephone calls, and email exchanges, where they reached agreements on pricing and market allocations. Examples of some such meetings occurred, among others, on October 15–19, 2000 (various meetings involving Samsung, Sony, GS-Melcotec, NEC, Hitachi Maxell, GS Yuasa, and Matsushita in Japan, resulting in a pledge to "maintain the cooperation, not the competition" between certain companies); March 12–16, 2002 (various meetings involving Samsung, Sony, Hitachi Maxell, and Panasonic in Japan); July 28–30, 2004 (various meetings involving Sanyo, NEC, Panasonic, Hitachi Maxell, and Samsung); February 2006 (meetings involving LG and Samsung); and July 17–19, 2007 (various meetings involving NEC, Samsung, Sanyo, Sony, and Panasonic in Japan). These meetings continued until May 2011.

9.     Two Defendants pled guilty to price-fixing charges in connection with a probe by the Antitrust Division of the United States Department of Justice's ("DOJ") into criminal antitrust violations in the Lithium Ion Battery market.  On September 20, 2013 and October 10, 2013, Sanyo Electric Co., Ltd. and LG Chem Ltd., respectively, pled guilty to conspiring to fix prices in violation of Section 1 of the Sherman Act.  (Case No. 13-cr-472, Dkt. No. 32.; Case No. 13-cr-472, Dkt. No. 28.)  Both Defendants pled guilty to participating in a conspiracy with other persons and entities engaged in the manufacture and sale of cylindrical Lithium Ion Battery Cells, the primary purpose of which was to fix the prices of cylindrical Lithium Ion Battery Cells sold in the United States and elsewhere for use in notebook computer battery packs.  Sanyo Electric Co., Ltd. also admitted in its guilty plea that Panasonic Corporation was its co-conspirator.

10.     In connection with the Sanyo Electric Co., Ltd.'s and LG Chem Ltd.'s guilty pleas, the DOJ has identified Plaintiff Dell Inc., among others, as a victim of the conspiracy.

11.     On information and belief, grand jury documents produced by certain Defendants and co-conspirators in response to criminal subpoenas from the DOJ in connection with its investigation into criminal wrongdoing in the Lithium Ion Batteries market, reveal evidence of

4

Defendants' and co-conspirators' regular, extensive communications and agreements. For example:

- In March 2004, in a document entitled "President Minutes," LG summarizes its agreement to raise prices with Sony, as well as the apparent agreement of other Defendants: "Sony plans to raise customer prices as said in Press release on Feb. 24. . . . Sanyo also announced price hikes to customers and MBI also plans to do so. Afterwards, we received the opinions of NEC/Hitachi Maxell that they would raise prices as well. . . . We believe that if LG Chem and [Samsung] cooperated in these moves, the growth of the Li-Ion battery industry is likely to go in the right direction."

- On June 30, 2004, Sony committed to avoiding price cuts in a meeting with Samsung. The President of Sony, remarking on Sony's close relationship with Samsung, stated he was "[g]lad that [Samsung] and Sony have been competitors, but also [have] been able to cooperate with each other at the same times as entities participating in the same business," and that he hoped that "such a relationship would continue."

- On August 9, 2004, in a meeting between LG and Sony, LG stated its willingness to actively participate in price cooperation; LG "proposed price cooperation to defend prices and to protect the industry, so mentioned that [LG] is also willing to cooperate through active participation."

- In February 2005, Sanyo, Samsung, MBI (Panasonic), GS Soft Energy, NEC and Hitachi Maxell agreed to refrain from adding new product lines to rein in supply and stabilize prices.

- On July 26, 2005, Samsung agreed to set prices for cylindrical batteries at ranges that LG proposed. The parties also "[p]roposed to minimize damages caused by unnecessary competition in dealing with customers by communicating with each other in the future."

- On October 26, 2005, Panasonic and Samsung agreed to avoid lowering Lithium Ion Battery prices.

- On September 8, 2006, Samsung agreed to set prices for cylindrical batteries at ranges that LG proposed. The parties also "[p]roposed to minimize damages caused by unnecessary competition in dealing with customers by communicating with each other in the future."

- A March 2007 Samsung document entitled "Summary of telephone call with Company P[anasonic]" stated the following: "Request for price increase staring [sic] this week"; "Increase (Proposal) Increase:  Start 10~13% and hope to end with 8~10%"; "Time to apply the increase: starting 4/1"; "Other company trend - Sanyo: hopes for 8~10% - Sony: about 10% (will end with less than 10% since starting with 10%)[.]"

- Notes from a round of meetings in March 2007 state that "[e]very company showed a keen sensitivity to increasing profitability[.]  Especially Sanyo and Matsushita [Panasonic] have strong interest in achieving profitability in lithium ion business due to deteriorating profitability in nickel-hydride battery."

5

- A February 8, 2011 LG email confirms that Samsung "consented to nullification of [Hewlett-Packard's] e-auction, and said that the Bottom [price] discussed between the two companies is $16."

12. Defendants participated in a combination and conspiracy to suppress and eliminate competition in the market for Lithium Ion Batteries by agreeing to fix, raise, stabilize, and maintain the prices of Lithium Ion Batteries in the United States. Defendants' combination and conspiracy constituted an unreasonable restraint of interstate and foreign trade and commerce in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

13. Defendants' anticompetitive conduct impacted prices for Lithium Ion Batteries throughout the United States, including the prices paid by Dell. As a result of Defendants' conduct, Dell paid inflated prices for Lithium Ion Batteries during the Relevant Period and has suffered antitrust injury to its business and/or property.

14. Dell brings this action on behalf of itself and its affiliates to recover for injury to its business and property and other harms arising from billions of dollars of purchases of Lithium Ion Batteries, at artificially inflated prices, over several years. Pursuant to this price-fixing conspiracy, Dell paid higher prices for Lithium Ion Batteries than it would have paid in a competitive market as a direct result of Defendants' and their co-conspirators' unlawful conduct. Dell seeks to recover compensatory damages for its Lithium Ion Batteries purchases from the Defendants and their subsidiaries, affiliates, and co-conspirators during the Relevant Period.

## II.     INTRADISTRICT ASSIGNMENT

15. Assignment to this division is proper because this action is related to *In re Lithium Ion Batteries Antitrust Litigation*, Case No. 13-md-02420, which is currently pending in this division before the Honorable Yvonne Gonzalez Rogers.

## III.     JURISDICTION AND VENUE

16. Dell brings this action to obtain injunctive relief under Section 16 of the Clayton Act, and to recover damages, including treble damages, under Section 4 of the Clayton Act, costs of suit, and reasonable attorneys' fees arising from Defendants' and their co-conspirators' violations of Section 1 of the Sherman Act (15 U.S.C. § 1). Dell also seeks to recover all appropriate damages for

DELL COMPLAINT

certain Defendants' breaches of contract, as alleged herein.

17.     The Court has subject matter jurisdiction over Dell's federal antitrust claims pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331 and 1337.   The Court has supplemental jurisdiction pursuant to 28 U.S.C. §§ 1367 over Dell's breach of contract claims set forth below.   These claims are so related to Dell's claims under Section 1 of the Sherman Act and Sections 4 and 16 of the Clayton Act that they form part of the same case or controversy.

18.     The activities of Defendants and their co-conspirators, as described herein, involved U.S. import trade and/or commerce or were within the flow of, were intended to, and did have a direct, substantial and reasonably foreseeable effect on United States domestic and import trade or commerce.   This anticompetitive effect gives rise to Dell's antitrust claims.   During the Relevant Period, Defendants and their co-conspirators' conspiracy adversely affected the price of Lithium Ion Batteries purchased in the United States.   In particular, Defendants' and their co-conspirators' conspiracy directly and adversely affected the price of Lithium Ion Batteries purchased by Dell.

19.     This Court has jurisdiction over each Defendant named in this action under Section 12 of the Clayton Act (15 U.S.C. § 22).   Defendants and their co-conspirators purposely availed themselves of the laws of the United States as they manufactured price-fixed Lithium Ion Batteries they knew would be sold to Dell and other customers in the United States.   Defendants' and their co-conspirators' conspiracy affected commerce in the Lithium Ion Batteries market in the United States. Defendants are further subject to the jurisdiction of this Court by virtue of their nationwide contacts and other activities, as well as their contacts with the State of California.

20.     Venue is proper in this District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) because all Defendants are found or transact business in this District.   Venue is also proper pursuant to Section 4 of the Clayton Act (15 U.S.C. § 15) and 28 U.S.C. § 1391(b)(1) and § 1391(c)(3) because all Defendants reside in this District or are not residents of the United States (i.e., alien corporations).    Venue is also proper under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Dell's claims occurred in this District.   Defendants and co-conspirators knew that price-fixed batteries would be sold and shipped in this District.

DELL COMPLAINT

# IV.   PARTIES

## A.   Plaintiffs

21.    Dell Inc. is a corporation duly organized under the laws of the State of Delaware, with its principal place of business in Round Rock, Texas.

22.    Dell Products L.P. is a Texas limited partnership with its principal place of business in Round Rock, Texas.

23.    Dell Inc. and Dell Products L.P. are referred to collectively herein as "Dell."

24.    Dell is a leading information technology company, offering a broad range of solutions, including services and products such as mobility products, laptop, notebook, and desktop computers, software and peripherals, including display devices, servers and networking services, and storage.

25.    During the Relevant Period, Dell purchased more than $3.1 billion worth of Lithium Ion Batteries directly from the Defendants and their co-conspirators, Defendants' and their co-conspirators' subsidiaries and affiliates, or agents controlled by Defendants, Defendants' subsidiaries and affiliates, co-conspirators or co-conspirators' subsidiaries and affiliates.

26.    As a direct result of Defendants' and their co-conspirators' unlawful conduct, Dell suffered injury to its business and/or property.

27.    Dell entered into contracts with and purchased Lithium Ion Batteries from Panasonic NA, Sanyo Electric Co., Ltd., Samsung SDI Co., Ltd., and Sony Corporation, and their subsidiaries and affiliates.  For example, Dell's purchases from Defendants were governed by:

- A Master Purchase Agreement with Panasonic NA and its sales affiliates entered into January 1, 2003.  The agreement covered sales of Lithium Ion Batteries from Panasonic NA and its sales affiliates to Dell.  It also covered Panasonic NA's Lithium Ion Batteries that Dell purchased from third-party original equipment manufacturers.

- A Master Purchase Agreement with Samsung SDI Co., Ltd. entered into March 31, 2004.

- A Master Purchase Agreement with Sanyo Electric Co., Ltd. entered into May 26, 2003. The Agreement covered sales of Lithium Ion Batteries by Sanyo Electric Co., Ltd. or any of its affiliates and subsidiaries to Dell.

- A Master Purchase Agreement with Sony Corporation, entered into October 1, 1996.  The Agreement covered sales of Lithium Ion Batteries to Dell.

DELL COMPLAINT

28.     During the Relevant Period, Dell held frequent negotiations with Defendants and their co-conspirators on the price and volume of Lithium Ion Batteries it purchased.  Dell held negotiations via multiple methods, including internet negotiations.   These negotiations were primarily conducted in Round Rock, Texas.   The agreed-upon price that resulted from the negotiation process was a worldwide price that applied to all of Dell's purchases of Lithium Ion Batteries for the given time period, regardless of where the Lithium Ion Batteries were to be delivered.  Many of Dell's agreements with Defendants contained explicit language providing that negotiations would occur within the United States, specifically Texas, and the negotiated prices would apply worldwide:

- In the Panasonic MPA, the parties and their subsidiaries and affiliates agreed that "[w]orldwide prices will be negotiated between [the parties] at Dell's corporate headquarters in Austin, Texas."

- In the Sanyo MPA, the parties and their subsidiaries and affiliates agreed that "[w]orldwide prices will be negotiated between [the parties] at Dell's corporate headquarters in Austin, Texas."

- In the Samsung MPA, the parties and their subsidiaries and affiliates agreed that "[w]orldwide prices will be negotiated between [the parties] at Dell's corporate headquarters in Austin, Texas."

29.     During the August 8, 2014 motion to dismiss hearing before the *Batteries MDL* court, the Defendants argued that the DPPs lacked standing, asserting that none of the current plaintiffs had directly purchased battery cells nor could they tell if they purchased completed battery packs from affiliates of battery cell manufacturers.   Counsel for the Panasonic and Sanyo Defendants, referenced Dell multiple times during his argument and specifically stated that Dell would be a company that would be an appropriate direct purchaser plaintiff.   Transcript of Proceedings at 7-8, *In re Lithium Ion Batteries Antitrust Litigation*, No. 13-md-02420, Dkt. No. 502 (Northern District of California Aug. 8, 2014).

30.     Dell Inc. has received assignments of claims with its relevant subsidiaries and affiliates, whereby any of the antitrust claims described in this Complaint against the Defendants and their co-conspirators that are held by Dell's subsidiaries and affiliates have been or will be assigned to Dell Inc.

DELL COMPLAINT

/ / /

B.   **Defendants**

31.    Paragraphs 32-52 below identify each of the Defendants and describe the relationship of ownership or control between each Defendant conspirator and its divisions, subsidiaries, or affiliates that sold Lithium Ion Batteries. The relationships between the conspirators and sellers are characterized by the ability to exercise restraint or direction; to dominate, regulate, or command; and/or to have the power or authority to guide or manage.

### 1.   LG Defendants

32.    Defendant LG Chem, Ltd. ("LG Chem") is a business organized under the laws of Korea with its principal executive offices at LG Twin Towers 128, Yeoui-daero, Yeongdeungpo-gu, Seoul, 150-721 South Korea.  LG Chem is an affiliate of Seoul-based conglomerate LG Electronics. LG Chem is one of the world's leading manufacturers of Lithium Ion Batteries.  During the Relevant Period, LG Chem manufactured, sold, and/or distributed Lithium Ion Batteries throughout the United States and directly caused Lithium Ion Batteries to be imported into the United States.

33.    Defendant LG Chem America, Inc. ("LG Chem America") is a business organized under the laws of Delaware with its principal place of business at 910 Sylvan Avenue, Englewood Cliffs, New Jersey 07632.  LG Chem America is a wholly-owned subsidiary of LG Chem.  During the Relevant Period, LG Chem America manufactured, sold, and/or distributed Lithium Ion Batteries throughout the United States and directly caused Lithium Ion Batteries to be imported into the United States.

34.    Defendants LG Chem and LG Chem America are referred to individually and collectively herein as "LG."  All of the entities referred to as LG participated in the collusive conduct described herein, either directly or as represented by other members of the LG entities.

### 2.   Samsung Defendants

35.    Defendant Samsung SDI Co., Ltd ("Samsung SDI") is a Korean corporation with its principal executive offices at 150-20, Gongse-ro, Giheung-gu, Youngin-si, Gyeonggi-do, South Korea.  Defendant Samsung SDI is approximately twenty percent (20%) owned by the Korean conglomerate Samsung Electronics Co., Ltd.  Defendant Samsung SDI is the world's largest

10

manufacturer of Lithium Ion Batteries. Defendant Samsung SDI, either directly or through its wholly-owned subsidiaries, participated in the conspiracy alleged in this Complaint and manufactured, marketed, and/or sold Lithium Ion Batteries that were distributed throughout the United States, including in this District, during the Relevant Period.

36. Defendant Samsung SDI America, Inc. ("Samsung SDI America") is a California corporation with its principal place of business at 3655 North First St., San Jose, California 95134. Samsung SDI America is more than 90% owned by Samsung SDI. Defendant Samsung SDI America, either directly or through its wholly-owned subsidiaries, participated in the conspiracy alleged in this Complaint and manufactured, marketed, and/or sold Lithium Ion Batteries that were distributed throughout the United States, including in this District, during the Relevant Period.

37. Defendants Samsung SDI and Samsung SDI America are referred to collectively herein as "Samsung." All of the entities referred to as Samsung SDI participated in the collusive conduct described herein, either directly or as represented by other members of the Samsung entities.

### 3. Panasonic Defendants

38. Defendant Panasonic Corporation, formerly known as Matsushita Electric Industrial Co., Ltd. ("MEI"), is a Japanese corporation headquartered at 1006 Oaza Kadoma, Kadoma-shi, Osaka 571-8501, Japan. Until October 1, 2008, Matsushita Battery Industrial Co., Ltd. ("MBI") was a wholly-owned subsidiary of MEI and manufactured and sold Lithium Ion Batteries. MEI and MBI are collectively referred to herein as "Matsushita."

39. Effective October 1, 2008, MEI changed its name to Panasonic Corporation, and MBI became an internal divisional company of Panasonic Corporation, operating within Panasonic Corporation's Energy Segment.[3] According to Panasonic Corporation's Annual Securities Report for the fiscal year ended March 31, 2013 (the 106th Business Term), Panasonic Corporation has manufacturing facilities for batteries at its Osaka Plant in Moriguchi-shi, Osaka, and its Suminoe Plant at Suminoe-ku, Osaka-shi, Osaka. That report further states, "[f]or production, the Company

---

[3] http://panasonic.co.jp/corp/news/official.data/data.dir/en081001-4/en081001-4.html (last accessed June 25, 2015).

1    and its subsidiaries and affiliates are responsible as a manufacturer for each product." In addition,

2    "[t]he Company has documented its actual status of the internal control system, with coordination

3    provided by the Internal Auditing Group, in order to ensure reliability in financial reporting of the

4    Panasonic Group including its subsidiaries, ranging from the control infrastructure to actual internal

5    control activities. Specifically, the Company has reinforced its internal controls by implementing

6    self-checks and self-assessment programs at each of the Divisional Companies and business

7    divisions, etc." Panasonic Corporation is one of the world's leading manufacturers of Lithium Ion

8    Batteries.  As explained in detail below, Panasonic Corporation, including through its subsidiaries

9    and affiliates, participated in the conspiracy alleged in this Complaint and manufactured, marketed,

10   and/or sold Lithium Ion Batteries that were purchased throughout the United States, including in

11   this District, during the Relevant Period.

12           40.     Defendant Panasonic Corporation of North America ("Panasonic NA"), formerly

13   known as Matsushita Electric Corporation of America, is a business entity organized under the laws

14   of Delaware with its principal place of business at 2 Riverfront Plaza, Newark, New Jersey 07102-

15   5490.   Panasonic NA is a wholly-owned and controlled subsidiary of Panasonic Corporation.

