1  JAMES B. BALDINGER (*Pro Hac Vice*)
   DAVID B. ESAU (*Pro Hac Vice*)
2  **CARLTON FIELDS JORDEN BURT, PA**
   CityPlace Tower
3  525 Okeechobee Boulevard, Suite 1200
   West Palm Beach, Florida  33401
4  Telephone:    (561) 659-7070
   Facsimile:     (561) 659-7368
5  desau@cfjblaw.com

6  *Attorneys for Plaintiff TracFone Wireless, Inc.*

7

8

9

10

11

12                    UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF CALIFORNIA
13                          OAKLAND DIVISION

14

15  IN RE: LITHIUM ION BATTERY              Master File No. 4:13-md-02420-YGR (DMR)
    ANTITRUST LITIGATION                    MDL No. 2420
16

17  This document relates to:               Individual Case No.  4:15-cv-02199-YGR

18  Case No.  4:15-cv-02199-YGR

19  TRACFONE WIRELESS, INC.                 **FIRST AMENDED COMPLAINT**

20                     Plaintiff,           **JURY TRIAL DEMANDED**

21          vs.

22  LG CHEM, LTD., *et al.*,

23                     Defendants.

24

25

26

27

28

Plaintiff TracFone Wireless, Inc. ("TracFone" or "Plaintiff") sues all the defendants named herein, and alleges as follows:

## I.   **INTRODUCTION**

1.       Defendants, the world's largest suppliers of Lithium Ion Battery Cells (defined below) globally and in the United States, engaged in a massive conspiracy to fix, raise, stabilize, and maintain the prices of Lithium Ion Battery Cells from at least as early as January 1, 2000 through at least May 31, 2011 (the "Relevant Period"). The conspiracy artificially raised the prices of Lithium Ion Batteries and Lithium Ion Battery Products (defined below) that were purchased by TracFone.

2.       "Lithium Ion Batteries" or "Batteries," as used in this Complaint, are cylindrical, prismatic, or polymer batteries that are rechargeable and use lithium ion technology. Lithium Ion Batteries are an important source of portable energy for many consumer products, including the mobile wireless handsets that TracFone purchased for resale to its customers.

3.       "Lithium Ion Battery Cells," as used in this Complaint, are the main components of Lithium Ion Batteries. As explained in more detail below, a cell includes the cathode, anode, and electrolyte. Individual or multiple cells are assembled or "packed" inside an enclosure. In some cases, certain protection circuitry is also added inside the enclosure. The assembled product, which is referred to as the "battery," "pack," or "module," is purchased for incorporation into various consumer products to supply power.  Lithium Ion Battery Cells account for more than 80% of the cost of the Lithium Ion Battery. The assembly of battery cells into battery packs does not change the essential character of the cells.[1] Packing simply allows the cells to operate as a battery for use in a battery product. In general, cells have no practical use on their own and, with few exceptions, cells and batteries are essentially the same from an economic standpoint, so that a price fix on the cells is a price fix on the batteries. As such, there is no meaningful practical or economic distinction between Cells and Batteries in terms of how Defendants price fixed the Batteries. Global independent safety standards in place throughout the Relevant Period require Lithium Ion Battery Cells and Lithium Ion

---

[1] United States International Trade Commission Rulings And Harmonized Tariff Schedule, HQ 563045 (http://www.faqs.org/rulings/rulings2004HQ563045.html).

-2-

Batteries to be marked with each manufacturer's name, trade name, or trademark and model designation.

4.      "Lithium Ion Battery Products," as used in this Complaint, are products manufactured, marketed, and/or sold by Defendants, their divisions, subsidiaries or affiliates, or their co-conspirators that contain one or more Lithium Ion Battery Cells manufactured by Defendants or their co-conspirators. Lithium Ion Battery Products include mobile wireless handsets, such as those purchased by TracFone.

5.      Defendants control a substantial majority of the $16 billion annual market for Lithium Ion Batteries, dominating sales to computer companies and mobile telecommunications providers, such as TracFone, and virtually every other household consumer electronics company.

6.      Defendants and their co-conspirators' (collectively, the "Conspirators") cartelization of the worldwide market is revealed in the Conspirators' secret internal materials and records.

7.      Defendants include two convicted felons – Sanyo Electric Co., Ltd. and LG Chem, Ltd. – both of which pled guilty to the criminal price-fixing of Lithium Ion Batteries.  TracFone purchased hundreds of millions of dollars worth of LG-branded mobile wireless handsets during the Relevant Period.

8.      During the period from at least 2000 through at least May 31, 2011, TracFone purchased Lithium Ion Batteries and Lithium Ion Battery Products in the United States both directly and indirectly from the Conspirators, including but not limited to Defendants and/or Defendants' subsidiaries and affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled.

9.      Defendants' unlawful conduct is a textbook price-fixing cartel. That is, a small, concentrated group of Lithium Ion Battery manufacturers, producing commoditized products, sought to artificially increase prices by agreeing to restrain competition among themselves. Defendants' agreement to fix and stabilize Lithium Ion Battery prices was accomplished through several means, including restricting output and supply, agreeing on prices or price targets (including price increases, and limiting price reductions), using common formulas tied to material costs to set industry prices,

-3-

and price-floors, below which Defendants would not agree to sell Lithium Ion Batteries. While the manner, means, and impact varied over time, the cartel's common goal during the conspiracy was to artificially raise the prices of Lithium Ion Batteries above the competitive level. Defendants were successful, to the detriment of TracFone.

10.     No later than 2000, Defendants were engaging in collusive discussions – including face-to-face meetings and telephone conversations – for the purpose of providing confidential, highly-sensitive information to each other concerning their manufacture and sale of Lithium Ion Batteries. The collusive discussions and in-person meetings occurred among Defendants sometimes on a monthly basis, and sometimes even more frequently. Meetings between these competitors occurred at locations such as restaurants, airports, office buildings, and hotel meeting rooms. During these collusive meetings and discussions, it was understood that Defendants shared a common goal to restrain price competition. Defendants believed cooperation was important to limit price competition. And so in furtherance of their common goal to limit price competition, Defendants communicated to each other highly detailed information about pricing, capacity, utilization, demand, marketing and product development plans.  These meetings continued until at least May 2011.

11.     Defendants held these collusive discussions over numerous years to restrain competition, in part, because the market for Lithium Ion Batteries was experiencing pricing pressure based on the increasingly commoditized nature of Lithium Ion Batteries and new entrants who were willing to lower prices to increase their market share. The competitors quickly concluded that they did not want to wage a price war – and so they colluded instead of competed.

12.     By engaging in these collusive meetings, and systematically sharing highly-sensitive, competitive information, Defendants sought to, and did, achieve their joint goal of elevating Lithium Ion Battery prices.  Defendants engaged in dozens of face-to-face conspiratorial meetings, in which high-level executives with pricing authority discussed and agreed to cooperate to avoid price competition. To achieve their common goal, these senior executives shared confidential pricing, capacity, utilization, demand, marketing, and product development future plans and strategies.

FIRST AMENDED COMPLAINT
CASE NO. 4:15-CV-02199-YGR
MDL NO. 4-13-MD-02420-YGR

102641422.1

13.     Internal emails and other records document Defendants' conscious commitment to collectively stabilize and raise Lithium Ion Battery prices. For example, on October 24, 2002, executives from Samsung and Sanyo GS Soft Energy Co. Ltd. ("GS Soft Energy" or "SGS"), two direct competitors, met at GS Soft Energy Company's offices in Japan and discussed and agreed they did not want industry price competition because it would hurt them and the other Defendants: "*With price competition only, all will be in trouble → have to make the industry Healthy*."[2]

14.     Another collusive meeting in 2004 documented Sony and Samsung's understanding that price reductions by the competition needed to (and would) stop. Specifically, on June 30, 2004, the following executives from Sony and Samsung, two direct competitors agreed: "*Some Cell Makers started price reduction. This is a dangerous situation where cost is increasing while price is going down. Sony is not responding with price. If it responds, then the market will be destroyed so price reduction must be suppressed.*"

15.     On July 22, 2005, Samsung executives met with executives from competitor Hitachi Maxell, in Osaka, Japan at the "Ibaraki Market Maxell Factory Internal Conference Room." The companies agreed that they "*[m]ust cooperate in terms of control over industry.*"

16.     More examples of Defendants' meetings to collude include discussions about restraining output to increase prices. For example, in February 2005 meetings, executives from Samsung, Sanyo, Sony, Matsushita (predecessor of Panasonic), GS Soft Energy, NEC-Tokin, and Hitachi Maxell, discussed and agreed upon supply restrictions. Samsung's "Planning Department" wrote internally after these collusive meetings: "*It is the situation of the decline of selling price and oversupply, thus, the overall situation of the industry for 2005 is expected to be difficult. [and that Samsung] Requested to refrain from adding lines competitively, and each company seems to be willing to refrain from adding new lines.*"

17.     Evidence also demonstrates that in August 2006 competitors Samsung and Sanyo met in Tokyo at a restaurant "near Roppongi." Defendants memorialized their discussions which included their understanding "*that the 3 companies (Sanyo, SONY, SDI) will lead the market with stability*

---

[2] All emphasis in these documents have been added by Plaintiff, unless otherwise indicated.

-5-

*with the golden section – okay to compete on technology, but refuse competition based on sales price*."

18.      Defendants understood their actions violated international antitrust laws – and yet they cavalierly dismissed these concerns. For example, in November 2007, an LG executive sent an internal email regarding a recent conversation with LG's direct competitor Samsung (referred to as "S Company"). "In regards to an S Company meeting, S Company informed me that it is uncomfortable attending a meeting due to company internal issues and that it would contact us soon." Another LG executive explained that Samsung seemed to be under "*special investigation by the Prosecutors' Office. As an external explanation, they are saying that they are restraining from contacts with other companies due to the Fair Trade Commission's investigation*." LG characterized Samsung's statement as "somewhat of a *lame excuse*." LG then indicated that despite the investigation, "*During a phone conversation with JGL [a Samsung senior executive], we agreed to make a contact in any way next year*."

19.      Samsung shared LG's view that governmental antitrust investigations were, as LG put it, a "lame excuse" and should not impede the price-fixing conspiracy. After this discussion in December 2007 between LG and Samsung, for example, on December 1, 2010, LG executive Young Wook Chun reported via email to numerous LG executives his discussions with Samsung Vice President Yo Ahn Oh, stating: "*We said that we would raise the price at least by 10% from the existing price, and they also promised to commit*."

20.      Frequently, Defendants' collusive meetings occurred between two Defendants at one time. The same Defendants would then hold collusive meetings with other Defendants as well within days of each other. Or, the Defendants would simply pass along the meeting notes to their co-conspirators. It was understood based on the substance of the discussions in these meetings that Defendants had been having collusive discussions with other Defendants for the same purpose of collectively raising Lithium Ion Battery prices.

21.      Defendants' consciousness of guilt is also shown by their use of concealment measures, such as coded emails, covert meetings, and instructions to destroy evidence of their

102641422.1

conspiracy. Documents reflect a near-constant use of code names such as "S Company," "Osaka Company," and descriptions such as "information obtained regarding the grand mansion S across the sea. . . ." (referring to Japanese conspirator Sanyo). Numerous emails between conspirators instructed that the recipient should "delete . . . upon reading" and delete "immediately" and "as soon as possible" – evidencing an awareness of their illegal activities.

22.     In order for Defendants' conspiracy to succeed worldwide in elevating prices, the Defendants had to work in concert when targeting the integral U.S. sector of the $16 billion annual market for Lithium Ion Batteries. The conscious participation of numerous U.S. Subsidiary Defendants in Defendants' scheme is evidenced by internal discussions. For example, in September 2008, a senior executive from LG in Korea emailed an executive at LG's U.S. subsidiary in Texas to report on a collusive meeting with competitor Samsung, and that Samsung "*told us to basically move together, and has decided to delay a price cut and minimize a decrease level as much as possible*."

23.     Defendants' conspiracy mirrors in many respects their conduct in other price-fixing cases previously brought against them, their parents, or affiliates. These Defendants, their parents, subsidiaries, and/or affiliates have orchestrated some of the largest global price-fixing conspiracies witnessed in the past decade – fixing the prices of key components for consumer electronic goods, in particular computers, televisions, and cellular phones. These entities, and many of their executives, have pleaded guilty to price-fixing dynamic random access memory ("DRAM") chips, liquid crystal display ("LCD") screens, optical disk drives ("ODD"), and cathode ray tube ("CRT") screens. These component part conspiracies – like the conspiracy to fix Lithium Ion Battery prices – all have very similar features, including: (a) a highly concentrated market, controlled by Asian corporations; (b) pricing pressure exerted on the conspirators by large original equipment manufacturers ("OEMs") seeking to price their products in a competitive consumer electronics market; (c) rapid commoditization of new technology; and (d) pricing behavior inconsistent with a competitive market.

24.     Defendants' anticompetitive conduct impacted prices for Lithium Ion Batteries and Lithium Ion Battery Products that were sold to TracFone. As a result of Defendants' conduct,

-7-

TracFone paid inflated prices for Lithium Ion Batteries and Lithium Ion Battery Products during the Relevant Period, and has suffered antitrust injury to its business or property.

## II.      JURISDICTION AND VENUE

25.      TracFone bring this action to obtain injunctive relief under Section 16 of the Clayton Act, to recover damages, including treble damages under Section 4 of the Clayton Act, costs of suit, and reasonable attorneys' fees arising from Defendants' violations of Section 1 of the Sherman Act (15 U.S.C. § 1).

26.      TracFone also bring this action under the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. Section 501.201 *et seq.* ("FDUTPA").

27.      The Court has jurisdiction under 28 U.S.C. §§ 1331 and 1337 over TracFone's claims under Section 1 of the Sherman Act and Sections 4 and 16 of the Clayton Act. The Court has supplemental jurisdiction over TracFone's FDUTPA claim, and that claim is so related to TracFone's claims under Section 1 of the Sherman Act and Sections 4 and 16 of the Clayton Act that it forms part of the same case or controversy.

28.      The activities of Defendants and their co-conspirators, as described herein, involved U.S. import trade or commerce and/or were within the flow of, were intended to, and did have a direct, substantial, and reasonably foreseeable effect on United States domestic and import trade or commerce, as well as on commerce in Florida. This effect gives rise to TracFone's claims. During the Relevant Period, Defendants' and their co-conspirators' conspiracy affected the price of Lithium Ion Batteries and Lithium Ion Battery Products that TracFone purchased in the United States.  These Lithium Ion Batteries and Lithium Ion Battery Products moved through, and/or were purchased, sold in, or used in Florida.

29.      This Court has jurisdiction over each Defendant named in this action under Section 12 of the Clayton Act, 15 U.S.C. § 22. In addition, Defendants and their co-conspirators purposely availed themselves of the laws of the United States as they manufactured Lithium Ion Batteries and Lithium Ion Battery Products for sale in the United States, or which were subsequently incorporated into Lithium Ion Battery Products that Defendants and their co-conspirators knew would be sold to

-8-

customers in the United States. Defendants' and their co-conspirators' Conspiracy affected this commerce in Lithium Ion Batteries and Lithium Ion Battery Products in the United States. Moreover, Defendants and their co-conspirators who have entered guilty pleas in connection with the Conspiracy alleged herein have acknowledged that their illegal activities had a substantial effect on interstate and foreign trade and commerce.

30.    Venue is proper in the Southern District of Florida under Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391 because each Defendant is either an alien corporation, transacts business in this District, or is otherwise found within this District. In addition, venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this claim occurred in this District. Defendants and their co-conspirators knew that price-fixed LIBs would be sold and shipped into this District.

31.    This action concerns substantially the same parties, transactions and events as *In re Lithium Ion Battery Antitrust Litigation*, Case No. 4:13-md-02420-YGR, pending in the United States District Court for the Northern District of California insofar as it involves a suit for damages and injunctive relief arising out of Defendants' and their co-conspirators' conspiracy to fix the prices of lithium ion batteries in violation of the Sherman Act.

## III.    THE PARTIES

### A.    Plaintiff

32.    Plaintiff TracFone Wireless, Inc. is the largest prepaid cellular phone provider in the United States with more than 25 million customers. TracFone sells mobile wireless handsets to its customers through more than 70,000 retailers nationwide, including in Florida, California, and elsewhere.  During the Relevant Period, TracFone purchased more than eighty-six million mobile wireless handsets for resale to customers.  The mobile wireless handsets that TracFone purchased during the Relevant Period contained Lithium Ion Batteries.

33.    Since 1996, TracFone has maintained its corporate headquarters in Miami-Dade County, Florida where it purchased and sold mobile wireless handsets, made nearly all of its purchasing and sales decisions regarding mobile wireless handsets, negotiated purchasing and sales

-9-

contracts for mobile wireless handsets, and made and received payments for mobile wireless handsets, among other activities.

34.    TracFone, as a large wireless telecommunications provider, helped increase consumer demand in the United States for mobile wireless handsets during the Relevant Period and thus demand for Lithium Ion Batteries manufactured by defendants.   TracFone served as a major distribution channel for mobile wireless handsets for the U.S. market.  Defendants knew that mobile wireless providers, like TracFone, were some of the most important purchasers of mobile wireless handsets containing the Lithium Ion Batteries they manufactured, and that the Lithium Ion Batteries they price-fixed would end up in mobile wireless handsets purchased by wireless providers in the United States, such as TracFone.

35.    During the Relevant Period, TracFone directly purchased mobile wireless handsets that were manufactured, marketed, and/or sold by Defendants, their divisions, subsidiaries or affiliates, or their co-conspirators that contain one or more Lithium Ion Battery Cells manufactured by Defendants or their co-conspirators, including from LG and Samsung.

36.    Specifically, TracFone purchased tens of millions of mobile handsets from LG Electronics Mobilecomm USA, Inc., which is a sales and marketing division of, and is wholly owned and controlled by, LG Electronics, Inc. (described below). The LG-branded phones that were purchased by TracFone during the Relevant Period include at least the following models:  LG231C, LG900G, LG0225, LG100C, LG1500, LG200C, LG220C, LG290C, LG300G, LG320G, LG400G, LG410G,  LG420G,  LG600G,  LG620G, LGS100C,  LGS220C,  LG420G,  LG620G,  LG3280, LG0225, LGA300G.  Those mobile handsets and the Lithium Ion Batteries contained therein bore the distinctive "LG" markings and corporate logo.  LG Electronics, Inc. manufactured, negotiated prices for, and sold the LG-branded mobile handsets that were purchased by TracFone during the Relevant Period. LG Electronics procured Lithium Ion Batteries from its affiliate, LG Chem, for inclusion in the LG-branded mobile handsets that were manufactured for and sold to TracFone during the Relevant Period.

FIRST AMENDED COMPLAINT
CASE NO. 4:15-CV-02199-YGR
MDL NO. 4-13-MD-02420-YGR

102641422.1

37.     TracFone also purchased tens of millions of mobile handsets directly from Samsung Electronics America, Inc., which is a sales and marketing arm of, and is wholly owned and controlled by Samsung Electronics Co., Ltd., which, in turn, is the single largest shareholder of Defendant Samsung SDI Co., Ltd.  Samsung Electronics Co., Ltd. also controlled the management and affairs of Defendant Samsung SDI Co., Ltd. during the Relevant period.  The Court has already held that this type of purchasing structure and allegations "satisfy *Royal Printing* for purposes of pleading."[3]  The Samsung-branded phones that were purchased by TracFone during the Relevant Period include at least the following models:   R335C, T255G, T404G, R355C, R451C, S451C, T201G, T401G, R810C, T401G, T101G, T105G, T155G, T301G. Those mobile handsets and the Lithium Ion Batteries contained therein bore the distinctive "Samsung" markings and corporate logo. Samsung Electronics Co., Ltd. manufactured, negotiated prices for, and sold the Samsung-branded mobile handsets that were purchased by TracFone during the Relevant Period.  Samsung Electronics Co., Ltd. procured Lithium Ion Batteries from its subsidiary, Defendant Samsung SDI Co., Ltd., for inclusion in the Samsung-branded mobile handsets that were manufactured for and sold to TracFone during the Relevant Period.

38.     TracFone also purchased Lithium Ion Batteries and Lithium Ion Battery Products through third party mobile handset manufacturers during the Relevant Period.  Specifically, TracFone purchased tens of millions of mobile handsets from both Motorola, Inc. and Nokia, Inc. -- both of which purchased Lithium Ion Batteries directly from at least Defendants Panasonic, Sanyo, LG Chem, Sony, and Samsung SDI.  The Motorola phones that were purchased by TracFone during the Relevant Period include at least the following models 120C, 120T, V120, V601, C139, C155, C261, T326G, TV3A, W370, W375, W377, W385C, W408G, V170, V171, V176, C343, W175, W260, W370, W376, V120, V170, V176.  The Nokia phones that were purchased by TracFone during the Relevant Period include at least the following models:  3390, 5125, 5165, 5180, 1100, 1600, 2600, 6790G, E71G, 1100, 1112, 1221, 2126, 2285, 3390, 5125, 5180.

---

[3] *See* Omnibus Order re: Motions to Dismiss the Second Consolidated Amended Complaints of Direct and Indirect Purchaser Plaintiffs, at n. 24, Oct. 2, 2014 (Dkt. No. 512).

-11-

102641422.1

39.     Nokia and Motorola typically purchased Batteries (as opposed to raw Cells) from the Defendants – meaning that, for those purchases, there was only one intermediary between the Defendants and TracFone.  Defendants' own documents show that they understood that Nokia and Motorola preferred to purchase Batteries packed by the same company that manufactured the Cell. According to Sanyo, "customers, like Dell, Nokia, and Motorola, recognize[] SANYO's Pack Technology, and prefer[] SANYO to manufacture and supply Pack." Panasonic also understood that "Nokia decided that in principle, Cell and Pack must be supplied by the same supplier."  As part of their illegal conduct described herein, Defendants specifically targeted sales to Nokia and Motorola.

40.     As a result of the conspiracy, TracFone has been injured in its business and property because the prices it paid for Lithium Ion Batteries and Lithium Ion Battery Products were artificially inflated by the conspiracy.  The Conspirators' price-fixing was the proximate cause of TracFone paying artificially-elevated prices for Lithium Ion Batteries and Lithium Ion Battery Products.

41.     The Sherman Act claims in this Complaint include TracFone's purchases of LG- and Samsung-branded mobile handsets where the Lithium Ion Battery Cells were packed by: (a) Defendants or their Co-Conspirators; (b) companies for Defendants or their Co-Conspirators where title to those Cells did not transfer; or (c) companies under common ownership or control with defendants or their co-conspirators.  TracFone is not alleging a co-conspirator exception to *Illinois Brick* at this time.  The FDUTPA claims in this Complaint include TracFone's purchases of Motorola- and Nokia-branded mobile handsets that contained Lithium Ion Batteries, and any other of TracFone's purchases of Lithium Ion Batteries or Lithium Ion Battery Products during the Relevant Period that are not cognizable under the Sherman Act.

**B.     Defendants**

42.     Defendant LG Chem, Ltd. ("LG Chem") is a Korean corporation with its principal executive offices at 20 Yeouido-dong, Yeongdeungpo-gu, Seoul, South Korea. LG Chem is one of the world's leading manufacturers of Lithium Ion Batteries. Defendant LG Chem, either directly or through a wholly owned subsidiary, participated in the conspiracy alleged in this complaint and

-12-

manufactured, marketed and/or sold Lithium Ion Batteries that were purchased throughout the United States, including in this district, during the Relevant Period.

43.     Early in the Relevant Period (2000-2003), LG Chem and LG Electronics, Inc. were owned and controlled by an entity called  "the LG Group," which was a family-owned Korean conglomerate. Both LG Chem and LG Electronics had a family of shareholders (the Koo family) that owned upwards of twenty percent of each company.  According to publicly available annual reports, the operations of LG Chem and LG Electronics during that time were inefficient, intermingled, and each company was "excessively burdened" with investing in each other and various other subsidiaries in a problematic "circulatory investment" structure.[4]

44.     In mid-2003, LG Corp. was created to establish "transparent management and the simplification of 'circulatory investment structure between subsidiaries'" – including those between LG Chem and LG Electronics.  From 2003 through at least 2011, LG Corp. was the single largest shareholder of both LG Electronics, Inc. and LG Chem, owning between 33-40% of the shares of each company during that time period.  From 2003 through the Relevant Period, LG Corp.'s responsibilities and management over its subsidiaries LG Electronics and LG Chem included obligations to:

- "control its subsidiaries"
- "collect a certain ratio of sales in royalties from subsidiaries that use the LG brand"
- "strictly manage[] its subsidiaries' performance, thus reinforcing responsible professional management and transparency sanctioned by the [LG Corp.] Board [of Directors]"
- "push business in strategic overseas markets"
- "proactively manage risks" for its subsidiaries
- "strengthen" its subsidiaries
- "proactively protect and manage the entire 'LG brand'"
- "monitor" its subsidiaries' businesses

---

[4] LG Corp. Annual Report, 2003.

-13-

- "create synergies" between subsidiaries

- "Check and approve subsidiaries' business strategies"

- "Formulate and present corporate visions and long-term strategies" for subsidiaries

- "Allot and manage business resources" for each subsidiary

- "Evaluate [subsidiary] management's performance"

- "provide corresponding incentives" to subsidiaries' management

- "improve management transparency, strengthen competitiveness and maximize shareholder and corporate value."[5]

LG Chem stated unequivocally that its affairs were controlled by LG Corp. during the Relevant Period.  For example, in 2004, LG Chem stated that it was "under the control of" LG Corp., and that "the strict management led by the [LG Corp.] Board of Directors will enable [LG Chem and its sibling companies] to focus on their own business areas."[6]  LG Electronics made similar admissions in its annual reports during the Relevant Period.

45.     During the Relevant Period, LG Corp.'s consolidated financial statements included the operations of both LG Chem and LG Electronics, and LG Chem and LG Electronics each issued annual reports that cross-referenced one another. Each of the sets of consolidated financial statements describe significant transactions between LG Chem and LG Electronics, noting that the two companies are "related."  The annual reports also reflect that LG Corp guaranteed indebtedness of both LG Chem and LG Electronics during the Relevant Period, and paid salaries, benefits, and severance packages for, and granted stock options to, key management of both LG Chem and LG Electronics.

46.     LG Corp. also controlled the executive suites and boards of directors of LG Chem and LG Electronics, and each subsidiary had overlapping board members. For example, from 2003 through at least 2009, LG Chem's board of directors included Yu-Sig Kang, who was Vice Chairman and CEO of LG Corp., and was *also* a member of the board of directors of LG Electronics, Inc.

---

[5] All bulleted quotes taken from LG Corp. Annual Report, 2003.
[6] LG Chem Annual Report, 2002.

-14-

during the same time period.  Other senior level managers and executives at each subsidiary came from the other subsidiary and the parent company during the Relevant Period. For example, prior to 2008, Juno Cho was promoted from President of LG Electronics Mobilecomm USA, Inc. in the United States to Executive Vice President for LG Corporation in Korea.  There are many similar instances where LG employees transfer from one entity to another.

47.     Thus, LG Corp controlled the management and decision-making of all of its LG-branded subsidiaries, including LG Chem and LG Electronics.  For these reasons, and because of the significant overlapping inter-company management, business dependencies, and financial transfers between the companies, LG Corp. would not permit its sibling subsidiaries to sue one another for antitrust violations. Nor is there any likelihood that such a lawsuit would be brought in the United States seeking relief through the U.S. antitrust laws since neither party is based in the United States. The relationship between LG Chem and LG Electronics involves such functional economic and other unity that, when TracFone purchased LG-branded mobile handsets from LG Electronics, there effectively was only one sale between LG Chem and TracFone of the LG-branded Lithium Ion Batteries that were incorporated into those LG-branded mobile handsets.  Thus, TracFone is the proper party to seek redress under the United States antitrust laws with respect to its purchase of LG-branded mobile handsets containing price-fixed LG Chem Lithium Ion Batteries.

48.     Defendant LG Chem America, Inc. ("LGCAI") is a New Jersey corporation with its principal place of business at 1000 Sylvan Avenue, Englewood Cliffs, New Jersey 07632. Defendant LGCAI is a wholly owned subsidiary of Defendant LG Chem, Ltd. Defendant LG Chem America, either directly or through a wholly owned subsidiary, participated in the conspiracy alleged in this complaint and manufactured, marketed and/or sold Lithium Ion Batteries that were purchased throughout the United States, including in this district, during the Relevant Period.

49.     Defendants LG Chem and LGCAI are collectively referred to herein as "LG" or "LG Chem."

50.     Defendant Samsung SDI Co., Ltd. ("Samsung SDI") is a Korean corporation with its principal executive offices at 575 Shin-Dong, Youngtong-Gu, Suwon, Gyeonggi South Korea.

-15-

Defendant Samsung SDI is the world's largest manufacturer of Lithium Ion Batteries. Defendant Samsung SDI, either directly or through a wholly owned subsidiary, participated in the conspiracy alleged in this complaint and manufactured, marketed and/or sold Lithium Ion Batteries that were distributed throughout the United States, including in this district, during the Relevant Period.

51.     Defendant Samsung SDI America, Inc. ("Samsung SDI America") is a California corporation with its principal executive offices at 85 W. Tasman Drive, San Jose, California 95134-1703. Samsung SDI America is a wholly owned subsidiary of Defendant Samsung SDI. Defendant Samsung SDI America, either directly or through a wholly owned subsidiary, participated in the conspiracy alleged in this complaint and manufactured, marketed and/or sold Lithium Ion Batteries that were distributed throughout the United States, including in this district, during the Relevant Period.

52.     Defendants Samsung SDI and Samsung SDI America are collectively referred to herein as "Samsung" or "SDI."

53.     Defendants LG and Samsung are referred to herein at times as the "Korean Defendants," to distinguish them from the remaining defendants, referred to herein at times as the "Japanese Defendants."

54.     Defendant Panasonic Corporation is a Japanese corporation with its principal executive offices at 1006 Oaza Kadoma, Osaka 571-8501, Japan. On or about October 1, 2008, Panasonic Corporation issued a press release stating that "[e]ffective today, October 1, 2008, Matsushita Electric Industrial Co., Ltd. has become Panasonic Corporation" and also that "Matsushita Battery Industrial Co., Ltd., which used to be a wholly-owned subsidiary of Matsushita Electric Industrial Co., Ltd., has become an internal divisional company of Panasonic Corporation…." Defendant Panasonic manufactures and sells Lithium Ion Batteries under the Panasonic name and also under the name of Defendant and wholly owned subsidiary Sanyo Electric Co., Ltd. With respect to those batteries sold under the Panasonic name, they are produced under Panasonic's internal division called "Energy Company." Defendant Panasonic Corporation is one of the world's leading manufacturers of Lithium Ion Batteries. Defendant Panasonic Corporation, either

-16-

1   directly or through a wholly owned subsidiary, participated in the conspiracy alleged in this

2   complaint and manufactured, marketed and/or sold Lithium Ion Batteries that were distributed

3   throughout the United States, including in this district, during the Relevant Period.

