UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

*ORIGINAL*

BEFORE THE HONORABLE DONNA M. RYU, MAGISTRATE JUDGE

IN RE: LITHIUM ION BATTERIES)          NO. C 13-MD-2420 YGR
ANTITRUST LITIGATION        )
                            )          MDL No. 2420
_____)          Pages 1 - 43

                                       Oakland, California
                                       Thursday, April 28, 2016


### TRANSCRIPT OF ELECTRONICALLY RECORDED PROCEEDINGS

**APPEARANCES:**

For Direct Purchaser      Saveri & Saveri, Inc
Plaintiffs:               706 Sansome Street
                          San Francisco, California  94111
                  BY:     CARL N. HAMMARSKJOLD, ATTORNEY AT LAW


                          Berman DeValerio
                          One California Street, Suite 900
                          San Francisco, California  94111
                  BY:     JESSICA MOY, ATTORNEY AT LAW


                          Pearson Simon Warshaw & Penny LLP
                          44 Montgomery Street, Suite 2450
                          San Francisco, California  94104
                  BY:     AARON SHEANIN, ATTORNEY AT LAW


Reported By:      Raynee H. Mercado, CSR No. 8258

     Proceedings reported by electronic/mechanical stenography;
transcript produced by computer-aided transcription.

**A P P E A R A N C E S (cont'd.)**

For LG Chem Defendants: Akin Gump Strauss Hauer & Feld LLP
                        580 California Street, Suite 1500
                        San Francisco, California  94104-1036
                   BY:  MOLLIE MCGOWAN LEMBERG,
                            ATTORNEY AT LAW


For Hitachi/Maxell        Vinson & Elkins LLP
Defendants:               2200 Pennsylvania Avenue NW
(telephonically)          Suite 500 West
                          San Francisco, California  94105-2763
                   BY:  LINDSEY R. VAALA, ATTORNEY AT LAW


For Panasonic and         Winston & Strawn
Sanyo Defendants:         200 Park Avenue
                          New York, New York 10166
                   BY:  JEFFREY J. AMATO, ATTORNEY AT LAW


For Toshiba               White & Case, LLP
Corporation:              3000 El Camino Real
                          5 Palo Alto Square, Ninth Floor
                          Palo Alto, California  94306-2109
                   BY:  HEATHER M. ABRAMS, ATTORNEY AT LAW

                          White & Case LLP
                          701 Thirteenth Street, NW
                          Washington, DC  20005-3807
                   BY:  ANDREW L. BLACK, ATTORNEY AT LAW




                          --o0o--

```
 1    Thursday, April 28, 2016                        11:46 a.m.

 2                  ELECTRONICALLY RECORDED PROCEEDINGS

 3         THE CLERK:  Calling C-13-2420YGR, In Re lithium

 4    antitrust litigation.

 5       Counsel, please state your appearances.

 6                   (Pause in the proceedings.)

 7         THE CLERK:  Please approach the podium and state your

 8    appearances, counsel.

 9         MR. SHEANIN:  Good morning, Your Honor.  Aaron

10    Sheanin from Pearson Simon and Warshaw for direct purchaser

11    class plaintiffs.

12         THE COURT:  Good morning.

13         MR. AMATO:  Good day, Your Honor.  Jeffrey Amato from

14    Winston & Strawn for the Panasonic and Sanyo defendants.

15       Good to see you.

16         THE COURT:  Good morning.

17       Okay.  I know there's other counsel in the case here in

18    the courtroom, and we have their appearances on the sign-up

19    sheets, so we'll just move forward.

20       I'm going to assume that Mr. Amato and Mr. Sheanin are

21    presenting argument today.

22         MR. SHEANIN:  Yes, Your Honor.

23         MR. AMATO:  Yes.

24         THE COURT:  Okay.  Great.

25       So same rule applies, need to identify yourself each time.
```

```
 1              UNIDENTIFIED SPEAKER:  Sure.

 2              THE COURT:  I want to start with the nomenclature

 3      question 'cause it is a little confusing, Mr. Sheanin.

 4              MR. SHEANIN:  Okay.

 5              THE COURT:  What I got was a joint letter that had

 6      four depo notices attached to them.  I didn't actually get the

 7      document requests.

 8          The depo notices have a -- They're 30(b)(6) depos, so they

 9      have a lot of different subject areas, some of which,

10      Mr. Sheanin, your clients have carved out as objectionable.

11          But when I look at them, they seem to arguably capture

12      more than just traditional downstream data.  So for example,

13      they talk about activity that would -- that the DPP has with

14      suppliers, which I think of as more potentially upstream.

15          So what are you calling "downstream data"?

16              MR. SHEANIN:  We are calling downstream data anything

17      that relates to sales, sales practices, sales policies,

18      pricing, et cetera.  There are --

19              THE COURT:  Going downstream.

20              MR. SHEANIN:  Yes, I apologize.  Aaron Sheanin for

21      the record.

22              THE COURT:  Okay.

23              MR. SHEANIN:  Going downstream.

24              THE COURT:  Okay.

25              MR. SHEANIN:  Documents pertaining to or deposition
```

 1    testimony pertaining to purchases from the defendants,

 2    obviously that is fully relevant.  We produced material on it.

 3    We're prepared to testify about that.

 4        We are prepared to testify about -- Well, let me back up.

 5    There are issues about other third-party vendors, their

 6    upstream sales, that we question the relevance on.

 7        However, for 30(b)(6) purposes, I believe we're prepared

 8    to testify generally about those kinds of purchases.

 9        And I think certain documents have been produced relating

10    to those vendors.  Certain ones, we've -- we may not have

11    produced.  But the issue as far as I understand with respect

12    to this particular motion goes to the sales policies,

13    practices, marketing, distribution, as -- data as well as

14    documents and other testimony.

15            **THE COURT:**  Well, with the following further

16    statement, that those are directed downstream.

17            **MR. SHEANIN:**  Correct.

18            **THE COURT:**  So those are looking at transactions from

19    the DPP's and their customers.

20            **MR. SHEANIN:**  Correct.

21            **THE COURT:**  Okay.

