UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE YVONNE GONZALEZ ROGERS, JUDGE

| IN RE: LITHIUM ION BATTERIES) | NO. C 13-MD-2420 YGR |
|---|---|
| ANTITRUST LITIGATION       ) | |
| _____) | MDL NO. 2420 |
| | PAGES 1 - 40 |

OAKLAND, CALIFORNIA
MONDAY, FEBRUARY 28, 2017

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

**FOR DIRECT PURCHASER**
**PLAINTIFFS:**            **COTCHETT PITRE & MCCARTHY LLP**
                          **840 MALCOLM ROAD**
                          SAN FRANCISCO AIRPORT CENTER
                          BURLINGAME, CALIFORNIA 94010
                  **BY:  DEMETRIUS X. LAMBRINOS, ESQUIRE**


**FOR INDIRECT PURCHASER**
**PLAINTIFFS:**
                          **LIEFF, CABRASER, HEIMANN &**
                          **BERNSTEIN**
                          275 BATTERY STREET, 30TH FL.
                          SAN FRANCISCO, CALIFORNIA  94111
                  **BY:  BRUCE SIMON, ESQUIRE**
                       **RICK SAVERI, ESQUIRE**

FURTHER APPEARANCES ON NEXT PAGE.


REPORTED BY:        KATHERINE WYATT, CSR NO. 9866

    PROCEEDINGS REPORTED BY ELECTRONIC/MECHANICAL STENOGRAPHY;
TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION.

```
 1            A P P E A R A N C E S (CONT'D.)

 2   ALSO FOR INDIRECT PURCHASER PLAINTIFFS:

 3   HAGENS BERMAN SOBOL SHAPIRO LLP
     715 HEARST AVENUE
 4   BERKELEY, CALIFORNIA 94710

 5   BY:  JEFF D. FRIEDMAN, ESQUIRE

 6


 7   FOR DEFENDANTS:

 8   FOR NEC CORPORATION:
                         WINSTON & STRAWN
 9                       101 CALIFORNIA STREET
                         SAN FRANCISCO, CALIFORNIA  94111
10               BY:  ROBERT B. PRINGLE, ESQUIRE
                      DANA COCK-MILLIGAN, ESQUIRE
11

12   FOR TOSHIBA          WHITE & CASE, LLP
     CORPORATION:         3000 EL CAMINO REAL
13                        5 PALO ALTO SQUARE, 9TH FLOOR

14                        PALO ALTO, CALIFORNIA 94306

15               BY:  HEATHER BURKE, ATTORNEY AT LAW

16   FOR HITACHI MAXWELL:

17                        VINSON & ELKINS
                          2200 PENNSYLVANIA AVENUE NW
18                        SUITE 500 WEST
                          WASHINGTON, DC 20037
19

20                        BY:  LINDSEY ROBINSON VAALA, ATTORNEY AT
                          LAW
21   FOR LG CHEM:

22                        EIMER STAHL LLP
                          224 SOUTH MICHIGAN AVENUE
23                        SUITE 1100
                          CHICAGO, ILLINOIS 60604
24               BY:  VANESSA G. JACOBSEN, ATTORNEY AT LAW
                      NATHAN P. EIMER, ESQUIRE
25
```

**FEBRUARY 28, 2017**                             **2:00 O'CLOCK P.M.**

**P R O C E E D I N G S**

     **THE CLERK:**  CALLING CIVIL ACTION 13-MD-2420, IN RE:
LITHIUM BATTERIES ANTITRUST LITIGATION.

     **THE COURT:**  ALL RIGHT.  WE'LL START WITH THE
PLAINTIFFS.

     MR. FRIEDMAN, GOOD AFTERNOON.

     **MR. FRIEDMAN:**  GOOD AFTERNOON, YOUR HONOR.  JEFF
FRIEDMAN FOR THE IPP'S.

     **MR. LAMBRINOS:**  DEMETRIUS LAMBRINOS, IPP'S, COTCHETT,
PITRE & MCCARTHY.

     **MR. EMIER:**  GOOD AFTERNOON, YOUR HONOR.  WE'RE
RELATIVELY NEW IN THE CASE.  NAT EIMER ON BEHALF OF THE LG CHEM
DEFENDANTS.

     **MS. JACOBSEN:**  AND VANESSA JACOBSEN ALSO ON BEHALF OF
THE LG CHEM DEFENDANTS.

     **THE COURT:**  COME TO THE MIC, PLEASE.

     **MS. JACOBSEN:**  VANESSA JACOBSEN ALSO ON BEHALF OF THE
LG CHEM DEFENDANTS.

     **THE COURT:**  OKAY.

     **MS. VAALA:**  LINDSEY VAALA ON BEHALF OF THE MAXWELL
DEFENDANTS.

     **THE COURT:**  LINDSEY VAALA?

     **MS. VAALA:**  YES.

1              **THE COURT:** GREAT. OKAY.

2              **MR. PRINGLE:** GOOD AFTERNOON, YOUR HONOR. ROBERT

3  PRINGLE ON BEHALF OF NEC CORPORATION. WITH ME IS DANA

4  COOK-MILLIGAN ON BEHALF OF NEC CORPORATION.

5              **THE COURT:** OKAY.

6     SO I HAVE A CARD FOR HEATHER BURKE ON BEHALF OF TOSHIBA.

7  JUST WATCHING?

8              **MS. BURKE:** YES, YOUR HONOR.

9              **THE COURT:** I SEE MR. PITRE IN THE BACK? NO?

10    ALL RIGHT. SO, MR. FRIEDMAN, I AM GOING TO ASK YOU TO WALK

11  THROUGH THESE WITH ME.

12            **MR. FRIEDMAN:** SURE, YOUR HONOR.

