R. Alexander Saveri (Bar No. 173102)
Geoffrey C. Rushing (Bar No. 126910)
**SAVERI & SAVERI, INC.**
706 Sansome Street
San Francisco, CA 94111
Telephone: (415) 217-6810
Facsimile: (415) 217-6813

Bruce L. Simon (Bar No. 96241)
Benjamin E. Shiftan (Bar No. 265767)
**PEARSON, SIMON & WARSHAW, LLP**
44 Montgomery Street, Suite 2450
San Francisco, CA 94104
Telephone: (415) 433-9000
Facsimile: (415) 433-9008

Joseph J. Tabacco, Jr. (Bar No. 75484)
Todd A. Seaver (Bar No. 271067)
Jessica Moy (Bar No. 272941)
**BERMAN TABACCO**
44 Montgomery Street, Suite 650
San Francisco, CA 94104
Telephone: (415) 433-3200
Facsimile: (415) 433-6382

*Interim Co-Lead Counsel for Direct Purchaser Plaintiffs*
[Additional Counsel on Signature Page]

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| IN RE: LITHIUM ION BATTERIES ANTITRUST LITIGATION | Case No. 13-md-02420-YGR MDL No. 2420 |
| | **CO-LEAD COUNSEL FOR DIRECT PURCHASER PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR AN AWARD OF ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES AND SERVICE AWARDS** |
| This Document Relates To: | |
| ALL DIRECT PURCHASER ACTIONS | |
| | Date: Time: Judge: Hon. Yvonne Gonzalez Rogers Location: Courtroom 1 |

# TABLE OF CONTENTS

**PAGE**

NOTICE OF MOTION AND MOTION........................................................................ 1

STATEMENT OF THE ISSUES TO BE DECIDED ............................................. 2

MEMORANDUM OF POINTS AND AUTHORITIES .......................................... 2

I.    PRELIMINARY STATEMENT ............................................................... 2

II.   SUMMARY OF WORK BY PLAINTIFFS' COUNSEL ....................................... 4

    A.    Pre-filing investigation ...................................................................... 4

    B.    Consolidated Amended Complaints, Two Rounds of Motions to Dismiss,  Answers 5

    C.    Discovery Efforts ............................................................................... 6

         1.    Coordination with IPPs and Discovery Protocols .......................... 6

         2.    Document productions and review ..................................... 6

         3.    Written Discovery ...................................................... 8

         4.    Depositions ............................................................ 8

         5.    Discovery disputes ...................................................... 8

    D.    Toshiba's Summary Judgment Motion ....................................... 9

    E.    Motion for Class Certification .................................................. 9

    F.    Obtaining Cooperation From Amnesty Applicant Defendant ................. 10

    G.    Settlements ............................................................ 10

III.  The requested fee award is reasonable ................................................... 11

    A.    The Common Fund Doctrine Applies and the Percentage-of-the-Fund Method  For Calculating Fees is Appropriate Here ........................................ 11

    B.    An Upward Adjustment of the Benchmark Is Justified ........................... 12

         1.    Plaintiffs' Counsel achieved an exceptional result ...................... 13

         2.    Plaintiffs' Counsel undertook enormous risk on a contingent fee ............... 14

         3.    Plaintiffs' Counsel undertook a financial burden to prosecute the action  for the DPP Class ...................................................... 16

         4.    Awards in similar complex antitrust cases confirm the request here is reasonable ............................................................ 16

5.      The negative lodestar multiplier means a 30% fee award cannot result in  a "windfall" .................................................................................................. 18

C.      Plaintiffs' Counsel's Expenses Are Reasonable and Necessarily Incurred.............. 20

D.      Payment of Service Awards to the Class Representatives is Appropriate ............... 21

IV.   CONCLUSION ....................................................................................................... 23

1

## TABLE OF AUTHORITIES

2
**PAGE(S)**

3

## CASES

4

*Boeing Co. v. Van Gemert*,
   444 U.S. 472 (1980) ............................................................................ 11

5

*Hawaii v. Standard Oil Co.*,
   405 U.S. 251 (1972) ............................................................................ 11

6

7

*In re Bluetooth Headset Prods. Liab. Litig.*,
   654 F.3d 935 (9th Cir. 2011) .............................................................. 18

8

9

*In re Cathode Ray Tube (CRT) Antitrust Litig. (CRT II)*,
   No. C-07-5944 JST, 2016 WL 3648478 (N.D. Cal. July 7, 2016)....................................... 13, 22

10

*In re Cathode Ray Tube (CRT) Antitrust Litig. (CRT III)*,
   No. C-07-5944 JST, 2016 WL 4126533 (N.D. Cal. Aug. 3, 2016)....................................... 13, 18

11

12

*In re Colgate-Palmolive Co. ERISA Litig.*,
   36 F. Supp. 3d 344 (S.D.N.Y. 2014) .................................................... 17

13

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig. (DRAM)*,
   No. M-02-1486-PJH, 2007 WL 2416513 (N.D. Cal. Aug. 16, 2007)....................................... 17

14

*In re Flash Memory Antitrust Litig.*,
   No. C 07-0086 SBA, 2010 WL 2332081 (N.D. Cal. June 9, 2010)......................................... 15

15

*In re Graphics Processing Units Antitrust Litig.*,
   253 F.R.D. 478 (N.D. Cal. 2008) ........................................................ 15

16

17

*In re High-Tech Emp. Antitrust Litig.*,
   No. 11-CV-02509-LHK, 2015 WL 5158730 (N.D. Cal. Sept. 2, 2015) ................................. 17

18

*In re Linerboard Antitrust Litig.*,
   No. CIV.A. 98-5055, 2004 WL 1221350 (E.D. Pa. June 2, 2004)............................................ 14

19

20

*In re NASDAQ Mkt.-Makers Antitrust Litig.*,
   187 F.R.D. 465 (S.D.N.Y. 1998)..................................................... 14, 15

21

*In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig. (NCAA)*,
   No. 14-cv-2758-CW, 2017 WL 6040065 (N.D. Cal. Dec. 6, 2017), *appeal docketed*,
   No. 18-15054 (9th Cir. Jan. 11, 2018)............................................ 18, 19, 22

22

23

*In re Omnivision Techs., Inc.*,
   559 F. Supp. 2d 1036 (N.D. Cal. 2008).................................................. 20

24

25

*In re Online DVD-Rental Antitrust Litig.*,
   779 F.3d 934 (9th Cir. 2015) ................................................. 12, 13, 19, 21

26

*In re Optical Disk Drive Antitrust Litig.*,
   303 F.R.D. 311 (N.D. Cal. 2014) ....................................................... 15

27

28

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
    725 F.3d 244 (D.C. Cir. 2013).................................................................................... 15

*In re Remeron Direct Purchaser Antitrust Litig.*,
    No. Civ. 03-0085 (FSH), 2005 WL 3008808 (D.N.J. Nov. 9, 2005)....................... 16

*In re Rite Aid Corp. Sec. Litig.*,
    396 F.3d 294 (3d Cir. 2005)....................................................................................... 18

*In re Superior Beverage/Glass Container Consol. Pretrial*,
    133 F.R.D. 119 (N.D. Ill. 1990).................................................................................. 14

*In re TFT-LCD (Flat Panel) Antitrust Litig. (LCD I)*,
    No. 07-MD-1827 SI, 2011 WL 7575003 (N.D. Cal. Dec. 27, 2011)....................... 17

*In re TFT-LCD (Flat Panel) Antitrust Litig. (LCD II)*,
    No. 07-MD-1827 SI, 2013 WL 149692 (N.D. Cal. Jan. 14, 2013).......................... 17

*In re TFT-LCD (Flat Panel) Antitrust Litig. (LCD III)*,
    No. 07-MD-1827 SI, 2013 WL 1365900 (N.D. Cal. Apr. 3, 2013).......................... 17

*In re Wash. Pub. Power Supply Sys. Sec. Litig.*,
    19 F.3d 1291 (9th Cir. 1994)....................................................................................... 11

*Pillsbury Co. v. Conboy*,
    459 U.S. 248 (1983).................................................................................................... 11

*Reiter v. Sonotone Corp.*,
    442 U.S. 330 (1979).................................................................................................... 11

*Rodriguez v. West Publ'g Corp.*,
    563 F.3d 948 (9th Cir. 2009)....................................................................................... 22

*Staton v. Boeing Co.*,
    327 F.3d 938 (9th Cir. 2003)................................................................................ 11, 22

*Torrisi v. Tucson Elec. Power Co.*,
    8 F.3d 1370 (9th Cir. 1993)......................................................................................... 12

*Vincent v. Hughes Air West*,
    557 F.2d 759 (9th Cir. 1977)....................................................................................... 20

