UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA



BEFORE THE HONORABLE DONNA M. RYU, MAGISTRATE JUDGE

| | |
|---|---|
| IN RE: LITHIUM ION BATTERIES) | NO. C 13-MD-2420 YGR |
| ANTITRUST LITIGATION          ) | |
|                               ) | MDL No. 2420 |
| _____) | Pages 1 - 52 |

**Discovery Disputes**

Oakland, California
Thursday, April 19, 2018

<u>**REPORTER'S TRANSCRIPT OF PROCEEDINGS**</u>

**APPEARANCES:**

| | |
|---|---|
| For Direct Purchaser | Pearson Simon Warshaw LLP |
| Plaintiffs: | 44 Montgomery Street, Suite 2450 |
| | San Francisco, California  94104 |
| BY: | BENJAMIN E. SHIFTAN, |
| | ALEXANDER L. SIMON, ATTORNEYS AT LAW |

| | |
|---|---|
| For Indirect | Lieff, Cabraser, Heimann & |
| Purchaser Plaintiffs: | Bernstein |
| | 275 Battery Street, 30th Floor |
| | San Francisco, California  94111 |
| BY: | LIN Y. CHAN, |
| | MIKE SHEEN, ATTORNEYS AT LAW |

Reported By:      Raynee H. Mercado, CSR No. 8258

Proceedings reported by electronic/mechanical stenography; transcript produced by computer-aided transcription.

**A P P E A R A N C E S (cont'd.)**

For Panasonic/Sanyo        Winston & Strawn
Defendants:                101 California Street
                           San Francisco, California  94111
                    BY:    IAN L. PAPENDICK, ATTORNEY AT LAW


For Objector Rinis         N. ALBERT BACHARACH, JR.,
Travel Service, Inc.:       ATTORNEY AT LAW
                           4128 NW 13th Street
                           Gainesville, Florida  32609



                           --o0o--

```
 1   Thursday, April 19, 2018                          11:06 a.m.
 2                        P R O C E E D I N G S
 3           THE CLERK:  Calling 4-13-2420YGR, In Re: Lithium Ion
 4   Batteries Antitrust Litigation.
 5       Please come forward and identify yourselves.
 6                   (Pause in the proceedings.)
 7           MS. CHAN:  Good morning, Your Honor.  Lyn Chan for
 8   the indirect purchaser plaintiffs.
 9           THE COURT:  Good morning.
10           MR. SHIFTAN:  Good morning, Your Honor.  Ben Shiftan
11   from Pearson Simon & Warsaw for the direct purchasers, and
12   with me is my cocounsel Alex Simon.
13           THE COURT:  Good morning.
14           MR. PAPENDICK:  Good morning, Your Honor.  Ian
15   Papendick for Winston & Strawn for the Panasonic and Sanyo
16   defendants.
17           MR. SHEEN:  Morning, Your Honor.  Mike Sheen also for
18   indirect purchaser plaintiffs.
19           THE COURT:  Good morning.
20       And I think -- Mr. Bacharach?
21           MR. BACHARACH:  Yes, Your Honor.
22           THE COURT:  Please come forward.  I'm going to start
23   with that matter first.
24           MR. BACHARACH:  Good morning, Your Honor, Albert
25   Bacharach for Rinis Travel.
```

1     **THE COURT:**  Good morning.

2   All right.  I'm going to start with joint letter Docket

3 No. 2206, which has to do with the document subpoena, and

4 2248, which has to do with a deposition subpoena for Rinis

5 Travel Service.

6   Let's start with 2248, which is the deposition subpoena.

7 Mr. Bacharach, is it correct that your client did not serve

8 any objections to the subpoena?

9     **MR. BACHARACH:**  It is correct that they did not serve

10 objections to the subpoena, Your Honor.

11     **THE COURT:**  Seems like they waived their objections.

12     **MR. BACHARACH:**  Well, was -- Sorry.  I understand

13 that I'm playing in a different ball court, but I read your

14 standing order.  It said not to file discovery objections and

15 in fact to -- as I read it, you're not supposed to file

16 discovery objections but instead to speak with the other side.

17 And then if you can't reach a conclusion, to then move forward

18 with the joint letter brief.

19     **THE COURT:**  That's not what my standing order says at

20 all, and it wouldn't be allowed to say that because that would

21 be in conflict with the Federal Rules of Civil Procedure, and

22 this is governed by Rule 45 on subpoenas.  And there's a --

23 there's a requirement to file objections.

24   That's not something I could or would overrule by a

25 standing order.  And there's nothing in my standing order that

```
 1   talks about objections.  It does talk about a process for

 2   resolving discovery disputes.

 3      So, for example, there may be objections that are lodged

 4   or positions taken through objections that the other side

 5   disagrees with that.  We then have to work out through a

 6   meet-and-confer process, and if that doesn't work, through

 7   adjudication.  But there's nothing in there that somehow

 8   overrides the obligation to file objections.

 9           MR. BACHARACH:  I am not in argument with the court,

10   Your Honor.  It was my understanding from reading it that it

11   says not to file normal discovery motions, and so I did not.

12           THE COURT:  That's a different issue.

13           MR. BACHARACH:  I understand.

14           THE COURT:  Normal discovery motion; that's correct.

15   We don't -- In this district, we do not -- I think

16   universally.  I'm not sure if there's any judge who uses a

17   motion -- regular motion practice on this.

18      It's a joint letter practice for discovery disputes,

19   instead of motions to compel or motions for protective order.

20   That's entirely different from the normal obligation under the

21   rules for written discovery or for depositions, to file

22   objections.

23           MR. BACHARACH:  Well, Your Honor, we would have -- I

24   wouldn't file objections.  I was going to move for protective

25   order.
```

1           **THE COURT:**  Same thing.

2           **MR. BACHARACH:**  And so my understanding was not to do

3      that and to tell them, so --

4           **THE COURT:**  You still to have lodge objections.  It's

5      just sort of like saying, "Well, I didn't respond to those

6      requests for production and file objections because I thought

7      your standing order prohibited it."  I mean, that's an absurd

8      reading.

9           **MR. BACHARACH:**  I -- Except, Your Honor, I'm -- the

10     final decision's yours.  I'm certainly not arguing.  I'm

11     telling you.

12          **THE COURT:**  Okay.  Well, I just want to understand

13     the basis for that -- for your position.

14          **MR. BACHARACH:**  The basis of the position was that I

15     would normally in Florida or Georgia or Alabama in the

16     Eleventh Circuit file a motion for protective order.

17        But I read the standing order to say not to do that,

18     instead to contact the other side.  So I may be totally wrong.

19     I'm not arguing that I'm correct.  I'm just informing the

20     court that if you're -- if you read it to not file for a

21     protective order, then I've done it correctly.

22          **THE COURT:**  We -- I think we're still not talking the

23     same language here.

24          **MR. BACHARACH:**  Okay.

25          **THE COURT:**  You're saying that you believe my

1    standing order required you to go through another process

2    instead of filing a motion for protective order.  That's true.

3            **MR. BACHARACH:**  Okay.

4            **THE COURT:**  But what I'm trying to figure out is what

5    in my standing order relieved you of the obligation to file

6    objections.

7            **MR. BACHARACH:**  I'm lost in your question, Your

8    Honor.  I mean, I -- I -- with regard to the issue of the

9    deposition, I would have moved anywhere else for a protective

10   order because they wanted the client to bring in a computer

11   for examination.

12           **THE COURT:**  I understand.

13           **MR. BACHARACH:**  And we said that the computer had

14   sensitive financial information and that they would not

15   provide the computer but they would -- they have a battery

16   that comes right out of the computer.  We gave them a picture

17   of that.  We filed that with the court.

18       So the deposition objection is basically with regard to

19   giving them access to financial information from the

20   business -- that isn't even tangentially related to the issues

21   before the court.

