**Counsel listed on signature page**

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### (OAKLAND DIVISION)

| | |
|---|---|
| IN RE: LITHIUM ION BATTERIES ANTITRUST LITIGATION<br><br>_____<br><br>This Document Relates To:<br><br>ALL INDIRECT PURCHASER ACTIONS | Case No. 4:13-md-02420-YGR (DMR)<br><br>MDL No. 2420<br><br>**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO INDIRECT PURCHASER PLAINTIFFS' RENEWED MOTION FOR CLASS CERTIFICATION**<br><br>Date: January 12, 2018<br>Time: 10:00 am<br>Judge: Hon. Yvonne Gonzalez Rogers<br>Court: Courtroom 1, 4th Floor |

# **TABLE OF CONTENTS**

DEFINITIONS ........................................................................................................................ ii

STATEMENT OF THE ISSUES TO BE DECIDED .......................................................... vi

INTRODUCTION ................................................................................................................ 1

ARGUMENT ........................................................................................................................ 5

I.       IPPS FAILED TO CURE ANY OF THE FATAL DEFICIENCIES IN THEIR PASS-
         THROUGH EVIDENCE AND STILL DO NOT RELIABLY DEMONSTRATE PASS
         THROUGH ON A CLASS-WIDE BASIS .............................................................. 5

         A.      Defect Number 1: IPPs Still Have No Reliable Method for Proving Pass Through in
                 the Presence of Focal Point Pricing. ......................................................... 5

         B.      Defect Number 2: IPPs Still Do Not Account for the Packers. ................... 11

         C.      Defect Number 3: IPPs' Pass-Through Studies Still Fail to Account for the Real-
                 World Effects of Rebates, Discounts, and Bundling. ................................. 14

         D.      Defect Number 4: IPPs Failed to Perform Any OEM Pass-Through Study Outside of
                 Toshiba Laptops. ....................................................................................... 18

II.      THE IPPS' RENEWED MOTION SUFFERS FROM ADDITIONAL FLAWS THAT
         PREVENT CLASS CERTIFICATION .............................................................. 20

         A.      Dr. Leamer's Pass-Through Data Set Lacks Sufficient Class-Wide Coverage to Assess
                 Which Class Members Experienced Impact in the Presence of Rampant Non-Pass
                 Through. ..................................................................................................... 20

         B.      Supreme Court Precedent, Due Process, and Manageability Issues Also Prevent
                 Certification of a 30-State Class Under California Law. ............................. 22

CONCLUSION .................................................................................................................. 25

i

**DEFINITIONS**

| TERM | DEFINITION |
|---|---|
| Class Cert. Opp'n I | Defendants' Memorandum of Points and Authorities in Opposition to Indirect Purchaser Plaintiffs' Motion for Class Certification, May 24, 2016, ECF No. 1282 |
| DPP Class Cert. Opp'n | Defendants' Opposition to Direct Purchaser Plaintiffs' Motion for Class Certification, May 24, 2016, ECF No. 1281-4 |
| DPPs | Direct Purchaser Plaintiffs |
| Ex. | Exhibit to the Declaration of Cristina M. Fernandez in Support of Defendants' Opposition to Plaintiffs' Renewed Mot. for Class Certification, Oct. 24, 2017 |
| IPPs or Plaintiffs | Indirect Purchaser Plaintiffs |
| Guerin-Calvert | Expert Report of Margaret Guerin-Calvert, May 24, 2016 |
| Haider II | Expert Report of Laila Haider, Oct. 24, 2017 |
| Leamer I | Corrected Expert Report of Edward E. Leamer, Ph.D., Feb. 2, 2016, ECF No. 1056-1 |
| Leamer II | Expert Reply Report of Edward E. Leamer, Ph.D., Aug. 23, 2016, ECF No. 1402-31 |
| Leamer III | Supplemental Expert Report of Edward E. Leamer, Ph.D, Sept. 26, 2017, ECF No. 1960-9 |
| Leamer *Daubert* II | Defendants' Notice of Motion and Motion to Exclude the Proposed Expert Testimony of Dr. Edward E. Leamer, Oct. 24, 2017 |
| Leamer Tr. | Excerpts from Transcript of Deposition of Edward E. Leamer, Ph.D., Apr. 26, 2016, Sept. 27, 2016, Oct. 10, 2017 |
| Moe Decl. | Declaration of Daniel J. Moe, May 24, 2016 |
| Order | Order of Judge Gonzalez Rogers Denying Without Prejudice Motions for Class Certification; Granting in Part and Denying in Part Motions to Strike Expert Reports or Portions Thereof, April 12, 2017, ECF No. 1735 |
| Original Mot. | Indirect Purchaser Plaintiffs' Motion for Class Certification, Jan. 22, 2016, ECF No. 1036 |
| Renewed Mot. or Renewed Motion | Indirect Purchaser Plaintiffs' Renewed Motion for Class Certification, Jan. 12, 2018, ECF No. 1960-2 |

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*Archer Daniels Midland Co. v. Seven Up Bottling Co.*,
5
   746 So. 2d 966 (Ala. 1999) ................................................................................................ 24

6

*In re Bridgestone/Firestone Tires Prods. Liab. Litig.*,
   288 F.3d 1012 (7th Cir. 2002) ......................................................................................... 24
7

*Bristol-Myers Squibb Co. v. Superior Ct. of California*,
8
   137 S.Ct. 1773 (June 19, 2017) .................................................................................. 22, 23

9

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
   2014 WL 1088256 (N.D. Cal. March 13, 2014) .............................................................. 25
10

11

*Ciardi v. F. Hoffmann-La Roche Ltd.*,
   762 N.E.2d 303 (Mass. 2002) .......................................................................................... 25
12

*In re Class 8 Transmission Indirect Purchaser Antitrust Litig.*,
13
   679 F. App'x 135 (3d Cir. 2017) ..................................................................................... 12

14

*Clayworth v. Pfizer, Inc.*,
   49 Cal. 4th 758, 775 (2010) ............................................................................................ 11
15

16

*Collegenet, Inc. v. Common Application, Inc.*,
   104 F. Supp. 3d 1137 (D. Or. 2015) ................................................................................ 7
17

*Comcast Corp. v. Behrend*,
18
   569 U.S. 27 (2013) ........................................................................................................... 10

19

*Contreras v. Toyota Motor Sales U.S.A. Inc.*,
   484 F. App'x 116 (9th Cir. 2012) ................................................................................... 11
20

21

*Deiter v. Microsoft Corp.*,
   436 F.3d 461 (4th Cir. 2006) ..................................................................................... 16, 18
22

*In re Digital Music Antitrust Litig.*,
23
   2017 WL 3037577 (S.D.N.Y. July 18, 2017) ................................................................. 25

24

*Doyle v. Chrysler Group, LLC*,
   663 F. App'x 576 (9th Cir. 2016) ................................................................................... 10
25

26

*Fair Isaac Corp. v. Experian Info. Sols., Inc.*,
   650 F.3d 1139 (8th Cir. 2011) ........................................................................................ 10
27

*In re Flash Mem. Antitrust Litig.*,
28
   2010 WL 2332081 (N.D. Cal. June 9, 2010) ................................................................. 13

iii

*Flores v. Supervalu, Inc.,*
    509 F. App'x 593 (9th Cir. 2013) ................................................................. 16, 18

*Food Lion, LLC v. Dean Foods Co.,*
    312 F.R.D. 472 (E.D. Tenn. 2016)................................................................. 15, 18

*In re Graphics Processing Units Antitrust Litig.,*
    253 F.R.D. 478 (N.D. Cal. 2008)..................................................................... *passim*

*In re Graphics Processing Units Antitrust Litig.,*
    540 F. Supp. 2d 1085 (N.D. Cal. 2007) .............................................................. 24

*In re Intel Corp. Microprocessor Antitrust Litig.,*
    2010 WL 8591815 (D. Del. July 28, 2010) ........................................................ 24

*Koike v. Starbucks Corp.,*
    378 F. App'x 659 (9th Cir. 2010) ....................................................................... 13

*Laumann v. NHL,*
    117 F. Supp. 3d 299 (S.D.N.Y. 2015).................................................................. 8

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) ......................................................................................... 11

*Marlo v. UPS,*
    639 F.3d 942 (9th Cir. 2011) .............................................................................. 12

*McCann v. Foster Wheeler LLC*
    48 Cal. 4th 68, 98 (2010) .................................................................................. 24

*In re Optical Disk Drive Antitrust Litig.,*
    303 F.R.D. 311 (N.D. Cal. 2014)......................................................................... 6

*Perez v. State Farm Mutual Auto Insurance,*
    628 F. App'x 534 (9th Cir. 2016) .................................................................... 9, 10

*Pilgrim v. Univ. Health Card,*
    660 F.3d 943 (6th Cir. 2011) ......................................................................... 15, 18

*In re Processed Egg Products Antitrust Litig.,*
    312 F.R.D. 124 (E.D. Pa. 2015)........................................................................... 6

*Ralston v. Mortg. Inv'rs Grp., Inc.,*
    2011 WL 4081696 (N.D. Cal. Sept. 12, 2011) ................................................... 11

*Reading Int'l, Inc. v. Oaktree Capital Mgmt. LLC,*
    2007 WL 39301 (S.D.N.Y. Jan. 8, 2007) .......................................................... 10

*Standard Oil Co. of Ky. V. State ex rel. Attorney General*,
65 So. 468 (Miss. 1914), *overruled in part on other grounds sub nom. Mladinich
v. Kohn*, 164 So. 2d 785 (Miss. 1964) ........................................................................ 24

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
2010 WL 2610641 (N.D. Cal. June 28, 2010) ............................................................ 23

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
2011 WL 1113447 (N.D. Cal. Mar. 25, 2011) ............................................................ 25

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
586 F. Supp. 2d 1109 (N.D. Cal. 2008) ...................................................................... 24

*Thomasson v. GC Servs. Ltd.*,
539 F. App'x 809 (9th Cir. 2013) ............................................................................... 13

*United Food & Commercial Workers Local 1776 & Participating Emp'rs Health &
Welfare Fund v. Teikoku Pharma USA, Inc.*,
74 F. Supp. 3d 1052 (N.D. Cal. 2014) ........................................................................ 25

*Wash. Mut. Bank v. Superior Court*,
24 Cal. 4th 906 (2001) ............................................................................................... 24

*Zinser v. Accufix Research Inst., Inc.*,
253 F.3d 1180 (9th Cir. 2001) .................................................................................... 25