16   According to Panasonic Corporation's Annual Securities Report for the fiscal year ended March 31,

17   2013 (the 106th Business Term), Panasonic NA is one of Panasonic Corporation's principal

18   consolidated subsidiaries.  Panasonic Corporation has 100% of the voting rights in Panasonic NA.

19   Panasonic Corporation and Panasonic NA share an interlocking directorate, meaning that Panasonic

20   Corporation's "employees concurrently hold position of directors or officers" in Panasonic NA.  For

21   example, during the Relevant Period, Yoshihiko Yamada served as an Executive Officer of

22   Panasonic, Director of Corporate Management Division for North America, and Chairman,

23   Panasonic NA.  Panasonic NA entered into agreements with U.S.-based customers calling for the

24   customers to indemnify not only Panasonic NA, but also "its divisions, parent, subsidiaries and

25   affiliates, and their respective officers and directors" for liabilities caused by Lithium Ion Batteries

26   cells sold by Panasonic NA.  Panasonic Industrial Company and Panasonic Consumer Electronics

27   Company are divisions of Panasonic NA.  As explained in detail below, Panasonic NA, including

28   through its subsidiaries and affiliates, participated in the conspiracy alleged in this Complaint and

12

manufactured, marketed, and/or sold Lithium Ion Batteries that were purchased throughout the United States, including in this District, during the Relevant Period.

41.     Defendants Panasonic Corporation and Panasonic NA are collectively referred to as "Panasonic."   All of the entities referred to as Panasonic participated in the collusive conduct described herein, either directly or as represented by other members of the Panasonic entities.

### 4.     Sanyo Defendants

42.     Defendant Sanyo Electric Co., Ltd. is a Japanese corporation headquartered at 5-5 Keihan-Hondori 2-chome, Moriguchi City, Osaka 570-8677, Japan.  Sanyo Electric Co., Ltd. is one of the largest manufacturers and suppliers of Lithium Ion Batteries in the world.  In December 2009, Panasonic Corporation completed its acquisition of a majority of the voting stock of Sanyo Electric Co., Ltd.; Sanyo Electric Co., Ltd. and its subsidiaries became consolidated subsidiaries of Panasonic Corporation.  Sanyo Electric Co., Ltd. became a wholly-owned subsidiary of Panasonic Corporation on April 1, 2011.  Sanyo Energy (USA) Corporation is a subsidiary of Sanyo Electric Co., Ltd., and has been classified as part of the   Components Business Group of Sanyo Electric Co., Ltd.  Sanyo Mobile Energy Company is a division of the Component Group of Sanyo Electric Co., Ltd.  Sanyo Electric Co., Ltd. monitored its subsidiaries' business development functions and directed subsidiaries such as Sanyo Energy (USA) Corporation to handle certain accounts to the exclusion of other Sanyo subsidiaries.  As explained in detail below, Sanyo Electric Co., Ltd., including Sanyo GS Soft Energy Co., Ltd. ("GS Soft Energy")—its joint venture with Defendant GS Yuasa Corporation—and its other subsidiaries and affiliates, participated in the conspiracy alleged in this Complaint and manufactured, marketed, and/or sold Lithium Ion Batteries that were purchased throughout the United States, including in this District, during the Relevant Period.

43.     Defendant Sanyo North America Corporation is a Delaware corporation with its principal place of business at 2055 Sanyo Avenue, San Diego, California 92154-6299. Sanyo North America Corporation was a wholly-owned subsidiary of Sanyo Electric Co., Ltd.  In December 2009, Sanyo North America Corporation became an indirect, consolidated subsidiary of Panasonic Corporation.  On April 1, 2011, Sanyo North America Corporation became an indirect, wholly-owned subsidiary of Panasonic Corporation.  As explained in detail below, Sanyo North America

1   Corporation, including through its subsidiaries and affiliates, participated in the conspiracy alleged
2   in this Complaint and manufactured, marketed, and/or sold Lithium Ion Batteries that were
3   purchased throughout the United States, including in this District, during the Relevant Period.

4       44.    Defendants Sanyo Electric Co., Ltd. and Sanyo North America Corporation are
5   collectively referred to as "Sanyo."  All of the entities referred to as Sanyo participated in the
6   collusive conduct described herein, either directly or as represented by other members of the Sanyo
7   entities.

8               **5.      Sony Defendants**

9       45.    Defendant Sony Corporation ("Sony Corp.") is a business entity organized under the
10  laws of Japan with its principal executive offices at 1-7-1 Konan, Minato-ku, Tokyo 108-0075
11  Japan.  Sony Corp. has been one of the world's leading suppliers of Lithium Ion Batteries.  At
12  various times during the Relevant Period, Sony Energy Company, Sony's Core Technology &
13  Network Company, and Sony's Micro System Network Company were divisional companies and
14  business units of Sony Corp.  As explained in detail below, Sony Corp., including through its
15  subsidiaries and affiliates, participated in the conspiracy alleged in this Complaint and manufactured,
16  marketed, and/or sold Lithium Ion Batteries that were purchased throughout the United States,
17  including in this District, during the Relevant Period.

18      46.    Defendant Sony Energy Devices Corporation ("Sony Energy") is a Japanese
19  corporation with its principal executive offices at 1-1 Shimosugishita, Takakura, Hiwada-machi,
20  Koriyama-shi, Fukushima 963-0531 Japan.  Defendant Sony Energy is a wholly owned subsidiary of
21  Defendant Sony Corp.  Sony Corp. manufactures Lithium Ion Batteries through its wholly-owned
22  subsidiary Sony Energy.  Defendant Sony Energy manufactures Lithium Ion Batteries at plants
23  located in Japan, Singapore, and China.  Defendant Sony Energy, either directly or through its
24  wholly-owned subsidiaries, participated in the conspiracy alleged in this Complaint and
25  manufactured, marketed, and/or sold Lithium Ion Batteries that were distributed throughout the
26  United States, including in this District, during the Relevant Period.

27      47.    Defendant Sony Electronics, Inc. ("Sony Electronics") is a Delaware corporation
28  with its principal executive offices at 16530 Via Esprillo, San Diego, California 92127-1708.

1    Defendant Sony Electronics is a wholly-owned subsidiary of Sony Corp.   Defendant Sony
2    Electronics, either directly or through its wholly-owned subsidiaries, participated in the conspiracy
3    alleged in this Complaint and manufactured, marketed, and/or sold Lithium Ion Batteries that were
4    distributed throughout the United States, including in this District, during the Relevant Period.

5           48.    Defendants Sony Corp., Sony Energy and Sony Electronics are referred to
6    collectively as "Sony."  All of the entities referred to as Sony participated in the collusive conduct
7    described herein, either directly or as represented by other members of the Sony entities.

8                  **6.     GS Yuasa Defendant**

9           49.    GS Yuasa Corporation is a business entity organized under the laws of Japan, with
10   its principal place of business at 1, Inobanba-cho, Nishinosho, Kisshoin, Minami-ku, Kyoto 601-
11   8520, Japan.  Its businesses include the manufacture and supply of batteries, power supply systems,
12   lighting equipment, and other specialty electrical equipment.  GS Yuasa Corporation and Sanyo
13   Electric Co., Ltd. were joint venture parents of Sanyo GS Soft Energy Co., Ltd. ("GS Soft Energy"),
14   which was the successor-in-interest to GS-Melcotec Co. ("GSMT").  GS Soft Energy was a business
15   entity organized under the laws of Japan, with its principal place of business at 5, Ichinodancho,
16   Kisshoinshinden, Minami-Ku Kyoto, 6018397, Japan.  GS Yuasa Corporation, including through its
17   subsidiaries and/or affiliates GSMT and GS Soft Energy, participated in the conspiracy alleged in
18   this Complaint and manufactured, marketed, and/or sold Lithium Ion Batteries throughout the United
19   States, including in this District, during the Relevant Period.

20          50.    GS Yuasa Corporation is referred to herein as "GS Yuasa."

21                 **7.     Toshiba Defendants**

22          51.    Toshiba Corporation is a business entity organized under the laws of Japan, with its
23   principal place of business at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan.  Toshiba
24   Corporation, including through its subsidiaries A&T Battery Corporation and Toshiba America
25   Electronic Components Inc., participated in the conspiracy alleged in this Complaint and
26   manufactured, marketed, and/or sold Lithium Ion Batteries throughout the United States, including
27   in this District, during the Relevant Period.

28          52.    Toshiba Corporation shall be referred to as "Toshiba."

                                              15

## V.      AGENTS AND CO-CONSPIRATORS

53.      The acts alleged against the Defendants and co-conspirators in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' and co-conspirators' businesses or affairs.

54.      Each Defendant or co-conspirator acted as the principal, agent, or joint venturer of, or for, other Defendants or co-conspirators with respect to the acts, violations, and common course of conduct alleged by Dell.  Each Defendant and co-conspirator that is a subsidiary of a foreign parent acted as the United States agent for Lithium Ion Batteries made by its parent company.

55.      Various persons and/or firms not named as Defendants in this Complaint participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.  These co-conspirators are believed to include, without limitation, Hitachi, Ltd., Hitachi Maxell, Ltd., Maxell Corporation of America;; NEC Corporation; and NEC Tokin Corporation.

56.      Hitachi, Ltd. is a business entity organized under the laws of Japan with its principal executive office at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo 100-8280 Japan.   Hitachi, Ltd. manufactures and sells Lithium Ion Batteries through its Components and Devices Business Unit. Hitachi, Ltd. either directly or through its wholly-owned subsidiaries, participated in the conspiracy alleged in this Complaint and manufactured, marketed, and/or sold Lithium Ion Batteries that were distributed throughout the United States, including in this district, during the Relevant Period.

57.      Hitachi Maxell, Ltd. ("Hitachi Maxell") is a Japanese corporation with its principal executive offices at 2-18-2 Iidabashi, Chiyoda-ku, Tokyo 102-8521 Japan.  Hitachi Maxell became a wholly-owned subsidiary of Hitachi, Ltd. in April 2010.  On December 31, 2012, Hitachi Maxell Energy, Inc. merged into Hitachi Maxell, which became the successor-in-interest to Hitachi Maxell Energy, Inc.  Hitachi Maxell, either directly or through its affiliates and subsidiaries participated in the conspiracy alleged in this Complaint and manufactured, marketed, and/or sold Lithium Ion Batteries that were distributed throughout the United States, including in this district, during the Relevant Period.

58.      Maxell Corporation of America ("Maxell") is a New Jersey corporation with its

16

1   principal executive offices at 3 Garrett Mountain, Plaza, Suite 204, in Woodland Park, New Jersey,

2   07424-3318.  Maxell is a wholly-owned subsidiary of Hitachi Maxell, Ltd.  Maxell, either directly or

3   through its affiliates and subsidiaries, participated in the conspiracy alleged in this Complaint and

4   manufactured, marketed, and/or sold Lithium Ion Batteries that were distributed throughout the

5   United States, including in this district, during the Relevant Period.

6       59.     Hitachi, Ltd., Hitachi Maxell, and Maxell are referred to collectively herein as

7   "Hitachi."

8       60.     NEC Corporation is a business entity organized under the laws of Japan, with its

9   principal place of business at 7-1, Shiba 5-chome Minato-ku, Tokyo 108-8001, Japan.  NEC

10  Corporation, either directly or through its affiliates and subsidiaries, participated in the conspiracy

11  alleged in this Complaint and manufactured, marketed, and/or sold Lithium Ion Batteries throughout

12  the United States, including in this District, during the Relevant Period.

13      61.     NEC Tokin Corporation ("NEC Tokin") is a business entity organized under the

14  laws of Japan, with principal executive offices at 1-1, Asahicho 7-chome, Shiroshi-shi, Miyagi 989-

15  0223, Japan.   Until February 1, 2013, NEC Tokin was a wholly-owned subsidiary of NEC

16  Corporation.  At that time, KEMET Electronics Corporation purchased 51% of the voting stock,

17  which represents 34% of the economic interest, of NEC Tokin.  NEC Corporation owns 49% of the

18  voting stock, which represents 66% of the economic interest.  NEC Tokin, either directly or through

19  its affiliates and subsidiaries, participated in the conspiracy alleged in this Complaint and

20  manufactured, marketed, and/or sold Lithium Ion Batteries throughout the United States, including

21  in this District, during the Relevant Period.

22      62.     NEC Corporation and NEC Tokin are collectively referred to as "NEC."

23      63.     Defendants are also liable for acts done in furtherance of the alleged conspiracy by

24  companies they acquired through mergers and acquisitions.

25      64.     When Dell refers to a corporate family or companies by a single name in this

26  Complaint, it is alleging that one or more employees or agents of entities within that corporate

27  family engaged in conspiratorial acts on behalf of every company in that family.  The individual

28  participants in the conspiratorial acts did not always know the corporate affiliation of their

17

counterparts, nor did they distinguish between the entities within a corporate family. Defendants marketed themselves to customers as singular corporate families. For instance, Sony advised customers that its "Li-ion Worldwide Operations" had personnel in multiple locations in the U.S. in addition to Japan, the United Kingdom, Korea, China, Taiwan, and Singapore. Similarly, Panasonic presented itself to customers as providing a comprehensive global team with personnel in the U.S. as well as Japan, China, Singapore/Malaysia, and Taiwan to provide support for the Lithium Ion Battery business. One Panasonic employee explained, "Remember, customers view us as one Panasonic, and don't understand our complicated organization and silo'd structure."

65. Defendants and their U.S. affiliates obscured the differences between members of their corporate families by using the same domain names for their email addresses. For example, employees of LG Chem, Ltd. and LG Chem America, Inc. use the lgchem.com domain name for their email addresses. Similarly, Samsung SDI Co., Ltd. employees and Samsung SDI America, Inc. employees use the samsung.com domain name for their email addresses.

66. Personnel often shifted back and forth or "sojourned" between Asian and U.S. entities within the same Defendant corporate family, further blurring the distinctions between the foreign parents and U.S. subsidiaries. A number of these sojourning employees engaged in collusive conduct during the Relevant Period and then brought their knowledge of the conspiracy with them when they moved across borders. On information and belief, the following is a non-exhaustive list of sojourning personnel within the Defendant corporate families that engaged in collusive conduct:

| LG CHEM | | |
|---|---|---|
| Employee | LG Chem | LG Chem America |
| Jae Min (Jerry) Park | Senior Manager, Notebook Business CRM Team, Battery Division 2005–07 | General Manager, 2008–10 |

18

| | | |
|---|---|---|
| Dong Woo (Donny) Lee | Assistant Manager, Global Battery Sales, Battery Division, 2004<br><br>Assistant Manager, Notebook PC Business CRM Team, Battery Division, 2005–06<br><br>Assistant Manager, Mobile CRM Team 3, 2007–10 | Assistant Manager, 2010–11<br><br>Manager, 2011 |
| Yoo Sung (Brian) Oh | Planning Team Assistant Manager, Battery Division, 2003<br><br>Senior Manager, Notebook Business CRM Team, Mobile Energy Division, 2008–10<br><br>Senior Manager, Mobile CRM Team 2, Mobile Energy Division, 2011 | Senior Manager, 2004–07 |
| Jung Han (Jason) Park | Manager, Global Battery Sales Team, Battery Division, 2003–04<br><br>Manager, Notebook Business CRM Team, Mobile Energy Division, 2009 | Manager, 2005–08 |
| Young Sun Kim | General Manager, Mobile CRM Team 3, Mobile Energy Division, 2009 | Senior Manager, 2003–07 |
| **SAMSUNG** | | |
| Employee | Samsung SDI | Samsung SDI America |
| Y.A. (John) Oh | Sales Group General Manager, 2002–05<br><br>Vice President North America, 2006–09<br><br>Vice President Battery Marketing Team and Battery Cylinder Division, 2010 | President, 2006–07<br><br>Acting President of LCD, Battery & PDP Sales, 2006–07 |

19

| PANASONIC | | |
|---|---|---|
| Employee | Panasonic Corporation | Panasonic Corporation North America/ Panasonic Industrial Company |
| Shuzo Yamada | Overseas Marketing & Sales Group, Assistant Leader of Panasonic Product Sales, 2003–06 | Manager, Strategic Accounts OEM Battery Administration, 2008–11<br><br>Senior Planning Manager, 2009<br><br>Senior Product Manager, 2010 |
| Takahiro Yoshida | In charge of sales to Black & Decker and Bosch, Industrial Battery Marketing and Sales Office, 2008–11 | Senior Planning Manager, OEM US Sales, Batteries Division, 2003–08<br><br>Senior Project Manager, 2007 |
| SANYO | | |
| Employee | Sanyo Electric Co./Sanyo Mobile Energy | Sanyo North America<br><br>Corporation/Sanyo Energy USA |
| Takanao Matsumoto | 2002–06 | Vice President Global Sales, 2006–11 |

67.     The individual participants entered into agreements on behalf of their respective corporate families.  As a result, those agents represented the entire corporate family with respect to such conduct, and the corporate family was party to the agreements that those agents reached.

68.     Various persons, partnerships, sole proprietors, firms, corporations, and individuals not named as Defendants in this Complaint, and individuals, both known and unknown, participated as co-conspirators with Defendants in the offenses alleged in this Complaint, and performed acts and made statements in furtherance of the conspiracy.  Dell reserves the right to name some or all of these entities and persons as Defendants at a later date.

## VI.     TRADE AND COMMERCE

69.     During the Relevant Period, each Defendant and co-conspirator, or one or more of

1  its subsidiaries, affiliates, and/or joint ventures, sold Lithium Ion Batteries in the United States in a

2  continuous and uninterrupted flow of interstate commerce and foreign commerce.