4          55.      Defendant Panasonic Corporation of North America, formerly known as Matsushita

5   Electric Corporation of America, is a Delaware Corporation with its principal executive offices at 1

6   Panasonic Way, Secaucus, New Jersey 07094. Panasonic Corporation of North America is a wholly

7   owned and controlled subsidiary of Defendant Panasonic Corporation. Defendant Panasonic

8   Corporation of North America, either directly or through a wholly owned subsidiary, participated in

9   the conspiracy alleged in this complaint and manufactured, marketed and/or sold Lithium Ion

10  Batteries that were distributed throughout the United States, including in this district, during the

11  Relevant Period.

12         56.      Defendants Panasonic Corporation and Panasonic Corporation of North America are

13  collectively referred to herein as "Panasonic."

14         57.      Defendant Sanyo Electric Co., Ltd. ("Sanyo") is a Japanese corporation with its

15  principal executive offices at 5-5 Keihan-Hondori, 2-chome, Moriguchi, Osaka 570-8677, Japan.

16  Defendant Sanyo is one of the largest manufacturers and suppliers of Lithium Ion Batteries in the

17  world. As of December 9, 2009, Defendant Sanyo became a wholly owned subsidiary of Defendant

18  Panasonic Corporation. Defendant Sanyo, directly or through a wholly owned subsidiary, including

19  through its joint venture Sanyo Soft Energy Co., Ltd., formed and operated with defendant GS-Yuasa

20  Corp., participated in the conspiracy alleged in this complaint and manufactured, marketed and/or

21  sold Lithium Ion Batteries that were distributed throughout the United States, including in this

22  district, during the Relevant Period.

23         58.      Defendant Sanyo North America Corporation is a Delaware corporation with its

24  principal executive offices at 2055 Sanyo Avenue, San Diego, California 92154. Defendant Sanyo

25  North America Corporation is a wholly owned subsidiary of Defendant Sanyo Electric Co., Ltd.

26  Defendant Sanyo North America Corporation, either directly or through a wholly owned subsidiary,

27  participated in the conspiracy alleged in this complaint and manufactured, marketed and/or sold

28

-17-

102641422.1

1   Lithium Ion Batteries that were distributed throughout the United States, including in this district,

2   during the Relevant Period.

3         59.      Sanyo Electric Co., Ltd., Sanyo North America Corporation, and Sanyo GS Soft

4   Energy Co. Ltd. are collectively referred to herein as "Sanyo."

5         60.      Defendant Sony Corporation is a Japanese corporation with its principal executive

6   offices at 7-1 Konan 1-Chome, Minato-Ku, Tokyo, Japan. Defendant Sony Corporation invented the

7   Lithium Ion Battery in 1991 and since then, has been one of the world's leading suppliers of Lithium

8   Ion Batteries. Defendant Sony Corporation, either directly or through a wholly owned subsidiary,

9   participated in the conspiracy alleged in this complaint and manufactured, marketed and/or sold

10   Lithium Ion Batteries that were distributed throughout the United States, including in this district,

11   during the Relevant Period.

12         61.      Sony Energy Devices Corporation is a Japanese corporation with its principal

13   executive offices at 1-1 Shimosugishita, Takakura, Hiwada-machi, Koriyama-shi, Fukushima, Japan.

14   Defendant Sony Energy Devices Corporation is a wholly owned subsidiary of defendant Sony

15   Corporation. Sony Corporation manufactures its Lithium Ion Batteries though its Sony Energy

16   Devices Corporation subsidiary. Sony Energy Devices Corporation manufactures its Lithium Ion

17   Batteries at plants located in Japan, Singapore, and China. Defendant Sony Energy Devices

18   Corporation, either directly or through a wholly owned subsidiary, participated in the conspiracy

19   alleged in this complaint and manufactured, marketed and/or sold Lithium Ion Batteries that were

20   distributed throughout the United States, including in this district, during the Relevant Period.

21         62.      Defendant Sony Electronics, Inc. is a Delaware corporation with its principal

22   executive offices at 16530 Via Esprillo, San Diego, CA 92127. Defendant Sony Electronics, Inc. is a

23   wholly owned subsidiary of defendant Sony Corporation. Defendant Sony Electronics, Inc., either

24   directly or through a wholly owned subsidiary, participated in the conspiracy alleged in this

25   complaint and manufactured, marketed and/or sold Lithium Ion Batteries that were distributed

26   throughout the United States, including in this district, during the Relevant Period.

27

28

-18-

63.     Defendants Sony Corporation, Sony Energy Devices Corporation, and Sony Electronics, Inc. are collectively referred to herein as "Sony."

64.     Defendant Hitachi Maxell, Ltd. ("Hitachi Maxell") is a Japanese corporation with its principal executive office at 2-18-2 Iidabashi, Chiyoda-ku, Tokyo, 102-8521 Japan. Defendant Hitachi Maxell is a wholly owned subsidiary of Hitachi, Ltd. Hitachi Maxell was founded in 1960 and manufactures and sells batteries through its batteries business unit. Defendant Hitachi Maxell, either directly, or through a wholly owned subsidiary, participated in the conspiracy alleged in this complaint and manufactured, marketed and/or sold Lithium Ion Batteries that were distributed throughout the United States, including in this district, during the Relevant Period.

65.     Defendant Maxell Corporation of America ("Maxell") is a New Jersey corporation with its principal executive office at 3 Garett Mountain Plaza, 3rd Floor, Suite 300, Woodland Park, New Jersey 07424. Defendant Maxell, either directly, or through a wholly owned subsidiary, participated in the conspiracy alleged in this complaint and manufactured, marketed and/or sold Lithium Ion Batteries that were distributed throughout the United States, including in this district, during the Relevant Period.

66.     Defendants Hitachi Maxell, Ltd., and Maxell Corporation of America are collectively referred to herein as "Hitachi Maxell."

67.     Defendant NEC Corporation is a business entity organized under the laws of Japan, with its principal place of business at 7-1, Shiba 5-chome, Minato-ku, Tokyo 108-8001, Japan. Defendant NEC Corporation either directly, or through a wholly owned subsidiary, participated in the conspiracy alleged in this complaint and manufactured, marketed and/or sold Lithium Ion Batteries that were distributed throughout the United States, including in this district, during the Relevant Period.

68.     Defendant NEC Tokin Corporation is a Japanese corporation with its principal executive office at 7-1, Kohriyama 6-chome, Taihaku-ku, Sendai-shi, Miyagi 982-8510, Japan. Its website presently states that the "Laminated lithium-ion rechargeable battery business was transferred to 'NEC Energy Devices, Ltd.,' on April 1, 2010." The "NEC Technical Journal" in 2012

-19-

stated that "NEC Energy Device, Ltd. was established in 2010 for the development and manufacture of lithium-ion batteries" and that "the precursor businesses and technological developments have a history of over 20 years."  The article continues that "NEC has been pursuing battery business by focusing on compact batteries for mobile phones and digital still cameras for consumer use" and that "[a]lthough the company names and management structures have changed a great deal since the establishment of the joint venture Moli Energy Limited in 1990."  Defendant NEC Tokin Corporation, either directly, or through a wholly owned subsidiary, participated in the conspiracy alleged in this complaint and manufactured, marketed and/or sold Lithium Ion Batteries that were distributed throughout the United States, including in this district, during the Relevant Period.

69.     Defendants NEC Corporation and NEC Tokin Corp. are referred to herein as "NEC."

70.     Defendant Toshiba Corporation ("Toshiba") is a Japanese company with its principal executive office at 1-1, Shibaura 1-chrome, Minato-ku, Tokyo 105-8001, Japan. Defendant Toshiba Corporation, including through its subsidiaries A&T Battery Corporation and Toshiba America Electronic Components Inc., either directly, or through a wholly owned subsidiary, participated in the conspiracy alleged in this complaint and manufactured, marketed and/or sold Lithium Ion Batteries that were distributed throughout the United States, including in this district, during the Relevant Period.

71.     Toshiba Corporation, and A&T Battery Corporation are collectively referred to as "Toshiba."

72.     All of the foreign-based defendants identified above are at times referred to herein as the "Foreign Defendants."

73.     All of the U.S.-based defendants identified above are at times referred to herein as the "U.S. Subsidiary Defendants."

**C.     Agents and Co-Conspirators**

74.     Defendants' officers, directors, agents, employees, or representatives engaged in the conduct alleged in this Complaint in the usual management, direction, or control of Defendants' business or affairs.

-20-

75.     Defendants are also liable for acts done in furtherance of the alleged conspiracy by companies they acquired through mergers and acquisitions.

76.     When Plaintiff refers to a corporate family or companies by a single name in this Complaint, they are alleging that one or more employees or agents of entities within that corporate family engaged in conspiratorial acts on behalf of every company in that family. The individual participants in the conspiratorial acts did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family. The individual participants entered into agreements on behalf of their respective corporate families. As a result, those agents represented the entire corporate family with respect to such conduct, and the corporate family was party to the agreements that those agents reached.

77.     Each of the Defendants acted as the agent of, co-conspirator with, or joint venture partner of the other Defendants and co-conspirators with respect to the acts, violations and common course of conduct alleged in this Complaint. Each Defendant or co-conspirator that is a subsidiary of a foreign parent acted as the United States agent for Lithium Ion Batteries and/or Lithium Ion Battery Products made by its parent company.

78.     Various persons, partnerships, sole proprietors, firms, corporations, and individuals not named as Defendants in this lawsuit, and individuals, both known and unknown, participated as co-conspirators with Defendants in the offenses alleged in this Complaint, and performed acts and made statements in furtherance of the conspiracy.  One such entity includes GS Yuasa Corporation ("GS Yuasa"), which is a Japanese corporation with its principal executive office at 1, Inobanba-cho, Nishinosho, Kisshoin, Minami-ku, Kyoto, 601-8520 Japan. GS Yuasa Corporation and defendant Sanyo Electric Co., Ltd. were joint venture parents of Sanyo GS Soft Energy Co., Ltd. ("GS Soft Energy"), which was the successor-in-interest to GS-Melcotec Co. ("GSMT"). GS Yuasa Corporation, either directly or through a wholly-owned subsidiary, including through its subsidiaries and/or affiliates GSMT and GS Soft Energy, participated in the conspiracy alleged in this complaint and manufactured, marketed and/or sold Lithium Ion Batteries that were distributed throughout the

-21-

102641422.1

United States, including in this district, during the Relevant Period. TracFone reserves the right to name additional persons and entities as Defendants at a later date.

## IV.   DESCRIPTION OF LITHIUM ION BATTERIES

### A.      Background of Batteries

79.      Batteries are one of the primary sources of energy that power many different machines and devices used every day. There are three different categories of batteries: 1) chemical; 2) physical; and 3) biological. Chemical batteries generate electricity through a chemical reaction that occurs inside the battery. The batteries at issue in this case – Lithium Ion Batteries – are within the chemical family of batteries.

80.      Chemical batteries are generally classified as either "primary" or "secondary." Primary batteries are disposable batteries that are used until they are expended, and then they are discarded. Secondary batteries are rechargeable. Rechargeable batteries account for roughly 80% of all chemical batteries produced worldwide.

81.      There are four types of batteries that account for the vast majority of secondary batteries: (1) Lithium Ion Batteries; (2) lead-acid; (3) nickel-cadmium; and (4) nickel-metal hydride.

82.      Both Lithium Ion Batteries as well as nickel-metal hydride rechargeable batteries were introduced in or around 1991. Since that time, however, Lithium Ion Batteries have quickly become the most popular type of secondary battery, easily outpacing nickel-metal hydride and nickel-cadmium rechargeable batteries.

83.      The European Commission ("EC"), in examining Panasonic's 2009 acquisition of Sanyo, detailed the distinctiveness of Lithium Ion Batteries. The EC stated the following in its "Article 6(s) Non-Opposition" dated September 29, 2009: "Portable rechargeable batteries come mainly in three principle different chemistries, nickel-cadmium ("NiCd"), nickel-metal hydride ("NiMH") and Lithium-ion ("Li-ion"), which all have different physical and performance characteristics." The EC report rejected Panasonic's suggestion that nickel-metal hydride and Lithium Ion batteries were a part of the same market:

-22-

The market investigation does not support the Parties' submission. It has shown that both battery types belong to distinct product markets. The production facilities for NiMH batteries and Li-Ion batteries are completely different so that there is no supply-side substitutability. As the Parties themselves point out, each of these batteries chemistries gives the respective rechargeable battery distinctive physical and performance characteristics. These characteristics also necessitate a different product design for the end-application so that during the life time of a certain model, the two types of batteries are not substitutable. However, even in the case of new models, most market participants have indicated that they would not switch chemistry in response to a permanent price increase of 5-10%.

And the EC report concluded that after obtaining pricing data from the parties to further investigate battery types, "the pricing analysis points towards a separate market for NiMH batteries and a separate market for Li-ion batteries."

## B.   Lithium Ion Batteries

### 1.   Properties and Types of LIBs.

84.     A Lithium Ion Battery generally contains three primary components: (1) the negative electrode (cathode); (2) positive electrode (anode); and (3) the electrolyte. The negative electrode of a conventional Lithium Ion Battery is made from carbon, typically graphite. The positive electrode is a metal oxide (usually a layered oxide (such as lithium cobalt oxide), a polyanion (such as lithium iron phosphate), or a spinel (such as lithium manganese oxide)). The electrolyte is typically a mixture of organic carbonates such as ethylene carbonate or diethyl carbonate containing complexes of lithium ions (usually lithium salts such as lithium hexafluorophosphate, lithium hexafluoroarsenate monohydrate, lithium percolate, lithium tetrafluoroborate, and lithium triflate).

85.     Internally, the battery has a separator between the cathode and anode and is filled with the organic electrolyte solution. The separator prevents short-circuits that would occur if there were contact between the anode and cathode. At the same time, the separator protects the electrolyte solution and preserves the battery's conductivity. In the recharging process, lithium ions are released from the cathode into the electrolyte solution where they accumulate between the anode layers. During the discharge process, the ions return to the cathode. The movement of lithium ions between the cathode and the anode during the discharge process creates the electric current from the battery, which powers the specific device it is used in.

-23-

86.     There are generally two primary steps in the manufacture of the batteries described herein. In the first step, the "cell" of the battery is manufactured, which includes the cathode, anode, and electrolyte. The cell, and in some cases, multiple cells, are then assembled inside an enclosure. In some cases, certain protection circuitry is also added inside the enclosure. The assembled product is referred to as the "battery" or "module" and is the product that is placed inside a device to supply power to the device. All of the Defendants named herein manufacture both raw lithium ion battery cells as well as modules.

87.     In addition to the manufacture and sale of raw lithium ion battery cells and modules, the Defendants also sell raw cells to other entities commonly referred to in the industry as "assemblers" or "packers." In these cases, the raw lithium ion battery cells made by Defendants are incorporated into a module by assemblers who assemble the cells (and if necessary, circuitry) and then sell the module under their own brand name. Whether a module is manufactured by a Defendant or a packer, the raw cells in a finished battery or module make up the overwhelming cost of a finished lithium ion battery module.

88.     Lithium Ion Batteries are generally divided into four different types: (1) small cylindrical (solid body without terminals); (2) large cylindrical (solid body with large threaded terminals); (3) prismatic, sometimes known as "square" (semi-hard plastic case with large threaded terminals); and (4) lithium ion polymer, sometimes known as "pouch" (soft, flat body such as those used in cell phones). Each Defendant manufactures and markets at least one type of Lithium Ion Battery. Lithium ion cylindrical or prismatic batteries are used primarily in notebook computers, camcorders, mobile phones, and other electronic devices.

89.     Lithium ion polymer batteries have more freedom in battery shape, which enables the battery to be easily and perfectly tailored to fit the device. The exterior of the lithium ion polymer battery is generally made of a laminate film, which allows it to be more flexible in terms of its shape.

90.     One of the primary distinguishing features of lithium ion polymer batteries is that the lithium salt electrolyte is not held in an organic solvent, but rather in a solid polymer composite such as polyethylene oxide or polyacrylonitrile. The dry polymer design offers advantages over the

-24-

traditional lithium ion battery in terms of fabrication and ruggedness since the electrolyte is a solid polymer as opposed to a gel or liquid electrolyte.

91. Lithium Ion Batteries, as defined herein, include cylindrical, prismatic, and polymer Lithium Ion Batteries.

92. Lithium Ion Batteries possess certain unique performance qualities which make them the most popular form of rechargeable battery. In addition, because of these characteristics, Lithium Ion Batteries are not interchangeable (not economic substitutes) with other types of secondary or rechargeable batteries such as nickel-cadmium or nickel-metal hydride.

93. Unlike other forms of rechargeable batteries (such as nickel-cadmium or nickel-metal hydride), Lithium Ion Batteries are the only rechargeable battery that do not suffer from any "memory effect." For example, if a nickel-cadmium battery is charged repeatedly to 70 percent capacity, the discharge voltage will begin to fall sharply from the 70 percent even after a full charge and eventually, the battery will be incapable of holding a charge. The battery essentially remembers 70 percent as the full capacity. Lithium Ion Batteries, on the other hand, do not suffer from the memory effect, and there is no risk to reducing the capacity of the battery when only partially charging the battery.

94. A second feature that makes Lithium Ion Batteries unique is that they are more powerful than all other types of rechargeable batteries. For example, the nominal voltage of a nickel-metal hydride rechargeable battery is 1.2 volts. The nominal voltage of a Lithium Ion Battery, on the other hand, is 3.7 volts, nearly three times more powerful.

95. Lithium Ion Batteries also possess a higher "energy density" than other types of rechargeable batteries. "Capacity" refers to the volume of electricity that a battery can hold. The energy volume in a battery is the voltage times the capacity. Lithium Ion Batteries possess high energy density, both per weight and per volume, as compared to other types of rechargeable batteries. Essentially, a lighter and smaller Lithium Ion Battery can generate the same amount of electricity as a heavier and larger battery of a different type. For example, Lithium Ion Batteries can be as much as

-25-

70 percent lighter and 60 percent smaller in volume than nickel hydride batteries but deliver the same amount of power.

96.     Lithium Ion Batteries also retain their charge better than other types of rechargeable batteries. For example, Lithium Ion Batteries lose only about five percent of their charge per month when idle. Other types of rechargeable batteries, like nickel-metal hydride batteries, lose nearly 20 percent of their charge per month when idle.

### 2.     LIBs are commodity products.

97.     Because of their superior performance characteristics, and their small size, Lithium Ion Batteries have become the standard battery used in consumer electronic products. It is estimated that about 40 to 50 percent of all Lithium Ion Batteries used today are used in small consumer electronic products such as cell phones and notebook computers. Much of the remaining market for Lithium Ion Batteries is for use in digital cameras, power tools, and other devices.

98.     Lithium Ion Batteries are also highly standardized products, and interchangeable among the same type and across manufacturers. International standard-setting organizations, such as the International Electrotechnical Commission or the Institute of Electrical and Electronics Engineers develop standards to be followed by the manufacturers of Lithium Ion Batteries so that products which utilize Lithium Ion Batteries can be developed to accommodate a specific Lithium Ion Battery. For example, a Lithium Ion Battery "18650" refers to a cylindrical shaped battery measuring 18.6 millimeters in diameter by 65.2 millimeters in height with a nominal voltage of 3.6 volts and a capacity of 2250mAh.

99.     The Institute of Electrical and Electronics Engineers reported in 2008 that the "world increasingly runs on lithium-ion batteries." It continued that "[t]his is an industry ready for change but not necessarily expecting, let alone striving for it. The big companies that dominate lithium-ion production – Sony, Panasonic, Sanyo, Samsung, and LG – are all selling batteries not much different from the ones they sold five years ago. Only the initial capacity of batteries has been increasing, at about 5 percent a year. Today they are ***commodity products***, manufactured in huge quantities and sold at vanishingly slim profit margins."

-26-

100.     In May of 2003, *EE Times* reported:

> Practical economics more than ever dictate product paths, and thus there's also a **consolidation of form factors** for both cylindrical and prismatic (rectangular) shapes … "The industry seems to be focusing *on two standard polymer footprints*: 50 x 34 and 30 x 48 mm. Two years ago, there were more than 20 different battery flavors." … To keep their edge, [Japanese manufacturers] kept close tabs on the basic consumer areas, by boosting the capacity of the **standard** 18650 Li-ion cell, long viewed as a primary building block for notebooks.

* * *

> Lithium-ion batteries are still most widely used; the polymers are picking up a bit, though," he said, noting the leap in materials research with various intermetallic compounds. "**Standardization** and cost are the driving issues. *The number of package footprints is down to a very few, because a lot of different products make design engineers nervous*. All of this is driving costs lower." Ultralife says it will boost the capacity for the industry-standard 18650 Li-ion cell, viewed as a **primary building block for notebooks**, to 2.4 A-h by the end of the year."

101.     In a detailed July 20, 2012 investor report titled "*Lithium-ion batteries – A Japanese tech growth story?*" Citi Research, a division of Citigroup Global Markets, Inc. told its investor clients that, with respect to notebook PC batteries, "a lack of progress in boosting battery output has resulted in **increasing commoditization**," and that "[t]he **commoditization** of cylindrical batteries used in notebook PCs continues."

102.     Apple Inc., a major purchaser of Defendants' Lithium Ion Batteries, recently stated on its website: "Lithium-ion Batteries. Rechargeable lithium-based technology currently provides the best performance for your Apple notebook computer, iPod, iPhone, or iPad. You can also find this **standard battery technology** in many other devices. Apple batteries share the characteristics common to lithium-based technology in other devices."

103.     Samsung recently stated on its website that "Both prismatic and cylindrical type batteries **have same [sic] operating mechanism basically**. Prismatic type is usually used for mobile devices and its general capacity is 500~1200mAh; whereas cylindrical type is mostly used for Notebook PC and camcorders and has 1600~2400mAh capacity which is higher than prismatic type."

**3.     Packing**

-27-

104.     Defendants employed several means to pack their cells into Lithium Ion Batteries for their own sales. For example, at times during the Relevant Period, Sanyo packed Lithium Ion Batteries through a production subsidiary and maintained separate cell manufacturing and packing facilities. At times during the Relevant Period, Sony and LG Chem packed most of its own batteries using production personnel in its subsidiaries.

105.     Other Defendants use other entities as their agents, acting on Defendants' behalf, to pack and label Lithium Ion Batteries under Defendants' names. For instance, Hitachi Maxell employs entities to pack its Lithium Ion Batteries on its own behalf. Samsung packs its own Lithium Ion Batteries and also outsources that function to other entities, including a company called Elentec. Samsung affiliates dominated and controlled Elentec, holding four of seven positions in Elentec's General Executive including the Representative Director, President, Vice President, and Managing Director.

106.     When a Defendant or an entity, acting on the Defendant's behalf, packs Lithium Ion Batteries for sale by the Defendant, the packs bear markings identifying the Defendant as the manufacturer. Moreover, when such an entity (like Elentec) is employed for packing, title over the Lithium Ion Battery Cells typically remains with the Defendant.

107.     Besides manufacturing, packing, and selling their own batteries, Defendants also at times provide some of their Lithium Ion Battery Cells to third-party "packers" for assembly into Lithium Ion Batteries. These transactions tend to involve a transfer of title over the Lithium Ion Battery Cells to the third-party packers. Three packers based in Taiwan are Simplo Technology, Inc., Celxpert Energy Corporation, and Dynapack International Technology Corporation. These and other packers do not manufacture their own battery cells. They source their battery cells from Defendants and in certain circumstances, require Defendants' authorization to pack Lithium Ion Batteries for Defendants. As a result, packers are dependent upon Defendants for their business and must maintain a close relationship with Defendants to keep the supply chain intact.

108.     TracFone did not purchase Batteries directly from third party packers.

-28-

## V.   DEFENDANTS CONSPIRED TO RAISE AND STABILIZE LITHIUM ION BATTERY PRICES

### A.   Summary of Defendants' Overt Acts in Furtherance of the Conspiracy

109.    Defendants' high-level executives engaged in a series of collusive meetings and communications starting in or around 2000, and continuing at least into 2011, all in conscious furtherance of their goal of inflating Lithium Ion Battery prices. Defendants varied the frequency of their collusive meetings and communications according to market conditions, sometimes meeting twice a year, sometimes quarterly, and sometimes within weeks or days of the last meeting or discussion.

110.    Documentary evidence reflects at least dozens of collusive meetings among Defendants. During these meetings, high-level executives with pricing authority discussed confidential future plans and strategies concerning pricing, capacity, utilization, demand, marketing and product development in furtherance and reinforcement of Defendants' conspiracy.

111.    In secret, Defendants shared past, present, and future production and capacity figures and forecasts to facilitate the object of their conspiracy, that is, raising Lithium Ion Battery prices to supra-competitive levels. Defendants' collusive discussions concerning price, output, and capacity provided necessary information to cartel members to reach agreement on what price levels should be offered to customers, and whether to indeed increase or decrease supply in order to restrict price competition. Defendants' collusive discussions were also used to police, enforce, and verify that each member of the cartel was adhering to Defendants' plan to artificially raise Lithium Ion Battery prices.

112.    In these conspiratorial meetings, Defendants agreed to provide – and indeed did provide – *company-specific*, highly detailed data and information, not merely aggregated or industry-wide data. The information was *non-public* and was not shared with non-participating companies or anyone else.

113.    By 2000, the Japanese Defendants produced 95 percent of the world's secondary batteries. In 1999 to 2000, however, the South Korean companies Samsung and LG entered the business. Samsung and LG began mass production in 2000. Prior to that time, Samsung and LG

-29-

began their secret collusion with the Japanese Defendants. These collusive meetings involved commercially-sensitive market information and not yet publicly available information, including pricing information and future output and capacity details.

114.     For example, on August 16, 1999, executives from GS Soft Energy named Honma and Iui met with representatives from SDI, and discussed the battery business and potential collaboration between competitors. A document memorializing this meeting was marked by the meeting participants as "strictly confidential."

115.     On October 17, 2000, the following executives from competitors Samsung and Hitachi Maxell met at "Hitachi Maxell Shibuya Headquarters" in Japan from 10:00 a.m.-12:30 p.m.:

| Conspirator Company | Employees Attending Collusive Meeting (Title of Employee) |
|---|---|
| Samsung from "Business Planning" | Ui Jin Yoo (General Manager) Young No Kwon (Manager) Seung Kee Yoon (Chief) |
| Samsung from "M/E Business" | Yoo Mi Kim (Senior Manager) Sung Sik Moon (Manager) |
| Samsung from "Energy Lab" | Sang Won Lee (Manager) |
| Samsung from "Tokyo Office" | Hee Seung Yoo (Senior Manager) Tyoung Taek Cho (Manager) |
| Hitachi Maxell | Genichi Fukabori (General Manager, Secondary Battery Sales) Hiro Horike (Chief engineer, design) Kenji Hanada (Chief secondary battery sales) Naoki Akagawa (Secondary battery sales) |

Agenda items discussed included "Business status," "Sales status," "Secondary batteries product status," "Production status," "Business strategy," and "Market outlook." The parties discussed Hitachi Maxell's "production status" of "2 million cells/m produced (less than 50% operation rate) but that "[d]espite the low operation rate, plan to expand capacities for major products."

116.     On October 18, 2000, the following executives from competitors Samsung and Yuasa met at "Yuasa Odawara factory" in Japan from 9:30 a.m.-12:30 p.m.:

-30-

| Conspirator Company | Employees Attending Collusive Meeting (Title of Employee) |
|---|---|
| Samsung from "Business Planning" | Ui Jin Yoo (General Manager)<br>Young No Kwon (Manager)<br>Seung Hee Yoon (Chief) |
| Samsung from "M/E Business" | Yoo Mi Kim (Senior Manager)<br>Sung Sik Moon (Manager) |
| Samsung from "Energy Lab" | Sang Won Lee (Manager) |
| Samsung from "Tokyo Office" | Hee Seung Yoo (Senior Manager)<br>Young Taek Cho (Manager) |
| Yuasa | Kenichi Takeuchi (Director Research Development Division)<br>Taizo Harada (Depute General Manager, Research Center)<br>Naoyoshi Nagata (Director, Planning and Development)<br>Kazuo Arahi (General Manager, Research) |

Agenda topics included: "Business Status," Major research status," and "Development status." The parties discussed Yuasa's "Polymer battery capacity," described as "35K cumulative as of October. Can produce up to 300K cells if the facility is fully operated for 20 days a month."

117.    The parties further discussed "Both companies' cooperation" and in regards to the "Purpose of cooperation," the parties communicated that "The two companies have been exchanging for 5 years since 1995 in the nickel hydride battery field." The parties continued that "SDI is in the electronics field and Yuasa is in the commercial field, so there would be a lot *for the two companies to be complementary*." (Emphasis in original.) The parties continued "*With the idea that the two companies can Win-Win as long as we maintain the cooperation, not the competition, [I] thought of maintaining the cooperation between the two companies.  SDI's significant strength is having the substantial domestic market that is SEC [Samsung Electronics Company]."* The parties continued regarding the "Cooperation method" that "Rather than trying to achieve something big from the beginning, it would be good, after entering into an NDA, to set various themes and proceed with something feasible through exchanges." The parties continued that "[t]here is ample room for development of ion batteries and polymer batteries, so it is possible to *avoid duplicate investment through the cooperation of the two companies*." (Emphasis in original.)

-31-

118.     Also on October 18, 2000, the following executives from Samsung and Matsushita met at "Matsushita, Chigasaki factory" from 3:00 p.m.-5:00 p.m.:

| Conspirator Company | Employees Attending Collusive Meeting (Title of Employee) |
|---|---|
| Samsung from "Business Planning" | Ui Jin Yoo (General Manager) Young No Kwon (Manager) Seung Hee Yoon (Chief) |
| Samsung from "M/E Business" | Yoo Mi Kim (Senior Manager) Sung Sik Moon (Manager) |
| Samsung from "Energy Lab" | Sang Won Lee (Manager) |
| Samsung from "Tokyo Office" | Hee Seung Yoo (Senior Manager) Young Taek Cho (Manager) |
| Matsushita | Yukio Aoyagi (General Manager, Planning and Marketing) Tsyuyoshi Mori (Manager, Planning and Marketing) Mami Masuda (Chief, Planning and Marketing) |

Agenda items included "Business status," "Market outlook," and "Production capacity." The parties communicated that Matsushita's production capacity for "Lithium ion battery" was "10 million cells/m (cylindrical 6 million / prismatic 4 million)" with a "plan to expand to 12 million cells/m" and that for "Polymer" it was "1 million cells /m, (few are actually produced)."