22        So I'm not going to concern myself with the following

23    things.  I'm not going to concern myself with the fact that

24    the subject areas that you're complaining about arguably go

25    beyond that, and so maybe some of that is -- is discoverable,

1    but that's not before me, so I'm not going to -- you can meet
2    and confer about that.
3        I'm also going to rule out of bounds the fact that the
4    parties are still talking about cost-plus contracts,
5    competitive intelligence information, and the production of
6    documents that have been assembled in other proceedings, such
7    as the Ritz bankruptcy and Circuit City information in the *LCD*
8    case and the *CRT* case.
9        Those I all understand to be in meet-and-confer, so I'm
10   putting those aside.  If you -- If there's problems down the
11   road, then I'm sure you'll raise them with me.  But those
12   sound like they're still in progress.
13           **MR. SHEANIN:**  I think that's accurate, Your Honor.
14           **MR. AMATO:**  Jeffrey Amato for defendants.
15       I do agree that those are in meet-and-confer discussions,
16   but we're at a point here in this litigation where our
17   oppositions to class certification are due on May 24th.  And
18   so I mean, subject to what Your Honor's rulings are today, I
19   would -- I would think that this -- this issue needs to be
20   resolved very quickly because -- and it really highlights the
21   problem with the plaintiffs taking an absolute bar to anything
22   they deem to be downstream discovery.
23       It's really giving us a lot of trouble getting the
24   evidence we need to put in our oppositions, which are, you
25   know, less than a month away.

1     **THE COURT:**  Okay.  So that sounds like a need to have

2     the parties move quickly on those outstanding issues that are

3     not before me today.

4          So are -- where are the parties in their meet-and-confer

5     on documents that were produced in *LCD* or *CRT* for Circuit City

6     or in the bankruptcy proceedings that may not be -- I don't

7     know if they're burdensome to produce, but they seem like they

8     may be in a different category than what's before me today.

9          **MR. SHEANIN:**  Sure, Your Honor.

10         Aaron Sheanin again for the direct purchaser plaintiffs.

11         We represent Circuit City, and so I'm prepared

12    specifically to talk about them and I'm happy to talk about

13    the others, but let me focus on Circuit City first.

14         **THE COURT:**  Okay.

15         **MR. SHEANIN:**  Circuit City produced something like

16    26 -- in excess of 26,000 documents in this case that were

17    related to the direct purchaser -- to the discovery that was

18    at issue in this case.

19         They pertained to batteries.  They pertained to other

20    things relating to our purchases, et cetera.

21         Circuit City also in a -- in *LCD* and in *CRT* was an

22    individual opt-out case.  They had direct purchaser claims.

23    And they had indirect purchaser claims.  And they produced in

24    those actions, which we were not counsel for in those cases,

25    something like 165,000 for each action.

1        It's a fairly overlapping set of documents but not

2   exclusively or entirely overlapping.

3        Those documents exist.  However, they address not only

4   purchase issues for those products but also sales issues that

5   relate to those and other products and policies, et cetera,

6   which we contend certainly in this case are not appropriate

7   and are out of bounds and are irrelevant.

8        Now, the defendants have asked us for that information.

9   And they said please produce it here, which is a little odd to

10  us because it's not the type of specific document request, a

11  request with specificity that one would normally get in this

12  type of litigation, and it's not about the same products.

13  It's not about entirely the same issues.

14       What we said, however, was, tell us -- you've seen these

15  documents because counsel for Toshiba, for example, was

16  counsel for Toshiba in all of those cases.  They've seen these

17  documents.  We said, tell us what specifically you're

18  interested in.  We're happy to look at those.  We'll meet and

19  confer with you about them.

20       What they said to us in response was, we want the entire

21  universe.  We want the entire production.

22       Now, the entire production clearly does not relate to all

23  of the issues that are at stake.  But we're happy to meet and

24  confer about a reasonable set of documents.

25       They say there are 200 documents that really matter

1    because they relate to competitive intelligence issues, for

2    example, that we think pertain both to *CRT* and to *Lithium Ion*

3    *Batteries*.  Great.  We're happy to talk about that.

4          **THE COURT:**  Okay.  So here's what we're going to do.

5    On those outstanding issues, I agree, Mr. Amato.  We need to

6    queue these up quickly because you've got an opposition that's

7    due soon.

8          But to give you some -- some guidance, some -- assuming

9    that the facts are as Mr. Sheanin just described them, that

10   there's a body of documents that were produced by Circuit City

11   in -- for -- as an IPP and also DPP in the *LCD* litigation and

12   that there's, you know, over a hundred thousand of them and

13   some of them have to do with relevant issues here, some of the

14   same products --

15         **MR. BLACK:**  Your Honor, could I just respond to that

16   briefly?  This is Andrew Black for -- representing Toshiba

17   Corporation.

18         **THE COURT:**  Okay.  Sure.

19         **MR. BLACK:**  So I'm counsel that's been involved in

20   the meet-and-confers.  So I start off just by saying that

21   we've been meeting and conferring about this for many months

22   and going back and forth with letters.  We've asked for a

23   meet-and-confer date many times over the phone and have not

24   been given a date, so --

25         **THE COURT:**  Well, I'm about to give you one.

```
 1            MR. BLACK:  Okay.  I would also say that it's not
 2     exactly accurate that the -- many of the products are not the
 3     same.  The products are in fact the same as the LCD case with
 4     the exception of televisions.
 5        So these are about -- we're talking about notebook
 6     computer.  We're talking about camcorders.  We're talking
 7     about digital cameras.  We're talking about MP3 players.
 8     These are all the same products that were at issue in LCD.
 9     These are the same products that Circuit City claimed on in
10     LCD.  The only product that's different are televisions.
11            THE COURT:  Okay.  So I don't want to hear an
12     advanced argument --
13            MR. BLACK:  Okay.
14            THE COURT:  -- because we don't have time.  I want to
15     get to the issues that are in front of me today.  But I want
16     to give you some guidance, and I want to turn this around
17     quickly.
18        If -- If I'm asked to enforce a document request that
19     says, give us everything that was produced in LCD, I'm never
20     going to enforce that because you haven't shown that it's
21     relevant.  It needs to be relevant and proportional.
22        So when you're meeting and conferring, you know, keep
23     those things in mind.  If you're going to make more specific
24     requests of Circuit City, you'll need to say, here are the
25     following documents that we think are relevant here and not
```

1   hard to produce and, you know, otherwise fall within the

2   proportionality factors that are now in Rule -- right up front

3   in 26(b).

4       Mr. Sheanin, on -- on your client's part, that's sort of

5   the same thing.  If it's something that's relevant here,

6   that -- and because it is -- because they seem like they've

7   already been produced there's probably less of a burden

8   argument than -- than there might otherwise be in terms of

9   trying to collect the information.

10      They're going to have an easier showing on that than might

11  otherwise be the case.  That's the ground rules here.

12      The -- I'm sure there's something in between you all can

13  agree on, but if you can't, then I want a joint letter by

14  Wednesday.  Okay?

15          **MR. BLACK:**  Yes.