13            **THE COURT:** IN PRINCIPLE I AM DELIGHTED THAT PEOPLE ARE

14  RESOLVING. I HAVE BEEN WORKING ON CLASS CERT MOTIONS, BUT, YOU

15  KNOW, THERE ARE SOME INTERESTING ISSUES IN THIS CASE.

16    WHAT I'M TRYING TO FIGURE OUT -- I HAVE SOME QUESTIONS -- IS

17  HOW ALL OF THIS -- HOW ALL OF THIS REALLY IS GOING TO ULTIMATELY

18  WORK. IT'S AN MDL, SO OBVIOUSLY I HAVE FLEXIBILITY IN HOW TO

19  DEAL WITH IT. BUT IT SEEMS TO ME THAT IT COULD CREATE ALL SORTS

20  OF PROBLEMS GIVEN THAT IT IS PIECEMEAL.

21    AND IT COULD CREATE PROBLEMS IN TERMS OF VARIOUS CLASS

22  DEFINITIONS. I'VE GOT SONY, YOU KNOW, WITH ONE SET. I'VE GOT

23  OTHER PEOPLE COMING AND GOING. I DON'T KNOW HOW ONE REALLY

24  NOTIFIES A CLASS THAT SOMETHING IS HAPPENING, BUT WE HAVE

25  ABSOLUTELY NO IDEA WHAT YOU ARE GOING TO GET.

1    SO IT'S JUST -- IT IS NOT OBVIOUSLY A TRADITIONAL CASE WHERE

2   WE HAVE A PACKAGE FOR A SINGLE CASE, AND SO I CAN EVALUATE THAT

3   IN VERY TRADITIONAL WAYS.  SO I'VE, YOU KNOW, CREATED SOME CHARTS

4   TRYING TO FIGURE OUT HOW THINGS WORK.  BUT GIVEN BOTH SIDES --

5   AND I'D LIKE TO HEAR FROM BOTH SIDES -- THE EXPERIENCES THAT YOU

6   HAD IN THOSE MDL CASES, YOU KNOW, HOW ALL OF THIS IS REASONABLY

7   GOING TO COME TOGETHER AT SOME, YOU KNOW, POINT IN -- UNKNOWN

8   POINT IN THE FUTURE.

9    SO ENLIGHTEN ME.

10   **MR. FRIEDMAN:**  SO, YOUR HONOR, I COMPLETELY AGREE THAT

11   IT IS NOT A TRADITIONAL CASE THAT THE COURT FACES OR COURTS

12   USUALLY FACE.  BUT IT IS A TRADITIONAL ANTITRUST, MULTI DEFENDANT

13   CLASS ACTION MDL IN THAT THE COURT IS BEING PRESENTED WITH FAIRLY

14   TYPICAL -- I'M NOT SAYING "IDENTICAL" -- BUT FAIRLY TYPICAL

15   PARADIGM OF WHAT HAPPENS IN THE CASES.

16   AND LET ME GIVE A LITTLE BACKGROUND ON THAT.  AND, OF

17   COURSE, THE COURT CAN INTERRUPT ME AND YOU CUT ME OFF FREELY IF

18   I'M GIVING YOU TOO MUCH INFORMATION.

19   BUT TYPICALLY WHAT HAPPENS, YOUR HONOR, IS THAT YOU HAVE A

20   SERIES OF SETTLEMENTS.  AND FROM THE PLAINTIFFS' PERSPECTIVE --

21   AND WE'LL GET TO THE DIFFERENT CLASS DEFINITION ISSUES, BECAUSE I

22   DO THINK THAT THAT IS SOMEWHAT OF A MORE OF A THORNIER ISSUE, BUT

23   IT IS ONE THAT WE DEAL WITH.

24   TYPICALLY WHAT HAPPENS, YOUR HONOR, WHAT END UP HAPPENING IS

25   YOU GET A SERIES OF SETTLEMENTS.  AND ONE OF TWO THINGS HAPPEN.

1    EITHER A, FROM THE PLAINTIFFS' PERSPECTIVE YOU REACH CRITICAL

2    MASS IN TERMS OF THE AMOUNTS OF DAMAGES OR THE AMOUNT, THE SIZE

3    OF THE POT TO DISTRIBUTE THAT IT MAKES ECONOMIC SENSE TO

4    DISTRIBUTE AND NOT WAIT FOR YEARS AND YEARS AND YEARS DOWN THE

5    ROAD TO SEE IF EVERYONE SETTLES OR IF THERE'S GOING TO BE A TRIAL

6    AN APPEAL, ET CETERA.

7         AND THAT, THEREFORE, YOUR HONOR, IS ONE WAY THAT IT IS DONE

8    IS THAT WE COME TO THE COURT AND SAY HAVE:

9              "WE HAVE 65 MILLION OR WE HAVE A HUNDRED MILLION," OR A

10        CERTAIN NUMBER THAT WE SAY:  "IT MAKES SENSE TO DISTRIBUTE

11        TO THE CLASS MEMBERS."

12        AND YOU MAY HAVE DEFENDANTS THAT ARE OUT THERE IF THE COURT

13   CERTIFIES THE CASE, OR IF THE COURT DOESN'T CERTIFY THE CASE,

14   THAT WILL THEN HAVE TO DEAL WITH THOSE SORT OF FACTORS ON THE

15   GROUND AS THEY EVOLVE.

16        WE'RE GETTING CLOSE, YOUR HONOR, TO THAT CRITICAL MASS

17   WHERE, AGAIN, THE COURT DOES NOT HAVE TO ORDER OR AGREE FOR

18   DISTRIBUTION, BUT WE'RE GETTING REALLY CLOSE TO THE POINT WHERE

19   IT MAY MAKE SENSE, WHICH I CAN TALK TO YOU ABOUT A LITTLE BIT, AS

20   WELL.

21        NOW, WITH RESPECT TO THE ISSUE ABOUT THE DIFFERENT CLASS

22   DEFINITIONS, SO WHAT WE'RE TALKING ABOUT REALLY RIGHT NOW IS

23   DISTRIBUTION.  AND THE CLAIM FORM THAT WE'RE DEALING WITH,

24   BECAUSE WE DO HAVE A SONY SETTLEMENT THAT INCLUDES MORE PRODUCTS

25   BECAUSE IT INCLUDES THE PRISMATIC AND POLYMER AS OPPOSED TO

1   LIMITED TO CYLINDRICAL.

2       YOU'LL HAVE 19-AND-A-HALF-MILLION APPROXIMATELY, THAT IS

3   DESIGNATED FOR THOSE PEOPLE CAN MAKE A CLAIM THAT DID NOT BUY A

4   CYLINDRICAL PRODUCT, BUT DID BUY A PRISMATIC OR POLYMER PRODUCT.

5       AND SO THOSE PEOPLE WILL HAVE AVAILABLE TO THEM A CLAIM TO

6   UPWARDS OF THAT $19-AND-A-HALF MILLION.

7       THE CYLINDRICAL, JUST FOR THE COURT'S INFORMATION, IS IN

8   TERMS OF THE SCOPE OF WHAT WE'RE TALKING ABOUT, CYLINDRICAL MAKES

9   UP IN TERMS OF THE PRODUCTS AT ISSUE -- AND DON'T HOLD ME TO THE

10  EXACT, BECAUSE MY RECOLLECTION LOOKING AT MARKET INFORMATION,

11  CYLINDRICAL PRODUCTS CAN MAKE UP BETWEEN 40 AND 60 PERCENT OF

12  EFFECTIVELY THE PRODUCTS AT ISSUE.

13      AND, PREDOMINANTLY, YOUR HONOR, THAT COMES IN LAPTOP

14  COMPUTERS.  THAT'S A HUGE PERCENTAGE.  AND SO IF YOU THINK ABOUT

15  IT, YOUR HONOR, WHEN YOU'RE TALKING ABOUT THE PRACTICAL

16  APPLICATION, IS SOMEONE GOING TO HAVE BOUGHT A CELL PHONE THAT

17  HAS A PRISMATIC IN IT THAT DID NOT BUY A COMPUTER IN THE CLASS

18  PERIOD THAT WE HAVE, THE TEN-YEAR PERIOD, APPROXIMATELY.

19      IT'S POSSIBLE.  IS IT LIKELY THAT THAT'S GOING TO MAKE UP A

20  LARGE PERCENTAGE OF THE CLAIMS?  PROBABLY NOT.  SO WHAT YOU ARE

21  GOING TO HAVE MOST LIKELY, YOUR HONOR, IN PRACTICAL TERMS IS THAT

22  YOU ARE GOING TO HAVE CYLINDRICAL PURCHASERS THAT ARE GOING TO

23  HAVE THE RIGHT TO MAKE A CLAIM TO THE ENTIRE BODY OF THE POOL OF

24  MONEY.

25      AND THEN, YOU ARE GOING TO HAVE SOME PEOPLE WHO ONLY BOUGHT

1   A CELL PHONE OR AN IPAD, FOR EXAMPLE, THAT HAD A PRISMATIC OR A

2   POLYMER, BUT NOT A CYLINDRICAL THAT WILL GET A PRO RATA SHARE OF

3   WHAT EXISTS IN THAT 19.5 MILLION POT.

4        AND THAT WILL BE DONE BY A CLAIM FORM.  IN THE CLAIM FORM

5   THAT WE'VE SUBMITTED THE INDIVIDUALS WILL CHECK THE BOXES OF THE

6   TYPES OF PRODUCTS THAT THEY PURCHASED.

7        AND IF THEY EXCLUSIVELY CHOOSE A CELL PHONE, FOR EXAMPLE,

8   THAT WERE NOT CYLINDRICAL, THEY WILL ONLY GET A PRO RATA SHARE OF

9   THE $19.5 MILLION.

10       IF THEY CHECK BOTH BOXES, SOMETHING THAT HAD CYLINDRICAL AND

11  SOMETHING THAT HAD A PRISMATIC, THEY GET ACCESS AND A PRO RATA

12  SHARE TO THE TOTALITY OF THE POOL.

13       NOW, IN -- DO YOU HAVE ANY QUESTIONS FOR ME AT THIS POINT?

14            **THE COURT:**  NOT SO FAR.

15            **MR. FRIEDMAN:**  OKAY.  NOW, THE COURT ABSOLUTELY PUTS

16  THE COURT'S FINGER ON WHAT IS A VERY COMMON BUT BEDEVILING ISSUE

17  THAT COMES UP IN CLASS ACTIONS ALL THE TIME, WHICH IS:

18            "WELL, HOW MUCH DO YOU GET?  HOW MUCH IS SOMEONE GOING

19       TO GET FROM THIS?"

20       NOW, THE ISSUE IS DIFFICULT IN SEVERAL WAYS THAT I WRESTLE

21  WITH ALL THE TIME AND HAVE TRIED -- AND I'LL TELL YOU SOMETHING

22  THAT WE'RE TRYING TO DO THAT'S SORT OF ON THE FOREFRONT OF THIS

23  ISSUE.  THE ISSUE IS:  WELL, THE MORE CLAIMANTS YOU HAVE, THE

24  LESS AMOUNT OF MONEY PRO RATA YOU ARE GOING TO GET.

25       AND SO HOW DO WE KNOW HOW MANY CLAIMANTS YOU ARE GOING TO

HAVE?  WE CAN DO PROJECTIONS.  WE CAN LOOK AT HISTORICALS.  WE

CAN LOOK AT -- THERE'S VARIOUS VARIABLES.  BUT THERE'S REALLY BAD

INFORMATION IN TERMS OF PREDICTION OTHER THAN THE FACT THAT WE

KNOW IF YOU HAVE TO FILL OUT A FORM AND IT'S REALLY COMPLICATED,

YOUR CLAIMS RATE IS GOING TO BE LOWER.

        SO WHAT DO WE DO?  WE TRY TO HAVE THE LEAST AMOUNT OF

INFORMATION REQUIRED.  IF YOU HAVE TO SUBMIT RECEIPTS IT DRIVES

IT DOWN.  THERE'S ALL THESE THINGS THAT ARE VARIABLES THAT DRIVE

CLASS MEMBER CLAIMS RATES DOWN.  EVEN WHEN YOU MAKE IT EASY IT'S

NOT A HIGH RESPONSE RATE, WHICH IS EXTREMELY, I THINK, TROUBLING

POLICY-WISE.  IT'S TROUBLING IN TERMS OF PERCEPTIONS OF CLASS

ACTIONS.

        THERE'S A LOT OF PROBLEMS WHEN YOU HAVE LOW CLAIMS RATES

BECAUSE THE LAWYERS ARE THE ONLY ONES BENEFITING.  THAT'S THE

ARGUMENT.  I'M NOT GOING TO TAKE THAT ON RIGHT NOW WITH THE

COURT.

        SO WE'RE SENSITIVE TO THAT.  SO WHAT DO WE DO?  WHAT DO WE

DO AND WHAT HAVE WE BEEN TRYING TO DO?

        SO YOU WILL I'LL GIVE YOU CLEARLY FACTS IN THIS CASE.  WE

HAVE 15.8-MILLION EMAIL ADDRESSES THAT WE HAVE GOTTEN FROM

SOURCES SUCH AS DELL AND HP, BECAUSE THEY ARE OBVIOUSLY COMPUTER

MANUFACTURERS AND MAKE UP A LARGE PERCENTAGE OF THE POTENTIAL

PRODUCTS AT ISSUE.

        WE HAVE SUBPOENAED THEM AND RECEIVED THAT INFORMATION FROM

OUR CASE THAT I LED IN ODD, AND HAVE IMPORTED THAT CONTACT

1    INFORMATION HERE.

2        WE'VE ALSO ASKED FOR RETAILER INFORMATION.

3        SO NOW, AGAIN, THAT 15.8 MILLION EMAIL ADDRESSES, WHAT DOES

4    THAT DO?  WELL, FIRST OF ALL, YOU HAVE TO GO THROUGH AND FIND OUT

5    HOW MANY OF THOSE EMAIL ADDRESSES ARE STILL GOOD?  AND SO THERE'S

6    A WINNOWING.  I DON'T WANT TO REPRESENT TO THE COURT THAT ALL

7    15.8 MILLION ARE GOOD ADDRESSES AND ARE GOING TO BE ABLE TO GET

8    MONEY TO THEM.

9        WE STILL FACE THE PROBLEM.  SO WHAT?  YOU HAVE 15.8 MILLION

10   EMAIL ADDRESSES.

11       SO WHAT I DID AND MY FIRM DID AND HAVE DONE IT FOR THE FIRST

12   TIME IN OUR MILK ANTITRUST CASE IN FRONT OF JUDGE WHITE, WHICH IS

13   WE FOUND A COMPANY IN SAN FRANCISCO THAT'S -- THE COMPANY'S NAME

14   IS SIPREE.  AND --

15           **THE COURT:**  HOW DO YOU SPELL THAT?

16           **MR. FRIEDMAN:**  S-I-P-R-E-E.  AND THIS WAS BORNE OUT OF

17   FRUSTRATION WITH THIS VERY ISSUE IN ODD WHERE I HAD MULTI

18   MILLIONS OF CLASS MEMBERS.  AND I SAID:

19           "HOW ARE WE GOING TO GET THEM THE MONEY?  WE HAVE OVER

20           $125,000,000 IN SETTLEMENTS.  HOW DO WE GIVE THEM THE

21           MONEY?"

22       SO I PICKED UP THE PHONE, CALLED PAYPAL, AND SAID:

23           "IF I GIVE YOU AN HUNDRED MILLION DOLLARS AND CAN

24           DISTRIBUTE -- CAN YOU JUST DISTRIBUTE A HUNDRED MILLION

25           DOLLARS THROUGH PAYPAL?

1            "CAN'T DO IT.  OUR INFRASTRUCTURE ISN'T BUILT FOR IT.

2        WE CAN'T DO IT."

3        SO I THEN FOUND A COMPANY CALLED "SIPREE."  SIPREE IS

4    DESIGNING AND HAS A SYSTEM THAT WITH AN EMAIL ADDRESS, YOUR

5    HONOR, THAT THEY ARE ABLE TO FIRST GIVE THAT EMAIL RECIPIENT AN

6    OPTION TO DIRECT MONEY INTO VARIOUS PAYMENT FORMS.  THEY CAN OPEN

7    A PAYPAL ACCOUNT.  THEY CAN USE AN EXISTING ACCOUNT THAT THEY

8    HAVE.

9        THERE'S ALSO A WAY IN WHICH WE BELIEVE WE'RE ABLE TO GET

10    MONEY EVEN IF PEOPLE DON'T RESPOND, YOUR HONOR.  TO FORCE MONEY

11    TO THEM BY YOUR HONOR GETTING $5 FROM AMAZON, AND YOU SPEND IT

12    ANY WAY YOU WANT TO.  IT'S NOT A COUPON.  YOU CAN MY MILK WITH

13    IT.  YOU CAN BUY ANYTHING YOU WANT WITH IT.

14        AND IT'S FORCED, AND IT SHOWS UP IN YOUR EMAIL, AND IT SAYS:

15            "HERE'S $5 FOR YOU TO SPEND ON AMAZON."