*Vizcaino v. Microsoft Corp.*,
    290 F.3d 1043 (9th Cir. 2002)..................................................................................... 12

*Wal-Mart Stores, Inc. v Visa U.S.A., Inc.*,
    396 F.3d 96 (2d Cir. 2005).......................................................................................... 12

**STATUTES**

Fed. R. Civ. P. 23(h)............................................................................................................ 1

Fed. R. Civ. P. 54(d)............................................................................................................ 1

**OTHER AUTHORITIES**

5 W. Rubinstein, Newberg on Class Actions, § 15:81 (5th ed. Dec. 2017 update) ................... 18, 19

Eisenberg, Miller & Germano, *Attorneys' Fees in Class Actions: 2009-2013*, 92 N.Y.U. L.
    Rev. 937 (2017) ............................................................................................................. 18

**DOCKETED**

*In re Cathode Ray Tube (CRT) Antitrust Litig. (CRT IV)*,
    No. 07-cv-05944-JST (N.D. Cal. June 8, 2017) ......................................................... 17

*In re Optical Disk Drive Antitrust Litig.*,
    No. 10-md-2143 RS (N.D. Cal. July 23, 2015) ......................................................... 17

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
    No. 4:07-MD-01819-CW (N.D. Cal. June 30, 2012) ................................................. 17

*United States v. LG Chem, Ltd.*,
    No. 13-cr-0473 YGR (N.D. Cal.) ................................................................................ 3

*United States v. Sanyo Electric Co., Ltd.*,
    No. 13-cr-0472 YGR (N.D. Cal.) ................................................................................ 3

# GLOSSARY OF DEFINED TERMS

| | |
|---|---|
| ACPERA | Antitrust Criminal Penalty Enhancement and Reform Act |
| CAC | DPPs' Consolidated Amended Complaint (July 11, 2013), ECF No. 234 |
| Cell or cell | Lithium Ion Battery Cells as defined in SCAC, as defined below, ¶3 |
| Class Period | January 1, 2000 through May 31, 2011 |
| Class Representatives | Named plaintiffs in the SCAC:  Automation Engineering LLC; Charles Carte; Alfred H. Siegel, not individually, but acting solely in capacity as the Liquidating Trustee of Circuit City Stores, Inc. Liquidating Trust ("Circuit City"); First Choice Marketing, Inc.; James O'Neil; Alfred T. Giuliano, as the Chapter 7 Trustee of Ritz Camera & Image, LLC ("Ritz Camera & Image, LLC" or "Ritz"); The Stereo Shop; Univisions-Crimson Holding, Inc.; and Terri Walner |
| Co-Lead Counsel | R. Alexander Saveri of the firm Saveri & Saveri, Inc.; Bruce L. Simon of the firm Pearson, Simon & Warshaw LLP; and Joseph J. Tabacco, Jr. of the firm Berman Tabacco |
| Compendium or Comp. | Compendium of Plaintiffs' Counsel Declarations in Support of Co-Lead Counsel for Direct Purchaser Plaintiffs' Motion For An Award of Attorneys' Fees, Reimbursement of Expenses and Service Awards, filed herewith |
| DPP or DPPs | Direct Purchaser Plaintiffs (also referred to as "Class Representatives," defined above) and the named plaintiffs in the SCAC (defined below) and proposed Settlement Class Representatives, and were the proposed Class Representatives on DPPs' Motion for Class Certification |
| DPP Class | Settlement Class of direct purchasers defined as:  All persons and entities that purchased a Lithium Ion Battery or Lithium Ion Battery Product from any Defendant, or any division, subsidiary or affiliate thereof, or any co-conspirator in the United States during the Class Period, from January 1, 2000 through May 31, 2011.  Excluded from the Class are Defendants, their parent companies, subsidiaries and affiliates, any Co-Conspirators, federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and any judge or jurors assigned to this case. |
| Defendants | Defendants which have settled the DPP action:  LG Chem, Ltd.; LG Chem America, Inc.; Samsung SDI Co., Ltd.; Samsung SDI America, Inc.; Panasonic Corporation; Panasonic Corporation of North America; Sanyo Electric Co., Ltd.; Sanyo North America Corporation; Sony Corporation; Sony Energy Devices Corporation; Sony Electronics, Inc.; Hitachi Maxell, Ltd.; Maxell Corporation of America; NEC Corporation; NEC TOKIN Corporation; and Toshiba Corporation |
| ESI | Electronically Stored Information |
| Hitachi Maxell | Hitachi Maxell Ltd. and Maxell Corporation of America, or either of them |
| IPPs | Indirect Purchaser Plaintiffs |

| | |
|---|---|
| LG Chem | LG Chem, Ltd. and LG Chem America, Inc., or either of them |
| LiB | Cylindrical, prismatic, or polymer batteries that are rechargeable and use lithium ion technology. |
| LiB Products | Products manufactured, marketed, and/or sold by Defendants, their divisions, subsidiaries or affiliates, or their co-conspirators that contain one or more LiB cells manufactured by Defendants or their co-conspirators. LiB Finished Products include notebook computers, cellular (mobile) phones, digital cameras, camcorders, power tools, and other devices. |
| NEC Corp. | NEC Corporation |
| NEC Tokin | Tokin Corporation (f/k/a NEC TOKIN Corporation) |
| OSKR | OSKR, LLC (f/k/a C&A Economics), an economics analysis firm that Co-Lead Counsel retained to provide supporting economic services to Dr. Roger Noll, DPPs' economic expert |
| Panasonic | Panasonic Corporation (f/k/a Matsushita Electric Industrial Co., Ltd.), and Panasonic Corporation of North America (f/k/a Matsushita Electric Corporation of America), or either of them |
| Plaintiffs' Counsel | Co-Lead Counsel and all counsel listed in DPPs' accompanying Compendium, defined above |
| Samsung SDI | Samsung SDI Co., Ltd. and Samsung SDI America, Inc., or either of them |
| Sanyo | Sanyo Electric Co., Ltd., Sanyo North America Corporation, or any of them |
| Saveri Decl. or Declaration | Declaration of R. Alexander Saveri in Support of Direct Purchaser Plaintiffs' Motion For An Award of Attorneys' Fees, Reimbursement of Expenses, and Incentive Awards, **attached as Exhibit C to the Compendium** |
| SCAC or SCAC ¶ | DPPs' Second Consolidated Amended Complaint (Apr. 8, 2014), ECF No. 415 |
| Settlements | Settlement Agreements reached with Defendants: Sony ($19 million); NEC Corp. ($1 million); Hitachi Maxell ($3.45 million); Panasonic/Sanyo ($42.5 million); Toshiba ($2.9 million); LG Chem ($41 million); Samsung SDI ($24.5 million); NEC Tokin ($4.95 million) |
| Settlement Fund | Total cash recovery of all the settlements combined in the amount of $139,300,000 |
| Simon Decl. or Declaration | Declaration of Bruce L. Simon in Support of Co-Lead Counsel for Direct Purchaser Plaintiffs Motion For An Award of Attorneys' Fees, Reimbursement of Expenses and Service Awards, **attached as Exhibit B to the Compendium** |
| Sony | Sony Corporation, Sony Electronics, Inc., Sony Energy Devices Corporation, or any of them |

| Tabacco Decl. or Declaration | Declaration of Joseph J. Tabacco, Jr. In Support of Co-Lead Counsel For Direct Purchaser Plaintiffs' Notice of Motion And Motion For An Award of Attorneys' Fees, Reimbursement of Expenses and Service Awards, **attached as Exhibit A to the Compendium** |
|---|---|
| Toshiba | Toshiba Corporation, including its wholly-owned subsidiaries |
| Zahid Decl. or Declaration | Declaration of Judith A. Zahid In Support of Co-Lead Counsel For Direct Purchaser Plaintiffs' Notice of Motion And Motion For An Award of Attorneys' Fees, Reimbursement of Expenses and Service Awards, **attached as Exhibit D to the Compendium** |

**NOTICE OF MOTION AND MOTION**

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that at 2:00 p.m. on May 8, 2018, DPPs and their counsel will, and hereby do move before the Honorable Yvonne Gonzalez Rogers, United States District Judge, at the United States Courthouse, 1301 Clay Street, Courtroom 1 – 4th Floor, Oakland, California, pursuant to Fed. R. Civ. P. 23(h) and 54(d) for the following:

- an award of attorneys' fees in the amount of $41,790,000 (30% of the $139,300,000 Settlement Fund) plus interest;

- reimbursement of litigation expenses in the amount of $3,354,573.35, which includes (i) unreimbursed litigation expenses of $2,501,352.52 (including litigation fund expenditures in the amount of $2,247,198.62); (ii) outstanding unpaid invoices of retained experts in the amount of $212,030.00; and (iii) $641,190.83 for uncompensated document hosting services; and

- service awards for the nine Class Representatives in various amounts totaling $135,000 (0.09% of the Settlement Fund).