22           **THE COURT:**  Okay.  I'm looking at Rule 45(d)(2),

23   demand to produce materials or permit inspection and -- and

24   (b) -- (d)(2)(b) talks about the service of objections.  So

25   I -- that's what I'm not understanding.  But I think we can

```
 1    move on.
 2                MR. BACHARACH:  Okay.
 3                THE COURT:  Those objections were waived.  So if
 4    you've waived the objections, then those -- the objections
 5    don't stand.  Okay?
 6          Now, that being said, my understanding is that the DPP's
 7    are willing to forego production of the commuter itself
 8    assuming the deposition goes forward.
 9          Is that correct?
10                MR. SHIFTAN:  Your Honor, that certainly was our
11    position in the most recent letter brief.  I'm a little bit
12    reluctant to offer concessions given that we were forced to
13    brief this whole issue.
14          However, in the spirit of compromise, I think we're
15    willing to go forward with the deposition if we can at least
16    have the laptop there and pop the battery out to inspect it.
17          We are willing to not turn the computer on.
18                THE COURT:  Okay.  I mean, is that enough for you
19    to -- can you just inspect the battery?  Is that sufficient to
20    determine whether the -- the -- Rinis Travel Service is a
21    class member?
22                MR. SHIFTAN:  We think that in conjunction with
23    taking the deposition and asking questions about the purchase,
24    so long as we get the deposition next week, that would suffice
25    for our purposes.
```

```
1          THE COURT:  That's -- It seems to allay any privacy

2    concerns.  I'm not even sure what the privacy concerns were.

3    But if we're not even going to turn the computer on, simply

4    going to see that it is taken out of the computer and then

5    have the deposing party inspect that battery, I don't think

6    that that's unduly burdensome.

7          Do you have any objection to that?

8          MR. BACHARACH:  No, we don't.

9          THE COURT:  Okay.  So that will be the process.

10         As to the requests, again, as I said, you've waived the

11   objections to the six topics.  But I will say that on topics 4

12   and 5, ten years seems a little broad.

13         Why do you need ten years?

14         MR. SHIFTAN:  I think given Rinis and the affiliated

15   entities' histories, we thought that was a nice sample size to

16   select from.  But, of course, if Your Honor wants us to cull

17   that down, we're more than happy to.

18         THE COURT:  It seems pretty broad.  What do you think

19   would be more reasonable?

20         MR. SHIFTAN:  I think we're willing to do seven

21   years.

22         MR. BACHARACH:  Your Honor, it's irrelevant to --

23   Backing up.

24         THE COURT:  Well, I -- I did carefully read the

25   parties' positions.  I don't think there's -- first of all,
```

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

1    all of the objections have been waived, number one.  Number

2    two, to the extent you're trying to draw a distinction about

3    objecting to fees as opposed to the fairness of an overall

4    settlement, I didn't see any case talking about drawing a

5    distinction on -- on that basis for purposes of determining

6    what is the proper scope of discovery on an objector,

7    particularly a potentially serial objector, where there's

8    questions about motive and whether there've been -- whether

9    there is a history of using an objector status in an improper

10   way, in other words, to extract money without really effecting

11   any change on -- on a settlement, whether it's on fees or on

12   some other aspect of it because of the -- the nature of the

13   objection.

14        So that is fair game, and that has been recognized in our

15   district as fair game, as well as in other courts.

16        I do think ten years is too broad.  I'm going to go with

17   five.  I think five years is fine for topics 4 and 5.

18        As to topic 6, I just want to clarify what this is about.

19   And that has to do with corporate history.  So what are you

20   getting at with that?

21        Is that about Rinis and its various entities, or is it

22   something else?

23             **MR. SHIFTAN:**  I think the corporate history topic,

24   Your Honor, was really trying to get an understanding of how

25   Rinis Travel Service, Inc. is connected to the profitsharing

```
 1      trust, the -- the IRA account, all of that, Your Honor.

 2              THE COURT:  That doesn't sound like corporate

 3      history.  That sounds like corporate organization.

 4              MR. SHIFTAN:  Yeah.  It probably could have been

 5      worded better.  I would agree with that.

 6              THE COURT:  'Cause history sounds like, well, how did

 7      you come into being?  Were there prior entities?  Is that what

 8      you're going to be asking?

 9              MR. SHIFTAN:  I think corporate organization's --

10      basically we just want to understand really in order to defeat

11      this argument that they are the stand-alone entities, how the

12      profitsharing trust is related to the Inc. and who the owners

13      are, who the agents are, that sort of thing.

14              THE COURT:  That would be appropriate in order to

15      understand the connections between those, because my

16      understanding from the presentations in the letters is that

17      Rinis Travel Service has objected in this case.

18          But other entities or individuals that appear to be

19      connected with Rinis have objected in other cases such that,

20      you know, it may be fair to take a look at all of them

21      together to -- to determine whether there is -- whether it's

22      fair to characterize everybody together as sort of a serial

23      objector.  And that's something that's -- that's important for

24      Judge Gonzalez to know -- Gonzalez Rogers to know.

25          So I'm inclined, Mr. Bacharach, to order a deposition to
```

```
 1   take place in the next week, meaning no later than April 27th,
 2   given that the fairness hearing is May 8th, correct?
 3           MR. SHIFTAN:  Correct.
 4           THE COURT:  That it be no longer than four hours,
 5   that it cover the topics -- topics 1 through 6, except that
 6   topics 4 and 5 are shortened to ten years -- sorry -- to five
 7   years, and that it take place -- well, I -- let me hear what
 8   is the position -- I'm not inclined to issue monetary
 9   sanctions here.
10       But I am concerned that the deposition was set and the
11   objector did not appear and there was expenses incurred as a
12   result.  And my understanding is that the DPP's didn't know
13   that the objector wasn't going to show up until 2:40 in the
14   morning via an email, which is completely inappropriate.
15       So I think the appropriate thing here is to make some
16   adjustments on where this deposition is going to take place
17   based on that.
18       So what is your position?
19           MR. SHIFTAN:  Your Honor, I -- I do think if you're
20   not willing to grant us monetary sanctions, I think that would
21   be a perfectly appropriate remedy.  And we'd be, obviously,
22   more than willing to take it here in San Francisco.
23           THE COURT:  Do you need to take it in person?
24           MR. SHIFTAN:  I think we would like to take it in
25   person.  We especially do because we need to inspect the
```

1    laptop battery.

2              **THE COURT:**  Right.

3       Okay.  Well, I'd be inclined to let them decide where

4    they're going to take the deposition because they already

5    underwent the expense and trouble of trying to hold it in -- I

6    guess New York or --

7              **MR. SHIFTAN:**  It was going to be in Washington, D.C.

8              **THE COURT:**  In D.C. and is that where Rinis is

9    located?

10             **MR. SHIFTAN:**  They're located just across the border

11   in Maryland from my understanding.

12             **THE COURT:**  Okay.  But your client kind of blew that.

13      And so I think it's appropriate that they -- this time

14   around, they -- they don't get have their choice of location

15   for the deposition.