**Statutes**

Ala. Code § 6-2-38(1) .................................................................................................. 25

Kan. Stat. Ann. § 60-512 ............................................................................................. 25

Mass. Gen. Laws Ch. 93A, § 9 .................................................................................... 25

Miss. Code Ann. § 15-1-49 .......................................................................................... 25

N.Y. Gen. Bus. Law § 349 ........................................................................................... 25

Tenn. Code Ann. § 28-3-105 ........................................................................................ 25

Utah Code Ann. §§ 76-10-918, 76-10-919 ................................................................... 25

2006 Utah Laws Ch. 19 ............................................................................................... 25

**Other Authorities**

N.Y. C.P.L.R. § 214(2) ................................................................................................ 25

### STATEMENT OF THE ISSUES TO BE DECIDED

Whether IPPs' Renewed Motion cures the deficiencies the Court identified when denying IPPs' prior motion for class certification.  Specifically, whether Dr. Leamer's supplemental analyses are capable of reliably demonstrating on a class-wide basis that the small alleged overcharges of mere cents on lithium ion cells were uniformly "passed on" through each level of the distribution chain where those analyses: (i) have no reliable basis to determine whether pervasive "focal point pricing" by retailers precluded an impact on price or product quality for a large and unidentifiable number of putative class members; (ii) have no reliable basis to determine whether third party overseas packers, which accounted for as much as fifty percent of the market, passed through the alleged overcharges to their OEM customers; (iii) have no reliable basis to determine whether rebates, discounts, and bundling eliminated pass through to a large and unidentifiable number of putative class members; and (iv) fail to show that pass through occurred in a representative sample of the wide variety of finished products purchased by putative class members.

Additionally, the IPPs' Renewed Motion raises the issues of whether: (i) pass through occurred in a representative sample of the many different distribution channels through which putative class members purchased finished products containing the allegedly price-fixed battery cells; (ii) a single class consisting of citizens who purchased in multiple states can be certified under California law; and (iii) IPPs' have made any showing to support certification of their class of government entities.[1]

---

[1]  IPPs treat the Renewed Motion as a continuation of their previous briefing on class certification.  Defendants dispute that this is procedurally appropriate, but focus this Memorandum of Points and Authorities in Opposition to Indirect Purchaser Plaintiffs' Renewed Motion for Class Certification on those issues raised by IPPs in the Renewed Motion.  Accordingly, Defendants' submission of this Opposition does not constitute a waiver of any arguments raised in their Memorandum of Points and Authorities in Opposition to Indirect Purchaser Plaintiffs' Motion for Class Certification, May 24, 2016, ECF No. 1282, as well as all materials cited therein.  Defendants specifically preserve all class certification arguments for any subsequent appeal or motion practice.

### INTRODUCTION

IPPs' Renewed Motion and Dr. Leamer's Supplemental Expert Report fail to present a reliable methodology capable of establishing class-wide impact of the alleged overcharges on lithium ion battery cells—of **mere cents**—for the putative class of purchasers of finished products (notebook computers, camcorders, power tools, and replacement batteries for these products). To make such a showing, IPPs must establish a reliable common methodology to prove those small price changes were "passed on" to each level of a variety of resellers and consumers in an intricate distribution chain (packers to OEMs and ODMs, to distributors and retailers, and individual consumers, each of whom have their own set of divergent decision-making processes), throughout the 11-year class period, for all categories of finished products. IPPs must further demonstrate that damages can be determined using a reliable common methodology linked to IPPs' theory of liability. The IPPs' Renewed Motion, like their prior motion, fails to meet the requirements of Rule 23.

In denying IPPs' prior attempt to certify identical proposed classes, the Court held that Dr. Leamer's pass-through analysis suffered from a number of fatal defects that rendered it "too abbreviated" and incapable of demonstrating that "antitrust impact is 'passed on' to each level of the indirect purchasers in the distribution chain." Order at 19. In particular, the Court identified four specific categories of defects and invited IPPs to "make a more fulsome showing" to try and "revis[e] the analysis to cure the defects identified." *Id.* But Dr. Leamer did not revise his defective methodology on pass through. Instead, he attempts to defend the prior defective methodology with a handful of new studies and some additional data, none of which remedy the defects identified by the Court. Moreover, as demonstrated in the accompanying motion to exclude Dr. Leamer's testimony, his efforts to address these defects cannot serve as evidence in support of class certification because they again fail to meet the reliability standards of the Federal Rules of Evidence and the Supreme Court's *Daubert* test.

***Defect Number 1: IPPs Still Have No Reliable Methodology for Proving Pass Through of Tiny Battery Cell Overcharges in the Presence of Focal Point Pricing for Finished Products.*** IPPs have not presented a reliable methodology to account for retailer focal point pricing and how this common practice blocked the pass through of the small price increases in battery cell prices at issue in

this case.  Rather than presenting a methodology that addresses this real-world pricing strategy, IPPs ask the Court to ignore focal point pricing based on unsupported speculation that such pricing *should* be rare and irrelevant.  This defect is fatal to certification, as Dr. Leamer has conceded that indirect purchasers who bought their products at focal point prices would not suffer any price impact from the alleged conspiracy at all, and he has offered no methodology for determining which putative class members would or would not have been shielded from such a price impact.  *See* Ex. 1, Leamer Tr. ("Leamer Tr.") 714:12-715:25, 720:18-721:9.  The simple, undeniable fact is that a retailer faced with an alleged average battery cell price increase in a notebook computer of less than $3 is not going to adjust the focal price of that notebook computer set at $699.

In an effort to overcome the lack of any methodology to account for the large number of unidentifiable members of the putative class who bought finished products at focal point prices and suffered no price impact, Dr. Leamer presents an alternate impact theory of "quality adjustment."  This theory speculates that those unidentified putative class members who purchased at focal point prices, and thus experienced no pass through of the overcharge, may have instead received a quality reduction in the product that they purchased.  But this theory is not supported with any reliable methodology or evidence indicating that an economic harm to class members actually occurred—or could be measured—in this way.  Instead, Dr. Leamer simply speculates that because the many different quality features of notebook computers have experienced leaps of improvements during the relevant time period, it is possible that "*if* a manufacturer wanted to hold the price of a product to a specific price point, it *can* do so."  Leamer III ¶ 95 (emphases added); *see also* Leamer Tr. 720:8-721:9.  Indeed, Dr. Leamer concedes that he has no methodology to determine damages for any class members who purportedly suffered a quality reduction.

Significantly, this quality-adjustment theory concedes that the many class members who purchased at focal point prices would have suffered no price pass-through impact or damages because they paid no passed-through overcharge.  These two divergent theories of claimed injury—an overcharge for those who purchased at a non-focal point, and a quality adjustment for those who did— leave IPPs without a common methodology to establish common impact or damages as required by Rule 23.

2

***Defect Number 2: IPPs Still Do Not Account for the Packers.***  Despite their claims to the contrary, IPPs still have ***no data from the overseas third-party packers themselves***, and thus no analysis capable of reliably studying whether, and by how much, independent overseas packers of cylindrical batteries pass through small battery cell cost increases to their OEM customers.  Notably, none of Dr. Leamer's packer studies analyze packs sold to OEMs for use in power tools or camcorders, thus making it impossible for the Court to certify a class including purchasers of those products. Equally significant, these analyses do not provide any actual pass-through analysis of a cost change in cell price to the overseas packers as they do not use any actual data from the packers.  The only data Dr. Leamer uses from an entity even affiliated with an overseas packer is from Simplo USA, a battery pack distributor that only sold standalone ***replacement batteries for notebook computers to a single customer***, Dell.  This narrow data set (from only 2007-2011) cannot form the basis for any common methodology for determining whether the overseas packers passed through cost increases to their wide variety of OEM customers on a uniform basis across the entire class period.  Beyond this, the record on price and cost from the independent packers is barren.

***Defect Number 3: IPPs Still Fail to Account for the Real-World Effects of Rebates, Discounts, and Bundling.***  Rather than developing a reliable methodology to account for the impact of rebates and discounts, IPPs instead offer Dr. Leamer's conjecture that it is unnecessary to account for rebates and discounts because of his unsupported speculation that they should not matter to his results.  That inadmissible speculation is based solely on Dr. Leamer's look at instant rebates for purchases of notebook computers provided by only three small business-to-business ("B2B") entities and discounts provided by one OEM.  Strikingly, Dr. Leamer still does not account for the vast amounts of rebates or discounts given to consumers by retailers (including rebate and discount data available to, but not used by, Dr. Leamer), or any mail-in or other post-sale rebates at all.

Along with rebates and discounts, the Court previously determined that Dr. Leamer's methodology failed to account for the common retailer practice of bundling together a product within the class definition (such as a laptop) with products and/or services outside the class definition (such as a printer, software, or a warranty) and how this practice might eliminate any price impact to a consumer from a small upstream overcharge on a battery cell.  Here again, Dr. Leamer acknowledges

3

that bundling often occurs, but his pass-through studies still do not account for the price effects of such bundling, *i.e.*, selling multiple products or services together at a single discounted price.

***Defect Number 4: IPPs Still Fail to Show Pass Through of Battery Costs in a Representative Sample of Finished Product Prices.***  In its previous decision, the Court found that a study of pass through in the notebook computers of a single company, Toshiba, was not a sufficient methodology to demonstrate class-wide impact in the sales of other companies' notebook computers—let alone other finished products.  Despite this warning (which was made in the context of the DPP analysis, but is equally applicable to the IPP expert work), Dr. Leamer relies only on a Toshiba laptop computer analysis (which does not even show statistically significant pass through) as the basis for proving class-wide pass through at the OEM level.  Indeed, IPPs have not come forward with even a single analysis of OEM pass through for either camcorders or power tools, rendering it impossible for them to meet their burden to certify a class including these products.

***Additional Fatal Flaws in IPPs' Renewed Motion: 1) Insufficient Class-Wide Coverage.***  IPPs' revised (but still non-random) data set only includes a tiny portion of the billions of dollars in class sales included in Dr. Leamer's data set—and is not presented as a statistically representative sample of the vast and diversified class that IPPs seek to certify.  Dr. Leamer admits that he has done nothing to determine whether these analyses are a representative sample of the class.  Leamer Tr. 618:17-619:21.  Moreover, the gaping holes in IPPs' data set are a particularly acute defect because even IPPs' non-representative studies show entire categories of sellers with ***zero*** statistically significant pass through—making it impossible to know without an individualized inquiry which class members, if any, were impacted.