3       70.    During the Relevant Period, Defendants and their co-conspirators collectively

4  imported billions of dollars of Lithium Ion Batteries into the United States.  Such conduct constitutes

5  United States import trade and/or import commerce.

6       71.    In addition, substantial quantities of equipment and supplies necessary to the

7  production and distribution of Lithium Ion Batteries, as well as payments for Lithium Ion Batteries,

8  sold by Defendants and purchased by Dell, traveled in United States domestic interstate commerce,

9  United States import and export commerce, and foreign trade and commerce.

10       72.    LG, Panasonic, Sanyo, Sony, Samsung, Hitachi, and Toshiba maintained sales and

11  marketing arms in the United States to conduct business with major customers.  These Defendants

12  and co-conspirators are incorporated, located, and headquartered in the United States, and each does

13  substantial business in domestic interstate commerce throughout the United States.   Many

14  Defendants had United States-based representative responsible for supporting sales of Lithium Ion

15  Batteries to Dell.  For example, Defendant Samsung SDI America maintained sales and marketing

16  personnel in Texas, with sales responsibilities for Dell.   Those United States-based personnel

17  reported to Y.A. Oh, who served simultaneously as the President of Samsung SDI America and as

18  the Vice President for North America of Samsung SDI Co., Ltd.  Sanyo similarly stationed sales and

19  engineering personnel in Texas to support Dell and other accounts.

20       73.    The activities of Defendants in connection with the production, sale, and/or

21  importation of Lithium Ion Batteries, and the conduct of Defendants and their co-conspirators as

22  alleged in this Complaint:  (a) constituted United States domestic interstate trade or commerce; (b)

23  constituted United States import trade or import commerce; and/or (c) were within the flow of and

24  had a direct, substantial, and reasonably foreseeable effect on United States domestic trade or

25  commerce and/or United States import trade or commerce.  Given the marketing, importation, and

26  sales by Defendants of Lithium Ion Batteries in the United States, and the volume of affected

27  commerce, as alleged in this Complaint, such effects were direct and substantial.

28       74.    Defendants' own documents show that the United States is one of the world's

largest markets for Lithium Ion Batteries.  For example, Samsung's report of meetings it held with Japanese manufacturers in October 2000 notes that the Americas were one of the "largest targeted market[s]" for polymer batteries.  Therefore, it is reasonably foreseeable that Defendants' wrongful conduct, as alleged in this Complaint, would raise and artificially inflate prices for Lithium Ion Batteries sold in the United States, and would have an effect on United States domestic trade or commerce and/or United States import trade or commerce.

75.     Such effects, including the artificially raised and inflated prices that Dell paid for Lithium Ion Batteries during the Relevant Period, caused antitrust injury in the United States to Dell, and give rise to Dell's claims under Section 1 of the Sherman Act, 15 U.S.C. § 1.

76.     Indeed, as set forth in more detail below, Defendants and their co-conspirators targeted Dell and Dell's purchases of Lithium Ion Batteries.

77.     In connection with both Sanyo Electric Co., Ltd.'s and LG Chem Ltd.'s guilty pleas, the DOJ has identified Dell, Inc. as a victim.

78.     Contemporaneous conspiracy documents reflect that Dell was frequently a subject of conversation during illegal meetings regarding Lithium Ion Batteries.  For instance:

    a.     On September 23, 2003, Thomas Kowalak, an employee of Panasonic NA, "had a meeting with Sanyo's Account manager today to discuss the battery business at Dell."

    b.     On March 8, 2005, LG Chem and Samsung met in a coffee shop and discussed, among other things, the status of LG Chem's price negotiations in connection with a Dell Lithium Ion Battery project.

    c.     A September 8, 2006 report of a meeting between Samsung and LG Chem reflects that these competitors shared pricing information for a Dell Lithium Ion Battery project.

    d.     On March 27, 2007, LG Chem Senior Manager Jae Min Park wrote to LG Chem America Senior Manager You Sung Oh that Park had communicated with Samsung "to decide to maintain 2Q pack price for Dell."

    e.     In summer 2007, Sony Taiwan Ltd.'s Division President Takeshi Nakayama

DELL COMPLAINT

requested that Sony Corporation General Manager Taku Katahira "to check whether other companies have intentions to raise the prices at this Dell I/N ...."  In response, Katahira commented that "I heard that S S P has talked about the increase in price of materials last week and have been following up in the US this week.  I couldn't get a hold of L." Defendants used code to describe their competitors: "S S P" referred to Samsung, Sanyo, and Panasonic, and "L" referred to LG.

79.    The above instances are representative of countless additional meetings and illegal competitor information exchanges during the Relevant Period where Dell was discussed and targeted.

## VII.    FACTUAL ALLEGATIONS UNDERLYING THE UNLAWFUL CONSPIRACY

### A.    Lithium Ion Batteries

#### 1.    Composition and characteristics of Lithium Ion Battery Cells

80.    Lithium Ion Battery Cells are a type of rechargeable battery that possess certain characteristics giving them advantages over other types of rechargeable batteries.  Lithium Ion Batteries are smaller, lighter, and have higher energy density and specific energy than other types of rechargeable batteries.  These and other characteristics of Lithium Ion Battery Cells, and, in turn, Lithium Ion Battery Packs, have made them the standard battery of choice in consumer electronic products, including notebook computers manufactured and sold by Dell.

#### 2.    Packing Lithium Ion Batteries

81.    To be functional Lithium Ion Battery Cells must be placed into packs intended for insertion and use in a device.  The process of placing one or more cells into packages together with the associated circuitry is referred to as "packing."  The assembly of battery cells into battery packs does not alter the essential character of the cells.  Rather, packing allows the cells to operate as a battery to provide power for a device, such as a laptop or notebook computer.  Typically, the cost lithium ion cells account for the majority of the cost of lithium ion packs.

82.    Defendants manufacture and sell Lithium Ion Batteries to their own affiliates (e.g., Sony packs Lithium Ion Batteries for use in Sony VAIO notebook computers). Defendants also manufacture and sell Lithium Ion Batteries to one another (e.g., Sony packs Lithium Ion Batteries

DELL COMPLAINT

for use in Toshiba Satellite and Tecra notebook computers).  Defendants also manufacture and sell Lithium Ion Batteries to unaffiliated customers.  Following meetings with Japanese Defendants on March 12–16, 2002, Samsung reported that "Most Japanese companies sell in Pack to guarantee customer quality. Sony 100%, Sanyo 70%, Matsushita 90%."

83.     Samsung's notes of meetings it held with Japanese manufacturers in July 2005 report that Sony packed 100% of its cylindrical cells, while Sanyo packed 70% of its cylindrical cells and 65% of its prismatic cells. Samsung recognized that "Sanyo and SONY have advantage in the Pack business, so it affected positively on the Cell sales."

84.     Defendants sold a substantial volume of Lithium Ion Batteries to the major laptop and notebook computer manufacturers, including Dell.

**3.     The packing business and the relationship between Defendants and the battery packers**

85.     Defendants employ several means to pack their cells into Lithium Ion Batteries for their own sales.  For example, during the Relevant Period, Sanyo packed Lithium Ion Batteries through a production subsidiary and maintained separate cell manufacturing and packing facilities. During the Relevant Period, Sony packed most of its own batteries using production personnel in its subsidiaries.

86.     Other Defendants and co-conspirators use other entities as their agents, acting on Defendants' and co-conspirators' behalf, to pack and label Lithium Ion Batteries under Defendants' and co-conspirators' names.  For example, Samsung packs its own Lithium Ion Batteries and also uses a company called Elentec Co., Ltd. ("Elentec") to pack its Lithium Ion Batteries.  Samsung affiliates dominated and controlled Elentec, holding four of seven positions in Elentec's General Executive Board including the Representative Director, President, Vice President, and Managing Director.

87.     When a Defendant or an entity, acting on the Defendant's behalf (including entities such as Elentec), packs Lithium Ion Batteries for sale by the Defendant, the packs bear markings identifying the Defendant as the manufacturer, and title over the Lithium Ion Battery Cells typically remains with the Defendant.

DELL COMPLAINT

88.     Besides manufacturing, packing, and selling their own batteries, Defendants also provide some of their Lithium Ion Battery Cells to third-party "packers" for assembly into Lithium Ion Batteries. These transactions tend to involve a transfer of title over the Lithium Ion Battery Cells to the third-party packers.   Three packers based in Taiwan are Simplo, Dynapack, and Celxpert Energy Corporation.   These and other packers do not manufacture their own battery cells.   They source their battery cells from Defendants and, in certain circumstances, require Defendants' authorization to pack Lithium Ion Batteries for Defendants. As a result, packers are dependent upon Defendants for their business and must maintain a close relationship with Defendants to keep the supply chain intact.

89.     During the Relevant Period, major customers recognized a distinction in quality between Lithium Ion Batteries packed by cell manufacturers and those packed by third-party packers. According to Sanyo, "customers, like Dell, Nokia, and Motorola, recognizes (sic) SANYO's Pack Technology, and prefers SANYO to manufacture and supply Pack."  Sanyo also told Dell that it is not responsible for the battery, if it is not a Sanyo pack.  As a result, Defendants maintained a substantial business selling packed Lithium Ion Batteries in addition to Lithium Ion Battery Cells.  Those Lithium Ion Battery sales by Defendants are within the commerce that is the subject of this Complaint.

### 4.     Nature of the claims asserted as it pertains to particular types of Lithium Ion Batteries

90.     As alleged above, cells are the core part of the pack and have no practical use on their own. There is no meaningful practical or economic distinction between cells and battery packs in terms of how the price fix occurred.  Defendants, and their co-conspirators, as herein alleged, fixed the price of Lithium Ion Battery Cells that went into Lithium Ion Batteries purchased by Dell. The claims in this Complaint include Lithium Ion Battery Cells which were packed by Defendants and their co-conspirators, Lithium Ion Battery Cells that were packed by companies for Defendants and their co-conspirators where title to said cells did not transfer, Lithium Ion Battery Cells that were packed by companies owned or controlled by Defendants and their co-conspirators.

91.     Dell purchased Lithium Ion Batteries directly from Defendants and their co-

DELL COMPLAINT

conspirators, and their affiliates and subsidiaries, pursuant to purchasing agreements.  *See supra* ¶¶ 27-28.  In these agreements with Defendants and their co-conspirators, and their affiliates and subsidiaries, Dell agreed to purchase Lithium Ion Batteries.

### 5.   Lithium Ion Batteries are commodity products

92.     There are three formats of Lithium Ion Batteries for which Dell seeks to recover overcharges it paid:  cylindrical, prismatic, and polymer.  Dell seeks to recover for its substantial direct purchases of cylindrical, prismatic, and polymer batteries.

93.     The basic composition and manufacturing for each of these formats largely overlaps. For instance, Samsung's report of meetings it held with Japanese manufacturers in October 2000 notes that polymer batteries have the "[s]ame structure as lithium ion that uses liquid electrolyte."  Sony's Battery Technology Planning Team Leader has explained that the chemistry of polymer batteries and prismatic batteries is the same.  As a result, the Lithium Ion Battery business is a single overall market, rather than separate markets for each type of battery format.

94.     Lithium Ion Batteries are highly standardized products, and interchangeable among products of the same type and across manufacturers.  These factors make Lithium Ion Batteries susceptible to commoditization—a process whereby a good that once possessed distinct attributes ends up being an indistinguishable commodity.  Commodities are wholly or partially fungible, and since they are viewed by the market as equivalent without regard to who produced them, customers tend to purchase them on the basis of price alone.  Once a good is wholly commoditized, producers can increase their market share only by cutting prices, thus leading to lower sales prices to customers.  This scenario is precisely the situation Defendants wanted to avoid, and explains why they colluded to restrain supply and stabilize Lithium Ion Battery prices.

### B.   Defendants Colluded to Keep the Price of Lithium Ion Batteries Elevated During the Relevant Period

95.     As alleged in this Complaint, Defendants engaged in a conspiracy to fix, raise, stabilize, and maintain the price of Lithium Ion Batteries throughout the Relevant Period. Defendants' acts, practices, and course of conduct in furtherance of their conspiracy evolved over

26

time and included, but were not limited to the following: coordinating prices for specific customers and products; engaging in continuous communications on confidential and proprietary business matters to eliminate price competition; allocating market shares; restricting supply of Lithium Ion Batteries; using input costs as a pretext for industry-wide pricing formulas; and concocting mechanisms to nullify competitive sales processes to their customers.  Examples of Defendants' conduct are described in detail below.

### 1.   The Korean Defendants' entry into the market undermined Japanese dominance and threatened to cause prices to drop

96.     In 1991, Sony released the first commercial Lithium Ion Battery.  Between 1991 and 1999, Sony and its fellow Japanese suppliers dominated the market for Lithium Ion Batteries, with 95% of the world's secondary batteries coming from Japan by 2000.  Prices for Lithium Ion Batteries remained stable during this period.

97.     Around 1999, Korean manufacturers entered the Lithium Ion Battery market, posing the first competitive threat to the Japanese suppliers.  LG became the first Korean manufacturer of Lithium Ion Batteries in 1999, and Samsung followed in 2000.

98.     To stem the decline in Lithium Ion Battery prices caused by the competition between the Japanese and Korean producers, the Japanese Defendants conspired with the Korean Defendants to fix, raise, stabilize, and maintain prices.  As alleged in detail below, Defendants took various acts in furtherance of this conspiracy over the course of at least 110 illicit meetings and communications that began in 2000 and lasted until May 2011.

99.     On information and belief, participating in many of these meetings and communications were top-level management for Defendants and co-conspirators including, among others:

    a.     For LG—Soon Yong Hong (Executive Vice President), Myung Hwan Kim (Director, Battery Division), and Joon Hoo Lee (Vice President, LG Notebook Division);

    b.     For Samsung—Jin Geon Lee (Executive Vice President and Sales Team Leader), Oong Kyun Kim (General Manager), Jong Seon Park (Senior

Manager), and Hee Kyu Yeo (Group Leader and Senior Manager);

c.    For Panasonic—Toru Ishida (President) and Masatsugu Kondo (Director, Small Battery Division);

d.    For Sanyo—Toshimasa Iue (President and COO) and Mr. Ikegami (General Manager);

e.    For Sony—Mr. Gazi (CEO, Sony Energy Company) and Yutaka Nakagawa (Deputy President, Sony Micro Systems Network Company and President, Sony Energy Company);

f.    For Hitachi—Kakbon Kakumoto (Vice Director of Battery Sales Headquarter and Business Strategy General Manager) and Taekjeong Sawai (Proxy General Manager of Business Strategy Division);

g.    For GS Soft Energy—Mr. Homma (President), its Vice President and its General Manager;

h.    For NEC—its Executive Vice President and its General Manager (Planning Division), Motohiro Mochizuki (NEC-Tokin's Head of Business Planning Department); and

i.    For Toshiba—Hirayama Kazunari (General Manager of Business) and Ozaki Hidemichi (General Manager of Planning).

**2.    Defendants engaged in collusive communications regarding supply, customer information, and market movements**

100.    Beginning not later than in 2000, when it became apparent that the Korean manufacturers would continue to grow their share of the Lithium Ion Battery market, the Japanese Defendants began colluding with the Korean manufacturers and sharing with them confidential and competitively sensitive information regarding supply and demand, market trends, capacity, sales forecasts, and pricing for Lithium Ion Batteries.

101.    Defendants were able to and did use the confidential, proprietary, and forward-looking information obtained from other Lithium Ion Battery suppliers to set prices to their own customers.  This type of information would not normally be exchanged absent collusion, and shows

28

that Defendants were more interested in cooperating with each other rather than competing against each other.

102.    At first, these collusive meetings took place during semi-annual visits by representatives of the Korean Defendants to the offices of the Japanese Defendants.  During the Relevant Period, these semi-annual meetings usually occurred in late February/early March and again in late July/early August.  These semi-annual meetings were frequently supplemented with other gatherings that tended to occur in "off" months such as October or November.

103.    At the semi-annual meetings, Defendants explicitly sought mutual cooperation and shared commercially sensitive, non-public information pertaining to their respective battery businesses.  Topics of discussion at these meetings included supply and demand outlook; sales performance and outlook; expansion plans and capacity; notebook computer and cellular phone market information (the two largest markets for Lithium Ion Batteries); the possibility of moving production to China; expanding to other product markets; updates on competitors; and the impact of raw material prices on the manufacturers' cost structure.  One recurring theme among the discussions was that Defendants should agree never to fully meet market demand, thereby ensuring a perennial supply shortage and generating higher prices.

104.    In addition to their on-site visits, Defendants engaged in other meetings typically at cafes, restaurants, and other out-of-the-way locations.

105.    Although Defendants generally limited their meetings so as to have no more than two companies meeting together at any one time (in order to better conceal their conspiratorial behavior), all Defendants participated in such meetings during the Relevant Period.

### 3.    Defendants and co-conspirators engaged in collusive meetings throughout the Relevant Period

106.    Defendants' and co-conspirators' collusive conduct began as early as 1999. On August 16, 1999, Toshimasa Iue, who simultaneously served as Executive Vice President and CMO of Sanyo Electric Co., Ltd. and as President of Sanyo Soft Energy Company, and General Manager Honma, Head of Sales Operations for Sanyo Soft Energy Company, visited Samsung and discussed "cooperation for the battery business."

DELL COMPLAINT

107.     Samsung's Operation Planning Team (General Manager Ui Jin Yoo, Manager Young No Kwon, and Assistant Manager Seung Hee Yoon), M/E Business Team (Senior Manager Yoo Mi Kim and Manager Sung Sik Moon), Energy Lab (Manager Sang Won Lee), and Tokyo Office (Senior Manager Hee Seung Yoo and Manager Young Taek Cho) held meetings in Japan with Sony Energy Company (General Manager Konno and Manager Oiyama), GS-Melcotec (General Manager Eiji Yamada, Manager Kazunori Nagahata, and Keiji Matsuo), NEC (Ryuichi Matsumoto), Hitachi Maxell (General Manager Fukabori, Mr. Horike, Mr. Hanada, and Mr. Akagawa), GS Yuasa (Director Takeuchi, Deputy General Manager Harada, Director Nagata, and General Manager Arahi), and Matsushita (General Manager Aoyagi, Manager Mori, and Mr. Masuda) to discuss the polymer and prismatic battery business on October 15-19, 2000.  The meeting participants exchanged at least secondary battery market forecasts on the polymer business, and the potential of the Chinese market.

108.     These meetings reflect the parties' collusion with respect to Lithium Ion Batteries. For example, Samsung and Sony recognized that the polymer format would not replace the prismatic format, and discussed that "[b]attery makers should rather create a new market than aggravating the competition amongst the makers." Samsung and NEC discussed the "[n]eed to create a family-like relationship with set makers in order to be successful in battery business."