119.     On October 20, 2000, the following executives from competitors Samsung and Sony met at "Gate City Osaki Headquarters" in Tokyo, Japan at 10:00 a.m.:

| Conspirator Company | Employees Attending Collusive Meeting (Title of Employee) |
|---|---|
| Samsung from "Business Planning" | Ui Jin Yoo (General Manager) Young No Kwon (Manager) Seung Hee Yoon (Chief) |
| Samsung from "M/E Business" | Sung Sik Moon (Manager) |
| Samsung from "Energy Lab" | Sang Won Lee (Manager) |
| Samsung from "Tokyo Office" | Hee Seung Yoo (Senior Manager) Young Taek Cho (Manager) |
| Sony | Chiho Konno (General Manager, Energy Company, Products Planning) Seiichi Oiyama (Manager, Energy Company, Battery Business Div., LIB Dept.) |

-32-

Agenda items discussed included "Business status and strategy," "Production capacity," " Product status," "Market outlook," "Market size," "Target market," and "Li-ion vs. polymer competition." The parties discussed the relationship among cylindrical, prismatic, and polymer batteries, and agreed that "*Battery makers should rather create a new market than aggravating the competition amongst the makers.*"

120.    Also on October 20, 2000, the following executives from competitors Samsung and GS-Melcotec Co. met at "Kanda headquarters" in Tokyo, Japan at 2:00 p.m.:

| Conspirator Company | Employees Attending Collusive Meeting (Title of Employee) |
|---|---|
| Samsung from "Business Planning" | Ui Jin Yoo (General Manager) Young No Kwon (Manager) Seung Hee Yoon (Chief) |
| Samsung from "M/E Business" | Yoo Mi Kim (Senior Manager) Sung Sik Moon (Manager) |
| Samsung from "Energy Lab" | Sang Won Lee (Manager) |
| Samsung from "Tokyo Office" | Hee Seung Yoo (Senior Manager) Young Taek Cho (Manager) |
| GS-Melcotec | Kazunori Nagahata (Manager, Marketing and Sales) Keini Matsuo (Overseas Marketing and Sales) |

Agenda items discussed included "Business status and strategy," "Mid-term business plans," "Market outlook," and "Li-ion vs. polymer competition." GS-Melcotec communicated its detailed production figures, specifically "Producing 5.5 million cells/month (entire production in Kyoto) – Prismatic 4.8 million/month (9 lines) . . . Polymer 300K / month (1 line)." GS-Melcotec communicated its "Mid-term business plans": "10 million cells/m in 2001" and "total 20 million in 2004/2005 (need to maintain the market share)." The parties further discussed GS-Melcotec's "Strategy to focus on Prismatic (to respond to cellular phone" demand.

121.    Also, on October 20, 2000, the following executives from competitors Samsung and NEC met at Chuncheon DakGalbi restaurant in Shinjuku, Tokyo, Japan at 6:00 p.m.:

| Conspirator Company | Employees Attending Collusive Meeting (Title of Employee) |
|---|---|

-33-

| Conspirator Company | Employees Attending Collusive Meeting (Title of Employee) |
|---|---|
| Samsung from "Business Planning" | Ui Jin Yoo (General Manager) Young No Kwon (Manager) Seung Hee Yoon (Chief) |
| Samsung from "M/E Business" | Yoo Mi Kim (Senior Manager) Sung Sik Moon (Manager) |
| Samsung from "Energy Lab" | Sang Won Lee (Manager) |
| Samsung from "Tokyo Office" | Hee Seung Yoo (Senior Manager) Young Taek Cho (Manager) |
| NEC | Ryichi Matsumoto (Overseas Sales) |

Agenda items included "Business Status and Strategy," "Pouch-Li-ion production status," "Li-ion battery production status," the "Market outlook," the "Cylindrical market," and a "Li-ion vs. Polymer comparison outlook." The parties discussed NEC's "pouch battery volume" and its "full capa: 100K cells/m, actual production: 50K cells/m," and its "Li-ion battery production status" – "Capa – 5 million cells/m; 3 million cells / m being produced" and its "Plan to increase production to 8 million cells/m by June 2001." The parties further discussed that NEC's sales were "95% overseas and 5% domestic" and that "[o]f the 95% . . . 30% is USA." The parties further communicated about the "**Overall oversupply**."

122.    On October 23, 2000, Samsung's Senior Manager Hee Seung Yoo conducted a "Phone interview" with Sanyo overseas sales Senior Manager "Tachihara," and discussed Sanyo's "Production status," *i.e.*, "15 million shipped since August 2000" and that "[o]f those, 10 million or more are prismatic Li-ion" and that Sanyo's "Overall strategy" was to "focus on slim prismatic batteries."

123.    Defendants' collusive meetings continued in 2001, reflecting the same pattern often seen in subsequent years – a high frequency of intensive meetings often occurring in back-to-back days, with Samsung visiting numerous Japanese companies in Japan to facilitate collusion. Internal company memoranda suggest that the following occurred:

| Date of Meeting | Meeting Location | Meeting Participants | Topics Communicated About |
|---|---|---|---|
| 5/1/2001 | Unknown | Meeting between LG Chem and Sony | Introduced new representatives for each |

-34-

| Date of Meeting | Meeting Location | Meeting Participants | Topics Communicated About |
|---|---|---|---|
| | | <u>LG Chem</u>: Vice President Gyu Pyo Hong; Sr. Manager S.H. Kwak. <br><br> <u>Sony:</u> Director Nishi. | company. <br><br> Discussion of "cooperation" between the two companies. |
| 5/7/2001 (9:30 – 11:30 am) | Tokyo, Japan | SDI meeting with GS Yuasa. <br><br> <u>SDI</u>: Unknown <br><br> <u>GS Yuasa</u>: Aoki, Director | Agenda: NDA signing, cross-licensing, regular bilateral meetings (Plans a working-level technology meeting in the second half. Meetings will be held biannually.) |
| 5/7/2001 (2-4 pm) | Tokyo, Japan | SDI meeting with Sony Energy Inc. <br><br> <u>Sony</u>: Kazi or Gazi (President) <br><br> <u>SDI</u>: Unknown | Agenda: Production in Mushaku, China (purpose, target market, domestic sales?); why focus on polymer business?; polymer market size? Future polymer battery market size? Reason for a selling price reduction? What are Sony's countermeasures? |
| 5/7/2001 | Tokyo, Japan | SDI meeting with GS Yuasa. <br><br> <u>Yuasa</u>: Aoki (Director) <br><br> <u>SDI</u>: Unknown | Dinner meeting. |
| 5/8/2001 (10-11:30 am) | Tokyo, Japan | SDI meeting with Toshiba. <br><br> <u>Toshiba</u>: Sumimoto (VP) <br><br> <u>SDI</u>: Unknown | Meeting. |

-35-

| Date of Meeting | Meeting Location | Meeting Participants | Topics Communicated About |
|---|---|---|---|
| 5/8/2001 (1-3 pm) | Tokyo, Japan | SDI meeting with GS Melcotec.<br><br>GS Melcotec: Okada (GM)<br><br>SDI: Unknown | Meeting Agenda: Short/long term market outlook? What's GSMT's final M/S achievement goal? Which product will you focus – prismatic, ion pouch, polymer? Opinion on GSMT's NCB (pouch type) and plan for expansion? Mitsubishi's role in GSMT? GSMT's plan for overseas business? |
| 5/9/2001 (3-5 pm) | Osaka, Japan | GS Soft Energy meeting with SDI<br><br>Sanyo: Honma (Sales Dept Head)<br><br>SDI: Unknown | Meeting Agenda: Expansion of lithium ion battery production, overseas business (including production in China), opinion on reason of/response to rapid price reduction |
| 5/10/2001 (10:00am – 12 pm) | Osaka, Japan | SDI meeting with Matsushita Battery Industrial (MBI)<br><br>Matsushita: Kawase (Director)<br><br>SDI: Unknown | Meeting Agenda: Matsushita's major sales strategy? Profitability? What is the optimal royalty level for Bellcore PLI batteries? Polymer battery outlook? Will you continue Stacking type PLI battery business? |
| 8/26/2001 | Unknown | LG Chem Meeting with Sony<br><br>LG Chem:<br>VP Jong Pal Kim; General Manager Woon Hyun Hwang; Senior Manager S.H. Kwak<br><br>Sony<br>Mr. Gazi<br>CEO of Sony Energy | New company representatives were introduced and Sony "asked for cooperation." |

-36-

| Date of Meeting | Meeting Location | Meeting Participants | Topics Communicated About |
|---|---|---|---|
| | | Mr. Nishi | |
| 9/17/2001 (noon – 1 pm) | Tokyo, Japan | SDI meeting with Sony Media World (guided by FPD Division's Aoki)  Sony: Aoki (Department Head)  SDI: President, EVP Hong, EVP Jung, VP Ahn, Senior Manager Yoo | "Sony Media World" Tour. Meeting participants designated meeting materials as "strictly confidential." |
| 9/18/2001 (noon to 3:30 pm) | Osaka, Japan | SDI meeting with Matsushita Battery Industrial (MBI).  Matsushita: Kawase, Hirushi (Director) Saito (Department Head)  SDI: President, EVP Hong, EVP Jung, VP Ahn, Senior Manager Yoo | Battery Exhibit Hall Tour Matsushita Digital Exploratorium "Ehii" Tour Meetings participants designated meeting materials "strictly confidential." |
| 9/19/2001 (11 am – 1 pm) | Osaka, Japan | SDI meeting with GS Soft Energy  Sanyo: Kan, Akira (Vice President)  SDI: President, EVP Hong, EVP Jung, VP Ahn, Senior Manager Yoo | Meeting / lunch Meeting participants designated meeting materials as "strictly confidential." |

-37-

102641422.1

124.    On November 5, 2001, the following executives from competitors Samsung and GS-Melcotec met at Shibaura Futou, GS-Melcotec at 3:00 p.m. to 5:30 p.m.:

| Conspirator Company | Employees Attending Collusive Meeting (Title of Employee) |
|---|---|
| SDI | Chan Sik Park (General Manager) |
| | Young No Kwon (Senior Manager) |
| | Young Tae Cho (Manager) |
| | Han Myung Kim (Manager) |
| | Seung Won Lee (Manager) |
| GSMT | Tanaka (Vice-President) |
| | Okada (Sales Director) |
| | Sato (Sales Dept. Head) |
| | Nagahata (Sales Dept. Head) |
| | |
| | |

Agenda items included "Market outlook," "Polymer market," and "Cylindrical line." The parties discussed GSMT's production "line status" of "14 lines, total 7.5 million cells/m CAPA (excluding cylindrical), "Prismatic – 10 lines (CAPA is based on three teams in two shifts for 24 hours)," "Kyoto – 9 lines (Lines 1 to 3 CAPA 40,000 cells/month, Lines 4 to 9 500-600,000 cells/month , Shanghai China (Mushaku)– 1 line (1 million cells/m), and "Polymer – 4 lines (CAPA 1.8 million/m)" as well as Locations – "Pack – Kyoto (Unj, 2 million/m), Shanghai (Pusong, 2/million/m)" and "Sales-GSMT (Tokyo), GMUS (California), GMEU (UK), GMTW (Taiwan)." The parties further discussed a "Market Outlook," and GSMT's specific projections for its projections of "Prismatic" and "Polymer" production for 2002, 2003, 2004, and 2005." The parties further discussed a "proposal" to "[s]eek collaboration for pouch battery type" and that "[d]evelopment of polymer battery market and market information exchange requested." Finally, the parties discussed "Cylindrical line – Line stopped in the first half of 1999 due to drastic cylindrical price decrease."

125.    On November 6, 2001, the following executives from Samsung and Toshiba met at the "Shibaura Toshiba Display Parts and Material Company Meeting Room" at 9:30 a.m.-11:00 a.m.:

-38-

102641422.1

| Conspirator Company | Employees Attending Collusive Meeting (Title of Employee) |
| --- | --- |
| SDI | Young No Kwon (Senior Manager) Young Tae Cho (Manager) Han Myung Kim (Manager) Seung Won Lee (Manager) |
| Toshiba | Iwasaki (Group Leader) Ozaki (Planning Production Dept. Head) Tatsukawa (Planning Leader) |

Agenda items included "Company and line status." The parties discussed Toshiba's "Line status" for "Cylindrical: 2 lines, 1.5 million / m CAPA," "Prismatic: 16 lines, 3 million / m CAPA," "Polymer: 2 lines, 1.5 million /m CAPA."

126.    Also on November 6, 2001, the following executives from Samsung and Sony met at the " Ohsaki SONY Gate City West Tower" at 2:00 p.m.-3:30 p.m.:

| Conspirator Company | Employees Attending Collusive Meeting (Title of Employee) |
| --- | --- |
| SDI | Young No Kwon (Senior Manager) Hee Seung Yoo (Senior Manager) Young Tae Cho (Manager) Seung Wno Lee (Manager) |
| Sony | Furuya (Planning Management General Manager) Konno (Marketing Planning General Manager) Nagamine (Strategy Department Head) Sekai (Marketing Planning Division Technology Dept. Head) |

Agenda items included "Line and market status," "Line and Capa status," and "Polymer outlook." The parties discussed Sony's "Line and Capa status" of "15 million/m CAPA," "Prismatic – 4 lines 2 million/m CAPA," "Polymer – 3 million/m (Japan and China)," "Cylindrical – 10 million/m")" and that Sony "[W]ould like to expand lines for cylindrical."

127.    On November 7, 2001, the following executives from Samsung and Matsushita met at the Kanagawa Matsushita Factory at 1:00 p.m. to 3:00 p.m.:

-39-

| Conspirator Company | Employees Attending Collusive Meeting (Title of Employee) |
|---|---|
| SDI | Young No Kwon (Senior Manager) Hee Seung Yoo (Senior Manager) Young Tae Cho (Manager) Han Myung Kim (Manager) Seung Won Lee (Manager) |
| Matsushita | Mori (Group Leader) Shimizu (Group Leader) |

Agenda items included "Market outlook," and "Capacity status." The parties discussed Matsushita's capacity, *i.e.*, "Cylindrical – 5-6 million/m (3.5 line relative to SDI line capa)" and "Prismatic – 4 million/m (plan to expand to 6 million in 2002)."

128.     Between March 12, 2002, and March 16, 2002, Samsung met in Japan with Sanyo, Sony, Panasonic, Maxell and GSMT. Specifically, on March 14, 2002, from 10:00 a.m. to 12:00 p.m., the following executives from Samsung and Sony met in the fifth floor conference room of Sony's Gate City West Tower in Osaka:

| Conspirator Company | Employees Attending Collusive Meeting (Title of Employee) |
|---|---|
| Sony | Geumya Konno (General Manager covering Marketing Strategy Division Hiratsuka (General Manager for Technology Strategy) |
| Samsung | Jeon, In Sang (General Manager) Kim, Han Myoung (Manager) |

Agenda items discussed by these executives included "Cylindrical Type Capa.," meaning capacity, "Concerning the Note PC Market," "Square Type Market Forecast," meaning prismatic batteries, and "Polymer." The Samsung and Sony executives communicated their companies' production capacities, and then a "Supply and Demand Forecast," agreeing that "the supply and demand shall be considered as tight." The executives then agreed that they would "*refrain from Capa. [capacity] extension*," and that "[u]nder the current market condition where profit realization is very hard" that "[f]ull operation of the lines currently possessed is the best choice."

-40-

129.     On March 14, 2002, Samsung met in Japan with Hitachi Maxell. Specifically, between 2:00 p.m. to 4:00 p.m., the following executives from Samsung and Maxell met at the Shibuya Hitachi Maxell 7th Floor Conference Room:

| Conspirator Company | Employees Attending Collusive Meeting (Title of Employee) |
| --- | --- |
| Samsung | Jeon, In Sang (General Manager) Cho, Young Taek (Senior Manager) Kim, Han Myoung (Manager) |
| Hitachi Maxell | Unknown |

Agenda items included "[t]he Demand for Square Type," the "[f]orecast of Supply and Demand for Square Type," the "Polymer Market," and "Concerning Sales of Cylindrical Type Line."

130.     On March 15, 2002, the following executives from Samsung met in Japan with Sanyo executives from 9:30 a.m. to 12:00 p.m. in the Samsung Japan Conference Room:

| Conspirator Company | Employees Attending Collusive Meeting (Title of Employee) |
| --- | --- |
| Samsung | Jeon, In Sang (General Manager) Kim, Han Myoung (Manager) Cho, Young Taek (Manager) |
| Sanyo | Sam, Mori (Strategy Group Leader and General Manager) |

Agenda items included "Supply and Demand for Cylindrical Type," "Cylindrical Market for Note PC," and "Forecast on Supply and Demand of Square Type." Sanyo communicated that its "cylindrical type equipment Capa. is approximately 10 million/month – High-speed line: 200~250 ten thousand/month X 3 lines – Low-speed line: 300 ten thousand/month." Regarding the "Cylindrical Market for Note PC," the companies communicated that while prices had dropped more significantly in prior years, "in 2002, it is expected that it will be 3%/half year." The conspirators further communicated that as compared to Panasonic, Maxell, NEC and GSMT, "Sanyo's operating rate is highest, *but they plan to avoid the extension in the future* and remodel the lines to respond to new Cell."

-41-

131.      Between October 22, 2002, and October 25, 2002, Samsung conducted another round of collusive meetings with its competitors in Japan. For example, on October 22, 2002, the following executives from Toshiba and Samsung met at Toshiba Display, Component Materials Corporation Battery Energy Department:

| Conspirator Company | Employees Attending Collusive Meeting (Title of Employee) |
| --- | --- |
| Toshiba | Hirayama Kazunari (General Manager of Business) Ozaki Hidemichi (General Manager of Planning Production) |
| Samsung | Ahn, Ki Hoon (Business Team Leader) Oh, Yo Han (General Manager) Kim, Han Myoung (Manager) Cho, Young Taek (Senior Manager) |

132.      Agenda items included "Cylindrical Type," and "Square Type." The companies communicated that for cylindrical, "The price of 2.2Ah to Motorola-ESG is almost the marginal cost level," and communicated regarding the "2003 price for mobile phone use" and that "it is expected that the demand for discount will be approximately under 10%." The conspirators further "*[a]greed to hold the regular interchange staffer-centric* conference (around end of November) → once every six months."

133.      Also on October 22, 2002, the following executives from GSMT and Samsung met at GS-Melcotec Business Department (Tokyo):

| Conspirator Company | Employees Attending Collusive Meeting (Title of Employee) |
| --- | --- |
| GSMT | Lin Quian Zuolang (President) Kobayashi Koichi (Vice President) Toshihide Tanaka (Director, Development) Shinzo Tanaka (Director of Sales, Board Member) |
| Samsung | Ahn, Ki Hoon (Business Team Leader) Oh, Yo Han (General Manager) Kim, Han Myoung (Manager) Cho, Young Taek (Senior Manager) |

-42-

The conspirators agreed regarding "CAPA extension → Rather than new extension, focus on productivity with the remodeling the existing line," and that "Current supply and demand BALANCE is good because after 2001 investment for extension there has been no additional extension." The conspirators further agreed that while "Most of the companies are contemplating additional extensions depending on 2003 demand forecast." "We should be careful based on the experience that there was oversupply caused by 2001 overinvestment." Samsung further noted the discussion of the "Cooperative Relation with Our Company."

134.    On October 24, 2002, the following executives from GS Soft Energy and Samsung met at GS Soft Energy:

| Conspirator Company | Employees Attending Collusive Meeting (Title of Employee) |
|---|---|
| Samsung | Ahn, Ki Hoon (Business Team Leader) Oh, Yo Han (General Manager) Kim, Han Myoung (Manager) Cho, Young Taek (Senior Manager) |
| GS Soft Energy | Honma (Vice President) Noguchi (General Manager of Management) |

The conspirators agreed that with respect to the "Forecast on Market from Now on" it was "*necessary to be careful in supply ability expansion*." The conspirators cautioned each other regarding the "[e]xperience of oversupply due to the whole industry's optimistic market prospect in 2001." The executives further agreed that "*With price competition only, all will be in trouble → have to make the industry Healthy*." They further discussed a "strategy to get rid of a company which disturbs the market." Samsung noted in its meeting notes "Let's talk separately with General Manager of Business, Ahn later." There also were pricing discussions between SDI and Sanyo with respect to Sanyo's 2.0A battery – a popular product.

135.    On October 25, 2002, the following executives from Matsushita and Samsung met at Matsushita Battery Industrial Co., Ltd.:

| Conspirator Company | Employees Attending Collusive Meeting (Title of Employee) |
|---|---|
| Samsung | Ahn, Ki Hoon (Business Team Leader) Oh, Yo Han (General Manager) |

-43-

| Conspirator Company | Employees Attending Collusive Meeting (Title of Employee) |
|---|---|
|  | Kim, Han Myoung (Manager) |
|  | Cho, Young Taek (Senior Manager) |
| Matsushita | Futtsu Toshiyuki (Vice President of Secondary Battery) |
|  | Norio Saito (General Manager of Marketing) |
|  | Yasuo Anno (Marketing Correspondence Leader) |
|  | Shimizu Akihiro (Management Planning Division) |
|  | Takagi Hiroki (Management Planning Division) |

Agenda items included "Cylindrical Type" and "Square Type." Matsushita discussed a recent "supply shortage of cylindrical type (reduction of Matsushita's M/S)" and communicated that the "price discount cut may become small; *however, there is no plan to reduce the price ever*." Regarding the "Market Forecast from Now on," Matsushita "do not expect considerable growth in the 2003 market" and "*[t]hey hope not to reduce the price competitively*." Samsung later internally described, "Although it was a joke, in the case that there is a merger like Sanyo/GS-MT, or there is a request to recommend a company that wishes to cooperate [i]n reply, if Matsushita experiences difficulties, they would like us to take care of them."

136.    Defendants' collusive meetings continued apace in 2003. For example, on or about June 26, 2003, executives from Samsung and GS Soft Energy met in Japan at Sanyo's headquarters, and communicated to each other their specific "2Q Sale Forecast" for each of them broken down by "Cylindrical Type, "Square Type" and "Polymer." They then communicated to each other their projected "2003 (March 2004 period) Sale Forecast," again broken down by each of the three battery types. They further communicated to each other their "Capa status" (capacity status) again broken down by each of the battery types, further broken down into potential and actual production by units of ten thousand units /month. The conspirators further communicated regarding the "Sanyo Capa Extension Plan," detailing the "Cylindrical Type: 1,000 → 1,200 ten thousand unit," the "Square Type: 1,600 → 2,000 ten thousand units," and "Polymer: nothing."

137.    On July 15, 2003, the following executives from Samsung and Toshiba met at 2:00 p.m. at a conference room within the Japan Tokyo ANA Hotel:

-44-

| Conspirator Company | Employees Attending Collusive Meeting (Title of Employee) |
|---|---|
| Samsung | Yoo, Eui Jin (Executive Director of Administration Planning Team) Cho, Young Taek (Senior Manager at Japan Branch) |
| Toshiba | Kazunori, Fukuma (Person in charge of Display – Parts Materials) Kubo Hiroshi (Display – Parts Materials) |

The conspirators discussed that Toshiba's battery business was for sale, and that its executives were also meeting with a company presumed to be LG regarding a possible sale. The conspirators discussed the significant intellectual property assets that, apparently due to the operation of law, would not be allowed to be transferred to a buyer. Samsung asked "Do you intend to keep IPR [intellectual property rights] while not running the business?" Toshiba responded that "We are not going to run the business and attached the manufacturing (AT Battery) → patent free. Cross License (C/L) with Sanyo and Sony has been reached." Toshiba further stated that it "is negotiating with other companies, and we are making proposal to 2 Korean companies as well as Japanese companies." Samsung stated that "We have formed a connection for a long time through liaison conferences with Toshiba so that it will be significantly reviewed as a matter of concern of Samsung Group." Toshiba communicated detailed capacity and operating rate information.

138.    On October 2, 2003, the following executives of Samsung and GS Soft Energy met at 7:00 p.m. at Tokyo Shinjuku Restaurant:

| Conspirator Company | Employees Attending Collusive Meeting (Title of Employee) |
|---|---|
| GS Soft Energy | Nagahata (General Manager in Charge of Marketing / Sales) |
| Samsung | Kim, Han Myoung (ME Sales Manager) Cho, Young Taek (Japan Branch – Senior Manager) |

The conspirators communicated that "[t]here is a grand-scale extension of Sanyo, but it is getting concentrated / emphasized on Nokia." The conspirators communicated regarding their "Price

-45-

Forecast," and communicated that "B/Cell 8% (Pack 10%) drop forecasted," and that "B/Cell is expected to drop approximately 8%, but it could grow due to the influence of China" and that "[i]n Pack condition (including cell 8%), a 10% price drop is expected." The conspirators communicated a very detailed "Extension Trend by Each Company" with "Equipment Company Information" shared and then "Verified" – for SGS, in regards to a 100 ten thousand extension, Sanyo "considered at the beginning 2 line extensions, but now, nothing has been decided" and "it is very likely that they will extend to a Japan (Tokyo) factory) and "[i]t is very likely, first, 1 line, 1 million; and it is expected to produce next spring at earliest." With respect to Sanyo, details were exchanged regarding "Cylindrical type September 120 ppm (440 ten thousand) completion," "Square type China 150 ten thousand extension completed, additionally, it is scheduled 4 line extensions," and that "[e]xtension of cylindrical type 300 ten thousand was completed in spring, and the after plan is unknown" and "Square type is proceeding as planned."

139.     Defendants' collusive meetings continued in 2004. On February 5, 2004 Seok Hwan Kwak of LG (Senior Manager, Tokyo Office) sent an email to Naito Toshiaki at Sony about an upcoming meeting between several executives at both companies. Kwak wrote, "It has been a quite some time since we met last time. . . . *Thank you ALWAYS for receiving my phone with a pleasant voice*." Mr. Kwak of LG then referred to their phone conversation earlier that day, stating that the Executive Vice President of Information & Electronic Materials Company and the Vice President of Battery Business Division would like to "meet you and your people to show their salutation/share the GENERAL information of Secondary Battery business and etc." Kwak requests three days in early March that would work for Toshiaki, and confirms that "[o]f course, we will visit at your site and . . . we hope to meet your responsible people including Energy Company's President and [Japanese characters] since it is their first time with a new position to SONY. . . ." He lists LGC's participants at the meeting as: 1) Soon-Yong Hong, Executive Vice President ("You've met him before . . ."), 2) Myung-Hwan Kim, Vice President Battery Business Division, and 3) Seokh-Hwan Kwak, Leader, Tokyo Information & Technology Center. He concludes by saying that "[a]gain, *SONY's kind cooperation is always appreciated by LGChem*."

-46-

140.     On February 23, 2004 an internal LG email was sent from Assistant Manager Yoo Sung Oh to General Manager Hyun Sik Park (Battery Planning Development Team). The email included information in preparation for a meeting with Sony. Oh wrote: "This is the content on the people to meet, summarized by Senior Manager Kwak, Seok Hwan, regarding the March 2 Sony meeting of the President and the Division Leader. Please refer to it." Oh forwarded an email from Senior Manager Seok Hwan Kwak of the Battery Planning and Development Team and Assistant Manager Yoo Sung Oh. That email begins, "***Dear Executive Vice President, Regarding SONY, I would like to remind you of the LGC's meeting history***." The email then describes a detailed history of meetings between LG and Sony, and a comprehensive chart of Sony's organization within its "electronics-related" business. It ends by mentioning a meeting (and meal) with Sony's Mr. Naito and Mr. Kamiyama on February 26. The following is a brief summary of the meetings between LG and Sony:

- **May 2001**: Vice President Gui Pyo Hong and Senior Manager Seok Hwan Kwak "met Director Nishi, introduced and asked for cooperation."

- **August 26, 2001**: Executive Vice President Jong Pal Kim, General Manager Woon Hyun Hwang, and Senior Manager Seok Hwan Kwak were "introduced to Mr. GAZI, then CEO of the Energy Company, and Director Nishi, and asked for cooperation."

- **July 23, 2002**: "EVP Hong Division leader Mr. HOSOZAWA/Mr. NAITO in charge of Cellular first greeting and asked for cooperation (on the business trip where he met MBI/SONY/SANYO/Toshiba/MCC division leaders)."

- **November 21, 2002**: "Afterwards, received a proposal for the acquisition of Sony Prismatic K5 line, and regarding K5, EVP Hong came to Japan again and met people, such as Mr. Katayama (executive in charge of technology) of the Koriyama factory, other than division leader Mr. HOSOZAWA. Afterwards, LGC completed the K5 acquisition on June, 2003."

The document goes on to outline the attendees of the upcoming February meeting between Sony and LG: "Since then, it is the first SONY visit by EVP Hong, and the attendees this time are: Mr.

-47-

Nakagawa (appointed as the president of SONY Energy Company from 2002); Mr. Naito (in charge of Cellular Battery); Mr. Kamiyama (in charge of business management planning and strategy); Mr. HOSOZAWA, who was the division leader of PCC division, that he met before. . . ." Kwak concludes by asking for Assistant Manager Yoo Sung Oh to tell him any additional questions "EVP" has before Kwak meets with Mr. Naito on February 26.