16      And could I just add, Your Honor?  This -- This set of

17  documents.  We're not talking about a few documents here.

18  We're talking about -- about 165,000 documents, about 650,000

19  pages, and the majority of which are relevant and the majority

20  of which are responsive to discovery requests that we've

21  already issued in this case and they should have been produced

22  already.

23          **THE COURT:**  Well, we'll see.

24          **MR. BLACK:**  Okay.

25          **THE COURT:**  Again, I don't need to have a preview of

```
 1    the argument because I don't have it in front of me.  I think
 2    I can do a better job if you actually queue it up -- and, you
 3    know, with a joint letter after you've talked so I can
 4    understand with more granularity what the questions are.
 5    Okay?
 6              MR. BLACK:  Okay.
 7              THE COURT:  So hold your fire on that.
 8              MR. BLACK:  Okay.
 9              THE COURT:  Save it for Mr. Sheanin.
10        I want -- The Ritz issue, same deadline, so please let
11    Ritz counsel know --
12        Is that person here?
13              MR. SHEANIN:  Ritz counsel -- Mr. Hammarskjold --
14              THE COURT:  Okay.  So, Mr. Hammarskjold, same -- same
15    deadline.
16        Everybody meet and confer so we can get that sorted out
17    and -- and so get your motion on, if there is one, by next
18    Wednesday.  Okay?
19        So as to competitive intelligence and cost-plus contracts,
20    those were also carved out as part of the meet-and-confer.
21    Okay.
22        Are -- Are those -- Should I give you the same deadline?
23    Are you making any headway on that?
24              MR. SHEANIN:  Well, what I would -- I would say --
25        Aaron Sheanin, Your Honor.
```

1      What I would say is I don't think there's an issue on

2   cost-plus contracts.  We're prepared -- I don't believe there

3   are any.  We're prepared to produce something if such exists.

4   If they know of one and want to show it to me, I'm happy to do

5   that because we recognize that that is certainly

6   within *Hanover Shoe* and *Illinois Brick*.  I have no problem

7   producing that.

8      As far as competitive intelligence, we have carved -- we

9   are prepared to testify at deposition or a 30(b)(6) deposition

10  next week for Circuit City on competitive intelligence issues,

11  certainly at least generally.

12     To the extent that it goes into absolute specific pricing

13  problems or pricing issues, that may be something that we're

14  discussing here in court a little bit later.

15     As to additional competitive intelligence documents, what

16  I think -- we have said that we're prepared to produce

17  competitive intelligence documents to the extent they relate

18  to lithium ion batteries and lithium ion battery products.

19     Defendants have said we think that they relate to

20  absolutely everything in the entire universe or the way

21  Circuit City or Ritz Camera operated in total.

22     To some extent I think maybe the depositions will sort of

23  shed some light on that.  But to another extent, if there are

24  specific documents, again, from the prior productions the

25  defendants think would be beneficial on this issue, I am

```
1    prepared to look at those documents and to tell them that, if

2    it's makes sense, it should come in.  And if it doesn't, it

3    shouldn't.  Or -- Or we would dispute that, and obviously it'd

4    be resolved.

5             THE COURT:  Okay.  So same deadline for

6    competitive -- I think what you're saying is hold on until the

7    depos are done to see what else there -- what else we might

8    argue about.

9         But I don't know that there's time for that.  I mean --

10                  (Simultaneous colloquy.)

11            THE COURT:  Go forward.

12            MR. SHEANIN:   The depositions are Wednesday and

13   Thursday of this coming week, Your Honor.

14            THE COURT:  Okay.  Well, we're going to -- I'm going

15   to give you, then, to Friday to file any joint letter on

16   competitive intelligence and cost plus just because there may

17   be something that gets sorted out through the depositions

18   that's helpful.

19        But we still need to keep this on a short timeline.  Okay?

20            MR. SHEANIN:  Of course.

21            MR. AMATO:  Thank you, Your Honor.

22            THE COURT:  Okay.

23        So turning to what's in front of me, the first question --

24   well, defendants have articulated two theories of relevance

25   for the downstream data at issue here.
```

1          The first theory is that it's relevant to the IPP

2     overcharge case.  And I -- I'll tell you, I'm not inclined to

3     produce -- order production on that because as was articulated

4     in -- in the *Vitamins* case and in this district in *LCD* and

5     *ODD*, just because the DPP's and IPP's are in the same case

6     doesn't mean that you can force that kind of discovery on the

7     DPP's in order to support what is absolutely relevant in the

8     IPP case.  And I couldn't find a single case that stood for

9     that proposition.

10         I think it's burdensome, especially at the level of detail

11    that defendants are looking for here, so I would not order

12    production on that basis.

13         Mr. Amato, if you want to argue, I'll give you an

14    opportunity.

15              **MR. AMATO:**  Thank you.  Jeffrey Amato for Panasonic

16    and Sanyo.

17         I see this a lot differently.  Judge Gonzalez Rogers back

18    in the fall said that these cases are coordinated in this MDL

19    and that every -- all the parties should be participating in

20    discovery cooperatively.

21         And so we took that on its face to say that the direct

22    purchaser plaintiffs who are named in the direct purchaser

23    case should be participating in discovery in the IPP case,

24    and --

25              **THE COURT:**  Did she articulate that exactly?

1    **MR. AMATO:**  Well, what was articulated was that the

2    direct-action plaintiffs would be able to participate in

3    discovery from the defendants and in the class cases in the

4    same manner as if they were in the cases.

5        And so what -- but what we've said -- and we've been

6    meeting and conferring with the direct purchaser plaintiffs

7    about this -- was we'll be happy to serve a subpoena on you if

8    that will resolve the issue to bring you into the IPP case.

9        That's -- you know, we're happy -- we can do that

10   tomorrow.  But as you see in the letter brief, they say that

11   that would not resolve the issue, that they would not be

12   giving downstream discovery because of its burden.

13       And I don't believe it's burdensome.  This -- This is --

14   we're talking -- Let's focus in on Circuit City.  This was the

15   major retailer of the products at issue in the IPP case for

16   most of the class period before Best Buy took over.

17       They sold billions of dollars of merchandise, and the

18   IPP's themselves -- their own expert -- say that empirical

19   evidence of those sales is essential to determining whether

20   there's been pass-through of the overcharges.

21       Circuit City is not a small player in this action.  The

22   burden arguments must be credible for them to avoid

23   participating in discovery in the IPP action.

24       **THE COURT:**  Well, I don't know what Judge Gonzalez

25   Rogers said other than what you just told me, that people

1   should cooperate.  But I'm -- I feel pretty confident that

2   this question wasn't in front of her, whether the various

3   parties in their own cases should be treated as parties for

4   discovery purposes in the other -- in the consolidated cases.