16        AND SO THIS IS WHAT WE'RE -- WE'RE DOING IT IN THE MILK

17    ANTITRUST CASE IN FRONT OF JUDGE WHITE.  WE STARTED, YOUR HONOR,

18    WITH A 200,000 OUT OF ABOUT 30 MILLION HOUSEHOLDS' CLAIMS.

19        AND MR. EIMER IS ONE OF THE DEFENSE COUNSELS IN THE CASE

20    AND, SO HE'S FAMILIAR WITH THIS.

21        SO THERE WAS 200,000 THAT WAS COMING ONLINE THROUGH EFFORTS

22    OF SOCIAL MEDIA THAT, YOU KNOW, WE HAVE TO INVEST AND PAY FOR.

23    WE NOW HAVE THE CLAIMS.  THERE ARE OVER FOUR MILLION CLAIMS, YOUR

24    HONOR.  AND WE ARE GOING TO ELECTRONICALLY DISTRIBUTE TO -- WE

25    MAKE AS LONG AS THOSE FORMS ARE GOOD -- LET'S JUST SAY THEY

1   ARE -- WE'RE GOING TO ELECTRONICALLY DISTRIBUTE THE ENTIRE BODY

2   ELECTRONICALLY TO THOSE 4 MILLION CLAIMANTS.

3       AND THE AVERAGE DISTRIBUTION THERE WILL BE SOMEWHERE BETWEEN

4   FIVE AND TEN DOLLARS.  AND BESIDES THE ABILITY TO GET THE MONEY

5   TO THE PEOPLE THIS WAY, WE ALSO ARE TAKING THINGS ELECTRONICALLY,

6   BECAUSE OLD SCHOOL WHEN WE HAD TO SNAIL MAIL A POSTCARD CHECK WE

7   WERE GETTING CHARGED -- DEPENDS ON THE NEGOTIATION -- SOMEWHERE

8   BETWEEN 25 CENTS AND 50 CENTS A CHECK, A POSTCARD CHECK, WHICH

9   THERE'S COSTS AND POSTAGE ASSOCIATED WITH IT. BUT IF WE HAD TO DO

10  THAT FOR FOUR TO 10 MILLION PEOPLE IF WE WERE LUCKY ENOUGH TO GET

11  ADDRESSES -- VERY FEW PEOPLE WERE WILLING T GIVE PHYSICAL

12  ADDRESSES -- THAT WOULD COST THREE, FOUR, $5 MILLION JUST TO DO.

13      SO WE'RE DRIVING THAT DOWN, AND WE'RE ALSO FACILITATING THE

14  ABILITY TO DO IT.  SO WE ARE GOING TO TRY AND PROPOSE DOING THE

15  EXACT SAME THING HERE, YOUR HONOR.  WE'RE DOING IT AS A TEST CASE

16  IN MILK.

17      I'M HOPING THERE'S NOT BUMPS, YOU KNOW, BUT IT IS NEW

18  TECHNOLOGY.  AND --

19          **THE COURT:**  AND WHAT DOES JUDGE WHITE HAVE TO SAY ABOUT

20  IT?

21          **MR. FRIEDMAN:**  WELL, I'M WAITING FOR FINAL APPROVAL AS

22  WE SPEAK.  JUDGE WHITE DID NOT -- IN THE FINAL APPROVAL HEARING

23  HE HAD -- HIS REAL CONCERN -- WELL, I DON'T WANT TO SPEAK FOR

24  WHAT HIS REAL CONCERN WAS.  ONE OF HIS -- THE COURT'S ARTICULATED

25  CONCERN WAS AT THE TIME WAS SO FEW PEOPLE WOULD GET THE

1   DISTRIBUTION OF MONEY BECAUSE WHEN WE WENT IN FOR THE FINAL

2   APPROVAL, THERE WAS ONLY 200,000 CLAIMANTS AT THE TIME.

3       AND WE'VE NOW CONTINUOUSLY SUBMITTED TO JUDGE WHITE UPDATES

4   WITH WHAT HAS HAPPENED WITH SOCIAL MEDIA LEARNING ON HOW TO GET

5   PEOPLE AWARE OF THESE SMALL DOLLAR CLAIMS.

6       AND THAT'S KEY, THE AWARENESS OF IT AND THE EASE TO WHICH

7   YOU CAN PUT IN AN E-MAIL ADDRESS AND SAY:

8           "I'M A CLAIMANT," AND GET THE MONEY.  AND WE'RE TRYING

9   TO BREAK DOWN THOSE BARRIERS.

10          **THE COURT:**  SO DO I NEED TO SANCTION THE DISTRIBUTION

11  PROCESS AT PRELIMINARY APPROVAL STAGE OR IS IT ENOUGH THAT IT IS

12  PRO RATA?

13          **MR. FRIEDMAN:**  YOU DO NOT NEED TO SANCTION THE PROCESS

14  YET.  YOU CERTAINLY WILL NEED TO WHEN YOU ORDER DISTRIBUTION.

15  THAT'S CLEAR.  WE WILL BE ASKING FOR APPROVAL OF THAT.  AND PRO

16  RATA CLEARLY IS IN TERMS OF THE PROPOSAL IS A FAIR, REASONABLE,

17  YOU KNOW, ALLOCATION.  IT'S SOMETHING THAT IS VERY CUSTOMARY AND

18  STANDARD.

19          **THE COURT:**  WELL, LET'S MOVE TO THE MONEY.

20          **MR. FRIEDMAN:**  OKAY.

21          **THE COURT:**  UNLESS YOU WANT TO SAY  -- I MEAN, IT'S

22  VERY HELPFUL FOR ME.  BUT IF THERE'S ANYTHING ELSE I DON'T MEAN

23  TO CUT YOU OFF.

24          **MR. FRIEDMAN:**  NO.  NO. I DIDN'T WANT TO GIVE YOU MORE

25  THAN YOU NEEDED, BUT IT IS A VERY TOPICAL ISSUE AND I UNDERSTAND

COURT'S HAVING CONCERNS OR WRESTLING WITH THESE ISSUES.

      **THE COURT:** SO JUST AGAIN FOR MY OWN EDIFICATION AND COMPARISON, I UNDERSTAND WHAT YOU'RE DOING WITH THE MILK CASE. BUT WHAT ABOUT LCD? HOW DID IT WORK THERE? CRT, HOW DID IT WORK THERE? AND I GUESS SRAM WOULD BE THE THIRD. I DON'T KNOW IF JUDGE DONATO HAS ONE IN FRONT OF HIM. AND PERHAPS THIS IS SOMETHING THAT WE AS JUDGES WILL ALL TALK ABOUT TOGETHER.

      BUT, ANYWAY, IT WOULD BE HELPFUL TO UNDERSTAND THE LAY OF THE LAND AT LEAST WITH RESPECT TO THE ANTITRUST CASES IN THIS DISTRICT.

      **MR. FRIEDMAN:** SO IF THE COURT'S ASKING ABOUT DISTRIBUTION IN THOSE CASES? MY UNDERSTANDING IS IT WAS OLD SCHOOL. IT WAS --

      **THE COURT:** AND SO HOW -- WHAT WAS THE -- DID YOU END UP DOING MULTIPLE DISTRIBUTIONS, THEN? I MEAN, HOW DID YOU -- RIGHT? BECAUSE IF YOU ARE SENDING OUT CHECKS AND PEOPLE AREN'T CASHING THEM, WAS IT GOING STRAIGHT TO A CY PRES? AND WHAT WAS THE AMOUNT? I MEAN, WHAT ARE WE LOOKING AT IN THESE KINDS OF, YOU KNOW, HUGE ELECTRONIC CASES?

      **MR. FRIEDMAN:** SO I HAVE NOT BEEN THE IPP COUNSEL IN THOSE CASES, SO I'M GOING TO GIVE YOU -- I WANT TO STOP SHORT OF GIVING YOU MORE SPECIFICS THAN THE FOLLOWING. HERE'S MY UNDERSTANDING.

      MY UNDERSTANDING IS THAT THESE WERE CERTAINLY THE DAMAGES FOR IPP'S FOR CONSUMER PURCHASERS IN THOSE CASES WERE IN THE

ORDER OF, YOU KNOW, BETWEEN $10 AND $80. SO WE'RE NOT TALKING

ABOUT THOUSANDS OF DOLLARS.

SO THE DOLLAR DAMAGES WERE CERTAINLY IN THE 80 TO -- 50 TO

80 TO $100. THEY WERE NOT THOUSANDS AND THOUSANDS OF DOLLARS.

SO ON AVERAGE YOU WERE HAVING SMALL DOLLAR FIGURES PER

PERSON. THAT'S NUMBER ONE.

NUMBER TWO, YOUR HONOR, I BELIEVE CHECKS WERE SENT SO IT WAS

NOT ELECTRONIC. THAT'S I'M VERY CONFIDENT OF. THE CHECKS WERE

SENT. I BELIEVE, YOUR HONOR, WHAT YOU HAD IN THIS ONE -- I'M NOT

POSITIVE ON -- BUT WHAT YOU ENDED UP HAVING, YOUR HONOR, WAS TO

THE EXTENT YOU HAD SMALL NUMBERS ISSUES BECAUSE OF THE ADDRESSES

AND THE CLAIMS, THOSE PEOPLE ENDED UP GETTING FAIRLY SIZABLE

CHECKS BECAUSE YOU ENDED UP HAVING A LARGE AMOUNT OF MONEY TO

DISTRIBUTE TO A SMALL NUMBER OF PEOPLE.

AND SO I DON'T KNOW IF THE CHECK SIZE ENDED UP BEING SEVERAL

HUNDREDS OF DOLLARS OR EVEN $1,000 BECAUSE THE EXCESS ENDED UP

GETTING SENT TO THOSE PEOPLE WHO CLAIMED AND CASHED.

I CANNOT TELL YOU WHETHER THERE WAS A REDISTRIBUTION PLAN

THAT OCCURRED. IT'S TYPICAL THAT A REDISTRIBUTION OCCURS FOR

UNCLAIMED OR UNCASHED CHECKS. THAT IS SOMETHING THAT HAPPENS,

CLEARLY. BUT I DON'T KNOW THE SPECIFICS OF THIS.

**THE COURT:** DOES ANYBODY ELSE IN THE COURTROOM KNOW

ANYTHING MORE?

OUT THERE?

**MR. SIMON:** I DIDN'T MAKE AN APPEARANCE, YOUR HONOR.

1          **THE COURT:**  I KNOW.