This motion is made on the grounds that (a) such fees are fair and reasonable in light of Plaintiffs' Counsel's efforts in creating the Settlement Fund; (b) the requested fees comport with the Ninth Circuit case law in common fund cases; (c) the expenses for which reimbursement is sought were reasonably and necessarily incurred in connection with the prosecution of this action; and (d) service awards to each Class Representative is warranted for bringing the case, assisting in extensive electronic document productions, responding to written discovery, and sitting for depositions regarding their LiB Product purchases and participation in this case.

This Motion is based upon this Memorandum of Points and Authorities, the Tabacco Declaration, the Saveri Declaration, the Simon Declaration, the Zahid Declaration, the declarations of Plaintiffs' Counsel, the proposed order submitted herewith, and all other records, pleadings, and papers filed in this action; and upon such argument and further pleadings as may be presented to the Court at the hearing on this Motion.

This Motion will be available today on the settlement website established for this case, www.batteriesdirectpurchaserantitrustsettlement.com for review by class members.

## STATEMENT OF THE ISSUES TO BE DECIDED

Whether the Court should (1) award the requested attorneys' fees in the amount of $41,790,000, representing 30% of the Settlement Fund of $139,300,000; (2) order payment from the Settlement Fund for Plaintiffs' Counsels' expenses totaling $3,354,573.35; and (3) approve service awards to nine Class Representatives in varying amounts totaling $135,000.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   PRELIMINARY STATEMENT

Plaintiffs' Counsel brought this antitrust class action nearly six years ago on a purely contingent-fee basis to recover overcharge damages from sophisticated foreign actors preying on United States victims.  At its outset, the nature of the case promised that Plaintiffs' Counsel would have to carry millions of dollars in out-of-pocket costs at risk of total loss.  Success meant overcoming difficult questions of proof at every stage leading up to trial, with no guarantee of any recovery for the DPP Class, much less one totaling $139.3 million, and no guarantee of any payment whatsoever for Plaintiffs' Counsel.

The requested attorneys' fee award is $41,790,000, representing 30% of the Settlement Fund. Based on Plaintiffs' Counsel's lodestar of $72.5 million, if awarded the requested fee will result in a negative multiplier of 0.58.

The result for the DPP Class is exceptional. The Settlement Fund of $139.3 million in cash represents a 39% recovery of the single damages the DPP Class could have hoped to obtain through total success on the merits at trial.  Tabacco Decl. ¶66.  This recovery was the result of Plaintiffs' Counsel's devotion of 173,863 hours of attorney and para-professional labor, matching the skill and tenacity of some of the finest defense counsel in the world at every stage of the five-plus year litigation.  *Id.*, ¶92 & Ex. 5.  Plaintiffs' Counsel further committed $3,354,573.35 to fund the litigation expenses, making no resort to any third-party litigation funding to mitigate the risk of total loss.  Zahid Decl. ¶2 & Ex. A.

The Settlements here are the only ones that will return money to the DPP Class, victims of the foreign cartel's alleged misconduct.  The two guilty pleas secured by the U.S. Government from Sanyo Electric Co., Ltd. and LG Chem. Ltd., came well over a year into this action and resulted in $10.731 million and $1.056 million in criminal fines, respectively, based on narrow pleas for price-fixing only cylindrical lithium ion battery cells used in notebook computers from April 2007 until September 2008.[1]  The pleas identified no additional conspirators aside from Sanyo's parent company, Panasonic, and the government sought no restitution for victims.

Far from piggy-backing off the government prosecution, Plaintiffs' Counsel developed evidence of a conspiracy far broader than the one targeted by the government, and indeed had to overcome the obstacle that the two narrow guilty pleas became in the hands of defense counsel. Plaintiffs' Counsel sought to prove a nine-year conspiracy from May 1, 2002 until May 31, 2011 against nine Japanese and Korean electronics manufacturers and their United States subsidiaries and affiliates.  Plaintiffs' Counsel developed evidence of a price-fixing conspiracy on lithium ion battery cylindrical cells *and* prismatic cells and, combined with sophisticated work by industry and economic experts, developed proof of an overcharge not just on *cells* but on cylindrical and prismatic *battery packs* and *finished products* (notebook PCs, mobile phones, digital cameras, etc.) that contained the price-fixed cells.  Only the skill and experience of Plaintiffs' Counsel, and in particular Co-Lead Counsel, made this possible.  *See generally* Tabacco Decl. ¶¶4-81; Simon Decl. ¶¶9-42; Saveri Decl. ¶¶6-37.

The requested award is commensurate with Plaintiffs' Counsel's efforts, the risk they undertook, the results they achieved, and is consistent with the fees awarded by Judges Illston, Wilken, Seeborg, and Tigar in other foreign electronics cartel class actions over the past decade in this District. In light of these and other factors addressed herein, the requested fee award is reasonable.[2]

---

[1] *United States v. Sanyo Electric Co., Ltd.*, No. 13-cr-0472 YGR (N.D. Cal.), Plea Agreement, at ¶9 (ECF No. 15-1) (Sept. 3, 2013); *United States v. LG Chem, Ltd.*, No. 13-cr-0473 YGR (N.D. Cal.), Plea Agreement, at ¶9 (ECF No. 13-1) (Sept. 3, 2013).

[2] The notice informed the DPP Class that Plaintiffs' Counsel would apply for an award of attorneys' fees of no more than 30% of the Settlement Fund and reimbursement of litigation expenses of no more than $3.9 million.  Aspects of the notice, claims administration and the grounds

## II.   SUMMARY OF WORK BY PLAINTIFFS' COUNSEL

Plaintiffs' Counsel invested substantial time and money in the prosecution of the DPP action. The work included pre- and post-complaint investigation into the industry, working with industry experts, drafting highly detailed complaints, defeating a multitude of motions to dismiss those complaints, propounding discovery, deploying a multi-lingual team to analyze defendants' documents in Japanese, Korean, Chinese, and English, extracting usable information from a recalcitrant ACPERA amnesty applicant, negotiating an ice-breaker settlement with defendant Sony for cash and valuable cooperation and then obtaining that cooperation to benefit the case, working with expert economists, collecting, reviewing and producing a massive set of documents from the larger Class Representatives, taking 34 party-opponent depositions of mostly foreign witnesses, defending 12 Class Representative depositions, moving for class certification and opposing *Daubert* motions, and negotiating the Settlements.  *See generally* Tabacco Decl. ¶¶4-81.  Measured by hours, the breakdown of the most significant labor is as follows:

| TASK | % OF TOTAL HOURS |
|---|---|
| Document review | 48% |
| Discovery *(excluding doc review and depositions)* | 24% |
| Pleadings and briefing *(including class certification)* | 12% |
| Depositions | 8% |
| Misc. *(including court appearances, settlement, strategy, case management)* | 8% |

*See* Tabacco Decl. ¶69.

### A.   Pre-filing investigation

Co-Lead Counsel began investigating this case years before filing the first DPP complaint in late 2012.  *See*, *e.g.*, Tabacco Decl. ¶5; Saveri Decl. ¶6; Simon Decl. ¶¶10-11. The investigation entailed retaining consultants to perform an economic analysis of the relevant market and researching the nature of purchases by various potential direct purchasers.[3]  *See* Simon Decl. ¶11.

---

for final approval of the three settlements not yet finally approved by the Court will be addressed in DPPs' forthcoming settlement final approval papers scheduled to be filed March 29, 2018.

[3] None of the attorney and professional time generated before the Court's appointment of Co-Lead Counsel in May 2013, which is not insubstantial, is included in the lodestar presented on this Motion.

### B.      Consolidated Amended Complaints, Two Rounds of Motions to Dismiss, Answers

On May 17, 2013, the Court appointed R. Alexander Saveri of the firm Saveri & Saveri, Inc., Bruce L. Simon of the firm Pearson, Simon & Warshaw LLP, and Joseph J. Tabacco, Jr. of the firm BT as Interim Lead Counsel for the DPP Class (referred to herein as "Co-Lead Counsel"). Tabacco Decl. ¶2; Simon Decl. ¶3; Saveri Decl. ¶10; ECF No. 194.   Subsequently, the DPPs, over Defendants' objections and in conjunction with the IPPs, obtained certain documents produced to government investigators, nearly all of them in Korean and Japanese. Tabacco Decl. ¶10.   In a compressed time period, Co-Lead Counsel organized a team of Korean and Japanese-speaking attorneys and translators to analyze the documents for potential use in the CAC.   Led by Co-Lead Counsel, a team of Plaintiffs' Counsel synthesized the new evidence and strategized regarding the nature and scope of the conspiracy which would be alleged.   *Id.*

In July 2013, DPPs filed their CAC alleging an over-arching horizontal conspiracy among the Defendants and their co-conspirators to fix prices, restrict production, and to allocate markets and customers for the sale of Lib Products in the United States during the Class Period.   Tabacco Decl. ¶¶11-12; Simon Decl. ¶16; Saveri Decl. ¶26; ECF No. 234.