16             **MR. BACHARACH:**  Your Honor, I don't believe it's

17   their choice of location.  I believe that --

18             **THE COURT:**  Well, within the -- Rule 45 of where

19   they're supposed to take place, that I think it's appropriate

20   to go outside of that rule given that they completely

21   disregarded their obligations under that subpoena and -- and

22   didn't give any indication that they weren't going to show up

23   until --

24             **MR. BACHARACH:**  That would not be --

25             **THE COURT:**  -- middle of the night.

```
1              MR. BACHARACH:  That would not be entirely correct,

2      Your Honor.  The indication that the -- they would not be

3      doing the deposition because of the computer issue was easily

4      four business days prior to the deposition.

5          When direct plaintiffs' counsel were -- were first

6      contacted by me, they basically wouldn't talk to me, said that

7      I hadn't pro hac'd into the Northern District, comma, despite

8      the fact this is an MDL, comma, and that they were on notice

9      from the time I contacted them that there was a problem with

10     the deposition.

11         So I think that not only should the deposition be in the

12     DC area but, in fact, it's -- it should probably be in

13     Maryland rather than in DC because --

14             THE COURT:  Well, there's a hundred-mile rule, right?

15             MR. BACHARACH:  Well, there's a hundred-mile rule for

16     depositions, but with regard to third parties that aren't

17     parties to the litigation --

18             THE COURT:  Well, it's not really clear whether they

19     are or are not.  That's an open question.  You're claiming

20     that your client is a class member in a certified class.

21             MR. BACHARACH:  Right.  In which --

22             THE COURT:  There's an open question of whether that

23     makes them a party or -- or subject to subpoena as a third

24     party.  But regardless, let me -- let me try this one.

25         Who has the computer?
```

1        **MR. BACHARACH:**  Rinis Travel Service.

2        **THE COURT:**  Okay.  Here is one potential solution

3    'cause I'm not completely convinced this needs to happen in

4    person.  So one way we could do this is a four-hour video

5    deposition, but Rinis pays for the costs immediately of

6    shipping the computer out here so that they can take a look at

7    it, and we have a promise by the DPP's that all they would do

8    is remove the battery -- they're not allowed to turn it on --

9    and then ship it back, all at the expense of Rinis so that way

10   we save the expense of an in-person deposition.  We save that

11   inconvenience.  But we get the -- get the computer.

12        And I feel comfortable, if it's under court order, that

13   the DPP's are only going to use it for the purpose of -- of

14   checking out the battery and not turning it on.

15        **MR. BACHARACH:**  Your Honor, it's -- it sounds like a

16   very Solomonic solution.  I'm not at all adverse, but couldn't

17   we just send them the battery?

18        **THE COURT:**  No.

19        **MR. BACHARACH:**  Okay.  And could I --

20        **THE COURT:**  Well, I think -- I mean, you want -- the

21   reason why you want it is you want to see that it's connected

22   to a certain model.  Does it matter?

23        **MR. SHIFTAN:**  I think we'd like to get the whole

24   computer and pop the battery out.

25        I would, Your Honor -- I don't think that it's entirely

1    fair to the direct purchasers when we already showed up once

2    in person for the deposition -- sorry -- and then to -- to now

3    somehow, after they didn't show up, for us to be relegated to

4    a video deposition.

5         **THE COURT:**  I'm not sure -- I'm not convinced that

6    you need more than a video deposition in this case.

7         You're going to get four hours of a depo of this -- of

8    this person on the topics -- nearly all the topics.  You're

9    going to get the battery.  You'll be able to take it out of

10   the computer.  I am not completely convinced that we all need

11   to go through the expense of people traveling around for this

12   deposition.  I think you can do a fine job on video.

13        But you tell me why that wouldn't be sufficient.

14        **MR. SHIFTAN:**  Well, I mean -- I think, Your Honor,

15   given Rinis's history as a serial objector, I do think there

16   is value in being in the room when you're actually questioning

17   them about some of these former cases in which they were

18   involved and what the outcomes of those cases were.

19        **THE COURT:**  You can ask pointed questions.  And Rinis

20   is going to have to answer them because I've said these are

21   fair game.

22        **MR. SHIFTAN:**  Okay.  And to the extent Your Honor was

23   concerned about expense from class members flying from

24   San Francisco out to DC, we do have a lawyer in DC who

25   actually appeared at the prior one.  He -- He would -- If we

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

1    were in person, he could take it again, but -- If Your Honor

2    would prefer video conference, that's fine.

3           **THE COURT:**  Well, if you want to take it out there,

4    so in other words, if -- another compromise would be it's in

5    person but it's where Rinis is instead of making Rinis fly out

6    here, I would be open to that.

7           **MR. SHIFTAN:**  I think that would be our preference.

8           **MR. BACHARACH:**  Now that we're down to some brass

9    tacks of how we're going to do this, could we have a court

10   reporter?  Because as I remember the subpoena also pick's a

11   lawyers office to sit in a conference room to do the

12   deposition.  And where I'm from that's thought of as bad form,

13   so we would -- because the unsophisticated client seems to

14   think that the lawyer is somehow connected to the court, and

15   that's why the deposition's being done in their office.  So

16   we're only asking for a court reporter as long as --

17          **THE COURT:**  Well, I'm sure there'll be a court

18   reporter.  You're saying you want it done at a court

19   reporter's office?

20          **MR. BACHARACH:**  Yes.

21          **THE COURT:**  Denied.

22          **MR. BACHARACH:**  Yes, Your Honor.

23          **THE COURT:**  So let's move on.

24       It is fine -- It is common practice to take depositions at

25   the offices of the attorney who's taking the deposition, and I

```
1    have no reason to believe that your client -- that you can't

2    explain to your client or that there'll be some undue

3    intimidation because they have come to a lawyer's office as

4    opposed to a court reporter's office.

5           MR. BACHARACH:  I understand the court's ruling.  I

6    was saying that because, again, where I practice, generally,

7    it's the reverse, that the courts believe that in fact it gets

8    a -- a stamp of approval from the court when the person has to

9    show up at the other side's law office to do something, so but

10   yes, I can explain it.  I'm --

11          THE COURT:  Then let me --

12          MR. BACHARACH:  More than competent.

13          THE COURT:  Let me correct what I said.  It's at

14   least standard practice here.  I don't pretend to speak for

15   every district in the country.  But certainly in the districts

16   I'm familiar with --

17          MR. BACHARACH:  No, I understood, Your Honor.  I

18   wanted to explain that -- I wasn't being obstreperous.  It's

19   just -- it's not what I'm used to, so --

20          THE COURT:  Okay.

21          MR. SHIFTAN:  Your Honor, one just housekeeping

22   matter.  The local attorney who will take the deposition, I

23   conferred with him before.  He can do it a week from tomorrow,

24   if that works for everybody.

25          MR. BACHARACH:  I'm not sitting here with my
```

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

```
 1    calendar, but I can almost always change my calendar to do

 2    that.

 3            THE COURT:  Okay.

 4            MR. BACHARACH:  And if there was a problem, Your

 5    Honor, I would work it out with them and do it a day earlier

 6    rather than a day later, so --

 7            MR. SHIFTAN:  He can't do it a day earlier.  That's

 8    why I'm giving that specific date.

 9            MR. BACHARACH:  Okay.  So we're -- Let's go back.  So

10    the specific date's going to be --

11            THE COURT:  April 27th, correct?

12            MR. SHIFTAN:  A week from tomorrow.  Correct.  I

13    don't have a calendar here unfortunately either.

14            MR. BACHARACH:  So April 27th?  Morning?  Afternoon?

15    Since we're doing four hours.

16            MR. SHIFTAN:  Start at 10:00 a.m.?

17            THE COURT:  Okay?

18            MR. BACHARACH:  Sounds like it works, Your Honor.

19            THE COURT:  All right.

20       Is that a for sure thing, or 'cause -- the other way we

21    can do it is you can meet and confer out in the hall

22    afterwards and let me know if it's a problem.

23            MR. BACHARACH:  Your Honor, if you could give me one

24    minute while you do something else, I can walk out and find

25    out from both the client and my staff that it works or doesn't
```

```
 1    work.

 2           THE COURT:  Okay.  Why don't we move on to the next

 3    matter, and then -- 'cause I'll need you here for that,

 4    Mr. Bacharach.  And then while I'm taking up the lithium ion

 5    matter, you can talk about it in the hall or make the calls.

 6    If there's some problem --

 7           MR. BACHARACH:  Okay.

 8           THE COURT:  -- I'll re-call you.  Okay?

 9        So let's move on to the letter 2206, which has to do with

10    the document requests.

11        Again, there -- Am I correct your client didn't serve any

12    objections?

13           MR. BACHARACH:  We don't object.

14           THE COURT:  Okay.  So they're waived.

15        But my understanding is your client answered "we don't

16    have any documents" and that's for answering on behalf of you,

17    Y-o-u, as defined in the request; is that correct?

18           MR. BACHARACH:  Well, it's -- at this point even more

19    than because, as "you" is defined in the request and to avoid

20    court time for an order that says, "you" includes beyond what

21    you think as "you" is, class counsel's also been informed that

22    none of the entities have any of the documents that they're

23    looking for.

24           THE COURT:  So that doesn't make sense to me.

25           MR. BACHARACH:  Okay.
```

```
 1              THE COURT:  If we note -- I don't understand how that
 2     could be true if we know that they have objected in the past.
 3        Isn't that correct?
 4              MR. BACHARACH:  They have objected in the past.
 5              THE COURT:  Okay.  And if -- Why don't they have
 6     documents?
 7              MR. BACHARACH:  They have not saved any documents or
 8     emails over the years.
 9              THE COURT:  Do they have possession, custody, or
10     control of them.
11              MR. BACHARACH:  No, Your Honor.  And --
12              THE COURT:  Have you been their lawyer?
13              MR. BACHARACH:  I have been -- I have been their
14     lawyer for 20 years, Your Honor.
15              THE COURT:  Do you have copies of them?
16              MR. BACHARACH:  I do not, Your Honor.
17              THE COURT:  How can that be true?  Don't you have
18     obligations under the law to keep documents?
19              MR. BACHARACH:  I only have obligations in my state
20     with regard to contingency matters, which I have to keep for
21     six years.
22        These aren't done on a contingency fee.  There's no
23     percentage that goes to me and percentage that goes to the
24     objector, so no, I don't have such an obligation.  And I don't
25     have those documents because my basic practice --
```