***2) IPPs Cannot Certify A Nationwide Class Under California Law or a Class of Government Entities.***  Finally, the Supreme Court's recent opinion in *Bristol-Myers* makes clear that it would violate due process to certify a multistate class under California law where there is no evidence that non-California class members purchased their class products in California or were injured by any conspiratorial acts in California.  Nor have IPPs come forward with any showing sufficient to certify their proposed class of government entities.

## ARGUMENT

I. **IPPS FAILED TO CURE ANY OF THE FATAL DEFICIENCIES IN THEIR PASS-THROUGH EVIDENCE AND STILL DO NOT RELIABLY DEMONSTRATE PASS-THROUGH ON A CLASS-WIDE BASIS**

A. **Defect Number 1:** IPPs Still Have No Reliable Method for Proving Pass Through in the Presence of Focal Point Pricing.

In its order denying class certification, the Court found that a fatal defect in IPPs' purported "show[ing] that pass-through and damages can be established by expert analysis on a class-wide basis" was that IPPs' pass-through model failed to account for "focal point pricing"—a prevalent pricing strategy in which retailers selected price points, *e.g.* $499.99, for finished products and did not adjust prices in response to small changes in costs. Order at 19; Haider II ¶¶ 18-31, Exs. 1, 2. The evidentiary record is brimming with examples of such focal point pricing, and it cannot be reasonably disputed that focal point pricing was dominant among retailers during the class period.[2] IPPs themselves testified that they "see a lot of this 99.99 kind of pricing." Ex. 2, Bugge Tr. 121:8-122:11.

Dr. Leamer estimated the average cell price overcharge was only 36 cents, which, *e.g.*, would only amount to a total of $2.16 in a notebook computer containing six cells. Leamer III at 68, Fig. 31; Haider II ¶ 26.[3] Dr. Leamer was thus forced to concede at his deposition that, as a result of focal point pricing, "the first few rounds of a $2 increase in cost don't produce any product price changes." Leamer Tr. 230:8-231:19. In other words, the "first few rounds" of class member purchasers would not suffer any price impact. Subsequent consumers would also suffer no price impact unless and until the retailer opted to raise its price to the next focal point. As Dr. Leamer put it, "***Nobody says that every cost is passed on*** . . . . We're just saying that in the long run, you know, given an adequate amount of time, there's going to be a relationship between the cost of the goods that are going to be sold and the sales price." *Id.* (emphasis added). Of course, Dr. Leamer's testimony that a small alleged cell

---

[2] *See* Class Cert. Opp'n I at 28-29 (collecting examples). For example, Best Buy sold approximately 42 million notebook computers at focal point prices (*i.e.*, prices ending in 09 cents, 99 cents, or 99 dollars) during the proposed class period, representing 84% of Best Buy's total notebook computer sales. Haider II ¶ 22. Best Buy also sold approximately 15 million camcorders at focal point prices, comprising 90% of its total sales of camcorders. *Id.* Ace Hardware sold roughly 19,000 power tools at focal point prices from August 2009 to May 2011, about 91% of its total power tools sales. *Id.* ¶ 23.

[3] Separately, Dr. Leamer's $3 average obscures the fact that any overcharge outside of the so-called "cobalt sensitivity period" would be well below $3, and in some time periods, as small as one or two pennies. Haider II ¶ 7.

price overcharge may eventually result in price increases "in the long run" to some other group of class members is just another way of saying that such cost increases would **not** impact the numerous class members who purchased at initial focal point prices.  Haider II ¶¶ 16, 95-97.  Indeed, Dr. Leamer admits there were numerous class members who would not have experienced any price impact at all from the alleged conspiracy because of focal point pricing, although he has no methodology to identify who they were.  Leamer. Tr. 714:21-715:2, 720:8-721:9.  The IPPs' continued inability to determine which class members did not suffer any adverse price impact as a result of focal point pricing is fatal to class certification.  Order at 19.[4]

IPPs try to obfuscate this issue by arguing that "price points were not evident in Best Buy purchase prices" (Renewed Mot. at 14), but this is irrelevant to the real issue that price points **are plainly** evident in Best Buy's and other retailers' **sales** prices to class members.  Haider II ¶¶ 9, 22-25.[5]  Dr. Leamer, too, attempts to downplay the significance of focal point pricing by asserting that "[a]ctual focal points do not last very long" before "prices are cut," and that "over fifty percent of the prices are changed in the first 30 days."  Leamer III ¶¶ 84-85.  In other words, class members who purchased at focal point prices in the interim 30 days, before any price change, experienced **zero** impact from price increases, while subsequent purchasers paid even lower prices when the initial focal point prices were lowered.  *Id.* ¶ 7.  Significantly, Dr. Leamer's own data set shows that when a focal point price was eventually reduced, it was usually to **another focal point price** (*e.g.*, from $499 to $449 to $399)—not a price that accounted for the pass through of any alleged cell price overcharge.[6]  Most significantly, Dr. Leamer has failed to perform **any** analysis to determine which class members suffered

---

[4] *See also In re Optical Disk Drive Antitrust Litig.*, 303 F.R.D. 311, 324-25 (N.D. Cal. 2014) ("*ODD I*") ("[I]f the overcharge paid by the direct purchaser on an ODD installed in a computer was only four dollars, it seems implausible that the retailer would then raise the price of a computer that otherwise would sell for $999 to $1003."); *In re Processed Egg Products Antitrust Litig.*, 312 F.R.D. 124, 158 (E.D. Pa. 2015) ("[Where] the use of price points is common . . . evidence that the anticompetitive overcharge, if any, cannot be determined on a classwide basis . . . .").

[5] IPPs also deceptively cite "Best Buy's testimony that there was 'not even an official policy in regards to the 97 or 99 cent endings'" as "support[]" for their argument that "focal point prices are not ubiquitous throughout the market."  Renewed Mot. at 14.  What Best Buy actually testified was, "there's not even an official policy in regards to the 97 or 99 cent endings.  It's just something that has always been done that way."  Ex. 3, Best Buy Tr. (Sept. 13, 2013) 95:17-96:2.

[6] Haider II ¶ 9, 30.  *Accord* Ex. 4, RITZ000197310 (Ritz Camera spreadsheet comparing the old and new prices it charged for Sony, JVC and Canon camcorders; indicating that almost all camcorders had prices ending in $9.95 and that **changes** in price were mostly in increments of **exactly $50 or $100**).

no pass through as a result of focal point pricing, making it impossible for IPPs to meet their Rule 23 burden to show a common methodology of class-wide impact and damages.

IPPs again try to convince the Court to ignore focal point pricing by theorizing that class members who may not have been impacted by paying the alleged overcharge instead were impacted by some sort of quality reduction in the products purchased.  Renewed Mot. at 14-16.  As an initial matter, this concession dooms IPPs' renewed bid for class certification because it recognizes that the alleged overcharges on cells were not passed through to consumers in the form of higher prices on a class-wide basis, because a number of unidentified members of the class who purchased at focal point prices necessarily paid no price overcharges.  Those who did not pay any overcharges, but rather were allegedly impacted through a product quality reduction (to the extent such an effect could even be called an antitrust injury, which it is not) would have been impacted in a way uncommon to that of other class members that would require individualized inquiries to resolve.[7]

But, more fundamentally, IPPs fail to present any methodology to assess quality-adjusted impact on a class-wide basis to the Court—instead presenting only Dr. Leamer's unsupported theory. They do not come forward with an analysis or study to show that the alleged overcharges were actually **passed through** to class members as quality reductions.  Haider II ¶¶ 32-36.  Indeed, IPPs present no evidence that there were quality and feature adjustments that could be made by an OEM that would result in cost reductions of the small magnitude of cell price overcharges at issue in this case.[8]  Dr. Leamer admitted that he did nothing to trace any alleged overcharge to any specific quality reduction in the products purchased by class members, rendering his entire opinion on this point unsupported speculation.  Leamer Tr. 734:13-736:23 ("I think that exercise would be rather hard to carry out and I've not done it.").

---

[7] *See Collegenet, Inc. v. Common Application, Inc.*, 104 F. Supp. 3d 1137, 1149 (D. Or. 2015) ("[Plaintiff's] allegation of diminished quality alone is not sufficient to establish injury," since "Plaintiff's opinion about what is best for [consumers] cannot suffice to establish antitrust injury"); *see also In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 507 (N.D. Cal. 2008) ("*GPU*") (denying class certification and rejecting plaintiffs' theory of antitrust impact via "lower quality" products because it raised individualized issues as to whether "each class member would have made different decisions about what to purchase" absent the alleged "quality" reductions).

[8] *See* Haider II ¶¶ 34, 37, 41.  *See also* Leamer II at 57, Fig. 24 (the features studied by Dr. Leamer suggest that even slight modifications to the most basic features would change the cost of the finished product at a minimum by $20—not the pennies on the dollar at issue in this case).

7

DEFS.' OPP'N TO INDIRECT PURCHASER PLS.' RENEWED MOT. FOR CLASS CERTIFICATION
CASE NO. 4:13-md-02420-YGR

The speculative quality-reduction theory offered by IPPs thus stands in stark contrast to the analyses of quality reduction submitted by the *ODD II* Plaintiffs, whose revised expert models were found to have assessed actual pass through of alleged overcharges in ODDs that took the form of quality-reduced prices to class members.  Haider II ¶¶ 33-36, 42-43.  No such studies or analyses have been presented here, where Dr. Leamer admits that he did not perform any analysis to demonstrate whether particular quality reductions were made in response to any alleged overcharges, and also provided no methodology to determine which class members would have experienced their injury in the form of a quality reduction or how much damages could be attributed to any such quality reduction injury.  Leamer Tr. 734:13-736:23.  Further, even Dr. Leamer's analysis on changes of quality features over time—which is untethered to the alleged cell overcharges—is not remotely representative of the class.[9]

Most profoundly, unlike the expert analysis submitted in *ODD II*, Dr. Leamer's quality reduction analysis ***does not evaluate pass through at all***.  Haider II ¶¶ 33-36, 42-43.  Instead, based solely on data from two laptop OEMs, HP and Acer, Dr. Leamer's analysis simply estimates that about "90 percent of the variation in [laptop] costs are explained by the laptop features" and "88 percent of price [is] explained by the components of the laptop."  Leamer III ¶¶ 92-95; Haider II ¶¶ 42-43.  What does such an analysis seek to prove?  As Dr. Leamer put it, "*if* a manufacturer wanted to hold the price of a product to a specific price point, it ***can*** do so."  *Id.* ¶ 95 (emphases added).  It does nothing, however, to determine whether quality-based "pass through" ever occurred, to which class members, or in what amounts.  *See* Leamer Tr. 735:18-736:23 (admitting his analysis does not assess "the actual features that are changed in a but-for world"); Haider II ¶¶ 33-36; 41-44.[10]

The case of *Perez v. State Farm Mutual Auto Insurance* is on point.  There, the class plaintiffs asserted antitrust claims for damages under the California Cartwright Act, alleging that defendants

---

[9] Specifically, Dr. Leamer's analysis of changes in quality features includes only eight hedonic regressions (1.9% as many as in *ODD II*) covering 12,840 laptop observations (0.2% as many as in *ODD II*) for two sellers, with ***no*** analysis whatsoever for camcorders or power tools.  Haider II ¶ 42.  As another court has recently held: "[T]he actual data on which [IPPs] rel[y] to extrapolate" that pass through via quality reductions occurred "is simply too sparse," since IPPs "knew next to nothing about a huge percentage of the [] market."  *Laumann v. NHL*, 117 F. Supp. 3d 299, 314-17 (S.D.N.Y. 2015); Leamer *Daubert* II at 4-5.