109.     Notes of the October 2000 meeting between Samsung and GS Yuasa memorialize the companies' history of cooperation on batteries and intent to maintain that cooperation on Lithium Ion Batteries:

(5) Two companies' cooperation relationship (Arahi GM)

- Purpose of cooperation – The two companies have had exchanges for 5 years since '95 in the nickel hydride battery field, but as the expiration of the contract is approaching, there is a sense of lacking feeling.

We believe strategic partnership will be important among companies for the battery business in the future.

SDI is an electronics company and Yuasa is strong in the industrial use field, so we believe there will be many parts where the <u>two companies can cooperate in supplemental fashion.</u>

DELL COMPLAINT

Based on the thought that if the two companies can maintain cooperation rather than be in a competitive relationship, it could be Win-Win, we thought of maintaining continued cooperation relationship between the two companies. SDI's significant strength is having the substantial domestic market that is SEC [Samsung Electronics Company].

- Cooperation method – Rather than trying to accomplish something substantial from the beginning, it would be better to first enter into an NDA and then set various Themes and carry forward those that are feasible first through exchange meetings.

As there is ample room for development in Ion batteries and Polymer batters in the future, it will be possible to avoid duplicate investment through the cooperation between the two companies.

- Yuasa's position towards SDI's Opinion: Basically was in agreement. (Emphasis in original.) Samsung and Yuasa agreed to meet bimonthly going forward.

110.    In May 2001, LG's Vice President Gui Pyo Hong and Senior Manager Seok Hwan Kwak met with Sony's Director Nishi and asked for cooperation on Lithium Ion Batteries.

111.    Samsung held meetings in Japan with an Executive Vice President from GS Yuasa, a Sales Business Department General Manager from Sanyo Soft Energy Company, the President of Sony Energy Company, a Vice President of MBI, a Director/General Manager of GS-Melcotec, and a Vice President of Toshiba on May 5–10, 2001. Those meetings included discussions of the outlook for the Lithium Ion Battery market, the status of each company including its products, sales performance, and production and sales status.  Samsung's report in advance of these meetings notes a "Major History of Cooperation" between Samsung and GS Yuasa including a proposal for cooperation during a meeting on August 9, 2000, a meeting between both companies' business team heads on August 28, 2000, and an agreement to pursue cooperation during a meeting of planning and business team personnel on October 18, 2000.  According to this report, "[Samsung] SDI will hold regular exchange meetings with Yuasa."

112.    On August 26, 2001, LG's Executive Vice President Jong Pal Kim, General Manager Woon Hun Hwang, and Senior Manager Seok Hwan Kwak met with Sony Energy Company's Chief Executive Officer, Mr. Gazi, and Sony's Director Nishi. At the meeting, they discussed cooperation on Lithium Ion Batteries.

113.    On September 16–19, 2001, Samsung's Senior Vice President Hong, Senior Vice

31

President Jeong, Vice President Ahn, and Senior Manager Yoo held meetings in Japan with Sanyo Soft Energy Company's Vice President Kan Akira and with MBI's Executive Vice President for Battery Business Kawase Kirushi. Samsung's report entitled "Japanese Companies Meeting Reference Material" describes the company overview of those competitors, their product line-up strategy, foreign market entry status, and production and sales of Lithium Ion Batteries in 2000.

114.    Samsung held meetings in Japan with GS-Melcotec, Toshiba, Sony, and Matsushita on November 4–8, 2001.  Participants for Samsung at these meetings included members of the Operation Planning Team (Senior Manager Hee Seung Yoo and Manager Young No Kwon), the M/E Business Team (Manager Han Myung Kim and Manager Seung Won Lee), and the Tokyo Office (General Manager Chan Shik Park and Manager Young Taek Jo). Participants from GS-Melcotec included Managing Director Tanaka, and Sales Division Director Okada. Participants from Toshiba included Production Planning Division Group Leader Iwasaki and Head of Production Planning Division Ozaki. Participants from Sony included Division Executive Manager Furuya, Group Executive Manager Konno, Business Strategy Chief Nagamine, and Group Technical Chief Engineer Sekai.  At the  meetings, the participants discussed company status, production/capacity status, market outlook, polymer battery business strategy, China market entry strategy, and cylindrical business. Samsung's Japan Business Trip Report Results highlights that: (1) "Panasonic showed willingness to exchange opinions"; (2) GS-Melcotec sought a "cooperative relationship" for polymer batteries; and (3) Samsung agreed to GS-Melcotec's request for an "exchange of information in polymer market and market development."

115.    For instance, from March 12-16, 2002, representatives from Samsung's business and marketing teams discussed—in separate meetings with Sony, Sanyo, Hitachi Maxell, GS-Melotec, and MBI (Panasonic)—current and forecasted supply and demand for cylindrical, polymer, and prismatic Lithium Ion Batteries; production capacity; possible entry into China; the notebook computer battery market; and problems caused by excess product supply.  As a result of these meetings, Samsung, Sony and Sanyo (and likely other Defendants) agreed to refrain from extending their existing capacity in order to keep supply tight.

116.    In July 2002, LG Executive Vice President Hong met with "Division Leaders" from

32

Toshiba, MBI (Panasonic), Sony, and Sanyo to secure cooperation from these Defendants and co-conspirators in the Lithium Ion Battery market.

117.    The Samsung team returned to Japan during the period October 22-25, 2002, at which time the team met with Sanyo, Toshiba, GS-Melotec, GS Soft Energy Co., and MBI (Panasonic) to discuss substantially the same objects that were raised in the March 2002 meeting. Responding to collective fears among Defendants and co-conspirators that excess supply would give rise to a drop in price, the Vice President and General Manager of GS Soft Energy encouraged the companies to meet only 80% of market demand.  In fact, there was explicit recognition that "With price competition only, all will be in trouble → have to make the industry Healthy."  GS Soft Energy and Samsung further discussed a "strategy to get rid of a company which disturbs the market."

118.    During these meetings, Defendants agreed not to compete with each other for sales to vertically-integrated affiliates. For instance, on October 24, 2002, Sanyo informed Samsung SDI that it would refrain from supplying Lithium Ion Batteries to Samsung Electronics.

119.    On November 21, 2002, management representatives from Sony and LG met at Sony's offices in Japan for the purpose of "maintaining future cooperating relations."  Personnel from Sony Corporation's Core Technology & Network Company included Senior General Manager Yasuhiro Hosozawa, General Managers Toshiaki Naito and Masaru Hiratsuka, Manager Isao Watanabe, Director Kiyoshi Katayama, and Senior Manager Ryoichi Yamane.  LG was represented by Seok Hwan Kwak, LG's Cell Business Division leader.  At this meeting, Sony proposed that the two companies allocate the business according to battery size, because "if the two companies engage in price competition on the size, it would cause a loss to both. . . ."  LG promised that, if Sony led an increase in polymer battery prices that was reasonable, LG would follow Sony's lead.

120.    The pattern of semi-annual collusive meetings between Korean and Japanese producers of Lithium Ion Batteries continued in June/July 2003 and October 2003.  For instance, Samsung representatives met with President Homma of GS Soft Energy on June 26, 2003, at which time they discussed 2Q sales forecasts for cylindrical, prismatic, and polymer Lithium Ion Batteries. On July 16, 2003, Samsung and Toshiba met at the Tokyo ANA Hotel to discuss capacity and operating rate information.   On October 2, 2003, Samsung representatives met with GS Soft

DELL COMPLAINT

Energy's General Manager of Marketing at Tokyo's Shinjuku Restaurant.   Discussion topics included the 2004 demand forecast for prismatic and polymer Lithium Ion Batteries, price forecasts, raw material supplies, and each Defendant and co-conspirator's sales trends.

121.   Meetings among Defendants and co-conspirators continued throughout the Relevant Period, including as set forth in the following paragraphs.

### 4.   Contemporaneous Meeting Reports Confirm Defendants' Conspiracy to Fix the Prices of Lithium Ion Batteries

122.   The conspiracy continued in 2004, with Defendants and co-conspirators increasing their cooperation to set prices, avoid price reductions, and tighten supply.

123.   High-level employees of LG and Sony met on March 2-3, 2004.   According to an LG document entitled "President Minutes on Business Trip to Japan," the purpose of the meeting was to introduce "LG Chem's new management/President of Energy Company at Sony, and the new division leader to each other, sharing information, and asking for cooperation among companies." Participating in this meeting were Yutaka Nakagawa, President of Sony Energy Company, LG Executive Vice President Hong, and Myung Hwan Kim, Director of LG's Battery Division.

124.   The same "President Minutes" document relates, in meticulous detail, both an agreement between LG and Sony to fix the price of Lithium Ion Batteries, and the agreement of the other Defendants and co-conspirators to do so as well:

> Sony plans to raise customer prices as said in Press release on Feb. 24. . . . Sanyo also announced price hikes to customers and MBI also plans to do so.  Afterwards, we received the opinions of NEC/Hitachi Maxell that they would raise prices as well. . . . We believe that if LG Chem and [Samsung] cooperated in these moves, the growth of the Li-Ion battery industry is likely to go in the right direction.

Later in the President Minutes, under the heading "LG Chem's Response," LG documents that "[w]e [LG] shared the opinion of Sony and mentioned that we would cooperate on [the price increase]."  LG also made reference to a "prior meeting with our competitor SONY," conducted by LG Executive Vice President Hong, "with the aim of achieving cooperation among companies in order for the growth of the healthy Li-Ion industry."

125.   On June 30, 2004, Samsung representatives met with Sony executives at the

34

headquarters of Sony Energy Company.  The Samsung and Sony representatives discussed price fluctuation in the notebook PC market, and expressed fear that the price of Lithium Ion Batteries could fall due to excessive inventory.  Sony executives committed to avoiding any price cuts.

126.     This June 30, 2004 meeting also showed how Defendants viewed each other, *i.e.*, as collaborators rather than competitors.  The President of Sony, in his opening remarks to the Samsung contingent, stated that Sony was "[v]ery close friends with Samsung . . . [h]as visited Samsung several times to discuss cooperation in memory stick."  Further, he was "[g]lad that [Samsung] and Sony have been competitors, but also [have] been able to cooperate with each other at the same times as entities participating in the same business," and he "[w]ish[ed] such a relationship would continue."

127.     On August 9, 2004, Sony and LG met at Sony's office, where LG "proposed price cooperation to defense prices and to protect the industry, so mentioned that [LG] is also willing to cooperate through active participation."

128.     Samsung, Sanyo, Sony, MBI (Panasonic), GS Soft Energy, NEC, and Hitachi Maxell held another round of meetings on February 21-25, 2005, in Tokyo.  Worried about being caught between rising raw material costs and softening battery prices, Defendants and co-conspirators agreed that they should refrain from adding new production lines to reduce supply and thus stabilize prices.  For example, Sanyo, which planned to have four new lines for its cylindrical batteries in operation by the end of 2005, decided instead to add only one.  Defendants and co-conspirators conveyed a similar message at another round of meetings, held on July 19-22, 2005.  During a July 22, 2005 meeting with Samsung, for example, Hitachi Maxell described a 50% oversupply of prismatic batteries and stated that there was a "[g]ap between the facility CAPA [capacity] and demand, so when considering the actual production CAPA, the rate of oversupply can decrease a bit."

129.     Representatives from LG also met with Samsung over lunch in February 2005 to discuss their sales forecasts for various types of Lithium Ion Batteries.  They agreed to cooperate in setting the sales price of their Lithium Ion Batteries as much as possible going forward.  At a meeting the following month at a coffee shop in Seoul, Defendants again discussed sales volume,

capacity, and utilization rates.

130.    Jae Min Park, then-Senior Manager for LG Chem, Ltd., and Y.A. Oh, then-General Manager for Samsung SDI met for lunch on July 26, 2005, and discussed sales figures by customer for particular batteries.  During this meeting, Samsung agreed to set prices for cylindrical batteries at ranges that LG proposed.  A note from one of these meetings demonstrates Defendants' continuing collusion throughout this period, stating that the companies "[p]roposed to minimize damages caused by unnecessary competition in dealing with customers by communicating with each other in the future."

131.    Defendants continued in their agreement not to compete for business with another battery manufacturer's electronics affiliate.  On September 26, 2005, Sanyo informed LG that it "has no plan to target major business divisions of LG or Samsung, which has its own battery maker company in its Group."  Sanyo also acknowledged that it would not target sales to the electronics divisions of Panasonic or Sony because they "have their own battery business sections."

132.    On October 26, 2005, representatives of Panasonic and Samsung agreed to avoid lowering the prices of certain Lithium Ion Batteries, as described in the notes of the meeting:

> 2.0Ah Ni—Mn [type of cylindrical Lithium Ion Batter] is seen to be Low-cost, but there is no reason to lower the price at the similar level as current Li-Co.

> Actually, cost is becoming a little less expensive, but Ni—Mn 2.0Ah's performance is better than Co.  Thus no reason to lower the price.

133.    The year concluded with meetings between Samsung, Sony, and Sanyo on November 14-16, 2005 in Tokyo.  Samsung's notes of this meeting again convey the collusive nature of Defendants' business relationship: "[t]rust is solidified through continuous information exchange meetings with Sanyo."

134.    Defendants' top management continued to play an active role in facilitating the conspiracy.  For example, a Business Trip Report reveals that LG executives met with high-level counterparts from Sanyo and Panasonic on September 26, 2005:

> [t]he objectives of these meetings were to create direct contact points between the top management of LG Chem and Japan's major battery companies.   Sanyo and [Panasonic]/share information/create a

36

partnership opportunity for the sound expansion of the market, as well as to establish cooperative relationship between the Battery Association of Japan . . . and the Battery R&D Association of Korea[.] . . . [Finally] [t]he companies (especially Sanyo) showed their strong willingness to cooperate with LG Chem in areas where cooperation is possible.  The meetings have created direct contact channels between top managements of the companies.

135.    The foregoing meeting topics also included pricing.  When Sanyo stated that it would not agree to a customer's request for a 20% price reduction, LG responded as follows: "If Sanyo does not lower prices, LG will not down its prices either."

136.    At meetings between LG and Sony on February 20 and 26, 2006 at Sony's Tokyo offices, a Sony executive, eager to institutionalize the exchange of information between the companies, stated that Sony "hoped that both [Sony and LG] discuss cooperation ways [sic] like information exchanges through regular meetings in the future."  The parties discussed holding a Division Leader-level meeting between the companies before moving onto a President-level meeting.

137.    At a lunch meeting with a representative from LG in May 2006, a Samsung representative discussed supply, demand, and pricing information for a number of Samsung's customers.  Similar meetings, consistent with the semi-annual meetings institutionalized among Defendants and co-conspirators, took place between Samsung and GS Yuasa on August 8, 2006 and March 15, 2007, and between Samsung and MBI (Panasonic) on August 9, 2006.

### 5.    Defendants provided pretextual justifications for coordinated price increases

138.    On February 24, 2007, high-level executives from Samsung and Panasonic met in a private room in a restaurant in Seoul, South Korea.  The attendees discussed the rise in the price of cobalt and agreed on a formula purportedly linked to the price of cobalt for collectively raising their prices for Lithium Ion Batteries.  The pricing formula was then conveyed to the other Defendants.  Samsung spoke to LG over the phone about the proposed price increase, while Panasonic conveyed it to the other Japanese Defendants.  Samsung and Panasonic further negotiated the price increase via phone calls and email.

139.    Just a few days later, on February 27, 2007, high-level executives from LG and

37

Sanyo, including LG Vice President Lee and Sanyo General Manager Mr. Ikegami, met at Akasaka Restaurant to discuss the timing of the price increase, and arranged for a continuous channel of communications with each other.

140. To ensure that their price-fixing plan would not be revealed, Defendants used secret codes in their emails: in arranging calls, they would state that the purpose of the call was to discuss "safety," when in reality it was price-fixing. They also insisted that those with access to this information keep it confidential.

141. In an email dated March 19, 2007, a Samsung manager wrote to his counterparts at Panasonic, "[w]e want to talk about your safety technology on HRL and PSS [types of batteries]. So please call Mr. Yeo. His Cell phone number is XX-XX-XXXX-XXXX." Mr. Yeo's position at Samsung, however, had nothing to do with safety—it was to set battery prices.

142. The next day, Samsung executive H.K. Yeo sent an internal email, dated March 20, 2007, which laid out the contours of the price-fixing plan he had worked out with Panasonic:

      1. Request for price increase starting this week

      2. Increase (Proposal) Increase: Start 10~13% and hope to end with 8~10% (Bottom).

      [. . .]

      3. Hope to apply to all models

      [. . .]

      4. Time to apply the increase: starting 4/1

      5. Other company trend

        -    Sanyo: hopes for 8~10%

        -    Sony: about 10% (will end with less than 10% since starting with 10%)

143. Joon Hoo Lee, LG's Notebook Battery Vice President, wrote in a coded April 4, 2007 email that he had discussed the proposed price increase with a representative of 'S' company, understood to be Samsung. In an email that same day, Lee told Jae Gil Kim of LG to "please make sure that you maintain internal and external security regarding the email, so that people other than

38

the recipients on the list cannot access the email."

144.    Later that month, at an April 26, 2007 meeting between LG and Sanyo, the companies "both had the same idea that device makers should share the burden of the sudden price rise of raw materials and that price adjustment would be possible for cylindrical batteries," as stated in an LG email summary.  The LG email further noted that "[i]t was further decided that both would keep exchanging ideas and [that Sanyo] would make Mobile Energy Division leader Mr. Itoh contact LGC Battery Division leader for mutual cooperation."

145.    Defendants then exchanged numerous calls and emails throughout the spring and summer of 2007 as they coordinated the implementation of their price-setting plan.  For instance, in an internal email dated June 20, 2007, Samsung's Hee Joung Moon, summarizing a call he had with Sony, stated: "[o]pinion that Sony is planning 6MT [type of Lithium Ion Battery] Ramp up in August . . . and 3Q pricing has been agreed upon at about JPY [ Japanese yen] 320 range.  4Q pricing has not been discussed, and for Sony, as long as the cobalt price is maintained at the current price level, plan is in progress to [s]tay 3Q pricing in 4Q also."