141.    On February 26, 2004, LG and Sony executives met, *i.e.*, for Sony, Hirokazu Kamiyama, the PCC Division Leader as of March 1, 2004, and Toshiaki Natio, the Cellular Battery Department Leader, PCC Division, Energy Company, and for LG, Seok Hwan Kwak, the Senior Manager, TITC. The meeting minutes prepared by Mr. Kwak and emailed internally stated "Please discard after reading." LG communicated:

> As Executive Vice President Hong mentioned during his previous visit to SONY, SONY and LG can regard each other as competitors in terms of secondary Li-Ion battery but we are engaged in a friendly competition to promote the growth of the overall Li-Ion industry, *and he asked for mutual collaboration in order to avoid any bloodshedding competition over just prices. So we'd like to speak in a frank manner.*

142.    An internal LG document, "President Minutes on Business Trip to Japan," describes meetings that took place March 2 and 3, 2004 in a meeting room at Sony's Shinagawa Seaside North Tower in Tokyo, the Akasaka Hotel, and various other locations in Japan. The participants from Sony and LG included:

| Conspirator Company | Employees Attending Collusive Meeting (Title of Employee) |
|---|---|
| Sony | Mr. Nakagawa (President of Energy Company) Mr. Kamiyama (Designated PCC Division Leader) Mr. Naito (GM of Cellular Batteries) Mr. Matsumoto (T-BTC attendees) Mr. Tanina (T-BTC attendees) |
| LG | Moon (Manager) Mr. Hirano (EVP) Soon Yong Hong (President of I&E Materials) Myung Hwan Kim (Battery Division Leader) Seok Hwan Kwak (Senior Manager) |

-48-

An initial summary of the meeting explains, "LG Chem has maintained friendly relations with SONY for the growth of the Li-Ion battery industry. The meeting was about introducing LG Chem's new management/President of Energy Company at SONY, and the new Division leader to each other, sharing information and asking for cooperation among companies." Detailed Sony organizational charts are included, focusing on business structure and, specifically, Sony's Lithium Ion Battery operations. The two companies discussed all aspects of the business: demand, products, supply, technological development, and prices. The document also discusses other companies' information: "SANYO also announced price hikes to customers and MBI also plans to do so. Afterwards, [it] received the opinions of NEC/Hitachi Maxell that they would raise prices as well. *Believe that if LG Chem and SDI cooperate in this, the growth of Li-Ion battery industry is likely to go in the right direction*." The meeting minutes also detail Sony's communication with competitors, including:

- Sony first approached SDI before LGC regarding the price hike issue and believes that SDI would also say OK. SDI seems to be most worried about responses from internal customers rather than external customers.

- Sony already pushed BAJ (Battery Association of Japan), and BAJ will ask companies for cooperation through various channels.

- Since this is the first price hike, [Sony] want[s] all Battery companies to cooperate.

143.     The document also recounts a discussion of Sony's plan to raise prices, despite concerns, which led them to "ask . . . LGC for cooperation. If Japanese companies, LGC and SDI cooperate on prices, expect that Chinese companies would have no choice." The topic of SONY-Ericsson Europe follows, with Sony stating that it is going to Europe to announce a price hike in the next week, and "[a]lso hopes that LGC will raise prices of SONY Ericsson."  Under the heading "LG Chem's Response," the meeting minutes read:

- Mentioned that we understand SONY's opinion enough and that we would be cooperative.

-49-

- After the Division leader returns to Korea, and discusses with SDI, and would report the related policy as soon as possible.

- The reason why Executive Vice President Hong had a prior meeting with our competitor SONY was to achieve cooperation among companies in order for the growth of the healthy Li-Ion industry. Today, rather thanked for specific cooperation request for Industrial Cooperation. Delivered an opinion hoping for more frequent meetings between companies and having a meeting on a regular basis if possible.

- LG delivered an opinion that it wants to cooperate with SONY on Polymer, and it wants to advance into Polymer along with SONY because Polymer customers are negative about Single Supplier.

144.    On June 30, 2004, the following executives from Sony and Samsung met at the Sony Energy Company Headquarters Meeting Room:

| Conspirator Company | Employees Attending Collusive Meeting (Title of Employee) |
|---|---|
| Sony | Nakagawa Yutaka (President) Kamiyama Hirokazu (PCC Div. General Manager) Naito Toshiaki (PCC Div. Cellular General Manager) |
| Samsung | Joonghyun Lee (EVP) Jinkun Lee (VP) Yoan Oh (GM) Insang Joen (GM) Heeseung Yoo (GM) |

Sony President Nakagawa delivered a "welcoming statement," stating that Sony was "Very close friends with Samsung. Has visited Samsung several times to discuss cooperation in memory Stick." He stated that he was "Glad that SDI and Sony have been competitors, but *also have been able to cooperate with each other at the same time as entities participating in the same business*" and that he "Wish such a relationship would continue."

145.    The conspirators proceeded to communicate historical and forward-looking detailed production figures for 2003, 2004, and 2005 for the "Cellular market" and the "Note PC market." The conspirators then discussed polymer, and communicated that "Sony desires to have competitiveness in technology rather than compete through price only." The conspirators held

-50-

discussions "[r]egarding the recent Note PC market and the fluctuation of cylindrical price." The conspirators continued that "Taiwanese pack makers have surplus stocks → Increase in production capacity → Some cell makers have began [sic] to reduce the price" and that "[t]his is a risky situation in that price goes down in spite of the increase in cost." The conspirators continued that "Sony is not reacting with price. *If Sony reacts with price, it will ruin the market. Therefore, should refrain from lowering price*." Another version of Samsung's meeting report was translated as stating, "This is a dangerous situation where cost is increasing while price is going down. Sony is not responding with price. If it responds, then the market will be destroyed so price reduction must be suppressed."

146.     Documents produced from LG's files reflect that the minutes of *this collusive meeting between competitors were shared with LG*, even though LG did not attend the meeting. In an internal document produced from LG's files, the same meeting is described in a June 30, 2004 document entitled "Sony Meeting Result Report" which recounts a meeting held between Sony and Samsung SDI at Sony Energy Company meeting room. The report describes the welcome greetings by Sony's President: "*[i]t was good in that [Samsung] SDI and Sony, as competitors and companies in the same industry at the same time, could cooperate each other, and hope that this kind of relationship will continue*." The report further states that "Sony's President visited Samsung several times for the "mutual cooperation on [m]emory [s]tick." At the meeting, the companies shared market information such as demand forecast for cellular phones, notebook PCs, PDAs, and digital cameras, and agreed to have another meeting.

147.     GS Soft Energy (SGS) and Sony met again on July 2, 2004, from 6:00 p.m. to 10:00 p.m. with SGS's "Head of Production Planning Division GM Nakahita" attending, and they communicated regarding detailed production unit figures for April and May of 2004, broken down by cylindrical and "rectangular" units. The report of this meeting between Sanyo and Sony was found in the files of Samsung – demonstrating again that even where a meeting was attended by two competitors, the conspiratorial discussions were shared with their co-conspirators.

148.     On July 28, 2004, Samsung met with the following executives from Matsushita Battery from 3:00 p.m. to 5:00 p.m. at Osaka Matsushita Battery: "Global Management Group GM

-51-

Akihiro Shimizu," and "Global Marketing Overall Management Department GM Masaya Niko." The conspirators shared their companies' production forecasts for 2004, 2005, and 2006 and reinforced that "There is no plan for cylindrical expansion in 2004."

149.    Later on July 28, 2004, Samsung met with the following executive from GS Soft Energy (SGS) from 6:00 p.m.-10:00 p.m. at a restaurant in Osaka regarding "Production Headquarters Planning Department GM Kazunori Nagahataa (Kazuniro Nagahataa)." The conspirators communicated regarding "SGS Capa [capacity] – Japan #2, 6, 7, 8, 9 each 600,000/month, #12 line 1 million/month" and "Shanghai #3,4,5 each 600,000/month, #10 line 1million/month" and "Polymer 500,000/month, 2 lines" and other capacity figures.

150.    On July 29, 2004, Samsung met with executives from NEC – Tokin from 2:00 p.m.-4:00 p.m. at "Tokyo NEC Energy Device Headquarters" with these attendees from NEC:

| Conspirator Company | Employees Attending Collusive Meeting (Title of Employee) |
|---|---|
| NEC | Motohiro Mochizuki (Battery Business Dept. Business Planning GM) Taniguchi Hiromichi (Business Overall Management, Business Strategy Dept.) Kazuhiko Sato (Sales Implementation Dept.) Takashi Yoshitaka (Sales Implementation Dept.) |

The conspirators communicated various detailed forecasts, including a "Cell demand forecast" for "rectangular/LIP" for 2004, 2005, and 2006," and detailed capacity information.

151.    Later the same day, July 29, 2004, from 5:00 p.m. to 7:00 p.m., Samsung met with the following executives from Hitachi Maxell at Tokyo Hitachi Maxell:

| Conspirator Company | Employees Attending Collusive Meeting (Title of Employee) |
|---|---|
| Hitachi Maxell | Shigehiro Kakumoto (Energy Solution Business Group Planning GM) Seiji Sumoto (B to B Sales) |

The conspirators communicated regarding various "demand forecast" projections and production capacity information.

-52-

152.     On July 30, 2004, Samsung met with the following executive from Sanyo Battery at Tokyo Sanyo Battery from 1:00 p.m. to 3:00 p.m.:

| Conspirator Company | Employees Attending Collusive Meeting (Title of Employee) |
| --- | --- |
| Sanyo | Hiroshi Noguchi (Mobile Energy Company, Strategic Business Unit) |

The conspirators communicated regarding Sanyo's 2003 "sales profit rate 10% range" and a "2004 sales amount 210 billion yen, sales profit 17% target." The conspirators further communicated regarding demand forecasts including a "Cell demand forecast" regarding "[r]ectangular/polymer demand for mobile phone use" and "cylindrical / rectangular" demand. The conspirators further discussed, regarding the "Toshiba takeover and SGS related," that "[a]s of June 2004, there is no change in the plan to expand rectangular 5M/month from 47M/month (cylindrical 16M, rectangular 30M, polymer 1M) Capa until the end of the year."

153.     On February 17, 2005, Samsung had a collusive lunch meeting with "LG VP Jang Soon Kim," and "VP Jin-Gun Lee." The conspirators communicated regarding 2004 sales volume, and regarding a "'05 1st quarter sales forecast." LG communicated that "Because of the after effect of the '04 cylindrical quality problems" that "it will be difficult to exceed 9 million cells per month from January to March '05 (around 3M cylinders, around 6M rectangles, 1M or less polymers." The conspirators further communicated regarding the "Nanjing factory operating status (cylindrical Capa: 2M/month, rectangle: 2M/month)" and details on "Polymer sales status" and an update on the expansion of two polymer lines.

154.     Samsung and LG further discussed "Price Cooperation," and that "[i]n an oversupply market situation, while it is difficult to cooperate on each and every case, for certain PJTs by each customer, both companies agreed to cooperate to stand up against the Japanese business when necessary." The conspirators further discussed the "LG Chemical CEO's perspective on the battery business," including that "For the time being, look at it as if there won't be any battery facility expansion (Postponing the '05 Nanjing expansion of 8 million was a good decision)." Going forward,

-53-

both companies agreed to communicate regarding price levels. Finally, Samsung's meeting notes indicate "Criticized that all the purchasing agents of HP, Dell ODMs are Spoiled."

155.    From February 21, 2005, through February 25, 2005, Samsung met with its competitors Sanyo, Sony, Matsushita, GS Soft Energy (SGS), NEC-Tokin, and Hitachi Maxell, again discussing detailed supply and demand issues. Samsung stated internally after these meetings that "[c]ompanies are trying to refrain from adding new lines due to declining profitability and recognition of oversupply." It further stated "[i]t is the situation of the decline of selling price and oversupply, thus, the overall situation of the industry for 2005 is expected to be difficult," and that it "*Requested to refrain from adding lines competitively, and each company seems to be willing to refrain from adding new lines.*"

156.    Specifically, the following executives from Samsung and Sanyo met on February 21, 2005, from 4:00 p.m. to 6:00 p.m. at the Sanyo Electronics Co., Mobile Energy Company Conference Room in Ueno, Tokyo:

| Conspirator Company | Employees Attending Collusive Meeting (Title of Employee) |
|---|---|
| Samsung | Jong Ho Kim (Deputy GM, Battery Marketing Dept.) Seung Won Lee (Manager, Planning Dept.) Hee Seung Yoo (SDI Japan Office, Deputy GM) Dong Seop Lee (Manager, Samsung SDI Japan) |
| Sanyo | Mr. Noguchi (GM, Business Strategy Unit) |

The conspirators communicated in detail regarding production line capacity for cylindrical, prismatic, and polymer, and the "Plan to add lines" and "[f]ocusing on cost reduction rather than price."

157.    On February 22, 2005, the following Samsung and Sony executives met between 2:00 p.m. and 4:00 p.m. at the SONY Co. Energy Company Conference Room, in Shinagawa, Tokyo:

| Conspirator Company | Employees Attending Collusive Meeting (Title of Employee) |
|---|---|
| Samsung | Jong Ho Kim (Deputy GM, Battery Marketing) |

-54-

| Conspirator Company | Employees Attending Collusive Meeting (Title of Employee) |
|---|---|
| | Seung Won Lee (Manager, Planning Dept.) Young Taek Cho (SDI Japan Office, Deputy GM) Dong Seop Lee (Manager, Samsung SDI Japan) |
| Sony | Mr. Nagamine (GM, Business Planning Dept.) Mr. Aoki (Manager, Business Planning Dep.t) Mr. Katahira (GM, Sales Dept.) Mr. Ishiharada (Manager, Sales Dept.) Mr. Nakayama (Manager, Sales Dept.) |

Just as before, the parties communicated in detail on a host of detailed subjects. The conspirators communicated and one or both "*[r]equested that companies refrain from building additional lines*."

158.    On February 22, 2005, executives with Samsung and NEC-Tokin met to again communicate regarding a host of confidential business information.

159.    On February 24, 2005, executives with Matsushita and Samsung met between 3:00 p.m. and 5:00 p.m. at the "Matsushita Batteries Conference Room" in Moriguchi, Osaka to again communicate regarding a myriad of confidential business topics, including that "Matsushita has not manufactured 2.0Ah made of Mn, but will use Mn for 2.2Ah" and that it "*[e]mphasized that this is to reduce cost of materials, not to sell at low prices*."

160.    On February 24, 2005, executives from Samsung and GS Soft Energy (SGS) met at "[a] Restaurant in Downtown Osaka" between 6:00 p.m. and 8:00 p.m. to again communicate regarding numerous confidential business topics.

161.    On February 25, 2005, executives from Samsung and Hitachi Maxell met between 10:00 a.m. and 12:00 p.m. at the "Conference Room in Maxell factory" in Ibaraki, Osaka to again communicate regarding numerous confidential business topics.

162.    On March 14, 2005, Samsung's "Jin Gun Lee (Managing Director, SDI)" met with LG's "Jang Soon Kim (Managing Director, LG Chemical)" at a coffee shop between 4:30 p.m. and 6:00 p.m. to communicate regarding numerous confidential business topics. Regarding "Cell Prices," they "Discussed pricing of 2.4Ah cell in connection with cell sold to Simplo and Dell, and asked for

-55-

$2.60." The collusive meeting notes continue "However, participants seem to have agreed to approximately $2.70 (SDI's Price: $2.80 (February)) – (will follow up)."

163.     Samsung and LG met again on May 23, 2005, to communicate regarding confidential business topics.

164.     Samsung and Sony met again on July 19, 2005, to discuss confidential business topics, between 3:00 p.m. and 4:30 p.m. in Tokyo at the "SONY Corporation Energy Company 6th Floor Conference Room."

165.     On July 20, 2005, Sanyo and Samsung met again to discuss confidential business topics, between 1:00 p.m. and 3:00 p.m. in Tokyo at the "Sanyo Electric Co., Ltd. Mobile Energy Company Conference Room." The conspirators communicated that "The business got much better because of the Co [cobalt] price fall, only need to save the fixed cost" and that "[f]or the sales price reduction rate, planned 10% Cylindrical, 20% Rectangular."

166.     On July 22, 2005, Samsung again met with Hitachi Maxell to discuss confidential business topics, between 9:00 a.m. and 10:50 a.m., in Osaka at the "Osaka, Ibaraki Market Maxell Factory Internal Conference Room." Defendants discussed that "Hitachi has no plans to enter the Polymer focused market." The conspirators further agreed that they *"[m]ust cooperate in terms of control over industry* → Outsourcing is possible too."

167.     An internal LG document dated September 26, 2005 includes a business trip report and describes an LG visit to Sanyo/MB and states: "The *objectives of these meetings were to create direct contact points between the top managements of LG Chem and Japan's major battery companies, SANYO and MBI/share information*." The report also described the purpose of the meeting to "establish cooperative relationship between the Battery Association of Japan (President: Mr. Ishida of MBI, Vice President: Mr. Honma of SANYO) and the Battery R & D Association of Korea. The report detailed market conditions and pricing, and said "*it is the mission for the industry to explore a new market and to avoid over-heated competition*."

168.     On October 26 and/or 27, 2005, Samsung again met with Matsushita in Osaka to hold conspiratorial discussions. For example, with respect to "Price" the conspirators communicated that

-56-

"[t]here is an opinion that especially towards SMP [the packer Simplo], the current price might be maintained." With respect to "Cooperation from now on," the conspirators "[s]uggested regular meeting at the level of once every three months" with the "[n]ext time '06 January Seoul" and further detailed the executives to contact "[i]n the case of necessary mutually urgent opinion exchange."

169. On November 3, 2005, Samsung and Sony executives again met, this time at the "SDI Headquarter[s] Office" to discuss their collusive goals, including the "Polymer market."

170. On November 14, 2005, Samsung and Sony's executives again met to collusively discuss confidential business topics. Samsung's meeting notes reflect that the conspirators have been meeting "2-3 times a year since 2004."

171. On November 16, 2005, Samsung and Sanyo's executives again met to discuss confidential business topics, agreeing that "[t]rust is solidified through continuous information exchange meetings with Sanyo" and discussing "SDI opinion on matters such as whether or not to actively enter Cylindrical 2.0Ah." The conspirators further discussed "[c]ylndrical high capacity (above 2.4AH)" and that "For Mobile Phone: '05 – '06 demand +8~10%, selling price Δ 15%" and "For Note PC: '05-'06 2.4Ah or more capacity products show demand +20%, selling price as Δ 10%, forecast for the sole expansion in the market." Regarding "Cylindrical Business," the conspirators communicated that "HP's low price model 2.0Ah demand is large, but price at below U$2.0 is a problem."

172. An undated document entitled "2005 – 2006 Marketing Expense Result" refers to expenses incurred for numerous business meals between LG and its competitors, including Samsung, MBI, Sony, and Sanyo.

173. On March 20, 2006, Samsung executives met with NEC executives Mr. Oyama (the General Manager, Energy Devices Business Unit, Sales Department) and Mr. Omori (from the Sales Department). They met from 1:00 – 2:40 p.m. on the 10th Floor of the NEC-Tokin Conference Room in Chiyoda, Tokyo. The parties collusively communicated on a number of subjects, for example, regarding NEC's projected demand from customers Nokia, Motorola and Siemens, and further communicated regarding NEC's sales ranking of NEC customers including Cannon, Kodak, Nikon,

-57-

Olympus, Casio, and Techwin. The parties further communicated regarding the "NEC-Tokin Trend," specifically, that "Target capacity of 7.5 million units / month through productivity improvement (Xiamen, China in particular) (mentioned capacity of 7.5 million units / month at the Information Exchange Meeting in February 2005)" and that NEC was "Considering adding lines to reach 10 million units / month by the second half of 2006 - Considering adding 1 line which is bigger than the existing lines" and that "Design capacity is 7.5 million units per month. The actual production volume is less than the full capacity. (5 million units sold per month as of the date of meeting in February 2005)." The parties further collusively communicated regarding NEC's detailed projected production figures, broken down by "Capacity/Month (# of Lines)" for NEC lines in Tochigi, Japan, Xiamen, China, and Wujiang, China. The parties further collusively communicated regarding NEC's "Plan to supply prismatic batteries to Apple (I-pod: hard disk type)" and "Entry into the Polymer Battery (pouch battery) Market -0.3 million units / month per line capacity for 3 lines; operating in Wujiang, China." Regarding "Plant Operation in China," Samsung's meeting minutes reflect "There is no sale to local; through NEC corporation, sold or imported to NEC or Japan."

174.   On August 7, 2006, Samsung again met with Sanyo to discuss confidential business topics, this time in Tokyo between 5:40 p.m. and 8:20 p.m. at a "restaurant near Roppongi." The conspirators discussed their "*[h]ope that the 3 companies (Sanyo, SONY, SDI) will lead the market with stability with the golden section. okay to compete on technology, but refuse competition based on sales price.*"

175.   On August 8, 2006, Samsung and GS Yuasa again met to discuss confidential business topics, in Kyoto between 4:10 p.m. and 6:00 p.m.

176.   On August 9, 2006, Matsushita and Samsung again met to discuss confidential business topics, between 1:00 p.m. and 2:20 p.m. at the "Osaka, Moriguchi Matsushita Secondary Battery Company Conference Room."

177.   On September 8, 2006, LG and Samsung again met to discuss confidential business topics, and to communicate that with respect to "E-bidding," "LG is very sensitive to SDI's pricing policy."

-58-

178.    An October 10, 2006 internal LG email with the subject line "(Important) HP Supply Review meeting in Seoul" from Young Sun Kim (General Manager, LGCAI LA Office) describes a meeting between LG and HP. The main purpose of HP's visit to Korea is "to secure cell supply and demand" and to discuss pricing issues. The email also refers to Samsung SDI's previous visit to HP where HP requested continued production of 2.0Ah, and Samsung SDI made it clear that it is hard to continue to produce 2.0Ah starting from 2Q and that SDI will concentrate on high capacity such as 2.8Ah/2.6Ah/2.4Ah. The email states that as this might lead to HP's conversion to 2.2Ah, "*please double check SDI's direction and check again that SDI does not cut cell prices*."

179.    In February 2007, a collusive meeting occurred between Matsushita (Panasonic) and SDI/Samsung. The meeting appears to be triggered by a rise in cobalt prices, as cobalt is a large percentage of the cost of manufacturing a battery cell. For Matsushita, Mr. Katsube and Mr. Shimizu attended the meeting. Attendees for Samsung were Mr. HK Yeo, Mr. MH Jeong, and Mr. Kim. The conspiratorial meeting was held in a private room at a traditional Korean barbeque restaurant near the Shilla hotel, a location specifically selected because the attendees would not easily by seen by others. HK Yeo of Samsung was in charge of Samsung's office in Japan. Mr. Yeo was the person primarily responsible for making pricing recommendations for cell prices to his boss, JG Lee, who had the ultimate responsibility. Mr. Yeo had the responsibility to recommend pricing of cells, and had pricing authority for cells used in computers and cell phones.

180.    In this February 2007 meeting, the conspirators discussed ways they could counter the increase in cobalt prices. Specifically, they exchanged forecasts of cobalt pricing, discussed their concerns over the rapid increase of cobalt prices, and agreed to raise cell prices. During the same meeting, the conspirators discussed using the previous three (3) month average of cobalt price increases as a mechanism to be reflected in the battery cell prices for each following quarter. For example, if the previous three (3) month cobalt average price increased by $10, then the price of a cylindrical cell would proportionally rise by $10.

181.    On February 23, 2007, Matsushita and Samsung again met to discuss confidential business topics at a restaurant in Seoul "because in early February Mr. Shimizu in charge of

-59-

marketing at M Company [Matsushita] proposed to discuss market situation following the sharp increase in cobalt price." The conspirators communicated that "[i]n previous years cobalt price skyrocketed at the end of the year and dropped in January, but the price is not dropping even now at the end of February and continues to soar so there is a concern of the serious situation in 2004 repeating." The conspirators further communicated their "*hope to mutually exchange the market situation with regard to the sales price for the 2Q volume so that the business can move towards a positive direction*."

182.    Samsung and Sony again met on March 14, 2007 between 1:00 p.m. and 2:30 p.m. at the "Tokyo, Shinagawa Sony Meeting Room" to discuss confidential business topics.

183.    Sanyo and Samsung again met on March 14, 2007 between 6:00 p.m. and 7:30 p.m. to discuss confidential business topics.

184.    Samsung and GS Yuasa again met on March 15, 2007 between 10:30 a.m. and 12:00 p.m. to discuss confidential business topics.

185.    Samsung and Matsushita again met on March 15, 2007 between 3:00 p.m. and 5:00 p.m. to discuss confidential business topics.

186.    Another incriminating email chain begins March 19, 2007 and ends March 20, 2007. Samsung's MH Jeong, the Senior Manager, Marketing Team, Energy Business Division, wrote to Panasonic's Mr. Shimizu and Mr. Katsube that "[w]e want to talk about your safety technology on PRL and PSS. So please call Mr. Yeo. His Cell phone number is . . ." But in truth, Mr. Yeo has nothing to do with safety technology. This email was code indicating that Mr. Jeong was asking for a collusive discussion, but did not want to put in writing what it was about. Mr. Yeo, after speaking with Panasonic, emailed Mr. Jeong on March 20, 2007 at 5:16 p.m. regarding the "Telephone conversation with P Company" and the "Request for price increase star[t]ing this week." Mr. Yeo continued that the "Increase (Proposal)" was "Start with 10~13% increase and hope to end with 8~10%. (Bottom)" and that "Hope to apply to all models" and "Time to apply the increase: starting from 4/1" and "Other company trend – Sanyo: hopes for 8~10% - Sony: 10% level (will end with less than 10% since starting with 10%)." At 1:28 a.m. later that day, Mr. Yeo forwarded his email,

-60-

1    stating "Strictly confidential, complete security requested" to Samsung's Ki Seop Lee, Young Hoon

2    Suh, and Won Taek Chang.

3        187.      As noted above, Samsung's Mr. Yeo reported on the content of the phone

4    conversation with "P Company" – also code (for Panasonic) and "Issue for D" – also code (for Dell

5    Computer). The email also referenced the need to get "Accept on the pack price from Company H,"

6    code for Hewlett Packard). The document mentions a concern about secrecy – this was because of

7    antitrust issues. The information received by Samsung/SDI in this document, about Sanyo and Sony,

8    came from Mr. Katsube of Matsushita. And Mr. Yeo later learned that Matsushita and Sanyo talked

9    to each other because he got a phone number for a Sanyo employee from Mr. Katsube of Matsushita.

10    When Mr. Yeo asked for Sanyo's contact information from Mr. Katsube he was given the name of

11    Mr. Tatchihara.

12        188.      An internal LG email dated May 11, 2007 with the subject line "Price-related update"

13    sent from Hee Kwan Ra (Account Manager, Battery Notebook Business, CRM Team) to

14    jhlee@popmail.lgchem.com (multiple recipients) updates the ongoing price progress between LG's

15    customers and "S Company" and begins by stating "***please delete this email upon reading***." The

16    email reports that Asus completed price discussions with "S Company," but Asus asked for rebate

17    which "S Company" declined. According to the email, "S Company" asked LG to decline Asus's

18    request as well.

19        189.      An internal LG document dated June 5, 2007 entitled "SDI Meeting Report" discusses

20    a meeting held on June 4, 2007 at Yeon ChunGee, a restaurant in Korea, attended by General

21    Managers of LG and SDI, as well as Planning and Development personnel. Topics discussed at the

22    meeting included sales plans, production capacity, and "how to cooperate between LG Chem and

23    SDI."

24        190.      Not all meetings between these conspirators involved only two defendants. A

25    conspiratorial meeting between Samsung, Matsushita and Sanyo took place in the middle of June

26    2007, in the Shinagawa district of Tokyo at a restaurant. The meeting was attended by Mr. Yeo (of

27    Samsung/SDI), Mr. Tatchihara (of Sanyo) and Mr. Katsube (of Matsushita). The three companies

28

-61-

agreed to raise the price in the third quarter of 2007 using the same cobalt average price increase formula. The three companies also agreed on the bottom line (a price floor) of their selling price – at or around $2 – $2.30 for the 2.2 cell product. The bottom line price was achieved along with the cobalt price increase in June 2007. LG Chem later also agreed to the formula and increase in prices.

191.    A July 15, 2007 internal LG email thread with the subject line "Regarding the second price increase" from Jae Min Park to Joon Ho Lee, and copied Min Jae Park and Jae Kil Kim, states "Basically, Suwon/Japan's S and M Companies increased a price by a combined 30 cents for the first/second rounds in total. In the case of Suwon, the second round price increase level was 10~12 cents, and Japan's S by more than 20 cents because it didn't raise much in the first round, and Japan's M Company by 15 cents in the second round." On information and belief, "Suwon" refers to Samsung, "Japan's S" company refers to Sony or Sanyo, and "Japan's M Company" refers to co-conspirator Matsushita.

192.    On July 15, 2007, a series of email exchanges between Joon Ho Lee (VP, in charge of Battery Notebook Business), Jae Min Park (Senior Manager, Battery Notebook Business, CRM Team) and Jaegil Kim share price increase information of "Suwon's S Company," "Osaka Company," and "Japan's M Company, "such as level of price increase. The email from Joon Ho Lee states, "in the July 7 meeting with Suwon Company, we checked that Osaka Company and M Company across the sea are already conducting the second round of price increase and also that Suwon Company also began the work last week." On information and belief, "Suwon S Company" refers to Samsung, "Osaka Company" refers to Sanyo as its headquarter is there and "Japan's M Company" refers to co-conspirator Matsushita.

193.    A September 27, 2007 internal LG email thread with the subject line "Fw: (Important) Bosch RFQ strategy" from Jae Min Park to Yong Wook Chung discusses pricing and production information gathered from Bosch. Jae Min Park concludes the email with "*[f]or more exact model prices, I will share with you tomorrow after the final discussion with S Company*."

194.    An October 5, 2007 internal LG email with the subject line "Bosch Price," from Yong Wook Jung to Joon Ho Lee states, "The price agreed with Manager Moon of SDI Frankfurt is as

-62-

follows: SDI 1st G: 2.10-2.20 . . . 2nd G: 2.30-2.40 (the same as above) LG Chem 2nd G: 2.29 USD (supply 2nd G only, the bottom price is 2.25 USD) SDI is 16:00 on 9th, and 15:15 on 10th. –End-" SDI refers to competitor Samsung/SDI.

195.     On November 30, 2007, Jae Min Park told Joon Ho Lee in an internal LG email with the subject line "Customer Meeting," that "In regards to an S Company meeting, S Company informed me that is it uncomfortable attending a meeting due to company internal issues and that is would contact soon." Mr. Lee responded to Mr. Park on December 2, 2007, "As far as I was able to find out, they seem to be under a ***special investigation by the Prosecutor's Office***. As an external explanation, they are saying that they are restraining from contacts with other companies due to Fair Trade Commission's investigation, ***which sounds to be somewhat of a lame excuse***."

196.     A January 26, 2008 email thread between Jae Min ("Jerry") Park from LG and Ushiyama Naoyuki from Sony in Japan discussed a meeting that they attended in Taiwan, and potential future meetings. Park emailed Naoyuki on January 25, 2008 to introduce himself as the person "in charge of cylindrical cell sales biz in LG Chem." Park refers to a meeting they previously had in Taiwan, and states that the "reason I sent the email to you suddenly is I would like to meet you again and exchange the market information for each other biz." Park further states that he "will visit Tokyo from 28th, Jan to 30th, Jan. If you are available in this period and O.K. to meet us, I would like to meet you in any place in Tokyo." Naoyuki responded he "will be available at 11:00-12:00 on Jan. 29th at our HQ in Shinagawa." Park accepted the invitation to meet at the headquarters in Shinagawa on January 29th, and listed LG's attendees: "John Lee (Sales, VP), Jerry Park (Sales, GM), and Paul Kwon (Sales, Japan account manager)." Park stated he would contact Naoyuki again before the meeting, and provided him with his mobile number in case Naoyuki needed to reach him.