5       I feel very confident she didn't reach that question and

6   that's something that she put to me in the first instance as

7   the discovery judge.  So I'm not inclined to hang much on the

8   fact that she said something about cooperation or

9   consolidation upfront in the case.

10      As to the subpoena, I mean -- okay, if we had you turn

11  around and file a Rule 45 subpoena for the same information,

12  then we're back to the -- the relevance and burden issue.  I

13  mean, it is a -- a much higher standard to meet when you're

14  doing Rule 45 discovery, so it's something that you would have

15  to demonstrate, Mr. Amato, in better shape than what's

16  demonstrated in the joint letter.

17      I understand joint letters are brief so you don't get to

18  get into the level of detail that perhaps you want, but these

19  are incredibly detailed discovery requests.  So without me

20  understanding truly the relevance of this information to the

21  case as a whole on the IPP side and the level of burden and

22  the proportionality issues, I'm not inclined to order it at

23  this time.

24      And you don't have a Rule 45 out at this moment, so it's

25  not even ripe.

```
 1        But that's -- If you were to do that and if it were to
 2   come back to me, that's what I would be looking for.  Okay?
 3             MR. AMATO:  Well, Your Honor, Jeffrey Amato for
 4   Panasonic and Sanyo.
 5        What we've told the direct purchaser plaintiffs that we
 6   would be prepared to do, and we could do this tomorrow, would
 7   be to serve a subpoena for deposition testimony from even just
 8   percipient witnesses, not even a 30(b)(6) -- on the same
 9   witnesses that have been designated in the DPP case for those
10   percipient witnesses to talk about their knowledge about
11   pricing practices.  And they've rejected that.
12             THE COURT:  Well, what I'm saying -- Well, because
13   you'd have to -- Well, I'm assuming what they're saying is
14   it's too burdensome.  And under Rule 45, you'd have a harder
15   burden to meet.
16        So I'm going to need a better record to -- to even
17   consider ruling in your favor, Mr. Amato.  And I don't have
18   that in front of me right now.
19        What I do have are these deposition notices that are
20   really detailed and that would call for very burdensome
21   information, so I would want to better understand the
22   relevance.  It hasn't really been explained here other than
23   that, you know, overcharge is relevant to the IPP case.
24        Well, yeah, that's true.  I accept that.
25        But it -- the inquiry is much more demanding than that.
```

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

1           **MR. AMATO:**  Jeffrey Amato for Panasonic and Sanyo.

2       But it's actually -- the -- the relevant information we're

3   seeking here is about the pass-through of the overcharge, and

4   the -- the damages claimed in this case are enormous, I mean,

5   approaching a billion dollars.

6       And so we think that our burden -- the burden of putting

7   up a witness in the same MDL who's going to be sitting for a

8   deposition anyway in the direct purchaser case examined on

9   very similar topics that are -- oftentimes you're unable to

10  segregate the procurement practice -- upstream from the

11  downstream sales practices -- that's the type of information

12  we'd be looking for.

13      We don't think it's burdensome, especially in proportion

14  to this MDL where billions of dollars are at stake and the

15  witnesses would be sitting in the chairs for depositions that

16  are scheduled in the next upcoming weeks.

17          **THE COURT:**  What the plaintiffs have told me are that

18  there are already 875,000 observations totaling over 133 -- 33

19  billion in commerce from other sources to illustrate the IPP

20  damage case and whether or not the overcharge was passed

21  through.

22      So again, we're back to proportionality and burden and

23  just to simply say this is a really big case and it's not that

24  hard doesn't give me enough.  And I also don't have a Rule 45

25  subpoena in front of me.  I'm not going to allow it based on

1    straight party discovery.

2        So if you want to go that route, you can try.  But I'm --

3    I'm just trying to give you some guidance that I'm -- would be

4    looking for a Rule 45-type standard that I'd apply.  And it's

5    fairly exacting.  And the burden would be on the defendants

6    to -- to establish it.  Okay?

7        **MR. AMATO:**  Your Honor, we're happy to establish

8    that, and we'll serve a subpoena forthwith.

9        **THE COURT:**  Okay.

10       So the other theory that you put forth was a little bit

11   opaque.  So defendants say that the downstream data is

12   relevant to class certification on the question of whether

13   plaintiffs can establish a class-wide impact.

14       So I'm not entirely sure what you're saying, and I don't

15   want to put words in your mouth.  I think I know what you're

16   arguing, but I'm not sure.  And I -- I don't know whether --

17   plaintiffs are saying either because I think it was a one-line

18   throwaway response, so I need more on this.

19       Mr. Amato, why don't you start.

20       **MR. AMATO:**  Yes, I'm happy to do so, Your Honor.  I

21   think it's a little bit hard to understand in black and white

22   in a few sentences.  But the direct purchasers in this case

23   cover a wide swath of the distribution chain for lithium ion

24   battery products.  And so what you have here are first-choice

25   marketing to a distributor of Sony products.

1    You then have Circuit City little further down in the

2    chain as a retailer of electronics including Sony products.

3    And you also have direct purchaser plaintiffs that are

4    individual consumers purchasing directly from -- I'll use for

5    this example the Sony store, Sony products.

6    And what we'd like to discover is the sales practices

7    of -- I'll just use as an example Circuit City here of selling

8    the Sony products and how that affected its upstream ability

9    to negotiate lower prices from Sony downstream to its

10   consumers which would show that the sales of Sony products

11   from Circuit City to consumers was possibly at a lower price

12   than Sony itself was selling to individual consumers through

13   its own stores.

14   And what that would show would be that there was no common

15   pricing impact to Circuit City as compared to another direct

16   purchaser, an individual consumer going into the Sony store.

17   And that would defeat commonality.  It would defeat price

18   impact that the direct purchaser must show to certify a class

19   here.  And it would also go to typicality, of course, because

20   Circuit City and we would contend an individual purchaser of a

21   Sony product with a battery are not typical.

22   And -- And if I -- if I might continue, what the evidence

23   we believe will show and we've seen it in other cases would be

24   that Circuit City's purchasing process would be highly

25   tethered to what it would be able to sell the products for.

1    Okay?

2         So it would be able to sell the Sony products for a

3    certain price plus a margin.  Also relevant would be marketing

4    development funds, rebates, other incentives that it would get

5    from Sony in order to reduce the -- the -- the price that is

6    eventually sold to consumers that those -- those incentives

7    and pricing strategies were not available or were not used in

8    the Sony store.