2          **MR. SAVERI:**  NOR DID I, YOUR HONOR.

3          **THE COURT:**  I KNOW.  YOU ARE WELCOME TO COME UP.  JUST

4     STATE YOUR NAME.

5          **MR. SIMON:**  BRUCE SIMON, CO-LEAD ON BEHALF OF THE

6     DIRECTS.  I WAS ALSO CO-LEAD IN LCD ON THE DIRECT SIDE.

7          **THE COURT:**  SPEAK UP MR. SIMON.  COME TO THE MIC.

8          **MR. SIMON:**  THE ISSUES ON THE DIRECT SIDE IN LCD, CRT

9     AND SRAM ARE DIFFERENT THAN THE INDIRECT SIDE BECAUSE IT'S A MORE

10    CONFINED GROUP OF PEOPLE.

11         **THE COURT:**  CORRECT.

12         **MR. SIMON:**  WE HAVE AN IDENTIFIED LIST.  THERE WAS, AS

13    I RECALL, IN LCD ON THE DIRECT SIDE ONLY ONE ULTIMATE

14    DISTRIBUTION, ALTHOUGH THERE WERE SETTLEMENTS IN PIECEMEAL

15    FASHION.  AND THEY DID WAIT, AS MR. FRIEDMAN SUGGESTED, UNTIL WE

16    HAD CRITICAL MASS AND WE HAD ALL DEFENDANTS IN THAT PARTICULAR

17    CASE EXCEPT FOR TOSHIBA AGAINST WHOM WE WENT TO TRIAL.

18         **THE COURT:**  AND THEN, DID YOU DO THE DISTRIBUTION

19    BEFORE OR AFTER THE TRIAL?

20         **MR. SIMON:**  WE DID THE DISTRIBUTION -- I THINK IN THAT

21    CASE BECAUSE OF THE TIMING WE DID THE DISTRIBUTION AFTER THE

22    TRIAL, BECAUSE THEN WE ALSO SETTLED WITH TOSHIBA AND THE ENTIRE

23    CASE WAS SETTLED AFTER TRIAL.

24         **THE COURT:**  I SEE.

25         **MR. SIMON:**  JUDGE ILLSTON, AND I BELIEVE JUDGE WILKEN

1   IN SRAM AND I BELIEVE JUDGE CONTI IN CRT AND JUDGE TIGAR, AS I

2   BELIEVE YOU ARE, ARE INTERESTED IN EFFICIENCY.  SO ONE OF THE

3   ADVANTAGES OF WAITING TO HAVE ENOUGH MONEY TO DISTRIBUTE IS ALSO

4   THAT YOU ONLY DO THE NOTICE ONCE.

5       **THE COURT:**  CORRECT.

6       **MR. SIMON:**  SO ON THE DIRECT SIDE IN LCD WE DID NOTICE,

7   COLLECTED ALL THE NAMES.  I FORGET HOW MANY THERE WERE.  BUT, YOU

8   KNOW, 250,000 OR SO NAMES ON THE DIRECT SIDE, WHICH IS SMALLER.

9       ONCE WE DID THAT AND WE WENT THROUGH, YOU KNOW, A COUPLE OF

10  ANNOUNCEMENTS OF SETTLEMENTS THAT BECAME FAIRLY ROTE BECAUSE WE

11  HAD EVERYTHING ELECTRONICALLY AND IT WAS DIRECT CONTACTS WITH

12  THEM EITHER BY DIRECT MAIL, POSTCARD OR AND/OR EMAIL.  AND THEN,

13  YOU ALSO KNEW WHO OPT-OUTS WOULD BE BY THAT POINT.

14      SO THERE IS SOME BENEFITS TO HAVING, YOU KNOW, ANNOUNCE IT

15  AS THEY COME ALONG, BUT NOT DO THEM ALL INDIVIDUALLY, BOTH

16  ECONOMICALLY AND EFFICIENCY-WISE.

17      BUT IT IS A LITTLE DIFFERENT ON THE DIRECT SIDE.

18      **THE COURT:**  YES.

19      **MR. SAVERI:**  YOUR HONOR, RICK SAVERI ON BEHALF OF THE

20  DIRECT PURCHASERS.  CRT, I'M LEAD COUNSEL IN CRT FOR THE DIRECT

21  PURCHASERS.  AND IN THERE WE HAD TWO BIG POTS OF MONEY.  THE

22  FIRST POT, BUT AS WE WERE MOVING ALONG TOWARD TRIAL AND WE SENT

23  OUT CLAIM FORMS THERE, WE THEN BEGAN TO SETTLE SORT OF THE SECOND

24  POT.

25      SO IT HAS BEEN APPROVED BY JUDGE TIGAR.  THE MONEY'S ALL

1  GETTING COMBINED FOR A SINGLE POT TO BE DISTRIBUTE.  BUT AS

2  MR. SIMON SAID, YOU KNOW, WE HAVE DIRECT MAILING WITH THE CLASS.

3      WE HAVE THE CLASS NAMES, CLAIMS ADMINISTRATOR.  WE'RE IN

4  CONTACT WITH THEM.  CLAIM FORMS ARE BEING SUBMITTED.  AND IT ALL

5  GETS DISTRIBUTED PRO RATA.  SO THERE'S NO REMAINDER ON THE DIRECT

6  PURCHASER SIDE.

7      THE OTHER THING OF WHY WE ALSO WANTED TO WAIT FOR ONE POT,

8  ONE DISTRIBUTION IS THE AUDIT PROCESS, TOO, BECAUSE THERE'S A

9  TENDENCY IN THE DIRECT PURCHASER CASES, YOU KNOW, A LOT OF CLAIMS

10  WILL COME IN.  AND SOMETIMES THERE'S A LOT OF PEOPLE PUTTING IN

11  CLAIMS FOR ALL DIFFERENT TYPES OF PRODUCTS, AND SO YOU HAVE TO

12  AUDIT THE CLAIMS.  AND SOMETIMES THE AUDITS CAN BE COSTLY.

13      SO IF YOU HAVE DIFFERENT ROUNDS OF MULTIPLE CLAIM FORMS

14  COMING IN THAT CAN DRIVE THE COSTS ON THE AUDIT.

15      IN DRAM I WAS LEAD COUNSEL FOR THE DIRECT PURCHASERS, IN

16  DRAM.  IN DRAM WE HAD TWO DISTRIBUTIONS, AS MR. FRIEDMAN SAID.

17  YOU KNOW, THERE WAS ONE BIG POT OF MONEY.  WE DID A CLAIMS

18  PROCESS, AND THAT WAS DISTRIBUTED.  AND THEN, WE HAD ANOTHER

19  SETTLEMENTS LATER WITH THREE ADDITIONAL DEFENDANTS.

20      BUT -- AND THEN, I WAS IN SRAM ON THE EXECUTIVE COMMITTEE ON

21  THE DIRECT PURCHASER SIDE, ALSO PRO RATA NORMAL CLAIMS

22  DISTRIBUTION.

23      I'M LEAD COUNSEL IN THE ODD DIRECT PURCHASER LITIGATION.

24  THERE WE ARE IN THE MIDDLE OF THE AUDITING OF THE CLAIMS PROCESS

25  AND WE ARE DOING ONE DISTRIBUTION, YOUR HONOR.

1          **THE COURT:**  SO THEN DO I TAKE IT -- MR. SIMON, DID YOU

2     WANT TO SAY SOMETHING ELSE?

3          **MR. SIMON:**  NO, I WAS JUST GOING TO SAY YOU ASKED A

4     QUESTION ABOUT MONEY AND REDISTRIBUTIONS.  TYPICALLY ALL THE

5     MONEY, AS MR. SAVERI SUGGESTED, ON THE DIRECT SIDE IS GIVEN OUT.

6     THERE MIGHT BE AT THE VERY END SOME UNCASHED CHECKS.  I THINK IT

7     WAS A VERY MINIMAL AMOUNT.  THAT DOESN'T MAKE SENSE TO, YOU KNOW,

8     ACTUALLY SEND IT BACK TO CLASS MEMBERS.  AND THEN SOMETIMES A CY

9     PRES IS ASKED FOR.  BUT THERE'S NO CY PRES BUILT INTO PRO RATA

10    ON THE DIRECT SIDE, AND I DON'T THINK NECESSARILY ON THE INDIRECT

11    SIDE, EITHER.

12          **THE COURT:**  SO YOU WERE GOING TO --

13          **MR. SAVERI:**  NO, I JUST WANT TO -- I WAS GOING TO ADD

14    ONE THING.  IN ALL THESE CASES WHAT I THINK YOUR HONOR IS ASKING

15    IS THERE ARE SETTLEMENTS ALL ALONG DURING THE PROCESS OF THE MDL,

16    AND YOU BUILD THAT FUND OF MONEY.

17          AND AS MR. FRIEDMAN SAID YOU LOOK AT IT AS YOU GO TO SEE THE

18    CRITICAL MASS.  IS NOW A GOOD TIME, DEPENDING ON THE STATUS OF

19    THE LITIGATION?  OR DO YOU WAIT TO DO WHAT IS MOST EFFICIENT AND

20    MOST BENEFICIAL FOR THE CLASS ON THE SIZE OF THE MONEY, THE

21    PERIOD OF TIME OF THE LITIGATION, OR ARE THERE ONGOING

22    SETTLEMENTS WITH OTHER DEFENDANTS IN THE WINGS OR ARE THERE

23    OUTSTANDING MOTIONS?

24          SO YOU ASSESS IT AS YOU GO.

25          **THE COURT:**  SO LET ME ASK THIS, THEN: YOU HAVE PROVIDED

1    ME WITH A SCHEDULE.

2              **MR. FRIEDMAN:**  YES.

3              **THE COURT:**  AND YOU'VE ALSO SAID THAT YOU ARE

4    APPROACHING CRITICAL MASS.

5              **MR. FRIEDMAN:**  YES.