After submitting Court-ordered pre-motion letters, Defendants filed a joint motion to dismiss and five more individual motions to dismiss, arguing, *inter alia*, that the CAC did not allege a plausible conspiracy for the entire alleged conspiracy period, that the DPPs lacked standing for lack of a lithium ion battery cell purchaser.   DPPs opposed.   The Court granted the joint motion to dismiss with leave to amend, for lack of antitrust standing. Tabacco Decl. ¶¶13-14, 72; Simon Decl. ¶17; Saveri Decl. ¶26.

DPPs amended the complaint to add further facts support a finding of antitrust standing, and Defendants moved to dismiss again, with both a joint motion and seven individual motions.   DPPs prevailed on all the motions, with the Court sustaining the SCAC.   Tabacco Decl. ¶¶15-17, 73-74; Simon Decl. ¶¶18-23; Saveri Decl. ¶26.

To oppose the veritable mountain of defense briefing, Co-Lead Counsel assigned teams of Plaintiffs' Counsel to work on various issues and discrete topics presented in the motions.   *Id.*, ¶¶15-17, 73-74; Simon Decl. ¶¶20-23; Saveri Decl. ¶26.

Defendants moved to certify the Court's order denying the motions to dismiss for interlocutory appeal. DPPs opposed, and the Court denied the motion. Tabacco Decl. ¶16.

When Defendants each answered the operative complaint, Co-Lead Counsel led a small team of Plaintiffs' Counsel to analyze the dozens of affirmative defenses and draft a motion to strike most of them. Through laborious meeting-and-conferring with a team of defense counsel counterparts, Plaintiffs' Counsel succeeded in causing substantial amendment of the answers by the Defendants. *Id.*, ¶18. Had this action not settled, this work would have translated into more streamlined summary judgment and trial phases.

### C.    Discovery Efforts

Discovery in this case was a massive undertaking. It required DPPs to obtain, from nine large, Defendant corporate families, comprehensive information about their battery business over a twelve-year period. Moreover, the lion's share of the critical documents, data and witnesses were located in Japan and Korea, and were written in or spoke a foreign language. *Id.*, ¶¶23, 77.

#### 1.    Coordination with IPPs and Discovery Protocols

Co-Lead Counsel created teams of Plaintiffs' Counsel and assigned a team to each Defendant family for discovery purposes. *Id.*, ¶23. The DPPs and IPPs coordinated closely on discovery, working together and with defense counsel to fashion various proposed orders and protocols for coordinated discovery, depositions, translation, and discovery of electronically-stored information (ESI). *Id.*, ¶¶23-24, 26-30, 77. DPPs and IPPs obtained relief from the Court to mandate that Defendants create and maintain "watch lists" of extraterritorial current employees, so that in the event such an employee departed the defendant, DPPs and IPPs would have notice and an opportunity to depose the witness. *Id.*, ¶29.

#### 2.    Document productions and review

The document production from Defendants was massive. To obtain it, Plaintiffs' Counsel negotiated search terms in three languages and negotiated with each defendant regarding custodians and other aspects of ESI searches. Tabacco Decl. ¶¶27, 29-30, 67.

Ultimately, Plaintiffs' Counsel analyzed 2.4 million documents, equaling 8.9 million printed pages. *Id.*, ¶27. Of these, 73% were primarily in Japanese or Korean, and others were a mix of

Japanese, Korean, and/or English.  *Id.*  To maximize the value of the review, Plaintiffs' Counsel created thousands of pages of work product, including memoranda, summaries, and spreadsheets organizing the evidence by element of the claim, and by witnesses.  Deposition binders were later created based on this work product.  *Id.*, ¶28.   In an effort to reduce the amount of "hands-on, eyes on" review by attorneys, paralegals, and translators, Co-Lead Counsel engaged a provider of Technology Assisted Review ("TAR").  However, owing largely to the foreign-languages present in most of the documents and the quality of the digitized document images, the TAR was only partially effective at reducing the need to rely on attorney and professional review.  *Id.*

With regard to document production by the DPPs, the document searches, collection, review, and ultimate production from several of the larger Class Representatives was a significant undertaking, demanding substantial hours of labor.

For example, production of plaintiff Circuit City's paper documents presented a challenge because of the enormous quantity of paper documents in storage for the class period, the minimal indexing of those documents, and the near-complete absence of the bankrupt retailer's employees to assist in identification of responsive documents. Tabacco Decl. ¶38; Simon Decl. ¶55; Comp. Ex. AA (Decl. of Daniel D. Owen in Supp. of DPPs Mot. for an Award of Attorneys' Fees, Reimb. of Expenses, and Incentive Awards ("Owen Fee Decl.")), ¶4(l).  The Circuit City review yielded over 500 boxes that were produced for inspection by defendants.  *Id.*

The production of plaintiff Ritz Camera's documents was similarly time-consuming, as the retailer was in liquidation and consequently manual searches through approximately 300,000 pages of paper files from the bankruptcy trustee's document warehouse was necessary.  In addition, purchase data came from searches of over 3.8 million pages of scanned accounting files from offline legacy systems, and disaster backup tapes had to be resurrected and searched to capture responsive discovery material.  Tabacco Decl. ¶39; Saveri Decl. ¶¶48-50; Comp. Ex. T (Decl. of Steven F. Benz in Supp. of DPPs Mot. for an Award of Attorneys' Fees, Reimb. of Expenses, and Incentive Awards ("Benz Decl.")), ¶4.

Finally, Plaintiffs' Counsel expended substantial time obtaining Defendants' transaction data and other information needed to understand the data, without which the scope of the conspiracy and damages period, and the amount of damages, if any, could not be ascertained.  Tabacco Decl. ¶25.

### 3.    Written Discovery

Plaintiffs' Counsel, largely in coordination with IPPs, propounded ten sets of requests for production (RFPs), six sets of interrogatories, nine sets of requests for admission (RFAs) totaling 1,526 individual requests, as well as seven subpoenas to third parties.  Tabacco Decl. ¶¶26, 31 & Table No. 1, cited therein.

For their part, Defendants propounded comprehensive document requests, interrogatories and requests for admission on the DPPs.  *See id.*, ¶¶36-37 & Table No. 2, cited therein.

### 4.    Depositions

Plaintiffs' Counsel marshaled the evidence from the document review and written discovery to take depositions, where the videotaped deposition testimony was in all likelihood going to have to be the testimony presented at trial. Depositions of witnesses like the ones here, involving former employees living abroad who are likely not subject to trial subpoenas, have the added necessity of extracting useful, if not critical, trial testimony in the first go.  Thorough preparation and sound examination techniques and experience are essential.  *Id.*, ¶¶32-34.

Coordinating with the IPPs, Plaintiffs' Counsel deposed 34 percipient defense witnesses.  *Id.*, ¶32.  All but one of the depositions required translation, stretching the depositions to a total of 81 days.  *Id.*  That some Defendants settled with the DPP Class did not reduce the scope of deposition discovery.  *Id.*, ¶35.  The DPP Class still needed to prove a conspiracy among all Defendants in order to tie any non-settling Defendant to the conspiracy.  *Id.*

Plaintiffs' Counsel prepared and defended all 12 of the Class Representatives' depositions, conducted across the country.  Tabacco Decl. ¶40.   Including the 34 merits depositions, 50 total depositions were taken in the DPP case over 100 days of testimony.  *Id.*, ¶34.

### 5.    Discovery disputes

Discovery was hard-fought.  Defendants frequently opposed reasonable discovery requests, with the result that the DPPs and IPPs coordinated to bring 14 motions to compel on various

disputes before Magistrate Ryu.  The DPPs and IPPs succeeded in obtaining the relief sought in all 14 motions.  Tabacco Decl. ¶¶41-44 & Table Nos. 3(a) & 3(b), cited therein.  For example, motions to compel were necessary before Defendants produced worldwide, transaction-level sales and cost data for lithium ion battery cells and packs.  *Id.*, ¶¶43-44 & Table No. 3(b), cited therein.  There were successful motions to compel deposition testimony, supplemental interrogatory responses, and identification of documents used to refresh a deponent's recollection.  *Id.*, Table No. 3(b), cited therein.

Plaintiffs' Counsel also successfully defeated Defendants' motions to compel, including a motion to compel DPP Class Representatives to produce downstream transaction data.  *Id.*, ¶¶45-46 & Table No. 4, cited therein.