1          What I most do with my life is represent disabled people

2    with regard to veterans benefits and Social Security benefits,

3    and I have to keep all of those medical files for years as

4    these cases wend they way through the administrative process,

5    the Court of Veterans' Appeals, the Federal Circuit, back down

6    to the VPA, back down to the State regional office, and so I'm

7    a small practice.  I have literally hundreds and hundreds and

8    hundreds of files filled with people's medical records, so I

9    don't keep anything I don't have to keep.

10          **THE COURT:**  So your representation to the court here

11   today is that we have a very broad definition of "you" in this

12   request.

13          **MR. BACHARACH:**  Um-hmm.

14          **THE COURT:**  It includes not just Rinis Travel Service

15   but individuals with the last name Rinis and a number of the

16   other Rinis-related entities.  And as broadly construed, your

17   representation is that nobody who must respond to these

18   requests has possession, custody, or control of any responsive

19   documents.

20       Is that right?

21          **MR. BACHARACH:**  That's correct.

22          **THE COURT:**  Okay.  So that -- that has to be put in

23   writing and verified under penalty of perjury.

24          **MR. BACHARACH:**  Glad to get you a declaration from

25   each of the Rinises -- well, I could do -- with the court's

1    permission, I can do one declaration that they sign as the --,

2    you know, as Rinis Travel Service, Inc., as the president, as

3    the -- themselves as individuals, and as the whoever they are

4    with regard to their retirement accounts and profitsharing

5    trusts.  And I can do that within two days.

6         **THE COURT:**  Okay.  But it has to say, "We have

7    searched --"

8         **MR. BACHARACH:**  Um-hmm.

9         **THE COURT:**  "-- on behalf of everyone listed as you

10   under the request for documents, and we're saying under

11   penalty of perjury that we have no responsive documents in our

12   possession, custody, or control."

13        **MR. BACHARACH:**  Yes, Your Honor.  No, I understand

14   perfectly.

15        **THE COURT:**  All right.  So -- that -- So that we're

16   not having any sort of loopholes lurking out there.

17        **MR. BACHARACH:**  There's no loophole, Your Honor.  I

18   mean, I -- I have made a number of calls with regard to these

19   issues.  And I am confident with regard to the Rinises and the

20   Travel Service that they don't keep the stuff.

21      People that don't keep emails for more than 30 to 60 days

22   don't keep much of anything.

23        **THE COURT:**  I simply am making clear --

24        **MR. BACHARACH:**  I understand, Your Honor, what you

25   want --

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

```
 1            THE COURT:  -- that the declaration needs to say

 2      those things --

 3            MR. BACHARACH:  It will be entirely clear.

 4            THE COURT:  Okay.  And on behalf of the DPP's, any

 5      other comment?

 6            MR. SHIFTAN:  I think that's fine.  I just, again,

 7      want to clarify that this -- that includes electronic

 8      documents, emails, text messages, et cetera.

 9            MR. BACHARACH:  They don't really text, Your Honor.

10            THE COURT:  I'm sure that you have defined

11      "documents" broadly in your request; is that correct?

12            MR. SHIFTAN:  Correct.

13            THE COURT:  Is that right?

14            MR. BACHARACH:  I will go through that definition and

15      list each one of those out, Your Honor.

16            THE COURT:  Okay. So that -- they have searched --

17      done a diligent search for the meaning of 'documents' as well

18      as the meaning of "you," and they have no responsive documents

19      in their possession, custody, or control.

20            MS. CHAN:  Okay.

21         All right.  So you'll do that within two days, you said.

22            MR. BACHARACH:  I can do --

23            THE COURT:  Well, let's say till Monday.

24            MR. BACHARACH:  Yeah, Monday would be the business

25      day.  It will be two days before the proposed deposition, so
```

```
 1    that should work fine.

 2              THE COURT:  The proposed --

 3         MR. BACHARACH:  Oh, to --

 4         THE COURT:  Hold on.

 5                   (Simultaneous colloquy.)

 6         THE COURT:  Stop.

 7         MR. BACHARACH:  Sorry, Your Honor.

 8         THE COURT:  The deposition will take place next

 9    Friday April 27th.  Okay?

10         MR. BACHARACH:  Oh, I'm sorry.  I thought it was

11    Wednesday, so I'm going through this whole thing in my mind

12    doing it Wednesday and I can get this to them by Monday.  I

13    can still get it to them by Monday, and the deposition will be

14    Friday.

15         THE COURT:  Okay.  So the declaration under penalty

16    of perjury is due Monday, the twenty --

17         THE CLERK:  Third.

18         THE COURT:  -- 23rd -- thank you -- of April.  And

19    the deposition will take place beginning 10:00 a.m. in

20    Washington, D.C. on Friday, April 27th.

21      What is the location of that?

22         MR. SHIFTAN:  It will be at the same firm where the

23    prior one was in.  It's Kellogg, Hansen, is the name of the

24    law firm.

25         THE COURT:  Okay.  Where the original --
```

1     **MR. SHIFTAN:**  Correct.

2     **THE COURT:**  -- deposition subpoena was noticed for.

3     **MR. SHIFTAN:**  Correct.

4     **THE COURT:**  Okay.

5     So anything further on these two letters?

6     **MR. BACHARACH:**  No, Your Honor.

7     **MR. SHIFTAN:**  I don't believe so, Your Honor.

8     **THE COURT:**  Okay.  So, Mr. Bacharach, if I could ask

9     you to go ahead and confirm just to make sure we don't walk

10    out with any problems with the deposition.

11    **MR. BACHARACH:**  Yes, Your Honor.  And as you move on,

12    if I come back in and just tell you it's okay or --

13    **THE COURT:**  A high sign will work.

14                 (Simultaneous colloquy.)

15    **THE COURT:**  Thank you.

16    **MR. SHIFTAN:**  Thank you, Your Honor.

17    **THE COURT:**  Okay.  I'm now going to take up letter

18    2194 and 2195.

19    Let's start with 2194, which are -- and what I'm going to

20    do is refer to them as Mr. S and Mr. G and Mr. T for the next

21    letter, okay, just to preserve confidentiality because I know

22    there was a request for sealing on some of this.