[10] Further detracting from the relevance of Dr. Leamer's quality analysis, his study of Acer did not even include batteries among the components whose price impact he studied.  Haider II ¶ 43.

8

1  "conspired to provide low-quality, non-OEM parts."  628 F. App'x 534, 534-35 (9th Cir. 2016).  Judge

2  Ware initially denied class certification on predominance and commonality grounds because "Plaintiffs

3  have not yet articulated [a common] methodology" to "distinguish between categories of parts that are

4  inferior to OEM parts and those that are not," and thus the court could not conduct the necessary

5  "'rigorous analysis' of the evidence" required under Rule 23.  *Perez*, 2012 WL 1570035, at *2 (N.D.

6  Cal. May 2, 2012).  The plaintiffs later submitted a new expert declaration purporting to provide such

7  a common methodology for showing that class members suffered an antitrust injury via lower quality

8  parts.  *Perez*, 2012 WL 3116355 at *3 (N.D. Cal. July 31, 2012).  That declaration, however,

9  "completely omit[ted] any evidence in [the expert's] reported findings about the quality" of actual parts

10  to support his assertion that certain "parts [we]re 'high quality'" and other parts were "'inferior' parts."

11  *Id.* at *5.  Accordingly, Judge Ware excluded the expert declaration as unreliable under *Daubert* and

12  denied class certification.  *Id.* at *7, *aff'd*, 628 F. App'x at 534-35 ("Plaintiffs [] failed to produce any

13  evidence of inferior parts" compared to what class members otherwise would have purchased).

14  　　　　Here, Dr. Leamer similarly theorizes that class members who did not pay higher prices as a

15  result of focal point pricing still could have experienced antitrust injury because "the effect of

16  overcharging for batteries will be to reduce the quality of the other components" in finished products.[11]

17  Renewed Mot. at 2.  But IPPs have not come forward with any expert evidence or methodology to

18  show quality reductions in the actual products that class members purchased.  *Perez*, 2012 WL

19  3116355, at *5; Haider II ¶¶ 33-36, 42-43.  IPPs' failure to offer common proof of any actual quality

20  reductions passed through to class members is further demonstrated by their damages model's inability

21  to measure ***any*** damages resulting from quality reductions, as Dr. Leamer admitted.[12]  Unlike the *ODD*

22  *II* expert, who built his quality analysis into his pass-through regressions to determine a quality-

23  reduction price impact, Dr. Leamer's "quality analysis" is simply a piece of theoretical speculation.

24  *Id.*; Haider II ¶¶ 33-36, 42-43.  IPPs' failure to propose a model to measure damages in a way consistent

25

26  [11] Notably, Dr. Leamer did not do any analysis to determine which customers were allegedly harmed by a price effect and which were allegedly harmed by a quality effect.  *See* Leamer Tr. 720:18-721:9.

27  [12] *See* Leamer Tr. 721:3-9 ("Q: . . . You haven't offered any methodology for measuring what is the quality effect on specific members of the class, correct, in terms of how much damages they incurred

28  because of a quality reduction as opposed to a price impact? A: That's correct.").

9

with their theory of antitrust impact via quality-based pass-through is, in itself, fatal under Rule 23(b)(3) and precludes class certification. *Comcast Corp. v. Behrend*, 569 U.S. 27, 33-35 (2013) ("[A]ny model supporting a 'plaintiff's damages case must be consistent with its liability case, particularly with respect to the alleged anticompetitive effect of the violation.'"); *Doyle v. Chrysler Group, LLC*, 663 F. App'x 576, 578-80 (9th Cir. 2016) (reversing and denying class certification as a "proposed damages model must measure" the damages "attributable to the theory of liability").

Yet another defect in IPPs' quality reduction argument is that Dr. Leamer offers no methodology to account for consumers valuing different "quality" features differently. Consumers each have individual utility levels associated with specific features, thus making any determination of antitrust injury to that class member subject to individualized inquiry. Haider II ¶ 44. Dr. Leamer even admitted that if "there's no value associated with" an added feature, "quality is not improved for" that particular purchaser. Leamer Tr. 736:24-737:7. *See also Reading Int'l, Inc. v. Oaktree Capital Mgmt. LLC*, 2007 WL 39301, at *13-14 (S.D.N.Y. Jan. 8, 2007) (holding that no antitrust injury was present where plaintiffs claimed "a decline in the overall quality of the moviegoing experience," because the mere fact that plaintiffs "ha[d] to instead go to another nearby theatre to see [a] film does not mean that there has been an actionable harm") (citation omitted).[13]

Finally, IPPs have failed to establish both constitutional standing and the requisite causal nexus under the California Cartwright Act because their theory of antitrust injury in their renewed motion for class certification now relies on pass through in the form of ***both*** price increases and quality reductions, yet they have failed to make any showing of actual quality reductions caused by the alleged battery cell price-fixing conspiracy. *See supra* at 7-10. IPPs and Dr. Leamer concede that their purported showing of pass-through via price increases "leaves open the question how there can be pass-through of battery overcharges during [a product's] introductory period when introductory prices are at focal points." Leamer III ¶¶ 7, 70-73. But they cannot fill this gap in their pass-through showing, and thus

---

[13] Because IPPs have failed to provide any common proof that class members were injured by purchasing products with actual, non-hypothetical ***quality reductions***, IPPs cannot show antitrust impact on a class-wide basis. *Perez*, 628 F. App'x at 534-35; *see also Fair Isaac Corp. v. Experian Info. Sols., Inc.*, 650 F.3d 1139, 1146 (8th Cir. 2011) ("[The] evidence does not establish that [plaintiff] has suffered antitrust injury because of reduced [product] quality," since plaintiff's purported evidence of quality reductions was "hypothetical").

cannot establish constitutional injury-in-fact and traceability, or causation under California law, by pointing to purely hypothetical quality-based injuries without any showing as to what specific quality-based "injuries" actually occurred to class members, and how they were caused.[14]

Indeed, IPPs have neither alleged nor offered any evidence of actual quality-based injury suffered by any proposed class representative.  These standing defects render them incapable of fulfilling the adequacy and typicality requirements—as individual class representative standing must be satisfied before the Rule 23 criteria can even be considered.  *See Ralston v. Mortg. Inv'rs Grp., Inc.*, 2011 WL 4081696, at *3 (N.D. Cal. Sept. 12, 2011) ("[O]nce standing has been established, whether [a potential class representative] will be able to represent the putative class, including absent class members, depends solely on whether he is able to meet the additional criteria [of] Rule 23.").

## B.    Defect Number 2: IPPs Still Do Not Account for the Packers.

Another fatal defect identified by the Court in IPPs' first motion for class certification was that "there [wa]s no analysis for packers in the IPP class since plaintiffs had not obtained data from any of the packers for the cylindrical batteries covered by the class definition."  Order at 19.  Instead of now offering analyses of actual overseas packer data, IPPs seek to rely on a patchwork of disjointed analyses by Dr. Leamer of data from non-packers—concerning only purchases by Acer and Dell—as a basis to draw inferences of uniform pass through by the overseas packers.  But none of these pseudo packer analyses come close to providing a methodology for reliably finding any pass through of claimed cell price overcharges by any of the overseas packers, who are admitted to account for as much as 50% of the putative class.  Leamer Tr. 304:15-25; Haider II ¶¶ 45-67, Ex. 3.

First, IPPs cannot prove class-wide impact in the packer channel based on the battery pack purchases of two notebook computer OEMs, Acer and Dell, between 2006 and 2011.  Because IPPs have failed to show that Acer's and Dell's purchasing data during this period was in any way representative of the many other OEMs and ODMs who purchased from third-party packers, this

---

[14] *See, e.g.*, *Contreras v. Toyota Motor Sales U.S.A. Inc.*, 484 F. App'x 116, 117 (9th Cir. 2012) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)) (Article III standing requires injury to be "actual or imminent, not conjectural or hypothetical"); *Clayworth v. Pfizer, Inc.*, 49 Cal. 4th 758, 775-76 (2010).  In their operative complaint, IPPs do not even *allege* that either their proposed class representatives or other class members experienced any quality-based injury, and instead rely solely on allegations that IPPs were injured by "paying higher prices for Lithium Ion Battery Products than they would have in the absence of Defendants' conspiracy."  IPP-FCAC ¶ 334, ECF No. 1168.

1    limited analysis provides no reliable basis for Dr. Leamer to draw any inferences about other packer

2    sales.  Leamer Tr. at 587:9-20, 651:3-654:25; Haider II ¶ 47-51, Ex. 3.  For example, Dr. Leamer

3    admitted that he did not know whether Acer and Dell had long-term contracts with the packers that

4    would limit or affect any pass through.  Leamer Tr. 563:24-565:3, 569:6-571:6.  Nor did he do anything

5    to determine whether their price arrangements with packers were at all representative of the price

6    arrangements of other OEM customers with the packers—including customers who bought packs for

7    power tools and camcorders.  *Id.* at 568:19-571:6.  The law is clear that such a non-representative data

8    sample, lacking data from the third-party packers themselves, cannot be a reliable basis for opining on

9    class-wide impact.  *In re Class 8 Transmission Indirect Purchaser Antitrust Litig.*, 679 F. App'x 135,

10   140 (3d Cir. 2017) ("[Plaintiffs'] analysis did not test class-wide impact because it: (1) was based

11   solely on a portion of linehaul transmission sales data, excluding performance transmission sales . . .