146.    A set of notes summarizing Samsung's semi-annual meetings with the Japanese Defendants and co-conspirators in July 2007, including NEC, Sony, Sanyo, GS Yuasa, and Panasonic, reveals that Defendants succeeded in increasing Lithium Ion Battery prices: "An upward trend in market sales price continues due to cobalt price increase and the common view on shortage in supply of cylindrical type."

147.    In June 2007, representatives from Defendants Samsung, Sanyo, and Panasonic met together at a restaurant in the Shinagawa district of Tokyo, so as to avoid detection by others.  The participants discussed the successful early 2007 price increase and plotted to raise prices again later that year.  Defendants also sought to establish a bottom-line selling price.  Once the three Defendants agreed on the terms of this latest price increase, Samsung SDI agreed to transmit the details to LG, while Sanyo and Panasonic agreed to share the details with the other Japanese manufacturers.  Defendants agreed to discuss implementation of the price increase via telephone calls.

148.    Defendants continued to meet throughout 2007 to exchange production capacity, sales volume, and customer information, and continued to make other anticompetitive agreements.

39

DELL COMPLAINT

Summary notes from a round of meetings with Japanese Defendants and co-conspirators Sony, Sanyo, GS Yuasa, and Panasonic in March 2007 taken by a Samsung representative state, under a bullet point entitled "Aggressive Pricing Policy Required to Increase Profitability," that:

> Every company showed a keen sensitivity to increasing profitability[.] Especially Sanyo and Matsushita [Panasonic] have strong interest in achieving profitability in lithium ion business due to deteriorating profitability in nickel-hydride battery.
>
> Considering supply and demand status based on industry's conservative plant expansion, aggressive proposal and adjustment on market price while placing emphasis on achieving profitability are required.

149.     On October 5, 2007, LG and Samsung explicitly agreed on the price increase. A letter confirming this increase provides: "Dear Vice President Lee [LG]. The price agreed with [Samsung] is as follows. . . ."

150.     Throughout 2008, Defendants and co-conspirators continued to meet frequently and discuss production capacity, supply and demand, customer and competitor movements, and market trends. During this period, they also agreed to implement specific battery price increases.

151.     For example, on January 28, 2008, representatives from LG and Sanyo met at Narita airport in Japan where they discussed another round of battery price increases and the formula they would use to effectuate those increases. LG was represented by Joon Ho Lee (Vice President in charge of Notebook business), Jae Min Park (Notebook CRM team leader), and Deuk Yong Kwon (Notebook CRM team). General Manager Ikegami participated on behalf of Sanyo.

152.     At the same time, in early 2008, the price of cobalt began to climb again. LG's contemporaneous discussions with Samsung demonstrate in detail Defendants' plan to tie the price increase to the rise in the price of cobalt. This plan became clear from an internal LG email dated February 11, 2008:

-   Effective date: March 1 (March/April/May)

-   Price increase: by 10% minimum

-   [Samsung's] Rationale: It is inevitable to increase the price at least by 10% because although in the past increase the Cobalt price was $30, Cobalt price of $40 is applied to months of March/April/May (three months). Considering current Cobalt price increases,

40

[Samsung] plans to mention in advance that additional price increase is unavoidable for June/July/August (three months).  ($40-> $50)

(Therefore, it plans to raise price twice, first by 10% at minimum for March/April/May, and second by 10% at minimum for June/July/August).

- [Samsung's] future schedule: [Samsung] will visit its Taiwan customers from February 13 to February 15 to explain the plan above and ask for their understanding.

- LG []'s future schedule: After LG [] also gives a notice to [Samsung], it will notify its customers of the price increase, and start to raise price from March 1.  However, LG [] needs to raise the price by about 12%.

LG [] will say it is inevitable to additionally raise the price 2% more compared to other competitors, due to higher production costs compared to [Samsung's] capacity.

153.    Communications in late February 2008 confirmed Defendants' intention to raise prices.  For example, in an internal LG email thread dated February 27, 2008, LG noted that Samsung "reconfirmed" the planned price increase, and "said that [Samsung] does not have any problem with raising the price according to the contents mentioned last time."  In a February 29, 2008 meeting between LG and Panasonic, the parties discussed a plan to increase prices, with LG planning to follow up with Panasonic General Manager Matsumoto "regarding the price increase level."

154.    Defendants' collusive communications in early 2008 produced their intended results later that year.  On May 16, 2008, LG learned from Samsung that Samsung agreed to increase prices for Lithium Ion Batteries effective June 2008.  Samsung also agreed that it would lead the increase.  LG directed its employees to share the information with is overseas branch offices.  An internal email among LG employees dated May 16, 2008, referenced information "acquired from the Korean S Company [Samsung]," and stated that Samsung is "[p]lanning to increase prices in June (approximately by US$0.16/Cell)."

155.    By the summer of 2008, the major suppliers had signed onto the plan and had increased their prices.  An LG email dated June 10, 2008, confirmed that Sony would increase Lithium Ion Battery prices as of June 15, 2008, and that Samsung, Panasonic, and Sanyo would implement corresponding price increases by July 1, 2008.  Meeting minutes from a June 2008 LG meeting involving LG's offices in the United States contained a chart that included further detail on

41

1    these price increases.

2          156.    As the summer of 2008 wore on, the price of cobalt began to drop.  Defendants, who

3    had sold the price increase to their customers on the basis of the rising price of cobalt, were faced

4    with the task of getting their customers to acquiesce to higher Lithium Ion Battery prices when the

5    price of cobalt was falling.

6          157.    On August 8, 2008, representatives of LG and Panasonic conducted two meetings,

7    one at the Lexington Hotel and another at a restaurant over dinner.  Minutes from the dinner meeting

8    show that falling cobalt prices were foremost in the minds of the representatives who talked about

9    how they would "sell" this round of price increases to customers when the price of cobalt was no

10   longer rising:

11

12           Since Cobalt price is falling and battery demand/supply normalization
             is expected soon, customers' growing pressure on price decrease is
13           anticipated.  In the case of [Panasonic], since it engages in negotiation
             with customers with its price-related mechanism, 4Q price drop
14           derived from falling Cobalt price is inevitable, and it is hard to break
             the rule just to maintain trust with customers.  However, even if the
15           price falls, plans to minimize the drop by developing internal logic.

16          158.    Later that year, at a meeting on October 10, 2008, at the Narita Airport in Japan,

17   representatives of LG and Sanyo discussed production capacity as well as pricing.  While Sanyo's

18   fourth-quarter adjustment was based on the previously agreed cobalt formula, Defendants realized

19   that this adjustment needed to be re-worked: "Cobalt's standard price fell by $4 from $49 to $45, so

20   price adjustment range is not that great."

21          159.    Throughout these discussions, Defendants took steps to make sure that falling cobalt

22   prices did not erode the collusive price of Lithium Ion Batteries.  In an email describing the meeting

23   between LG and Sanyo on October 10, 2008, LG reported that the companies "[e]xchanged opinions

24   on preventing activities to destroy prices within the market, and for that matter, [were] willing to

25   maintain and expand appropriate company-to-company communication about related market

26   information."

27          160.    Defendants understood that, to continue selling Lithium Ion Batteries at inflated

28   prices, they would have to abandon their original pricing formula that tied the battery price increase

                                                     42

to increases in the cost of cobalt.  At a meeting in Osaka, Japan on December 8, 2008, between LG Vice President Lee and Panasonic General Manager Matsumoto, among others, the two companies discussed creating a new pricing formula:

> Both companies agreed that they should defend the current selling price because it is hard to secure volume through price cutting.  Since Panasonic made the cobalt price of $18/lb as the reference value when it first raise the price, it will adjust the selling price by using the current formula until the price of cobalt becomes $18/lb.  It is said that when the price of Cobalt is under $18/lb, it would consult customers with a new formula, adding that they are now studying a new formula.

### 6.    Notwithstanding the worldwide economic downturn in late 2008, Defendants continued to manipulate Lithium Ion Battery prices.

161.    In the face of the economic downturn in late 2008, Defendants and co-conspirators continued their collusive efforts to maintain battery prices at an artificially high level, including continuing to meet and exchange competitively sensitive information with each other.

162.    For example, on October 13, 2008, LG's John Ho Lee sent an email to LG Executive Vice President Jungoh Kim that reported on a meeting in Osaka, Japan the previous week between LG and the head of sales for Sanyo:  "We exchanged opinions on preventing activities to destroy price mechanism within the market, and for that matter, both are willing to maintain and expand company-to-company communication about related market information."

163.    Similarly, on December 5, 2008, NEC and LG met at NEC's offices in Tokyo to share information regarding capacity and market trends.

164.    Defendants' conspiracy to fix the prices of Lithium Ion Batteries continued into 2009 and 2010.  For instance, in 2009, in connection with a Lithium Ion Battery bid being submitted to Hewlett Packard during a procurement event known as an e-auction, LG and Samsung coordinated their bids with each other to manipulate the outcome of the e-auction.  Rather than submitting the required "blind bid," LG first consulted with Samsung and submitted a complementary bid that would permit both LG and Samsung to get a share of the business being awarded by Hewlett Packard without having to submit a competitively low bid.

165.    A January 6, 2009 internal LG email with the subject line "Content checked by P Company," from Deuk Yong Kwon to Joon Ho Lee recounted discussions between LG and

Panasonic about future pricing to customers for lithium ion rechargeable batteries and strategies to "defend the selling price" in the face of declines of production costs.

166.    A February 12, 2009 internal LG email with the subject line "Report on Japanese makers' trends," from Jang Won Huh (Assistant Manager, Global Battery Marketing Team) to Joon Ho Lee, attaches a report on information from Japanese companies. Mr. Hun wrote "I am reporting the recently acquired information on 3 Japanese competitors (Sanyo, Sony, Panasonic). . . ." Major customer demand forecasts are exchanged and compared, as are production development plans for future technologies, such as car batteries.

167.    An April 7, 2009 internal LG email with the subject line "Market Info 090407," to Min Ho Chung, Jae Kil Kim and Hee Kwan Ra from Joon Ho Lee (VP, in charge of Battery, Notebook Business) shared "information obtained regarding the grand mansion S across the sea. . . ." The email to S Company's line expansion plan, pricing plan, and its plan for merger with P Company. The email ends by stating "please delete as soon as possible." On information and belief, "S Company" refers to Sanyo and "P Company" refers to Panasonic.

168.    A May 14, 2009 internal LG email with the subject line "Report on D Company's April performance (compared with LGC)" from Young Moon Riew attaches an excel file entitled "LGC v. SDI Comparison of 2009 Sales," which includes Samsung SDI's sales performance by product and customer from January to April 2009.

169.    On May 29, 2009, LG Chem America's JM Park stated in an email to LG Chem (executives Park, Jae Min; Kim, Jae Kil; Kim, Hyun Soo; Jeong, Su Beom; Choi, Jeh Won; Lee, Hoon Ho) regarding customer Hewlett Packard battery pack RFQ. LG Chem America's JM Park wrote that LG Chem America sent its quote to Hewlett Packard at 2pm "after checking that Cheon An Company completed price submission around 1:40 PM." On information and belief, Cheon An Company is a reference to Samsung and refers to a Korean location where SDI has a plant. JM Park further wrote that Samsung offered 2.2Ah ($20.5/pack), 2.8Ah ($28.5/pack).

170.    An October 16, 2009 internal LG email from General Manager Min Ho Chung exchanges information acquired from Panasonic and Sanyo during meetings, which took place July 8 to 10, 2009, as well as information regarding "yesterday's phone conversation content regarding

44

Panasonic's cylindrical cell extension." Chung reported "Japanese companies still internally
question about going for 6.5-7M/Month scale, unlike Korean companies." A chart was attached to
the email comparing cell makers and customers' cell demands. Also attached were the meeting
minutes between LG and Panasonic, which reflected discussions of production forecasts, customer
demand, pricing goals, potential extensions, and various products. The email also attached Sanyo
meeting minutes which included a discussion of Panasonic's acquisition of Sanyo stating "The U.S.
government is opposed to the Pana's pushing for acquisition due to the monopoly and oligopoly
issue of the NiMH business." The conspirators compared LG and Sanyo's demand forecasts and
plans for product development. The minutes also include a section for "The talk result between
LGC's purchasing director and the division leaders of Asahi kasei and Hitachi kasei (July 9,
Manager Choi in Tokyo)."

171.    In January 2010, Hitachi Maxell, Ltd. met with Motorola, a customer of Hitachi
Maxell and several of its competitors. Following the meeting, Hitachi Maxell's Hiroshi Miyaji
advised both Hitachi Maxell and Maxell Corporation of America employees that he will confirm the
information he received from Motorola with LG.

172.    In 2010, in connection with Apple's procurement of Lithium Ion Batteries for use in
its iPad, LG and Samsung both initially contemplated selling Lithium Ion Batteries to Apple in the
low $0.40 range.  But, rather than compete with each other, Young Sun Kim of LG Chem, Ltd.
Directed "Donny" Lee of LG Chem America, Inc. to speak to his counterpart at Samsung (who was
also in the United States at the time).  As a result of these communications, the two companies
agreed to hold firm at $0.50.  Samsung also shared its "4Q roadmap" with LG.

173.    On May 19, 2010, McCaul (Sony Electronics, Inc.) emailed Koichi Fukata (Sony
Energy Devices Corporation) asking for pricing for a RIM project. In his email to Fukata, McCaul
identified Sanyo's price to RIM as "below $3.50."

174.    September 14, 2010 internal LG email thread with the subject line "Apple line
allocation for Apple – K93 price response" from Yongsun Kim includes detailed information on
Apple negotiations, LG and SDI. On information and belief, "K93" refers to Apple's tablet, the iPad.
The email thread also refers to several meetings between the competitors. The email thread

45

DELL COMPLAINT

demonstrates an arrangement between SDI and LG regarding allocating sales to Apple. One email to LG Vice President Yong Wook Chung from Young Sun Kim, General Manager, states that after "checking [with] SDI today . . . it would be better just to observe the progress" regarding an Apple deal. Another message from Kim explains, "[b]ased on LGC's logic, prices should be matched. . . . [W]e need to consider action plans after checking competitors' information once again."

175.    On November 5, 2010, Min Ho Chung emailed Daeil An, Young Sun Kim, Yoo Sung Oh, Sang Woo Kim and Yong Chan Kim a report with the subject line "Movement of SDI." Chung wrote: "Please use this for your information to grab an idea of the current situation, and a strict embargo on resending it is requested."

176.    On November 15, 2010, Dong Woo Lee followed up: "Talked to Senior Manager Park Jong Seon of SDI sales (used to be in charge of Apple) who has been seconded to Cupertino Office since last week, over the phone today, but couldn't talk long as he is now on a business trip. It is likely that we can meet and talk properly once he comes back to Cupertino." Lee then added what was discussed over the phone: "1) [h]ave been asked recently to increase volume, like us, regarding K93; 2) [h]ave been requested for supply of 2M/M or more ([s]eems to be more than that); 3) and it is also difficult for SDI to deliver all the requested volume; [w]as told that it had been thought that it would be impossible to supply all since Apple does over forecast every time, regarding too much total volume." Next day, Lee updated his previous mail by stating, "Was told that the business trip site is currently Atlanta, fyi."

177.    In December 2010, John Oh (Head of Samsung SDI America) communicated with employees of LG Chem America regarding pricing plans for Apple. John Oh "promised to commit" to LG Chem's proposed plan to raise prices to Apple by 10%. In an LG Chem email about LG Chem's conversations with John Oh regarding pricing to Apple, YW Chung (of LG Chem Korea) reiterated to LG Chem America employee Donny Lee (who had been in contact with John Oh), to "reassure [SDI's John Oh] . . . and when you have conversations with them [SDI], never leave any written evidence." In another email string between Donny Lee [LG Chem America] and others at LG Chem in Korea, Lee reports on a meeting with John Oh regarding the Apple K93 contract. In the email, Lee confirms discussion with John Oh about the need to increase pricing to Apple. Lee notes that he told Oh about LG Chem's plans to go ahead with at least the price of $.50, and

46

confirms that "SDI[A] VP Oh Yo Ahn agreed to this."

178.    Defendants' illegal conduct continued until at least May 2011, when the DOJ's investigation was made public.  An internal LG email dated February 8, 2011 states that Samsung "consented to the nullification of e-auction, and said that the Bottom [price] discussed between the two companies is $16."  Internal LG emails from March 2011, at least one of which contains coded references to competitors, indicate that competitive information regarding pricing was still being collusively exchanged.

179.    Defendants' conspiracy to fix, raise, stabilize, and maintain Lithium Ion Battery prices continued undeterred throughout the Relevant Period.

## C.    Defendants Sought to Further Implement Their Price-Fixing Conspiracy Through Sales of Lithium Ion Batteries Packs

180.    During the Relevant Period, Defendants engaged in discussions and attended meetings with representatives of competitors, during which they colluded regarding the output and price of Lithium Ion Battery Cells.  They also exchanged information about Lithium Ion Battery Pack prices, as described below.

181.    On February 27, 2008, Albert Kim of LG Chem reported internally that Sanyo had "increased Cell price in March, and Pack price in April.  It's identified that it differentially increased the prices by Cell Biz/ Pack Biz."

182.    Also, on February 27, 2008, Joon Ho Lee, LG Chem's Vice President in charge of laptop business, Deuk Yong Kwon, LG Chem's laptop CRM team, and Sanyo's General Manager Ikegami met at the Akasaka Restaurant.  Minutes of that meeting reveal that the parties sought to "[i]dentify the timing of raising prices of Pack against NTPC [sic] makers and the specific range of price increase."

183.    On June 10, 2008, Jong Min (Mark) Lee of LG Chem provided a "Competitors' Price increase report" to several LG Chem executives. Among other things, Lee reported that MBI "plans to increase prices on July 1, and it would raise 3% for Pack, 5–6% for Cell."  Lee explained that Sanyo "plans to increase Pack price on July 1, and Cell price starting from late June.  It plans to raise 25 cent for all models."

184.    On July 1, 2008, Sung Hwan Kim, Senior Manager for LG Chem reported to Jae Min Park, another Senior Manager for LG Chem, and Joon Ho Lee, Vice President for LG Chem's Notebook Division, that Samsung "has increased the price of May to July (Dell's FY 2Q) Dell pack and the amount of increase is known to be the same with the price increase level of cell. ... [¶]  In addition, Seoul has confirmed that [Samsung] is currently in negotiation with HP for pack price increase."