197.     A January 28, 2008 internal LG document entitled "SANYO Meeting Minutes" describes a meeting held that day at Narita Airport between LG executives and "General Manager Ikegami (GM, overseas biz)" of Sanyo during which they discussed future exchanges of market information, customer demand, capacity, pricing, and agreeing that information bearing on prices and production costs should "***not be opened to the customers***."

-63-

198.     A January 31, 2008 email with the subject line "Meeting Minutes regarding 'SA' meeting," from Jae Min Park (Senior Manager, Battery Notebook Business, CRM Team) describing the same meeting referenced above, attended by LG and Sanyo, which took place on January 28, 2008 at Narita Airport. The email begins by saying "regarding this matter, *please delete it upon reading*." At the meeting, the companies exchanged market information and discussed demand, SA's capacity, and prices. As for continued collusive discussions, LG "*made suggestions of consistent [m]arket information exchanges in the future, and 'Sa' also showed positive response*."

199.     In a February 11, 2008 email with the subject line "About price adjustment," LG's Jae Min Park, wrote to LG's Jae Kil Kim, and copied Joon Ho Lee, and stated that "Regarding cylindrical cell price increase, things are going as below. Please take into account. – Effective date: 3/1 (March/April/May) – Price increase: by 10% minimum – Suwon S Company's Rationale: Although the Co[balt] Price was $30 in the past increase, Co price of $40 is applied to the months of March/April/May (three months). Therefore, it is inevitable to increase the price at least by 10%." LG's email regarding S Company continued, stating "Considering current Co[balt] price increase, it plans to mention in advance that additional price increase is unavoidable for June/July/August (three months). ($40->$50)." LG continued that "Therefore, it [S Company] plans to raise price twice, first by at least 10% for March/April/May, and second by at least 10% for June/July/August . . . LG Chem, after Suwon S Company completes notification, will also notify its customers of the price increase, and start to apply from March 1."

200.     A February 27, 2008, internal email thread from Jae Kil ("Albert") Kim to Joon Ho Lee advised Lee of the status of price increases, and the pricing implemented by competitors including Samsung SDI, Sony, and Sanyo. Joon Ho Lee responded "Members in the office in Taiwan, You did a good job." In response to Lee's email Jae Min Park reported "*Today, I received [a] call from Suwon to reconfirm the price increase, and [] Suwon said that it does not have any problem with raising the price according to the contents mentioned last time*. LGC also asked for support. Regarding this, LGC mentioned that they shouldn't be worried about it because LGC is aimed to carry out in addition to what was mentioned last time. General Manager Kwon, Sang Cheol

-64-

asked me to explain the contents of the price increase. I would appreciate if Vice President gave me your opinion whether I am allowed to open the contents to him." On information and belief, "Suwon" refers to LG's competitor, Samsung/SDI.

201.    On February 27, 2008, LG executives met with General Manager Ikegami of Sanyo at the Akasaka restaurant. Among other things, they discussed production, capacity, customer information, future pricing information, and efforts to keep information from their customers concerning their pricing strategies and costs of production.

202.    An internal LG document entitled, "'SA' Company Minutes" (Sanyo is later identified as the meeting participant) describes a meeting that took place on February 27, 2008 at the Akasaka restaurant. Attendees from LG were Joon Ho Lee (VP, Notebook Business), Deuk Yong Kwon (Notebook CRM Team); in attendance from Sanyo was Mr. Ikegami (General Manager, Overseas Business). They discuss capacity issues, and the need to check on competitors' production plans (Sony, MBI). Next to the section labeled "Regarding Price," it says:

- Check Sanyo's price increase logic.

- The price increase, this time around, reflects price hikes in raw materials including Cobalt, but did not mention the specific logic…. Regarding price increase, need to deliver a message again that the formula should not be open to customers.

- Expressed positively to LGC's proposal, but mentioned indirectly that it's not easy for [Sanyo] not to open the formula because of strong request of customers….Discuss the timing of the second round of price increase.

- Regarding LGC's mention, did not say specific yes/no opinion, but gave just a basic answer that they would raise prices if they need to reflect increase factors.

The companies discuss production capacity, product development, and relationships with various packers. In conclusion, LG notes that Sanyo says it "want[s] to maintain a communication channel with LGC in the future, and requested this meeting with the intention of maintaining continuous communication."

203.    A March 5, 2008 internal LG email circulated a February 29, 2008 meeting minutes report that LG executives met with General Manager Matsumoto of Panasonic to discuss production

-65-

capacity, customer information and a plan to increase prices. During the meeting it was confirmed that prices would be increased, and that LG would follow up with General Manager Matsumoto during the week following the meeting "regarding the price increase level."

204.    A May 13, 2008 internal LG email thread with the subject line "(revised) 'M' Company meeting minutes," which attaches meeting minutes, contains an email from Joon Ho Lee (VP, in charge of Battery Notebook Business) describing a meeting held on May 9, 2008 between Joon Ho Lee, Deuk Yong Kwon of LG and General Manager Matsumoto of "M" Company at the Ana Hotel in Tokyo. The companies discussed capacity and price and proposed "to take a common or cooperative line toward customers." Lee also asked Assistant Manager Kwon to "immediately create the Toshiba Supplier Meeting Summary." The meeting minutes attached to the email also states that "General Manager Matsumoto plans to visit Korea in the second week of June (An additional meeting with LGC is planned). When it comes to the detailed information of each company, promised to exchange information between the two over the phone." On information and belief, "M Company" refers to co-conspirator Matsushita.

205.    On May 16, 2008 at 1:14 p.m., LG's Joon Ho Lee emailed LG's Jae Min Park and Jae Kil Kim, and copied LG's Sunghwan Kim, Heekwan Ra, Byung Ung Jang, and Jung Won Lee, and stated "I would like to share the following information acquired from SDI. . . . (Please share the following[] with overseas branch offices and local members as well as with other related departments within the Division, if necessary.) – Planning to increase prices in June (approximately by US $0.16/Cell) – (Regarding this price adjustment, SDI shared information about Sony's movement and agreed that it would lead the price increase.)

206.    LG's Mr. Lee continued that "There was a proposal for setting up a dinner meeting with our division leader (with Senior Vice President JS Lee) around June, and both companies exchanged opinions on strengthening working-level employees cooperation. To team leader Mr. Park . . . please check the information about the current communication channel with SDI, and also the June price increase. I wish that the Taiwan branch office will also figure out the movements of . . . other Cell Makers and share the information."

-66-

207.     A June 11, 2008 internal LG email thread with the subject line "(Taiwan Office) Report on competitors' price increase," Sang Woo Kim (Manager, Battery Sales Team) reported internally about planned price increase by LG's competitors including Sony, Samsung SDI, MBI, and Sanyo. Jae Kil Kim (Senior Manager, Battery Notebook Business, CRM Team) also describes three options in terms of timing of LG's price increase and concludes that "it might be better to join other companies' price increase."

208.     An internal LG document contains meeting minutes of an August 8, 2008 meeting between LG and Panasonic at the Lexington Hotel, attended by Joon Ho Lee, Jae Kil Kim and Deuk Yong Kwon of LG, and General Manager Matsumoto of Panasonic. At this meeting the conspirators shared information about capacity, customer status and battery market outlook, price, Panasonic's customer strategy, SDI's entry to Japanese makers, 4Q price, verified information by each customer and others. The minutes further state that "LG asked for a meeting with a person in charge of Panasonic's power tool, and Panasonic mentioned that it would set up a meeting if there is an opportunity."

209.     An August 12, 2008 internal LG email with the subject line "(Sharing) P Company meeting minutes" from Deuk Yong Kwon (Manager), attaching a document entitled "'P' Company meeting minutes" states "*[p]lease delete the attachment upon reading*." On information and belief, "P Company" refers to co-conspirator Panasonic.

210.     A September 4, 2008 internal LG email with the subject line "Market information 080904" from Joon Ho Lee (VP in charge of Battery Notebook Business) shares information acquired regarding [Samsung SDI]'s current line status, production information, and pressure on [Samsung SDI] from one of its customers for price cut. Also mentions Osaka S Company's current status with [Toshiba] and L companies in Japan with respect to price adjustment. The email also states that [Samsung SDI] plans to have a series of opinion exchanges with overseas companies.

211.     A September 11, 2008 internal LG email with the subject line "Market information" from Jung Han Park (Manager, LGCAI NY HQ) reports one of LG's customer's pressure on LG for

-67-

102641422.1

price cut and states that "LGC too will have to discuss changing market dynamics with [Samsung SDI] and others, and prepare our official position. . . ."

212.    A September 29, 2008 internal LG email thread with the subject line "Report on HP price adjustment plan," from Joon Ho Lee discusses "double-check Sanyo's price decrease level," and refers to Samsung SDI and its planned price cuts and ranges. In an effort to remain discreet, Lee directs recipients "*From now on, when you create a document, let's omit the cover page if possible. Simplicity is the best*."

213.    On October 10, 2008, representatives of LG met with Sanyo at Narita Airport to discuss capacity, market plans, pricing to customers, and expected price trends.

214.    An October 13, 2008, internal LG email with the subject line "Market Information 081013," and attaching Sanyo meeting minutes, from Joon Ho Lee stated "As attached, I am reporting to you what was discussed in the last week's meeting with Sanyo, based in Osaka, Japan, and Sales Person-In-Charge." Lee further stated, "*We exchanged opinions on preventing activities to destroy price mechanism within the market, and for that matter, both are willing to maintain and expand company-to-company communication about related market information*." Lee concluded his report stating "*P.S. Please make sure that each related personnel takes a look at this email and delete it*. If you let me know what needs to be verified, I will check the information and share it with you."

215.    An October 12, 2008 internal LG email with the subject line "Report on the business trip to Japan," from Min Ho Chung (Senior Manager/Marketing, Mobile Energy Division) to Joon Ho Lee attaches detailed minutes from meetings with Japanese battery makers, Sanyo and Panasonic. The minutes describe how the Panasonic meeting took place on October 8, 2008 in a meeting room at a hotel in Osaka. Panasonic participants included General Manager Shimizu (Marketing), Manager Kondo (Business Planning) and Takagi (Prismatic Sales-Nokia). They discussed general business plans, market status, customer demand, forecasts, and specific products. The document reflects exchanges regarding extension plans and other companies in the market. LG and Panasonic made agreements to limit technology development:

-68-

LGC) In the process of each company preparing Post 3.0Ah individually, if companies go in a different development direction . . .in the future, there is a concern that suppliers would be divided in several groups or one company might go its own way. Therefore the industry needs to minimize development resources and risks through reaching a consensus for Post 3.0Ah development by actively using outside conferences.

216.     A meeting with Sanyo took place October 9, 2008 in a meeting room at a hotel in Tokyo. General Manager Noguchi (Marketing/Business Strategy) from Sanyo participated. The conspirators discussed many of the same topics as were discussed with Panasonic at the October 8, 2008 meeting: forecasts, customers, demands, product development, as well as more concerns about Chinese company ATL. The conspirators also discussed Cylindrical capacity and sales, with 2009 "expected to be the 1:1 competition between Sanyo and SDI." The meeting appears to close with a similar agreement on future product development as with Panasonic:

LGC) proposal Regarding the development direction after 3.0Ah, in order for both companies or the industry to avoid the risks;

1) it is needed to share development direction of the industry as a whole through conferences, or 2) to secure a consensus on the basic development direction between Sanyo and LGC (it was discussed with the director of BTC before the business trip)

Sanyo) Until now, the basic direction was the same so it has been done individually. It has the same idea that there is a need for cooperation regarding the difficult issues…which [are] hard to make a decision alone.  Sanyo) 'Do you think SDI has the same idea?'

LGC) If necessary, we will find out what SDI is thinking.

Sanyo) We will report this to the CEO and ask his opinion.

The meeting concludes with Sanyo expressing that it "[k]nows that recently, [capacity] of separator makers is insufficient, but fortunately, due to good relationship with Asahi, Sanyo is supplied first."

217.     An October 13, 2008 internal email with the subject line "Market Information 081013" attaches "SA Company Meeting Minutes." Joon Ho Lee (VP in charge of Battery Notebook Business) internally reported about the meeting held on October 10, 2008 with Japan's Osaka S Company at Narita Airport. Topics discussed at the meeting included line extension, production capacity, and price strategies for each of its customers. The companies "[e]xchanged opinions on

102641422.1

preventing activities to destroy prices within the market" and agreed to "maintain and expand appropriate company-to-company communication about related market information." The email continues "*[p]lease make sure that each related personnel takes a look at this mail and delete it immediately.*"

218.    An October 28, 2008 internal LG email thread with the subject line "Powertool weekly report," Joon Ho Lee (VP, in charge of Battery Notebook Business) internally shared information "acquired yesterday regarding the [power tool] business of [Samsung SDI]," stating that the information will be used for LG's future power tool business strategy. The email describes production information and power tool customer information.

219.    A November 12, 2008 internal LG email with the subject line "(Sharing) Phone conversation with Sa," from Deuk Yong Kwon, reports "I received a phone call today from General Manager I from S Company in Osaka, Japan, and I would like to share briefly what I checked with General Manager I." General Manager I contacted Mr. Kwon because Lenovo China had contacted "S Company" to request a price cut. General Manager I told Mr. Kwon that S Company would not cut prices, and asked LG to support S Company in refusing to cut prices. On information and belief, "S Company" refers to co-conspirator Sanyo. The email also describes a discussion about pricing strategy to other customers.

220.    An undated document entitled "NEC-Tokin Meeting" recounts a meeting held on December 5, 2008 between LG and NEC-Tokin at a NEC-Tokin meeting room in Tokyo. At the meeting the companies discussed battery business trends of the digital cameras and game devices markets and NEC-Tokin's production capacity and product roadmap.

221.    An internal LG document titled "Panasonic Minutes (December 8)" recounted a meeting between Panasonic and LG on December 8, 2008 in Osaka, Japan, attended by Vice President Joon Ho Lee (in charge of laptop business) and Deuk Yong Kwon (the laptop CRM 2 team) of LG and Panasonic General Manager Matsumoto (Team leader of Cylindrical sales) and Katsube (overseas sales Part leader) of Panasonic. The conspirators discussed production, capacity, supply and demand trends, and coordination of pricing to customers.

-70-

222.     In a December 10, 2008 internal LG email from Joon Ho Lee to Jeong Han Park, Jae Min Park, and copied Jae Gil Kim and Jeong Oh Kim, with the subject line "Executive Vice President's U.S. business trip," Lee discussed plans to raise prices to HP, and describes Samsung SDI's plans to submit new pricing to HP, when it would be submitted, and what the prices were expected to be.

223.     A January 6, 2009 internal LG email with the subject line "Content checked by P Company," from Deuk Yong Kwon to Joon Ho Lee recounted discussions between LG and Panasonic about future pricing to customers for lithium ion rechargeable batteries and strategies to "defend the selling price" in the face of declines of production costs.

224.     A February 12, 2009 internal LG email with the subject line "Report on Japanese makers' trends," from Jang Won Huh (Assistant Manager, Global Battery Marketing Team) to Joon Ho Lee, attaches a report on information from Japanese companies. Mr. Hun wrote "I am reporting the recently acquired information on 3 Japanese competitors (Sanyo, Sony, Panasonic). . . ." Major customer demand forecasts are exchanged and compared, as are production development plans for future technologies, such as car batteries.

225.     An April 7, 2009 internal LG email with the subject line "Market Info 090407," to Min Ho Chung, Jae Kil Kim and Hee Kwan Ra from Joon Ho Lee (VP, in charge of Battery, Notebook Business) shared "information obtained regarding the grand mansion S across the sea. . . ." The email to S Company's line expansion plan, pricing plan, and its plan for merger with P Company. The email ends by stating "*please delete as soon as possible*." On information and belief, "S Company" refers to Sanyo and "P Company" refers to Panasonic.

226.     A May 14, 2009 internal LG email with the subject line "Report on D Company's April performance (compared with LGC)" from Young Moon Riew attaches an excel file entitled "LGC v. SDI Comparison of 2009 Sales," which includes Samsung SDI's sales performance by product and customer from January to April 2009.

227.     An October 16, 2009 internal LG email from General Manager Min Ho Chung exchanges information acquired from Panasonic and Sanyo during meetings, which took place July 8

-71-

1   to 10, 2009, as well as information regarding "yesterday's phone conversation content regarding

2   Panasonic's cylindrical cell extension." Chung reported "Japanese companies still internally question

3   about going for 6.5-7M/Month scale, unlike Korean companies." A chart was attached to the email

4   comparing cell makers and customers' cell demands. Also attached were the meeting minutes

5   between LG and Panasonic, which reflected discussions of production forecasts, customer demand,

6   pricing goals, potential extensions, and various products. The email also attached Sanyo meeting

7   minutes which included a discussion of Panasonic's acquisition of Sanyo stating "The U.S.

8   government is opposed to the Pana's pushing for acquisition due to the monopoly and oligopoly issue

9   of the NiMH business." The conspirators compared LG and Sanyo's demand forecasts and plans for

10  product development. The minutes also include a section for "The talk result between LGC's

11  purchasing director and the division leaders of Asahi kasei and Hitachi kasei (July 9, Manager Choi

12  in Tokyo)."

13       228.     A March 12, 2010 internal LG email with the subject line "[Notice] Business leader's

14  instructions regarding SMP 2Q price," from Jung Won ("Justin") Lee provided a report/meeting

15  minutes from a March 10, 2010 pricing negotiation/meeting with SMP (packer Simplo). Target and

16  offer prices were exchanged between the two, and LG "checked various roots" to confirm suspicions

17  it had about SDI's offer. There was a section in the notes that listed competitor offers to Simplo (next

18  to the heading it read, "(content checked through PM)"). Under the accompanying chart, was a note,

19  "SDI/Sony/Sanyo are discussing again." The notes explained that "it is a situation where responding

20  with the price at the same level as SDI for 2.6Ah and in between MBI/SDI for 2.2Ah is desperately

21  needed in a position to discuss with SMP." Several "New Bottom Line (Price[s])" are also listed,

22  noting position amongst competitors. Another section, "Business leader's instruction," states, 1)

23  Ambiguously say D Company's [SDI] price, which was identified by contacting D Company's

24  General Manager "Yeo" before today's meeting, and check whether it is true or not. 2) Considering

25  the symbolic value of SMP price in the Taiwanese market, strongly Appeal that the prices of other

26  companies can ultimately become similar and it can grow into the pack price battle, and ask back at

27  the same time. 3) Do not propose the Bottom line price from the beginning, but propose to the

28

-72-

1   Bottom with some time gap, and when there is a wide divergence of opinion, prepare for the long-

2   running battle by earning time, not thinking about ending it today.

3       229.     A March 18, 2010 internal LG email thread with the subject line "FW: (Sharing &

4   Reporting) SMP 2Q price discussion" from Jae Kil ("Albert") Kim provides further information on

5   the March 10 SMP meeting. Before presenting the information, Sung Hwan Kim wrote, "[b]elow is

6   what has to be shared & reported on about the outcome of SMP price negotiation." Detailed notes

7   and charts follow, including a section under a price chart called "Background to above prices and

8   situation of competitors." Contained in this section is detailed competitor information such as SDI

9   contracts, sales forecasts, and price information. One notable portion reads: Was told that LGC prices

10  of 2.2Ah&2.6Ah were higher than [SDI] and was asked to make price cuts at the same level, so

11  requested prices of domestic competitors and was able to check them exceptionally (by competitor e-

12  mail, A strict embargo on releasing this piece of information is very much appreciated except for the

13  recipients of this e-mail.)

14      230.     A September 14, 2010 internal LG email thread with the subject line "Apple line

15  allocation for Apple – K93 price response" from Yongsun Kim includes detailed information on

16  Apple negotiations, LG and SDI. On information and belief, "K93" refers to Apple's tablet, the iPad.

17  The email thread also refers to several meetings between the competitors. The email thread

18  demonstrates an arrangement between SDI and LG regarding allocating sales to Apple. One email to

19  LG Vice President Yong Wook Chung from Young Sun Kim, General Manager, states that after

20  "checking [with] SDI today . . . it would be better just to observe the progress" regarding an Apple

21  deal. Another message from Kim explains, "[b]ased on LGC's logic, prices should be matched. . . .

22  [W]e need to consider action plans after checking competitors' information once again."

23      231.     On November 5, 2010, Min Ho Chung emailed Daeil An, Young Sun Kim, Yoo Sung

24  Oh, Sang Woo Kim and Yong Chan Kim a report with the subject line "Movement of SDI." Chung

25  wrote: "***Please use this for your information to grab an idea of the current situation, and a strict***

26  ***embargo on resending it is requested***."

27

28                                          -73-

232.     On November 15, 2010, Dong Woo Lee followed up: "Talked to Senior Manager Park Jong Seon of SDI sales (used to be in charge of Apple) who has been seconded to Cupertino Office since last week, over the phone today, but couldn't talk long as he is now on a business trip. It is likely that we can meet and talk properly once he comes back to Cupertino." Lee then added what was discussed over the phone: "1) [h]ave been asked recently to increase volume, like us, regarding K93; 2) [h]ave been requested for supply of 2M/M or more ([s]eems to be more than that); 3) and it is also difficult for SDI to deliver all the requested volume; [w]as told that it had been thought that it would be impossible to supply all since Apple does over forecast every time, regarding too much total volume." Next day, Lee updated his previous mail by stating, "Was told that the business trip site is currently Atlanta, fyi."

233.     In late 2010, Samsung and LG, including directly through LG's San Jose, California office, in furtherance of Defendants' conspiracy, expressly agreed on price levels to be charged for sales to Apple computer relating to Apple's iPad. Specifically, on December 1, 2010, at 5:03 PM, LG Chem America, Inc.'s Dong Woo Lee, a/k/a "Don Lee" or "Donny," emailed several LG executives from his San Jose, California office located at 2450 N. First St. #400. He wrote to Young Wook Chung a/k/a (Andrew (Y.O.) Chung) and four others that, regarding "K93 related information – D Company Meeting," that "I update the mutually shared K93-related information [meaning iPad information] at the meeting with D Company [meaning Samsung SDI America] today. 1. Price: $0.42~43/Wh range. We said that our price is a little bit higher than $0.38, and told them not to cut the price since we currently plan to increase the price to $0.42 level."

234.     LG's Yong Wook Chung wrote back that same night to Dong Woo Lee in San Jose, at 12:37 a.m., copying also LG's Young Sun Kim, Sung Jun Cho, Jung Ho Yoo and Hyunhwa Kim, stating "It's good information. Please send me the feedback after identifying if they [Samsung] can move in the same price range." LG's Young Wook Chung further wrote that same day, "We plan to go ahead with at least $0.50, and the counterpart's [meaning Samsung] vice president Oh, Yo Ahn agreed on this, so please try to create the same kind of feeling with the counterpart, and never make a sound in doing so."

-74-

235.     LG's Mr. Chung wrote again that same day to Dong Woo Lee in San Jose, stating that "We said that we would raise the price at least by 10% from the existing price, and they [Samsung] also promised to commit."

236.     A February 16, 2011, internal LG email sent by Jae Min Park relays information he gathered at a "Quality Summit" regarding a February 18 HP e-bidding auction and bidding positions. He reports that "STL/SDI is not interested. SMP will try to secure at least No. 2 position….It is expected that DNP is trying to secure No. 1 or No. 2 position. We have not checked Sanyo's case." Park goes on to explain LG's strategy for "minimize[ing] a pack price decrease" and "maximize[ing] profitability through raising cell prices for all packers…." He concludes by saying he will call with more information.

237.     A March 3, 2011, internal LG email thread with the subject line "(CRM 1 Team) Competitor's trend on Q2 cell prices for packers, from Jae Min Park discusses information regarding SDI's price increases."

238.     A March 22, 2011, internal email from LG's Paul Kwon shares information regarding "Sanyo['s] supply status after the Japanese earthquake." Kwon writes that this information was received via phone call with "General Manager I in HK today."

**B.     The U.S. Subsidiary Defendants Directly Participated in the Conspiracy**

239.     The U.S. Subsidiary Defendants participated in Defendants' collusion regarding Lithium Ion Batteries in several ways, including by (1) directly colluding with competitors; (2) employing executives who were involved in conspiring with foreign competitors; and (3) acting at the Foreign Defendants' direction as to pricing and supply decisions of the U.S. Subsidiary Defendants for U.S. customers in furtherance of the conspiracy.

240.     With respect to categories (2) and (3) in the preceding paragraph, the Foreign Defendants' executives, including those who participated in collusive meetings while in their positions at the Foreign Defendants, were routinely dispatched, seconded or sojourned to the U.S. Subsidiary Defendants to conduct the business of the subsidiaries, and engaged in collusive conduct while at those subsidiaries. Those foreign executives had actual and apparent authority over pricing

-75-

1    decisions that were carried out through U.S. Subsidiary Defendants. In other words, the foreign

2    executives dictated, controlled, set, directed and/or directly influenced the prices that their U.S.

3    Subsidiary Defendant counterpart sold Lithium Ion Batteries in the U.S., to U.S. customers.

4        241.    Moreover, to ensure adherence to the conspiratorial understanding between

5    Defendants, foreign executives exercised their pricing authority through direct discussions with U.S.

6    Subsidiary Defendant personnel. Without doing so, the Defendant conspirators could not have

7    successfully achieved their unlawful objective of restraining price competition for sales of Lithium

8    Ion Batteries.

9        242.    The foreign executives' relevant pricing communications with U.S. Subsidiary

10   Defendants' personnel occurred before, during, and **after** the foreign executives participated in the

11   secret, conspiratorial meetings and communications detailed herein. The foreign executives thus

12   knowingly and necessarily carried out the conspiracy through the employees of the U.S. Subsidiary

13   Defendants to successfully implement the Foreign Defendants' unlawful plan.

14       243.    The foreign executives therefore legally and factually directed the U.S. Subsidiary

15   Defendants to set conspiratorially inflated prices for Lithium Ion Batteries.

16               **1.    LGCAI's Participation in the Conspiracy**

17                   a.    LGCAI's Direct Communications Regarding the Conspiracy

18       244.    LG Chem America, Inc. ("LGCAI") directly participated in collusive communications

19   on numerous occasions. For example, on October 25, 2005, LGCAI's Yoo Sung Oh, from its Austin,

20   Texas location, wrote LGCAI's Young Sun Kim in its San Jose, California location, and told Young

21   Sun Kim that it was important to collaborate with Defendant SDI in negotiating prices to packer

22   Simplo, and that "they have to watch SDI offer prices in negotiating with Simplo."

23       245.    On September 7, 2006, LGCAI employees were involved in an email string detailing

24   collusive communications between LG Chem Korea and SDI Korea. On September 7, 2006, in an

25   internal LG Chem email string between employees of LG Chem Korea and LGCAI, meetings

26   between LG Chem Korea and SDI Korea are detailed, including a report that the companies agreed to

-76-

no longer compete on price, and the need to establish prices for Q4 2006. All recipients were invited to then attend the "Q4 pricing call," including employees from both LG Chem Korea and LGCAI.

246.     Also on September 7, 2006, LGCAI's Yoo Sung Oh, from LGCAI Austin, Texas, was included in an email string reporting on collusive communications between LGC Korea and SDI Korea. In an email from Jae Min Park (LGC Korean HQ Senior Manager) to Jae Kil Kim (LGC Taiwan) and Yoo Sung Oh , Park reported on a dinner meeting with SDI's HK Yeo at SDI Korean HQ, and that the discussion included that there should be "**no occasion anymore where both companies hurt each other through further price cuts**."

247.     On an email chain among LG personnel spanning between March 7, 2007, and March 21, 2007, LGCAI's Yoo Sung Oh, from its Austin, Texas office was included. The email chain discusses a Sanyo price increase notification. An included email from March 16, 2007 from LG's JH Lee stated that "For your reference, there is a movement where the Korean S Company is trying to carefully raise prices with Japan's M Company. In the circumstance where we were observing the situation since they tapped our opinion last week, it seems that Japan's S company first carried it out. . . . It is believed that now is a situation where all the Korean companies cannot decrease prices while there is a need to realize additional profits in the battery business."

248.     On March 27, 2007, LGC Korea's Jae Min Park, Senior Manager of Battery Notebook Team, gives directions to LGC Team (including employees at LGCAI) on pricing to customers such as Dell and HP. Jae Min Park also emailed Yoo Sung Oh (LGCAI, Dell Account Manager in Austin, TX), and told him that with respect to concerns about packers lowering prices to HP and Dell, "*[t]oday (March 27), [we] discussed with SDI [and] decide to maintain the 2Q pack price for Dell*."

249.     An April 2, 2007 email chain indicates that LGCAI is involved with checking competitor prices at the request of LGC Korea, and employees of LGCAI were involved in the email string reporting on LG Chem Korea's collusive communications with SDI Korea. LGC Korea's Joon Ho Lee emailed LGCAI's Young Sun Kim (LGCAI) discussing the e-auction result of bidding for the HP contract. Lee suggested that the auction bidding resulted in LGC losing the bid. As a result, Lee instructed: "please make sure that the U.S. and Taiwan check in details the bidding prices of the

-77-

top 3 companies and what's the plan about how to meet the cost structure in the future. LGC Korea's Jae Min Park then emailed LGCAI's Jung Han Park: "With regard to competitors' prices, please share what was checked in the U.S. Office/Taiwan Office, and first, when sharing competitors' prices, please limit the recipients to the people on this mail's recipient list."

250.   In a May 31, 2007 email from LGC Korea's Jae Min Park to LGCAI's Jason Park aka Jung Han Park regarding Defendant SDI's "line status," JM Park reports the status for each line and SDI's total supply volume to HP and that "talked over the phone with S Company's Group Leader, meaning, on information and belief, SDI.