9         And so we think it's highly relevant to the pricing

10   impact.  This has nothing to do with asserting a pass-on

11   defense.  This isn't about *Hanover Shoe* which had nothing to

12   do with class actions and had nothing to do with *Comcast* and

13   being able to prove a methodology of showing class-wide impact

14   on pricing.

15              **THE COURT:**  Okay.  Mr. Sheanin.

16              **MR. SHEANIN:**  Aaron Sheanin for the direct purchaser

17   plaintiffs.

18        I disagree with Mr. Amato.  This has everything to do with

19   *Hanover Shoe*.  *Hanover Shoe*, the -- In *Hanover Shoe*, the

20   Supreme Court said as a matter of policy that when a seller

21   overcharges a direct purchaser in violation of the federal

22   antitrust laws, whether the direct purchaser can or cannot

23   pass on that price does not matter.  The injury occurs at the

24   time they paid the overcharge.

25        That's the key thing right there.  So pass-on is

1   absolutely irrelevant.  And courts in this district and

2   elsewhere have regularly said no pass -- no -- no downstream

3   is allowed.

4   Judge Spero did in *ODD*.  It's been done any number of

5   times in *LCD* and *CRT* in -- by Judge Wilken in -- in *Meijer vs.*

6   *Abbott Labs*.  This is very commonplace.  This is the routine

7   issue.

8   The -- The issue that they're trying to raise, well, do we

9   have the same -- can we assert that the impact is common as to

10   everybody is, again, just a subset and a variation of

11   pass-through.

12   The only case that they've cited that remotely relates to

13   the class certification issue, right, can downstream sales be

14   picked up in discovery now so that they can be addressed on

15   class certification is the Eleventh Circuit's decision in

16   *Valley Drug*.  And *Valley Drug* has been roundly rejected by

17   Judge Wilken in an excellent decision in *Meijer vs. Abbott*

18   *Labs*, by Judge White in the *Braintree Labs* case.

19   It's off point but factually -- assuming you were to

20   accept it for a moment, it's off point because there you're

21   talking about large defendants -- large purchasers who were

22   not the named plaintiffs and small purchasers who were and

23   trying to see, is there a difference between those two, and

24   can the small purchasers appropriately represent the large

25   ones.

1          Whereas here, you're talking about a much broader variety

2     of class plaintiffs, including, as Mr. Amato said, retailers,

3     very large ones, distributors, and individual purchasers,

4     individual consumers.

5          Now, that is the factual distinction.  But as a matter of

6     law, all that gets to is the questions, once again, of

7     pass-through.

8          And -- And, as Judge Wilken said, when you look at it, it

9     ignores all of the ills that *Hanover Shoe* was trying to

10    address, which is the evidentiary complexities that would be

11    brought forward in analyzing the impact on any one particular

12    firm's profits, right?

13         It creates a long, complicated proceedings that are not --

14    that were -- may prove inconclusive or -- likely to prove

15    inconclusive, that are not relevant to these particular claims

16    even on a class-wide basis, and that it would undermine and

17    chill the deterrent effect, right, to have to go through that

18    kind of discovery, to put that kind of information in front

19    of -- as -- as a sort of side issue to make it be the central

20    issue and somehow would chill and create a deterrent effect on

21    the bringing of antitrust claims by direct purchaser

22    plaintiffs under the federal antitrust laws.

23         And that -- This court has rejected it.  What they're

24    trying to do now is basically bring in through the back door

25    what they cannot bring in through the front.

1          **THE COURT:**   Okay.  Mr. Amato, any rebuttal on that?

2          **MR. AMATO:**   Yes, Your Honor.  Jeffrey Amato for the

3    Panasonic and Sanyo defendants.

4       I -- As I said in -- in my first portion of the argument,

5    this isn't about *Hanover Shoe*.  This isn't about asserting a

6    pass-on defense.  It's exactly about whether the direct

7    purchaser plaintiffs can establish common class-wide impact on

8    the overcharge, and whether that impact is the same to a

9    consumer or a large retailer is -- is the essential question

10   in this case at the moment.

11      And what I would suggest is that we are able to obtain

12   this discovery, which we believe it will be used in a highly

13   relevant way in our oppositions, and that judge Gonzalez

14   Rogers be given the benefit to rule on our oppositions in

15   class certification and determine for herself whether that

16   information is determinative of the question, whether it's not

17   determinative of the question, or whether it is relevant and

18   completely barred by *Hanover Shoe*, a case from 50 years ago

19   that had nothing to do with class certification or the other

20   issues we're facing in this MDL.

21      And so that would be, from my perspective, the most

22   efficient way to proceed so that judge Gonzalez Rogers isn't

23   ruling in this case on -- on a record that's incomplete.

24          **THE COURT:**   So here's my view of the *Hanover Shoe*

25   question.  I mean, I think everybody -- we're all in

1    agreement, *Hanover Shoe* says no pass-through defense, right?

2    So you -- defendants understand that they can't ask for this

3    information and name that as the -- as the relevant reason.

4    It's barred.  Okay.

5        So over the years, there've been different attempts to

6    couch it for -- as relevant in other ways.  And so -- you

7    know, I don't think I can say as a matter of law that

8    downstream data is -- is completely out of bounds.  I don't

9    think there's any court that said you can never ask for

10   downstream data; it's never relevant.

11       But what the cases do seem to suggest is the following:

12   It's certainly frowned upon.  And *Hanover* and *Illinois Brick*

13   both explain how in addition to the -- you know, for the

14   reasons that they reject the pass-through defense as -- as

15   being overly complicated and drawing attention away from

16   the -- diverting attention away from the existence of a

17   conspiracy.  It's chilling.  It can be chilling 'cause it's so

18   burdensome.

19       So we have a number of cases that have gone at this

20   including Judge Wilken in *Meijer*, Judge Corley in *Braintree*,

21   where in both of those cases, defendants put up a class

22   cert-related relevance argument.

23       This is relevant to show that there's a conflict

24   between -- there's -- you know, the plaintiffs are not typical

25   because some are going to benefit from this, some are going to

 1    do better than others, or -- I think that was in both

 2    *Braintree* and in *Meijer*.  We have *Aspartame* where the

 3    defendants argued that it would be relevant to opposing Rule

 4    23 because we can ferret out issues of buying power, and

 5    that's a little bit close to what you're arguing, Mr. Amato.

 6       That's the same thing that was argued in *In Re Vitamins*,

 7    which is discussing folding -- folding carton.  Same kind of

 8    argument that we want to get at certain plaintiffs having --

 9    or certain plaintiffs having countervailing bargaining power.