6              **THE COURT:**  BUT YOU DIDN'T SAY YOU WERE AT CRITICAL

7    MASS.  SO IF WE'RE NOT AT CRITICAL MASS YET, THEN, WHY ARE WE

8    GOING THROUGH A PROCESS OF NOTIFICATION?  WHEN DOES FINAL

9    APPROVAL THEN COME AFTER WE HAVE AN INITIAL SENSE OF CLAIMS?  AND

10   IN LIGHT OF WHAT MR. SAVERI SAID, YOU KNOW, ARE THERE OTHER

11   THINGS OUT THERE THAT I MAY BE HEARING OF AND DOES IT MAKE SENSE

12   TO WAIT?

13             **MR. FRIEDMAN:**  SO GREAT QUESTION.  SO LET ME SEE IF I

14   CAN PROVIDE SOME CLARITY TO THIS.  THE IMPORTANCE -- SO THERE'S

15   TWO COMPONENTS THAT WE'RE OPERATING WITH.  ONE IS THE

16   DISTRIBUTION, WHEN TO DISTRIBUTE.  YOU OBVIOUSLY CAN'T DISTRIBUTE

17   UNTIL IT'S BEEN APPROVED FINALLY.

18        AND SO THE AIM IS TO GET THROUGH THE PROCESS THAT WILL THEN

19   ALLOW THE PARTIES AND THE COURTS TO ULTIMATELY DECIDE THE BEST

20   TIME TO DISTRIBUTE.  UNTIL WE GO THROUGH THAT PROCESS OF GETTING

21   THE COURT'S FINAL APPROVAL, THE FINAL JUDGMENT, HAVING TO DEAL

22   WITH OBJECTORS THAT ARE GOING TO COME IN, IN ALL OF THESE CASES.

23   THAT'S ANOTHER ONE THAT WE SEE ALL THE TIME.

24        UNTIL WE GET THROUGH THAT PART OF THE FUNNEL, THEN

25   DISTRIBUTION IS JUST SIMPLY THEORETICAL.  AND SO THE GOAL IS TO

1    TRY AND KEEP PUSHING THESE THROUGH THE MANUFACTURING LINE TO THE

2    POINT WHERE THE COURT HAS WEIGHED IN ON THE FAIRNESS OF IT,

3    HOPEFULLY GIVEN FINAL APPROVAL OF IT, AND THEN US PRESENTING TO

4    THE COURT:

5              "YOUR HONOR, WE BELIEVE NOW IS AN EFFICIENT TIME TO

6         DISTRIBUTE."

7         SO ALL ALONG -- AND HERE'S WHAT ENDS UP HAPPENING, YOUR

8    HONOR, WHILE THIS IS HAPPENING.  SO LET'S ASSUME HYPOTHETICALLY

9    YOU GAVE PRELIMINARY APPROVAL.  AND EVEN IF YOU -- YOU KNOW, SONY

10   IS STILL PENDING.  EVEN AT SOME POINT YOU APPROVED FINALLY SONY,

11   AND THEN WE GET FINAL APPROVAL OF THESE SETTLEMENTS, ALONG THE

12   WAY, WE'RE GOING TO BE EDUCATED AS TO IF THE COURT AGREES WITH,

13   AT LEAST PRELIMINARILY, AND FINALLY WITH THESE THREE DEFENDANTS'

14   SETTLEMENTS, WE'RE GOING TO KNOW WHETHER THERE'S ADDITIONAL

15   SETTLEMENTS, WHETHER THE CLASS IS CERTIFIED OR NOT, WHETHER

16   THERE'S NEGOTIATIONS.

17        I MEAN, THIS IS WHAT MR. SAVERI WAS SAYING.  WE'RE GOING TO

18   BE, AS WELL AS THE COURT IS GOING TO BE INFORMED HOW WE ARE

19   PROGRESSING.  THAT THEN TELLS US WHETHER TO DISTRIBUTE.

20        I'LL GIVE YOU ANOTHER EXAMPLE.  SO IN THE LEAD IN THE

21   ANIMATION CASE IN FRONT OF JUDGE KOH. SO WE HAD REACHED A POINT

22   WHERE WE WERE GOING FOR PRELIMINARY APPROVAL OF A DEFENDANT.  IT

23   WAS THE SECOND TO LAST DEFENDANT.  AND WE WERE ABOUT TO

24   DISTRIBUTE THE OTHER SETTLEMENT MONEY.  AND THEN, WE GOT

25   AGREEMENT WITH THE SECOND TO LAST DEFENDANT.

1          AND WE SAID TO JUDGE KOH:

2               "WE'D LIKE TO HOLD OFF TO DISTRIBUTE BECAUSE WE'RE

3          ABOUT TO GET ANOTHER, AND IT'S SIZABLE."

4          JUDGE KOH AGREED.  SOON THEREAFTER WE ENTERED INTO THE FINAL

5     SETTLEMENT WITH THE LAST DEFENDANT IN THE CASE, ANOTHER FAIRLY

6     SIZABLE DEFENDANT.

7          SO AS WE GOT TO CRITICAL MASS WE WERE ABLE TO SEE IN REAL

8     TIME:

9               "OKAY.  WE'RE ABOUT TO SETTLE WITH ANOTHER.  WE'RE

10         GOING TO HOLD OFF" -- VERSUS -- "WE'RE NOWHERE CLOSE," OR,

11    YOU KNOW WE'RE AT ANOTHER STAGE.

12         SO THERE'S THESE MILESTONES IN THE CASE THAT FREQUENTLY

13    ACCOMPANY WHETHER THE CASE IS GOING TO SETTLE WITH CERTAIN

14    DEFENDANTS OR NOT.

15         AND WE HAVE THAT EXPERIENCE TO THEN ALLOW US TO SAY TO THE

16    COURT:

17              "YOUR HONOR, WE THINK IT'S TIME TO DISTRIBUTE."

18         AND THE COURT SAYS:

19              "WHY NOW?"

20         AND WE SAY:

21              "WE'RE NOT CLOSE IN ANY NEAR FUTURE TIME TO RESOLVING

22         THIS ABSENT, YOU KNOW, SOMETHING UNUSUAL."

23              **THE COURT:**  SO LET ME ASK THIS.

24              **MR. FRIEDMAN:**  YES.

25              **THE COURT:**  IF YOU ARE A CLASS MEMBER AND YOU HAVE A

1    DEADLINE TO OPT-OUT, YOU HAVE TO HAVE ENOUGH INFORMATION TO MAKE

2    A JUDGMENT CALL.  FOR PROFESSIONAL OBJECTORS, YOU KNOW, THEY ARE

3    GOING TO -- WHAT DO THEY DO?  THEY TEND TO OBJECT ON THE BASIS OF

4    LACK OF INFORMATION OR OTHER KINDS OF ROUTINE SETS OF OBJECTIONS

5    THAT THEY MAKE.

6        SO WHAT IS IT THEN THAT YOU -- WHAT IS IT THAT YOU CAN THEN

7    SAY NOW TO ANY OF THESE PEOPLE TO ALLOW THEM TO ENGAGE IN A

8    MEANINGFUL WAY IN THE PROCESS?

9        AND DOES AN ORDER HAVE TO SAY -- AND BY THE WAY -- OR SHOULD

10   THE ORDER JUST SAY:

11           "LOOK, I UNDERSTAND THAT."  OKAY, AS I STARTED, RIGHT?

12       "HAPPY THAT PEOPLE ARE SETTLING.  LOOKING AT THE AMOUNTS.

13       LOOKING AT THE POTENTIAL PERCENTAGE RECOVERY, ET CETERA.

14       BUT EVERYTHING IS STILL UP IN THE AIR.  SO THIS IS

15       TENTATIVELY APPROVED UNTIL WE KNOW MORE."

16       I MEAN, I'M STILL KIND OF STRUGGLING ON HOW WE CAN EVEN GO

17   THROUGH ONE PHASE OF THIS WITHOUT A BIT MORE INFORMATION.

18       **MR. FRIEDMAN:**  SO I APPRECIATE IT.  AND THE COURT'S

19   AGAIN PUTTING ITS FINGER RIGHT ON SORT OF A PARADOX.  AND ONE OF

20   THE THINGS I THINK THE COURT IS HIGHLIGHTING IS THE INFORMATION

21   OF CLASS MEMBERS, RIGHT?

22       AND LET ME TAKE A COUPLE OF LAYERS OF THAT.  ONE LAYER IS

23   HOW MUCH:  HOW MUCH AM I GOING TO GET, RIGHT?  THAT'S JUST A

24   BASIC QUESTION.

25       AND THERE'S TWO SCHOOLS.  ONE IS A SCHOOL THAT SAYS, YOU

1  KNOW:

2          "IT'S GOING TO BE PRO RATA.  THEREFORE, WE CAN'T

3      ESTIMATE IT."

4      ANOTHER IS TO GIVE A RANGE.  AND WHAT HAPPENED IN <u>MILK</u> IN

5  THE ANTITRUST CASE WITH JUDGE WHITE -- AND THIS IS SOMETHING THAT

6  JUDGE WHITE HAD AN ISSUE WITH -- WE DID NOT, BECAUSE WE DON'T

7  KNOW HOW MANY CLAIMANTS THERE ARE GOING TO BE.

8      AND SO FOR THESE GROUP OF SETTLEMENTS WE HAVE A FIXED

9  NUMBER, YOUR HONOR, RIGHT?  BECAUSE IF SOMEONE OPTS OUT OF THIS

10  THEY CAN STILL BE IN ANOTHER SETTLEMENT IN THE FUTURE.

11      THEY ARE NOT -- WHEN SOMEONE OPTS OUT OR OBJECTS THAT

12  DOESN'T AFFECT THEM FOR A LATER SETTLEMENT THAT OCCURS, RIGHT?

13  JUST FOR THIS.

14      SO THEY KNOW.  LET'S ASSUME THERE WAS $64 MILLION POT HERE.

15  SO IN NOTICE WE TELL THEM:

16          "THERE'S $64,450,000."  AND WHAT WE CAN EITHER SAY IS:

17          "YOU ARE GOING TO GET A PRO RATA AMOUNT.  WE DON'T KNOW

18      HOW MANY CLAIMANTS THERE IS GOING TO BE, SO WE CAN'T TELL

19      YOU HOW MUCH MONEY YOU ARE GOING TO GET."

20      THE OTHER IS:

21          "WE'LL GIVE YOU AN ESTIMATE IN THE NOTICE."

22      WHAT JUDGE WHITE THEN HAD US DO WAS ON THE WEBSITE WE GIVE

23  AN ESTIMATE.  AND AS YOU GOT MORE AND MORE INFORMATION IN TERMS

24  OF HOW MANY CLAIMANTS, WE STARTED ADJUSTING DOWN, BECAUSE IT WENT

25  FROM 200,000 CLAIMANTS, WHERE WE SAID:

1     "YOU ARE GOING TO GET 40 TO $80," TO FOUR MILLION.  AND

2  IT WAS THEN CHANGED TO BETWEEN FIVE AND TEN DOLLARS.

3     AND WE JUST KEPT ADJUSTING IT AND KEPT ADJUSTING IT.  BUT

4  YOU CAN'T REALLY -- YOU HAVE TO CHOOSE ONE OR THE OTHER IN TERMS

5  OF THAT.

6     OR, YOUR HONOR, YOU CAN SAY:

7        "WELL, I'M ONLY GOING TO ULTIMATELY, WHEN THE WHOLE

8        THING IS OVER, WHEN EVERYTHING IS OVER, THEN I'M GOING TO DO

9        PRELIMINARY APPROVAL."

10     BUT THAT DOESN'T GET RID OF THE PROBLEM I'M TALKING ABOUT,

11  YOUR HONOR, WHICH IS WE DON'T KNOW HOW MANY CLAIMANTS THERE ARE

12  GOING TO BE.  THAT'S WHY YOU PUT YOUR FINGER ON THE PARADOX WHICH

13  WE WRESTLE WITH ALL THE TIME.

14     **THE COURT:**  SO NOW LET'S GO TO THE FACT THAT YOU'VE

15  GIVEN ME SPECIFIC DATES.  THOSE REAL DATES OR NOT?  AND I

16  PROBABLY, BY THE WAY, NEED AN UPDATED -- YOU'RE ALSO ASKING THAT

17  I DO THESE ALL KIND OF COLLECTIVELY TOGETHER.  AND IT SEEMS TO ME

18  IT WOULD BE HELPFUL TO HAVE A NEW PROPOSED FORM OF ORDER --

19     **MR. FRIEDMAN:**  YES.