### D.    Toshiba's Summary Judgment Motion

Toshiba moved for early summary judgment against the DPPs and IPPs in mid-2015 as all discovery was in full swing.  Toshiba sought judgment on the grounds that it had withdrawn from the conspiracy by exiting the lithium ion battery business, and that the DPPs' claims were time-barred.  Tabacco Decl. ¶¶19-20, 76.  DPPs, in coordination with the IPPs, conducted targeted discovery of Toshiba on an expedited basis in order to oppose summary judgement.  After full briefing and oral argument, the Court denied Toshiba's motion.  *Id.*, ¶¶21-22, 76.

### E.    Motion for Class Certification

DPPs moved for class certification in 2016, supported by DPPs' expert economist, Dr. Roger Noll of Stanford University, industry expert James L. Kaschmitter, and a declaration of counsel which offered 195 exhibits drawn from the developing evidentiary record.  *Id.*, ¶¶47-48, 78.  Defendants opposed the motion, contesting nearly every part of DPPs' Rule 23 showing and offering the opinion of their own expert economist, who opined that it is impossible to prove impact and damages in this action with common evidence.  Tabacco Decl. ¶¶47-49.  Defendants also sought to exclude opinion testimony of both of DPPs' experts.  *Id.*, ¶¶47-48, 78-80.

The effort on class certification required Co-Lead Counsel to expend significant time and money on the legal briefing, testifying experts, and the consulting economists charged with working the transactional data into shape for use in the sophisticated econometric modeling performed by

Dr. Noll, as well as assisting Co-Lead Counsel with examining the Defendants' expert economist at deposition and with defending the two depositions of Dr. Noll. Tabacco Decl. ¶¶48, 78,80. Additionally, Co-Lead Counsel also led efforts to identify, translate, and organize documents and Defendants' discovery responses to support DPPs' class certification motion.  In addition to conspiracy evidence, Co-Lead Counsel drafted legal and factual analysis to support DPPs' class certification motion and worked with Class Representatives to collect information relevant to the class certification motion and prepare them for deposition.  *Id.*, ¶80.

### F.    Obtaining Cooperation From Amnesty Applicant Defendant

From the pleading stage, Co-Lead Counsel in conjunction with the IPPs engaged counsel for an ACPERA amnesty applicant defendant, Samsung SDI, to obtain the cooperation in the civil litigation that an amnesty applicant is obligated to give.  The cooperation came out over the course of the case and was at all times limited to narrow attorney proffers regarding anticompetitive conduct related to cylindrical cells only from April 2007 to September 2008.  *Id.*, ¶¶10, 64, 77.  The amnesty applicant fought every stage of the litigation and was one of the last defendants to settle with DPPs.  *Id.*, ¶64.

### G.    Settlements

Substantial effort, skill and experience of Co-Lead Counsel were required to negotiate the Settlements.  Multiple mediation sessions before Judge Vaughn Walker (ret.) and attendant briefing and preparation were required before most of the Settlements could be reached.  *Id.*, ¶52.

DPPs first settled with Sony in an ice-breaker settlement after six months of negotiation for $19.5 million in cash and cooperation with the prosecution of the case against all the remaining defendants. *Id.*, ¶54.  The Sony cooperation proved highly useful with respect to class certification where Sony could confirm aspects of DPPs' expert economist's analysis and cost assumptions, as well as aspects of conspiracy proof.  Tabacco Decl. ¶81.

Next, after filing their class certification motion, Plaintiffs' Counsel reached settlements with NEC Corp. ($1 million plus cooperation), Hitachi Maxell ($3.45 million plus cooperation), Panasonic/Sanyo ($42.5 million plus cooperation), Toshiba ($2.9 million plus cooperation), LG

Chem ($41 million plus cooperation), Samsung SDI ($24.5 million), and finally NEC Tokin ($4.95 million).  *Id.*, ¶¶50, 55-58, 60-63.

Co-Lead Counsel did the necessary work to effectuate each settlement, including negotiating and drafting the settlement agreements, negotiating and drafting the attendant escrow agreements and establishing escrow accounts, providing notice to class members, and preparing the motions for preliminary approval and final approval necessary to finalize the settlements.  Tabacco Decl. ¶¶52, 59, 65; Saveri Decl. ¶¶33-37.

## III.     THE REQUESTED FEE AWARD IS REASONABLE

### A.     The Common Fund Doctrine Applies and the Percentage-of-the-Fund Method For Calculating Fees is Appropriate Here

Plaintiffs' Counsel have produced a benefit for the DPP Class in the form of a common fund and are entitled to payment of reasonable attorneys' fees from the common fund.  The Supreme Court has explained that "a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole."  *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); *Staton v. Boeing Co.*, 327 F.3d 938, 967 (9th Cir. 2003) (same).  The purpose of this doctrine is that "those who benefit from the creation of the fund should share the wealth with the lawyers whose skill and effort helped create it."  *In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1300 (9th Cir. 1994).

Here, the DPP Class will be eligible to receive distributions from the $139.3 million common fund generated by the labor of Plaintiffs' Counsel. The conduct could not practically have been challenged without the commitment of time and money by Plaintiffs' Counsel.

Paying reasonable attorneys' fees from the common fund compensates Plaintiffs' Counsel for bringing and prosecuting the action, which is critical to the enforcement of the antitrust laws, a point repeatedly emphasized by the Supreme Court.  *See*, *e.g.*, *Pillsbury Co. v. Conboy*, 459 U.S. 248, 262-63 (1983); *Reiter v. Sonotone Corp.*, 442 U.S. 330, 331 (1979); *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 266 (1972).

In the Ninth Circuit, the court has discretion in a common fund case to choose either the "percentage-of-the-fund" or the "lodestar" method to determine fees.  *Vizcaino v. Microsoft Corp.*,

290 F.3d 1043, 1047 (9th Cir. 2002); *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 949 (9th Cir. 2015).   Most courts have exhibited a clear preference for the percentage-of-the-fund method, as it "directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation.   In contrast, the lodestar create[s] an unanticipated disincentive to early settlements, tempt[s] lawyers to run up their hours, and compel[s] district courts to engage in a gimlet-eyed review of line-item fee audits." *Wal-Mart Stores*, *Inc. v Visa U.S.A.*, *Inc.*, 396 F.3d 96, 121 (2d Cir. 2005) (alterations in original) (citations and internal quotation marks omitted).

The Ninth Circuit instructs that when the percentage-of-the-fund method is used to calculate fees, conducting a lodestar cross-check will "confirm that a percentage of [the] recovery amount does not award counsel an exorbitant hourly rate."   *Online DVD*, 779 F.3d at 949 (citation and internal quotation marks omitted).

Here, Class Counsel's efforts have created a common fund of $139.3 million.  Plaintiffs seek 30% of the common fund as an award of fees, which will make an award of $41,790,000, an amount representing just 58% of Plaintiffs' Counsel's lodestar of $72.5 million.  Tabacco Decl. ¶94, Ex. 5. Consequently, under either a "percentage-of-the-fund" or "lodestar" method, Plaintiffs' Counsel's requested fee is deserved in light of the value of the extensive work performed, result achieved for the DPP Class, and the risk and expense of the contingent-fee representation.

### B.    An Upward Adjustment of the Benchmark Is Justified

"[I]n this circuit, the benchmark percentage is 25%," *Online DVD*, 779 F.3d at 949, with the 25% fee a "starting point" for analysis, *id* at 955.  A District Court must show why the percentage award is appropriate based on the circumstances of the case.  *Vizcaino*, 290 F.3d at 1048.  *See also Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1376 (9th Cir. 1993) ("This benchmark percentage should be adjusted, or replaced by a lodestar calculation, when special circumstances indicate that the percentage recovery would be either too small or too large in light of the hours devoted to the case or other relevant factors." (citation and internal quotation marks omitted)).

When considering a percentage-of-the-fund request for attorneys' fees, the Ninth Circuit requires consideration of the following factors:  (1) whether counsel "achieved exceptional results

for the class"; (2) "whether the case was risky for class counsel"; (3) "whether counsel's performance 'generated benefits beyond the cash settlement fund'"; (4) "the market rate for the particular field of law"; (5) "the burdens class counsel experienced while litigating the case (*e.g.*, cost, duration, foregoing other work)"; and (6) "whether the case was handled on a contingency basis." *Online DVD*, 779 F.3d at 954-55.

### 1. Plaintiffs' Counsel achieved an exceptional result

The Settlement Fund of $139.3 million in cash represents a 39% recovery of the single damages the DPP Class could have achieved through total victory at a trial on the merits. Tabacco Decl. ¶66.