23    **MR. PAPENDICK:**  Thank you, Your Honor.

24    **THE COURT:**  Okay.  So let me ask about Mr. S.

25    Mr. Papendick, my understanding of the sequence of events

1    is that Mr. S wrote an apology on February 10th, 2017.  His

2    deposition was taken on May -- sometime in May 2017.  But the

3    apology was not produced until July 10th, 2017, some months

4    after the deposition, even though it existed several months

5    prior to the deposition.

6        Am I right about that?

7        **MR. PAPENDICK:**  As for the exact dates, I believe

8    you're right.  But in general, right, he -- yes, that time

9    line is correct.

10       **THE COURT:**  Why wasn't the apology produced before

11   the deposition?

12       **MR. PAPENDICK:**  There are a number of reasons that

13   I'd go through Your Honor.  First, this was an internal

14   discipline process that we as outside counsel were not privy

15   to until -- we did not know that the letter existed or had

16   been submitted to the company until a couple of weeks before

17   the deposition.  We as outside counsel.

18       And so as is our right under the -- the rules, we were

19   evaluating whether or not to assert a privilege claim over the

20   document and also evaluating --

21       **THE COURT:**  What possible privilege could there be?

22       **MR. PAPENDICK:**  Certainly if the discipline was part

23   of an internal investigation and disciplinary proceedings that

24   were -- that occurred entirely in connection with activities

25   of internal legal counsel at -- at Panasonic/Sanyo, we think

1    that we do have -- we would have a --

2              **THE COURT:**  Wait.

3              **MR. PAPENDICK:**  -- a privilege claim under the law.

4    But nonetheless --

5              **THE COURT:**  What -- What privilege, attorney-client?

6              **MR. PAPENDICK:**  Yes.

7              **THE COURT:**  Can you cite me a single case that would

8    support that?

9              **MR. PAPENDICK:**  Your Honor, the -- this hasn't been

10   briefed because we ultimately determined that we did not have

11   a privilege claim under it, but I think that internal

12   investigation materials in general are privileged and work

13   product under *UpJohn*.

14             **THE COURT:**  I think that's an extremely broad reading

15   of privilege.  And my concern is and the reason why I'm

16   pressing you here is you're resting on that as the reason why

17   it didn't get turned over before a disposition, even though it

18   was clearly called for.

19             **MR. PAPENDICK:**  Well, there were other reasons.

20             **THE COURT:**  Okay.

21             **MR. PAPENDICK:**  Additionally, we were evaluating

22   whether to -- to assert an objection that it was outside the

23   scope of the document -- the RFP's that had been served to --

24   to that time.

25             **THE COURT:**  What's the basis for that?

1          **MR. PAPENDICK:**  When Your Honor ordered the

2    production of Mr. S's custodial documents at the end of 2016,

3    that was a -- he was -- Your Honor held that he would be a

4    limited custodian with limited documents and that he was not

5    one of the 60-plus custodians who were -- who had been

6    negotiated and their documents had been produced at least a

7    year and a half or -- or two years prior.

8          So we were evaluating whether or not to stand on a claim

9    that -- that it was not responsive to the existing doc

10   request.  Now --

11         **THE COURT:**  Because why?  I mean this is a document

12   that's written a couple months before the deposition -- we're

13   not talking about years before -- so what would be the actual

14   basis for saying it was outside the scope of what needed to be

15   produced?

16         **MR. PAPENDICK:**  Because the RFP that calls for it was

17   an RFP that called for the production of custodial documents

18   that we understood to be the document custodians who had been

19   previously negotiated, not -- not as the separate special

20   custodian.

21         Now, we ultimately did produce the document, and we -- we

22   allowed plaintiffs -- we did not object to plaintiffs taking

23   over three -- approximately three hours of testimony on the

24   record about the circumstances that surrounded the discipline

25   and the content of the discipline and the basis for the

1    discipline claim.

2            THE COURT:  You just didn't give them the hot

3    document for them to be able to do that with that in front of

4    them.

5            MR. PAPENDICK:  That's correct, but they did examine

6    the witness in depth about both his conduct during the

7    relevant time period that gives rise to their claims and --

8    and his discipline.

9            THE COURT:  Any other reasons for not giving to it

10   them before the deposition?

11           MR. PAPENDICK:  No, Your Honor.  I think that we were

12   honestly evaluating our privilege claim and our claim as to

13   whether or not the document is responsive.

14           THE COURT:  Okay.

15           MR. PAPENDICK:  And I -- And he -- Mr. S, he was

16   deposed for three days about all of his relevant conduct.

17       And where we are now in the case is that the class has

18   been denied.  The class certification has been denied.  The

19   key issue here is whether reopening the deposition would be

20   disproportionate under -- under Rule -- Rule 26(b).

21           THE COURT:  Well, the key question is whether there's

22   good cause to reopen the deposition, and that looks at whether

23   it's cumulative or duplicative; whether the parties seeking to

24   reopen it had an opportunity to -- an ample opportunity to get

25   the discovery that's sought, and then what are -- whether the

1    burden outweighs the benefits.

2        So that's the rule for reopening depositions.

3            **MR. PAPENDICK:**  And I believe that under this

4    circumstance, all of those weigh against reopening the

5    deposition.

6            **THE COURT:**  Okay.

7            **MR. PAPENDICK:**  As for cumulative and duplicativeness

8    (phonetic), they have taken three days of deposition testimony

9    on all the underlying conduct.  The -- The discipline --

10   Mr. S's discipline was in connection with conduct relating to

11   prismatic batteries sold to cell phone manufacturers in

12   Europe, whereas the named plaintiffs' claims, they are all --

13   their claims are only for damages based on overcharges on

14   cylindrical batteries in laptops, camcorders, power tools

15   purchased in the United States.

16           **THE COURT:**  Ms. Chan and her colleagues have laid out

17   a theory of relevance that's -- that's fairly persuasive,

18   which is that even though the class -- and now there's no

19   longer class claims -- but it was limited to cylindrical, they

20   still need to -- they're going to prove a conspiracy, and the

21   conspiracy could be broader than just cylindrical batteries.

22       And it also goes to intent, which is if you're showing

23   that, you know, people are apologizing for cartel behavior and

24   other types of lithium batteries, it tends to show that what

25   may have happened with the cylindrical ones was not a mistake.

1      And -- Sorry.  I'm blanking.  There was one more theory of

2   relevance.  Ms. Chan, please -- please remind me.

3          **MS. CHAN:**  Well, Mr. S was involved in cylindrical

4   lithium ion batteries, so his apology is -- is directly

5   relevant to the damages in this case.  And, in fact, Mr. S's

6   apology letter does not confine his acts of cartel to

7   prismatic batteries.  It doesn't even mention the word

8   "prismatic" in the apology letter itself.

9          **THE COURT:**  Okay.

10      So -- So I get that you -- the argument that is -- that

11   it's -- that your client wants to limit it to prismatic, but I

12   think there's -- even if that were true, there's other ways in

13   which it may be relevant.

14      But please continue.

15          **MR. PAPENDICK:**  I believe he testified as to the

16   basis of -- of what he was disciplined, and -- and I'm not --

17   I don't have transcript cites, but I think it was -- he

18   testified that it was in connection with his work with

19   prismatic batteries sold to European cell phone manufacturers.

20      But -- But, additionally, this document, the discipline

21   document, it was created a decade after the -- the underlying

22   events that the plaintiffs would need to prove to establish

23   liability for their claims.