12   and (2) excluded data from two truck manufacturers . . . "); *Marlo v. UPS*, 639 F.3d 942, 947-49 (9th

13   Cir. 2011) (affirming decertification where plaintiff "relied on a [] survey" to show predominance, but

14   "survey's designer stated in her deposition that she did not know whether the sample was

15   representative.").

         Second, IPPs' assertion that packer pass through is capable of common class-wide proof

16   through Dr. Leamer's faux packer analyses is further negated by the results of Dr. Leamer's packer

17   pass-through regressions, which do not show any statistically significant pass through for numerous

18   putative class members.  In particular, ***none*** of the surrogate "packer" regressions show any statistically

19   significant pass through of cell costs in pack prices within the same month of the cell purchase, and

20   none of those regressions except one (for replacement batteries sold from Simplo USA to Dell) finds

21   statistically significant "pass through" for batteries sold in the ***next*** month.  Leamer III at 15-16, Figs.

22   2-4; Haider II ¶ 54.  This is not surprising, since the record also demonstrates that packers often

23   absorbed cell cost increases without passing them on.[15]

24

25

26

27   _____

[15] *E.g.*, Ex. 5, E-mail from Ian Chen (Sony), Meeting Minutes at Dynapack, Feb. 4, 2007, SONY-LIB-
28   000713773 ("Dynapack is kind of pessimistic about the price increase to those brand NB companies,
     especially HP.  (***HP will ask packer to absorb the cost increase***)") (emphasis added).

Such wide swathes of zero pass-through impact on class members are "variations in [defendant's] liability as opposed to merely [in] damages," and individual inquiries would be needed at trial to assess which class members were not impacted by the lack of any packer pass through and thus not eligible for recovery.[16]  Nor can Dr. Leamer avoid this problem by citing to the fact that his surrogate packer analyses show a statistically significant long term impact, as he admits that such an impact, under his regression specification, could be a year later or even longer.  Leamer Tr. 605:17-614:3.  With these gigantic gaps in time, many OEM purchases of batteries from the packers would suffer no impact, even with long term effects, which means OEMs would have no overcharge to pass through to IPP class members.  Haider II ¶¶ 54-56 & n.129.

Particularly unreliable is the one analysis Dr. Leamer did using data from a packer affiliate, Simplo USA.  Simplo USA was established as a distribution company solely to sell replacement batteries to one customer, Dell, in the United States.[17]  Unaware of this limitation in Simplo USA's business, Dr. Leamer did nothing to determine whether such a unique arrangement between Simplo USA and Dell, which did not involve the pricing of battery packs included in OEM products, would in any way be representative of the prices or pass-through impact of OEM purchasers from the overseas packers.  Leamer Tr. 563:24-564:12, 568:21-570:5.  Moreover, because Dr. Leamer did not have any cost data from Simplo USA for the replacement battery packs it sold to Dell, he had no way to do an actual pass-through study of the cost changes experienced by Simplo USA.  His analysis thus did nothing to account for the transfer prices paid by Simplo USA to its parent, the effects of exchange rate fluctuations on Simplo's USA's prices compared to its parent's, changes in distribution services and costs thereof over time, or the differences in pricing between battery packs and replacement

---

[16] *Koike v. Starbucks Corp.*, 378 F. App'x 659, 661-62 (9th Cir. 2010) (affirming denial of class certification); *see also Thomasson v. GC Servs. Ltd.*, 539 F. App'x 809, 810-11 (9th Cir. 2013) (emphasis added) (holding that plaintiffs must provide "significant proof that the *entire* class suffered a common injury" "connected to the specific claim for relief" alleged by plaintiffs); *In re Flash Mem. Antitrust Litig.*, 2010 WL 2332081, at *8 (N.D. Cal. June 9, 2010) (denying class certification) ("The fact that price patterns varied over time among [] different [] purchasers means that any meaningful analysis of impact or overcharges would have to be performed separately for each [such] purchaser.").

[17] Ex. 6, Wei Tr. 119:3-5; Ex. 7, Email thread between C. Fernandez and H. Yang, dated Oct. 10-11, 2017.

batteries.  *See* Haider II ¶ 49.  The entire analysis, therefore, is unreliable to determine whether there was class-wide packer pass through.

Finally, IPPs cannot avoid the denial of class certification by arguing that, if they had more packer data, Dr. Leamer's results might show the missing pass-through relationship.  *See GPU*, 253 F.R.D. at 505-07 (denying IPP class certification); Order at 29 ("While it is unclear where to lay the blame, the Court nevertheless cannot ignore the large gaps in the evidence supporting the ability to demonstrate impact and damages on a class-wide basis.").[18]

## C.   Defect Number 3: IPPs' Pass-Through Studies Still Fail to Account for the Real-World Effects of Rebates, Discounts, and Bundling.

Another ground on which the Court denied IPPs' first class certification motion was the failure of their pass-through model to "account for" "bundling, rebates, and discounts," which "would affect the accuracy of [their] cost data" since that data would not reflect products' actual costs.  Order at 19. Dr. Leamer concedes that the "data required to measure pass-through are the true sales price and true cost of all transactions, ***net of any rebates and discounts***."  Leamer III ¶ 37 (emphasis added).[19]  In their Renewed Motion, IPPs have failed to correct this fatal failure to utilize the actual costs for a product—making it impossible to know if IPPs' purported "pass through" showing is just a byproduct of using incorrect and unreliable cost data.  Haider II ¶¶ 69, 72-79.

### 1.   Rebates and Discounts.

Instead of addressing the deficiency identified by the Court, IPPs rely upon an entirely speculative opinion from Dr. Leamer that rebates and discounts do not matter to his pass-through results, so his regressions do not need to account for them.  Leamer III ¶¶ 38-42.  This speculation is based solely upon his review of a tiny fragment of instant rebate data from three B2B IT solutions companies, Insight, CompuCom, and Zones, none of which sold to individual consumers, and discount data from a single laptop OEM, Gateway, for 2000-2006—which Dr. Leamer testified was the only

---

[18] IPPs argue both that there is currently sufficient data from which Dr. Leamer can measure pass-through at the packer level, and thus the *actual* packer data IPPs seek from Simplo Taiwan would be "for use in their analysis during the merits phase"—while also informing the Court at the discovery hearing before Judge Ryu that IPPs needed such data for their class certification reply.  *See* Renewed Mot. at 7-9 & n.14; Ex. 8, Oct. 3, 2017 Hr'g. Tr. at 35:9-17.

[19] *See also* Ex. 9, Ritz Camera Tr. 111:7-114:3 ("[W]hen Sony is referring to margin they are looking at their total dollars supporting the Ritz organization in addition to just the invoice price").

usable rebate and discount data that IPPs provided him.  *Id.*; Leamer Tr. 655:20-665:8.  These companies' non-random, unrepresentative data amount to only 3.4% of IPPs' pass-through data set, and do not include any sales of camcorders or power tools (which Dr. Leamer admitted he "would have" studied "if [h]e had that data").  Leamer III at 69, App. A; Haider II ¶¶ 72-73; Leamer Tr. 677:14-21.  Moreover, they do not include any data at all on mail-in or other post-sale rebates that are extremely common in the sale of the products at issue.  Haider II ¶¶ 72, 74-78.

IPPs thus cannot show a reliable methodology for proving class-wide impact and damages because they have failed to provide any common method of proving pass through based on ***actual*** prices and costs, net of rebates and discounts.  *E.g.*, *Pilgrim v. Univ. Health Card*, 660 F.3d 943, 948 (6th Cir. 2011) (predominance absent because "[w]here and when [suppliers] offered discounts is a prototypical factual issue that will vary from place to place"); *GPU*, 253 F.R.D. at 504 (denying class certification where "computer manufacturers individually negotiate[d] prices for [components] . . . and [] sometimes also receive[d] rebates on those products"); *Food Lion, LLC v. Dean Foods Co.*, 312 F.R.D. 472, 496 (E.D. Tenn. 2016) (determining that common elements of class were overwhelmed by "class [members] who bought pursuant to negotiated prices and/or received pricing concessions, rebates, and the like.").

IPPs' own data set shows that a number of major companies, including Dell, HP, SED, Home Depot, PC Connection and others, offered an enormous quantity of rebates and discounts during the class period.  The record further demonstrates that billions of dollars in rebates and discounts were paid to and offered by mainstream retailers such as Best Buy, Fry's, and Circuit City, none of which are accounted for by the Leamer analyses.  Haider II ¶ 74 & n.166.  These and other retailers offered

and received individual unit discounts,[20] volume incentive rebates and discounts,[21] price protection,[22] dealer support and market development funds ("MDF"),[23] and incentive payments to clear out excess inventory,[24] none of which Dr. Leamer studied or accounted for in his analyses. *Id.* ¶¶ 72-75.

In the context of the complicated distribution chains and the very small size of the alleged overcharge, this tremendous rebate and discount data gap—and the absence of any reliable methodology to account for products' ***actual*** costs—demonstrates IPPs' failure to show that class-wide impact is capable of common proof. *E.g.*, *Flores v. Supervalu, Inc.*, 509 F. App'x 593, 594-95 (9th Cir. 2013) (affirming finding of no predominance and "disallowing statistical studies and surveys" because the "idiosyncratic conduct" at issue precluded "extrapolation from statistics"); *Deiter v. Microsoft Corp.*, 436 F.3d 461, 467-68 (4th Cir. 2006) (denying certification because prices were "discounted and unique to each transaction").

---

[20] Ex. 44, Fry's Decl. ¶¶ 5, 8, 11 (describing Fry's discounts and rebates, and noting that "Fry's received various rebates, discounts, refunds, credits, and other monetary incentives from suppliers or vendors . . . which could vary depending on the negotiations"); Ex. 10, Moe Decl. ¶¶ 53-54 (describing Best Buy discounts and MDFs); Ex. 11, Walmart Decl. ¶¶ 7-9, 17 (describing Walmart discounts and rebates); Ex. 12, E-mail from Richard Campbell (Panasonic), Dec. 22, 2006, RITZ000192381 ("If we gave you $25 a unit up front to use as transition funding would that be of interest for a buy like that? You decide how best to use the funding to drive sales."); Ex. 13, Ltr. from Barry Coley (Sony), Nov. 30, 2006, RITZ000197373 ("Ritz Camera is receiving a promotional offer in excess of $100 per unit from a Digital SLR Products competitor of Sony . . . . In order to meet competition, we are committing the following: A trailing credit of $102.39 for the combo purchase of the DSLRA100K and the SAL75300 lens . . . .").