185.    On August 8, 2008, Joon Ho Lee, LG Chem's Vice President in charge of notebook PC business, Jae Kil Kim, LG Chem's Team Leader for Notebook CRM team, Deuk Yong Kwon, LG Chem's Assistant Manager form CRM, and Panasonic's General Manager Matsumoto held a meeting at the Lexington Hotel.  LG Chem's minutes of that meeting state, "Panasonic proposed that both [companies] should make efforts to normalize Japanese companies' pack prices, since Japanese pack prices are relative[ly] low compared to other makers."

### 1.    Defendants had anticompetitive communications with third-party packers

186.    Defendants tried to influence third-party packers, such as Dynapack and Simplo, to charge an amount for their Lithium Ion Batteries that supported Defendants' fixed prices for Lithium Ion Battery Cells. This included communications about nullifying e-auctions as described below.

187.    Sanyo and Panasonic had notified the third-party packers of a Lithium Ion Battery Cell price increase earlier in March 2007, and LG and Samsung did so in mid-April 2007 in accordance with their discussions.

### D.    The U.S. Subsidiary Defendants and Co-Conspirators Knew About the Conspiracy and Undertook Acts in Furtherance Thereof

188.    Defendants LG Chem America, Samsung SDI America, Panasonic NA, Sanyo North America Corporation, and Sony Electronics, and Maxell (collectively, "U.S. Subsidiary Defendants and Co-Conspirators") each consciously agreed to participate in, and/or can be charged with knowledge of, the conspiracy described herein.

### 1.    LG Chem America

189.    LG Chem America consciously agreed to participate in, and/or can be charged with

48

1   knowledge of, the conspiracy during the Relevant Period.

2         190.   For example, on September 8, 2006, David Son (Global Sales Manager, LG Chem,

3   Ltd.) forwarded an email to Jung Han Park (Assistant Manager, LG Chem America), Sang Woo Kim

4   (Manager, LG Chem America), and Yoo Sung Oh (Manager, LG Chem America), which noted that

5   "there is no reason not to agree with SDI's proposal for maintaining the price" and "I think it would

6   be good to discuss with HQ/U.S./Taiwan through con-cal next week."

7         191.   On October 10, 2006 Young Sun Kim (then General Manager, LG Chem America,

8   Inc.) sent an e-mail to Yoo Sung Oh (Manager, LG Chem America, Inc.) and others voicing a

9   concern about Samsung's supply to Hewlett Packard. Therein, Kim directed the recipients to

10  "please double-check SDI's direction and check again that SDI does not cut cell prices."

11        192.   On May 16, 2008, LG Chem, Ltd. learned from Samsung that Samsung agreed to

12  increase prices for Lithium Ion Batteries effective June 2008, and directed LG Chem's employees to

13  share the information with its overseas branch offices.

14        193.   An LG Chem email dated June 10, 2008 confirmed that Sony would increase

15  Lithium Ion Battery prices as of June 15, 2008, and that Samsung, MBI, and Sanyo would

16  implement corresponding price increases by July 1, 2008. Meeting minutes from a June 2008

17  meeting involving LG Chem America's offices in the United States contained a chart that included

18  further detail on these price increases.

19        194.   On July 2, 2008, Jae Min Park (Senior Manager, LG Chem America, Inc., who

20  previously served as Senior Manager, LG Chem, Ltd.) advised another Senior Manager that he

21  would check on Lithium Ion Battery pack pricing for Hewlett Packard with "a sojourning employee"

22  of Samsung in the U.S.

23        195.   On September 3, 2008, Jae Kil Kim (Senior Manager, LG Chem, Ltd.) emailed Jae

24  Min Park (Senior Manager, LG Chem America) to share "market trend information figured out

25  today with [Samsung] Company."  Samsung "is much focused on figuring out the industry's trend,

26  told us to basically move together, and has decided to delay a price cut and minimize a decrease

27  level as much as possible."  The parties also planned to meet again.

28        196.   In 2010, multiple emails involving Dong Woo (Donny) Lee (Manager, LG Chem

49

1  America, Inc.) evidence discussions with competitors, including Samsung SDI and Samsung SDI

2  America. In these communications, Lee was directed by LG Chem, Ltd. to reach out to his

3  counterpart at Samsung SDI America regarding customer pricing to Apple. Not only did Lee

4  communicate with Samsung SDI America, but he relayed that information to LG Chem, Ltd.

5              **2.      Samsung SDI America**

6         197.    Samsung SDI America consciously agreed to participate in, and/or can be charged

7  with knowledge of, the conspiracy during the Relevant Period.

8         198.    During the Relevant Period, Yo An Oh served in multiple senior positions at

9  Samsung SDI, including as Sales Group General Manager (2002-05), Vice President North America

10  (2006-09), and Vice President Battery Marketing Team (2010).  While he was the Vice President of

11  North America in 2006-07, Oh simultaneously served as the President of Samsung SDI America,

12  Inc.

13         199.    Oh was an active participant in the conspiracy alleged herein while he was at

14  Samsung SDI.  For example, in June 2004, Oh met with Sony's President at Sony's headquarters to

15  discuss the battery market and pricing of batteries.  Sony's President stated that he was glad that

16  "SDI and Sony .... [have] been able to cooperate with each other at the same time as entities

17  participating in the same business."

18         200.    In October 2005, Oh and others at Samsung SDI met with Matsushita in Osaka to

19  discuss supply and demand in the battery business, maintaining price, and intended expansion of the

20  battery business.  The parties agreed to cooperate going forward, and "suggested regular meetings

21  once every three months," with the next meeting in January 2006 in Seoul.

22         201.    As described above, in July 2005, Oh had lunch with Jae Min Park, then-Senior

23  Manager for LG Chem.  During their meeting, Oh agreed to fix cylindrical battery prices and

24  "[p]roposed to minimize damages caused by unnecessary competition in dealing with customers by

25  communicating with each other in the future."

26         202.    Oh knew about and continued to participate in the conspiracy after he moved to

27  Samsung SDI America.  For instance, in June 2007, an employee of the Mobile Energy Business

28  Team of Samsung SDI summarized a telephone call with a manager from LG Chem in which the

DELL COMPLAINT

parties exchanged information regarding inventory, compensation, and business issues.  This email was sent to, among others, Yo An Oh, then-President of Samsung SDI America.

203.    As noted above, Dong Woo (Donny) Lee of LG Chem America and his counterpart at Samsung SDI America met with each other in December 2010 at LG Chem America's office in San Jose, California, and discussed pricing to Apple that had been approved by Oh, who by then had returned to work for Samsung SDI Co., Ltd. as Vice President Battery Marketing Team.

### 3.    Panasonic NA

204.    Panasonic NA consciously agreed to participate in, and/or can be charged with knowledge of, the conspiracy during the Relevant Period.

205.    On September 23, 2003, Thomas Kowalak, an employee of Panasonic NA, "had a meeting with Sanyo's Account manager today to discuss the battery business at Dell."

206.    On July 19, 2005, Damian Pascar, an employee of Panasonic Corporation, apprised various employees of Panasonic NA (including Thomas Kowalak, an employee of Panasonic NA who had previously met with Sanyo in 2003 to discuss Dell's battery business), as well as employees of Panasonic Corporation, of Dell's e-auction results.  Pascar advised that he obtained the information "directly from someone at Sony" as to Sony's bid limits, and that such information could not be shared with Dell.

207.    In August 2005, Panasonic Corporation employee Yasushi Matsumoto emailed Robert Rauh (Panasonic Industrial Company, a division of Panasonic NA) to pass along information he obtained regarding Sanyo and Sony battery development. Matsumoto advised Rauh to "direct Tom [Thomas Kowalak] & Donna [Brewster, also in the U.S.] to UTILIZE this [sic] ingredients to gather competitors' information during its fresh period!!!" Rauh forwarded Matsumoto's email as directed; Kowalak responded, "I did meet most of competitors at the BITS training today, including folks from Samsung, Simplo, Sanyo and LG.  I'll start building the relationships so as to learn what they have in their bag of tricks."

208.    On July 19, 2006, Panasonic Corporation personnel conferred with "Sanyo Energy" regarding the battery business, including Sanyo's intentions with regard to certain customers. This email, containing competitor information, was forwarded to Robert Rauh and others affiliated with

Panasonic NA on July 21 by Panasonic Corporation personnel (Takahiro Yoshida).

209.   On May 16, 2008, McCaul communicated with Sony Corporation regarding pricing for Apple project "N82," and how Apple is rejecting any price increases. Not only did McCaul provide a chart demonstrating how Sony's current price compares to its competitors' pricing (including Samsung SDI Co., Ltd.), McCaul also related his understanding of what Sony's competitors intended to do regarding pricing to Apple in the next quarter.

210.   On October 30, 2008, Sony personnel had further discussions about Apple's "N82" project and Apple's desire to reduce prices. Keishi Hayasaka (then Sony Corporation, but later Sony Energy Devices Corporation) directed McCaul and Yuki Walsh (both of Sony Electronics, Inc.) and employees of Sony China Ltd. to advise him if they received any price reduction requests.

211.   On May 19, 2010, McCaul (Sony Electronics, Inc.) emailed Koichi Fukata (Sony Energy Devices Corporation) asking for pricing for a RIM project. In his email to Fukata, McCaul identified Sanyo's price to RIM as "below $3.50."

212.   On July 7, 2010, pricing information for customer "B&D" was obtained directly from Sony – "I got information from Sony." This information was then sent to a number of individuals affiliated with Panasonic NA, including Barbara Lahey, Senior Account Manager at Panasonic Industrial Company, who was attempting to quote a price to B&D.  Other U.S. employees on this email chain include Shuzo Yamada and Hiro Matsuno.

### 4.   Sanyo North America Corporation

213.   Sanyo North America Corporation consciously agreed to participate in, and/or can be charged with knowledge of, the conspiracy during the Relevant Period.

214.   On May 1, 2003, an account executive from Sanyo Energy (USA) Corporation, a division of Sanyo North America Corporation, emailed Sanyo Electric Co. Ltd. and noted that "[s]ince the November 30, 2001 Battery Supplier Meeting, there has NOT been another meeting bringing all battery suppliers together to discuss direction and opportunities." This email was circulated to other individuals at both the U.S. and Japanese Sanyo entities in June 2010. On October 25, 2006, Takanao Matsumoto of Sanyo Energy (USA) Corporation, a division of Sanyo North America Corporation, contacted Katsuo Seki of NEC Tokin Corporation seeking to exchange

information regarding Motorola. Matusumoto and Seki spoke by telephone and arranged to meet in person that evening.

215.    In January 2007, Matsumoto and Seki communicated on a number of occasions to exchange information regarding Motorola, and also to assist in setting up a meeting between NEC Tokin's Director of Batteries and the President of Sanyo Electric Co., Ltd. The dinner was scheduled for February 19, 2007 in Tokushima.

216.    On March 19, 2007, Takanao Matsumoto of Sanyo Energy (USA) contacted Katsuo Seki of NEC Tokin and stated "I hope ...we could exchange the information separately again." (Ellipses in original.) The following day, Matsumoto made contact with NEC Tokin and obtained information regarding its intentions with regard to future pricing to Motorola. Matsumoto asked that the recipients of his email reporting on the NEC Tokin contact "destroy this e-mail immediately."

217.    Also in March 2007, Matsumoto (Sanyo Energy (USA) Corporation) wrote to Mr. Noguchi (Sanyo Mobile Energy in Japan), "I have been occasionally exchanging the information with NEC Tokin for some time while drinking until we get drunk in Tokyo. The person at the other side is an executive managing director. ... On the other hand, as for Hitachi Maxell, [Mitsuru Iguchi of Sanyo GS Soft Energy Co., Ltd.] has been contacting underneath the surface.  We expect to acquire the information in a few days, so I will forward it to you again."

218.    On June 4, 2007, Matsumoto received an email from Iguchi (Sanyo GS Soft Energy Co., Ltd.) in which Iguchi relayed information he acquired from "Maxell," including its production capacity, packing process, price negotiations with customers, shipping routes and future purchasing plans, and shared it with Sanyo Electric Co., Ltd.

219.    Communications between Matsumoto (Sanyo Energy (USA) Corporation) and Seki (NEC Tokin) picked up again in June 2007. The competitors exchanged information regarding price increases and other competitive matters, which information was shared with individuals at Sanyo Electric Co., Ltd. and GS Soft Energy.

220.    On June 12, 2008, Matsumoto revealed that he was able to confirm Sanyo's competitors pricing "through separate top-secret information."

221.    On November 12, 2008, Howard Lim of Sanyo Energy (USA) Corporation sent

53

"Battery Power 2008" conference notes in an email to other U.S. employees and stated, "Conference was by chance participated by [sic] marketing group members of Samsung SDI – they will be important contacts for us going into future [sic] for competitive information."

### 5. Sony Electronics, Inc.

222.    Sony Electronics consciously agreed to participate in, and/or can be charged with knowledge of, the conspiracy during the Relevant Period.

223.    In 2006, for example, a slide presentation prepared by Sony Electronics relayed information obtained from LG Chem regarding LG Chem's stance on investments, profits and productivity.  The slide captioned "Current State of Competitors – LG Chem," directly quotes LG Chem as desiring to avoid a decline in prices.

224.    In mid-October 2006, just a few months before being promoted to Director of Sony Electronics, Robert McCaul (then of Sony Corporation) met H.J. Moon of Samsung SDI (Germany) at a Nokia supplier logistic day.  A few days after meeting Moon, on October 16, 2006, McCaul emailed Moon saying "It was quite nice to meet with you last week."  On October 17, Moon invited McCaul to visit Japan, stating "then it will be good chance to meet each other."  On October 19, McCaul offered October 24 or October 25; Moon confirmed his arrival for October 24 and wrote that he would call McCaul when he arrived.

225.    Following his move to Sony Electronics, Inc., McCaul communicated directly with Damian Pascar of Panasonic about Dell's confidential supplier rankings in March 2007.

226.    Following his move to Sony Electronics, in mid-June through early July 2007, McCaul and others were included in a series of email communications among Sony personnel regarding bids for a forthcoming Dell internet auction.  In particular, McCaul received an email request from Sony Taiwan Ltd.'s Division President Takeshi Nakayama to Sony Corporation General Manager Taku Katahira "to check whether other companies have intentions to raise the prices at this Dell I/N ...."  In response, Katahira commented that "I heard that S S P has talked about the increase in price of materials last week and have been following up in the US this week.  I couldn't get a hold of L." As alleged above, Defendants used code to describe their competitors: "S S P" referred to Samsung, Sanyo, and Panasonic, and "L" referred to LG.  In this same email chain

DELL COMPLAINT

(on which McCaul was a recipient), Katahira was asked to find out how price negotiations went in the U.S. for the "current increase in the price of cobalt."

227.    In December 2008, Sony was again engaged in internet negotiations with Dell. In an email from Tomohiko Nagashima (then Sony Corporation, but later Sony Energy Devices Corporation) to Robert McCaul, Steve Jaska, and Yuki Walsh (Sony Electronics) about the matter, Nagashima reiterated the importance of checking with competitors before bidding: "Although [Dell] requests a $30 level, but [sic] if competitors will not propose such level, we should not offer such price to Dell.  So it is important to check competitors [sic] status."

228.    McCaul was also involved in several communications between Sony Corporation and Sony Electronics, wherein the two entities discussed pricing (including pricing to Apple and Research in Motion (RIM)); Sony directed Sony Electronics to gather information regarding competitor pricing; and Sony Electronics funneled competitive information to Sony.

229.    No later than April 1, 2011, Sony's U.S. sales team, including McCaul and Jaska, had become part of Sony Energy.

### 6.    Maxell Corporation of America

230.    Maxell Corporation of America consciously agreed to participate in, and/or can be charged with knowledge of, the conspiracy during the Relevant Period.

231.    As noted in the June 4, 2007 email summarized above (Paragraph 218), Iguchi (GS Soft Energy) relayed information he acquired from "Maxell," including production capacity, packing process, price negotiations with customers, shipping routes, and future purchasing plans.

232.    In January 2010, Hitachi Maxell met with Motorola, a customer of Hitachi Maxell and several of its competitors.  Following the meeting, Hitachi Maxell's Hiroshi Miyaji advised both Hitachi Maxell and Maxell Corporation of America employees that he will confirm the information he received from Motorola with LG.

### E.    The Structure and Characteristics of the Lithium Ion Battery Market, Together with Other Factors, Render the Conspiracy Economically Plausible

233.    In addition to the numerous acts in furtherance of Defendants' conspiracy to fix, raise, stabilize, and maintain the price of Lithium Ion Batteries during the Relevant Period, the

structure and other characteristics of the Lithium Ion Battery market in the United States are conducive to a price-fixing agreement, and made collusion particularly attractive to Defendants.

234.    Specifically, the Lithium Ion Batteries market (1) has high barriers to entry and (2) is concentrated.    In addition to these market characteristics, (3) the existence of government investigations into anticompetitive conduct in this market, and (4) the existence of trade associations and other common forums, all support and facilitate the existence of the conspiracy Dell alleges in this Complaint.  Accordingly, the conspiracy was economically plausible.

### 1.    The Lithium Ion Batteries market has high barriers to entry.

235.    A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supra-competitive pricing.  Where, however, there are significant barriers to entry, new entrants are less likely.  Thus, barriers to entry help to facilitate the formation and maintenance of a cartel.

236.    During the Relevant Period, and continuing today, substantial barriers impede entry into the Lithium Ion Batteries market.  A new entrant into the market would face costly and lengthy start-up costs, including multi-million dollar costs associated with research and development, manufacturing plants and equipment, energy, transportation distribution infrastructure, skilled labor, long-standing customer relationships, safety and quality assurance, and reduction of high failure rates.

237.    One of the biggest barriers to entry into the Lithium Ion Battery market is the high cost of fabrication plants ("fabs"), where the batteries are manufactured.  In 2011, Panasonic announced that it planned to build a new fab in China that would cost up to $366 million.[4]  Also in 2011, LG announced that it planned to build two new fabs in South Korea and the United States that would cost $1.84 billion.[5]  In 2012, Samsung SDI announced that it would invest over $700 million over the next five years to upgrade its Malaysian factory in order to manufacture Lithium Ion

---

[4]  http://www.zemotoring.com/news/2011/04/panasonic-to-build-new-366-million-lithium-ion-plant-in-china (last visited June 25, 2015).