251.   In a May 2008 internal LGC email string, Joon Ho Lee (LGC Korea) emailed Jae Min Park (LGC Korea), Jae Kil Kim, Hee Kwan Ra, Byung Ung Jang, and Jung Won Lee, sharing and circulating "market information" that was "acquired from the Korean S Company" meaning Defendant SDI. The email includes the instruction to "please share the followings with overseas branch offices and local members as well as with other related departments within the Division if necessary." The information contains SDI's plans for a price increase in June 2008 (and the amount) and confirmation that SDI also talked to Sony regarding this "price adjustment" and "discussed on sharing what is identified about Sony's movement and leading, and secured agreement intention." The email also reports that there was a "dinner proposal" with the division leader around June [2008] (Senior LG Chem Vice President JG Lee), "and exchanged opinions on strengthening working-level employees' cooperation." On May 17, 2008, Joon Ho Lee sent the market information in summary form (and enclosing the full report from May 16, 2008) to Sung Hwan Kim, Hee Kwan Ra, Byung Ung Jang, Jung Won Lee, and Yoo Sung Oh (at LGCAI).

252.   In a July 1, 2008 email from Sung Hwan Kim (LG Taiwan) to LGCAI's Joon Ho Lee and Jae Min Park re "(HP/Dell pack) (Policy Sharing) (Taiwan Office) Report on competitors' price increase," SH Kim reported on SDI Cheonan (packer) price to Dell and other pack increase price information. In an earlier email, SH Kim reported to "share today's meeting minutes regarding 3Q sales price and our policies." Participants in the meeting included: "Business Leader, Notebook CRM, Taiwan and U.S. Offices." SH Kim reported on the future price increase plans of competitors

-78-

Sanyo, Sony, MBI, and SDI, and LG's policy in response, including the plan to "double-check the price increase level of competitors, and apply price increase to our shipment from mid-July at the latest." SH Kim continued that "please make sure that sojourning employees share information on competitors, re cell/pack price increases, by June 26." In conclusion, SH Kim wrote, "please frequently share information between the head office and overseas offices."

253.     In a September 3, 2008 email chain, Jae Kil Kim, Sr. Mgr. Battery Notebook CRM Team at LGC Korea, emailed Jae Min Park (Senior Manager, LGCAI NY HQ (Houston) re "market information" and shared information regarding a meeting with a company believed to be SDI. Kim wrote that "In particular, in the 3Q price adjustment, it raised prices a lot more than the cost increase, so it seems to think that it would be difficult not to relent to price adjustment for raw materials' price drop. . . . Price adjustment for D Company [SDI] is scheduled in Nov, so . . . no discussion yet. At the moment, it is . . .focused on figuring out the industry's trend, ***told us to basically move together, and has decided to delay a price cut and minimize a decrease level as much as possible***." In a September 5, 2008 email from Jae Min Park to Jae Kil Kim; Jung Han Park (LGCAI); Yoo Sung Oh (LGCAI), Park wrote: "Let's make it a principle that the US Office first checks the HQ's opinions after the Korean T-day holiday and officially responds [to HP]. If Ed [HP] requests a meeting . . . let's respond based on the officially prepared contents. Before that, let's respond passively, saying that currently in discussion with HQ."

254.     In a September 11, 2008 internal email, Jung Han Park (Manager, LGCAI , New York office) wrote regarding "market information," and reported on pressure from an LGC customer for a price cut, and stated that "LGC too will have to discuss changing market dynamics with [SDI] and others, and prepare our official position."

255.     On May 29, 2009, LGCAI's JM Park stated in an email to LGC (executives Park, Jae Min; Kim, Jae Kil; Kim, Hyun Soo; Jeong, Su Beom; Choi, Jeh Won; Lee, Hoon Ho) regarding customer HP battery pack RFQ. LGCAI's JM Park wrote that LGCAI sent its quote to HP at 2pm "***after checking that Cheon An Company completed price submission around 1:40 PM***." On information and belief, Cheon An Company is a reference to Samsung and refers to a Korean

-79-

location where SDI has a plant. JM Park further wrote that Samsung offered 2.2Ah ($20.5/pack), 2.8Ah ($28.5/pack).

256.     In December 2010, John Oh ( Head of SDIA) communicated with employees of LGCAI regarding pricing plans for Apple. John Oh "promised to commit" to LG Chem's proposed plan to raise prices to Apple by 10%. In an LG Chem email about LG Chem's conversations with John Oh regarding pricing to Apple, YW Chung (of LG Chem Korea) reiterated to LGCAI employee Donny Lee (who had been in contact with John Oh), to "reassure [SDI's John Oh] . . . and *when you have conversations with them [SDI], never leave any written evidence*." In another email string between Donny Lee [LGCAI] and others at LG Chem in Korea, Lee reports on a meeting with John Oh regarding the Apple K93 contract. In the email, Lee confirms discussion with John Oh about the need to increase pricing to Apple. Lee notes that he told Oh about LG Chem's plans to go ahead with at least the price of $.50, and confirms that "SDI[A] VP Oh Yo Ahn agreed to this."

257.     On December 1, 2010, Donny Lee (LG Chem America) and Andrew Chung (LG Chem) communicated about ongoing discussions with SDI over a need to increase price regarding Apple's K93 contract. Donny Lee used his contact and imparted wrong information about pricing and Andrew Chung argues that Mr. Lee must go back to his SDI contact and clear it up. Donny Lee was to follow up with SDI and to see if "they can move in same price range" as LG Chem needed to increase price. Mr. Chung wrote to Donny Lee that "We plan to go ahead with at least the price of $.50. SDI VP Oh Yo Ahn agreed on this. Please try to reach a consensus on that with your counterpart."

> b.     LGCAI Employed Foreign Executives Who Participated in Conspiratorial Conduct

258.     LGCAI employed foreign executives who directly participated in conspiratorial conduct while working at LG Chem.

> c.     LG Chem Directed LGCAI's Pricing and Supply Decisions

259.     LG Chem directed LGCAI's pricing and supply decisions. For example, On March 27, 2007, Jae Min Park (LGC Korea Senior Manager of Battery Notebook Team) participated in

-80-

collusive communications with competitors throughout the Relevant Period. Park directed pricing to customers such as Dell and HP by instructing employees at LGCAI. For example, Jae Min Park emailed Yoo Sung Oh (Dell Account Manager at LGCAI in Austin, TX), and told him that with respect to concerns about packers lowering prices to HP and Dell, "[t]oday, [we] discussed with SDI [and] decide to maintain the 2Q pack price for Dell."

260.    On October 11, 2007, Yoo Sung Oh of (LGCAI, Austin, TX) requested from LG Chem a price to be offered to Simplo (a Taiwanese Packer), for packs to then be supplied to Dell.

261.    On May 1, 2008, in an internal email from Jung Han Park (aka Jason Park) (LGCAI, Overseas Battery Department), Park informed Joon Ho Lee (LGC Korea) about a likely price increase by SDI. Park stated that "if SDI carries out a price increase, it is likely that other makers, including LGC will join SDI's price increase." Joon Ho Lee responded to Park with redlines to his original email, providing information on LGC's own position on the price increase, explaining that the price increase needs to be defended.

### 2.    SDIA's Participation in the Conspiracy

#### a.    SDIA's Direct Communications Regarding the Conspiracy

262.    SDIA directly participated in collusive communications on numerous occasions. For example, in December 2010, SDIA's President John Oh communicated with employees of competitor LG Chem's US subsidiary, LGCAI, regarding pricing plans for Apple. John Oh "promised to commit" to competitor LG Chem's proposed plan to raise prices to Apple by 10%. In an LG Chem email about LG Chem's conversations with John Oh regarding pricing to Apple, YW Chung (of LG Chem Korea) reiterated to LGCAI employee Donny Lee (who had been in contact with John Oh), to "reassure [SDIA's John Oh] . . . and when you have conversations with them [SDIA], *never leave any written evidence*." In another email string between Donny Lee [LGCAI] and others at LG Chem in Korea, Lee reports on a meeting with SDIA's John Oh regarding the Apple K93 contract. In the email, Lee confirms discussion with John Oh about the need to increase pricing to Apple. Lee notes that he told Oh about LG Chem's plans to go ahead with at least the price of $.50, and confirms that "SDI[A] VP Oh Yo Ahn agreed to this."

-81-

b.    SDIA Employed Foreign Executives Who Participated in Conspiratorial Conduct

263.    SDIA employed foreign executives who directly participated in conspiratorial conduct while working at Samsung.

c.    SDI Directed SDIA's Pricing and Supply Decisions

264.    SDI directed SDIA's pricing and supply decisions. The SDI Batteries Department (SDI and SDIA) all fall under the same leadership and direction out of SDI Korea. SDI's organizational charts demonstrate that the batteries sales team spans all regions, and includes customers in all regions, including the U.S., and that all regions report back to the Sales Team Vice President (e.g. Jin Gun Lee).

265.    An SDI memorandum dated December 17, 2008 was titled "Plan for Countermeasure for 2009 Apple e-bidding." SDI attendees for e-bidding events were listed as being from both SDIA and SDI Korean HQ – for SDIA, Director, John Oh, and from SDI Korea, Joon Yeol Yoon, a/k/a JY Youn, Jong Sun Park, and Derrick Choi. The document details that part of the strategy for tendering bids to Apple is the "suggestion of reasonable price through securing competitors' price information."

3.    **Sanyo North America's Participation in the Conspiracy**

a.    Sanyo North America's Direct Communications Regarding the Conspiracy

266.    Sanyo North America directly participated in collusive communications on numerous occasions. For example, on October 26, 2006, Takanao Matsumoto (SEC/Sanyo America) emailed Katsuo Seki (of competitor NEC Tokin), and stated that he was currently in Japan and wanted to exchange information about a customer, Motorola, before he returned to Chicago. Matsumoto planned to wait for Seki at the Suidobashi subway station for the collusive communication.

267.    On January 16, 2007, Katsuo Seki (of competitor NEC Tokin) emailed Takanao Matsumoto (SEC/Sanyo America) to thank Matsumoto for contacting him and to plan for their next meeting. Katsuo Seki stated that he would like to have dinner with Matsumoto and that Oka (competitor NEC Tokin's Director of Battery) wants to introduce himself to President Masato Ito of

-82-

1   SEC. On January 16, 2007, Matsumoto wrote back to confirm a meeting with Seki at around 6 p.m.

2   on January 26 "at the usual Suidobashi station" and that he would let President Ito know about Seki's

3   request.

4          268.     On January 25, 2007, Seki (of competitor NEC Tokin) emailed to apologize for

5   cancelling the meeting with Takanao Matsumoto (SEC/Sanyo America). On the same day,

6   Matsumoto replied and stated that President Masato Ito (SEC) welcomes the meeting that Katsuo

7   Seki requested earlier, but that "*it is not a good idea to meet at Awaji Plant, so a dinner [or lunch]*

8   *meeting in some other place such as Tokushima, Osaka or Tokyo is preferable*." Matsumoto wrote

9   that Ito's secretary will contact Seki's secretary to set up the meeting.

10         269.     Also on January 25, 2007, Takanao Matsumoto (SEC/Sanyo America) wrote to

11  President Masato Ito (SEC), reporting that Matsumoto has been in communication with Katsuo Seki

12  (of competitor NEC Tokin) "to exchange info re: Motorola." He further wrote that "although

13  irregularly, [Matsumoto] has been exchanging information re: Motorola with Advisor [or Consultant]

14  Katsuo Seki of NEC Tokin [Seki recently retired from the managing director position, but still holds

15  a position as advisor/consultant] and that Seki contacted Matsumoto to set up a meeting between Oka

16  (NEC Tokin's Director of Battery) and Ito. Ito replied on the same day, stating that "he remembers

17  meeting Seki in Osaka before" and that he "has no problem meeting someone in charge of battery

18  from NEC Tokin but does not think meeting at Sumoto plant is a good idea so wants to make it a

19  dinner [or lunch] meeting in Osaka or Tokushima." President Ito also wanted Sanyo's Katsushiro

20  Goto, Division General Manager of Lithium-Ion Battery, to attend.

21         270.     On March 19, 2007, SEC/Sanyo America's Takanao Matsumoto, stationed in

22  Chicago, Illinois, communicated with NEC Tokin's Katsuo Tokin via email. Seki's subject header

23  was "It's Been a While." Matsumoto wrote that "With the high materials fees, management is

24  becoming more intense . . . *I would like to exchange information*. If you have a chance to come to

25  Chicago, please contact me."

26         271.     On March 20, 2007, Takanao Matsumoto (SEC/Sanyo America) obtained pricing

27  information from competitor NEC Tokin and reported it to Sanyo Japan, including Terashima,

28                                                    -83-

1  Gotou, Nishimura, Ueda, Tsukamoto, Sawada, Iguchi, Murata (SEC/Sanyo America), and Kobayashi

2  (SEC/Sanyo America). Matsumoto stated that he tried to get the person from NEC Tokin to talk on

3  the phone, but it was difficult without the help of alcohol. Matsumoto then listed the information he

4  obtained from NEC Tokin, including shipment volume, production issues, and NEC Tokin's request

5  for a price increase. ***Matsumoto instructed the email recipients to discard the email immediately***

6  ***after reading***.

7      272.    On March 24, 2007, Takanao Matsumoto (SEC/Sanyo America) wrote an internal

8  email stating that he "***has been getting really drunk with NEC Tokin [Katsuo Seki] and exchanging***

9  ***information for a while***." He also wrote that Sanyo's Iguchi "has been secretly contacting

10  [competitor] Hitachi Maxell" and that information is expected soon.

11      273.    On June 12, 2007, Takanao Matsumoto (SEC Sanyo (USA)) and Katsuo Seki (of

12  competitor NEC Tokin Japan) communicated by email. Matsumoto asked whether Seki would be

13  attending the QBR in Atlanta, and stated that order quantities were decreasing rapidly due to the

14  cellular phone device sales slump. Matsumoto further stated that he tried to increase prices with

15  Motorola but did not receive a good comment. He asked to talk on the phone on June 13th to

16  exchange information. Seki stated that the 14th would work, and Matsumoto stated that he would call

17  by 11 Japan time on the 14th.

18          b.    Sanyo North America Employed Foreign Executives Who <u>Participated</u>
                  <u>in Conspiratorial Conduct</u>

19      274.    Sanyo North America employed foreign executives who directly participated in

20  conspiratorial conduct while working at Sanyo. For example, Mr. Ikegami (General Manager for

21  Sanyo Japan from 2005 to at least 2008, if not longer), spent 8 years in the United States at Sanyo's

22  U.S. subsidiary, SEC Sanyo, as a "sojourning" employee of Sanyo Japan from 1997- 2005. From

23  1997-2002, Mr. Ikegami, was at Sanyo USA in Chicago, with responsibility for the Motorola and

24  Black & Decker Accounts.  Then, from 2002-2005, he was located in Austin, Texas. Upon his return

25  to Sanyo Japan headquarters, Mr. Ikegami was a frequent participant at collusive competitor

26  meetings. For example, on 1/28/2008, Mr. Ikegami (on behalf of Sanyo Japan) met with LG Chem

27

28                                      -84-

executives at Narita Airport in Tokyo. They discussed "future exchanges of market information, customer demand, capacity, pricing, and agreeing that information bearing on prices and production costs should "not be opened to customers."  The group also discussed the need to conceal the meeting, and in an LG Chem report on the meeting, recipients were instructed to "delete it upon reading." On March 2, 2008, Mr. Ikegami met with high level executives from LG Chem, again, at the Akasaka restaurant and discussed pricing to Acer.

c.    Sanyo Japan Directed Sanyo North America Pricing and Supply Decisions

275.     Sanyo Japan directed Sanyo North America's pricing and supply decisions. For example, on December 25, 2006, Sanyo Japan gave Sanyo USA price direction, showing parent company pricing authority. Tsukamoto (from SM Energy in Japan) emailed VP Matsumoto (SEC USA) and listed his responses to a (customer) Motorola email regarding price. Tsukamoto listed Sanyo Japan's bottom price and asks Matsumoto to negotiate for a 80% market share.

276.     On June 16, 2008, Sanyo Japan (Mr. Tsukamoto and SEC (USA) Mr. Matsumoto) communicated regarding the "CY08/3Q Prismatic Li-Ion price for Motorola." Tsukamoto suggested Matsumoto to have Motorola commit the volume with the cheaper price than Sanyo previously offered for CYQ3, and Matsumoto asked for more discount prices with Motorola's request.

277.     On April 14, 2009, Sanyo USA (Han Phan) emailed Japan (Tetsu Tenjikukatsura) asking for "Japan's quote" for a customer who needs a battery to make a portable chainsaw.

278.     On July 27, 2010, Kazuhiko Nakamura (Sanyo Japan) gave negotiating instructions pertaining to cost to Tanigawa (SEC Sanyo/M) by conveying costs necessary for discussion with the other side. SEC's Tanigawa requests an internal consensus with the cost details provided. Japan's Nakamura replied that he wanted Tanigawa to try harder and provided additional negotiation instructions.

4.    **Panasonic North America's Participation in the Conspiracy**

a.    Panasonic North America's Direct Communications Regarding the Conspiracy

-85-

279.    Panasonic North America directly participated in collusive communications on numerous occasions. For example, on September 23, 2003, Thomas Kowalak (Senior Account Manager at PIC in Austin, Texas) emailed Toshio Katsube and others at Panasonic Japan and Panasonic US regarding "Confidential Meeting with Sanyo Account Manager." Kowalak reported that he met with competitor Sanyo's Account Manager today [presumably Sanyo's US account manager in Texas] to "discuss the battery business at Dell." Kowalak itemized the topics discussed, including engineering issues and procurement issues. Regarding Dell's request for a delay in shipment, Kowalak reported that "Sanyo has refused to comply as have we for the month of Sept."

280.    On July 19, 2006, Simon Chan of Panasonic Hong Kong gathered information from competitor Sanyo Energy and sent the information to Takaro Yoshida (likely in Japan), who then forwarded the email to Bob Rauh (in the US, PIC/PNA). Chan met directly with Sanyo about battery business, and he emailed a report stating, "Yesterday and today we collected information about Sanyo's Power Ion as follows: 1) info from Sanyo energy directly July 19 AM."

281.    On December 8, 2008, Toshiyuki Katsube, Overseas Sales Part Leader for Panasonic Corp. in Japan and Yasushi Matsumoto, General Manager for Panasonic Corp. in Japan, attended a collusive meeting with high-level executives from LG Chem, Ltd. in Korea, including Vice President Joon Ho Lee and Deuk Yong Kwon, in Osaka, Japan. At the meeting, the attendees discussed customer demand, capacity and line extension plans, and selling prices. Regarding selling prices, "Both companies agreed that they should defend the current selling price because it is hard to secure volume through price cutting."

282.    Then, on December 10, 2008, both Messrs. Katsube and Matsumoto were involved in directing Panasonic's U.S. sales team on pricing to be offered to Apple. On an internal Panasonic email string with executives from both Panasonic Corp. Japan and PENAC in the U.S., Tina Phan (Global Sales Manager for PENAC), requested a price quote for Apple from executives at Panasonic Corp. in Japan). Mr. Toshi Umemura of Panasonic Japan writes back with pricing to be offered to Apple, cc'ing Mr. Katsube and Mr. Matsumoto.

-86-

283.     On July 7, 2010, PNA received confidential pricing information from competitor Sony. The email thread concerns B & D (Black & Decker) business. In a July 7, 2010 email from Kenny Huang (Panasonic Taiwan) to other Panasonic employees, including Barbara Lahey (PIC/Panasonic America), he stated: "I got information from Sony: 1. Sony's 26650 2.6Ah price is $5.00 ~ 5.30 to TWN pack maker. And Sony did not sell 26650 to STL/B&D project, only 18650 cells." Tsuyoshi Hattori (Corporate Industrial Marketing & Sales Div., Panasonic Corporation) confirmed the battery size with Huang. Takahiro Yoshida wrote on July 9, 2010, that US subsidiary PIC will be working with the customer: "The price negotiation and spec discussion is with B&D and will be through PIC to B&D." He also wrote, "Referecing [sic] the competitors information as below, I will work with the factory side for the best pricing." On July 13, 2010, Yoshida provided "a target price to negotiate with BU side." Shuzo Yamada (Panasonic America) and Hiro Matsuno (Panasonic America) were later cc'd on the email chain on July 8, 2010.

b.     Panasonic Japan Directed Panasonic North America Pricing and Supply Decisions

284.     Panasonic Japan directed Panasonic North America's pricing and supply decisions. For example, Panasonic Japan issued prices to customer Apple Computer through the Panasonic US account team. A December 10, 2008 internal Panasonic email string regarding pricing to Apple included employees from Panasonic US (Panasonic Industrial Co, Global Sales Mgr Tina Phan, David Martinez; Shauna Peterson, and others) and Panasonic Japan (Yasushi Matsumoto, Keisuke Tanaka, Fukutome Kazutaka, Toshi Katsube, Haruhiko Hayashi and others). Conference calls were planned for Japan/US conversation re Apple. In preparation for the call, Tina Phan told the group that Joe Kelleher (Apple) requested a price quote for Apple by Wednesday, December 10, 2008 at the latest, and Phan requested that Umemura (Pana Japan) provide the cell pricing for Apple. Umemura then wrote back to Tina Phan/David Martinez with the price and volume availability to give to Apple.

**5.     Sony North America's Participation in the Conspiracy**

a.     Sony North America's Direct Communications Regarding the Conspiracy

-87-

285.     Sony North America directly participated in collusive communications on numerous occasions. For example, an SEL (California) internal slide presentation dated September 26, 2006 contained sensitive, competitive information obtained from competitor LG Chem, including their line status in 2006, their stance on investments, profits and productivity. The source of the information appears to be LG Chem, based on a quote of LG's anonymous executive's comments, "[we] cannot think of 50% share" and "as to pricing, we want to avoid such a drastic price reduction as in the last year." Another slide contains sensitive SDI information, including their entry to Neo in October, 2006, and yield rates. This slide stated that "*per our information exchange with LG Chem, SDI's commitment to polymer is questionable*."

> b.    Sony North America Employed Foreign Executives Who <u>Participated in Conspiratorial Conduct</u>

286.     Sony North America employed or otherwise utilized foreign executives who directly participated in conspiratorial conduct while working at Sony. Those executives' conspiratorial conduct is detailed elsewhere herein. For example, Taku Katahira (General Manager of the Sales Department for Sony Japan) was a participant in collusive meetings with other foreign defendants during the alleged Relevant Period. Mr. Katahira was also involved in the day-to-day pricing activities of Sony's US subsidiary. For example, on July 17, 2007, Mr. Takahira was on an email string along with Sony US employees regarding the Apple and Rim accounts. Robert McCaul of Sony US, asks Mr. Keishi Hayasaka (Sony Japan) to approve the price for Apple (as proposed during his negotiation with Apple that day). The email is also addressed to Mr. Katahira and others from Sony Japan.

287.     On August 11, 2004, high level executives from Sony Japan told high level executives of LG Chem Korea of its plans to respond to U.S. customers by dispatching five employees to the United States.

288.     Sony Corp.'s Japanese employees also frequently travelled to the United States to oversee its subsidiary's Lithium-Ion Battery-related business in the United States. For example, on May 2, 2008, Sony executive Kenji Enomoto (Sony Japan) emailed Kenichi Hoshino and Robert

-88-

McCaul, telling them that an employee from Sony Corporation (in Japan) would be moving to the U.S. to help support Apple."

              c.        Sony Japan Directed Sony North America Pricing and Supply Decisions

289.      Sony Japan directed Sony North America's pricing and supply decisions. For example, on June 22, 2005, Steve Jaska, of Sony U.S. in Texas, indicated in writing to Takeshi Nakayama of Sony Japan that he needed to get pricing for U.S. customer Dell Computer from Sony Japan.

290.      On February 12, 2008, Noriko Kazama from Japan (Core Components Business Group, Sony Corp.) writes to subsidiary employees Rob McCaul (Senior Manager, CSBD, SONY Electronics -San Jose, California) and Yuki Walsh (Senior Marketing Specialist of Sony Electronics in San Diego, California) regarding a pricing proposal to Apple, and stated "I have discussed the price reduction issue for Apple with our control division and concluded that we would reduce the price to $53.10 . . . we would like you to withdraw our pricing proposal that we reduce the price to $52.50 from $53.23 in April . . . we have to ask you to negotiate with Apple again due to the high cobalt prices."

291.      Similarly, on August 2, 2008, Keishi Hayasaka (an executive from Sony Corp. in Japan) emailed Robert McCaul in San Jose, California telling him that the pricing for "Single cell sample pricing" should be "$4.00/cell." Prior to that email, McCaul wrote to Hayasaka requesting price confirmation regarding "Single cell sample pricing" on August 1, 2008.

292.      On October 1, 2009, Robert McCaul of Sony U.S. in San Jose, California wrote in an email that he would be at headquarters in Japan on a business trip and asked the Sony U.S. team for updates on their Mobile/PC customers so he could get answers from Japan. Sony U.S. gave a status update on the Motorola account and asked Sony Japan what prices Japan wanted to quote to Motorola.

293.      On January 7, 2010, Marcel van den Bogert (Strategic Account Manager of Sony's U.S. subsidiary) sent an email to Robert McCaul regarding a trip to Japan. Mr. van den Bogert stated

that Sony Corp. would "prepare proposal of what 18560's Sony want to quote to Motorola and at what pricing." Earlier in the email chain, on September 29, 2009, Robert McCaul wrote that he would be at Sony's Japanese headquarters and asked his Sony America team: "Can you please send me the latest update on each of your respective Mobile/PC customers as I will be having a series of meeting with the Jigyoubu [operations] … so please highlight areas where we need answers/homework support from Japan to close pending issues."

294.    On May 9, 2010, Robert McCaul of Sony Electronics -San Jose, California wrote to Koichi Fukata, Manager of Sony Energy Devices of Japan, regarding the customer RIM, that "[w]e request that you consider a price competitive with Sanyo (Sanyo Price= below $3.50)."

295.    On October 28, 2010, in an email regarding "Dell's Project Update," Yosuke Kiyama in the San Jose, California office wrote to Mike Wu in Taiwan and stated that "This price is officially approved by Japan."

### 6.    Maxell Corp. of America's Participation in the Conspiracy

a.    Maxell Corp. of America's Direct Communications Regarding the Conspiracy

296.    In March 2007, Matsumoto (Sanyo Energy (USA) Corporation) wrote to Mr. Noguchi (Sanyo Mobile Energy in Japan), "I have been occasionally exchanging the information with NEC Tokin for some time while drinking until we get drunk in Tokyo. The person at the other side is an executive managing director. … On the other hand, as for Hitachi Maxell, [Mitsuru Iguchi of Sanyo GS Soft Energy Co., Ltd.] has been contacting underneath the surface. We expect to acquire the information in a few days, so I will forward it to you again."

297.    On June 4, 2007, Matsumoto received an email from Iguchi (Sanyo GS Soft Energy Co., Ltd.) in which Iguchi relayed information he acquired from "Maxell," including its production capacity, packing process, price negotiations with customers, shipping routes and future purchasing plans, and shared it with Sanyo Electric Co. Ltd.

298.    In January 2010, Hitachi Maxell, Ltd. met with Motorola, a customer of Hitachi Maxell and several of its competitors. Following the meeting, Hitachi Maxell's Hiroshi Miyaji

-90-

advised both Hitachi Maxell and Maxell Corporation of America employees that he will confirm the information he received from Motorola with LG.

        b.     Hitachi Maxell, Ltd. Directed Maxell Corp. of America's Pricing and Supply Decisions

299.     Hitachi Maxell, Ltd. directed Maxell Corp. of America's pricing and supply decisions. For example, on January 26, 2007, Akitaka Yamamoto (Manager of America & Europe Business Planning Department of Hitachi Maxell in Japan) reported via email that the subsidiary Maxell Corp. of America had been requested by Markiv, believed to be a customer, to lower its price offer. After pricing discussion among the Japanese parent company employees, Yamamoto of Japan sent the pricing decision to Tatsuya Shigeno and Stan Takao of Maxell Corporation of America stating "Below is the response."

**C.     The Defendants' Pricing and Production Levels in Response to the Global Economic Crisis in 2008 Further Supports the Existence of the Conspiracy**

300.     As the global recession reduced demand for the devices which use Lithium Ion Batteries, prices for these batteries also dropped. In fact, prices for Lithium Ion Batteries would fall roughly 34 percent from August 2008 through January 2009. Faced with rapidly decreasing prices during this time, cartel members sharply cut back production of Lithium Ion Batteries. Japanese cartel members dramatically cut production from 125 million units a month in September of 2008, to 52 million units per month in January of 2009, engineering a reduction in output of 58 percent over a period of just four months. (Alternatively, if measured by the power capacity – Ah – of the batteries, the same 58 percent reduction occurred). Then, just five months later, Japanese production shot back up near pre-economic crisis levels to approximately 103 million units per month.

301.     Defendants' near 60 percent reduction in output successfully arrested further decline in prices, while the continuing restraint in not resuming production growth after 2008 successfully stabilized prices at a roughly constant level, and stemmed further price declines.

302.     Economic principles teach that when producers are behaving competitively, they expand output to where price just covers the incremental or marginal cost of the last unit produced.

-91-

Defendants' reduction in production by 58 percent – only to increase output five months later to nearly the same production levels (while holding prices the same) – is not plausibly explained by competitive forces.

303.     This production and pricing behavior is better (more plausibly) explained by the existence of an anticompetitive agreement, because when Defendants raised production a mere five months later, they maintained prices at the same level as before the reduction in output. In other words, Defendants' production and pricing behavior would only be consistent with competition if incremental production costs had somehow been cut by a huge amount – 34 percent – over the intervening five months. This could then possibly support an inference of competitive prices remaining at the same levels when production returned to nearly the same levels. But as shown below, input costs for Lithium Ion Batteries do not explain Defendants' pricing and production behavior.

**D.      The Structure and Characteristics of the Lithium Ion Battery Market <u>Plausibly Support the Alleged Conspiracy</u>**

304.     The structure and other characteristics of the Lithium Ion Battery market are conducive to cartel behavior, and have made collusion particularly attractive in this market. Specifically, the Lithium Ion Batteries market: (1) has high barriers to entry; (2) has inelasticity of demand; (3) is highly concentrated; (4) features a high-level of contact among Defendants via trade associations and industry conferences; and (5) is characterized by other features supportive of collusion.

**1.      The Lithium Ion Batteries Market Has High Barriers to Entry**

305.     A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supra-competitive pricing. Where, however, there are significant barriers to entry, new entrants are less likely. Thus, barriers to entry help to facilitate the formation and maintenance of a cartel.