10       That's what I'm hearing the argument to be on the defense

11    side.  And so far, that argument has been rejected because

12    it's -- or the argument for discovery has been rejected

13    because the theory of relevance is pretty slim to justify what

14    is very burdensome discovery.

15       The -- The other problem is that, again, I'm looking at

16    extremely detailed discovery requests.  I don't even have the

17    document requests, but the depo notices are asking for

18    individualized downstream data.

19       And in order to do that -- or to order that, I'd have to

20    look at relevance.  And so far, I'm not finding -- defendants

21    have not made a case for strong relevance.  There may be some

22    relevance.  I'll grant that.  There may be some relevance to

23    class certification.

24       But you'd to have balance that with the rest of the

25    factors that are in 26(b), proportionality, burden, resources,

1    other ways to get this information.  And there's been no

2    attempt to do that.

3        So I -- I don't see on this record that I -- you know,

4    that there's grounds to order it.

5        But I see that Mr. Black wants to say something.

6            **MR. BLACK:**  I do, Your Honor.  So Andrew Black again

7    for Toshiba Corporation.

8        So there's a couple of unique issues here that I think

9    haven't been addressed that I'd like to quickly address with

10   the court.

11       First of all, the data is relevant with respect to

12   retailers such as Circuit City because the actual purchase

13   price cannot be established without the downstream data.  That

14   is because there are numerous levels of chargebacks, MDF's

15   that are linked as either percents or a return that is a

16   per-product sale.  We'll give you $5 back for every unit you

17   sale -- you sell.  That's not --

18           **THE COURT:**  Mr. Black, I'm going to stop you.  I'm

19   going to need you to go slower because this --

20           **MR. BLACK:**  Sure.

21           **THE COURT:**  Explain this to me --

22           **MR. BLACK:**  Sure.

23           **THE COURT:**  -- as if you're explaining to someone who

24   does not have any knowledge of this, and you'd be pretty close

25   to --

```
 1              MR. BLACK:  Okay.  So --

 2              THE COURT:  -- to reality.  So why -- when you say,

 3     we can't figure out the purchase price, what purchase price

 4     are we talking about?

 5              MR. BLACK:  The purchase price so --

 6                       (Simultaneous colloquy.)

 7              THE COURT:  -- from defendants to --

 8                       (Simultaneous colloquy.)

 9              THE COURT:  -- sorry --

10              MR. BLACK:  Circuit City.

11              THE COURT:  Okay.

12              MR. BLACK:  Because when -- when prices are

13     negotiated for purchasing, there's also built in oftentimes a

14     percentage chargeback.  It's either -- as a percentage of the

15     sale price or as a fixed dollar amount per unit sold.

16         Now, that is not in the purchase data.  And so without the

17     sales data, you can't know what the actual purchase price is.

18     And these are significant numbers.  I mean, we're talking --

19              THE COURT:  So, Mr. Black, again, I'm going to stop

20     you.  This -- None of this is in the brief.

21              MR. BLACK:  It is mentioned, I believe, in the -- in

22     the brief.  You know, we only had two and a half pages, so

23     it's -- it's short, but it is I believe touched upon in the

24     brief.

25         The other -- The other thing I would say in terms of the
```

1    burden, Your Honor, is that with respect to Circuit City,

2    there is no burden because this data's already collected.

3    They have it sitting, you know, right there ready to be

4    produced, and they haven't -- and so there is no actual burden

5    in terms of collecting the data.

6              **THE COURT:**  Are we talking about information from

7    *LCD*?

8              **MR. BLACK:**  We're talking about information from *LCD*

9    that -- that these -- that plaintiffs do have in their

10   possession, that Circuit City has -- I mean, they're --

11   they're the party from *LCD*, and they're the same products at

12   issue.

13      So the data's already collected --

14             **THE COURT:**  So let me just say -- So that's not

15   before me, but for your meet-and-confer going forward, right,

16   about these documents in *LCD* and whether they should be

17   produced, if -- again, if they show -- if they help establish

18   the purchase price, which would be important on the merits,

19   and they've already been collected, then it may be that, you

20   know, they need to be turned over.

21      Again, I'm just trying to give you some guidance.  I'm not

22   making rulings because I don't know the particulars.  You're

23   going to have to put them before me.

24             **MR. BLACK:**  Sure.

25             **THE COURT:**  But I want to give you whatever guidance

1    I can that you can implement on the next few days.  This is a

2    new argument.

3        The argument is purchase price from the defendant to

4    Circuit City is going to be important, and we can't

5    necessarily know the purchase price without some other

6    information which is already collected.

7        Mr. Sheanin, if that's the argument, you know, that's a

8    different argument.  But there, the -- the burden is less

9    because it's been collected.  Okay?

10       So I don't know how I would -- how I personally would come

11   out as the judge in weighing those things, and I'm not going

12   to come out on it today because you need to flesh this out.

13   I'm not going to hear the argument because it wasn't made --

14                      (Simultaneous colloquy.)

15            MR. SHEANIN:  May I respond to the two brief points

16   that Mr. Black made?

17            THE COURT:  Very briefly.

18            MR. SHEANIN:  Yes.

19       First of all, I find it very surprising to hear that

20   defendants have no idea what Circuit City or others paid for

21   lithium ion batteries and lithium ion battery products from

22   their purchases from the defendants because it's in

23   defendants' own transactional data.  They have it.  They know

24   what they sold it for.  They gave it to us already.  And they

25   cannot run their businesses without knowing that.

```
 1              THE COURT:  Okay.

 2              MR. SHEANIN:  That's --

 3              THE COURT:  So -- So, again, in Rule 26(b), you look

 4     at availability of information to the parties.  So that's

 5     one -- one of their arguments that you'd make.

 6         If you already have it, you don't really need it; it's

 7     only to confirm it.

 8              MR. BLACK:  That's not accurate.

 9              THE COURT:  Well, that's something you'll have to

10     talk through, and that's something that I would consider in

11     looking at 26(b).

12              MR. BLACK:  Okay.

13              THE COURT:  What's your second part?

14                   (Simultaneous colloquy.)

15              MR. SHEANIN:  You know what, I'll stand down on my

16     second point.

17              THE COURT:  Okay.

18              MR. SHEANIN:  Thank you, Your Honor.

19              MR. BLACK:  Briefly on the depositions, I would just

20     say that, you know, the depositions are next week, and in

21     terms of the -- the burden, it's also the case that the sales

22     information is directly related to the purchase.

23         So when -- when a purchase is done -- what we're afraid of

24     as part of this is that any ruling against -- not -- you know,

25     disallowing a witness to talk about sales is going to preclude
```

1      us from getting accurate information about purchases.