20     **THE COURT:**  -- THAT ADDRESSES ALL OF THEM.

21     **MR. FRIEDMAN:**  YES.

22     **THE COURT:**  BUT IT'S NOT CLEAR -- IT'S NOT CLEAR TO ME

23  THAT A NOTICE CAMPAIGN WOULD BEGIN IN ABOUT SIX WEEKS OR WOULD

24  IT?

25     **MR. FRIEDMAN:**  YES.

1          **THE COURT:**  SO HOW IS IT THEN THAT WE CAN HAVE A

2    FAIRNESS HEARING IN AUGUST IF IT'S NOT CLEAR THAT THERE'S GOING

3    TO BE A DISTRIBUTION BECAUSE IT'S NOT CLEAR THAT THERE'S CRITICAL

4    MASS?

5          **MR. FRIEDMAN:**  SO, YOUR HONOR, LET ME SEE IF I CAN

6    UNTANGLE THAT A LITTLE BIT, IF I UNDERSTAND IT.

7        THERE WILL BE A DISTRIBUTION.  THE ISSUE IS WHEN, RIGHT?

8    SO --

9          **THE COURT:**  RIGHT.  BUT I CAN'T -- I CAN'T APPROVE A

10   FINAL -- I CAN'T GIVE FINAL APPROVAL UNLESS I KNOW ULTIMATELY

11   WHAT THE PROCESS IS, WHETHER THERE ARE OPT-OUTS.  I MEAN, THERE'S

12   A LOT OF INFORMATION THAT I DON'T KNOW AT A PRELIMINARY STAGE

13   THAT I'M GOING TO HAVE TO KNOW AT A FINAL STAGE.

14       AND EVEN HERE YOU'VE GOT A CLOSE OF CLAIMS PERIOD TWO MONTHS

15   AFTER THE FAIRNESS HEARING.

16         **MR. FRIEDMAN:**  YES.

17         **THE COURT:**  SO HOW AM I -- HOW AM I SUPPOSED TO ASSESS

18   THAT?

19         **MR. FRIEDMAN:**  SO, YOUR HONOR, LET ME AGAIN -- YOU WILL

20   KNOW THE OPT-OUTS BECAUSE WE HAVE -- THERE WILL BE OPT-OUTS AHEAD

21   OF TIME, JUST LIKE IN EVERY CLASS ACTION.  YOU'LL HAVE A DEADLINE

22   BEFORE THE FAIRNESS HEARING, SO THAT IS NORMAL.  AND YOU WILL

23   KNOW WHO THE OBJECTORS ARE AND WHO THE OPT-OUTS ARE FOR THIS

24   GROUP.

25       THAT IS FAIRLY STRAIGHTFORWARD.  I DO BELIEVE IN TERMS OF --

1  YOU ARE ABSOLUTELY RIGHT, AND I WANT TO THINK ABOUT IT IN TERMS

2  OF WHETHER WE SHOULD PROPOSE TO YOU AND INCLUDE IN THE NOTICE THE

3  PROPOSED FORM AND PROCEDURE OF DISTRIBUTION, SO THAT IN YOUR

4  PRELIMINARY APPROVAL AND IN THE NOTICE THAT WE HAVE MORE DETAIL

5  ON THAT ISSUE.

6       I THINK -- I THINK THAT I'D LIKE TO THINK ABOUT THAT AND

7  RESPOND TO THE COURT IN TERMS OF A SUGGESTION ON THAT BECAUSE I

8  DO THINK THAT THAT MAY BE AN ISSUE THAT I WANT TO HAVE THE COURT

9  ASSESS PRELIMINARILY.  AND THAT IT IS SUFFICIENT -- MAKING SURE

10 IT IS SUFFICIENT IN THE NOTICE.  AND I DON'T KNOW THAT IT IS

11 RIGHT NOW.

12          **THE COURT:**  WELL, IT'S PRETTY SPARSE RIGHT NOW.

13          **MR. FRIEDMAN:**  AGREED.  SO I WOULD ASK -- I WOULD ASK

14 FOR THAT BECAUSE I THINK THE COURT HAS PUT ITS FINGER ON AN ISSUE

15 THAT HAS NOT -- IN THIS CASE HAS NOT CAUGHT UP TO IT BECAUSE OF

16 MUCH OF DOING IT IN MILK.

17      AND SO I THINK WE NEED TO THINK ABOUT THAT AND PRESENT IT TO

18 THE COURT FOR THE COURT TO CONSIDER NOW AS OPPOSED TO DOWN THE

19 ROAD.  AND THAT WON'T TAKE US A LONG TIME TO PRESENT TO THE

20 COURT.

21          **THE COURT:**  OKAY.  AND WHAT ABOUT THE OTHER ISSUE OF

22 HAVING A FINAL DECISION WITHOUT, IN FACT, HAVING A DECISION ON

23 DISTRIBUTION?

24          **MR. FRIEDMAN:**  IN TERMS OF WHEN TO DISTRIBUTE?  IS THAT

25 THE COURT'S QUESTION?

1    **THE COURT:**  CORRECT.

2         **MR. FRIEDMAN:**  IF WE DON'T HAVE A FINAL DECISION ON

3    WHEN WE DISTRIBUTE?

4         **THE COURT:**  WELL, NOT JUST ON WHEN.  I MEAN, AND

5    PERHAPS IT DEPENDS ON WHETHER THIS ELECTRONIC, THIS NEW APPROACH

6    IS AN EFFICIENT WAY TO DO IT.  BUT IT SEEMS TO ME THAT YOU, AS

7    CLASS COUNSEL, NEED TO KNOW IF -- WHAT I DON'T WANT TO DO IS GET

8    TO THE POINT -- AND IT MAKES IT COMPLICATED.  AND WHEN I'VE HAD

9    TO DO IT, I'VE DONE IT.  I PRELIMINARILY APPROVE SOMETHING, AND

10   THEN WE GET TO THE FINAL AND ALL SORTS OF THINGS HAVE GOTTEN

11   SCREWED UP.

12        THE PROCESS DIDN'T WORK.  THE CLAIMS NUMBERS DIDN'T COME IN

13   THE WAY WE WANTED, ET CETERA.  AND SO WITH THAT INFORMATION I

14   ULTIMATELY SOMETIMES HAVE TO SAY:

15        "SORRY."

16        **MR. FRIEDMAN:**  RIGHT.

17        **THE COURT:**  "NO FINAL APPROVAL.  GO BACK TO THE DRAWING

18        BOARD."

19        YOU KNOW, AND SO PERHAPS THAT'S WHAT YOU'RE THINKING WITH

20   RESPECT TO THE THIS.  I CAN TELL YOU STILL I HAVEN'T EVEN GOTTEN

21   TO IT.  THERE'S THE ISSUE WITH ATTORNEY'S FEES AND HOW ALL OF

22   THAT GETS SLICED AND DICED GIVEN THAT THERE'S STILL WORK BEING

23   DONE, SUBSTANTIAL AMOUNTS OF WORK BEING DONE.  THERE'S MORE

24   DEFENDANTS.  EVERYONE IS JOINT AND SEVERALLY LIABLE, ET CETERA.

25   SO THAT'S A WHOLLY SEPARATE ISSUE.

1    BUT IF YOU KNOW TODAY THAT, YOU KNOW, IT'S SIXTY-FOUR

2    FOUR-FIFTY YOU'RE NOT -- WE'RE NOT READY TO DISTRIBUTE, THEN WHY

3    ARE WE GOING THROUGH -- WHY ARE SPENDING THE MONEY TO GO THROUGH

4    THIS CLAIMS PROCESS?

5         **MR. FRIEDMAN:**  SO, YOUR HONOR, A COUPLE OF THINGS.  ONE

6    IS AT SIXTY-FOUR FOUR-FIFTY, IF I PRESENT TO YOU WHAT I BELIEVE I

7    WILL BE PRESENTING TO YOU, WHICH IS FOR ELECTRONIC DISTRIBUTION,

8    THEN THE EFFICIENCY BEHIND ELECTRONIC DISTRIBUTION, WHICH IS WHY

9    I'VE PUSHED REALLY HARD FOR IT, MAKES DISTRIBUTION VERY FEASIBLE

10   IN NOT HAVING TO WAIT.

11        **THE COURT:**  AT SIXTY-FOUR FOUR-FIFTY.

12        **MR. FRIEDMAN:**  ABSOLUTELY.

13        **THE COURT:**  OKAY.

14        **MR. FRIEDMAN:**  ABSOLUTELY.

15        **THE COURT:**  SO THAT'S A LITTLE BIT DIFFERENT THAN

16   SAYING:

17         "WE'RE NOT YET AT CRITICAL MASS."

18        **MR. FRIEDMAN:**  ABSOLUTELY.

19        **THE COURT:**  ALL RIGHT.

20        **MR. FRIEDMAN:**  AND, AGAIN, I JUST DON'T WANT TO

21   OVERPROMISE BECAUSE I'M WATCHING IT IN REAL TIME HAPPENING IN THE

22   MILK ANTITRUST CASE.  AND I'M GUARDEDLY OPTIMISTIC THAT IT'S

23   WORKING.  AND YET IT IS THE PILOT.

24        AND SO WHEN WE CAME IN HERE AND FILED FOR PRELIMINARY

25   APPROVAL I'M NOT SAYING WE DID IT PREMATURELY ON ANY OF THESE,

1    BUT IT'S BEEN A -- IT'S GONE ON IN REAL TIME IN A COURTROOM VERY

2    CLOSE TO YOU.

3         SO BUT I'M ANTICIPATING COMING BEFORE YOU AND SAYING:

4              "YOUR HONOR, WE WANT TO USE ELECTRONIC DISTRIBUTION.