A recovery of 39% of single damages is double the average recovery in similar cases. *See In re Cathode Ray Tube (CRT) Antitrust Litig. (CRT II)*, No. C-07-5944 JST, 2016 WL 3648478, at *7 n.19 (N.D. Cal. July 7, 2016) (describing survey of 71 settled cartel cases where weighted mean settlement recovery was 19% of single damages). The result here is one factor that justifies an increase over the 25% benchmark. *In re Cathode Ray Tube (CRT) Antitrust Litig. (CRT III)*, No. C-07-5944 JST, 2016 WL 4126533, at *5 (N.D. Cal. Aug. 3, 2016) (finding settlement recovery of 20% of single damages supports "modest increase over the Ninth Circuit benchmark").

Net of opt-outs, the single damages for cylindrical cells and packs—the narrow price-fixing conduct targeted by the Government criminal investigation—amounted to only $35.5 million. Tabacco Decl. ¶66. This means that the Settlements recovered nearly four times (3.9x) the single damages that would have been achievable had this action against these Defendants matched the narrower contours of the Sanyo and LG Chem guilty pleas. Plaintiffs' Counsel's skill in developing the evidence on which to base an expanded case that includes prismatic batteries and finished products for both cylindrical and prismatic is what created the value in the $139.3 million common fund.

The Sanyo and LG Chem guilty pleas proved to be an obstacle in the hands of defense counsel, which built a defense, beginning with motions to dismiss, around the theme that the only unlawful conspiracy was the one that was described in the guilty pleas as a narrow 18-month conspiracy affecting only cylindrical cells. To succeed through trial, Plaintiffs' Counsel would have

to prove a conspiracy among all the Defendants for a *nine-year* period for cylindrical *and* prismatic cells, causing an overcharge on cylindrical and prismatic *battery packs* and the *finished products* containing the price-fixed cells.

The $139.3 million common fund is an exceptional result that results in an immediate and substantial benefit to the DPP Class.[4]

### 2. Plaintiffs' Counsel undertook enormous risk on a contingent fee

The contingent nature of the representation meant that, from the outset of the case, the risk of nonpayment was high because the risk of non-recovery was high. Plaintiffs' Counsel represented the DPP Class on a purely contingent basis, investing considerable time and money in the prosecution of the action without any guarantee that the investments would ever be repaid. Tabacco Decl. ¶84.

Antitrust price-fixing conspiracy cases are notoriously complex and difficult to litigate. *See*, *e.g.*, *In re Linerboard Antitrust Litig.*, No. CIV.A. 98-5055, 2004 WL 1221350, at *10 (E.D. Pa. June 2, 2004) ("antitrust class action is arguably the most complex action to prosecute").

"Antitrust litigation in general, and class action litigation in particular, is unpredictable." *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465, 475 (S.D.N.Y. 1998). "The 'best' case can be lost and the 'worst' case can be won, and juries may find liability but no damages. None of these risks should be underestimated." *In re Superior Beverage/Glass Container Consol. Pretrial*, 133 F.R.D. 119, 127 (N.D. Ill. 1990).

Here, there was risk of failing to prove liability at trial. The fundamental fact that documents and witness testimony were nearly all in Japanese and Korean made developing the evidentiary record difficult and time-consuming, and made the prospect of presenting a cogent case-in-chief daunting. Proving to a jury that there was a nine-year conspiracy in which all the Defendants participated would be a challenge. Had they not settled, Defendants would have likely argued that there was no over-arching conspiracy, but instead episodic, bi-lateral communications and

---

[44] The Settlements each provided for cooperation in the form of witnesses at trial and other assistance, a valuable form of non-cash benefit that the DPP Class already enjoyed. The first Sony settlement in particular resulted in valuable cooperation from Sony which was used to advance the case against the remaining defendants. Tabacco Decl. ¶¶54, 63, 81.

information exchanges that involved some but not all Defendants, and the smaller Defendants would have argued they did not participate in any unlawful agreement.  Defendants likely would have argued that the periods before and after the short guilty-plea period were not infected by price-fixing, and that impact on prices from episodic information-sharing could not be shown and would not be unlawful even if they could be shown.  There is a risk that the Court or a jury would credit such defense arguments.

There was also a risk that a class would not be certified or would not remain certified through trial.[5]  Indeed, class certification risk manifested itself in this case when the Court denied DPPs' motion for class certification with leave to renew the motion.  Tabacco Decl. ¶51.  Co-Lead Counsel believe the Court would have certified the proposed DPP class on a renewed motion, as the areas in need of buttressing that were identified by the Court were curable with further work, and the retained experts had performed that work.  *Id.*  Certification likely would have led to a 23(f) appeal with all the attendant risks therein.

However, even with the class certified before trial, either a successful *Daubert* challenge or an effective cross-examination at trial could have resulted in a defense judgment or a significantly reduced verdict.  Defendants litigated their position that DPPs were entitled to no recovery for finished products—*e.g.*, camcorders and notebook PCs—which account for the vast majority of DPPs' damages.  DPPs' experts estimate that finished products constitute 75% of class members' purchases.  Tabacco Decl. ¶49.  Consequently, the risk of proving liability but not recovering most of the damages was real.  "[T]he history of antitrust litigation is replete with cases in which antitrust plaintiffs succeeded at trial on liability, but recovered no damages, or only negligible damages, at trial, or on appeal."  *NASDAQ Mkt-Makers*, 187 F.R.D. at 476.  Indeed, the risk of proving liability but having the jury not award most of the damages occurred in the *LCD* direct purchaser class

---

[5] Several large antitrust class actions have been denied certification in recent years. *See, e.g.*, *In re Optical Disk Drive Antitrust Litig.*, 303 F.R.D. 311, 325 (N.D. Cal. 2014); *In re Flash Memory Antitrust Litig.*, No. C 07-0086 SBA, 2010 WL 2332081, at *19 (N.D. Cal. June 9, 2010); *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 508 (N.D. Cal. 2008) (denying certification of indirect purchaser class and certifying a direct purchaser class that was much smaller than requested). *See also In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 255 (D.C. Cir. 2013).

action, which went to trial against Toshiba.  There, the jury found Toshiba liable as a conspirator but awarded a level of damages that would ostensibly be set-off entirely by earlier settlement recoveries from other defendants.  *See* Tabacco Decl. Ex. 13 (Special Verdict dated July 3, 2012).

When Judge Hochberg (ret.) described the risk of nonpayment in actions like this one, she remarked on "the sometimes undesirable characteristics" of contingent-fee antitrust class actions. *In re Remeron Direct Purchaser Antitrust Litig.*, No. Civ. 03-0085 (FSH), 2005 WL 3008808, at *14 (D.N.J. Nov. 9, 2005).  Those include "the uncertain nature of the fee, the wholly contingent outlay of large out-of-pocket sums by plaintiffs, and the fact that the risk of failure and nonpayment in an antitrust case are extremely high."  *Id.*

### 3. Plaintiffs' Counsel undertook a financial burden to prosecute the action for the DPP Class

The litigation is now in its sixth year.  Plaintiffs' Counsel have spent $3,354,573.35 out-of-pocket on necessary litigation costs, and Co-Lead Counsel have not requested any interim reimbursement from the settlements as they have presented those agreements to the Court for approval.

The advancement of all the litigation expenses has been at risk of total loss.  No third-party litigation funding was sought or used, which might otherwise have mitigated the risk of loss.  For all of the services for which Plaintiffs' Counsel seek payment now, they have waited years for payment.

The financial burden is made heavier by the fact that Plaintiffs' Counsel have necessarily foregone some other work during the six-year pendency of this action, as many team members have been almost exclusively assigned to this action for long periods.  Tabacco Decl. ¶84.

### 4. Awards in similar complex antitrust cases confirm the request here is reasonable

The requested 30% fee award is consistent with the fee award in similar antitrust class actions in this District, especially as the requested fee here amounts to a negative, 0.58 multiplier of the lodestar.  Moreover, a respected, recent study collecting empirical data on fee awards in class actions confirms that for an antitrust class action with this size common fund recovery, a 30% fee award is typical.

1    In other large electronics antitrust class actions in this District, the court has awarded a fee of

2    30% or near 30%.  *See*, *e.g.*, *In re Cathode Ray Tube (CRT) Antitrust Litig. (CRT IV)*, No. 07-cv-

3    05944-JST, slip op. at 3, 8, ECF No. 5169 (N.D. Cal. June 8, 2017) (**30%**) (attached as Ex. 10 to

4    Tabacco Decl.); *In re Optical Disk Drive Antitrust Litig.*, No. 10-md-2143 RS, slip op. at 2, ECF

5    No. 1658 (N.D. Cal. July 23, 2015) (**30%**) (attached as Ex. 11 to Tabacco Decl.); *In re TFT-LCD*

6    *(Flat Panel) Antitrust Litig. (LCD II)*, No. 07-MD-1827 SI, 2013 WL 149692, at *2 (N.D. Cal.