24      And the entire disciplinary process is -- is a subsequent

25   remedial measure that -- that would not be inadmissible at

```
1    trial under Federal Rule of Evidence 409, I believe.  And,

2    therefore, this -- this discovery that they're seeking, would

3    be of highly prejudicial, inadmissible evidence that --

4         THE COURT:  Well, that's not the test.  I mean,

5    whether something's admissible or not is not the test for

6    discovery.

7      And -- And I'm sorry.  Tell me why you think it's not

8    admissible?

9         MR. PAPENDICK:  We've cited authority in -- in our

10   briefs that subsequent remedial --

11        THE COURT:  I don't think that's why they're -- I

12   don't understand that that's why they want to offer it.  I

13   mean, I think they would try to offer it as an admission.

14   That's not a subsequent remedial measure.  It's an admission

15   of guilt and of -- of -- yeah, of culpability.

16        MR. PAPENDICK:  The -- The discipline and apology

17   process, it was part of the company's disciplinary process

18   following the -- the --

19        THE COURT:  Well, that --

20        MR. PAPENDICK:  -- the conduct, and it's -- it's --

21   we've cited authority holding that discipline documents

22   themselves are -- are not admissible, and I think that --

23        THE COURT:  It's debatable.  And that's something

24   that Judge Gonzalez Rogers will sort out, but at any rate,

25   that's not the driver for what's discoverable.
```

1    **MR. PAPENDICK:**  But they were able to examine the

2    witness at length on all of his conduct and all of his

3    documents during the relevant time period.

4           **THE COURT:**  Okay.  Let's turn to Mr. G.

5       But first Mr. Bacharach is back in the courtroom.  Do

6    we've thumbs' up?  Thumb's up.  Okay.  Thank you.

7           **MR. BACHARACH:**  Thank you.

8           **THE COURT:**  All right.

9           **MR. PAPENDICK:**  And I would just -- under the -- I

10   would just like to say that under the current formulation of

11   Rule 26(b), proportionality of the discovery is a main driver

12   of whether challenged discovery should be ordered.

13      And we do think that after the three days of testimony

14   that they've had, especially in light of the fact that the

15   class has been denied and now Rule -- Rule 26(b) provides that

16   things such as the amount in controversy should be balanced

17   with the relevance and the potential benefits of the discovery

18   sought.

19      And we do think that under the current formulation of Rule

20   23(b), the discovery that they're seeking is disproportionate

21   to what -- the burdens that it would place on the witness and

22   on the company, especially in light of the fact that they have

23   already had three days of deposition to examine the witness on

24   all of the underlying conduct.

25          **THE COURT:**  I think it's entirely possible that --

 1     that -- Well, what I'm concerned about here is that Mr. S and

 2     his lawyers created the burden in this case.  It's a burden

 3     that could have been easily taken care of on the front end.

 4         I mean, this is a hot document.  It was withheld on basis

 5     that sounds like shaky to me.  Of course, I don't know all

 6     the -- those matters were not argued to me.  But what you've

 7     presented today don't sound terribly convincing.  So they were

 8     robbed of an opportunity to depose him with the document in

 9     hand.

10         And it's -- I don't think it's appropriate now to argue,

11     well, they got a chance to ask him things already, even though

12     they didn't have the document that we -- that was available

13     ahead of time but we decided we weren't going to give it to

14     them till months after the deposition.

15         That's my concern, and I think that does really change the

16     burden analysis.

17         But let's turn to Mr. G.

18             **MR. PAPENDICK:**  Yes, Your Honor.

19             **THE COURT:**  Now, Mr. G is -- Ms. Chan, this seems

20     like it's an entirely different situation.  We have an apology

21     that's written after the deposition, so it's -- it wasn't in

22     existence at the time.  And I understand that your clients

23     believe there are inconsistencies between the deposition

24     testimony given by Mr. G and the apology that's written months

25     later.

1    I'm not sure that they're inconsistent.  I think that

2    the -- the defense is arguing they're not.  And I don't have

3    the transcripts in front of me to be able to see really

4    whether there are or are not inconsistencies, but that's

5    something that you can go at at trial.

6        I mean, that is something that's often done.  If you -- if

7    you believe that there's impeachment material there, then --

8    then that can come up at trial.

9        But I'm -- I'm not sure in this case with Mr. G -- that

10   there is good cause to -- to reopen.  But why don't you tell

11   me --

12           **MS. CHAN:**  Your Honor, first of all, with respect to

13   trial, Mr. G is a foreign employee there's no guarantee that

14   Sanyo will bring Mr. G live in person at trial.  If Sanyo is

15   willing to --

16           **MR. PAPENDICK:**  May ask counsel, since -- since the

17   court has already stated that --

18           **MS. CHAN:**  Apologies.

19           **MR. PAPENDICK:**  Thank you.

20           **MS. CHAN:**  Apologies.

21       If Sanyo is willing to stipulate to bringing Mr. G to

22   trial so that we can impeach him on his apology letter,

23   then -- then that's a different story.

24           **THE COURT:**  Okay.

25           **MS. CHAN:**  But we may not have another run at asking

1    Mr. G questions about his letter.

2        Second --

3        **THE COURT:**  Let's stop there, Mr. Papendick.  Do I

4    have a stipulation?

5        **MR. PAPENDICK:**  Unfortunately, Your Honor, we can't

6    stipulate to that.

7        So we learned after the plaintiffs had made this request

8    that -- after we had gone through whole -- much of the

9    meet-and-confer process, we learned in November of last year

10   that Mr. G had -- retired from the company earlier in the year

11   prior to the plaintiff's request for a second deposition,

12   which was in June 2017.

13       So the most we would be able to commit to would be to --

14   to attempt to persuade Mr. G to appear for further testimony

15   either at a deposition or at trial.

16       **THE COURT:**  Okay.

17       Ms. Chan, you may continue.

18       **MS. CHAN:**  That -- That is surprising to me.  I was

19   not aware that he is no longer in the employment of Sanyo.

20       I think Your Honor also had questions about whether there

21   were true inconsistencies between the apology letter and his

22   testimony, so I can outline three areas of inconsistencies

23   here.

24       The first area is Mr. G's knowledge of information

25   exchanges by his subordinates.  During his deposition, he

1   testified over eight times that he did not know that his

2   subordinates were exchanging information.

3       By contrast, his apology letter stated that he apologized

4   for knowing that his subordinates were exchanging information

5   with competitors.  So that's one area.

6           THE COURT:  So let me ask you, let's say that he

7   can't -- he doesn't show up.  He refuses to cooperate and --

8   and you don't have the authority to force him to be there

9   because he's a foreign deponent or foreign witness, why can't

10  you use his testimony and the apology letter to create

11  impeachment in absentia?

12          MS. CHAN:  We would seek to do that.  It -- It's

13  not -- I'm sure that the jury would want to know why we

14  couldn't ask these questions of him directly.  And it sounds

15  like he's not in the employment of Sanyo anymore so -- so this

16  is a problem.  We would like --

17          THE COURT:  Couldn't you raise that with the jury?

18  Talk about why he's not there?

19          MS. CHAN:  If Sanyo would stipulate to our -- that

20  explanation, then we certainly could raise it.

21          MR. PAPENDICK:  The explanation that you couldn't ask

22  him the questions because he -- he was unavailable for a

23  deposition?

24          THE COURT:  Or unavailable to testify at trial.

25          MR. PAPENDICK:  To testify at trial with respect to

1   the document that was created after his deposition.

2          MS. CHAN:  After his deposition, and we -- we never

3   had the opportunity to ask him these questions apparently.

4          MR. PAPENDICK:  I'm not sure what form the

5   stipulation would take.  In general, I think that that would

6   be -- that that wouldn't be problematic.  But I think we'd

7   want to know exactly what -- how it would be presented and --

8   and what -- what it would specifically say.

9          THE COURT:  Well, how it's presented is something

10  that Judge Gonzalez Rogers really has to control, but the

11  general idea is an agreement by the defense on this that some

12  statement can be made to the jury that Mr. G is not available

13  for trial for reasons beyond the parties' control and that

14  plaintiffs -- the IPP's were not able to ask him about this

15  document because it was prepared after his deposition.  And

16  they didn't get a chance to ask him again.