[21] Ex. 14, Circuit City Tr. 66:13-67:5 ("[I]f you are buying five camcorders from Panasonic you may get a better deal than if you are buying four or three."); Ex. 15, Univisions-Crimson Tr. 122:23-124:13 ("A. … [Panasonic] would send us a report saying your purchases for this time period under this program was $1 million and here's a check for $2,000"); *id.* 188:15-190:13 (testifying that "by buying from Sony in volumes of $25,000 or more per quarter Univisions-Crimson received volume incentive rebates of between five percent and 11 percent").

[22] Ex. 16, CCITYHC000070217 (charts showing hundreds of millions of dollars in price protection and MDF paid to Circuit City by Defendants' affiliates and OEM customers for 2007 to 2009); Ex. 17, Sony-Ingram Micro Distrib. Agreement, Apr. 1, 2004, SONY-LIB-000404794 ("Price Protection … In the event of a price decrease, the Distributor will . . . receive . . . a credit equal to the difference between the decreased price and the price at which the Protected Products were purchased . . . .").

[23] Ex. 18, Ltr. from Acer to CompUSA, Feb. 6, 2003, AACTOSH000606089 (describing MDFs and price protection received by CompUSA); Ex. 19, CCITYHC000070002 (listing various funds that Sony provided Circuit City for selling Sony camcorders, including MDFs, volume incentive rebates, and high definition camcorder rebates, with a "total value of . . . $5,730,000.00"; providing for price protection for any "subsequent price reduction or promotion on goods purchased in their inventory"); Ex. 20, (Ex. 1029) (chart showing $276,550 in MDFs awarded by Sony to Ritz Camera for January to July 2006); Ex. 15, Univisions-Crimson Tr. 113:22-116:11 ("[W]e bought one million dollars worth of product . . . $10,000 would go to a dealer support fund.").

[24] Ex. 9, Ritz Camera Tr. 182:16-183:8 ("The last day of the month for Panasonic, they need to move product … [T]his was an offer to take 1,000 of the DMC-FZ1s . . . [F]or doing that there would be an additional $15,000 of funding that we can do with what we want").

---

16

## 2. Bundling.

IPPs also fail to make any showing that Dr. Leamer's pass-through analyses are reliable in the presence of bundling, which, as Dr. Leamer put it, "has the potential for causing errors in prices or costs or both which might affect the pass-through estimates." Leamer III ¶ 45; Haider II ¶¶ 70-71, 80-83, 86-88. The only new "common proof" offered by IPPs on this issue consists of a speculative opinion by Dr. Leamer that bundling is immaterial to his results. That speculation, in turn, is based on: (i) an analysis of bundling data for a tiny, non-representative subset of companies (Haider II ¶¶ 71, 82, 86-87); and (ii) studies for individual product rates of pass through and the rate of pass through of a completely bundled product. But such analyses do not address the issue identified by the Court in its prior opinion—whether the price of the bundle changes when the cost of the cell in the finished lithium ion battery product at issue changes, or whether a price change is the result of the non-battery product. Haider II ¶¶ 70, 81.

Specifically, Dr. Leamer utilizes bundling data from only the retailers Insight and PC Connection for laptops (retailers with merely *2.5%* of the laptop sales in IPPs' pass-through data set), and OEMs Black and Decker and Cornwell and retailers ACE Hardware, Fry's, and Home Depot for power tools. Leamer III at 30, Fig. 10, 69, App. A; Haider II ¶ 71 & n.160. Yet, he admits that he has done nothing to determine if this non-randomly selected data would be representative of bundling by the numerous other retailers who sold bundled products to class members. Leamer Tr. 691:14-693:4. This renders all of his bundling opinions unreliable. *GPU*, 253 F.R.D. at 506 ("Dr. Netz's regressions examine pass-through for graphics cards sold on a stand-alone basis. Significantly, she has not yet analyzed pass-through for graphics cards sold bundled with computers.").

Indeed, IPPs' own data set shows that bundling was prevalent at companies that sold large quantities of the relevant products to putative class members that were not studied by Dr. Leamer, such as Dell, HP, and PC Connection. Haider II ¶¶ 83-86 & n.184. For example, Dell's data shows that it frequently bundled laptops with warranties, software (*e.g.*, Microsoft Office or Adobe Acrobat), gift cards, and extra replacement batteries. *Id.* ¶ 86. Similarly, the record shows that Panasonic and Sony camcorders were frequently bundled by resellers with add-ons such as spare lithium ion batteries and

cases.[25]  Manufacturers and retailers paid reduced prices for laptops and their components, in exchange for bundling certain software.[26]  Even some of the purchases by IPP class representatives were actually bundled products.[27]

In the absence of a reliable and representative study of the price impact of bundling on a class-wide basis, IPPs cannot meet their class certification burden.  The IPPs have simply not addressed whether a cost increase in a battery cell would lead to a pass through of that very small cost change in a bundled sale of a computer, software, a printer, and a product warranty costing more than a thousand dollars, to a specific class member.  Haider II ¶¶ 70, 80-81, 87.  *See Flores*, 509 F. App'x at 594-95; *Pilgrim*, 660 F.3d at 948; *Deiter*, 436 F.3d at 467-68; *Food Lion*, 312 F.R.D. at 496; *GPU*, 253 F.R.D. at 504.

**D.    Defect Number 4: IPPs Failed to Perform Any OEM Pass-Through Study Outside of Toshiba Laptops.**

In its Order, the Court found the DPPs' methodology was insufficient to support class certification because, among other things, it only studied the pass-through data of a single computer OEM, Toshiba, to determine whether notebook purchasers were impacted by a cell overcharge.  Order at 28-29.  The Court's finding as to the DPPs' analysis applies with equal force to Dr. Leamer's analysis of pass through to finished products in the IPPs' proposed class.  In order to show cell price cost pass-through at the OEM level, IPPs rely solely on Dr. Leamer's analysis of "the relationship between battery costs and notebook sales prices" using "Toshiba [] datasets containing cost breakdowns for individual components, including batteries, used in particular notebook models from 2006 through 2011."  Leamer I ¶ 119.  Like DPPs, however, IPPs have no analysis comparing battery component costs to finished product prices for ***any*** company or product except Toshiba laptops.  Leamer Tr. 749:1-

---

[25] Ex. 15, Univisions-Crimson Tr. 132:9-14, 145:6-146:6 ("Q. So to summarize, each [Panasonic camcorder model] order within a 150 mile radius of Univisions-Crimson came with free camera case and free tape, a $200 M.D.A., and a $150 salesman's spiff, is that correct? A. For the time period of April 15 through July 31, that is correct."; "The [camcorder] package price is $800, approximately $850, $750 below the individual [dealer] pricing level of each component.").

[26] Ex. 21, Micro Elecs. Tr. 125:25-126:19.

[27] Class Cert. Opp'n I at 36 n.41 (citing testimony by seven IPPs that their relevant purchases were bundled with a printer, carrying case, a mouse, a charger, or software).

1    24; Haider II ¶¶ 99-100.  As the Court held, this Toshiba laptop-only data set is "insufficient to run an

2    analysis as to any of the other products types covered by the class definition."  Order at 28-29.

3          Dr. Leamer admitted that the only pass-through analysis he has done at the OEM level to show

4    pass through of the battery pack prices in the sales of finished products by an OEM is the same Toshiba-

5    specific analysis.  Leamer Tr. 749:1-24.  Yet, he has done nothing to determine whether Toshiba's

6    supposed pass through would be representative of other laptop OEMs, let alone of the power tool and

7    camcorder manufacturers, who he has not studied at all.  As the Court has noted, such a limited OEM

8    pass-through analysis cannot be used to show class-wide impact or damages because it purports to

9    assess the pass-through of battery costs in product prices without "actual cost data for any products

10   other than Toshiba laptops."  Order at 28.

11         The insufficiency of IPPs' Toshiba-specific pass-through analysis is further demonstrated by

12   other evidence showing that tiny changes in component costs (like the alleged overcharges) often had

13   zero impact on finished product prices, which were much more expensive.[28]  Consistent with this

14   factual record, even IPPs' Toshiba-specific pass-through model shows ***no statistically significant pass-***

15   ***through of battery costs in Toshiba laptop prices***.  Leamer I at 75, Fig. 42.  Dr. Leamer thus

16   summarized the results of this study as follows: "[I]t's saying that the impact of battery costs on

17   Toshiba notebook is hard to estimate."  Leamer Tr. 250:20-251:19.  This is the opposite of a reliable

18   common methodology for showing class-wide impact at the OEM level.

19

20

21

22

23

24

---

[28] *See* Ex. 22, Dell Decl. ¶¶ 13-14 ( ████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

█████████████████████████████████████ ⌐ ); Ex. 44, Fry's Decl. ¶ 9 ("[A] change in Fry's cost of [a] Lithium Battery
Product did not necessarily change Fry's sales price of that same Lithium Battery Product.  Fry's
decision to adjust its resale price . . . depended on the product and various circumstances.  Fry's retail
prices for Lithium Battery Products were not always raised when its suppliers raised purchase prices
of Lithium Battery Products.").

DEFS.' OPP'N TO INDIRECT PURCHASER PLS.' RENEWED MOT. FOR CLASS CERTIFICATION
CASE NO. 4:13-md-02420-YGR

## II.   THE IPPS' RENEWED MOTION SUFFERS FROM ADDITIONAL FLAWS THAT PREVENT CLASS CERTIFICATION

### A.   Dr. Leamer's Pass-Through Data Set Lacks Sufficient Class-Wide Coverage to Assess Which Class Members Experienced Impact in the Presence of Rampant Non-Pass Through.

Disingenuously, IPPs claim that "Dr. Leamer has now measured pass-through for entities representing" 65% to 72% of OEM and retailer sales for each product type.  Renewed Mot. at 3.  In reality, their pass-through data set includes only a meager, non-representative fragment of data for products sold by large OEMs and retailers, such as HP (only 164 observations), Bosch (only 92 observations), Canon (only 314 observations), and Target (only 83 observations)—and does not include any ***actual*** packer data at all, or any OEM pass-through data other than the Toshiba laptop study discussed above.  *See supra* at Sections I.A., I.D.; Leamer III at 69, App. A; Haider II ¶¶ 45 n.101, 99-100.  In reality, IPPs' damages model only utilizes data for a tiny portion of the billions of dollars in sales of class products that occurred.