[5]  http://gm-volt.com/2011/04/15/lg-chem-opens-ochong-battery-plant-expects-major-market-share/ (last visited June 25, 2015).

DELL COMPLAINT

Batteries.[6]

238.     In addition to the large costs of building a plant, given the nature of the materials used in Lithium Ion Batteries, any new entrant would be required to comply with environmental regulations in whatever jurisdiction such plant is built.  Compliance would require extensive testing and the receipt of government approvals, all of which would take many years.

239.     Defendants also own multiple patents for Lithium Ion Batteries.  These patents potentially place a significant and costly burden on potential new entrants, which must avoid infringing on the patents when entering the market with a new product.

### 2.     The market for Lithium Ion Batteries is concentrated.

240.     A concentrated market is more susceptible to collusion and other anticompetitive practices.  The Lithium Ion Batteries market was concentrated during the Relevant Period.  In fact, during the Relevant Period, Defendants and their co-conspirators together have maintained high market shares.

### 3.     Government investigators are targeting certain Defendants in connection with fixing the price of rechargeable batteries.

241.     A globally coordinated antitrust investigation is taking place in at least the United States and Europe, aimed at suppliers of Lithium Ion Batteries.

242.     On June 28, 2011, Sony Corporation disclosed in its Form 20-F for the fiscal year ending March 31, 2011, that its wholly-owned United States subsidiary, Sony Electronics, Inc., "received a subpoena from the United States Department of Justice ("DOJ") Antitrust Division seeking information about its secondary battery business."

243.     Around August 20, 2012, LG confirmed that it also was the target of the DOJ's investigation.

244.     News articles have confirmed that, in addition to Sony and LG, Samsung and Panasonic were also investigated by the DOJ for price fixing with respect to the sale of rechargeable

---

[6]  *See* http://cj.my/post/69146/samsung-to-create-43907-jobs-through-investment-in-senawang/ (last visited June 25, 2015); http://www.thestar.com.my/Story/?sec=b&file=%2F2012%2F6%2F15%2Fbusiness%2F20120615081735 (last visited June 25, 2015).

1    batteries.

2       245.    It is significant that Defendants' anticompetitive behavior is the subject of a criminal

3    grand jury investigation being conducted by the DOJ.   For the DOJ to institute a grand jury

4    investigation, a DOJ Antitrust Division attorney must believe that a crime has been committed and

5    prepare a detailed memorandum to that effect.[7]   Following a review of that memorandum, the

6    request for a grand jury must be approved by the Assistant Attorney General for the Antitrust

7    Division, based on the standard that a criminal violation may have occurred.

8       246.    That the DOJ Antitrust Division investigation is criminal, as opposed to civil, is

9    significant as well.   The Antitrust Division's "Standards for Determining Whether to Proceed by

10   Civil or Criminal Investigation" state: "In general, current Division policy is to proceed by criminal

11   investigation and prosecution in cases involving horizontal, *per se* unlawful agreements such as price

12   fixing, bid rigging and horizontal customer and territorial allocations."[8]   Accordingly, the existence

13   of a criminal investigation into the market for Lithium Ion Batteries supports the existence of the

14   unlawful conspiracy alleged in this Complaint.

15      247.    On September 20, 2013, Sanyo Electric Co., Ltd. pled guilty to one count of

16   conspiring to fix prices in violation of Section 1 of the Sherman Act. The conspiracy to which Sanyo

17   Electric Co., Ltd. pled guilty was to fix the prices of cylindrical lithium ion battery cells sold in the

18   United States and elsewhere for use in notebook computer battery packs from about April 2007 to

19   about September 2008.  Sanyo Electric Co., Ltd.'s factual admissions in its Plea Agreement included

20   the following:

21          a.    In furtherance of the conspiracy, Sanyo Electric Co., Ltd. and its parent Panasonic

22                Corporation, through their employees, engaged in discussions and attended meetings

23                with representatives of competitors, during which they reached agreements to fix

24                prices of cylindrical lithium ion battery cells.

25          b.    The cells and packs containing the price-fixed cells, as well as payments for both,

26   _____

27   [7]  *See* Antitrust Division Manual, Chapter III, at p. III-81 (5th Ed. Apr. 2015), *available at*
     http://www.justice.gov/atr/public/divisionmanual/atrdivman.pdf (last accessed June 25, 2015).

28   [8]  *See* Antitrust Division Manual, Chapter III, at p. III-12 (5th Ed. Apr. 2015), *available at*
     http://www.justice.gov/atr/public/divisionmanual/atrdivman.pdf (last accessed June 25, 2015)..

DELL COMPLAINT

1    traveled in interstate and foreign trade and commerce.

2    c.    The business activities of Sanyo Electric Co., Ltd. and its co-conspirators were within

3        the flow of, and substantially affected, interstate and foreign trade and commerce.

4    d.    Acts in furtherance of the conspiracy were carried out within the Northern District of

5        California.  Cells and battery packs containing the price-fixed cells were sold by one

6        or more of the conspirators to customers in this District.

7    248.    On October 10, 2013, LG Chem pled guilty to one count of conspiring to fix prices

8    in violation of Section 1 of the Sherman Act. The conspiracy to which LG Chem pled guilty was one

9    to fix the prices of cylindrical lithium ion battery cells sold in the United States and elsewhere for

10    use in notebook computer battery packs from about April 2007 to about September 2008.   LG

11    Chem's factual admissions in its Plea Agreement included the following:

12    a.    In furtherance of the conspiracy, LG Chem, through its employees, engaged in

13        discussions and attended meetings with representatives of competitors, during which

14        they reached agreements to fix prices of cylindrical lithium ion battery cells.

15    b.    The cells and packs containing the price-fixed cells, as well as payments for both,

16        traveled in interstate and foreign trade and commerce.

17    c.    The business activities of LG Chem and its co-conspirators were within the flow of,

18        and substantially affected, interstate and foreign trade and commerce.

19    d.    Acts in furtherance of the conspiracy were carried out within the Northern District of

20        California.  Cells and battery packs containing the price-fixed cells were sold by one

21        or more of the conspirators to customers in this District.

22

23    **4.    Trade associations and other common forums facilitated Defendants'**

24    **collusion.**

25    249.    Defendants and co-conspirators are members of several battery trade associations,

26    which they used to facilitate their conspiratorial conduct.

27    250.    Panasonic, Sanyo, Sony, Hitachi Maxell, Toshiba, affiliates of Samsung, GS Yuasa,

28    and NEC are all members of the Battery Association of Japan ("BAJ").  The BAJ's stated purpose is

59

to "promote[] research and development of batteries and battery applied products."[9]   Among its primary tasks is participating in international working groups and conferences "in order to exchange information and promote international collaboration."[10]   Samsung and LG are members of the Battery R&D Association of Korea ("KORBA").

251.     Defendants and co-conspirators used the BAJ to facilitate collusive price increases. For example, in a March 2, 2004 high-level meeting between Sony and LG, Sony revealed to LG that it had "pushed BAJ (Battery Association of Japan) to help with this issue [*i.e.*, raising prices], and BAJ will ask companies for cooperation through various channels."   Principals at this meeting from Sony included Yutaka Nakagawa (Deputy President of Micro Systems Network Company ("MSNC") and President of Energy Company, the division of Sony that produces Lithium Ion Batteries), Hirokazu Kamiyama (Division Leader of MSNC), and Toshiaki Naito (General Manager of cellular battery division).   Principals for LG included Soon Yong Hong (Executive Vice President and President of I&E Materials), Director Myung Hwan Kim (Battery Division leader), and Senior Manager Seok Hwan Kwak.

252.     Defendants also used the trade associations to cooperate with each other and inhibit other entrants into the Lithium Ion Batteries market.   For instance, during a top management meeting in July 2005, Mitsuru Honma, the group leader for Sanyo's division responsible for rechargeable batteries, and LG's CEO Noh Ki-ho discussed using BAJ and KORBA to cooperate, facilitate exchanges of technology, and establish safety standards.   Similar discussions were held during a September 2005 top meeting between Toru Ishida, the President of MBI, and LG's Mr. Noh.   At the time these meetings occurred, Mr. Ishida was the President of the BAJ, Mr. Honma was the Vice President of the BAJ, and Mr. Noh was the CEO of KORBA.   LG's minutes of these meetings explain that setting safety standards not only protected customers, but also enabled Defendants to "prevent[] Chinese companies . . . from entering the market with low prices alone."

253.     Defendants and co-conspirators continued to use the trade associations to prevent new market entrants and increase prices throughout the Relevant Period.   Notes of a February 2008

---

[9]   http://www.baj.or.jp/e/about/overview.html (last accessed June 25, 2015).

[10]   http://www.baj.or.jp/e/about/maintasks.html (last accessed June 25, 2015).

DELL COMPLAINT

meeting between senior executives of Panasonic and LG refer to Panasonic General Manager Matsumoto as saying, "Battery regulations, such as BAJ, can ultimately stop new makers, whose product qualities are not stable, from entering the market, while emphasizing safety technologies' importance to customers and helping the cell makers receive premium prices for the technologies. Therefore, it [Panasonic] is aggressively supporting the activities, and asked us [LG] to actively join the moves."

## VIII.   ANTITRUST INJURY

254.    Defendants' conspiracy had the following effects, among others:

    a.    Price competition has been restrained or eliminated with respect to Lithium Ion Batteries;

    b.    The prices of Lithium Ion Batteries have been fixed, raised, stabilized, or maintained at artificially inflated levels; and

    c.    Purchasers of Lithium Ion Batteries, including Dell, have been deprived of free and open competition.

255.    By reason of the alleged violations of the antitrust laws, during the Relevant Period, Dell and other purchasers have sustained injury to their businesses and property, having paid higher prices for Lithium Ion Batteries than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy, and as a result have suffered damages.  This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## IX.      FRAUDULENT CONCEALMENT

256.    Dell did not have knowledge of the combination or conspiracy alleged in this Complaint, or of facts sufficient to place them on inquiry notice of their claims, until the public disclosures of the government investigations into Lithium Ion Battery price-fixing, which occurred no earlier than June 28, 2011.

257.    Prior to the public disclosure of government investigations, no information in the public domain or available to Dell suggested that any Defendant or co-conspirator was involved in a criminal conspiracy to fix prices for Lithium Ion Batteries.

258.    Because Defendants kept their conspiracy secret until at least June 28, 2011, Dell did

DELL COMPLAINT

not know before then that it was paying supra-competitive prices for Lithium Ion Batteries.

259.    Defendants successfully concealed their conspiratorial conduct by, among other things; making false public statements suggesting that the market for Lithium Ion Batteries was competitive; directing their employees to destroy incriminating documents; undertaking to avoid creation of a paper documentation of collusive activity; and agreeing to withhold from purchasers potentially incriminating information.   For instance, as discussed in Paragraph 206, Panasonic Corporation employee Damian Pascar expressly instructed employees not to share with Dell information he had obtained from Sony.

260.    During the Relevant Period, Defendants made numerous misleading public statements falsely portraying the market for Lithium Ion Batteries as a competitive one.   For example:

    a.    In a February 2, 2004 presentation to investors entitled "2003 Business Results & 2004 Outlook," LG declared its "[a]im to enter Top-tier [of the rechargeable battery market] by '05 through expanding customer bases with product differentiation and preceding R&D."   In a section of the presentation titled "Competition Status," LG described the Lithium Ion Battery market as "aggressive," with its competitors focused on "capacity expansion," "intensive investment," and a "[s]trategy to sustain [a] leading position."   At the time LG made these statements about the competitive state of the market it knew that they were false.   LG was a member of the conspiracy and knew that the Lithium Ion Battery producers were not competing against each other aggressively but, rather, were conspiring to avoid price competition.

    b.    Panasonic stated in its 2005 Annual Report that, "[a]mid intensifying global competition in the rechargeable battery market, the Company focuses management resources on lithium-ion batteries."   In 2007, the company stated that "Matsushita's business is subject to intense price competition worldwide. . . ."   Panasonic knew when it made these statements that they were false because Defendants, who accounted for the vast majority of Lithium Ion Batteries sold worldwide, had previously agreed not to compete on price.

c. In 2010, Panasonic stated that, "[w]e anticipate the harsh price competition with South Korean makers will continue. We are reviewing our production process to strengthen our cost competitiveness so that we can win the battle."[11] Similarly, a Sony spokesman stated in 2010 that "Sony anticipates a difficult environment for the battery business because of competition and price declines."[12] By 2010, of course, these and other Japanese suppliers had agreed for more than a decade not to compete on price with Korean makers of Lithium Ion Batteries.

261. Defendants also actively concealed their illegal activities by offering pretextual justifications for their illegal price agreements. For instance, in February 2007, the price of cobalt, a key commodity input for Lithium Ion Batteries, rose sharply. Defendants, concerned about being squeezed between rising manufacturing costs and falling battery prices, decided to act. Using the rise in raw material cost as a pretext, Defendants, through a series of clandestine meetings, phone calls, and coded emails, orchestrated a uniform price increase for Lithium Ion batteries.

a. In February 2007, Samsung and Panasonic executives met in a private room in a restaurant in Seoul, South Korea, to discuss a formula for increasing prices based on the increase in the price of cobalt, as described in more detail in paragraph 138.

b. In early 2008, LG and Samsung representatives discussed in detail Defendants' plan to justify an illegal increase in the price of Lithium Ion Batteries by linking it to an increase in the price of cobalt, as described in more detail in paragraph 152.

c. In the summer of 2008, with cobalt prices decreasing, LG and Panasonic met to discuss how to "sell" price increases to customers despite the falling cobalt price. They discussed developing "internal logic" (i.e., pretext) to "minimize the drop" in price that customers were likely to demand, as set out in more

---

[11] http://www.bloomberg.com/news/2010-08-25/panasonic-samsung-sdi-battery-price-war-to-escalate-on-glut-analysts-say.html (last accessed June 25, 2015).

[12] *Id.*

63

1      detail in paragraph 157.

2      262.   Defendants also took steps to conceal the conspiracy (in addition to ensuring its

3  implementation) by meeting with competitors in advance of negotiations with specific customers to

4  discuss how best to "sell" illegal price increases.  For example, on October 1, 2007, Hee Jung Moon

5  of Samsung held a call with Mr. Negi of Sony regarding 2008 Lithium Ion Battery price negotiations

6  with a common customer—Sony Ericsson Mobile Communications ("SEMC").  During the call,

7  Moon and Negi, ostensible competitors, strategized about how they would "sell" the proposed price

8  increases to SEMC.  Then, having agreed on their SEMC strategy, they had a follow-up call on

9  October 5 to formulate a plan for selling the price increase to Bosch, another common customer.

10     263.   Defendants also undertook to conceal their actions by instructing employees to

11  destroy incriminating documents.  For example, an internal LG email dated February 26, 2004, that

12  detailed a meeting that day between LG and Sony executives concerning Lithium Ion Battery

13  pricing, stated "[p]lease discard after reading."

14     264.   Additional LG emails detailing conspiratorial conversations and meetings among

15  Defendants contained explicit instructions to "delete . . . upon reading," "[p]lease share this email

16  only with people on the recipients list, and delete it immediately upon reading," and "[p]lease make

17  sure that each related personnel takes a look at this mail and delete it."  Emails bearing such

18  instructions were transmitted on at least the following dates: May 11, 2007, August 1, 2007, January

19  31, 2008, October 13, 2008, and October 14, 2008.

20     265.   Defendants further concealed their conduct by avoiding the creation of a paper trail

21  in the first instance.  A December 10, 2010 internal LG email regarding price fixing with "D

22  Company" stated, "when you have conversations with [D Company], never leave any written or

23  evidence [sic]."  In a February 15, 2011 LG internal email chain also with regard to "D Company"

24  (believed to be Samsung), LG executive J.H. Lee explained that "it seems our communication

25  content is too direct."  Lee's LG colleague responded: "Well understood.  And I will be careful

26  about contact."

27     266.   In addition, Defendants jointly prohibited customer access to their Lithium Ion

28  Battery pricing formulas in order to conceal their price collusion and the pre-textual nature of their

price increase justifications.  At a February 27, 2008 restaurant meeting between LG and Sanyo, LG emphasized that: "Regarding price increase, need to deliver a message again that the [pricing] formula should not be opened to customers."  Sanyo responded "positively" to LG's proposal to prevent customers from accessing the formula behind the price increases.  Sanyo also confirmed to LG that "Sony does not open [its] pricing formula to customers."

267.    Similarly, at a January 27, 2008 meeting between LG and Sanyo at the Narita Airport, Sanyo inquired as to whether LG "has an internal formula explained to customers at the time of price increase."  LG then proposed that "each company's confidential information, such as costs, should not be opened to the customers."

268.    As alleged in Section VII.B and elsewhere in this Complaint, Defendants took other affirmative acts to conceal their wrongdoing, including offering pre-textual justifications for collusive price increases; arranging clandestine meetings and phone calls among themselves to exchange pricing, production, and other competitive, non-public information; using personal email accounts and coded messages when arranging meetings; and, on at least one occasion, meeting in a private room at a restaurant so as not to be seen or hear by others.

269.    Defendants' and their co-conspirators' anticompetitive conspiracy, by its very nature, was self-concealing.  Lithium Ion Batteries are not exempt from antitrust regulation, and thus, before June 28, 2011, Dell reasonably considered it to be a competitive industry.  Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of Defendants' Lithium Ion Battery prices before June 28, 2011.

270.    Dell exercised reasonable diligence.  Dell could not have discovered the alleged conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to conceal their conspiracy.

271.    As a result of Defendants' concealment, the running of any statute of limitations has been tolled with respect to any claims that Dell alleges in this Complaint.

272.    The running of any statute of limitations had also been tolled with respect to any claims that Dell alleges in this Complaint as of October 3, 2012 – the filing of the earliest complaint

65

that is now part of the Direct Purchaser Plaintiff class in the MDL – because, as an unnamed party/ putative member of an asserted class, Dell receives the benefit of tolling under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974) and related authority.   Moreover, the DOJ's investigation also tolled the running of any statute of limitations.