306.     There are substantial barriers that preclude, reduce or make more difficult entry into the Lithium Ion Batteries market. A new entrant into the business would face costly and lengthy start-

-92-

up costs, including multi-million dollar costs associated with research and development, manufacturing plants and equipment, energy, transportation, distribution infrastructure, skilled labor and long-standing customer relationships. As F.H. Sung, chairman and CEO of Simplo Technology Co., Ltd., the Taiwanese battery pack manufacturer that is a major customer of Defendants and discussed herein, aptly stated in December 2009, "No amateurs can make good batteries, especially overnight, as the business calls for major investments and cutting-edge technologies

307.    It has been estimated that the cost to build a plant to manufacture Lithium Ion Batteries that is capable of producing 3 million cells per month is approximately $3 to $4 per cell. Thus, a plant making 3 million cells per month would cost approximately $108 to $144 million. This estimate does not include the cost of research, development, and engineering that produced the technology and equipment designs for the plant.

308.    In addition to the large costs of building a plant, given the nature of the materials used in Lithium Ion Batteries, any new entrant will be required to comply with various environmental regulations in whatever jurisdiction such plant is built. Compliance with such regulations will require extensive testing and the receipt of government approvals, all of which will take many years.

309.    Moreover, significant patent and/or licensing expenditures are a prerequisite to competing in the industry. For example, Samsung stated the following in March 2000:  Samsung SDI plans to construct a cooperative relationship with its affiliated companies and, together with the Samsung Advanced institute of Technology, to obtain the basic core technology and process technology which are necessary for the commercialization of the battery. Samsung SDI has secured a firm position in the battery industry by obtaining access to the basic patents and technology for the lithium-sulfur battery as well as the lithium-ion battery and the lithium-polymer battery. This means that SDI has surpassed the replication phase of other advanced products and has stepped into a new phase: Samsung has secured, for the first time among Korean companies, competitive and highly qualified technology and products to compete with Japanese companies *that today hold hegemony in the worldwide batteries market*.

FIRST AMENDED COMPLAINT
CASE NO. 4:15-CV-02199-YGR
MDL NO. 4-13-MD-02420-YGR

102641422.1

310.     In April 2011, GoldSea Inc. reported that "Japan remains the undisputed leader in battery technology, with 2,206 lithium-ion battery patents registered in the U.S., and two-thirds of all patents in the field last year. The U.S. was second with 679 and Korea third with 463."

311.     Other factors further limit new entrants. For example, in April 2012, Korea IT Times reported that "China has yet to increase its market share because it has not attained a trusted brand name, which is essential for success in the industry."18 The U.S. Government's Advanced Technology Program ("ATP") (part of the U.S. Department of Commerce's National Institute of Standards and Technology) stated the following in December 2006 report titled "Factors Affecting U.S. Production Decisions: Why are There No Volume Lithium-ion Battery Manufacturers in the United States?": Because of safety and performance considerations, Li-ion manufacturers (except those in China) do not sell individual cells. Japanese cell manufacturers sell only battery packs with safety devices included. A battery pack can consist of a single cell, or multiple cells connected in series or in parallel, to give the required voltage and capacity. Individual cells from major Japanese manufacturers are available only to outside pack assemblers on approval of their electronic control circuitry in the pack. Individual cells are available from Chinese manufacturers, but are often of inferior quality. They often lack the usual safety features in cell design and electronic controls and thus constitute some danger to the public. This is not true for responsible manufacturers who try to match the world standard of performance. The replacement market for Li-ion cells is minimal. Of the purchasers of a new piece of equipment such as a cell phone or a notebook computer, about 30 percent will buy a second battery pack from the OEM. After that, replacement sales account for less than 2 percent of total battery sales. People typically buy a new, higher performance notebook computer about the time that their old battery would need replacement.

312.     In a detailed July 20, 2012 investor report titled "*Lithium-ion batteries – A Japanese tech growth story?*" Citi Research, a division of Citigroup Global Markets, Inc., informed its investor clients that "We think that the local Chinese battery makers operate in a market that is basically independent of the global lithium-ion battery market, as it is a low-end field which Japanese and South Korean firms do not target and the major sources of demand, such as makers of 'white box'

-94-

goods, are in the gray zone." The report continued that "The big Chinese firms of BYD, BAK, and Tianjin Lishen Battery have entered the consumer electronics battery market but they have quality and technology issues. . . ."

313.   In a 2008 presentation, Tesla Motors noted in a slide titled "Profitability of Li-ion manufacturing" that "U.S. companies have difficulty justifying this commodity business (GE for example) and that "[l]arge Asian manufacturers can justify this business by supporting related electronics divisions (cell phones, laptops, cameras, etc.) and through government support."

314.   The U.S. Government's ATP report further stated the following in December 2006: "Success in the rechargeable market requires knowledge of the electrical requirements for emerging products that use batteries as well as the ability to generate rapid product improvements to meet the demand and then to assemble the unit cells into battery packs for use in the device. Most U.S. producers have lacked this marketing and design/production infrastructure. Large Japanese vertically integrated, consumer electronics companies have this infrastructure in place. These companies are major players in both [the] primary and rechargeable battery industries."  The report continued: Japanese companies are geographically closer to other Asian markets for selling their products, sourcing production, and working with other makers of portable devices. The Japanese battery supplier is most often part of a vertically integrated Japanese electronics company. Proximity to the device designer gives them a significant advantage in developing new products for the market. In the United States, major battery producers are "on the outside looking in," with limited access to or understanding of the needs of portable electronic device manufacturers.

315.   It is even more difficult for U.S. manufacturers to identify new battery requirements for devices that are being developed in Japan, the heartland of portable device developments. The Japanese market is not readily accessible to non-Japanese companies, making it very difficult for U.S. battery manufacturers to act as suppliers of the batteries for new products developed in Japan. As a result, the U.S. battery manufacturers were unable to take advantage of the introduction of the Li-ion battery to the portable device market in 1991.

-95-

316.     The relationship of battery suppliers/manufacturers to the OEM manufacturers of portable electronic devices follows two patterns. In the vertically-integrated Japanese electronic companies, device designers and battery groups are equal partners in developing leading edge new products. The intensity of market competition in Japan has resulted in the recognition by both groups that having batteries of the highest capacity is critical to device sales. Designers of battery components have advanced notice of the needs of the device designers. They thus have time to develop a battery with special characteristics or offer an improved version of their present battery for incorporation into the device.

317.     This coordination between device designer and battery manufacturer does not exist in the United States. Since new device designs constitute very sensitive business information, the device designer will not share detailed information on the battery needs with outside battery suppliers until the device is almost ready for production. Once new device designs are complete, OEMs specify battery requirements. They then use their specification to purchase from suppliers worldwide, based on price.

318.     The relationship of U.S. battery manufacturers to device designers, including U.S. cellular phone, notebook computer, and other wireless manufacturers, is distant. The device designer imposes new product requirements. The device manufacturers develop relatively detailed battery performance specifications and buy against their specifications on price. They also want at least two suppliers of each component to have an assured supply to meet their needs. The battery manufacturers have relatively little advance warning when a new cell size is required for a new device. U.S. and European device manufacturers would buy a battery product from U.S. suppliers if it were available and the cost and performance were competitive.

### 2.     The Demand For Lithium Ion Batteries Is Inelastic

319.     "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in one or the other. For example, demand is said to be "elastic" if an increase in the price of a product

102641422.1

1  results in diminished revenues, with declines in the quantity sold of that product outweighing the

2  effects of higher prices on the value of sales. For products with a highly elastic demand, a price

3  increase results in a large drop in the value of sales. In other words, customers have many feasible

4  alternatives for cheaper products of similar quality, and so cut purchases sharply in the face of even a

5  small price increase.

6       320.     For a cartel to profit from raising prices above competitive levels, market demand

7  must be relatively less elastic at competitive prices. That is, an increase in prices should not cause a

8  huge decline in demand. Otherwise, increased prices would result in sharply declining sales, as some

9  customers purchased substitute products or declined to buy altogether. A less elastic demand is a

10  market characteristic that facilitates collusion, allowing producers to raise their prices without

11  triggering customer substitution and sufficient lost sales revenues as to offset the beneficial effect of

12  higher prices on profits for products they still continue to sell.

13       321.     Demand for Lithium Ion Batteries is not very elastic because there are no close

14  substitutes for these products.

15          3.     **The Market For Lithium Ion Batteries Is Highly Concentrated**

16       322.     Market concentration facilitates collusion. If an industry is divided into a large number

17  of small firms, the current gain from cheating on a cartel (profits from sales captured from other

18  cartel members through undercutting of the cartel-fixed price in the current time period, which risks

19  causing the cartel to fall apart in the future) is large relative to the firm's possible gains from the

20  cartel's continuing future success (the firm's future share of the total cartel profits if collusion were

21  to continue successfully). Conversely, with a more concentrated industry, a greater share for a

22  colluding firm in future cartel profits tips the balance in favor of continued collusion, and away from

23  any short-term, transitory bump in profits that could be achieved by undercutting the cartel price and

24  gaining a transitory increase in market share.

25       323.     Empirical scholarship on cartels has primarily focused on a concentration measure

26  called the CR4 – the four-firm concentration ratio, the share of product sales accounted for by the

27

28                                  -97-

102641422.1

four largest firms – as a diagnostic in analyzing what levels of concentration facilitate multi-firm collusion.

324.     A seminal published study of the DOJ's price-fixing investigations found that 76 percent of these cartels occurred in sectors with CR4s of 50 percent or greater, which was about double the average CR4 for manufacturing. Fully a quarter of these cartels therefore were still organized in markets with a less than 50 percent share held by the four largest firms.   The CR4 exceeded 60 percent in the market for Lithium Ion Batteries for all of the Relevant Period, topping 80 percent in some years. The market share of the alleged cartel members never fell below 70 percent, and reached to almost 90 percent in some years.

325.     In a detailed July 20, 2012 investor report titled "*Lithium-ion batteries – A Japanese tech growth story?*" Citi Research, a division of Citigroup Global Markets, Inc., informed its investor clients that "The Big 3 of Panasonic, Samsung SDI, and LG Chem have a combined market share of over 60% and **the market is increasingly becoming an oligopoly**." In a September 2011, 2008 article in the *Taipei Times*, Jackie Ding, the CFO of major Taiwanese packer Simplo Technology Co., one of Defendants' primary customers, was quoted as stating "***All those cell players, what they do is control the market***. . . . If it's in oversupply status, then the oversupply will hurt them, while for us it will be an advantage."

### 4.     Trade Associations, Industry Conferences and Other Common Forums Available to Facilitate Collusion

326.     Defendants are members of numerous trade associations, and participate in numerous major industry trade shows, conferences, and seminars, providing Defendants with ample opportunities to further implement, facilitate, reinforce and monitor collusive activity under the guise of legitimate business undertakings, including travel and information exchanges.

#### a.     Battery Association of Japan

327.     As noted herein, Japanese companies pioneered and initially dominated the world market for Lithium Ion Batteries, and they formed trade associations to facilitate their activities. GS Yuasa International Ltd., Hitachi Maxell, Ltd., NEC Energy Devices, Ltd., Panasonic Corporation,

-98-

Sony Corporation and Toshiba Corporation are listed as "Regular Members" of the "Battery Association of Japan" (the "BAJ"). The "Samsung Yokohama Research Institute" is listed as an "Associate Member." The BAJ was formed in 1997 with the merger of the Japan Dry Batteries Industries Association and the Japan Storage Battery Industries Association.  The BAJ states that the "Main Products of the Regular Member Companies" include Lithium Ion Batteries.

328.     The BAJ lists its current Chairman as Mitsuru Homma, an Executive Director & Executive Vice-President of Defendant Sanyo Electric Co., Ltd. and a member of the Board of Directors of Defendant Panasonic Corporation.

329.     The BAJ has a myriad of committees and subcommittees, such as the "Secondary Battery Division," the "Secondary Battery Division 2," the "Standardization Committee," the "International Battery Standardization Committee," the "Material Procurement Committee," the "Next Generation Storage Battery Committee," the "Marketing Committee," and the "Technology Committee."

330.     The BAJ lists its "Main Tasks" as including the "standardization activities of battery specifications," which includes participating "in the TC21, the SC21A and the TC35 meetings as a member of the International Electrotechnical Commission (IEC), an international standards council, and works to promote IEC standards." The BAJ further acts as "Secretary of the Commission, supervises the SC21A and TC35 meetings, and acts as the chair of the working group."

331.     The BAJ lists another of its "Main Tasks" as conducting "Statistical surveys on the activities of battery industries" and that "surveys are conducted to track battery and appliance production and distribution as well as battery consumption, and the information is published in the BAJ newsletter and distributed to all types of publications and groups."

332.     The BAJ lists another of its "Main Tasks" as the "promotion of interchange activities with relevant domestic and international organizations" and states that it "promotes the exchange of information between domestic related industries as well as with the European and American battery industries and the China battery association." The BAJ also lists, among it "Operations," that it

-99-

1  "engages in the following activities to achieve its objective: . . . Association and cooperation with

2  external organizations involved with batteries and battery applied products."

3       333.     The BAJ further lists a catchall "Main Task" category of "Others," which includes "to

4  actively promote all activities necessary for the development of the industry." The BAJ also states

5  that its operations include "[a] range of additional [activities] required to achieve the Association's

6  objective other than those stated above.

7                          b.       Korean Battery Trade Associations

8       334.     Korea IT Times reported in April 2012 that Japan's Institute of Information

9  Technology issued a report that "analyzed Samsung SDI's success and how Korea overtook the

10  secondary batteries market" and that "gave Samsung SDI and LG Chem high marks for placing

11  Korea at the forefront of this industry by cooperating within the small rechargeable lithium-ion

12  batteries market."

13      335.     In or about March 1997, the "Korea Battery Research Association" was formed,

14  including Samsung and LG. An offshoot formed in 2011 and discussed below, the "Korea Battery

15  Industry Association," disseminated a slide presentation dated August 28th 2012, titled "Battery

16  Technology Commercialization Strategies in Korea" for the "Germany-Korea Electric-auto Battery

17  Technology Workshop." The presentation analyzed the close ties formed as a result of the 1997

18  association formation, noting under heading titled "Factors that Made Korea's Rechargeable battery

19  Industry the Global Leader" that there was "Cooperative R&D between materials, batters and

20  demand companies – link between development and commercialization" and that there was

21  "Continuous growth by ensuring stable demand from Samsung Electronics and LG Electronics." The

22  presentation further notes that there was the "Formation of consortiums among research institutions,

23  materials, batteries, and demand companies." The presentation further notes there was

24  "Reinforcement of cooperative systems between accessories, materials and battery companies for

25  maximization of investment synergy" and there was the "Expansion of exchanges through

26  technology exchanges [sic] seminars, promotion of custom cooperative R&D."

27

28                                          -100-

336.     The 2012 presentation continues, under a section titled "Stable Demand" that the Korea "Possesses global mobile IT device companies such as SEC [Samsung] and [LGE] as captive markets."

337.     In a report titled "*Next Generation Batteries: The Case of Korea*," issued in approximately 2003, Invest Korea, an investment arm of the Korea Trade-Investment Promotion Agency, established in compliance with the Foreign Investment Promotion Act of 1998, stated that "For the secondary industry to grow on a continuing basis, the government plans to establish a Battery Industry Supporting Center, thereby forming a unified "window" for organic collaboration among the industry, universities and research organizations and initiating efforts to develop fundamental business such as technical evaluation and certification, development of parts, materials, and equipment industries, human resource development, international cooperation, and provision of information." The report further noted the Korea Government's "plan to implement various supportive measures for the industry, including the development of a medium-term industrial plan by 2008, to advance and create sustainable conditions for the battery and related industries."

338.     The "Korea Battery Industry Association" ("KBIA") was formed in November 2011, and Defendant Samsung SDI Co. Ltd. states the following regarding it: Samsung SDI's CEO, Park Sangjin, was elected as the first chairman of the Korea Battery Industry Association, which was newly launched in November 2011. The Association has a membership of over 50 companies both large and small, including Samsung SDI, LG Chem, SK innovation, GS Caltex, and L&F Materials. At its inaugural meeting held on November 1st 2011, a "Mutual Development Council" was installed, and the members agreed to pursue mutual development through "3 Main Strategies and 7 Joint Projects", which can be summarized as: patent-related cooperation; eschewing vertical integration; and collaborative R&D.As the chair company of the Korea Battery Industry Association, Samsung SDI will take a leadership role and, with the support of the government, mediate between large companies and SMEs, thus contributing to a healthy environment for mutual growth.

-101-

339.     The KBIA's 2012 presentation, referenced above, continues that the "Main Projects in 2012" include the "strengthening of global networks" and "Establishing MOUs with BAJ (Japan) and CIBA (China)."

c.     Other Trade Associations

340.     The "PRBA – Rechargeable Battery Association" ("PBRA") was originally established in 1991 as the "Portable Rechargeable Battery Association" to develop battery recycling programs. Panasonic and Sanyo were among its founding members.44 Officer of Panasonic, Sanyo and Sony sit on the organization's board of directors, and it counts Maxell, Panasonic Battery, and Samsung SDI among its members. It now acts as the "voice of the Rechargeable Power Industry, representing its members on legislative, regulatory and standards issues at the state, federal and international level." It states that it "provides reports, newsletters and other information to keep its members informed of the latest activities and issues affecting the rechargeable power industries." The PRBA further states that it "has a long-standing and successful working relationship with the Battery Association of Japan (BAJ)" and that it "works closely with its counterparts in Europe and coordinates its efforts with several European battery trade associations including, RECHARGE, Eurobat, European Portable Battery Association and European Battery Recycling Association."

341.     "Battery Power" is an annual conference in existence for more than a decade, to be held in Colorado this year, and it bills itself as "an international conference highlighting the latest developments and technologies in the battery industry." The conference "is designed for OEM design engineers and system engineers involved in battery powered products and systems and power management technology, as well as battery pack and cell manufacturers."

342.     "Battery Japan" bills itself as the "world's largest trade show for rechargeable batteries," and is a concurrent exhibition and technical conferences. Representatives of Sanyo, Sony and Panasonic all participated as Committee Members for the 2011 Conference, and Samsung was listed as among the 2013 exhibitors.

**E.     Government Investigations into the Lithium Ion Batteries Cartel**

-102-

343.     A globally coordinated antitrust investigation is taking place in at least the United States and Europe, aimed at manufacturers of Lithium Ion Batteries. In the United States, as detailed below, two Defendants – Sanyo Electric Co., Ltd. and LG Chem, Ltd. – have pled guilty to the criminal price-fixing of Lithium Ion Batteries.

344.     On or about June 27, 2012, Sony issued its SEC Form 20-F for its fiscal year ended March 31, 2012, disclosing an investigation into its lithium ion battery business, and stating that "DOJ and agencies outside the United States are investigating competition in the secondary batteries market."

345.     On or about August 20, 2012, LG Chem confirmed that it also was the target of the investigation being conducted by the DOJ. As detailed below, LG Chem subsequently pled guilty.

346.     Other subsequent news articles have confirmed that in addition to defendants Sony and LG Chem, Samsung SDI and Panasonic are also under investigation by the DOJ for price fixing with respect to the sale of rechargeable batteries.

347.     On November 7, 2012, Defendants confirmed in writing to the Judicial Panel on Multidistrict Litigation that they "are informed and believe that a grand jury of the Northern District of California is conducting an antitrust investigation into the pricing of lithium ion batteries, and the San Francisco field office of the Antitrust Division of the DOJ is leading that effort."

### 1.     The Criminal Guilty Pleas of Sanyo Electric Co. and LG Chem, Ltd.

#### a.     Sanyo Electric Co. Ltd.'s Criminal Guilty Plea

348.     On September 3, 2013, the DOJ filed with this Court a criminal "Plea Agreement" entered into and signed by Defendant Sanyo Electric Co., Ltd. This Plea Agreement included the following:

- [D]efendant will waive indictment and plead guilty to a one-count Information to be filed in the Unites States District Court for the Northern District of California. The Information will charge the defendant with participating in conspiracy to suppress and eliminate competition by fixing the prices of cylindrical lithium ion battery cells sold in the United States and elsewhere for use in notebook battery packs from about April 2007 to about September 2008, in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

-103-

102641422.1

- The defendant will plead guilty to the criminal charge described in Paragraph 2 above pursuant to the terms of this Plea Agreement and will make a factual admission of guilt to the Court . . ."

- Had this case gone to trial, the United States would have presented evidence sufficient to prove the following facts . . . During the relevant period, [Matsushita Electric Industrial Co., Ltd.] and Sanyo Electric . . . participated in a conspiracy with other persons and entities engaged in the manufacture and sale of cylindrical lithium ion battery cells, the primary purpose of which was to fix the prices of cylindrical lithium ion battery cells sold in the United States and elsewhere for notebook computer battery packs."

- Acts in furtherance of this conspiracy were carried out within the Northern District of California. Cylindrical lithium ion battery cells used in notebook computer battery packs and battery packs containing the price-fixed cells that were the subjects of this conspiracy were sold by one or more of the conspirators to customers in this District."

- The defendant and the defendant's parent, Panasonic, and the subsidiaries of the defendant and Panasonic (collectively, "related entities") will cooperate fully and truthfully with the United States in the prosecution of this case, the current federal investigation of violations of federal antitrust and related criminal laws involving the manufacture or sale of cylindrical lithium ion battery cells . . . For purposes of this Plea Agreement, subsidiaries are entities in which the defendant or Panasonic, directly or indirectly, had a greater than 50% ownership interest as of the date of signature of this Plea Agreement.

- [T]he United States agrees that it will not bring further criminal charges against the defendant or any of its related entities for any act or offense committed before the date of this Plea Agreement that was undertaken in furtherance of an antitrust conspiracy involving the manufacture or sale of cylindrical lithium ion battery cells.

349.    The one-count criminal Information referenced above states the following among other things: For the purpose of forming and carrying out the charged combination and conspiracy, the defendant and its co-conspirators did those things that they combined and conspired to do, including, among other things:

- participating in meetings, conversations, and communications in Korea, Japan, and elsewhere to discuss the prices of cylindrical lithium ion battery cells for use in notebook computer battery packs;

- agreeing, during those meetings, conversations, and communications, to charge prices of cylindrical lithium ion battery cells for use in notebook computer battery packs at certain predetermined levels;

- issuing price quotations in accordance with the agreements reached;

-104-

- collecting and exchanging information on prices and sales of cylindrical lithium ion battery cells for the purpose of monitoring and enforcing adherence to the agreed-upon prices;

- authorizing, ordering, and consenting to the participation of subordinate employees in the conspiracy; and

- taking steps to conceal the conspiracy and conspiratorial contacts, conversations, and communications through various means.

350.    On October 01, 2013, this Court entered a "Judgment in a Criminal Case," stating that Sanyo Electric Co. Ltd. "pleaded guilty to count One of the Information" and that it "is adjudicated guilty of these offenses: 15 U.S.C. section 1 Price Fixing"

### b.    LG Chem Ltd.'s Guilty Plea Agreement

351.    On September 3, 2013, the DOJ filed with this Court a criminal "Plea Agreement" entered into and signed by Defendant LG Chem, Ltd. This Plea Agreement included the following:

- [D]efendant will waive indictment and plead guilty to a one-count Information to be filed in the Unites States District Court for the Northern District of California. The Information will charge the defendant with participating in conspiracy to suppress and eliminate competition by fixing the prices of cylindrical lithium ion battery cells sold in the United States and elsewhere for use in notebook battery packs from about April 2007 to about September 2008, in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

- The defendant will plead guilty to the criminal charge described in Paragraph 2 above pursuant to the terms of this Plea Agreement and will make a factual admission of guilt to the Court . . ."

- Had this case gone to trial, the United States would have presented evidence sufficient to prove the following facts . . . During the relevant period, [LG Chem Ltd.]. . . participated in a conspiracy with other persons and entities engaged in the manufacture and sale of cylindrical lithium ion battery cells, the primary purpose of which was to fix the prices of cylindrical lithium ion battery cells sold in the United States and elsewhere for notebook computer battery packs."

- Acts in furtherance of this conspiracy were carried out within the Northern District of California. Cylindrical lithium ion battery cells used in notebook computer battery packs and battery packs containing the price-fixed cells that were the subjects of this conspiracy were sold by one or more of the conspirators to customers in this District."

-105-

- The defendant and its subsidiaries will cooperate fully and truthfully with the United States in the prosecution of this case, the current federal investigation of violations of federal antitrust and related criminal laws involving the manufacture or sale of cylindrical lithium ion battery cells . . . The defendant's subsidiaries for purposes of this Plea Agreement are entities in which the defendant had a greater than 50% ownership interest as of the date of signature of this Plea Agreement.

- [T]he United States agrees that it will not bring further criminal charges against the defendant or any of its subsidiaries for any act or offense committed before the date of this Plea Agreement that was undertaken in furtherance of an antitrust conspiracy involving the manufacture or sale of cylindrical lithium ion battery cells.

352.   The one-count criminal Information referenced above states the following among other things:  For the purpose of forming and carrying out the charged combination and conspiracy, the defendant and its co-conspirators did those things that they combined and conspired to do, including, among other things:

- participating in meetings, conversations, and communications in Korea, Japan, and elsewhere to discuss the prices of cylindrical lithium ion battery cells for use in notebook computer battery packs;

- agreeing, during those meetings, conversations, and communications, to charge prices of cylindrical lithium ion battery cells for use in notebook computer battery packs at certain predetermined levels;

- issuing price quotations in accordance with the agreements reached;

- collecting and exchanging information on prices and sales of cylindrical lithium ion battery cells for the purpose of monitoring and enforcing adherence to the agreed-upon prices;

- authorizing, ordering, and consenting to the participation of subordinate employees in the conspiracy; and

- taking steps to conceal the conspiracy and conspiratorial contacts, conversations, and communications through various means.

353.   On October 10, 2013, this Court conducted a hearing regarding LG Chem Ltd.'s guilty plea, and asked LG Chem Ltd. through its corporate representative Heung Ryu Yoon, General Counsel and Vice President, the following questions and received the following answers:

**THE COURT:** And it is true that high-level personnel of LG Chem did participate in a conspiracy that he identified?

-106-

**THE DEFENDANT**: (Through the interpreter) Yes. (Pause in the proceedings.)

**THE COURT:** Approximately how many discussions or meetings occurred? (Translation by the interpreter.)

**THE COURT:** Just an approximation.

**THE DEFENDANT**: (Through the interpreter) About 20 or 30.

**THE COURT:** And can you describe generally what is meant by "high-level personnel"?

**THE DEFENDANT:** (Through the interpreter) I'm referring to the officers within the Battery Division.

354.     On October 15, 2013, this Court entered a "Judgment in a Criminal Case," stating that LG Chem Ltd. "pleaded guilty to count 1 of the Information" and that it "is adjudicated guilty of these offenses: 15 U.S.C. section 1 Price Fixing"

### F.     Defendants Have a History of Conspiring to Fix Prices for Critical Components of Consumer Electronics

355.     Many of the Defendants have a long history of criminal collusion and are either currently involved in worldwide investigations into other technology-related products or have been convicted of participating in price fixing cartels involving technology-related products. Further, much of the illegal conduct to which the Defendants or their affiliates have admitted to, took place during the Relevant Period identified in this complaint.

356.     Notably, the Lithium Investing News, which identifies itself as a "source for unbiased, independent news and information on the lithium market," evaluated the allegations in the initial complaint in this matter, wrote that the "***allegations aren't far fetched***" and noted that "[e]lectronics companies have been the subject of several price-fixing investigations conducted by the United States and the European Union in recent years." (emphasis added).

357.     A notebook computer contains four key pieces of hardware: a dynamic random access memory (DRAM) chip, a liquid crystal display (LCD) screen, an optical disk drive (ODD), and a rechargeable lithium-ion battery. Guilty pleas have been entered for fixing the prices of all four

-107-

components – and the DOJ is investigating whether to bring additional criminal price-fixing charges for Lithium Ion Batteries.

358.    In a detailed July 20, 2012 investor report titled "*Lithium-ion batteries – A Japanese tech growth story?*" Citi Research, a division of Citigroup Global Markets, Inc., wrote to investor clients that "We think that behind the advance of South Korean firms lie many of the same ingredients that led to their success in semiconductor memory and LCD panels."

359.    That success in fact came about by illegal means, as in the present case. For example, in or around October 2005, Samsung Electronics Company, Ltd. and Samsung Semiconductor, Inc. agreed to plead guilty and pay a $300 million fine for "participating in an international conspiracy to fix prices in the [Dynamic Random Access Memory] market . . . ." Samsung Electronics Company, Ltd. and Samsung Semiconductor, Inc. admitted that they participated in the conspiracy from approximately April 1, 1999 through June 15, 2002. In addition, seven Samsung executives (Il Ung Kim, Sun Woo Lee, Yeongho Kang, Young Woo Lee, Thomas Quinn, Young Hwan Park, Young Bae Rha) agreed to plead guilty to participating in the conspiracy with respect to DRAM. Each agreed to pay a $250,000 criminal fine and serve a prison sentence in the United States ranging from seven to fourteen months.

360.    Although it has not been publicly acknowledged, it is widely believed that Samsung is in the DOJ leniency program with respect to the DOJ's investigation into the market for LCDs, meaning that it has admitted its participation in the cartel.

361.    In November 2008, LG Display Co., Ltd., a wholly owned Korean subsidiary of LG Electronics, agreed to plead guilty and pay a $400 million fine to the United States, in connection with its participation in a worldwide conspiracy to fix the prices of LCDs during the period from September 2001 through June 2006. At the time, the fine paid by LG was the second highest fine ever imposed by the Antitrust Division of the DOJ. In addition, in April 2009, an executive of LG Display, Bock Kwon, agreed to plead guilty to participating in the global LCD conspiracy from September 2001 through June 2006. Kwon, a Korean national, agreed to serve 12 months in a U.S. prison and pay a $30,000 criminal fine. Further, in February 2009, another LG Display executive,

-108-

1   Duk Mo Koo, agreed to plead guilty to participating in the global conspiracy with respect to LCDs
2   from September 2001 through December 2006.

3       362.    In March 2009, Hitachi Displays, Ltd., a wholly owned Japanese subsidiary of
4   Hitachi, Ltd., agreed to plead guilty and pay a $31 million fine for participating in a worldwide
5   conspiracy to fix the prices of LCDs during the period April 1, 2011 through March 31, 2004.

6       363.    In September 2011, an entity which is a joint venture between Hitachi, Ltd. and LG
7   Electronics, Inc. - Hitachi-LG Data Storage, Inc. - agreed to plead guilty and pay a $21.1 million fine
8   for participating in various conspiracies to rig bids and fix prices for ODDs during the period from
9   June 2004 through September 2009. In addition, three Hitachi-LG Data Storage executives also
10  agreed to plead guilty for participating in the same conspiracy. In December 2011, Yong Kuen Park,
11  Sang Hun Kim, and Sik Hur agreed to plead guilty for participating in the conspiracy with respect to
12  ODDs during the period November 2005 through September 2009. All three agreed to serve prison
13  time in the United States and pay criminal fines.