2          Because the way purchasing were done -- and we know this

3      because we have the benefit of having deposed Circuit City

4      many times before -- the way purchasing is done is that

5      Circuit City looked at what it thought it could sell a -- sell

6      a product at, and then it said, I'm willing to buy it for this

7      price because I'm going to be able to make this much on it.

8          So if we're put in a situation where we can't fully talk

9      about purchasing, that's a problem for us.  And we're not

10     asking them to provide any information that's going to be

11     overly burdensome.

12         The witness that they put forward is -- is a buyer and was

13     later the -- the head of their -- one of their merchandising

14     divisions.  He was the individual who set both the sale price

15     and the purchase price.  He has personal knowledge of this,

16     and it's not going to be burdensome to ask these questions of

17     him.

18         These are -- These are things that are going to go to how

19     purchasing was done, and that's -- that's the focus -- there

20     is sales -- there is a sales aspect, but what we don't want to

21     happen is not to be able to fully ask about purchasing because

22     they're interrelated.

23             THE COURT:  Is there a problem with asking about

24     purchasing, Mr. Sheanin?

25             MR. SHEANIN:  Certainly, there's no problem asking

```
 1    about purchasing.  We're prepared to testify about that.
 2                    (Simultaneous colloquy.)
 3          MR. BLACK:  It's not talking about --
 4          MR. SHEANIN:  Mr. Black --
 5          MR. BLACK:  Sorry.  Apologies.
 6          MR. SHEANIN:  We do have the -- We do recognize that
 7    there are certain areas where there is some relationship
 8    between purchasing and sales.  And I am not going to instruct
 9    my witness to absolutely refuse to respond to any such
10    question that might touch upon sales if it's really about
11    purchasing.
12          THE COURT:  Okay.
13          MR. SHEANIN:  On the other hand, Your Honor, if it's
14    really something that is a sales discussion -- and I've read
15    through the deposition transcripts in prior -- CRT and LCD,
16    and I know that the vast majority of that pertained to sales,
17    what were your pricing practices, what were your sales
18    practices, et cetera.  That, I think, is off limits, certainly
19    based upon what this court's ruling has been today.
20       And if that's the case, then, yes, I think it's
21    appropriate for me to instruct not to answer to the extent
22    that it complies with this court's order.
23          THE COURT:  So to summarize, next week, there will be
24    questioning about purchasing, and that is fair game.
25    Everybody agrees.
```

1    Mr. Sheanin has just said that there may be questions that

2    go beyond the strict confines of what we think of as

3    purchasing but that are relevant -- materially relevant to

4    purchasing and that those questions are going to be allowed.

5        But if they're outside the bounds, reasonable bounds --

6    reasonable bounds of what's irrelevant to purchasing, then

7    it's not relevant to purchasing, and you may instruct because

8    the -- there's -- if -- it's -- it's more about downstream

9    activity.

10       So have I captured what you said accurately?

11           **MR. SHEANIN:**  Aaron Sheanin for the record.

12       Yes, I believe you have, Your Honor.

13           **THE COURT:**  Okay.  So as to the motion in front of me

14   today, here's the problem.  The argument -- Well, I think we

15   just cleared up that argument, Mr. Black.  Okay?

16       But as to the very broad requests to depose at length next

17   week on individualized downstream data, the defendants have

18   not made their case because they haven't established, you

19   know, a -- either a high level of relevance or -- well, they

20   haven't -- they have to show that it falls within 26(b), that

21   it is relevant and proportional.

22       So I'm seeing marginal relevance maybe to a class

23   certification issue, although it's not entirely clear, and

24   certainly no attempt to tailor these to make them

25   non-burdensome and get at exactly what you might need for the

 1  relevance that you've articulated.

 2      Had you not gone for broke and tried to do something more

 3  tailored, then this -- this might be a different outcome, but

 4  what I have in front of me are very broad discovery requests.

 5          **MR. AMATO:**  Jeffrey Amato for the defendants.  I'd

 6  like to say two things.

 7      First, on that point right there, we actually negotiated

 8  with the direct purchaser plaintiffs for months about how to

 9  tailor the downstream information we needed both in documents

10  and -- and in testimony.  And we thought we were very close to

11  reaching an agreement where only percipient witnesses who had

12  knowledge of the downstream information would -- would be

13  giving general answers about the pricing practices that --

14  that were relevant to the DPP case and that touch on some of

15  the pass-through issues in the IPP case.

16      And so that process came to a halt very abruptly, I would

17  say, in -- in March when the clock was really -- started to

18  ticking down on our ability to get information that we could

19  use in our class oppositions.

20      And so that's when we issued I guess what you would call

21  as a go-for-broke subpoena request.  But there were attempts

22  to be made, and we were leading down that path --

23          **THE COURT:**  But here's the problem.

24          **MR. AMATO:**  Then they shut the door on that.

25          **THE COURT:**  Okay.  Well, so the -- things fell apart,

1    and, as you said, you issued a "go-for-broke" subpoena, which

2    is problem.

3        Had you made a request that was tailored to what you could

4    show to be relevant, then you'd have a much better shot at

5    convincing me that it falls within the scope of 26(b).

6        But I don't see that here.  You didn't say, well, we would

7    settle for the following compromise.  We need this, and this

8    is why we need it, we need it from these individuals, so on

9    this record, I can't rule in your favor.

10            **MR. AMATO:**  Well, Your Honor, I would submit that in

11    a case where Circuit City is claiming hundreds of millions of

12    dollars of damages and the -- and the damages in the expert

13    reports quantify the direct case at -- approaching a billion

14    dollars, I would think that having a witness prepare to sit

15    under the time limits in the deposition protocol where we

16    could fit in some questioning about downstream issues that are

17    relevant to pricing of the products that were purchased from

18    the defendants, I don't see that as burdensome at all.

19        And I'd like -- I would just like, if you could give me a

20    moment, about what Mr. Sheanin said about allowing some

21    inquiry to downstream issues that are, you know, related to

22    purchases.

23        Just last week, Ritz Camera sat for a deposition.  This

24    question was asked:  Did Ritz ever determine the price at

25    which it wanted to sell a product before deciding how much it

1      was willing to pay for a product?

2          That question, the witness was instructed not to answer.

3      And we could not obtain that testimony.

4          That -- And we believe that that information about how

5      Ritz Camera would negotiate the price it purchased the product

6      is directly relevant to the direct purchaser case.

7                  **THE COURT:**  Mr. Sheanin?

8              **MR. SHEANIN:**  Couple of things.  One is I disagree

9      with Mr. Amato's characterization of the meet-and-confer, but

10     I will put that aside.

11                 **THE COURT:**  Okay.