5         WE BELIEVE WE ARE EFFICIENTLY GOING TO BE ABLE TO DO IT.

6         SIXTY-FOUR FOUR-FIFTY IS ENOUGH MONEY TO DO IT.  WE'D LIKE

7         TO DO IT.  AND, IN FACT, HOPEFULLY, YOU KNOW, AT THE END OF

8         THE DAY, WE'LL SAY DISTRIBUTION IS GOING TO HAPPEN SOON

9         AFTER WE GET FINAL APPROVAL AND IT BECOMES FINAL.  AND BY

10        THE WAY, WE'RE ALSO SEEING VISIBILITY THAT WE'RE GOING TO

11        ASK YOU TO HOLD OFF BECAUSE WE HAVE ANOTHER SETTLEMENT OF

12        SIZABLE AMOUNT THAT WE'RE GOING TO ADD TO THE POT.  AND

13        THEN, WE'LL DECIDE AT THAT POINT IN TIME WHETHER WE HOLD

14        OFF OR NOT."

15             **THE COURT:**  SO IS THERE ANYTHING ELSE IN THE WORKS OR

16   NOT?

17             **MR. FRIEDMAN:**  YOUR HONOR, I THINK IN TERMS OF WHAT I

18   CAN SAY IS THAT WE ARE -- WE ARE -- FROM PLAINTIFFS' PERSPECTIVE

19   WE ARE GOING -- WE'RE MAKING EFFORTS TO SEE IF RESOLUTION CAN

20   OCCUR NEAR TERM.  WE'RE MAKING THOSE EFFORTS CURRENTLY, NEAR

21   TERM, YOUR HONOR.

22             **THE COURT:**  WE DIDN'T TALK ABOUT CLOSING THE CLAIMS

23   PERIOD BEFORE OR AFTER THE FAIRNESS HEARING.  USUALLY, AGAIN, I

24   WOULD HAVE ALL THE NUMBERS BEFORE DOING A FINAL APPROVAL.

25             **MR. FRIEDMAN:**  SO THE COURT'S HITTING ON EVERY SINGLE

1   PET ISSUE THAT I HAVE IN CLASS ACTIONS DOWN THE LINE.  SO THE LAW

2   IN THE NINTH CIRCUIT, UNLESS IT GETS CHANGED BY ACTS OF CONGRESS

3   AFOOT, IS THAT YOU LOOK AT THE AMOUNT OF MONEY MADE AVAILABLE.

4   IT'S NOT A COUPON SETTLEMENT AND MONEY IS NOT REVERTING.  THERE'S

5   NO REVERTING TO ANY DEFENDANTS.

6        AND SO YOU LOOK AT THE AMOUNT OF MONEY THAT IS MADE

7   AVAILABLE TO CLASS MEMBERS.  AND IF THAT AMOUNT OF MONEY ENDS UP

8   GOING TO CLASS MEMBERS OR ECHEATS OR GOES TO CY PRES, THEN THAT

9   DOES NOT REFLECT ON THE COURT'S ULTIMATE DECISION.

10       NOW, AGAIN, THERE'S PLENTY OF SETTLEMENTS THAT ARE

11  CONSTRUCTED IN A WAY THAT'S DOESN'T HAVE A CHANCE OF GOING TO

12  CLASS MEMBERS.  AND THE COURT, OF COURSE, LOOKS AT THAT AND SAYS

13  WHETHER OR NOT THAT WAS NOT A MEANINGFUL RESULT FOR ANY CLASS

14  MEMBERS.

15       THAT IS DIFFERENT, YOUR HONOR, THAN WHAT WE'RE TALKING ABOUT

16  IN THIS TYPE OF CASE WHERE YOU WILL RUN INTO THE PROBLEM WHETHER

17  WE GOT A HUNDRED MILLION DOLLARS OR A BILLION DOLLARS,

18  IT'S -- THAT DOESN'T REFLECT ON THE -- IT DOES NOT REFLECT ON THE

19  QUALITY OF THE RESULT.

20       IT REFLECTS ON THE CLAIMS RATE WHICH IS THE PROBLEM THAT

21  I'VE DESCRIBED TO YOU.  IT HAPPENS IN EVERY CLASS CASE.  AND

22  THAT'S WHY THE COURTS IN THE NINTH CIRCUIT IN BOEING HAVE SAID:

23            "YOU LOOK AT WHAT IS MADE AVAILABLE."

24       WE'RE GOING TO DO OUR BEST, AS I'VE SCRIBBLED TO YOU, TO TRY

25  AND DISTRIBUTE EVERY SINGLE DOLLAR TO CLASS MEMBERS.  BUT LET ME

1   RAISE ONE OTHER ISSUE WITH THE COURT, WHICH IS, YOU KNOW, THERE

2   ARE COURTS THAT HAVE SAID YOU CAN HAVE A CLAIMS RATE -- AND I'M

3   SORT OF ALLUDING TO THIS IN LCD OR SOME OF THESE OTHER CASES.  I

4   WASN'T THERE, BUT YOU CAN HAVE A CLAIMS RATE THAT IS LOW THAT

5   RESULTS IN CLASS MEMBERS WHO WERE INJURED GETTING WHAT PEOPLE

6   CALL "A WINDFALL."  THEY GOT MORE THAN TREBLE DAMAGES.

7       BUT SO THEIR TREBLE DAMAGES MAY HAVE BEEN $50.  AND THEY END

8   UP GETTING, IF WE'RE ALLOWED TO, $300.

9           **THE COURT:**  OKAY.  BUT SO THE LAW DOESN'T REQUIRE IT.

10          **MR. FRIEDMAN:**  CORRECT.

11          **THE COURT:**  SO WHAT?  THAT DOESN'T EXPLAIN WHY I WOULD

12  DEPART FROM A NORMAL PRACTICE AND HAVE EVERYTHING IN FRONT OF ME

13  BEFORE I DO A FINAL APPROVAL.

14          **MR. FRIEDMAN:**  YOU'RE JUST TALKING ABOUT THE CLAIMS

15  RATE?

16          **THE COURT:**  I'M TALKING ABOUT THE CLOSE OF THE CLAIMS

17  PERIOD.

18          **MR. FRIEDMAN:**  SO, YOUR HONOR, I HAVE TO TELL YOU THAT

19  NOT QUESTIONING YOUR NORMAL PRACTICE, BUT THERE'S A LOT OF

20  PRACTICES, MY E BOOKS CASE IN FRONT OF JUDGE WHITE, WHERE THE

21  CLAIMS RATE HAS GONE PAST THE FINAL APPROVAL POINT.

22      SO THAT IS --

23          **THE COURT:**  WHAT WOULD BE THE BENEFIT?  WHAT'S THE

24  BENEFIT OF THAT?  IF JUDGES ARE MAKING CHOICES --

25          **MR. FRIEDMAN:**  SURE.

1    **THE COURT:**  -- THEN WHY WOULD YOU GOING GO -- BECAUSE

2    IT DOESN'T REALLY MATTER, RIGHT?  YOU HAVE IT -- LET'S SAY RIGHT

3    NOW YOU HAVE IT SEPTEMBER 30TH.  SO I HAVE A HEARING ON, YOU

4    KNOW, OCTOBER 6.  I MEAN, WHAT DOES IT MATTER?  WHAT ARE THE PROS

5    AND CONS OF DOING THIS APPROACH HAS OPPOSED TO JUST WAITING?

6         **MR. FRIEDMAN:**  FOR THE FINAL APPROVAL TO OCCUR AFTER

7    THE CLOSE?  YOU CLEARLY CAN DO THAT, YOUR HONOR.  THE PROS IS

8    THAT YOU CAN EXTEND THE CLAIMS PERIOD LONGER TO GIVE MORE PEOPLE

9    OPPORTUNITY TO CLAIM.  THAT IS ALLOWING A LONGER CLAIMS RATE

10   PERIOD.  IT POTENTIALLY INCREASES COSTS.

11        **THE COURT:**  I'M JUST TRYING TO UNDERSTAND WHY JUDGES

12   WOULD HAVE FINAL APPROVAL BEFORE THE CLOSE OF -- I'M TRYING TO

13   UNDERSTAND THE LOGIC.

14        **MR. FRIEDMAN:**  I UNDERSTAND.

15        **THE COURT:**  IF IT'S NOT -- IF IT'S NOT REQUIRED BY LAW,

16   I'M TRYING TO UNDERSTAND THE LOGIC.  AND I DON'T SEE THE LOGIC

17   QUITE YET.

18        **MR. FRIEDMAN:**  OKAY.  YOUR HONOR, WHAT I'M DOING A BAD

19   JOB EXPLAINING IT IS THAT IN -- YOU CAN SET THE CLOSE OF THE

20   CLAIMS RATE BEFORE THE FINAL APPROVAL HEARING, ABSOLUTELY.  YOU

21   CAN SET IT AFTER.

22        THERE'S NO LEGAL REQUIREMENT EITHER WAY.  IF THE COURT

23   BELIEVES IT WANTS WHAT THE FINAL NUMBER IS BEFORE IT MAKES AN

24   ASSESSMENT, COURT CAN DO THAT.

25        AND WHAT I WAS SIMPLY TRYING TO ARTICULATE IS THAT IN TERMS

 1  OF WHETHER IT'S FAIR OR NOT, THE SETTLEMENT, WHICH IS WHAT YOU'RE

 2  DECIDING, IS ONE IN WHICH --

 3        **THE COURT:**  AND THAT WAS HELPFUL.  I JUST -- WE ALL DO

 4  THINGS SLIGHTLY DIFFERENTLY.  SOMETIMES THERE'S NO REASON.

 5  SOMETIMES IT'S PERSONAL PREFERENCE.

 6        **MR. FRIEDMAN:**  RIGHT.

 7        **THE COURT:**  AND I'M TRYING TO FIGURE OUT IF THERE'S

 8  SOME LOGICAL REASON FOR DOING IT ONE WAY VERSUS THE OTHER.  NOW,

 9  OBVIOUSLY, IF IT WAS A COUPON SETTLEMENT WHICH ARE HIGHLY, YOU

10  KNOW, DISFAVORED, YOU NEED TO KNOW.

11        **MR. FRIEDMAN:**  ABSOLUTELY.