7    Jan. 14, 2013) (**30%**); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, No. 4:07-MD-

8    01819-CW, slip op. at 2, ECF No. 1370 (N.D. Cal. June 30, 2012) (**30%**) (attached as Ex. 12 to

9    Tabacco Decl.); *In re TFT-LCD (Flat Panel) Antitrust Litig. (LCD I)*, No. 07-MD-1827 SI, 2011

10   WL 7575003, at *2 (N.D. Cal. Dec. 27, 2011) (**30%**); *In re TFT-LCD (Flat Panel) Antitrust Litig.*

11   *(LCD III)*, No. 07-MD-1827 SI, 2013 WL 1365900, at *20 (N.D. Cal. Apr. 3, 2013) (**28.6%**); *In re*

12   *Dynamic Random Access Memory (DRAM) Antitrust Litig. (DRAM)*, No. M-02-1486-PJH, 2007 WL

13   2416513, at *1 (N.D. Cal. Aug. 16, 2007) (**25%**).

14   When a fee award is less than 30%, unlike this case, it typically involves a positive

15   multiplier—*i.e.*, counsel receive a multiple of their hourly rate.  *See*, *e.g.*, *In re High-Tech Emp.*

16   *Antitrust Litig.*, No. 11-CV-02509-LHK, 2015 WL 5158730, at *10-11 (N.D. Cal. Sept. 2, 2015)

17   (awarding multiplier of 2.5).

18   The award DPPs seek is consistent with recoveries awarded in other major class action cases.

19   Indeed, a 30% fee award is the market rate for an antitrust class action like this one.  *See Vizcaino*,

20   290 F.3d at 1050 ("market rates" are a question of "lawyers' reasonable expectations [for recovery

21   of contingent fees], which are based on the circumstances of the case and the range of fee awards

22   out of common funds of comparable size").

23   A recent study collecting empirical evidence of attorneys' fees in class action settlements

24   likewise supports the requested fee.[6]  The authors found that, of the 19 antitrust settlements between

25   2009 and 2013 with a mean recovery of $501.09 million and a median recovery of $37.3 million, the

26   mean and median fee percentages were 27% and 30%.  Eisenberg, Miller & Germano, *Attorneys'*

27

28   _____
        [6] This Court has previously consulted such studies, which can serve as an "unbiased and
     useful reference for comparing fee[] cases of similar magnitude."  *In re Colgate-Palmolive Co.*
     *ERISA Litig.*, 36 F. Supp. 3d 344, 349 (S.D.N.Y. 2014).

*Fees in Class Actions: 2009-2013*, 92 N.Y.U. L. Rev. 937, 952 (2017) (attached as Ex. 6 to the Tabacco Declaration).  *See also In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig. (NCAA)*, No. 14-cv-2758-CW, 2017 WL 6040065, at *2 (N.D. Cal. Dec. 6, 2017) (relying on same empirical finding), *appeal docketed*, No. 18-15054 (9th Cir. Jan. 11, 2018).

> ### 5.   The negative lodestar multiplier means a 30% fee award cannot result in a "windfall"

Finally, a cross-check of the requested fee with Plaintiffs' Counsel's lodestar shows that the requested fee is reasonable.[7]  A lodestar cross-check may be used to ensure that class counsel has done the work necessary to justify the fee sought.  *Vizcaino*, 290 F.3d at 1050.  *See also In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 306-07 (3d Cir. 2005) ("[T]he lodestar cross-check calculation need entail neither mathematical precision nor bean-counting.  The district courts may rely on summaries submitted by the attorneys and need not review actual billing records." (footnote omitted)).

The Ninth Circuit has acknowledged the existence of the so-called "megafund" approach to attorneys' fees which dictates that courts should consider awarding lower fee percentages in actions where the recovery is greater than $100 million—but simultaneously referenced the lodestar cross-check as indispensable.  *In re Bluetooth*, 654 F.3d at 942.  The bedrock principle is that a "windfall" exists only if a percentage award results in a high, positive multiplier of the lodestar.  Indeed, the "windfall" that courts guard against is the situation "where awarding 25% of a 'megafund' would yield windfall profits for class counsel ***in light of the hours spent on the case***."  *Id.* (emphasis added).  *See also* 5 W. Rubinstein, Newberg on Class Actions, § 15:81 (5th ed. Dec. 2017 update); *CRT III*, 2016 WL 4126533, at *6 ("[T]he best way to guard against a windfall is first to examine whether a given percentage represents too high a multiplier of counsel's lodestar.").

Here, while the recovery of $139.3 million could technically be viewed as a "megafund" raising the possibility of a windfall, the concept of the $100 million threshold to qualify as a

---

[7] The lodestar method requires that the Court determine the number of hours reasonably spent by counsel on a matter, multiply it by counsel's reasonable hourly rates, and then adjust the lodestar up or down based on various factors similar to those relevant to the percentage method.  *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 941-42 (9th Cir. 2011).

1   "megafund" is misplaced in this circumstance.  *See* 5 Newberg on Class Actions, § 15:81 ("[T]he

2   mega-fund approach is an odd idea in that it implies that everything is rational until $100 million,

3   but irrational thereafter, creating a cliff-like effect rather than a gradually-reducing percentage along

4   the lines of a hill [known as the 'sliding scale' approach].")  In any case, as Judge Wilken recently

5   explained, "[F]ederal district courts across the country have, in the class action settlement context,

6   routinely awarded class counsel fees in excess of the 25% 'benchmark,' even in so-called 'mega-

7   fund' cases."  *NCAA*, 2017 WL 6040065, at *9.

8         Here, a lodestar cross-check "confirm[s] that a percentage of recovery amount does not

9   award counsel an exorbitant hourly rate."  *Online DVD*, 779 F.3d at 949 (citation and internal

10  quotation marks omitted).  Plaintiffs' Counsel here have devoted 173,863 hours, resulting in a total

11  lodestar of $72.5 million.  Tabacco Decl. ¶92 & Ex. 5.  This results in an average hourly rate of

12  $417 per hour.  The resulting multiplier, moreover, is negative at 0.58, so if the requested fee is

13  awarded, the effective average hourly rate is $241.82 per hour.  *Id.*, ¶94.

14        There is no windfall.

15        The 173,863 hours that Plaintiffs' Counsel devoted to the litigation is the result of the

16  complexity and labor-intensive nature of the legal work.  Tabacco Decl. ¶¶67, 77, 92-93.  Co-Lead

17  Counsel maintained control over the work and carefully monitored the work Plaintiffs' Counsel

18  performed to avoid duplication of effort.  *Id.*, ¶70.  Co-Lead Counsel required every law firm

19  representing the DPP Class to commit in writing to a time and expense protocol as a precondition to

20  receiving any assignments.  *Id.*, ¶71 & Ex. 4.  The protocol mandated billable hour caps for the

21  various   types   of   attorney   and   para-professional   work,[8]   reporting   requirements   of

22  contemporaneously-kept time records, and strict rules on what is and what is not compensable time.

23  *Id.*  After the final settlement agreement was reached, Co-Lead Counsel halted all ongoing work by

24  Plaintiffs' Counsel and performed an audit of all the detailed time records of every firm.[9]  *Id.*

25

26        [8] For example, the protocol enforces caps of $350/hr for attorneys' document review,
    $400/hr for foreign language document review, $175/hr. for paralegals and investigators.  Tabacco
27  Decl. Ex. 4, at 2.  With nearly half of all the billable hours dedicated to document review, these rate
    caps had a major effect.

28        [9] The lodestar includes zero time billed for the time and expense audit, nor, for that matter,
    the work to prepare this Motion.  Moreover, Co-Lead Counsel will likely incur hundreds of

1    Indeed, the total lodestar would be higher if Co-Lead Counsel had not capped billing rates but

2    charged what large defense firms charge for hourly rates.

3        Accordingly, a lodestar cross-check confirms the requested 30% fee should be awarded.

4    **C.    Plaintiffs' Counsel's Expenses Are Reasonable and Necessarily Incurred**

5        Plaintiffs' Counsel seek payment from the Settlement Fund of $3,354,573.35 in expenses

6    necessarily incurred in the prosecution of this action, an amount representing 2.4% of the Settlement

7    Fund.  Tabacco Decl. ¶¶96-101 & Ex. 7.

8        Attorneys who create a common fund for the benefit of a class are entitled to be reimbursed

9    out-of-pocket expenses incurred in creating the fund so long as the submitted expenses are

10   reasonable, necessary and directly related to the prosecution of the action. *Vincent v. Hughes Air*

11   *West*, 557 F.2d 759, 769 (9th Cir. 1977); *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1048

12   (N.D. Cal. 2008) ("Attorneys may recover their reasonable expenses that would typically be billed

13   to paying clients in non-contingency matters.").