17         MR. PAPENDICK:  And we would certainly be arguing in

18  limine that the document's inadmissible.  And so if the court

19  rules that the document's inadmissible, then the latter part

20  of that statement would be one that we wouldn't have to make.

21         MS. CHAN:  Correct.

22         THE COURT:  Yeah.

23         MR. PAPENDICK:  Yes.  I think that's fine.

24         THE COURT:  Okay.  All right.  So we have an

25  agreement on that at least -- I mean, I haven't made a ruling

1    here yet, but that -- but one of your points, Ms. Chan, was

2    just about how does this play in and out front of a jury, so I

3    wanted to make sure that I understood that.  Think we've

4    wrapped that part up.

5        So you may continue.

6            MS. CHAN:  All right.  The second area that is

7    inconsistent -- of testimony that's inconsistent, if Your

8    Honor still wants to hear about that.  Perhaps not.

9            THE COURT:  I think -- It sounds to me like there may

10   well be some things that a jury could find to be inconsistent

11   and draw whatever inferences they want to draw from that, but

12   I -- inconsistencies don't necessarily mean reopening of a

13   deposition.

14       So what other points do you want to make on this?

15           MS. CHAN:  I think the only other point is that

16   plaintiffs offered a reasonable compromise here.  We've really

17   tried very hard for almost a year now to resolve this issue

18   without coming to Your Honor.

19       And our -- our request is simply to be allowed to ask the

20   questions to the witnesses that we should have been able to

21   ask in the first place during the deposition.

22           THE COURT:  Okay.

23       Submitted?

24           MS. CHAN:  Can we talk about -- in the event that

25   Your Honor is going to order a -- an -- to reopen the

1   deposition of Mr. S, may we ask that it be limited to -- to a

2   half day and in Japan to minimize the burden on the witness

3   having to appear again for -- in the United States for a

4   deposition.

5          **THE COURT:**  Ms. Chan?  And one other thing I'd

6   consider is video.

7          **MS. CHAN:**  Right.  We -- We offered to depose -- as

8   an offer of compromise to depose Mr. S by video remotely,

9   either in Japan, or if that's not allowed, in Hong Kong, to

10  minimize the travel burdens.  That was what we believed to be

11  a reasonable offer of compromise.

12      Our view is that we've now waited almost a year.  They

13  have declined that offer of compromise, so it does seem to

14  provide a free option to Sanyo to simply refuse reasonable

15  offers of compromise.  But that is an offer that we have -- we

16  have put on the table.

17         **THE COURT:**  Okay.

18      I understand your argument, Ms. Chan, but the other piece

19  that's happened is there's been a denial of class

20  certification.

21      Now it's unclear in the law whether the good cause

22  standard imports proportionality but sort of common sense

23  tells me that it should at some level look at that.  And the

24  texture of the case -- the scope of the case has changed

25  pretty dramatically since you began this dispute.

1    So here's where I come out on this.  I do find a

2  fundamental difference between what happened with Mr. S and

3  Mr. G.  So for Mr. G, I find no good cause to reopen.

4    But we have an agreement on the record about -- you know,

5  if the apology letter is usable at trial, that there is a -- a

6  agreed statement that you can present to Judge Gonzalez Rogers

7  about, you know, his unavailability and -- and therefore the

8  IPP's inability to ask him questions about the other apology

9  letter as previously stated on the record.

10    As to Mr. S, I would allow a four-hour deposition solely

11  on the issue of the apology letter, and it can take place --

12  so -- is your preference that it's by video as opposed to

13  going in person?

14    **MS. CHAN:**  My preference is to have it take place in

15  person, but we're willing to do video.

16    **THE COURT:**  Well -- Even if you need to go to Japan

17  to do it?

18    **MS. CHAN:**  I -- I think that would -- well, that I

19  would take it by video, just as a practical matter.

20    **THE COURT:**  I'm not going to force a -- a deposition

21  under these circumstances to take place in the U.S.  But I

22  think video -- since you don't want to travel there, Ms. Chan

23  then I would have it done by video.

24    But do you think, Mr. Papendick, that will happen in Japan

25  or in Hong Kong, or shall I just leave that to the parties to

1    sort out.

2            **MR. PAPENDICK:**  I think you should leave that to the

3    parties to sort out.  I am fairly confident that it's not

4    permitted to do a video deposition in Japan.  We could do it

5    either video or in person in Hong Kong, so we could confer on

6    that.

7            **THE COURT:**  Okay.

8       Well --

9            **MR. PAPENDICK:**  If -- If that's fine with --

10           **MS. CHAN:**  That is fine with me.  Thank you.

11           **MR. PAPENDICK:**  -- plaintiffs.

12           **THE COURT:**  Okay.

13      All right?  So anything further on that dispute.

14           **MS. CHAN:**  No, Your Honor.  Thank you.

15           **THE COURT:**  Okay.  Let's turn to 2195, which is the

16   dispute regarding Mr. T and also some requests for production.

17      So Ms. Chan, one thing -- I mean, this is squarely a

18   proportionality question.  This is, do they have to -- I'm

19   sorry.  It's not -- not request for production.  I guess

20   interrogatories and -- and request for production on Mr. T's

21   information.

22      When I go through the proportionality factors, the one

23   that's, I think, quite central here but I -- but was not --

24   dealt with by the IPP's has to do with this:  How important is

25   this discovery to the resolution of the case.

```
 1         So let me just back up a little.  I think you make a good

 2    case for -- for relevance, but -- but relevance is a very

 3    broad concept.  And the factor that goes to how important is

 4    this discovery to the resolution of the case is really asking

 5    for how relevant, how central is this.  And I'm not sure that

 6    it is.

 7         They have produced information about individuals who gave

 8    apologies or were disciplined for behavior -- or cartel

 9    behavior having to do with cylindrical batteries.  That's

10    clearly the center of the case.

11         And they argue that this is about prismatic or other kinds

12    of lithium ion batteries.  And while I understand you can make

13    some relevance argument, I'm not seeing it as super central to

14    the issues here.  And we're now talking about a case that has

15    less than $5,000 at issue unless you're able to reverse it on

16    appeal.

17         So can you answer that for me?

18         MS. CHAN:  Yes, Your Honor.  Mr. T received emails

19    about information exchanges relating to cylindrical lithium

20    ion batteries, so his discipline and apology relating to his

21    cartel acts is something that we would want to put into

22    evidence when we try this case at the end of January.

23         THE COURT:  Okay.  So we're --

24         MS. CHAN:  And it --

25         THE COURT:  So we're talking -- I guess we're going
```

1    to break this up.

2        One is Mr. T's information and one is the interrogatory

3    responses, so let's start with the interrogatory responses.

4    They already responded with respect to cylindrical batteries.

5        Why should they have to do more than that?

6        **MS. CHAN:**  Two reasons, Your Honor.  One is that our

7    theory of the case has to do with a lithium ion battery

8    conspiracy irrespective of lithium ion battery type.

9        Second, proportionality has two sides of the coin.  On is

10   the importance of the issues at stake and the amount in

11   controversy.  And the second is the burden on the defendants.

12   And here, my understanding is that Panasonic and Sanyo already

13   know the names of the employees who have been disciplined.  So

14   it seems to me that there is no burden on their side for

15   simply responding to the discovery.

16       And I would -- I would just add that plaintiffs are aware

17   of the impending discovery cutoff, so we don't intend to have

18   this be the start of some sort of never-ending chain of -- of

19   discovery disputes.

20       We -- We are just trying to complete our discovery and

21   prepare for trial at this point, so -- so I don't think one of

22   the -- one of the issues that Panasonic and Sanyo raised about

23   there being no stopping point to discovery related to other

24   types of employees, I don't think that is true at this point

25   because we do have this May discovery cutoff.

1    **THE COURT:**  Okay.  Now let's talk about Mr. T

2    specifically.  What is it that you want?