The tiny, fragmentary nature of IPPs' data set is particularly fatal to Dr. Leamer's conclusion of 100% pass through for all products, at all levels of the supply chain, for the entire class period because IPPs' own pass-through model shows ***zero statistically significant*** pass through for many sellers.  IPPs have presented no common methodology to determine which of the many companies excluded from their data set were also zero statistically significant pass-through sellers.  Haider II ¶¶ 91-93.[29]  Worse yet, one of the fatal defects in IPPs' pass-through showing in their first class certification motion was their lack of ***any*** statistically significant pass-through finding for price increases under $5—*i.e.*, price increases similar to the alleged small overcharges here.  Leamer II at 67, Fig. 17.  IPPs have made no attempt in their renewed motion to offer any common proof that such small cost increases were passed through to class members as price increases.  Haider II ¶¶ 95-98.

---

[29] For example, IPPs' pass-through model shows zero statistically significant pass-through for laptops sold by Gateway and AOpen, for non-bundled power tools sold by Home Depot, for bundled power tools sold by Fry's, and for camcorders and power tools sold by Petra.  Haider ¶¶ 88, 93; Leamer III at 30, Fig. 10, 65-66, Figs. 29-30; Leamer Tr. 695:14-24 ("[I]t's basically a zero").  IPPs' pass-through model also shows no statistically significant pass through for ***any*** pack sales within the month the cells were sold, and no statistically significant pass through in the next month except for Simplo USA's replacement battery sales to Dell.  Leamer Tr. 603:8-605:13.

DEFS.' OPP'N TO INDIRECT PURCHASER PLS.' RENEWED MOT. FOR CLASS CERTIFICATION
CASE NO. 4:13-md-02420-YGR

The record confirms that *non-*pass through was actually prevalent for numerous class members, for whom any price impact was absorbed upstream. For example, Defendants' pack-selling affiliates frequently absorbed increases in the costs of cells they purchased from Defendants,[30] and resellers often absorbed increases in their costs for finished products.[31] Further, large retailer customers often prevented pass-through by simply refusing to pay increased prices.[32] Long-term fixed-price sales contracts also prevented pass-through of small component cost increases to many class members, as Dr. Leamer now implicitly recognizes. Leamer Tr. 563:24-564:12. For example, he explains that increases in sugar costs were not passed through as increases in Coke prices because a "contract [] fixed the price of Coke," and he opines that "[i]f batteries were to consumer goods, as sugar was to Coke, *I would agree that there would be no pass-through of small changes of battery prices to final goods prices*." Leamer III ¶ 68 (emphasis added). In fact, long-term sales contracts often *did* set the prices of numerous lithium ion cells, packs, and finished products for a year or more, resulting in zero pass through during those contractual periods by Dr. Leamer's own reasoning.[33]

Exacerbating these problems, as discussed in Defendants' motion to exclude, Dr. Leamer *no longer stands by his prior testimony* that the regressions IPPs rely upon as "common proof" of class-

---

[30] *E.g.*, Ex. 23, ████████████████████████████ SONY-LIB-000492282 ████████████████████████████████████████████████████████████████ ██████████ SONY-LIB-000929093 ████ Ex. 24, ████████████████████████████████

[31] *E.g.*, Ex. 14, Circuit City Tr. 167:25-168:21 (testifying about Sony discount program; "[T]hey had the ability to cause us to sell the product at a lower price, yet we got no reduction in cost."); Ex. 25, Guerin-Calvert ¶¶ 90-91 (listing "examples of products with constant standardized costs as defined by Dr. Leamer and changing prices and those with constant prices and changing costs").

[32] Ex. 26, Goto Tr. 104:1-8 ("Q. … Were you able to pass on the increased cost of cobalt to your customers in the form of higher prices for batteries? … A. That depended on the customer"); Ex. 27, E-mail from Doug Kiefer (Progressive Technologies) to Keith Jungermann (Panasonic) et al., RE: P0123837, Mar. 31, 2008, PNA0113464 ("We can not accept these [lithium ion batteries] at the new price. Our customer refuses to pay and we can't absorb it.").

[33] Haider II ¶ 39; Ex. 28, Sanyo Energy USA Corp. & Bose Corp. Purchase Agreement, Nov. 1, 2007, SNA0042714 (providing that battery packs' price would be $30.82 for over a year); Ex. 29, E-mail from Lisa Harris (Sanyo), May 10, 2006, SANYO-C000682676 ("Moto confirmed this is our last chance to re-quote for the 2-3 year contract . . . ."); Ex. 30, E-mail from Michael Austin (Motorola) to Lisa Harris, Feb. 26, 2004, S-DOJ0000632 (despite cost increases, "our customers will not allow us to breach our contracts with them—we do not have the luxury to raise pricing to our customers"); Ex. 31, Hewlett-Packard Co. Form 10-K at 9, Dec. 18, 2008 (noting it "enter[ed] into longer-term pricing commitments with vendors to improve the priority, price and availability of supply").

wide pass through are all reliable.[34]  Instead, he made the startling admission at his deposition that he now has concluded that many of these regressions are unreliable, although he has not done the data analysis to determine which ones should be relied upon and which one should be cast aside.  Leamer Tr. 539:19-545:5.

Finally, it should be noted that IPPs have not come forward with a common methodology to show impact or injury to its proposed class of government entities.  IPPs make no attempt to show that the claims of the cities of Palo Alto and Richmond are typical of the claims of the other members of the proposed governmental entity class given the vast discrepancies in size, bargaining power, purchasing practices, and unique factors influencing these entities' respective purchases.  Class Cert. Opp'n I at 6 n.4.  And, as before, neither IPPs nor their expert have offered any methodology for assessing impact to the proposed governmental entity class using common evidence.

**B.    Supreme Court Precedent, Due Process, and Manageability Issues Also Prevent Certification of a 30-State Class Under California Law.**

Despite the Court's guidance, IPPs' Renewed Motion does not show that applying California law to purchasers in 30 different states would satisfy due process or overcome inherent manageability problems.[35]

*AT&T Mobility* is clear that, in order to apply California law to out of state purchasers, Plaintiffs must establish "with respect to *each Defendant*," that such "defendant's alleged conspiratorial activity leading to the sale of price-fixed goods to plaintiffs took place in California."  707 F.3d 1106, 1113-14 (9th Cir. 2013).  Thus, it is irrelevant whether a particular Defendant conducted some business in California—or if some Defendants had corporate affiliates in California or contracts with non-class members that applied California law.  Instead, the relevant inquiry is whether each Defendant conducted "anticompetitive activities within California."  *Id.* at 1112.

These governing principles are reinforced by the Supreme Court's recent opinion in *Bristol-*

---

[34] *See* Leamer Tr. 539:19-545:5 (explaining that although some of his pass through regressions are "not [] reliable," he is "not in a position to give the Court advice on" which specific regressions yield unreliable results).

[35] IPPs chose not to renew their request to certify individual state subclasses—which could only be for those 15 states in which a named plaintiff resides, and for which a claim is made under that state's law. *See* Class Cert. Opp'n I at 48-49.

*Myers Squibb Co. v. Superior Ct. of California*, which holds that due process must be satisfied as to each Defendant and clarifies the requisite level of contact needed to comply with due process. 137 S.Ct. 1773 (June 19, 2017). In *Bristol-Myers*, the Supreme Court implicitly rejected that portion of *AT&T Mobility* stating that due process was satisfied so long as the alleged conspiratorial conduct's nexus to California "is not 'slight and casual'" or where "more than a *de minimus* amount of that defendant's alleged conspiratorial activity leading to [a] sale" took place in the state.[36] Instead, the Supreme Court held that the defendant's in-state conduct must *directly relate* to the out-of-state sale to the non-residents.[37] Thus, the Supreme Court found that where nonresidents purchased the products at issue and sustained their injuries outside the state, "specific jurisdiction is lacking *regardless of the extent of a defendant's unconnected activities* in the state."[38] *Bristol-Myers* presents an apt analogy here, as IPPs have fallen well short of demonstrating "a connection between the forum and *the specific claims at issue*."[39] IPPs have made no serious attempt to establish that *each Defendant* engaged in anticompetitive or conspiratorial conduct in California, or that any such conduct directly led to the injuries of the non-California putative class members.[40]

---

[36] *See* Order at 21 (quoting *AT&T Mobility LLC*, 707 F.3d at 1107, 1113). The Supreme Court opinion is consistent with Judge Illston's initial formulation in *AT&T Mobility*, resulting in her dismissal of claims and admonition regarding the need for individualized analyses. *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2010 WL 2610641, at *8-9 (N.D. Cal. June 28, 2010).

[37] *Bristol-Myers*, 137 S.Ct. at 1779-81, 1783.

[38] *Id.* at 1781 (emphasis added).

[39] *Id.* (emphasis added).

[40] Virtually all of the "California" connection evidence proffered by IPPs relates to business operations generally, and many of the citations have nothing to do with California at all. *See* Class Cert. Opp'n I at 45-46 & nn.66-71 (citing IPPs' purported evidence). For example, IPPs pointed to communications by Sanyo's Takanao Matsumoto, but he lived and worked in **Chicago and Dallas**—not California. Ex. 32, Matsumoto Tr. 12:6-13:10; *see also* Ex. 33, S-DOJ0085571E. IPPs also referenced a meeting between Sanyo and Samsung in California, citing only a document that refers to a November 2008 conference, which took place in **Dallas, Texas**—not California. Ex. 34, S-DOJ0169553; *see also* Ex. 35, Nexergy Press Release, Nov. 4, 2008. IPPs inaccurately cited this same document to support the proposition that Samsung employees colluded in "Irvine, California." *See* Original Mot. at 41 & n.120. Moreover, other of IPPs' claimed California contacts have no relation to the alleged conspiracy. *E.g.*, Ex. 36, LGC-MDL0002334 (related to a polymer battery, which falls outside IPPs' class definition, as discussed in Exhibit 37, Lee Tr. 53:15-18); Ex. 38, LGC-MDL0000928 (same); Ex. 39, LGC-MDL0002181 (same); Ex. 40, NECT00043104 (not related to class definition as TOKIN never made cylindrical lithium ion batteries). *See also* Leamer Tr. 777:24-779:8. As to Toshiba, the *entirety* of IPPs' evidence relies on irrelevant contacts of subsidiaries that are not defendants and *draft* agreements—two of which do not even mention lithium ion batteries— that had choice-of-law provisions selecting California law. Ex. 41, TSB-LIB-00004066; Ex. 42, TSB-LIB-00142661; Ex. 43, TSB-LIB-0015202.