## X.   DELL'S CONTRACTS WITH SAMSUNG SDI, PANASONIC NA, SANYO ELEC., AND SONY CORP.

### A.   SAMSUNG MPA

273.   Effective March 31, 2004, Dell Products L.P. and Samsung SDI Co. Ltd. entered a Master Purchase Agreement (the "Samsung MPA").   This agreement sets forth the terms and conditions by which Dell Products L.P. and all of Dell's subsidiaries and corporate affiliates purchase certain Lithium Ion Batteries from Samsung SDI.

274.   Since it became effective, both Dell and Samsung SDI have treated the Samsung MPA as applicable to all Lithium Ion Batteries purchased by Dell Inc., and any of its affiliates and subsidiaries, from Samsung SDI, and any of its affiliates and subsidiaries regardless of the specific parties that entered the Samsung MPA or which sold or purchased the Lithium Ion Batteries.

275.   The Samsung MPA requires Samsung SDI to comply with all applicable laws, orders and regulations of any governmental authority with jurisdiction over its activities in connection with the agreement.

276.   As described through this Complaint, Samsung SDI and its affiliates and subsidiaries failed to comply with all applicable laws in connection with their provision of Lithium Ion Batteries to Dell, including both U.S. and foreign antitrust laws.   Accordingly, Samsung SDI has breached the Samsung MPA.

277.   The Samsung MPA permits Dell to sue for damages for breach, an order requiring specific performance, or for any other remedy available at or in equity.   Therefore, Dell is entitled to damages and all other available remedies on account of Samsung SDI breach.

### B.   SANYO MPA

278.   Effective May 26, 2003, Dell Products L.P. and Sanyo Electric Co., Ltd. ("Sanyo Elec.") entered a Master Purchase Agreement (the "Sanyo MPA").   This agreement sets forth the

66

terms and conditions by which Dell Products L.P. and all of Dell's subsidiaries and corporate affiliates purchase certain Lithium Ion Batteries from Sanyo Elec.

279.    Since it became effective, both Dell and Sanyo Elec. have treated the Sanyo MPA as applicable to all Lithium Ion Batteries purchased by Dell Inc., and any of its affiliates and subsidiaries, from Sanyo Elec., and any of its affiliates and subsidiaries regardless of the specific parties that entered the Sanyo MPA or which sold or purchased the Lithium Ion Batteries.

280.    The Sanyo MPA requires Sanyo Elec. to comply with all applicable laws, orders and regulations of any governmental authority with jurisdiction over its activities in connection with the agreement.

281.    As described through this Complaint, Sanyo Elec. and its affiliates and subsidiaries failed to comply with all applicable laws in connection with their provision of Lithium Ion Batteries to Dell, including both U.S. and foreign antitrust laws.  Accordingly, Sanyo Elec. has breached the Sanyo MPA.

282.    The Sanyo MPA permits Dell to sue for damages for breach, an order requiring specific performance, or for any other remedy available at or in equity.  Therefore, Dell is entitled to damages and all other available remedies on account of Sanyo Elec.'s breach.

## C.    PANASONIC MPA

283.    Effective January 1, 2003, Dell Products L.P. and Panasonic NA entered a Master Purchase Agreement (the "Panasonic MPA").  This agreement sets forth the terms and conditions by which Dell Products L.P. and all of Dell's subsidiaries and corporate affiliates purchase certain Lithium Ion Batteries from Panasonic NA.

284.    Since it became effective, both Dell and Panasonic NA have treated the Panasonic MPA as applicable to all Lithium Ion Batteries purchased by Dell Inc., and any of its affiliates and subsidiaries, from Panasonic NA, and any of its affiliates and subsidiaries regardless of the specific parties that entered the Panasonic MPA or which sold or purchased the Lithium Ion Batteries.

285.    The Panasonic MPA requires Panasonic NA to comply with all applicable laws, orders and regulations of any governmental authority with jurisdiction over its activities in connection with the agreement.

286.     As described through this Complaint, Panasonic NA and its affiliates and subsidiaries failed to comply with all applicable laws in connection with their provision of Lithium Ion Batteries to Dell, including both U.S. and foreign antitrust laws.  Accordingly, Panasonic NA has breached the Panasonic MPA.

287.     The Panasonic MPA permits Dell to sue for damages for breach, an order requiring specific performance, or for any other remedy available at or in equity.  Therefore, Dell is entitled to damages and all other available remedies on account of Panasonic NA's breach.

**D.     SONY MPA**

288.     Effective October 1, 1996, Dell Products L.P. and Sony Corp. entered a Master Purchase Agreement (the "Sony MPA").  This agreement sets forth the terms and conditions by which Dell Products L.P. and all of Dell's subsidiaries and corporate affiliates purchase certain Lithium Ion Batteries from Sony Corp.

289.     Since it became effective, both Dell and Sony Corp. have treated the Sony MPAs as applicable to all Lithium Ion Batteries purchased by Dell Inc., and any of its affiliates and subsidiaries, from Sony Corp., and any of its affiliates and subsidiaries regardless of the specific parties that entered the Sony MPA or which sold or purchased the Lithium Ion Batteries.

290.     The Sony MPA requires Sony Corp. to comply with all applicable laws, rules, regulations orders and ordinances of the United States and any other state or country with jurisdiction over the party or the party's activities in connection with the agreement.

291.     As described through this Complaint, Sony Corp. and its affiliates and subsidiaries have failed to comply with all applicable laws in connection with their provision of Lithium Ion Batteries to Dell, including both U.S. and foreign antitrust laws.  Accordingly, Sony Corp. has breached the Sony MPA.

292.     The Sony MPA permits Dell to sue for damages for breach, an order requiring specific performance, or for any other remedy available at or in equity.  Therefore, Dell is entitled to damages and all other available remedies on account of Sony Corp.'s breach.

## COUNT I – CLAIM FOR VIOLATION OF 15 U.S.C. § 1

### (ALL DEFENDANTS EXCEPT LG)

293.    Dell incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

294.    Defendants and their Co-Conspirators entered into and engaged in a combination or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

295.    Defendants' acts in furtherance of their combination or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

296.    At least as early as January 2000, and continuing until such time as the anticompetitive effects of Defendants' conduct ceased, the exact dates being unknown to Dell, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade to fix, raise, stabilize, and maintain prices for Lithium Ion Batteries, thereby creating anticompetitive effects.

297.    Defendants' anticompetitive acts involved United States domestic commerce and import commerce, and had a direct, substantial, and foreseeable effect on interstate commerce by raising and fixing prices for Lithium Ion Batteries throughout the United States.

298.    The conspiratorial acts and combinations have caused unreasonable restraints in the market for Lithium Ion Batteries.

299.    As a result of Defendants' unlawful conduct, Dell has been harmed by being forced to pay inflated, supra-competitive prices for Lithium Ion Batteries.

300.    In formulating and carrying out the alleged agreement, understanding, and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including, but not limited to, the acts, practices, and course of conduct set forth in this Complaint.

301.    Defendants' conspiracy had the following effects, among others:

a.      Price competition in the market for Lithium Ion Batteries has been restrained,

69

suppressed, and/or eliminated in the United States;

      b.      Prices for Lithium Ion Batteries sold by Defendants, their divisions, subsidiaries, and affiliates, and their co-conspirators have been fixed, raised, stabilized, and maintained at artificially high, non-competitive levels throughout the United States; and

      c.      Defendants, their divisions, subsidiaries, and affiliates, and their co-conspirators have deprived Dell of the benefits of free and open competition.

302.     As a direct and proximate result of Defendants' anticompetitive conduct, Dell has been injured in its business or property and will continue to be injured in its business and property by paying more for Lithium Ion Batteries than it would have paid and will pay in the absence of the conspiracy.

303.     The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

## COUNT II – CLAIM FOR VIOLATION OF 15 U.S.C. § 1
## (LG DEFENDANTS)

304.     Dell incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

305.     Defendants and their Co-Conspirators entered into and engaged in a combination or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

306.     Defendants' acts in furtherance of their combination or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

307.     At least as early as January 2000, and continuing until such time as the anticompetitive effects of Defendants' conduct ceased, the exact dates being unknown to Dell, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade to fix, raise, stabilize, and maintain prices for Lithium Ion Batteries, thereby creating anticompetitive effects.

308.     Defendants' anticompetitive acts involved United States domestic commerce and

import commerce, and had a direct, substantial, and foreseeable effect on interstate commerce by raising and fixing prices for Lithium Ion Batteries throughout the United States.

309.   The conspiratorial acts and combinations have caused unreasonable restraints in the market for Lithium Ion Batteries.

310.   As a result of Defendants' unlawful conduct, Dell has been harmed by being forced to pay inflated, supra-competitive prices for Lithium Ion Batteries.

311.   In formulating and carrying out the alleged agreement, understanding, and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including, but not limited to, the acts, practices, and course of conduct set forth in this Complaint.

312.   Defendants' conspiracy had the following effects, among others:

a.   Price competition in the market for Lithium Ion Batteries has been restrained, suppressed, and/or eliminated in the United States;

b.   Prices for Lithium Ion Batteries sold by Defendants, their divisions, subsidiaries, and affiliates, and their co-conspirators have been fixed, raised, stabilized, and maintained at artificially high, non-competitive levels throughout the United States; and

c.   Defendants, their divisions, subsidiaries, and affiliates, and their co-conspirators have deprived Dell of the benefits of free and open competition.

313.   As a direct and proximate result of Defendants' anticompetitive conduct, Dell has been injured in its business or property and will continue to be injured in its business and property by paying more for Lithium Ion Batteries than it would have paid and will pay in the absence of the conspiracy.

314.   The alleged contract, combination, or conspiracy is a per se violation of the federal antitrust laws.

315.   Dell expressly limits this Claim, and only seeks to recover against, LG for the time period beginning no later than January 2000 and ending September 30, 2009.

DELL COMPLAINT

**COUNT III – BREACH OF CONTRACT**

**(SAMSUNG SDI)**

316.     Dell incorporates by reference all the above allegations as if fully set forth herein.

317.     Pursuant to the Samsung MPA with Dell, Samsung SDI agreed to comply with all applicable laws, orders and regulations of any governmental authority with jurisdiction over its activities in connection with the provision of Lithium Ion Batteries to Dell.

318.     Samsung SDI has treated the Samsung MPA as applicable to all Lithium Ion Batteries Purchased by Dell Inc., and any of its affiliates and subsidiaries, from Samsung SDI and any of their affiliates and subsidiaries, respectively, regardless of the specific parties that entered the initial agreement or which sold or purchased the Lithium Ion Batteries.

319.     As set forth herein, Samsung SDI and affiliates and subsidiaries of the same, did not comply with all applicable laws in providing Lithium Ion Batteries to Dell due to their participation in an illegal price fixing conspiracy, and therefore breached the Samsung MPA.

320.     Samsung SDI's breach of the Samsung MPA proximately caused sales of Lithium Ion Batteries to Dell at inflated prices since the effective dates of the Samsung MPA and through the remainder of the Relevant Period.

321.     Dell is entitled to damages for Samsung SDI's breach in the amount of the overcharges it paid to Samsung SDI and its affiliates and subsidiaries for all Lithium Ion Batteries purchases after the effective dates of the Samsung MPA and through the Relevant Period.

**COUNT IV – BREACH OF CONTRACT**

**(SANYO ELEC.)**

322.     Dell incorporates by reference all the above allegations as if fully set forth herein.

323.     Pursuant to the Sanyo MPA with Dell, Sanyo Elec. agreed to comply with all applicable laws, orders and regulations of any governmental authority with jurisdiction over its activities in connection with the provision of Lithium Ion Batteries to Dell.

324.     Sanyo Elec. has treated the Sanyo MPA as applicable to all Lithium Ion Batteries Purchased by Dell Inc., and any of its affiliates and subsidiaries, from Sanyo Elec. and any of its affiliates and subsidiaries, respectively, regardless of the specific parties that entered the initial

72

agreement or which sold or purchased the Lithium Ion Batteries.

325.    As set forth herein, Sanyo Elec., and affiliates and subsidiaries of the same, did not comply with all applicable laws in providing Lithium Ion Batteries to Dell due to their participation in an illegal price fixing conspiracy, and therefore breached the Sanyo MPA.

326.    Sanyo Elec.'s breach of the Sanyo MPA proximately caused sales of Lithium Ion Batteries to Dell at inflated prices since the effective dates of the Sanyo MPA and through the remainder of the Relevant Period.

327.    Dell is entitled to damages for Sanyo Elec.'s breach in the amount of the overcharges it paid to Sanyo Elec. and its affiliates and subsidiaries for all Lithium Ion Batteries purchases after the effective dates of the Sanyo MPA and through the Relevant Period.

## COUNT V – BREACH OF CONTRACT

### (PANASONIC NA)

328.    Dell incorporates by reference all the above allegations as if fully set forth herein.

329.    Pursuant to the Panasonic MPA with Dell, Panasonic NA agreed to comply with all applicable laws, orders and regulations of any governmental authority with jurisdiction over its activities in connection with the provision of Lithium Ion Batteries to Dell.

330.    Panasonic NA has treated the Panasonic MPA as applicable to all Lithium Ion Batteries Purchased by Dell Inc., and any of its affiliates and subsidiaries, from Panasonic NA and any of its affiliates and subsidiaries, respectively, regardless of the specific parties that entered the initial agreement or which sold or purchased the Lithium Ion Batteries.

331.    As set forth herein, Panasonic NA, and affiliates and subsidiaries of the same, did not comply with all applicable laws in providing Lithium Ion Batteries to Dell due to their participation in an illegal price fixing conspiracy, and therefore breached the Panasonic MPA.

332.    Panasonic NA's breach of the Panasonic MPA proximately caused sales of Lithium Ion Batteries to Dell at inflated prices since the effective dates of the Panasonic MPA and through the remainder of the Relevant Period.

333.    Dell is entitled to damages for Panasonic NA's breach in the amount of the overcharges it paid to Panasonic NA and its affiliates and subsidiaries for all Lithium Ion Batteries

purchases after the effective dates of the Panasonic MPA and through the Relevant Period.

## COUNT VI – BREACH OF CONTRACT

### (SONY CORP.)

334.    Dell incorporates by reference all the above allegations as if fully set forth herein.

335.    Pursuant to the Sony MPA with Dell, Sony Corp. agreed to comply with all applicable laws, orders and regulations of any governmental authority with jurisdiction over its activities in connection with the provision of Lithium Ion Batteries to Dell.

336.    Sony Corp. has treated the Sony MPA as applicable to all Lithium Ion Batteries Purchased by Dell Inc., and any of its affiliates and subsidiaries, from Sony Corp. and any of its affiliates and subsidiaries, respectively, regardless of the specific parties that entered the initial agreement or which sold or purchased the Lithium Ion Batteries.

337.    As set forth herein, Sony Corp., and affiliates and subsidiaries of the same, did not comply with all applicable laws in providing Lithium Ion Batteries to Dell due to their participation in an illegal price fixing conspiracy, and therefore breached the Sony MPA.

338.    Sony Corp.'s breach of the Sony MPA proximately caused sales of Lithium Ion Batteries to Dell at inflated prices since the effective dates of the Sony MPA and through the remainder of the Relevant Period.

339.    Dell is entitled to damages for Sony Corp.'s breach in the amount of the overcharges it paid to Sony Corp. and its affiliates and subsidiaries for all Lithium Ion Batteries purchases after the effective dates of the Sony MPA and through the Relevant Period.

## PRAYER FOR RELIEF

340.    WHEREFORE, Dell prays that the Court enter judgment on its behalf, adjudging and decreeing that:

a.    Defendants and their co-conspirators engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), and Dell was injured in its business and property as a result of Defendants' and their co-conspirators' violations;

b.    The unlawful conduct, conspiracy or combination alleged herein be adjudged and decreed:

74

1
2

      i.      An unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act; and

3

      ii.     A *per se* violation of Section 1 of the Sherman Act;

4
5

    c.     Samsung SDI, Panasonic NA, Sanyo Elec., and Sony Corp. breached their contracts with Dell for the supply of Lithium Ion Batteries;

6
7
8

    d.     Dell recover damages to the maximum extent allowed under federal antitrust laws, and that a joint and several judgment in favor of Dell be entered against Defendants in an amount to be trebled to the extent such laws permit;;

9
10

    e.     Dell be awarded compensatory damages for Samsung SDI's, Panasonic NA's, Sanyo Elec.'s, and Sony Corp.'s breaches of their contracts with Dell;

11
12
13
14
15
16

    f.     Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

17
18
19

    g.     Dell be awarded pre-judgment and post-judgment interest, as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of the initial Complaint in this action;

20
21

    h.     Dell recover its costs of this suit, including reasonable attorneys' fees as provided by law; and

22
23

    i.     Dell receive such other or further relief as the case may require and the Court may deem just and proper.

24
25

## XI. JURY TRIAL DEMANDED

26
27

341.    Pursuant to Federal Rule of Civil Procedure 38(b), Dell demands a trial by jury of all of the claims asserted in this Complaint so triable.

28

DELL COMPLAINT

Dated: June 26, 2015

*/s/ Rodney J. Ganske*
Michael P. Kenny (*pro hac vice* pending)
  mike.kenny@alston.com
Debra D. Bernstein (*pro hac vice* pending)
  debra.bernstein@alston.com
Rodney J. Ganske (*pro hac vice* pending)
  rod.ganske@alston.com
Matthew D. Kent (*pro hac vice* pending)
  matthew.kent@alston.com
Donald M. Houser (*pro hac vice* pending)
  donald.houser@alston.com
**ALSTON & BIRD LLP**
1201 West Peachtree Street
Atlanta, Georgia  30309-3424
Tel: (404) 881-7000
Facsimile: (404) 881-7777

*/s/ Douglas R. Young*
Douglas R. Young (State Bar No. 073248)
  dyoung@fbm.com
Alexander M. Porcaro (State Bar No. 281185)
  aporcaro@fbm.com
**FARELLA BRAUN + MARTEL LLP**
235 Montgomery Street, 17th Floor
San Francisco, CA  94104
Telephone:  (415) 954-4400
Facsimile:  (415) 954-4480

*Attorneys for Plaintiffs*
*DELL INC. and DELL PRODUCTS L.P.*

76

DELL COMPLAINT