14      364.    Defendants have also entered guilty pleas for fixing prices for other high-tech
15  products.

16      365.    In or around March 2011, Defendant Samsung SDI, Company, Ltd. agreed to plead
17  guilty and pay a $32 million fine for participating in a "global conspiracy to fix prices, reduce output,
18  and allocate market share of color display tubes, a type of cathode ray tube used in computer
19  monitors and other specialized applications . . . ." Samsung SDI Company Ltd. admitted it
20  participated in the conspiracy from approximately January 1997 through at least March 2006.

21      366.    In September 2010, Defendant Panasonic Corporation agreed to plead guilty and pay a
22  $49.1 million fine for participating in a conspiracy to "suppress and eliminate competition by fixing
23  prices to customers of household compressors . . ." during the period October 14, 2004 through
24  December 31, 2007.

25  **VI.    MANNER AND MEANS OF THE CONSPIRACY**

26      367.    For purposes of forming and carrying out the charged combination and conspiracy,
27  Defendants did those things that they combined and conspired to do, including, among other things:

28                                          -109-

- participating in meetings, conversations and communications in the United States, Japan, Korea and elsewhere to discuss the prices of Lithium Ion Batteries in the United States and elsewhere;

- agreeing, during those meetings, conversations and communications, on prices for Lithium Ion Batteries sold in the United States and elsewhere;

- agreeing, during those meetings, conversations and communications, to depress the supply of Lithium Ion Batteries;

- agreeing, during those meetings, conversations and communications, to coordinate prices for Lithium Ion Batteries sold in the United States and elsewhere;

- selling Lithium Ion Batteries in the United States and elsewhere at collusive and noncompetitive prices;

- accepting payment for Lithium Ion Batteries at collusive and noncompetitive prices;

- engaging in meetings, conversations and communications in the United States and elsewhere for the purpose of monitoring and enforcing adherence to the agreed-upon price-fixing scheme; and

- employing measures to keep their conduct secret.

## VII.   THE INFLATED PRICES OF LITHIUM ION BATTERIES WERE INCURRED BY AND/OR PASSED THROUGH TO TRACFONE

368.    Defendants' conspiracy to raise, fix, or maintain the price of Lithium Ion Batteries at artificial levels resulted in harm to TracFone because it resulted in TracFone paying higher prices for Lithium Ion Batteries and Lithium Ion Battery Products than it would have in the absence of Defendants' conspiracy.

369.    Lithium Ion Batteries are commodity-like products with functionally equivalent products available from Defendants. Defendants manufacture Lithium Ion Batteries pursuant to standard specifications.

370.    Lithium Ion Batteries and Lithium Ion Battery Products are purchased by telecommunications companies such as Plaintiff as stand-alone products, and the battery and/or the cell inside the battery itself is directly traceable to the specific manufacturing defendant. They do not undergo any physical alterations as they move through the chain of distribution.

-110-

371.     When TracFone purchased Lithium Ion Batteries indirectly, the direct purchaser mobile phone manufacturers were subject to vigorous price competition and thin net margins such that any increase in the price of batteries or battery cells led to corresponding increases in prices for Lithium Ion Batteries and Lithium Ion Battery Products at TracFone's purchasing level. Such price increases can be, and commonly are, isolated through regression analyses such that the impact of the overcharge suffered by TracFone can be measured and quantified. This overcharge moves distinctly, identifiably, and nearly automatically, through layers of the distribution structure to TracFone.

## VIII.     ANTITRUST INJURY

372.     The effect of Defendants' conduct as described herein has been to artificially inflate the prices paid by TracFone for Lithium Ion Batteries and Lithium Ion Battery Products.

373.     Defendants' conspiracy had the following effects, among others:

    a.     Price competition has been restrained or eliminated with respect to Lithium Ion Batteries and Lithium Ion Battery Products;

    b.     The prices of Lithium Ion Batteries and Lithium Ion Battery Products have been fixed, raised, stabilized, or maintained at artificially inflated levels; and

    c.     Purchasers of Lithium Ion Batteries and Lithium Ion Battery Products, such as TracFone, have been deprived of free and open competition.

374.     During the Relevant Period, TracFone paid supracompetitive prices for Lithium Ion Batteries and Lithium Ion Battery Products.

375.     By reason of the alleged violations of the antitrust laws, TracFone has sustained injury to its businesses or property, having paid higher prices for Lithium Ion Batteries and Lithium Ion Battery Products than it would have paid in the absence of Defendants' illegal contract, combination, or conspiracy, and as a result have suffered damages.

376.     This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## IX.     PLAINTIFF'S CLAIMS ARE NOT BARRED BY THE STATUTE OF LIMITATIONS

-111-

102641422.1

### A. The Statute of Limitations Did Not Begin to Run Until Summer 2012 at the Earliest Because Plaintiff Did Not and Could Not Discover Its Claims

377.   TracFone had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein, until (at the earliest) Summer 2012. Any reports prior to that lacked detail, were not widely disseminated, and lacked any specifics as to the "who, what, where, when, why and how" of any potential unlawful activity.

378.   Publicly, Defendants repeatedly and expressly stated throughout the Relevant Period, including on their public Internet websites, that they maintained antitrust / fair competition policies which prohibited the type of collusion seen in this litigation. For example:

379.   **Samsung**: In its "Global Code of Conduct," dated January 2006 ("Code of Conduct") Samsung publicly stated that "This Global Code of Conduct will be the guiding standard for everyone in Samsung Electronics, outlining standards of conduct in all business activities." Samsung publicly stated that it "will not enter into price fixing, bid collusion, market collusion or reduced production agreements with competitors, and will not discuss with competitors prices, bids, customers, sales territories and conditions including price confirmation." Samsung further publicly stated that it "will compete freely and fairly at all its business sites around the world, abiding by relevant international standards and national, state and local laws, with the laws of the host jurisdiction prevailing."

380.   Samsung further publicly stated in its Code of Conduct that one of the five "Samsung Values" was "Integrity," and one of the "7 Factors of a World Leading Company" was "Trust & Credibility."

381.   **Sony**: Sony publicly stated on its website that "In May 2003, Sony adopted the Sony Group Code of Conduct, which sets the basic internal standards to be observed by all directors, officers and employees of the Sony Group . . . The Code of Conduct has been adopted and implemented by each Sony Group company globally and is the subject of frequent 'tone from the top' messaging and other training." Sony, in its "Sony Group Code of Conduct" ("Code of Conduct") stated:

-112-

**3.3 Fair Competition**: It is the policy of Sony Group to comply with all applicable antitrust, competition and fair trade laws and regulations of each country and region where Sony Group conducts business. These laws and regulations are designed to prohibit agreements or undertakings *vis-à-vis* third parties that fix prices, divide markets, limit production or otherwise impede or destroy market forces. Some countries or regions have antitrust or competition laws that assert extraterritorial jurisdictions over certain activities taking place outside the jurisdictions if they affect the markets of those jurisdictions. All Personnel must know and comply with those laws and regulations applicable to their jobs.

382.     **Sanyo:** Sanyo Electric Co., Ltd., in its "Code of Conduct and Ethics," listed with an establishment date of April 1, 2006, publicly stated: "Free Competition and Fair Commercial Transactions – We will conduct our business activities lawfully and with fairness and transparency. We will not unfairly limit free competition which would include not making arrangements with others in the same trade about product prices, volumes, manufacturing facilities, and market share. We will not involve ourselves in bid-rigging to decide the winning bidder and contract price in bidding."

383.     Sanyo further publicly stated that "We will carry on our business activities in compliance with the laws regulations and rules of each country and region in which we operate and those prescribed specifically for respective business categories."

384.     **LG:** LG, in its "LG Electronics Code of Conduct,"84 issued in 2009, publicly stated that "Our Standard" was to "not accept competitor information directly from a competitor. Not only would this be an illegitimate way to gather competitive information, information-sharing with a competitor also could suggest that an improper agreement exists between competitors."

385.     LG further stated in a section titled "Fair Competition: Dealing with Competitors," that "We want to be respectful of our competitors and avoid situations that suggest improper interactions. In general, relationships among competitors can cause problems with fair competition. Our first duty is to serve our customers. We serve them by supporting the rules that encourage our continued innovation and success in a strong, competitive market."

386.     LG further publicly stated that "Our Standard" is "Do not enter into any contract, agreement or formal, informal or implied understanding with a competitor without legal staff approval. Seek proper guidance before encouraging the Company to follow a competitor's activities."

-113-

387.     LG further publicly stated that "Our relationships ultimately should focus on serving our customers and working effectively with our business partners, not unfairly restricting fair trade."

388.     LG publicly stated that "In 1994, LG Electronics took the initiative in practicing fair and transparent management when it became the first private company in Korea to publish an ethical code (LG Electronics Code of Ethics). In the following year, the company announced its Management by Principle which elaborates on its ethical code. In 2004, the 'LG Code of Ethics' and 'LG Code of Ethics Guidelines for Practice' were established to clearly define the company's high standards of ethical behavior and practices to employees."

389.     In its "LG Code of Ethics," LG publicly stated "It is our intention to uphold the principle [sic] of free market economy, which embodies the spirit of fair competition . . . we regard our customers as the primary standard for our decisions and conducts [sic] . . . We are always truthful to our customers, and are bound to keep our promises . . . Chapter 2. Fair Competition . . . 1. Pursuit of Free Competition. We uphold the principle of the free market economic system. Therefore we pursue free competition, and earn our customers' trust . . . We compete fairly and capably with our competitors . . . We conduct our domestic and overseas business activities in strict accordance with local laws and regulations . . . ."

390.     **Hitachi**: Hitachi in its "Code of Conduct," dated April 5, 2010, publicly stated that "[t]he Hitachi Group Codes of Conduct have been established as specific codes of conduct that apply to all companies of the Hitachi Group."

391.     Hitachi further publicly stated that "We will observe domestic and overseas competition laws and regulations as a matter of course and act appropriately as a member of society under the basic principles of conduct according to the rule of law and ethical corporate integrity and fair, transparent and free competition."

392.     In 2006, Hitachi-Maxell publicly issued its "Corporate Social Responsibility Report," stated that its "Code of Conduct" was issued in June 1983 and included as its first statement that "We will comply with the laws and regulations of the countries in which we operate and observe corporate ethics."

-114-

393.     Hitachi-Maxell further publicly stated in its 2006 report that one of the items in its "Hitachi Maxell Group Ethical Guidelines" was that "We will engage in fair, transparent and free competition, and will maintain sound and ethical relations with government and administrative bodies" and that "We will reject all contact with organizations involved in activities in violation of the law or in violation of accepted standards of responsible social behavior."

394.     Hitachi further publicly stated in its 2006 Report: "[Ensuring Fair and Free Competition] In the interest of proactively preventing any violation of the Antimonopoly Law, in January 2006 a revised edition of the Antimonopoly Law Handbook (Hitachi Group) was distributed to employees, who are urged to adhere rigorously to its content."

395.     **Panasonic**: Panasonic, in its "Panasonic Code of Conduct," in place through the Relevant Period, publicly stated that "No matter how severe the competition may be, we will pursue fair and ethical marketing activities in compliance with all applicable laws and regulations. In other words, we will never violate any laws, regulations or social norms in pursuit of greater sales or profit. We will not engage in bribery, collusion on bids, price fixing or other cartel activities."

396.     Panasonic further publicly stated that "we will respect free and fair competition, and abide by all applicable antitrust (competition law) and other laws and regulations" and that "We will fulfill our tasks by always observing not only applicable laws and regulations, but also the highest standards of business ethics" and "We will conduct business with integrity, a law-abiding spirit, and the highest ethical standards."

397.     **NEC**: NEC, in its "Code of Conduct," publicly stated throughout the Relevant Period, including to this day on its website, the following:

3.2 Free Competition and Fair Commercial Transactions (1) WE will conduct fair commercial transactions with all business partners based on the principle of free competition and in compliance with anti-trust, competition and fair trade laws and all other applicable laws, rules and regulations (2) WE will not undertake any action that inhibits free and fair competition, including collusion and cartel formation, nor will we participate in meetings or in exchanges of information that may limit free competition or engage in any activity that may be construed as doing so. (3) WE will always keep relations with customers, business partners and competitors, open and fair. In addition, we will carry out all commercial transactions with integrity by adhering to social ethics.

-115-

398.     **Toshiba**: Toshiba publicly stated in its 2008 Annual Report that "Compliance programs covering Antitrust Law and code of conduct covering sales to government and public offices have been introduced, and all sales personnel get dedicated training in these areas."88 Toshiba presently and publicly states on its website the following, and has done so since at least as early as August 2010: "Directors and Employees shall: 1. follow sound and fair business practices in all dealings with customers; 2. promote marketing and sales that comply with all applicable laws and regulations, observe sound business practices and respect socially accepted ideas; 3. observe the SOC on "Competition Law" and endeavor to practice and promote free and fair competition.

> **1. Toshiba Group Corporate Policy** Toshiba Group Companies shall:  1. comply with any and all laws and regulations enacted for the purpose of maintaining free and fair competition (hereinafter called "Competition Laws");
>
> **2. SOC for Toshiba Group Directors and Employees**  Directors and Employees shall: 1. observe the Competition Laws compliance programs as well as the company rules on marketing activities toward governmental agencies and promote free and fair business activities;  2. avoid agreements or understandings with competitors relating to pricing (including quotations and bids), the volume of production and sales, allocation of markets, customers or territories, or restrictions on production capacities or technology. The prohibition of such agreements is not limited to those actually recorded in writing by way of memoranda or minutes, but also extends to oral agreements; * * *  4. not engage in activities or organize or participate in meetings, make pledges or arrangements, or exchange information which may be a cause of concern in respect of paragraphs 2 and 3 above, or engage in any related activities or activities which may result in suspicion of engaging in such activities"

399.     It was reasonable for Plaintiff to believe that the Defendants were enforcing these policies.

400.     For these reasons, the statute of limitations as to Plaintiff's claims did not begin to run, and has been tolled with respect to the claims that Plaintiff has alleged in this Complaint.

### B.     Fraudulent Concealment / Equitable Estoppel Tolled the Statute of Limitations

401.     In addition, application of the doctrine of fraudulent concealment, which is a species of equitable estoppel under Florida law, tolled the statute of limitations on the claims asserted herein by TracFone. TracFone did not discover, and could not discover through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until Summer 2012, at the earliest.

-116-

402.     Before that time, TracFone was unaware of Defendants' unlawful conduct, and did not know before then that it was paying supra-competitive prices for Lithium Ion Batteries and Lithium Ion Battery Products. No information, actual or constructive, was ever made available to TracFone that even hinted to TracFone that it was being injured by Defendants' unlawful conduct.

403.     The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that were intended to preclude detection.

404.     TracFone has detailed herein the Defendants' use of mechanisms designed to conceal their collusion, such as covert meetings, use of code words or terms to refer to competitors and/or customers, use of pretexts to mask the true purpose of collusive communications, use of non-company phones, and instructions to destroy emails evidencing collusive activities. For example, an internal LG Chem email dated February 26, 2004, that detailed a meeting that day between LG Chem and Sony executives concerning Battery pricing, stated "[p]lease discard after reading." Similarly, an April 4, 2004 internal LG Chem email relating price-fixing conversations among Defendants implored: "please make sure that you maintain internal and  security regarding the email, so that people other than the recipients on the list cannot access the email."

405.     Additional LG Chem emails detailing conspiratorial conversations and meetings among Defendants contained explicit instructions to "delete . . . upon reading," "[p]lease share this email only with people on the recipients list, and delete it immediately upon reading," and "[p]lease make sure that each related personnel takes a look at this mail and delete it." Emails bearing such instructions were transmitted on at least the following dates: May 11, 2007, August 1, 2007, January 31, 2008, October 13, 2008, and October 14, 2008.

406.     Defendants further concealed their conduct by avoiding the creation of a paper trail in the first instance. A December 10, 2010 internal LG Chem email regarding price fixing with "D Company" stated, "when you have conversations with [D Company], never leave any written or evidence [sic]." In a February 15, 2011 LG Chem internal email chain also with regard to "D Company" (believed to be Samsung SDI), LG Chem executive J.H. Lee explained that "it seems our

-117-

communication content is too direct." Lee's LG Chem colleague responded: "Well understood. And I will be careful about contact."

407.     In addition, Defendants jointly prohibited customer access to their Battery pricing formulas in order to conceal their price collusion and the pretextual nature of their price increase justifications. At a February 27, 2008 restaurant meeting between LG Chem and Sanyo, LG Chem emphasized that: "Regarding price increase, need to deliver a message again that the [pricing] formula should not be opened to customers." Sanyo responded "positively" to LG Chem's proposal to prevent customers from accessing the formula behind the price increases. Sanyo also confirmed to LG Chem that "Sony does not open [its] pricing formula to customers."

408.     Similarly, at a January 27, 2008 meeting between LG Chem and Sanyo at the Narita Airport, Sanyo inquired as to whether LG Chem "has an internal formula explained to customers at the time of price increase." LG Chem then proposed that "each company's confidential information, such as costs, should not be opened to the customers."

409.     By its very nature, Defendants' anticompetitive conspiracy was inherently self-concealing. Lithium Ion Batteries and Lithium Ion Battery Products are not exempt from antitrust regulation, and thus, before Summer 2012, TracFone reasonably considered it to be a competitive industry. Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of Defendants' Lithium Ion Battery and Lithium Ion Battery Product prices before Summer 2012.

410.     TracFone could not have discovered the alleged contract, conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, combination, or conspiracy.

411.     Because the alleged conspiracy was both self-concealing and affirmatively concealed by Defendants and their co-conspirators, TracFone had no knowledge of the alleged conspiracy, or of any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed, until the Summer of 2012, when Sony issued its SEC Form 20-F, disclosing an

-118-

investigation into its lithium ion battery business, and stating that "DOJ and agencies outside the United States are investigating competition in the secondary batteries market, and when LG Chem also confirmed that it was the target of the investigation being conducted by the DOJ.

412.     To the extent that Defendants may claim that TracFone's filing is late, Defendants bear responsibility for the late filing because Defendants and their co-conspirators committed fraudulent acts as alleged herein and actively concealed those acts, including concealing the existence of the conspiracy alleged in this Complaint and representing to the public that prices were the result of the competitive process. TracFone could not have discovered its claims or facts sufficient to place it on notice of the claims until the Summer of 2012 at the earliest. Prior to that time there was no information to suggest any of the Defendants was involved in a criminal conspiracy to price-fix the Lithium Ion Batteries that were included in the mobile handsets purchased by TracFone.

## X.     TOLLING

413.     The statutes of limitations relevant to Plaintiff's claims have also been tolled under the tolling doctrine set forth in the decision of *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974) and the cross-jurisdictional tolling doctrine, as a result of the filing of multiple class actions concerning the Lithium Ion Battery Conspiracy against Defendants and their co-conspirators.  Other reasons for tolling the statutes of limitations also exist, including under Section 5(i) of the Clayton Act, 15 U.S.C. § 16(i), because of the existence of the aforementioned criminal proceedings regarding Lithium Ion Batteries.

## XI.     TRADE AND COMMERCE AFFECTED BY DEFENDANTS' CONSPIRACY

414.     During the Relevant Period, Defendants collectively controlled the vast majority of the market for Lithium Ion Batteries, both globally and in the United States.

415.     Defendants sold Lithium Ion Batteries and Lithium Ion Battery Products to TracFone and others, including manufacturers and consumers, located in numerous states in the United States other than states in which Defendants are located, substantial quantities of Lithium Ion Batteries and Lithium Ion Battery Products shipped from outside the United States and from other states in a continuous and uninterrupted flow of interstate and foreign trade and commerce.

-119-

416.     In addition, substantial quantities of equipment and supplies necessary to the production and distribution of Lithium Ion Batteries and Lithium Ion Battery Products, as well as payments for Lithium Ion Batteries and Lithium Ion Battery Products and related products sold by Defendants, traveled in interstate and foreign trade and commerce. The business activities of Defendants in connection with the production and sale of Lithium Ion Batteries and Lithium Ion Battery Products that were the subject of the charged conspiracy were within the flow of, and substantially affected, interstate and foreign trade and commerce.

### A.     Defendants' Conduct Involved Import Trade or Import Commerce

417.     Defendants' illegal conduct involved U.S. import trade or import commerce. Defendants knowingly and intentionally sent price-fixed Lithium Ion Batteries and Lithium Ion Battery Products into a stream of commerce that they knew led directly into the United States, one of their most important markets and a major source of their revenues – including directly to TracFone in Florida and elsewhere in the United States.  In this respect, they directed their anticompetitive conduct at imports into the United States with the intent of causing price-fixed Lithium Ion Batteries and Lithium Ion Battery Products to enter the United States market and inflating the prices of Lithium Ion Batteries and Lithium Ion Battery Products destined for the United States. Such conduct was meant to produce and did in fact produce a substantial effect in the United States in the form of higher prices.

418.     The U.S. Lithium Ion Battery market is enormous and was a major focus of and very important to the conspiracy. Defendants placed into the stream of commerce hundreds of millions of dollars worth of Lithium-Ion Batteries and Lithium Ion Battery Products that were imported into the United States during the Relevant Period. As a result, Defendants' revenues from TracFone were entirely derived from the U.S. market.  Defendants spent hundreds of millions of dollars on advertising their products in the United States.

419.     Because of the importance of the U.S. market to Defendants and their co-conspirators, Lithium Ion Batteries and Lithium Ion Battery Products intended for importation into and ultimate consumption in the United States were a focus of Defendants' illegal conduct. Defendants knowingly

-120-

and intentionally sent price-fixed Lithium Ion Batteries and Lithium Ion Battery Products into a stream of commerce that lead directly into the United States.  Indeed, tens of millions of mobile wireless handsets containing Lithium Ion Batteries were sold by the Defendants, their affiliates, and co-conspirators directly to TracFone in the United States. This conduct by Defendants was meant to produce and did in fact produce a substantial effect in the United States (and on TracFone) in the form of artificially-inflated prices for Lithium Ion Batteries and Lithium Ion Battery Products.

420.    During the Relevant Period, every Defendant shipped Lithium Ion Batteries directly into the United States, and every Defendant also placed Lithium Ion Batteries and Lithium Ion Battery Products into a stream of commerce that they knew would be consumed in the United States.

421.    When high-level executives based at Defendants' Asian headquarters agreed on prices, they knew that their price-fixed Lithium Ion Batteries would be incorporated into products containing Lithium Ion Batteries sold in the United States.

422.    For the reasons set forth above, Defendants' illegal conduct involved import trade or import commerce into the United States.

**B.    Defendants' Conduct Had a Direct, Substantial, and Reasonably Foreseeable Effect on U.S. Domestic and Import Trade or Commerce That Gave Rise to Plaintiff's Antitrust Claims**

423.    TracFone is located in Florida.  Defendants' illegal conduct had a direct, substantial, and reasonably foreseeable effect on U.S. domestic and import trade or commerce in the form of higher prices for Lithium Ion Batteries and Lithium Ion Battery Products that TracFone paid. These prices, tainted by collusion, directly and immediately impacted TracFone in the United States. In this respect, the U.S. effects of Defendants' illegal conduct gave rise to TracFone's antitrust claims and were the proximate cause of the injury that TracFone suffered.

## XII.    LEGAL CLAIMS

### A.    First Claim for Relief -- Violation of Section 1 of the Sherman Act

424.    TracFone incorporates by reference all the above allegations as if fully set forth herein.

-121-

425.     Beginning no later than 2000, the exact date being unknown to TracFone and exclusively within the knowledge of Defendants, Defendants and their co-conspirators entered into a continuing contract, combination, or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

426.     In particular, Defendants and their co-conspirators combined and conspired to raise, fix, maintain, or stabilize the prices of Lithium Ion Batteries sold in the United States.

427.     As a result of Defendants' unlawful conduct, prices for Lithium Ion Batteries and Lithium Ion Battery Products were raised, fixed, maintained, and stabilized in the United States.

428.     The contract, combination, or conspiracy among Defendants and their co-conspirators consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

429.     For purposes of formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

- participating in meetings and conversations to discuss the prices and supply of LIBs;

- sharing the pricing and other discussions with other members of the LIBs product industry to further the Conspiracy;

- communicating in writing and orally to fix target prices, floor prices, and price ranges for LIBs;

- agreeing to manipulate prices and supply of LIBs sold in the United States in a manner that deprived direct purchasers of free and open competition;

- issuing price announcements and price quotations in accordance with the agreements reached;

- selling LIBs and LIB Products to customers in the United States at noncompetitive prices;

- exchanging competitively sensitive information, including customer information, in order to facilitate their Conspiracy;

-122-

- agreeing to maintain or lower production capacity; and

- providing false statements to the public to explain increased prices for LIBs.

430.     As a result of Defendants' and their co-conspirators' unlawful conduct, TracFone was injured in its business and property in that it paid more for Lithium Ion Batteries and Lithium Ion Battery Products than it otherwise would have paid in the absence of Defendants' and their co-conspirators' unlawful conduct.

**B.      Second Claim for Relief - Violation of the Florida Deceptive and Unfair Trade Practices Act**

431.     TracFone incorporates and re-alleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraph of this Complaint.

432.     By reason of the foregoing, defendants have engaged in unfair competition or unfair or deceptive acts in violation of Florida Stat. §§ 501.201 *et seq*.

433.     During the Relevant Period, TracFone maintained its principal place of business and executive offices in Miami-Dade County, Florida.  During the Relevant Period, TracFone: conducted purchasing negotiations in Florida for mobile wireless handsets containing Lithium Ion Batteries; made purchasing decisions in Florida regarding mobile wireless handsets containing Lithium Ion Batteries; purchased in Florida tens of millions of mobile wireless handsets containing Lithium Ion Batteries; resold in Florida tens of millions of mobile wireless handsets containing Lithium Ion Batteries through independent retailers located in Florida and elsewhere; and provided wireless communication services to millions of customers in Florida, among other Florida-based activities. As a result of its presence in Florida, its purchases and sales in Florida, and the substantial business it conducts in Florida, TracFone is entitled to the protection of the laws of Florida.

434.     The acts, omissions, misrepresentations, practices, and non-disclosures of Defendants, as described above, substantially affected Florida commerce, Florida consumers, and TracFone in Florida.

435.     During the Relevant Period, defendants and their co-conspirators engaged in unlawful unfair methods of competition and unfair or deceptive trade practices by fixing prices at artificially inflated levels, in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. Section

-123-

501.204.  Defendants have each acted in violation of Section 501.204 by acting in concert to fix, raise, stabilize, and maintain prices of, and allocate markets for, Lithium Ion Batteries and Lithium Ion Battery Products at artificially inflated levels.  Defendants' conduct substantially affected Florida commerce and proximately caused injury to TracFone in Florida.

436.     For the purpose of forming and effectuating the unlawful methods of competition, defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following:

- participating in meetings and conversations to discuss the prices and supply of LIBs;

- sharing the pricing and other discussions with other members of the LIBs product industry to further the Conspiracy;

- communicating in writing and orally to fix target prices, floor prices, and price ranges for LIBs;

- agreeing to manipulate prices and supply of LIBs sold in the United States in a manner that deprived direct purchasers of free and open competition;

- issuing price announcements and price quotations in accordance with the agreements reached;

- selling LIBs and LIB Products to customers in the United States at noncompetitive prices;

- exchanging competitively sensitive information, including customer information, in order to facilitate their Conspiracy;

- agreeing to maintain or lower production capacity; and

- providing false statements to the public to explain increased prices for LIBs.

437.     The combination and conspiracy alleged herein has had, inter alia, the following effects:

A.     price competition in the sale of Lithium Ion Batteries and Lithium Ion Battery Products has been restrained, suppressed and/or eliminated in the State of Florida;

-124-

B.      prices for Lithium Ion Batteries and Lithium Ion Battery Products sold by defendants, their co-conspirators, and others have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the State of Florida; and

C.      those who purchased Lithium Ion Batteries and Lithium Ion Battery Products from defendants, their co-conspirators, and others (including TracFone) have been deprived of the benefit of free and open competition.

438.    As a result of the conduct of defendants and their co-conspirators, TracFone paid supra-competitive, artificially inflated prices for the Lithium Ion Batteries and Lithium Ion Battery Products it purchased during the Relevant Period.

439.    As a direct and proximate result of defendants' conduct, TracFone has been injured in its business and property by paying more for Lithium Ion Batteries and Lithium Ion Battery Products sold by the defendants, their coconspirators, and others than it would have paid in the absence of defendants' unfair methods of competition.  As a result of defendants' violation of Fla. Stat. Section 501.204, TracFone is entitled to damages and reasonable attorneys' fees and costs, pursuant to Fla. Stat. Sections 501.211 and 501.2105, and is entitled to an injunction under Fla. Stat. Section 501.211 against all defendants, preventing and restraining the violations alleged herein.

## XIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests:

A.      That the unlawful agreement, conduct, contract, conspiracy or combination alleged herein be adjudged and decreed to be:

i.      A restraint of trade or commerce in violation of Section 1 of the Sherman Act, as alleged in the First Claim for Relief; and

ii.     An unreasonable restraint of trade or commerce, unfair competition, and /or unfair or deceptive trade practices in violation of the Florida Deceptive and Unfair Trade Practices Act, as alleged in the Second Claim for Relief above;

-125-

102641422.1

B.     That TracFone recover damages, as provided by federal and state laws, and that a judgment be entered in favor of TracFone against Defendants, jointly and severally, in an amount to be trebled if in accordance with such laws;

C.     That Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

D.     That TracFone be awarded pre- and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial Complaint;

E.     That TracFone recover its costs and disbursements of this suit, including reasonable attorneys' fees as provided by law; and,

F.     That TracFone be awarded such other, further, and different relief as the case may require and the Court may deem just and proper under the circumstances.

## XIV.   <u>JURY TRIAL DEMAND</u>

Pursuant to Federal Rules of Civil Procedure Rule 38(b), Plaintiff demands a trial by jury for all issues so triable.

Dated: November 30, 2015              Respectfully submitted,

By: ___*/s/ David B. Esau*_____
      David B. Esau

**CARLTON FIELDS JORDEN BURT, PA**
JAMES B. BALDINGER (*pro hac vice*)
jbaldinger@cfjblaw.com
DAVID B. ESAU (*pro hac vice*)
desau@cfjblaw.com
525 Okeechobee Boulevard, Suite 1200
West Palm Beach, FL 33401
Phone: (561) 659-7070 / Fax: (561) 659-7368

*Counsel for Plaintiff TracFone Wireless, Inc.*

-126-