12             **MR. SHEANIN:**  To -- With respect to Ritz Camera, I

13     think that the plaintiffs were waiting to see where this

14     court's ruling was going to be and trying to understand where

15     we were.

16         We had a reasonable basis to make those instructions and

17     objections based upon the motion for protective order that we

18     had filed, and we were standing on it.

19         We've had this discussion here before Your Honor today.  I

20     think if I were to have a conversation with Ritz Camera's

21     counsel and -- and be in that deposition if it were to take

22     place now, I would say, look, a little more latitude is

23     necessary.

24         In the event, after the deposition of Circuit City, that

25     the defendants say that they really want to take that very

1  small, I think, modest amount of testimony on Ritz Camera, I'm

2  happy to discuss that with Ritz Camera's counsel to see what

3  can be done.

4      But I would suggest that it be done probably, one,

5  telephonically to avoid everybody having significant problems

6  of trying to haul everyone back in place.  And, two, in a very

7  limited manner to -- you know, no more than an hour, probably

8  less, of that kind of testimony.  But I'm prepared to have

9  that kind of negotiation, though I do think it probably makes

10  more sense to get through Circuit City's deposition first.

11      **THE COURT:**  Okay.

12      So, Mr. Amato, at the -- you know, Mr. Sheanin explained

13  that there's not going to be an instruction that draws it that

14  close when Circuit City is -- is deposed, and I think that's

15  appropriate.

16      As to any disagreements about what Ritz Camera did, meet

17  and confer on it, and try to set up a way -- 'cause I think if

18  that issue were put in front of me and if that question is --

19  I think -- did you read it or were you --

20      **MR. AMATO:**  Yes, I read it from the record.

21      **THE COURT:**  Okay.  So that is a problematic

22  instruction, and -- but I -- I would want the parties to work

23  out a reasonable way to get a further answer for your client,

24  Mr. Amato.

25      So telephonically and, you know, we're not going to reopen

1    everything to everything else.  But the reasonable,

2    not-too-burdensome way of creating an opportunity for you to

3    get answers to questions that were properly asked is -- is in

4    order.

5        Okay?

6            **MR. AMATO:**  Thank you.

7            **THE COURT:**  Is there anything further?

8        So my ruling today, just to be clear is -- I made some

9    rulings about a deadline for meeting and conferring on some

10   outstanding issues and getting papers in front of me if

11   there's a remaining problem.

12       I ruled that -- I'm not going to require the DPP's in this

13   case to produce downstream data in order to support the

14   pass-through case for the IPP's.

15       I'm also going to -- I'm also ruling that the downstream

16   data, as presented here, will not be compelled because the

17   defense failed to establish more than, you know, a modicum of

18   relevance to their argument about class certification and that

19   what they're requesting is very burdensome and out of

20   proportion and there was no attempt to try to tailor it to the

21   reasons they -- they said they needed it for.

22       We had some discussion about the depositions for next week

23   and how the questioning needs to account for the fact that

24   some of the lines are a little blurry around what purchasing

25   is.

1        And we talked about what to do about the Ritz instruction

2    in last week's deposition.

3        Okay?  Is there anything further?

4            **MR. BLACK:**  Your Honor, I had one question as to how

5    this pertains to percipient depositions.

6        Andrew Black, again for Toshiba Corporation.

7            **THE COURT:**  Okay.

8            **MR. BLACK:**  If it's in the witness's personal

9    knowledge, I mean, is it appropriate for counsel to instruct

10   the witness not to answer if the witness knows on his own -- I

11   understand the ruling as to the 30(b)(6).

12           **THE COURT:**  I personally would not see a distinction

13   between -- about where you draw that line for percipient

14   versus 30(b)(6) depositions.

15       Mr. Sheanin, do you have argument --

16           **MR. SHEANIN:**  Aaron Sheanin for the record.

17       No, I agree with Your Honor.  I don't see a distinction

18   between those two.  And, again, to me, it's trying to get in

19   through back door what they can't get in through the front.

20           **THE COURT:**  Well, I guess I heard the question a

21   little differently.

22       If you're asking a percipient witnesses about purchasing

23   and something goes a little beyond purchasing but is fairly

24   related to purchasing, you're asking, can I ask -- is it okay

25   to go ahead and ask the question if it's not a 30(b)(6).

1        **MR. BLACK:**  Yes, Your Honor.

2        **MR. SHEANIN:**  Okay.  As to that, that's fine, Your

3   Honor.

4        As to can I ask questions about sales of a percipient

5   witnesses, to me, that falls within the line of what we've

6   previously discussed here, and it would be off limits.

7        **THE COURT:**  Correct.  What my ruling is that I'm not

8   drawing distinctions between percipient and 30(b)(6)

9   witnesses.  If it's prohibited discovery for 30(b)(6), it's

10  prohibited for a percipient.  If it's allowed for 30(b)(6),

11  it's allowed for percipient.  Okay?

12       Mr. Black, does that answer your question?

13       **MR. BLACK:**  It does, Your Honor.  I guess I see a

14  distinction on the -- the burden if the witness already knows

15  the answer, but -- but I take Your Honor's point.

16       **THE COURT:**  Right.  Okay.

17       **MR. SHEANIN:**  Your Honor, one quick point on the

18  meet-and-confer deadlines and the filing of motion, we

19  originally set Wednesday for I think both the downstream

20  issue -- or the *CRT/LCD* productions, as well as cost plus,

21  et cetera.  And then there was a discussion about Friday.

22       I think it may make sense to move both of those to Friday

23  just because we'll be in deposition and either we'll get

24  through this or we won't, but it should all go in one shot.

25  Is that --

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

1          **MR. AMATO:**  I think we're fine with that.  We'll be

2   in the deposition as well, so --

3          **THE COURT:**  Okay.  So Friday's the deadline for all

4   of those disputes to come to me if they're not worked out.

5   Okay?

6          **MR. BLACK:**  Thank you, Your Honor.

7          **THE COURT:**  All right.  Thank you all.

8          (Proceedings were concluded at 12:40 P.M.)

9                       --o0o--

10

11      CERTIFICATE OF TRANSCRIPTION OF ELECTRONIC RECORDING

12

13          I, RAYNEE H. MERCADO, hereby certify that the

14   foregoing is a true and correct transcription to the best of

15   my ability, of the above pages, of the official electronic

16   sound recording provided to me by the U.S. District Court,

17   Northern District of California, of the proceedings taken on

18   the date and time previously stated in the above matter.

19

20   _____

21          Raynee H. Mercado

22          Friday, April 29, 2016

23

24

25