12        **THE COURT:**  BUT -- AND PERHAPS THAT'S WHY I'M USED TO

13  DOING IT THAT WAY JUST BECAUSE, YOU KNOW, IT'S A NORMAL PRACTICE

14  IN CERTAIN KINDS OF CASES.

15        **MR. FRIEDMAN:**  THE ONLY REASON, YOUR HONOR, IS IF YOU

16  WANTED TO HAVE A FINAL APPROVAL THAT THEN WOULD MAKE THE CASE

17  FINAL, AND THEN YOU COULD HAVE DISTRIBUTION SOONER.  AND,

18  THEREFORE, YOU WOULD WANT TO HAVE THE CLAIMS RATE EARLIER IF YOU

19  WANT THAT INFORMATION.  AND ALL THIS PROPOSAL DOES IS GIVE A

20  LONGER PERIOD FOR PEOPLE TO CLAIM.  THAT'S IT.

21        **THE COURT:**  LET ME ASK THIS: DO YOU FIND IN TERMS OF

22  RESPONSIVENESS THAT IN THESE KINDS OF CASES YOU NEED A CERTAIN

23  LENGTH OF PERIOD SO THAT PEOPLE ACTUALLY, YOU KNOW -- OR ARE MOST

24  CONSUMERS JUST LIKE LAWYERS AND THEY WAIT UNTIL THE LAST MINUTE

25  ANYWAY?

1      **MR. FRIEDMAN:**  SO, HERE'S -- THE ANSWER IS YOU DON'T --

2  YOU DON'T GET A HOCKEY STICK, BECAUSE A LOT OF TIMES THIS PIECE

3  OF INFORMATION IT'S NOT A BIG ENOUGH DEAL THAT PEOPLE PUT IT IN

4  THEIR POCKET AND SAY:

5           "I'M GOING TO WAIT 90 DAYS TO THEN FILL OUT THIS FORM

6      FOR THE $5 OR $15 OR $20."  PEOPLE'S BEHAVIOR DOESN'T -- WE

7  DON'T SEE THAT IN THE DATA.  I HAVEN'T SEEN THAT AS A

8  CONSISTENCY.

9       WHAT WE'VE SEEN, YOUR HONOR, MOSTLY THAT DRIVES -- AND THIS

10  WAS THE PILOT CASE AND THE USE CASE THAT HAPPENED THAT WENT FROM

11  $200,000 THAT HAD MANY MONTHS TO FOUR MILLION, WAS THAT THEY ARE

12  GETTING BETTER.

13       SOME OUTFITS, ADMINISTRATORS ARE GETTING BETTER AT USING

14  SOCIAL MEDIA IN WAYS THAT GENERATES INTEREST AND LIKES AND POKES

15  AND ALL OF THOSE THINGS THAT HAPPEN.  AND THAT WHAT ENDED UP

16  HAPPENING THAT WE WERE ABLE TO TRACE IS THAT ON FACEBOOK THEY

17  WERE ABLE TO SEED AN AREA WHICH GOT PICKED UP BY LOCAL NEWS

18  CONSUMER REPORTS.

19       AND THOSE CONSUMER REPORTS WERE POSTED ON IN IOWA, IN

20  ILLINOIS, AND AT VARIOUS LOCAL NEWS WEBSITES POSTED.

21       AND THEY POSTED THE LINK, YOUR HONOR, TO THE WEBSITE WITH

22  THE CLAIM FORM.  AND THAT DROVE -- IT WAS AN UNBELIEVABLE AMOUNT

23  OF TRAFFIC THAT DROVE CLAIMS 20-FOLD FROM 200,000 TO FOUR MILLION

24  JUST ON THAT.

25       AND SO IT'S THOSE TYPE OF THINGS THAT ARE DRIVING THE

ABILITY TO -- WHICH IS WHAT WE'RE TRYING TO DO:  DRIVE UP CLAIMS

AND DISTRIBUTION.  IT'S THOSE TYPE OF SORT OF MORE ELECTRONIC

LEARNING THAT IS HAPPENING THAN ANYTHING ELSE THAT WE'RE SEEING.

   **THE COURT:**  SO UNDER THIS PROPOSAL, YOU HAVE

FIVE-AND-A-HALF MONTHS FOR A CLAIMS PERIOD.  IS THERE MAGIC TO

THAT AMOUNT?

   **MR. FRIEDMAN:**  NO.

   **THE COURT:**  WHAT WOULD YOU SAY IS THE SHORTEST AND WHAT

IS THE LONGEST?

   **MR. FRIEDMAN:**  SO, YOUR HONOR, I'M THINKING.  I THINK

BETWEEN THREE MONTHS AND SEVEN MONTHS, SORT OF THE THREE TO SIX

MONTHS WHAT IS I'VE SEEN.

  THOSE ARE SORT OF THE BRACKETS IN THE MEDIAN OR THE AVERAGE,

I SHOULD SAY, THE MEAN.

   **THE COURT:**  OKAY.  AND THEN, THE CY PRES, THIS IS GOING

TO THE STATE GOVERNMENTS, IS THAT --

   **MR. FRIEDMAN:**  I THINK IT'S A ESCHEATING, YOUR HONOR.

   **THE COURT:**  OH, OKAY.

   **MR. FRIEDMAN:**  I BELIEVE IT'S ESCHEATING.  RIGHT?

   **THE COURT:**  AND THE 750,000 ADMIN COSTS THAT'S ACROSS

ALL OF THEM?  THAT'S THE ESTIMATE?

   **MR. FRIEDMAN:**  YES.  NOW, THAT DOES NOT INCLUDE

DISTRIBUTION, YOUR HONOR, WHICH IS WHAT I WANT TO GO AND WORK

OUT --

   **THE COURT:**  OKAY.

1       **MR. FRIEDMAN:** -- TO DEAL WITH THIS, WHICH IS THE ISSUE

2  THAT WE'RE TALKING ABOUT.

3       **THE COURT:** HOW LONG IS THE CLAIM PERIOD IN THE <u>MILK</u>

4  CASE?

5       **MR. FRIEDMAN:** I WAS JUST THINKING ABOUT THAT, YOUR

6  HONOR. I BELIEVE -- AND, AGAIN, CLAIM PERIOD JUST CLOSED

7  JANUARY 31ST. THE FINAL APPROVAL, I BELIEVE, WAS DECEMBER 16.

8  SO IT WAS FINAL APPROVAL, AND THEN WE HAD A MONTH-AND-A-HALF LAG.

9  I WANT TO SAY THE CLAIM PERIOD WAS FOUR MONTHS?

10     MR. EIMER, ABOUT?

11      **MR. EMIER:** ABOUT THAT, YES, SIR.

12      **MR. FRIEDMAN:** IT WAS ABOUT FOUR MONTHS, YOUR HONOR.

13     WE HAD PRELIMINARY APPROVAL, AND THEN A SIMILAR TYPE

14  SCHEDULE. SO IT WAS BETWEEN FOUR AND FIVE MONTHS, YOUR HONOR.

15      **THE COURT:** DO I TAKE IT THAT DEFENDANTS AT THIS POINT

16  HAVE YOU BEEN WAITING? THAT IS DISCOVERY IS ON HOLD, ET CETERA?

17  SO APPROVING THE SETTLEMENT WOULD BE HELPFUL FOR THE DEFENDANTS

18  IN THAT REGARD?

19      **MR. EMIER:** YOUR HONOR, ON BEHALF OF THE LG DEFENDANTS,

20  THAT'S CORRECT. ONE OF THE PRIME MOTIVATORS FOR THE DEFENDANTS

21  OF SETTLING A CASE IS TO HAVE THE EXPENSE AND DISRUPTION OF THE

22  CASE END. AND SO GETTING THE PRELIMINARY APPROVAL AND THE FINAL

23  APPROVAL ARE OBVIOUSLY IMPORTANT MOTIVATORS TO GETTING A CASE

24  SETTLED.

25      **THE COURT:** YOU DON'T WANT TO COME AND TRY THIS ONE?

1      **MR. EMIER:**  YOU'RE WELCOME TO DO THAT, BUT I HAVE A

2  FEELING THERE ARE OTHERS WHO PREFER NOT.

3      **THE COURT:**  ALL RIGHT.  SO HOW MUCH TIME, THEN, WOULD

4  YOU WANT TO GET BACK TO ME ON DISTRIBUTION, THE REVISED PROPOSED

5  FORM OF ORDER, ET CETERA?

6      **MR. FRIEDMAN:**  YOUR HONOR, TWO WEEKS, I THINK, WOULD BE

7  SUFFICIENT, IF THAT'S ACCEPTABLE TO THE COURT AND DEFENDANTS,

8  OBVIOUSLY.

9      **MR. EMIER:**  THAT'S FINE, YOUR HONOR.

10      **MR. FRIEDMAN:**  AND I'M HAPPY TO TALK TO THE DEFENDANTS

11  ABOUT THIS, AS WELL.

12      **MR. EMIER:**  MR. FRIEDMAN AND I HAVE WORKED THESE THINGS

13  OUT PRETTY QUICKLY BEFORE, AND AS THE MILK EXAMPLE SHOWS IT'S

14  QUITE STRAIGHTFORWARD.

15      **THE COURT:**  OKAY.  ALL RIGHT.  WELL, LET'S SEE.  TWO

16  WEEKS WOULD BE MARCH 14TH.

17      SO WHAT I WILL DO IS I WILL CONTINUE THIS HEARING TO MARCH

18  21ST.

19      FILE SOMETHING BY THE 14TH.  AND I CAN TAKE IT OFF CALENDAR

20  UNLESS YOU CAN'T MAKE IT.  BUT I WOULD SAY IN CASE I HAVE

21  QUESTIONS I WANT TO HAVE SOMETHING ON THE CALENDAR.

22      **MR. FRIEDMAN:**  SO, YOUR HONOR, I'M IN NEW YORK

23  DEPOSITION ON THE 21ST.  THAT WEEK I'M BASICALLY OUT.  EITHER

24  BEFORE THAT WEEK OR AFTER THAT WEEK.

25      **THE COURT:**  WE CAN DO IT ON IT IS 14TH, IF YOU CAN GET

```
 1    IT TO ME IN ADVANCE.

 2            MR. FRIEDMAN:  LET ME TRY AND DO THAT.  HOW ABOUT WE

 3    PUT IT ON THE 14TH, AND I'LL DO MY BEST TO GET IT TO YOU IN -- MY

 4    GOAL IS AT LEAST THREE DAYS BEFORE.

 5            THE COURT:  HOW ABOUT BY THURSDAY, THE 9TH.

 6            MR. FRIEDMAN:  BY THE 9TH?  YES, YOUR HONOR.

 7            THE COURT:  AND THAT WAY, AGAIN, IF I LOOK AT IT AND I

 8    DON'T HAVE QUESTIONS, THEN YOU'LL JUST GET AN ORDER TAKING IT OFF

 9    CALENDAR.

10        BUT AT LEAST THIS WAY WE'VE GOT -- I KNOW EVERYBODY IS

11    BUSY -- WE HAVE SOMETHING ON THE CALENDAR.

12        ANYBODY ELSE WANT TO SAY ANYTHING ELSE ON THE DEFENSE SIDE?

13        NO?

14        ON PLAINTIFFS' SIDE?

15            MR. EMIER:  NO, YOUR HONOR.

16            THE COURT:  WELL, THANK YOU VERY MUCH.  I APPRECIATE

17    IT.  IT IS -- IT'S A STICKY PROBLEM, AND IT'S HELPFUL TO HAVE

18    KIND OF THE KIND OF MORE GLOBAL INFORMATION TO START THINKING

19    ABOUT IT.

20        AND, FRANKLY, IT SOUNDS LIKE A REALLY INTERESTING PROCESS

21    THAT YOU HAVE GOING IN THIS MILK CASE.  BECAUSE WE CERTAINLY -- I

22    KNOW I CERTAINLY GET FRUSTRATED WITH LOW CLAIMS RATES.

23        AND, YOU KNOW, THE GOAL, ON THE ONE HAND WE WRITE ALL ABOUT

24    HOW THE GOAL OF THESE CLASS ACTIONS IS TO HELP THE CONSUMER, OR

25    AT LEAST, YOU KNOW, AT LEAST THAT'S ONE OF THE GOALS.
```

1    BUT WHEN WE AREN'T REACHING THEM, IT MAKES ONE WONDER.

2    SO I LOOK FORWARD TO SEEING THE UPDATED PROPOSAL AND PUT YOU

3  ON, LIKE I SAID THE CALENDAR.

4    WE'LL CONTINUE THIS UNTIL MARCH 14.

5    IF I DON'T HAVE ANY QUESTIONS YOU'LL HEAR FROM ME IN

6  WRITING.

7         **MR. FRIEDMAN:**  GREAT, YOUR HONOR.  APPRECIATE IT.

8         **THE COURT:**  THANK YOU.  HAVE A GOOD DAY.

9         (THEREUPON, THIS HEARING WAS CONCLUDED.)

10  STENOGRAPHY CERTIFICATION

11         "I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT
    FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER."

12         MARCH 4, 2017
           KATHERINE WYATT

13  _____

14

15

16

17

18

19

20

21

22

23

24

25