14       With this Motion, the Tabacco Declaration (regarding expenses generally) together with the

15   Zahid Declaration (providing the Litigation Fund accounting) provide an accounting for expenses

16   incurred by Plaintiffs' Counsel.  Tabacco Decl. ¶¶96-101, Ex. 7; Zahid Decl. ¶¶2-16 & Exs. A-B.

17   Of the $3,354,573.35 in expenses, $2,501,352.52 are out-of-pocket, *i.e.*, already expended for the

18   DPP Class' benefit.[10]  *See* Tabacco Decl. Ex. 7.  The remaining amount consists of an unpaid

19   invoice for economic consulting work ($212,030) and unpaid charges for document hosting

20   ($641,190.83).  *Id.*

21       The primary out-of-pocket expense in this case was for economic expert fees, which at

22   $1,623,777 (expenses for experts Noll and OSKR) account for 48% of all expenses.  *See* Zahid Decl.

23

24   additional hours in connection with their continuing responsibilities of administering the settlements
     and any post-judgment proceedings and appeals, without prospect for further fees.

25   [10] Co-Lead Counsel have elected not to seek any reimbursement for money spent by any
     Plaintiffs' Counsel on travel, meals and lodging expenses, which totaled $190,914.56.  *See* Tabacco
26   Decl. Exs. 7 & 9.  Restaurant receipts, hotel bills, and airfare charges are frequently targeted for
     scrutiny, both fair and unfair.  District courts can be lured into a time-consuming review of such
27   charges as part of a dutiful exercise to ensure class counsel enjoyed no frills at the class' expense.
     Here, there is nothing untoward about these expenses, but not seeking them spares the Court's time
28   and resources.

Ex. B.  Absent the investment in the economic expert fees, there would be no Settlement Fund at all. The expert economists sorted and scrubbed massive quantities of transaction data to arrive at an econometrically-sound impact and damages methodologies for trial.  Without the expert economists working hand-in-glove with Co-Lead Counsel to arrive at workable impact and damage proof, the Defendants never would have been wrestled to the settlement table, let alone persuaded to part with $139.3 million.

The second-largest item is the charge of $641,190.83 from Polsinelli LLP which hosted millions of pages of documents on a Relativity-based platform to facilitate document review.  The charge is for services rendered which have not been compensated.  Information on the charge for the document hosting is found in the Tabacco Declaration at ¶99 as well as the Declaration of Daniel D. Owen Regarding Document Hosting Expenses ("Owen Document Hosting Decl."), Comp., Ex. BB. The document hosting was necessary to the prosecution of the case and consequently it is requested that payment be made from the Settlement Fund to satisfy it.

Other major categories of expenses—such as the out-of-pocket expenses for Technology-Assisted Review and related data analytics ($97,336.29), trial consultants ($50,203.79), and foreign language translators ($209,942.91)—were likewise reasonable and necessary, and should be reimbursed.  *See* Zahid Decl. Ex. B.

As the Ninth Circuit recognizes, in contingency fee class actions "litigation expenses make the entire action possible."  *Online DVD*, 779 F.3d at 953.  Plaintiffs' Counsel advanced these expenses, interest free, with no assurance they would ever be recouped.   The request for reimbursement is reasonable.

### D.      Payment of Service Awards to the Class Representatives is Appropriate

Plaintiffs' Counsel request that the Court approve service awards to the nine Class Representatives in the following amounts:  Ritz Camera, Circuit City, and Univisions ($30,000 each); Automation Engineering, Stereo Shop and First Choice Marketing ($10,000 each); and Charles Carte, Terri Walner, and James O'Neil ($5,000 each).  If awarded, the total is $135,000 to be deducted from the Settlement Fund, an amount equal to 0.09% of the Settlement Fund.

1   Service awards, *a.k.a.*, "incentive awards," encourage victims of antitrust and other harms to

2   undertake the responsibilities and risks of representing classes and to recognize the time and effort

3   spent in the case.  *NCAA*, 2017 WL 6040065, at *11.  "Incentive awards are fairly typical in class

4   action cases" as they are intended "to compensate class representatives for work done on behalf of

5   the class, to make up for financial or reputational risk undertaken in bringing the action, and,

6   sometimes, to recognize their willingness to act as a private attorney general." *Rodriguez v. West*

7   *Publ'g Corp.*, 563 F.3d 948, 958-59 (9th Cir. 2009).  Service awards are evaluated in light of "the

8   actions the plaintiff has taken to protect the interests of the class, the degree to which the class has

9   benefitted from those actions … [and] the amount of time and effort the plaintiff expended in

10  pursuing the litigation." *Staton*, 327 F.3d at 977 (citation and internal quotation marks omitted).

11  Here, the Class Representatives spent significant time and effort litigating this case for over

12  five years for the benefit of the DPP Class.  *See generally* Simon Decl. ¶¶53-59; Saveri Decl. ¶¶38-

13  51; Tabacco Decl. ¶¶102-07.  Each reviewed draft versions of complaints and other pleadings.  *See,*

14  *e.g.*, Saveri Decl. ¶42.  Each spent time reviewing and responding to three sets of document requests

15  containing a total of 74 separate requests, assisted and participated in the collection of responsive

16  hard copy documents, and in the cases of Ritz Camera, Circuit City and Univisions, identified ESI

17  sources likely to contain responsive transaction data and other relevant information.  Simon Decl.

18  ¶54; Saveri Decl. ¶43; Tabacco Decl. ¶¶37-39, 67, 104.

19  Each Class Representative reviewed and responded to three sets of interrogatories totaling 27

20  separate interrogatories, requiring sworn certifications on multiple occasions.  Simon Decl. ¶56;

21  Saveri Decl. ¶44; Tabacco Decl. ¶¶36-37, 67, 105.  They each kept abreast of the major filings in the

22  case. Simon Decl. ¶57;  Saveri Decl. ¶45;  Tabacco Decl. ¶¶104, 106.   Finally, each Class

23  Representative spent significant time preparing for deposition and then sitting for examination.

24  Simon Decl. ¶58; Saveri Decl. ¶46; Tabacco Decl. ¶107.

25  The total requested amount for service awards, $135,000 (Tabacco Decl. ¶¶108-17) is only

26  0.09% of the Settlement Fund, a fact supporting the request.  *See CRT I*, No. C-07-5944 JST, 2016

27  WL 153265, at *3 (N.D. Cal. Jan. 13, 2016) (service awards representing 0.196% of settlement is

28  "very small percentage").  The requested awards to the three larger corporate Class Representatives

of $30,000 each, to the three small businesses of $10,000 each, and the three individuals of $5,000 each are reasonable. *See id* (awarding $25,000 each to ten businesses for service as class representatives. For the individuals, $5,000 is presumptively reasonable. *Id* at *2.

**IV.    CONCLUSION**

For the foregoing reasons, Plaintiffs' Counsel for the DPP Class respectfully submit that their requests for fees, expenses and service awards are reasonable and should be granted.

DATED:  February 8, 2018

**BERMAN TABACCO**


*/s/ Todd A. Seaver*
Todd A. Seaver

Joseph J. Tabacco, Jr.
Jessica Moy
44 Montgomery Street, Suite 650
San Francisco, CA 94104
Telephone: (415) 433-3200
Facsimile:  (415) 433-6382
jtabacco@bermantabacco.com
tseaver@bermantabacco.com
jmoy@bermantabacco.com

*Interim Co-Lead Counsel for Direct*
*Purchaser Plaintiffs*

**PEARSON SIMON & WARSHAW, LLP**          **SAVERI & SAVERI INC.**


*/s/ Bruce L. Simon*                               */s/ R. Alexander Saveri*
Bruce L. Simon                                      R. Alexander Saveri

Benjamin E. Shiftan                                Geoffrey C. Rushing
44 Montgomery Street, Suite 2450                   706 Sansome Street
San Francisco, CA 94104                            San Francisco, CA 94111
Telephone: (415) 433-9000                          Telephone: (415) 217-6810
Facsimile:  (415) 433-9008                         Facsimile:  (415) 217-6813
bsimon@pswlaw.com                                  rick@saveri.com
bshiftan@pswlaw.com                                geoff@saveri.com

*Interim Co-Lead Counsel for Direct*              *Interim Co-Lead Counsel for Direct*
*Purchaser Plaintiffs*                            *Purchaser Plaintiffs*

1

**ZELLE LLP**

2

3
*/s/ Judith A. Zahid*
Judith A. Zahid

4
Qianwei Fu
Heather T. Rankie

5
44 Montgomery Street, Suite 3400
San Francisco, CA 94104

6
Telephone: (415) 693-0700
Facsimile:  (415) 693-0770

7
jzahid@zelle.com
qfu@zelle.com

8
hrankie@zelle.com

9
*Interim Liaison Counsel for Direct Purchaser*
*Plaintiffs*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28