3    **MS. CHAN:**  We are simply asking for the records

4    relating to his discipline and any apology letters that he

5    authored.

6    **THE COURT:**  Okay.  And in Mr. T's case, you have

7    emails that are at least copied to him that are talking about

8    discipline for cylindrical battery cartel behavior, correct?

9    **MS. CHAN:**  Correct.

10    **THE COURT:**  Okay.

11    So, Mr. Papendick, none of this sounds terribly

12    burdensome.  Is there a burden?

13    **MR. PAPENDICK:**  It's certainly true that we -- that

14    the company has the identities of the people who were

15    disciplined for conduct relating only to prismatic and that we

16    obviously have the personnel files of Mr. T.  So in -- That

17    they're asking for.

18    Sorry, when you say "the apology letters," that's -- when

19    I said the personnel files, I apologize.  I meant the -- the

20    apology letter that -- they're asking for.

21    **THE COURT:**  Just so we're absolutely clear on the

22    record, does your client concede that it would not be

23    burdensome to actually produce the information in the

24    documents and the further interrogatory response that

25    Ms. Chan's clients are asking for?

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

1          **MR. PAPENDICK:**  There is authority which we've cited

2    holding that it is an emotional burden on individuals who have

3    been subject to employ -- employer discipline, to have

4    their -- that information disclosed outside the company.

5          While the company itself does not -- would not have a

6    burden to -- to produce the information, there is that burden,

7    especially in connection with products that -- that are not

8    related to the products that plaintiffs claim that they

9    purchased and were injured by.

10         **THE COURT:**  Would this information be produced

11   pursuant to a protective ordered?

12         **MR. PAPENDICK:**  It would be certainly.  And the court

13   has previously held that identities of -- people who have been

14   disciplined are sealable and which is why we're speaking with

15   their initials today.

16         But that said, we don't know how -- how plaintiffs intend

17   to introduce this information, if they intend to introduce it

18   at a public trial.

19         **THE COURT:**  Well, I'm assuming that it would go

20   through a fairly rigorous in limine process for the same

21   reasons that you talked about before, that your client,

22   Mr. Papendick, is going to argue that this is all so

23   tangential, things that have to do with non-cylindrical

24   batteries that Judge Gonzalez Rogers shouldn't let it in.

25         And if she rules in that direction, then the information

1    will not be become part of the public report record.  If she

2    thinks that it's relevant and admissible, then it's fair game.

3        But the -- sounds like there's a couple layers of

4    protection on the issue that you raised, which is somebody's

5    name coming to light as being disciplined and -- and the -- I

6    guess the shame that goes along with that, that that would

7    only happen if -- if there's a motion in limine that is

8    overruled.

9        Are there other concerns that you have about that that I'm

10   not seeing?

11           **MR. PAPENDICK:**  That encapsulates it, Your Honor.

12           **THE COURT:**  Okay.

13           **MR. PAPENDICK:**  But I would say that I agree with --

14   with your opening remarks before you were asking Ms. Chan

15   questions about -- about the -- the proportionality of the

16   discovery, that -- that this information is really not

17   proportional to -- to the needs of their case at this time.

18           **THE COURT:**  Okay.

19       So this information -- Well, I think there's a little bit

20   of a difference.  I'm not sure that it matters here.

21       I think there's a stronger case for Mr. T's information

22   because he's actually copied on emails that talk about

23   cylindrical.  I understand that the defense is arguing that

24   being copied doesn't mean that you're culpable.  But that's

25   something that should be explored, and -- and is -- would

 1    certainly be discoverable.

 2        So for Mr. T, the there's a stronger case for production,

 3    especially 'cause there's no burden whatsoever.

 4        Now, as to other -- the identification of other

 5    individuals who received discipline for violating antitrust or

 6    cartel policies or laws, it's a -- you know, it's a little

 7    broader than the core of the case.  But on the other hand,

 8    there is very little burden, and the burden that's been

 9    identified can -- is easily protected in the manner that I

10    just suggested.

11        So I find under -- in letter 2195, that the defense should

12    produce documents and amend their interrogatory consistent

13    with the IPP's request.  And really it came down to there

14    isn't hardly any burden here.  It would be quite different if

15    this were a -- a heavier lift that the IPP's were asking for

16    in light of the fact that the case is much smaller.

17            **MS. CHAN:**  Thank you, Your Honor.

18            **MR. PAPENDICK:**  May I just -- Ms. Chan represented

19    that this would be the last of the discovery.  There would be

20    no follow-on depositions for -- or additional document

21    discovery.  I think that is what is informing Your Honor's --

22            **THE COURT:**  It is.

23            **MR. PAPENDICK:**  -- assessment that there's no burden

24    so we're --

25        Are we entitled to rely on that representation?

1          **THE COURT:**  Well -- Well, just to be clear, here's my

2     path of thinking.

3          Ms. Chan said, Look, if they have to respond to this

4     interrogatory by giving us other names and if they have to

5     give us more information on Mr. T, we're not going to then

6     turn around and start getting depositions on other people

7     identified in the interrogatories or -- or asking for more

8     documents or asking for a further deposition of Mr. T, who I

9     guess has not been deposed.

10          Is that all true?

11          **MS. CHAN:**  Yes.  Absent exceptional circumstances.  I

12     don't know these people are who -- who have not been

13     disclosed.  I can't -- I can't speak to their identities.

14          But absent exceptional circumstances, we do not intend to

15     have this lead us into another rabbit hole of discovery.

16          **THE COURT:**  Okay.  And I think that's a fair

17     carve-out.  If there's something that's just kind of

18     mind-blowing and that's exceptional, then it may well be that

19     they try to seek some more and they may have a good point.

20          But in what we sort of expect is going to happen, what

21     they've represented to me is, this is all they're going to be

22     asking for in this area.

23          **MR. PAPENDICK:**  And it would be production of Mr. T's

24     documents.  That's the apology letter.

25          **MS. CHAN:**  The apologize letter and his disciplinary

1   record.

2          MR. PAPENDICK:  And his disciplinary record.  Okay.

3          MS. CHAN:  Correct.

4          THE COURT:  Okay?

5      Anything further on these two letters?

6          MR. PAPENDICK:  Not from Panasonic, Your Honor.

7   Thank you.

8          MS. CHAN:  No.  Thank you, Your Honor.

9          THE COURT:  All right.  Thank you.

10             (Off-the-record discussion.)

11         THE COURT:  Our reporter just brought to my attention

12  that counsel on both sides may have used Mr. G's full name,

13  and I'm not sure.  I think it was just him.  And I -- she says

14  that both counsel used it.

15         MR. PAPENDICK:  I don't remember myself using it, but

16  obviously she is the one taking the record.  I believe that

17  counsel for plaintiffs did -- did on a couple of occasions, I

18  think, say Mr. G's --

19         THE COURT:  Okay.  And our reporter has said that you

20  did as well, Mr. Papendick, so I'm going to instruct our

21  reporter to just reduce that to "Mr. G."

22     Okay.  Any objection to that?

23         MR. PAPENDICK:  No objection.

24         MS. CHAN:  No.  I apologize.  And thank you for

25  noting that.

1    **MR. PAPENDICK:**  And I -- we certainly appreciate this

2    accommodation.

3         **THE COURT:**  Okay.  Thank you.

4         (Proceedings were concluded at 12:30 A.M.)

5                      --o0o--

6

7

8                **CERTIFICATE OF REPORTER**

9

10        I certify that the foregoing is a correct transcript

11   from the record of proceedings in the above-entitled matter.

12   I further certify that I am neither counsel for, related to,

13   nor employed by any of the parties to the action in which this

14   hearing was taken, and further that I am not financially nor

15   otherwise interested in the outcome of the action.

16

17   _____

18        Raynee H. Mercado, CSR, RMR, CRR, FCRR, CCRR

19               Saturday, April 21, 2018

20

21

22

23

24

25