---

23

Another relevant question is whether the interests of the 29 non-California states "outweigh California's interest in having its law applied" to non-citizens.[41]   It is a given that state consumer protection and antitrust laws differ significantly on key issues.[42]   Defendants previously identified conflicts between the Cartwright Act and the laws of the other 29 states preventing extraterritorial application of California state law[43], but set forth here are additional conflicts further preventing certification of the proposed class.  The Mississippi Antitrust Act, for example, prohibits conduct only where it has "as one of its objects [a restraint] in the *intrastate trade therein* to be accomplished in part at least by transactions which are also *wholly intrastate*."[44]   Alabama similarly "does not provide a cause of action for damages allegedly resulting from an agreement to control the price of goods shipped in interstate commerce."[45]   The Arkansas Deceptive Trade Practices Act "does not reach the price-fixing conduct alleged here."[46]   Additionally, the California Supreme Court has already determined that California's interest in applying "extended timeliness rule[s]" for injuries caused in other states must yield to states' interests in providing "reasonable assurance . . . that the time limitation[s] embodied in [their] statute[s] would operate to protect [both foreign and non-foreign] businesses in the future."[47]   Thus, the interests of Alabama, Kansas, Mississippi, New York, and Tennessee in applying

---

[41] *Wash. Mut. Bank v. Superior Court*, 24 Cal. 4th 906, 921 (2001).

[42] These issues include "who has standing . . . the amount of damages recoverable, the requisite proof of damages, available defenses and whether the statutes apply only to conduct that is predominantly intrastate as opposed to interstate," as well as "the types of acts and practices that are forbidden, the statutes of limitations, the standards for punitive and enhanced damages, reliance, scienter, remedies and prefiling requirements."  *In re Intel Corp. Microprocessor Antitrust Litig.*, 2010 WL 8591815, at *54-61 (D. Del. July 28, 2010) (finding that applying California law to out-of-state purchases would more significantly impair those states' interests than California's); *see also In re Bridgestone/Firestone Tires Prods. Liab. Litig.*, 288 F.3d 1012, 1018 (7th Cir. 2002) ("State consumer-protection laws vary considerably, and courts must respect these differences rather than apply one state's law to sales in other states with different rules.").

[43] Class Cert. Opp'n I, § VI.

[44] *Standard Oil Co. of Ky. V. State ex rel. Attorney General*, 65 So. 468, 471 (Miss. 1914), *overruled in part on other grounds sub nom. Mladinich v. Kohn*, 164 So. 2d 785 (Miss. 1964); *see also In re Graphics Processing Units ("GPU") Antitrust Litig.*, 540 F. Supp. 2d 1085, 1099 (N.D. Cal. 2007) ("Mississippi law requires that the majority of an antitrust conspiracy occur within the state.").

[45] *Archer Daniels Midland Co. v. Seven Up Bottling Co.*, 746 So. 2d 966, 988-90 (Ala. 1999) (holding that Alabama antitrust law only regulates "activities that occur 'within this state'—within the geographic boundaries of this state").

[46] IPPs identify this as the source for their Arkansas law claims.  Mot. at App. C.  *See also In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1125 (N.D. Cal. 2008) (dismissing indirect purchaser claims in component price-fixing suit).

[47] *McCann v. Foster Wheeler LLC*, 48 Cal. 4th 68, 98 (2010).

their shorter limitations periods outweigh any interest California has in extending its four-year limitations period to non-Californians.[48]  Moreover, three of the 29 states at issue only repealed *Illinois Brick* for part of the relevant time period—Nebraska and Oregon in 2002, and Utah for purchases occurring after May 1, 2006)—and, under Massachusetts law, businesses lack standing to recover damages for indirect purchases.[49]  There is thus no basis to permit indirect purchasers in these states to recover for purchases made prior to enactment of their repealer laws.[50]

Finally, even if IPPs had maintained their request for certifying classes under the laws of individual states, it would be inappropriate to do so for the reasons expressed in Defendants' prior briefing: (1) Plaintiffs only have potentially appropriate representatives for 15 states; and (2) the differences in state laws and the need to provide separate jury instructions and proof as to these laws would render a class action unmanageable.[51]  This defect thus provides an alternative ground for denying certification of the single 30-state class that the IPPs seek.

## CONCLUSION

For all the foregoing reasons, the Court should once again deny certification of the proposed indirect purchaser class.  IPPs have been given a second chance—and a roadmap by the Court—but their renewed submission only demonstrates that they will never discharge their burden under Rule 23 to certify their proposed class.

---

[48] Ala. Code § 6-2-38(1) (2 years); Kan. Stat. Ann. § 60-512 (3 years); Miss. Code Ann. § 15-1-49 (3 years); N.Y. C.P.L.R. § 214(2) (3 years); N.Y. Gen. Bus. Law § 349 (3 years); Tenn. Code Ann. § 28-3-105 (3 years).

[49] Original Mot. at App. C, p. 6 (noting that an amendment in 2002 removed the *Illinois Brick* bar on indirect purchaser suits); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2011 WL 1113447, at *2-3 (N.D. Cal. Mar. 25, 2011) (Oregon Attorney General agreed that Oregon's *Illinois Brick* repealer applied only prospectively, and withdrew pre-January 1, 2002 claims); Utah Code Ann. §§ 76-10-918, 76-10-919, as amended by 2006 Utah Laws Ch. 19; *Ciardi v. F. Hoffmann-La Roche Ltd.*, 762 N.E.2d 303, 311-12 (Mass. 2002) (clarifying that individual indirect purchasers may bring claims under Mass. Gen. Laws Ch. 93A, § 9, but businesses suing under Mass. Gen. Laws Ch. 93A, § 11 cannot); *United Food & Commercial Workers Local 1776 & Participating Emp'rs Health & Welfare Fund v. Teikoku Pharma USA, Inc.*, 74 F. Supp. 3d 1052, 1084-85 (N.D. Cal. 2014); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2014 WL 1088256, *3 (N.D. Cal. Mar. 13, 2014).

[50] Plaintiffs have acknowledged this point.  *See* Original Mot. at 51 n.170 (specifying that the proposed Utah class's damages period would begin on May 1, 2006).

[51] Class Cert. Opp'n I, § VI.C.  *See also In re Digital Music Antitrust Litig.*, 2017 WL 3037577 at *28-29 (S.D.N.Y. July 18, 2017); *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1189 (9th Cir. 2001) (class certification denied due to manageability issues presented by applying the laws of multiple states).

DATED: October 24, 2017

Respectfully submitted,

WINSTON & STRAWN LLP

By: */s/* Jeffrey L. Kessler

Jeffrey L. Kessler (*pro hac vice*)
Eva W. Cole (*pro hac vice*)
Jeffrey J. Amato (*pro hac vice*)
Mark E. Rizik Jr. (*pro hac vice*)
Cristina M. Fernandez (*pro hac vice*)
200 Park Avenue
New York, NY  10166-4193
Telephone:  (212) 294-6700
Facsimile:  (212) 294-4700
jkessler@winston.com
ewcole@winston.com
jamato@winston.com
mrizik@winston.com
cfernandez@winston.com

Ian L. Papendick (SBN 275648)
WINSTON & STRAWN LLP
101 California Street
San Francisco, CA 94111
Telephone: (415) 591-1000
Facsimile: (415) 591-1400
ipapendick@winston.com

Roxann E. Henry (*pro hac vice*)
MORRISON & FOERSTER LLP
2000 Pennsylvania Avenue, NW
Suite 6000
Washington, DC 20006
Telephone: (202) 887-1500
Facsimile: (202) 887-0763
rhenry@mofo.com

*Counsel for Panasonic Corporation, SANYO Electric Co., Ltd., Panasonic Corporation of North America, and SANYO North America Corporation*

By: */s/* Christopher M. Curran

Christopher M. Curran (*pro hac vice*)
J. Frank Hogue (*pro hac vice*)
WHITE & CASE LLP
701 Thirteenth Street, N.W.
Washington, DC 20005
Telephone: (202) 626-3600
Facsimile: (202) 639-9355
ccurran@whitecase.com
fhogue@whitecase.com

26

1

2    Martin M. Toto (*pro hac vice*)
     Michael E. Hamburger (*pro hac vice*)
3    WHITE & CASE LLP
     1221 Avenue of the Americas
4    New York, NY 10020
     Telephone: (212) 819-8200
5    Facsimile: (212) 354-8113
     mtoto@whitecase.com
6    mhamburger@whitecase.com

7    Heather M. Burke (SBN 284100)
8    WHITE & CASE LLP
     3000 El Camino Real
9    5 Palo Alto Square, 9th Floor
     Palo Alto, CA 94306
10   Telephone: (650) 213-0300
     Facsimile: (650) 213-8158
11   hburke@whitecase.com

12
     *Counsel for Toshiba Corporation*
13

14   By: */s/ John Roberti*
     John Roberti (*pro hac vice*)
15   Matthew R. Boucher (*pro hac vice*)
     ALLEN & OVERY LLP
16   1101 New York Avenue NW
     Washington, D.C. 20005
17   202-683-3800
     john.roberti@allenovery.com
18   matthew.boucher@allenovery.com
19

20   Michael S. Feldberg (*pro hac vice*)
     ALLEN & OVERY LLP
21   1221 Avenue of the Americas
     New York, NY 10020
22   212-610-6360
     michael.feldberg@allenovery.com
23

24   *Counsel for Defendants Samsung SDI Co., Ltd. and
     Samsung SDI America, Inc.*
25

26

27

28

27

1

**E-FILING ATTESTATION**

2

I, Jeffrey L. Kessler, am the ECF User whose ID and password are being used to file this

3

document. In compliance with Civil Local Rule 5-1(i)(3), I hereby attest that each of the signatories

4

identified above has concurred in this filing.

5

6

By: /s/ Jeffrey L. Kessler

7

Jeffrey L. Kessler

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFS.' OPP'N TO INDIRECT PURCHASER PLS.' RENEWED MOT. FOR CLASS CERTIFICATION
CASE NO. 4:13-md-02420-YGR