GUIDELINES AND BEST PRACTICES

IMPLEMENTING 2018 AMENDMENTS TO

RULE 23 CLASS ACTION SETTLEMENT PROVISIONS

BOLCH JUDICIAL INSTITUTE, DUKE LAW SCHOOL

DUKE LAW SCHOOL
AUGUST 2018

## FOREWORD†

On October 6–7, 2016, the Bolch Judicial Institute, Duke Law School (formerly Center for Judicial Studies) held a conference in Washington DC to identify consensus positions that could be developed into standards and best practices for the bench and bar to implement in light of pending amendments to Rule 23, which are scheduled to take effect on December 1, 2018.

At its April 14, 2016, meeting, the Advisory Committee on Civil Rules recommended a package of amendments to Rule 23, addressing class-action settlement issues. Many of the amendments codify emerging or best practices of courts and are relevant today. Among other things, the amendments require lawyers to provide additional information up front for the court to preliminarily approve settlements ("frontloading"), permit notice by electronic means, impose limitations on compensating objectors, and clarify final-settlement criteria.

The October conference laid the groundwork for the *Class Action Settlement Guidelines and Best Practices*, which were drafted by 38 prominent defense and plaintiff practitioners and experts well experienced in class action litigation — with significant input and comment from six federal and state court judges.

The *Guidelines and Best Practices* was prepared under the leadership of eight distinguished practitioners drawn from the plaintiffs' and defense bars, which comprise the Editorial Board. Four teams were formed from the other 30 volunteers, with a plaintiff and defense team leader from the Editorial Board leading each team.

---

† Copyright © 2018, Duke Law Bolch Judicial Institute, All Rights Reserved. This document does not necessarily reflect the views of Duke Law School or its faculty, or any other organization including the Judicial Conference of the United States or any other government unit.

The teams worked for several months preparing a draft. The drafts were first reviewed by the individual teams and then later by all 38 judges, lawyers, and experts on the project. A revised draft was circulated to the 125 practitioners and judges, who attended the October 6–7, 2016, Duke Law Distinguished Lawyers Class Action Settlement Conference. It was posted on the Institute's web site for public comment.

This document is intended to help the bench and bar comply with the 2018 amendments to Rule 23. It adds detail to the general guidance provided in the amended rule and committee note. Because many in the bench and bar had already adopted many of the new provisions in the amended rule in their practice, the recommendations in the *Guidelines and Best Practices* are based on a solid foundation. These guidelines and best practices are recommended because they have proven useful across cases and have been adopted by multiple courts.

> John K. Rabiej
> Deputy Director, Bolch Judicial Institute
>
> Malini Moorthy
> Chair, Distinguished Lawyers' Conference
> Advisory Council
>
> Dena Sharp
> Vice-chair, Distinguished Lawyers'
> Conference Advisory Council

## ACKNOWLEDGEMENTS

The *Class Action Settlement Guidelines and Best Practices* is the work product of over 38 experienced practitioners and experts, who devoted substantial time and effort to improve the law. Eight of the practitioners assumed greater responsibility as the editorial board, consisting of:

## EDITORIAL BOARD

| | | |
|---|---|---|
| John Beisner | Hassan Zavareei | Steve Herman |
| Skadden Arps Slate Meagher & Flom LLP | Tycko & Zavareei LLP | Herman Herman & Katz LLC |
| Melissa Holyoak | Caleb Marker | Mary Massaron |
| Competitive Enterprise Institute | Zimmerman Reed LLP | Plunkett Cooney PC |
| Adam Moskowitz | Aaron Van Oort | |
| The Moskowitz Law Firm | Faegre Baker Daniels LLP | |

## CONTRIBUTORS

| | | |
|---|---|---|
| Jennie Anderson | Lauren Barnes | Sheila Brodbeck |
| Andrus Anderson LLP | Hagens Berman Sobol Shapiro LLP | Pfizer Inc. |
| Elizabeth Cabraser | James Cecchi | Steve Cirami |
| Lieff Cabraser Heimann & Bernstein LLP | Carella Byrne Cecchi Olstein Brody & Agnello P.C. | Epic |
| Christian Clapp | David Cohen | Christina Diaz |
| Angeion Group | Stephan Zouras LLP | GlaxoSmithKline |
| George Dougherty | Jeanne Finegan | Andra Greene |
| Shook Hardy Bacon LLP | HF Media LLC | Irell & Manella LLP |
| Ellen Gusikoff | Victor Jih | Joe Juenger |
| Robbins Geller Rudman & Dowd LLP | Irell & Manella LLP | Garretson Resolution Group |
| Bethany Kristovich | Adam Levitt | Rich Lewis |
| Munger Tolles & Olson LLP | DiCello Levitt & Casey | Hausfeld |
| Gary Mason | Niki Mendoza | Darrell Miller |
| Whitfield Bryson & Mason LLP | Epic | Duke University |
| Cathy Moses | Mike Pennington | Chris Seeger |
| Irell & Manella LLP | Bradley Arant Boult Cummings LLP | Seeger Seeger Weiss |
| Robert Shelquist | Richard Simmons | Tom Sobol |
| Lockridge Grindal Nauen PLLP | Analytics Consulting LLC | Hagens Berman Sobol Shapiro LLP |
| Todd Stenerson | Steven Weisbrot | Joe Whatley |
| Hunton & Williams LLP | Angeion Group | Whatley Kallas LLP |
| | Charles Zimmerman | |
| | Zimmerman Reed LLP | |

Special thanks go to Elizabeth Cabraser and Adam Levitt as team members who provided substantial drafting assistance.

The feedback of the judiciary has been invaluable in identifying best practices, exploring the challenges faced by judges, and the viability of the proposed guidelines and best practices. The ways in which these guidelines and best practices have benefitted from the candid assessment of the judiciary cannot be understated. It is with the greatest of thanks that we recognize the contributions of the 14 judges who attended the conference and the six judges who reviewed early drafts and provided comments and suggestions.

The Bolch Judicial Institute, Duke Law School, expresses its appreciation for the outstanding contributions made by the editors, authors, and reviewers.

Bolch Judicial Institute, Duke Law School
August 2018

## PREFACE

On December 1, 2018, amendments to Rule 23 will take effect, provided they are not rejected by Congress.[1]

In 2017, the Committee on Rules of Practice and Procedure recommended to the Judicial Conference of the United States that it transmit the amendments to the Supreme Court for its review and approval.   On April 26, 2018, the Supreme Court submitted the amendments to Congress for its approval. The amendments culminate more than five years of study and review by the Advisory Committee on Civil Rules.

In its 2017 report to the Judicial Conference, the Advisory Committee on Civil Rules transmitted proposed amendments addressing the following six issues:

1. Requiring earlier provision of information to the court as to whether the court should send notice to the class of a proposed settlement (known as "frontloading");
2. Making clear that a decision to send notice of a proposed settlement to the class under Rule 23(e)(1) is not appealable under Rule 23(f);
3. Making clear in Rule 23(c)(2)(B) that the Rule 23(e)(1) notice triggers the opt-out period in Rule 23(b)(3) class actions;
4. Updating Rule 23(c)(2) regarding individual notice in Rule 23(b)(3) class actions;
5. Addressing issues raised by "bad faith" class action objectors; and
6. Refining standards for approval of proposed class action settlements under Rule 23(e)(2).

The amendments codify many existing practices of courts. Based on that experience, the following GUIDELINES AND BEST PRACTICES provide guidance on three main areas addressed by the amendments, including: (1) means, format, and contents of settlement notice; (2) "frontloading" information for the court; and (3) "bad faith" class action objectors. Guidance is also provided on the role of court-appointed counsel vis-a-vis others, particularly lead counsel appointed in MDLs.

---

[1] Appendix A includes the text of these amendments and the corresponding committee notes.

# CHAPTER 1

## PROVIDING INFORMATION TO THE COURT TO DECIDE WHETHER TO SEND NOTICE TO CLASS MEMBERS AND APPROVE SETTLEMENT ("FRONT-LOADING")

Federal Rule Civil Procedure 23(e) requires court approval before claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised. As amended, Rule 23(e) adopts a two-stage approval process that requires a court first to approve the sending of notice to class members of the proposed settlement under subdivision (e)(1) and later to hold a hearing and approve the proposed settlement under subdivision (e)(2).

Amended Rule 23(e)(2) lists the core issues of procedure and substance that a court must consider in deciding whether to send notice and approve a proposed settlement. These issues do not displace the multiple criteria for settlement approval developed under circuit law,[2] but rather focus the court's examination on a limited number of core concerns in determining whether a proposed settlement is fair, reasonable, and adequate.

Amended Rule 23(e)(1) requires a court to "frontload" its examination by considering many of the same procedural and substantive factors at the notice stage that it will consider at the approval stage. This development addresses the serious problems of class member confusion and wasted time and effort that follow when a proposed settlement is ultimately disapproved after notice of a proposed settlement is sent to class members. By frontloading the court's review, Rule

---

[2] The various circuit courts of appeal employ variations on this general test. *See, e.g., In re Elec. Books Antitrust Litig.*, 639 F. App'x 724, 726 (2d Cir. 2016); *In re Cendant Corp. Litig.*, 264 F.3d 201, 232 (3d Cir. 2001); *see also Moulton v. U.S. Steel Corp.*, 581 F.3d 344, 349 (6th Cir. 2009) (considering "(1) the risk of fraud or collusion; (2) the complexity, expense and likely duration of the litigation; (3) the amount of discovery engaged in by the parties; (4) the likelihood of success on the merits; (5) the opinions of class counsel and class representatives; (6) the reaction of absent class members; and (7) the public interest") (citation omitted); *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984) (reviewing "(1) the likelihood of success at trial; (2) the range of possible recovery; (3) the point on or below the range of possible recovery at which a settlement is fair, adequate and reasonable; (4) the complexity, expense and duration of litigation; (5) the substance and amount of opposition to the settlement; and (6) the stage of proceedings at which the settlement was achieved").

23(e)(1) may also save the court, as well as the parties, the time and expense of correcting and supplementing specific factual issues and questions at the final approval stage.

Amended Rule 23(e)(1) effects the frontloading by specifying a new standard that a court should use in deciding whether to send notice of a proposed settlement to class members. The standard requires the court to determine whether it "will likely be able to approve" the proposed settlement, taking into consideration the core procedural and substantive concerns listed under amended Rule 23(e)(2). If a litigation class has not previously been certified in the case, the court must also consider whether it could certify a settlement class. To be clear, although the new standard requires the court to determine that it "will likely be able to approve" the proposed settlement, this standard is more lenient than the eventual standard required to grant final approval. One reason for this lower standard at the preliminary stage is to facilitate notice to the proposed class and to allow the court to consider the proposed class's reaction and opinion when determining whether final approval should be granted.

Counsel must provide the court with sufficient information addressing the Rule 23(e)(2) factors for the court to make its determinations at both the notice and approval stages. The following guidelines explain the rule provisions while the best practices provide guidance on how best to comply with the amended rule.

> **GUIDELINE 1:** Parties should request a court to approve sending notice to class members of a proposed settlement only if the court is likely to be able to: (1) approve the settlement after a hearing and a finding that it is fair, reasonable, and adequate under Rule 23(e)(2); and (2) certify the class.

Notice of settlement is required regardless of whether a class has previously been certified or will be certified as part of the settlement approval. A court may approve sending notice only after it decides that it will likely approve the proposed settlement at a later date. In all cases, the

court must initially determine whether class action criteria have been met under Rule 23(a) and (b), which is outside the scope of these guidelines and best practices.

In determining whether to approve sending notice of a proposed settlement, a court must predict that it likely will ultimately approve the settlement after taking into consideration a number of factors, several of which can only be known fully at a later time, *e.g.,* effectiveness of claims administration process and responses of the proposed class.

> BEST PRACTICE 1A*:* At both the notice and approval stages, the parties should provide the court with information sufficient for it to decide that the proposed settlement is fair, reasonable, and adequate, in accordance with the topics enumerated in Rule 23(e)(2).

Amended Rule 23(e)(2) sets out five broad topics to help the court determine whether a proposed settlement is fair, reasonable, and adequate. The topics are described as core procedural and substantive concerns. These topics synthesize various lists of factors adopted by circuit law and are designed to focus the court and lawyers on core concerns. The core concerns are not intended, however, to "displace any factors" under established circuit law.

The core concerns are to be finally determined when the court decides whether to grant final approval of the proposed settlement. But to the extent that information is available at the notice stage, the parties should provide the court with all available materials addressing the Rule 23(e)(2) procedural and substantive core concerns that they intend to submit to the court to support approval of the settlement under Rule 23(e)(2). The information must be sufficient for the court to determine whether it will likely approve the proposed settlement. At the approval stage, the court should also ensure that timely CAFA notice was sent to state and federal attorneys general in accordance with the Class Action Fairness Act of 2005.

GUIDELINE 2: At both the notice and approval stages, a court has wide discretion in determining how much information is sufficient to determine that a proposed settlement is fair, reasonable, and adequate.

A court has wide discretion in assessing the weight and applicability of the core concerns addressed by Rule 23(e) and, given that discretion, should take care to make the review process proportional to the requirements of each particular case.

BEST PRACTICE 2A: In general, if a settlement proposal lacks any indicia of collusion, conflict, or lack of fairness to the class members, a court should not require an exhaustive study and extensive information to make its findings that the proposal is fair, reasonable, and adequate. Conversely, if doubts arise about the fairness of the proposed settlement, the court should require additional information in making its determinations.

In deciding whether to approve notice of a proposed settlement under Rule 23(e)(1) or approve it under Rule 23(e)(2), the court should exercise its discretion in appropriate cases to require less information from the parties if there are no indications that the settlement is unfair, unreasonable, or inadequate.

A court should rely on certain indicators that strengthen the showing that the proposed settlement is fair, reasonable, and adequate, including: (1) supervision of a trusted third-party mediator over settlement negotiations, and particularly the mediator's representation as to the conduct of negotiations at arm's-length and a lack of collusion among the parties; (2) lack of any showing of conflicts of interest; (3) mature and adversarial proceedings that have included considerable discovery, survived dispositive motion practice, and proceeded toward, if not past, class certification; and (4) an absence of or few significant objections to the settlement and opt-outs despite a comprehensive and wide-reaching notice plan. If one or some combination of these protections is in place, demanding exhaustive information on every core procedural and substantive concern may not be warranted, for example, demanding extensive studies and

information on the precise amount of expected relief, the range of reasonableness of the settlement fund, or the defendant's ability to withstand a greater judgment.[3]

Alternatively, if the settlement relief offered to class members is significant when weighed against the weaknesses of the plaintiff's case, the court may require less information on other factors in the court's analysis. If the amount paid to the class is insignificant, or nonexistent as in a coupon settlement, or if a significant portion of the money made available through settlement is paid into a *cy pres* fund, allocated to attorney's fees, or may revert to defendants; however, the court should require additional information to ensure that there is no collusion and that the settlement class receives adequate relief.

A court should require more information if relief to the class seems insignificant and there is any suggestion that defendants may have "played" plaintiffs' counsel against one another in competing, parallel class actions in a "reverse auction," resulting in less favorable terms for the class. If such indicia are present — *e.g.*, the existence of numerous, competing class actions against the same defendants with settlement initiated by defendants with only one plaintiff group — the court should require counsel to explain and justify the course of events and reasons for the choices made, and any objections raised by competing, non-settling plaintiffs and their counsel should be carefully reviewed and thoroughly considered.

Cases that settle early in litigation may also warrant additional court inquiry to satisfy the requirements that the settlement be fair, reasonable, and adequate. In some cases, an early

---

[3] Where these protections are present, only a few absent class members have submitted objections, and those objections are suspect (*e.g.*, they were filed by counsel known to be "professional" or serial objectors), the court should require counsel for the objectors to appear at the fairness hearing and allow discovery to be taken of the objectors themselves. Such discovery may reveal that the objection is lawyer-driven and that the objector himself has misunderstood or has little knowledge of the settlement's terms. *See, e.g.*, Omnibus Order Granting Final Approval of the Class Action Settlement, Approving Class Counsel's Award of Attorneys' Fees and Costs and Denying the Objectors' Objections to the Settlement at *17, *Morgan v. Pub. Storage*, No. 1:14-cv-21559-UU, 2016 WL 1104393 (S.D. Fla. Mar. 10, 2016) (overruling objection where objector's "deposition revealed that he had no understanding of the lawsuit or the terms of the Settlement Agreement and could not even articulate the basis for his objection").

settlement may simply reflect that the type of claim is well known, that the underlying facts are not complex, that there are sufficient other settlements to accurately set a market value for the claims, or that there are limited and diminishing funds available as potential sources of recovery. In this situation, no additional inquiry may be needed. But in other cases, although early settlement may well benefit class members by rendering litigation less costly and eliminating the risk of early disposition, it may also result from collusion among the parties or indicate a rushed negotiation guided by a desire for a quick fee. If, for example, a class action settles before the parties have engaged in significant motion practice or discovery, the strength of the plaintiff's claims and the defendant's defenses may be difficult to ascertain. Similarly, the risks attendant to continued litigation and the complexity and likely expense of the proceedings may be unclear when a case is settled before adversarial engagement has even begun. Courts may also have an insufficient sense of the level of skill of the parties' counsel, or the relationship between them, to judge whether behind-the-scenes collusion is likely to have occurred.

A court should also scrutinize a settlement that provides for different amounts or types of relief for subgroups of the settlement class, or where the amount in controversy is considerable and distribution to the class complex. If the parties propose that some class members receive greater or different relief than others, or a complicated claims process may be required, the court should investigate the reasons for the proposal and ensure that there is a rational basis for the proposed allocation and distribution of settlement benefits. But if the amount in controversy is small, or the distribution of settlement funds is direct and simple, less scrutiny may be required.

In sum, if indicia of fairness are apparent and protections for the class are in place, the court should lighten the burden on counsel at the fairness hearing and place heavier reliance on the representations of counsel as to the settlement's fairness, adequacy, and reasonableness. However,

if indicia of collusion or conflict are present or suspected, or the relief to the class seems insignificant under the circumstances presented, the court should require counsel to justify its position and scrutinize a class action settlement more closely.

The following guidelines and best practices address the particular requirements that parties should address and a court should consider.

BEST PRACTICE 2B: Parties should provide information to the court showing that class representatives and counsel have adequately represented the class.

At the notice stage, the parties should provide information on the "actual performance" of counsel acting on behalf of the class up to that time. For example, the parties should describe the discovery completed, including the volume of electronically stored information reviewed, interrogatories submitted, and depositions held. If only limited discovery was conducted, the parties should explain why it was sufficient. Counsel should provide supporting detail in a declaration to the court. They may also provide a declaration from the mediator regarding counsel's work, professionalism, and performance during the mediation process. Similarly, counsel should provide information as to work and actions taken by the class representatives, such as providing deposition testimony, gathering and providing discovery, and assisting counsel in the matter.

The parties may also inform the court about any differences in the claims alleged in the complaint (or that survived the motion to dismiss and summary judgment) and the claims being released in the proposed settlement.

The court will consider the same information when deciding whether to approve the settlement at a later date under Rule 23(e)(2).

GUIDELINE 3: Parties should provide information to the court showing that the settlement was negotiated at arm's length.

The involvement of a neutral or a court-appointed mediator in negotiating the settlement is a strong indicator that the deal was negotiated at arm's length. Parties may wish to submit a declaration from the mediator attesting to the lack of collusion between the parties and providing detail of the parties' mediation efforts, including whether they were conducted at arms' length or were adversarial in nature. Mediators may also attest to the caliber of representation, giving the court additional comfort that class members' interests were adequately represented.[4] The parties may also offer evidence on other details of the settlement process, including the time devoted to settlement negotiations with the opposing party.

The court will consider the same information when it is deciding whether to approve the settlement at a later date under Rule 23(e)(2).

BEST PRACTICE 3A: Parties should provide information to the court showing that the expected relief of the proposed settlement to class members is adequate.

Information comparing the relief provided by the settlement to the relief that class members could potentially recover in litigation is one of the most important core concerns that a court must consider in determining whether the proposed settlement is fair, reasonable, and adequate.

To comply with amended Rule 23(e)(2)(C), the parties should provide information explaining the value of the relief made available to class members, including injunctive and other nonmonetary relief when that value is not apparent from the plain terms of the settlement. In recent lender-placed insurance litigation, for example, class-wide settlements offered class members a

---

[4] *See, e.g.*, Order Granting Final Approval to Class Action Settlement at *6, *Wilson v. EverBank*, No. 14-CIV-22264-BLOOM/VALLE, 2016 WL 457011, (S.D. Fla. Feb. 3, 2016) (crediting mediator's declaration that the settlement was a product of "lengthy and particularly hard-fought negotiations[,]" was "professionally conducted" and "quite adversarial[,]" and that "the caliber of representation on both sides was extraordinary[.]") (citations omitted).

percentage of the total amounts they had been overcharged for home owners' insurance. While the percentages may have seemed facially low — class members who submitted claims stood to recover 8 to 12.5 percent of the total amounts charged them — class members were in fact recovering almost all of the total *over*charge to their specific accounts. Class counsel provided this context to the courts in their own declarations and motions for approval, and the courts ultimately found that the relief afforded to the class was "extraordinary,"[5] noting that when the injunctive relief provided by the settlements was also considered, the settlements offered class members more than they likely would have ever received at trial, when each class member would be required to provide substantial evidence and proof beyond what the approved claims process required.[6] Amended Rule 23(e)(2)(C) lists four discrete subtopics that the court should consider in assessing the adequacy of the expected relief to the class members.

The court will consider the same information when it is deciding whether to approve the settlement at a later date under Rule 23(e)(2).

> BEST PRACTICE 3A(i): The parties should provide information to the court on costs, risks, and delay of trial and appeal in assessing whether relief provided for the class is adequate.

One of the benefits of a settlement is that the court and the parties avoid the uncertainty, burden, and expense of a full-blown trial on the merits. But in exchange, the settlement will often provide less relief than plaintiffs could recover in their best-case scenario in litigation.

---

[5] *Braynen v. Nationstar Mortg.*, LLC, No. 14-CV-20726-GOODMAN, 2015 WL 6872519, at *4 (S.D. Fla. Nov. 9, 2015) ("[O]ne district court touted settlements like this — that provide near-complete relief to class members on a claims-made basis — as extraordinary . . . .") (referencing *Arnett v. Bank of Am.*, N.A., No. 3:11-cv-1372-SI, 2014 WL 4672458 (D. Or. Sept. 18, 2014)).

[6] *See, e.g., Almanzar v. Select Portfolio Servicing, Inc.*, No. 1:14-CV-22586-FAM, 2016 WL 1169198, at *3 (S.D. Fla. Mar. 25, 2016) ("Factoring in the injunctive relief . . . the settlement very likely exceeds what Plaintiffs could have won at trial.") (quoting *Saccoccio v. JP Morgan Chase Bank, N.A.*, 297 F.R.D. 683, 693 (S.D. Fla. 2014)).

In assessing the adequacy of the proposed settlement, the relief provided to class members by the settlement should be compared with assessments of the range and likelihood of possible class-wide recoveries from litigated outcomes. The assessments may include best-case, worst-case, and likely-case results, along with estimates of the likelihood that each type of result will be realized. Recognizing that these assessments of potential future outcomes are necessarily imprecise—and also recognizing that counsel need to preserve their ability to be advocates if the settlement is not approved—courts should take care to tailor the level of precision they require in these assessments to the needs of the case.

> BEST PRACTICE 3A(ii): The parties should provide information on the effectiveness of the proposed method of distributing relief to class members in assessing whether relief provided for the class is adequate.

The parties should describe the proposed plan for equitably and reasonably distributing the settlement funds to class members. The parties should advise the court whether the defendant will pay settlement benefits directly to all class members or require submission of a claim as a condition of recovery. If the benefits are distributed in a "claims-made" settlement, the parties should explain the contemplated claims process and the proposed notice and claims methods to ensure the best practicable recovery by the class. At the notice stage, the parties should provide information showing that any proposed claims-processing method will facilitate the filing of legitimate claims and deter unjustified claims. At the same time, the court should ensure that the claims process is not unduly demanding, burdensome, and oppressive.

> BEST PRACTICE 3B: The parties should consider using a professional claims administrator to send notice and claim forms and distribute benefits.

Formulating a notice and administration plan typically requires the expertise of an experienced notice and claims administrator. Experienced claims administrators can provide guidance to the parties on forms of notice, the plan of allocation, and claim form.

Once selected, the parties should provide information to the court describing the claims administrator's experience with other similar settlements, the proposed notice plan for notifying the class of the proposed settlement and receiving class member claims, and the anticipated and estimated notice and claims administration costs.

The parties' explanation of the claims administration process should address the parties' proposed timeline for giving notice to the class, deadlines for opting out or objecting to the settlement, deadline for responding to objections, deadline for submitting claim forms, and a date for the settlement hearing required by Rule 23(e).

The court will consider the same information when it is deciding whether to grant final approval of the settlement at a later date under Rule 23(e)(2). At that stage, however, measuring the proposed relief may require evaluation of the claims process if the anticipated rate of claims submitted cannot be determined.

> BEST PRACTICE 3C: In determining whether the proposed method of distributing relief is effective, a court should not assume that automatically distributing benefits to all class members is superior to distributing benefits based on submitted claims.

A class settlement may be structured to distribute benefits to all known or identifiable class members, or alternatively it may be structured to distribute benefits only to class members who submit valid claims. Neither structure is inherently superior to the other in all circumstances. A court should therefore consider each method on its own merits.

"[T]he use of a claims process is not inherently suspect."[7] In fact, a claims process may be inevitable in certain settlements, such as where a claim is necessary to identify class members. An example of this situation could be a settlement involving an over-the-counter consumer product, where class members or the details of their purchases may not be readily ascertainable from a

---

[7] *Poertner v. Gillette Co.*, 618 F. App'x 624, 628 (11th Cir. 2015) (citation omitted).

defendant's records. But a claims process may have benefits even where its implementation is not inevitable or strictly necessary, and courts should consider factors other than necessity when reviewing a settlement's structure.

First, assuming that the overall value of a settlement is fixed and the only question is how to distribute that fixed amount of benefits, a claims process may be able to provide complete or otherwise significant relief for the subset of class members who choose to submit claims, whereas an automatic distribution would provide relief to a greater portion of the class but in much smaller amounts. This was the case in lender-placed insurance settlements, where defendants paid class members who participated in claims-made settlements near-complete monetary relief, but paid far less to members of direct-pay classes.[8] In these cases and others, although a claims-made settlement structure did not result in an award to all class members, it did maximize the *opportunity* available to each class member. This approach credits the decision made by each individual class member.[9]

Second, direct-pay settlements may distribute relief to a greater number of class members, but a court should be aware of the limitations in reach. A court should consider how accurate, current, and complete the address data is, as well as whether class members will be given the opportunity to verify the details of their claims addresses at the notice stage. The shakier the address data, the greater the risk of waste created by checks that are discarded, mistaken for junk mail, or sent to the wrong residence. Claims administrators should also consider how to reduce the

---

[8] *Compare Arnett*, 2014 WL 4672458, at *12 (direct pay settlement offering class members a net of 2.28% of premiums paid under a 25% fee award observed by court after declining a request for a 30% fee award due to a lack of "special circumstances" justifying a "departure from the benchmark fee of 25%), *with Montoya v. PNC Bank, N.A.*, No. 14-20474-CIV-GOODMAN, 2016 WL 1529902, at *11 (S.D. Fla. Apr. 13, 2016) (claims-made settlement offering class members "near-complete" monetary relief that "very likely exceed[ed] what Plaintiffs could have recovered at trial") (citations omitted).
[9] *See, e.g., Braynen*, 2015 WL 6872519, at *14 ("Negotiating for a smaller amount to go to Class Members would, in effect, unfairly reward some Class Members for their own indifference at the expense of those who would take the minimal step of returning the simple Claim Form to receive the larger amount.").

risk of fraud presented by checks being sent to outdated addresses or cashed by individuals other than the class member at the same address.

Third, if class members would receive only small amounts in a direct-pay structure, the administrative costs may erode the benefits received. These costs may include the costs of printing and mailing large volumes of checks, processing returned payments, and tracking down class members whose addresses may have changed. These costs are typically lower in a claims-made structure because of the lower number of participating class members.

Fourth, if the class members have claims that vary materially in amount, using a claims process may allow the parties to tailor the amounts paid by the settlement and avoid over- or underpayment to individual class members. If, for example, a defendant's records (or lack thereof) do not allow it to ascertain how much, if anything, is due to individual consumers, a claims process allows for self-identification and the provision of detailed claim information.

> **GUIDELINE 4:** The parties should provide information on the proposed attorney's fees, including timing of payments, in assessing whether relief provided for the class is adequate.

At the notice stage, the court should consider the amount of attorney's fees in evaluating the fairness of the proposed settlement. Each jurisdiction may have different applicable standards for the court to determine the appropriate nature of the proposed attorney's fees and costs, such as the "percentage of the fund" and "lodestar/multiplier" standards. The relation between the amount of the attorney's fees and the expected benefits to the class members may be important in some cases in evaluating whether the proposed settlement is fair, reasonable, and adequate. Depending upon the relevant standard in the jurisdiction, the court may also consider other relevant Rule 23 factors in preliminarily determining whether the amount of the proposed attorney's fees and costs are reasonable, such as the work performed by counsel, the risks associated with the case and any

other relevant factors provided by counsel in support of preliminary approval. The court may also determine whether the proposed attorney's fees are being provided by defendants in addition to the relief provided to the class.

> **GUIDELINE 5:** At the final approval stage, the court should consider relief delivered to class members in determining the appropriate award of attorney's fees in accordance with Rule 23(h). In appropriate cases, a court may consider non-monetary benefits as part of the total relief in relation to the proposed award of attorney's fees in evaluating whether the proposed settlement is fair, reasonable, and adequate.

A court awards attorney's fees in accordance with Rule 23(h). The Committee Note to Rule 23(h) sets out various factors that the court can consider in evaluating a request for attorney's fees, including: (1) work that produced a beneficial result for the class; (2) work that actually achieved a result for class members; (3) settlement provisions that provide for future payment; and (4) nonmonetary provisions that provide actual value for class members. These factors may also be adjusted based upon the accepted method for determining appropriate attorney's fees in that jurisdiction (*i.e.,* percentage of the fund, lodestar, etc.). The court should defer to the recommendations of appointed lead counsel when considering any division of attorney's fees among counsel, and it may give weight to agreements between class counsel and others about the fees claimed by the motion.

A court should consider and analyze settlements involving nonmonetary benefits for class members, according to the 2003 Committee Note accompanying Rule 23(h), to ensure that these benefits have actual value for the class, like injunctive and declaratory relief would in civil rights litigation.

BEST PRACTICE 5A: In an appropriate case, a court may consider awarding attorney's fees in a class action settlement based on a percentage of the total monetary awards made available to the class, as opposed to the actual claimed value of the settlement.[10]

Courts have disagreed about whether attorney's fees can be awarded based solely on the monetary value of the relief actually paid to participating class members, typically in a settlement where the total amount is not fixed but fluctuates based on the number and amount of valid claims, as compared with fees based on the total value made available by the settlement.[11]

On one hand, some courts have concluded that class counsel's compensation should be tied to the class's actual recovery, rather than the relief made available to plaintiffs and the class. And the Committee Note to amended Rule 23(e)(2), after acknowledging that awards of attorney's fees are made under Rule 23(h), states: "[T]he relief actually delivered to the class can be a significant factor in determining the appropriate fee award."

On the other hand, other courts have taken into account other items in determining the "actual value" of the relief provided to class members. These courts weigh the significant work and considerable risk assumed by lawyers who undertake to represent consumers in class actions against often large corporate defendants. These courts have concluded that the opportunity to recover meaningful relief by availing themselves of a claims process that is procedurally fair, even though many fail to do so, is "actual value" to the class members. And counsel should not be held

---

[10] *See, e.g.*, *Poertner*, 618 F. App'x at 629 (holding that indirect benefits to the class—such as injunctive relief or a *cy pres* award—are properly included in a court's valuation of the total "settlement pie" from which the court calculates a reasonable fee).

[11] *See Lopez v. Youngblood*, 2011 WL 10483569, at *3 (E.D. Cal. Sept. 2, 2011) (noting that while "the Ninth Circuit affords district courts "discretion to apply either the lodestar method or the percentage-of-the-fund method in calculating a fee award[,]" "[m]any courts and commentators have recognized that the percentage of the available fund analysis is the preferred approach in class action fee requests because it more closely aligns the interests of the counsel and the class, i.e., class counsel directly benefit from increasing the size of the class fund and working in the most efficient manner.") (internal quotations and citations omitted).

to account for class members' failure to take advantage of an otherwise fair and procedurally sound

settlement:

> There may be many reasons or no reasons why class members decide to participate
> in a settlement, *e.g.,* a desire not to be involved in litigation, ideological
> disagreement with the justice system, their individual experiences with [a product],
> or sympathy for the defendant. . . . Whatever the underlying reason, that is a
> decision to be made by each class member. Those decisions, however, do not affect
> whether the settlement provided to the Class is fair, adequate, and reasonable.[12]

> BEST PRACTICE 5B: The parties should provide information on any agreement made
> in connection with the proposed settlement in accordance with Rule 23(e)(3).

At the notice stage, the court should be advised of any side agreements in determining

whether the relief is adequate. For example, the parties should advise the court of any conditions

that must be met, other than the court's approval, to the settlement becoming effective.

The court will consider the same factors when it is deciding whether to approve the

settlement at a later date under Rule 23(e)(2).

> BEST PRACTICE 5C*: The parties should provide information on how the proposed
> settlement treats class members relative to each other, particularly if the proposed
> settlement addresses subclasses or other special categories of class members.

The parties should address any differences in treatment of class members, including

different payout schedules, limitations, requirements, or other restrictions, and explain how the

differences in treatment are linked to differences in the values or facts of the members' underlying

claims. Conversely, if the settlement gives all class members the same relief, a court should

consider whether differences among class members exist that should require tailored treatment.

Defendants, for example, may have identified such differences in opposing certification of a

litigation class. Finally, a court should consider whether the proposed class representatives expect

to request an award in addition to what they would receive as a class member.

---

[12] *Hall v. Bank of Am.*, N.A., No. 1:12-cv-22700-FAM, 2014 WL 7184039, at *8 (S.D. Fla. Dec. 17, 2014).

In making these assessments, a court should be mindful that there is a strong public policy favoring settlement in class actions, and that the factors are meant to be considered flexibly in the context of a particular settlement. In considering whether class members are treated equitably relative to each other, courts may note potential differences in class members and possible conflicts of interest. Such potential differences and conflicts alone, however, should not lead to disapproval of a settlement. The parties may legitimately compromise and simplify the treatment of claims to achieve speed, simplicity, and efficiency in claims handling, reducing costs of administration in order to deliver a greater portion of the settlement value to class members as benefits.

The court will consider the same consideration when it is deciding whether to approve the settlement at a later date under Rule 23(e)(2). At that stage, the court may have more information on any potential issues raised by objectors.

> BEST PRACTICE 5C(i): If the differences in the treatment between class members are material or the conflicts of interest are real, a court should consider whether certain safeguards protect the class members and whether the benefits of having a class-wide settlement otherwise outweigh the risks.

If class members are treated differently under the proposed settlement, the court should determine whether the differences in treatment are justified. In making this determination, the court should consider whether the proposed settlement was achieved with the help of a third-party neutral or other mediator in assessing the fairness of the different treatment. Material differences in class members' claims (either in strength or value) may be appropriately addressed in the claim process and plan for allocating the settlement fund to class members.

> BEST PRACTICE 5C(ii): In assessing the equitable treatment of class members relative to each other under Rule 23(e)(2)(D), a court should give due regard to the advantages of simplifying the treatment of claims to achieve efficiency and finality.

Similarly, even if some types of claims would have been too individualized to include in a class certified for litigation purposes (for example, common law fraud and its reasonable-reliance

17

requirement), courts should consider the benefit of obtaining relief through the class action mechanism for numerous class members, as opposed to requiring them to bring individual claims, and the willingness of defendants to pay a class settlement in order to obtain finality.

In sum, courts' consideration of the equitable treatment factor should be flexible, protecting the absent class members, while taking into account the benefit to class members and defendants of class action resolution.

> BEST PRACTICE 5D: Although not required by Rule 23(e)(1), a court should consider holding a hearing on whether to direct notice to the class of a proposed settlement in an appropriate case if the court has questions or concerns about whether the information presented by the parties is sufficient under the multiple Rule 23(e)(2) factors for it to decide that settlement approval at a later stage is likely.

Holding a hearing at the notice stage may be useful to: (i) help the court understand the proposed settlement approval process, which is not always spelled out clearly in the motion papers or settlement agreement; (ii) incorporate any changes the court finds necessary in the notice documents; and (iii) provide the parties with a preview of any concerns the court may have to approval of the settlement so that they may be addressed before notice is given to the class.

If the court has a concern about a particular settlement term, it should consider providing guidance to the parties, so that they can address the concerns and return with an amended proposal for the court's renewed consideration.

Because the court may only approve or deny approval of the settlement, and may not change its terms, any known deficiencies or concerns that could potentially lead to denial of the settlement should be addressed before notice is sent to the class. Otherwise, the court and the parties run the risk of sending out notice to class members, obtaining denial of the settlement, and then having to send out a new notice of new settlement terms — leading not only to additional

expenditures of time and money, but also to potential class member confusion due to receipt of multiple notices.

At the notice stage, the court should balance the interests of obtaining enough information to determine whether the court will likely grant approval of the settlement and certify the class, and the interests of getting notice out to the class and avoiding further delay when a final settlement hearing will be held after notice to the class is given and the class has an opportunity to object or opt out.

# CHAPTER 2

## PROCEDURES AND STANDARDS FOR OBJECTIONS AND RESOLUTION OF OBJECTIONS UNDER RULE 23(e)(5)

"Professional" or "serial" objectors are raising meritless objections in a growing number of proposed class-action settlements, hoping to use potential delay to extract large payments in return for dismissal of the objections. "Although [such] payment may advance class interests in a particular case, allowing payment perpetuates a system that can encourage objections advanced for improper purposes."[13] These payments can reduce the funds distributed to class members, delay settlement distributions to innocent class members, and bring disrepute on the administration of justice. The purpose of the amended rule is to institute an effective procedure discouraging this recent pernicious practice.

There is virtually unanimous consensus that objecting class members can play a critical role in the settlement-approval process and can provide a valuable service to the entire class. Accordingly, amended Rule 23(e) is intended to facilitate the assertion and consideration of good-faith objections made to protect or advance the collective interests of some or all class members, while at the same time deterring "professional objectors" from holding up class settlements in bad faith.[14] Separate and apart from protecting the rights and interests of the objecting class member, the court has an independent duty to ensure that the Rule 23(a), (b) and (e) criteria are satisfied.

---

[13] FED. R. CIV. P. 23(e)(5)(B) committee's note to the proposed 2018 amendment.
[14] *See, e.g.,* Brian T. Fitzpatrick, *The End of Objector Blackmail?*, 62 VAND. L. REV. 1623, 1625 (2009) ("Courts and commentators believe that objector blackmail is a serious problem. Objector blackmail is often seen as something of a 'tax' that class action lawyers must pay in order to settle class action litigation, and it has been decried in numerous court opinions and scholarly commentaries.") (footnotes omitted).

**GUIDELINE 6**: A court should interpret the language of Rule 23(e)(5) broadly and liberally to accomplish its stated intent to avoid perpetuating a system that facilitates objections advanced for improper purposes.

Rule 23(e)(5) is designed to reduce the financial incentive for professional objectors to object solely for personal financial gain by subjecting them to greater judicial scrutiny. The amended rule does this without compromising the ability of a class member to file a good-faith objection, which might assist the court in evaluating or improving a proposed settlement. In many cases, a good-faith objector is primarily interested in improving a settlement agreement and welcomes judicial scrutiny. Vigorous judicial enforcement of the amended rule will strengthen the ability of good-faith objectors to pursue meritorious actions, while curtailing abusive professional-objector tactics.

The parties may consider whether there are other means of discouraging bad-faith objectors. For example, the parties could: (1) include in the settlement agreement a provision that prohibits the parties from paying an objector to dismiss an appeal; (2) seek an order from the district court enjoining objectors from dismissing appeals in exchange for payment or other consideration; or (3) include a "quick-pay clause," providing that class counsel receives attorney fees even if an appeal is taken and before the class is paid, but requiring counsel to return the fees paid if the award is reversed on appeal.[15] Eliminating the possibility of extortionate payments to bad-faith objectors before any appeals are filed will discourage bad-faith objectors from filing appeals.

---

[15] *See In re Whirlpool Corp. Front-loading Washer Prod. Liab. Litig.*, 2016 WL 5338012, at *21 (N.D. Ohio Sept. 23, 2016) (noting that quick-pay clauses are increasingly common and the "essential purpose of a quick-pay clause is to disincentivize lawyers who are 'professional objectors'). Some argue the optics appear bad with class counsel being paid before class members. And there may be unforeseen consequences of obliging counsel to repay fees if the settlement is upset. On the other hand, courts have found that the "quick pay" provision "serves the socially-useful purpose of deterring serial objectors."

Amended Rule 23(e)(5)(A):

(A) In General. Any class member may object to the proposed settlement if it requires court approval under this subdivision (e)); the objection may be withdrawn only with the court's approval. The objection must state whether it applies only to the objector, to a specific subset of the class, or to the entire class, and also state with specificity the grounds for the objection.

Comments to the Committee raised concerns that the amendments to Rule 23(e)(5) could invite objections on behalf of others and that the objector should be required to "satisfy something like Rule 23(a)(4) (on adequacy of representation) to represent anyone else." The Committee rejected these concerns because the rule already provides that any class member may object: "It does not cabin what objections they make, and courts must consider those objections."[16] The following best practice recognizes these considerations but also acknowledges the Committee's determination that the court should consider all "cogent" objections, "whether or not the objector has a direct stake in the resolution of the objection."[17]

BEST PRACTICE 6A: A court may consider any objection raised by a class member, even if the objector has nothing personally at stake in regard to the matter raised by the objection.

An objection must state whether it applies only to the objector, to a specific subset of the class, or to the entire class. There is no intent to cabin any cogent objection. But requiring an objector to identify who benefits from the objection can shed light on the objector's motivations and provide the court useful information to evaluate whether payment for withdrawing the objection is justified. Although helpful objections can be made by an objector having no personal stake in the outcome, the court should take into account this factor in determining whether the objection was made for an improper purpose.

---

[16] FED. R. CIV. P. 23(e)(5)(A) committee's note to the proposed 2018 amendment.
[17] Id.

**GUIDELINE 7:** A class member objecting to a proposed settlement must state with specificity the grounds for objection sufficient to enable the parties to respond to them and the court to evaluate them.

The amended Rule 23(e)(5)(A) introduces a new burden on objectors to specify the grounds for their objection. A general statement that a settlement is "unfair" without more will usually be insufficient to meet this new requirement. In construing the specificity requirements, a court should not apply Rule 9's more rigorous "heightened" pleading standard and its associated jurisprudence, which require allegations of fraud or mistake to be stated with particularity. Instead, the objections are sufficiently asserted if they enable the parties to respond to them and assist the court to evaluate them. Requiring specificity will crystallize the issues for decision, narrow the scope of review, and frustrate "professional" objectors who would be required to carefully analyze the settlement agreement before objecting and who are generally unwilling to invest the substantial time and effort to improve the settlement agreement.

BEST PRACTICE 7A: An objection should identify the specific settlement term or structure that is being challenged and the reasons for such challenge.

An objector should identify the specific settlement term or structure that is being challenged and the reasons for such challenge, the specific holding in the preliminary approval order or other court order being challenged and the reasons for such challenge, or the class certification requirements or other Rule 23 criteria the objector claims are not satisfied. Objectors need not cite to a section or paragraph number provided they describe the settlement terms or court order in a manner that permits the court and parties to identify what is being challenged. This requirement would also be satisfied if objectors identify a settlement structure that they contend is unfair.

In adjudicating objections, the court "should take care, however, to avoid unduly burdening class members who wish to object, and to recognize that a class member who is not represented

by counsel may present objections that do not adhere to technical legal standards."[18] Many non-lawyer class members are unaware of the Federal Rules of Civil Procedure and can make wrong assumptions. For example, an unrepresented class member may wrongly interpret the requirement that an objector state whether their objection "applies to the objector" or to a "specific subset of the class" to mean that the objector should state whether she is "speaking" for another objector or representing other members of the class.

In determining whether a class member satisfied the specificity requirements, the court should consider whether and how the class members were notified of these requirements in the class notice. In an appropriate circumstance, deposition of the objector may be necessary for the parties to respond to the objection. Depositions should not be used to harass an objector.

> **GUIDELINE 8**: No payment or other consideration for forgoing or withdrawing an objection or forgoing, dismissing, or abandoning an appeal can be provided unless a court approves payment after holding a hearing.

> Amended Rule 23(e)(5)(B):

> (B) Court Approval Required For Payment to an Objector or Objector's Counsel. Unless approved by the court after a hearing, no payment or other consideration may be provided to an objector or objector's counsel in connection with:
> > (i)   forgoing or withdrawing an objection, or
> > (ii)  forgoing, dismissing, or abandoning an appeal from a judgment approving the proposal.

Rule 23(e)(5)(B) puts in place procedures whereby the court must closely evaluate any agreement to pay an objector to withdraw an objection. Objections may be withdrawn without court approval, but a hearing is required if an objector is paid for forgoing or withdrawing an objection or forgoing, dismissing, or abandoning an appeal. Although separate hearings can be held solely for this purpose, a court should consider ruling on all such requests along with other objections at the final Rule 23(e)(2) fairness hearing held to approve the proposed settlement. At

---

[18] FED. R. CIV. P. 23(c)(5)(A) committee's note to the proposed 2018 amendment.

the hearing, objectors should be provided an opportunity to address the court and the parties should be given an opportunity to respond.

> BEST PRACTICE 8A: The parties must disclose the terms of all agreements between objector and the parties. What constitutes payment or other consideration to an objector for forgoing or withdrawing an objection or forgoing, dismissing, or abandoning an appeal should be broadly construed.

The Committee Notes recognize that there are good objections that may add value to the class. The rule provides for payment to objector's counsel in such situations based on the value that the objection provides to the class. At a minimum, the objector and the parties must disclose the terms of all agreements.

To ensure that objectors cannot evade judicial scrutiny by accepting some benefit other than a monetary payment, or directing the payment or other "consideration" to someone other than the objector or objector's counsel, the rule is broadly interpreted to include any kind of arrangement that benefits objector or counsel for an objector. The term "consideration" should be broadly construed and includes immediate and deferred or future benefits. Nonmonetary consideration, like preferred future business relationships or other financial commitments, are benefits and encompassed by the rule. Payments made to organizations affiliated with the objector are likewise proscribed absent judicial approval.

Although the amended rule should be broadly construed, a court may not consider as a benefit to the class members the time that would otherwise be spent addressing the withdrawn objection or appeal. The sole fact that the withdrawal of an objection or dismissal of an appeal will expedite distribution of the settlement funds does not justify payment to withdraw an improper objection or dismiss an improper appeal. Otherwise, every improper objection would be subject to compensation on these grounds. At the same time, counsel who withdraws an objection or appeal without any expectation of compensation may do so without court approval.

25

BEST PRACTICE 8B: A court should inquire into communications that class counsel may have had with individuals who decided not to pursue (forgo) objections.

The rule requires court approval to pay for withdrawing or forgoing an objection or forgoing, dismissing, or abandoning an appeal. Court approval is also required, however, to pay a "potential" objector who is merely "considering," but who has not yet filed, an objection or appeal. The rule anticipates situations in which a professional objector informally or otherwise threatens to object unless the objector receives payment in return for assurances not to file the objection. The rule expressly proscribes paying an objector to "forgo" an objection or an appeal without court approval, and payment would clearly be inconsistent with the rule's stated purpose to avoid perpetuating a system that encourages objections advanced for an improper purpose.

Under Rule 23(g), a court has a duty to see that class counsel live up to their obligation to protect the class they represent. In certain situations, this may require the court to get information from class counsel about conversations between counsel and class members who considered an objection and then ultimately decided not to object. The Committee Notes specifically state that objections can provide the court with important information bearing upon its determination as to whether to approve a proposal. Inquiry of the nature described in this paragraph may also provide important information to the court and will help ensure that class counsel has adequately represented the class and has not put class counsel's interest above those of the individuals he or she represents.

BEST PRACTICE 8C: If the consideration involves a payment to counsel for an objector, the proper procedure to obtain a payment is by motion under Rule 23(h). The court should evaluate whether the objection added value to the class and therefore justifies the proposed payment.

In some circumstances, an objection may warrant payment of attorney's fees. The new rule makes clear that an objector who seeks payment of attorney's fees must follow the same

procedures as class counsel, i.e., the filing of a motion for an award of attorney's fees pursuant to Rule 23(h). A court need not award a fee to an objector merely because the objection assisted the court in understanding or evaluating the settlement. However, if the objection actually enhanced the class recovery by improving the settlement or otherwise conferring a benefit to the class, an award of fees to the objector's counsel may be justified.[19]

The Committee received comments suggesting that the amendment should provide a concrete standard for the payment of fees to objectors. The Committee could not find a good way to articulate such a standard, and determined "that this is a place to 'let judges be judges.'"

Nonetheless, the Committee Note to Rule 23(h) sets out various factors the court can consider in evaluating a request for attorney's fees, including: (1) work which produced a beneficial result for the class; (2) work which actually achieved a result for class members; (3) settlement provisions that provide for future payment; and (4) nonmonetary provisions that provide actual value for class members. The court must determine that the objector's fee award is fair and reasonable in light of the benefit conferred to the class by the objection.

The award of fees to counsel for the objector is usually paid from the fees awarded to class counsel. In a claims-made settlement, fees are paid separately by the defendant and are capped, so the only source of payment to the objector is the fees paid to class counsel. In a case with a settlement fund, the objector's counsel fee may be paid from the fees awarded to class counsel or may be paid directly from the fund if the total attorney's fees paid to class counsel and objector remain proportionate to relief paid to the class.

---

[19] *See, e.g.*, *In re Cendant PRIDES Litig.*, 243 F.3d 722, 743 (3d Cir. 2001) (observing that the district court has broad discretion to award fees to an objector who enhances the class's recovery); *In re* Classmates.com Consol. Litig., 2012 WL 3854501, at *8 (W.D. Wash. June 15, 2002) ("The court can award attorney fees to objectors, provided that the objectors prove that they "substantially enhanced the benefits under the settlement.") (internal citations and quotations omitted).

**GUIDELINE 9.** If approval to forgo or withdraw an objection has not been obtained before an appeal is docketed in the court of appeals, Appellate Rule 12.1 and Civil Rule 62.1 indicative-ruling procedures apply while the appeal is pending**.**

Amended Rule 23(e)(5)(C):

(C) Procedure For Approval After an Appeal. If approval under Rule 23(e)(5)(B) has not been obtained before an appeal is docketed in the court of appeals, the procedure of Rule 62.1 applies while the appeal remains pending.

Although Rule 23(e)(3) already requires disclosure of any agreement made in connection with a settlement proposal, this provision is easily evaded by deferring execution of fee agreements until after a notice of appeal is filed and the court is divested of jurisdiction. Rule 23(e)(5)(B) requires both a hearing on and approval of any agreement to pay an objector. Rule 23(e)(5)(C), discussed below, provides a mechanism for the court to grant or deny the motion during the pendency of the appeal.

Rule 23(e)(5)(C) requires the district court to make an indicative ruling pursuant to Rule 62.1 of the Federal Rules of Civil Procedure. This rule allows for "indicative rulings" and applies when the district court lacks authority to grant [a motion] because of an appeal that has been docketed and is pending. Rule 62.1 permits a district court to take one of three actions on a motion pending before it during appeal: (1) defer consideration of the motion; (2) deny the motion; or (3) state either that it would grant the motion if the court of appeals remands for that purpose or that the motion raises a substantial issue.[20]

---

[20] While an appeal of the class action settlement is pending, a district court may still have supplemental jurisdiction permitting it to rule on an objector's motion for attorneys' fees. *See Budinich v. Becton Dickinson & Co.,* 486 U.S. 196, 200 (1988).

BEST PRACTICE 9A: If the parties intend to settle with an objector, they should seek approval of the objection settlement prior to the filing of the appeal to avoid the delay of appeal.

Under the new rules, an appeal becomes a critical moment where the opportunity to end an objection in exchange for payment is diminished and the risk of protracted litigation is magnified. Post-appeal Rule 23(e)(5)(B) payments come with added risk that the district court will defer or deny ruling on the parties' motion while the case is on appeal, or that the appellate court will refuse to remand the case. In either of those situations, the parties are then forced to litigate their appeal — absent voluntary dismissal of the appeal — to its conclusion. This added expense and delay can be avoided by class counsel's and objectors' proactivity in resolving objections before an objector appeals.

BEST PRACTICE 9B: A court should hold a hearing and issue an indicative ruling once an appeal is filed and Rule 62.1 is in effect.

While a district court has the option to defer consideration of settlement of an objection under Rule 62.1, the court should issue an indicative ruling. Although the parties must still obtain Rule 23(e)(5)(B) approval from the district court before dropping an objection in exchange for compensation, the district court may lack authority to formally approve or deny any payments made to an objector once an appeal is filed. In this situation, Rule 23(e)(5)(C) requires the court to adhere to Rule 62.1 procedures, which gives the court three options on how to proceed. However, in the interest of judicial economy and case management efficiency, the district court should hold a hearing and issue an indicative ruling.

Issuing an indicative ruling removes a degree of uncertainty from the post-appeal settlement process by informing the appellate court what the district court's decision would be if the district court had jurisdiction. If the district court indicates that it would approve the settlement, the likelihood that the appellate court would remand for disposition is greatly increased.

Alternatively, an indicative ruling can alert the appellate court to a material issue that should be addressed by that court. In either event, judicial economy and efficiency are promoted. Absent an indicative ruling, the appellate court has no reason to remand for settlement approval and the parties must proceed through the entire appellate process, adding further expense and delay to a case that is otherwise capable of settlement.

> BEST PRACTICE 9C: If the objector has filed a motion for attorney's fees, the district court may inquire into settlement discussions between the objector and the parties regarding the fee motion.

The parties may circumvent the amended rules by settling the objector's "fee motion" rather than the objector's "objection." For example, an objector may object to a settlement, the district court approves the settlement, and while the case is still pending in district court, the objector files a motion for attorney's fees. The objector then appeals the final approval of the settlement. On appeal the objector may settle the "fee motion." The Rule 23 amendments would arguably not apply to this settlement because the rules apply to settlement of "objections," not other motions. A district court should examine the parties' attempts to circumvent the rules.

# CHAPTER 3

## THE ROLE OF COURT-APPOINTED LEAD COUNSEL VIS-À-VIS OTHERS

The process for the court's appointment of class counsel is governed by Federal Rule of Civil Procedure 23(g), an addition to the 1966 Rule that became effective in 2003. Rule 23(g)(1) requires the court to appoint class counsel at the time of class certification, and, in doing so, to consider: "the work counsel has done in identifying or investigating potential claims in the action; counsel's experience in handling class actions, other complex litigation and the types of claims asserted in the action; counsel's knowledge of the applicable law; and the resources that counsel will commit to representing the class."[21] The court's flexibility to take into account the circumstances presented by a particular class action is also recognized. Under Rule 23(g)(1)(B)–(E), the court "may consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class," may require potential class counsel to provide information "on any subject pertinent to the appointment and to propose terms for attorney's fees and non-taxable costs," may include in the appointing order provisions regarding fees and costs, and "may make further orders in connection with the appointment."

Often, especially in a "stand-alone" class action as opposed to a group of class actions coordinated before a single transferee court under the multidistrict litigation (MDL) statute, only one lawyer or firm will apply for class counsel appointment. Nonetheless, such appointment is not automatic. Rather, "[w]hen one applicant seeks appointment as class counsel, the court may appoint that applicant only if the applicant is adequate under Rule 23(g)(1) and (4)."[22] Frequently, however, more than one lawyer or firm will compete for appointment as class counsel, especially

---

[21] FED. R. CIV. P. 23(g)(1)(A)(i)–(iv).

[22] FED. R. CIV. P. 23(g)(2). Rule 23(g)(4) succinctly defines the duty of class counsel: "Class counsel must fairly and adequately represent the interests of the class."

in a situation where multiple class actions are coordinated in the same court, as an MDL or otherwise. In such circumstances, "[i]f more than one adequate applicant seeks appointment, the court must appoint the applicant best able to represent the interests of the class."[23] In practice, this provision has not been interpreted to prohibit the appointment of multiple attorneys and firms as the class counsel; to the contrary, especially in class actions coordinated in an MDL, the appointment of multiple lawyers and firms as class counsel or settlement class counsel under 23(g) is not atypical: courts recognize that often the combined human and economic resources of multiple firms will be essential to assure effective and adequate representation of the class.

In MDLs or other litigation involving multiple class actions, the putative classes may overlap, in whole or in part, such that the court may need to choose among counsel for the lead role. In other circumstances, the class actions may be parallel (*e.g.*, putative classes making similar allegations but on behalf of residents of different states). And sometimes (albeit rarely), the classes may be distinct and competing for the same assets. Depending on the circumstances, the court may appoint a lead for all of the class actions, a lead for each putative class, or both.

In contemporary practice, multiple class actions may be filed in a single court, or centralized via an MDL Transfer Order. Either situation can give rise to "rivalry or uncertainty" as multiple lawyers come forward to represent the class.[24] Additionally, the class certification determination is often preceded by substantial fact and expert discovery. The class certification determination has long ceased to be one based upon the pleadings; while courts remain prohibited

---

[23] FED. R. CIV. P. 23(g)(2).

[24] As observed in the committee's note to Rule 23(g), the appointment of interim counsel is particularly appropriate when there is "rivalry or uncertainty" because multiple lawyers are competing to represent the class. Rule 23(g)(3) interim appointment is thus viewed as a case management tool akin to the early appointment of a leadership structure in a contemporary MDL. Courts have sometimes resolved this "rivalry or uncertainty" by invoking the "first-filed" doctrine to stay duplicative class actions. The centralization of overlapping or competing class actions in an MDL also allows the transferee judge to utilize case management techniques, such as ordering the appointed plaintiffs' leadership group (whether or not interim class counsel are formally appointed at this stage), to file a consolidated class action complaint, utilizing this master pleading to organize the class allegations.

from basing the decision to certify a class on an impression of whether plaintiffs will win on the merits, the evidence the class will use to prove its claims (or at least significant elements of its claims) on a class-wide basis are relevant, as the Supreme Court decided in several recent opinions.[25] It takes time and resources to develop a record in the case sufficient to enable the court to make an informed class certification decision.

In recognition of contemporary class action jurisprudence, Rule 23 itself was amended in 2003 to change its prescription for the timing for the class certification motion from: "as soon as practicable after commencement" to "at an early practicable time."[26] This seemingly slight shift in wording has had a substantial impact upon class action practice, and its practical consequence requires significant efforts to be expended by those seeking a class counsel appointment long before the certification decision and counsel appointment is made. As the Rule 23(g) Committee's Notes observe, before certification, counsel is often responsible for preparing the motion for certification, responding to dispositive motions, conducting discovery, and participating in settlement negotiations. Accordingly, to prevent a Catch 22 situation, Rule 23(g)(3) provides for the appointment of "Interim Counsel": "The court may designate Interim Counsel to act on behalf of a putative class before determining whether to certify the action as a class action."[27]

In multidistrict proceedings culminating in a class action settlement, the counsel who were previously appointed to serve as Lead Counsel, as members of a plaintiff's steering committee (PSC), or other court-appointed leadership group have then been appointed to serve as settlement class counsel under Rule 23(g), in an appointment order issued at the beginning of the settlement

---

[25] See, e.g., *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011)

[26] FED. R. CIV. P. 23(c)(1)(A) (as amended 2003). The Committee's Notes a 2003 amendment included, as valid reasons to defer the certification decision, the time needed to conduct discovery, to gather and evaluate information, including "how the case will be tried."

[27] Fed. R. Civ. P. 23(g)(3). These duties are analogous to those customarily assigned to Plaintiffs' Lead Counsel in a contemporary MDL. *See* MANUAL FOR COMPLEX LITIGATION (FOURTH) § 40.22 (2004) (outlining "Responsibilities of Designated Counsel")

approval process.[28] This transition from lead counsel/PSC member to class counsel is essentially one of title rather than function. As class actions and multidistrict litigation have converged in recent years, MDL transferee judges, who must appoint plaintiff leadership at the outset of the proceedings, have often adopted the Rule 23(g) factors as qualifications for such leadership roles.[29] Guidelines for the court's selection of lead/liaison counsel and committees in MDL proceedings generally, including options for organizational structures, delineation of powers and responsibilities, provisions for compensation (usually through a "common benefit" order); and the roles and responsibilities of the appointed counsel in acting for and communicating with other attorneys (both in the MDL itself and in related state court litigation), are detailed with specific recommendations in Sections 10.2 through 10.225 of the *Manual for Complex Litigation*,[30] and in several of the FJC's contemporary publications addressing judicial case management of multidistrict and class actions. [31]

---

[28] *See, e.g.*, Order Appointing Interim Class Counsel, *In re Oil Spill* by the Oil Rig "Deepwater Horizon," MDL No. 2179 (E.D. La. Mar. 5, 2012), ECF No. 5960. This Order appointed the previously appointed Co-Liaison Counsel as Interim Class Counsel, to enable counsel to submit preliminary settlement approval papers and commence the settlement approval process. The subsequent Preliminary Approval Order then appointed the seventeen previously-appointed PSC members as Settlement Class Counsel. Preliminary Approval Order, *In re Oil Spill*, MDL No. 2179 (E.D. La. May 2, 2012), ECF No. 6419.

[29] The exemplar "Order Setting Initial Conference" contained in the *Manual for Complex Litigation* includes language that has been widely adopted by courts that widely adopted by MDL transferee judges in their initial orders, and speaks in terms conceptually similar to Rule 23(g)(1), articulating the "main criteria" for appointments to leadership positions as "(1) willingness and ability to commit to a time-consuming process; (2) ability to work cooperatively with others; (3) professional experience in this type of litigation; and (4) access to sufficient resources to advance the litigation in a timely manner." MANUAL (FOURTH), *supra* note 27, § 40.1, ("Order Setting Initial Conference").

[30] MANUAL (FOURTH), *supra* note 27.

[31] These include: U.S. JUDICIAL PANEL ON MULTIDISTRICT LITIG. & FED. JUDICIAL CTR., TEN STEPS TO BETTER CASE MANAGEMENT: A GUIDE FOR MULTIDISTRICT LITIGATION TRANSFEREE JUDGES (2d ed., 2014), https://www.fjc.gov/sites/default/files/2014/Ten-Steps-MDL-Judges-2D.pdf; BARBARA J. ROTHSTEIN & THOMAS E. WILLGING, MANAGING CLASS ACTION LITIGATION: A POCKET GUIDE FOR JUDGES (3d ed., Fed. Judicial Ctr. 2010), https://www.fjc.gov/sites/default/files/2012/ClassGd3.pdf; WILLIAM W. SCHWARZER & ALAN HIRSCH, THE ELEMENTS OF CASE MANAGEMENT (3d ed., Fed. Judicial Ctr. 2017), https://www.fjc.gov/sites/default/files/2017/ElementsCaseMgmt3dEd2017.pdf; BARBARA J. ROTHSTEIN & CATHERINE R. BORDEN, MANAGING MULTIDISTRICT LITIGATION IN PRODUCTS LIABILITY CASES: A POCKET GUIDE FOR TRANSFEREE JUDGES (Fed. Judicial Ctr. & Judicial Panel Multidistrict Litig. 2011), https://www.fjc.gov/sites/default/files/2012/MDLGdePL.pdf; and ALLAN HIRSCH, DIANE SHEEHEY & TOM WILLGING, AWARDING ATTORNEYS' FEES AND MANAGING FEE LITIGATION (3d ed., Fed. Judicial Ctr. 2015), https://www.fjc.gov/sites/default/files/2015/Awarding%20Attorneys%20Fees%20and%20Managing%20Fee%20Litigation%20Third%20Edition%202015.pdf.

In the recent *In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation*, the transferee judge issued its Pretrial Order No. 2: Applications for Appointment of Plaintiffs' Lead Counsel and Steering Committee Members articulating the following appointment criteria: "(1) professional experience in this type of litigation, including MDL experience as lead or liaison counsel and/or service on any plaintiffs' committees or subcommittees; (2) the names and contact information of judges before whom the applicant has appeared in the matters discussed in response to number one above; (3) willingness and ability to immediately commit to time-consuming litigation; (4) willingness and ability to work cooperatively with other plaintiffs' counsel and defense counsel: (5) access to resources to prosecute the litigation in a timely manner; and (6) willingness to serve a lead counsel, a member of the steering committee, or both; (7) the particular category or categories of plaintiffs the applicant wants to specifically represent (vehicle owners, lessees, dealerships, or all plaintiffs, etc.); and (8) any other considerations that qualify counsel for a leadership position."[32] Notably, the *Volkswagen* MDL was comprised primarily of actions filed as putative class actions.

> **GUIDELINE 10**: In an MDL action comprised of multiple putative class actions, the court should, in connection with an early and prompt initial conference with the parties, prescribe an application process for appointment of one or more firms, as appropriate, to serve as Interim Class Counsel under Rule 23(g)(3), upon considering factors pertinent to the case, including those specified in Rule 23(g)(1).

As noted above, an MDL transferee judge will frequently be appointed to preside over a multidistrict litigation that is comprised of multiple putative class actions. The court may consider whether to appoint plaintiffs' leadership under a traditional MDL leadership structure of lead, co-lead, or committees of counsel; to appoint a structure of Interim Class Counsel under Rule

---

[32] Pretrial Order No. 2: Application for Appointment of Plaintiffs' Lead Counsel and Steering Committee Members at 1–2, *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, and Prods. Liab. Litig.*, MDL No. 2672 (N.D. Cal. Dec. 22, 2015) (Breyer, J.), ECF No. 336.

23(g)(3); or to combine these roles such that lead, co-lead, or committees are also appointed under Rule 23(g) as Interim Class Counsel. These options are available to the court, in the exercise of its discretion, under most MDL proceedings in which class actions assert federal and state claims. However, in cases brought as putative securities class actions, the Private Securities Litigation Reform Act of 1995 prescribes a specific procedure for the court selection and appointment of the lead plaintiff and counsel.[33]

The advantage of a formal Rule 23(g)(3) Interim Class Counsel appointment in litigation comprised of multiple class actions is that a Rule 23 appointment comes with a Rule text and an established jurisprudence that articulates and interprets the duties of class counsel vis-à-vis the court and the putative class. As the FJC notes,

> attorneys representing classes are in a position to control the litigation process far more than attorneys representing individual clients. The class device enhances the role of such lawyers by virtue of the fact that even the approved class representatives do not have legal control over the litigation. Your power to appoint counsel and approve or reject a class settlement may be the only checks and balances on the power of attorneys for the class.[34]

In consumer class action MDLs, the leadership order is likely to include a Rule 23(g)(3) Interim Class Counsel appointment.[35] In litigations involving a mix of class actions and individual suits, courts have been more likely, at the outset of proceedings, to utilize a Lead Counsel and PSC structure, with a transition to class counsel appointment at the time of a class action settlement, as occurred in the *Deepwater Horizon* MDL, noted above, and more recently in the *Volkswagen*

---

[33] 15 U.S.C. § 78u-3(B) (2012). In the securities and antitrust contexts, some courts have utilized various procedures to set fee expectations at the outset of the case. Other courts await development of the case before setting fees, and many contemporary MDL judges establish timekeeping protocols early in the case. Courts frequently ask class counsel and PSC candidates to include their views and recommendations on fee structures and methodologies in their applications. *See generally* MANUAL (FOURTH), *supra* note 27, § 14.211 ("Selecting Counsel and Establishing Fee Guidelines").

[34] ROTHSTEIN & WILLGING, *supra* note 31, at 6–7.

[35] Case Management Order 2: Order Appointment Plaintiffs' Leadership Positions, *In re Am. Honda Motor Co., Inc., CR-V Vibration Mktg. & Sales Practices Litig.*, MDL No. 2661, 2015 WL 12723036, at *1 (E.D. Ohio Dec. 18, 2015).

MDL. Where the traditional MDL style of leadership appointment is utilized, the courts do and should, by pretrial order, set forth with specificity the roles and duties of various appointees within the plaintiffs' leadership structure, to provide clarity with respect to the roles of these counsel vis-à-vis others.

The *Deepwater Horizon* and *Volkswagen* pretrial orders are contemporary examples of MDL proceedings that 1) include both class and individual actions (*Deepwater Horizon*), and 2) are comprised entirely or predominantly of class actions (*Volkswagen*). In both of these, the transferee judges, at the inception of the MDL proceedings, appointed plaintiffs' leadership utilizing a Lead or Liaison Counsel/PSC structure, without a 23(g)(3) interim class counsel appointment. In each case, at the time the class action settlements were submitted to the court for its preliminary approval, the previously appointed PSC members (17 in *Deepwater Horizon*; 21 in *Volkswagen*) were then appointed as class counsel under Rule 23(g)(1) without previous appointment under Rule 23(g)(3). Whatever style or sequence of appointment is used, what is essential to the effective case management of the litigation, and to the effective prosecution of the common claims, is the appointment of counsel who are accountable to the MDL court and the plaintiffs or putative class members at an early stage. These counsel shoulder  responsibility to conduct the discovery and other pretrial proceedings that furnish the information the court will consider when making a class certification decision, whether for purposes of trial to assess a proposed settlement.

BEST PRACTICE 10A: In an MDL proceeding involving multiple actions that include putative class actions, the court should determine, in connection with an early and prompt initial conference with the parties, the nature and scope of the leadership structure it intends to appoint, including whether the appointment of Interim Class Counsel under Rule 23(g) is necessary or appropriate, and should specify and delineate with appropriate precision the roles and responsibilities of the counsel it appoints to leadership positions.

In contemporary practice, as the result of the concentration of putative class actions in the federal court system after the Class Action Fairness Act expanded federal diversity jurisdiction to include most cases brought as class actions,[36] and the availability of centralization of such actions before a single court under the multidistrict litigation statute, the challenges presented by the existence of competing or overlapping class actions in different jurisdictions have become less acute. There may still be some situations where multiple class actions are pending in different federal courts because no party has sought MDL centralization (or because the JPML has denied it), or a putative class action that overlaps with centralized federal class actions is pending in a state court. Much has been written regarding the effective coordination by federal judges, particularly MDL transferee judges, with their judicial colleagues in related state court litigation, and such guidelines and best practices will go far in meeting the challenges of coordination where putative class actions are pending in related federal and state proceedings.[37] Those counsel appointed by the federal court, either as Interim Class Counsel or to more traditional lead counsel/PSC roles, should be expected to coordinate with their state court counterparts in the interests of judicial economy, efficiency, and consistency, to minimize duplicative discovery, and

---

[36] 28 U.S.C. § 1332(d) (2012).

[37] See, e.g., MANUAL (FOURTH), supra note 27, §§ 20.1–20.32; FED. JUDICIAL CTR. & NATL'L CTR. FOR STATE COURTS, COORDINATING MULTIJURISDICTIONAL LITIGATION; A POCKET GUIDE FOR JUDGES (2013), https://multijurisdictionlitigation.files.wordpress.com/2012/11/multijurisdiction-pocket-final.pdf; see also In re Vioxx Prods. Liab. Litig., 760 F. Supp. 2d 640, 643 (E.D. La. 2010). In In re Vioxx, after appointing steering committee, to facilitate coordination, the court "created a web site accessible to all counsel and the public at large. All motions, Court orders, opinions, recent developments, a calendar of scheduled events, and various other matters were posted on this web site."

to avoid competing class certification schedules. While competing interests may pose difficulties in achieving coordination with state court counterparts, judges should consider expressly directing interim or lead counsel to use best efforts to coordinate with their state court counterparts.

If the class litigation in federal court involves only state law claims, and nationwide class certification is impracticable (or defendants oppose it), the federal court may wish to explore more active coordination with state courts in which statewide class actions are moving toward certification and trial. In other cases, the focus of litigation activity may be almost entirely in the federal proceedings, where discovery is proceeding, and where active (and court-supervised) settlement negotiations may lead to a nationwide class action settlement, which the parties expect to be approved and administered in federal court. The court can inform itself as to the nature and scope of related state court litigation, and the positions of the parties before it regarding the focus of federal vis-à-vis state proceedings, at an early case management conference. The court is then able, on an informed basis, to set a pretrial schedule for the cases before it (including a schedule for class certification motions and any prioritized discovery that may be important in informing the class certification decision), establish a trial date if practicable, and direct the parties to engage in settlement discussions, whether through a mediator chosen by counsel or under the auspices of a court-appointed settlement master, so that there is a clear schedule and set of expectations regarding the timing, scope, and goals of class action-related proceedings in the federal court. The role of court-appointed counsel in conducting these proceedings, in coordinating with any state court-appointed counterparts, and in reporting regularly to the court on status and progress should be set forth in a pretrial order, and reinforced through periodic status conferences.[38]

---

[38] There may be circumstances where, after familiarizing itself with the cases and hearing from counsel, the Court may consider declining to appoint interim counsel at the outset of coordinated proceedings. These might include vastly different procedural postures of the pending class actions. *See, e.g.*, *White v. TransUnion, LLC*, 239 F.R.D. 681 (C.D.

**GUIDELINE 11:** A court should, at an early point in its management of the proceedings before it, schedule pretrial proceedings (including class certification briefing and hearing dates, and, as early as practicable, a trial date on class claims); obtain information and establish procedures for coordination with any related putative class action litigation pending in other courts, designate counsel with responsibility to coordinate with counterparts in related litigation; and remind all parties and counsel of their duty to timely update the court and each other on developments in related actions pending in other courts.

The concentration of class actions in federal courts and their centralization via the MDL process before a single court have alleviated concerns over competing or overlapping class settlements. Nonetheless, it remains important for an order appointing plaintiff leadership in a putative class action, or group of class actions, to designate the counsel who will have authority to negotiate the terms of any class settlement. Pretrial orders appointing lead counsel thus typically vest lead counsel (and those designated by lead counsel to serve on the settlement team) with the authority to conduct settlement discussions and enter into proposed settlement agreements for presentation to the court.[39]

How specific should a court be in the structural subdivisions and functional details of the leadership group it appoints? In some MDLs, courts have set forth, in minute detail, the roles and responsibilities of a leadership structure, including subsidiary subcommittees and working groups, such that the tasks and responsibilities of all counsel are defined in detail at the outset. Other courts utilize a more generalized structure, appointing Lead or Co-Lead Counsel, with or without a PSC, and leaving the assignment of specific tasks and the creation of subcommittees or working groups

---

[39] *See, e.g.*, Pretrial Order No. 7: Order Appointing Plaintiffs' Lead Counsel, Plaintiffs' Steering Committee, and Government Coordinating Counsel, *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, and Prods. Liab. Litig.*, MDL No. 2672 (N.D. Cal. Jan. 21, 2016) (Breyer, J.), ECF No. 1084; Pretrial Order No. 3: Order Appointing Plaintiffs' Lead Counsel, Plaintiffs' Steering Committee, and Government Coordinating Counsel, *In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, and Prods. Liab. Litig.*, MDL No. 2777 (N.D. Cal June 19, 2017), ECF No. 173 (vesting in lead counsel the authority "to engage in settlement discussion with the Defendants, interact with the settlement master (once appointed), and enter into settlement; while noting that in carrying out these, and other responsibilities "the court expects lead counsel to consult and work collaboratively with the PSC in decision-making").

to those appointed. Applicants for leadership positions will often be asked by the court to propose specific structures and responsibilities, in more or less detail, tailored to their perception of the needs of the case. For example, applicants may be asked what is the appropriate number of members for the PSC, or the Interim Class Counsel group, given the nature and scope of the case and the number of defendants.

The level of detail with respect to structures, roles, and responsibilities in plaintiffs' leadership and Rule 23(g)(3) orders varies considerably. One contemporary trend is to leave specific assignments, within the court-appointed structure, to the discretion and authorization of the Lead or Co-Lead Counsel. This discretion is accompanied, however, by the use of detailed time and costs reporting protocols, adopted by the court through a pretrial order, which all court-appointed counsel and those working for the "common benefit" are required to follow. Such time and costs are then reported regularly, either to lead counsel, to a designee, or to the court on a periodic basis, to assure that all work is authorized and conducted in accordance with these pre-set guidelines.

One circumstance in which multiple Interim Class Counsel or separate PSCs are appointed to represent specific interests in a multiple class action situation is one in which early-defined subclasses may have overlapping or potentially conflicting claims. It is thus common, for example, for an MDL transferee court presiding over antitrust litigation to designate separate Interim Class Counsel or PSC or Reed/PSC structures for "direct purchasers" and "indirect" or "end" "purchasers." While there is a common core of discovery in which all purchaser groups are interested, their claims also diverge, with respect to the statutes and theories under which each is brought, and they will utilize separate expert damages analyses. It is thus considered generally

inappropriate for one counsel, firm, or group to represent all of these purchaser interests. In pretrial orders appointing lead, co-lead, and committees for each are the norm.[40]

The Judicial Panel on Multidistrict Litigation has sometimes created "hybrid" MDLs involving both personal injury claims and consumer/economic loss claims. Personal injury claims are typically asserted through individual actions, while the consumer/economic loss claims are most frequently brought as putative class actions. Recent examples of "hybrid" MDLs include the *Toyota Unintended Acceleration Litigation*[41] and the *GM Ignition Switch Litigation*.[42] When both types of proceedings are centralized before a single MDL transferee judge for coordinated case management, both advantages and challenges exist. Combining the tort and economic claims arising from a common fact pattern enables maximum efficiency in discovery, but must be accompanied by the recognition that tort plaintiffs' counsel, and consumer class counsel may have different perspectives and needs regarding the prioritization and emphasis of discovery. The discovery needed to prepare for tort trials and for consumer class certification, may, or may not be, identical.

In creating hybrid MDLs, the Judicial Panel has recognized that separate discovery tracks may be created to accommodate these different perspectives and priorities, without creating a preference for one type of claim over another.

---

[40] *See, e.g.*, Pretrial Order No. 6, *In re generic Digoxin & Doxycycline Antitrust Litig.*, MDL No. 2724 (E.D. Pa. Nov. 28, 2016) (appointing two attorneys to serve as co-lead counsel and twelve additional attorneys to comprise the PSC).
[41] Order No. 2: Adoption of Organization Plan and Appointment of Counsel at 5, *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, and Prods. Liab. Litig.*, MDL No. 2151 (C.D. Cal. May 14, 2010) (Selna, J.), ECF No. 159.
[42] Order No. 8 at 2, *In re Gen. Motors LLC Ignition Switch Litig.*, MDL No. 2543 (S.D.N.Y. Aug. 15, 2014) (Furman, J.), ECF No. 249.

BEST PRACTICE 11A: To assure that all tracks are managed effectively, a transferee court in a hybrid MDL should typically appoint different counsel to take primary responsibility for personal injury claims on the one hand, and economic loss claims on the other.

In the *In re Toyota Motor Corp. Unintended Acceleration* and *GM Ignition Switch* MDLs, the transferee court's initial conference orders appointed "Initial Conference Counsel" (*Toyota*) and "Temporary Lead Counsel" (*GM*), who were directed to develop and propose leadership structures that accommodated both personal injury and economic loss perspectives. Ultimately, while it found no "conflict" between the personal injury and economic loss (class) plaintiffs, the *Toyota* court's organization utilized separate lead counsel and committees for the personal injury and class components of the litigation; while the *GM* organization featured three Co-Leads, two with "primary responsibility" for class economic loss claims, and one with "primary responsibility" for the tort claims. The *GM* Executive Committee included counsel with both types of cases.[43]

BEST PRACTICE 11B: An MDL transferee judge who is appointed to manage individual and class claims concurrently should prioritize their judicial resources in assuring that both types of claims move forward appropriately, through discovery, pretrial disposition, settlement where appropriate, and trial, either in the MDL transferee court, through bellwether trials, or upon remand to districts of origin.[44]

In determining how to manage multiple types of cases, each competing to be prioritized, the court should become as informed as possible as to particular circumstances that might warrant the priority personal injury claims over economic loss claims, or vice versa. For example: Will prioritizing the consumer class claims enable a settlement to be reached, at an early stage, that may

---

[43] *See In re Toyota* Order No. 2, *supra* note 41; *In re Gen. Motors* Order No. 8, *supra* note 43.

[44] While the personal injury claims will most frequently have been brought as individual or multi-plaintiff complaints, without class allegations, in some MDLs personal injury class action complaints may also have been filed and must be factored into case management decisions. The Supreme Court has limited, but not prohibited, the use of class actions when appropriate in personal injury litigation. But the parties may agree, for example, to utilize the class action mechanism at the settlement stage to resolve such claims under ongoing court supervision. For a contemporary example, see *In re National Football League Players Concussion Injury Litigation [MDL No. 2323]*, 821 F.3d 410, *cert. denied* 137 S. Ct. 591, 607 (2016).

operate to reduce or minimize further injuries or deaths? In the *Toyota* case, for example, the consumer class action settlement was reached before personal injury bellwether trials were set to commence. The class settlement's features included both compensation and measures to address the alleged product concerns in the affected vehicles. In other cases, where the injuries and damages have already occurred, and are not recurring, it may be important to get death and injury claims set for early bellwether trials to inform the parties as to the merits and values of these cases.

Transferee courts managing hybrid MDLs are doing more than double duty. They are tasked not only with effectively managing each type of litigation that is before them, but in managing the necessary interactions and coordination between tort plaintiffs, class plaintiffs, and their respective leaderships. In such cases, friction, and even disputes, among leaders responsible for the respective types of claims may be inevitable; and, of course, the defendant or defendants themselves will have their own views as to whether and which types of claims should be prioritized.

The court can assist the lead counsel it appoints in coordinating with each other by more specifically delineating the duties and responsibilities of those it appoints in a hybrid MDL, as the *Toyota* court did. Another way to impose clarity at the outset is to utilize Rule 23(g)(3) Interim Class Counsel appointments on the "class side" of the hybrid MDL, while utilizing traditional MDL nomenclature and structure in appointing leadership for the "injury" track; such a leadership order would direct the Interim Class Counsel and tort lead counsel to work together on common discovery, to be responsible for the separate discovery necessary and appropriate to each type of claim, to coordinate scheduling proposals as much as possible between them, to propose schedules for each type of claim, and to pursue settlement, as appropriate, for their respective claims.

BEST PRACTICE 11C*: In a "hybrid" MDL, the court's order appointing a leadership structure should clearly delineate the roles and responsibilities for the class lead counsel and tort lead counsel and their respective committees.

An advantage to detailing specific roles and responsibilities within a leadership structure for specific counsel is that it may prevent or minimize ongoing tension or friction among attorneys who have been competitors in bringing the respective lawsuits that are now centralized before one court. Each counsel is given specific tasks and responsibilities and knows her role and place in the overall structure. The court may also consider whether it wishes to prescribe regular meetings or telephonic conferences of the leadership structure to assure ongoing communication and cooperation within that structure. Most courts have left such details up to self-ordering among designated counsel, seeing the advantage of ongoing flexibility, recognizing that the scope or nature of the litigation, and the need for particular tasks and responsibilities, will likely evolve over time, and trusting that it has appointed counsel to leadership roles who in actuality can, as the *Manual for Complex Litigation* recommends, "work cooperatively with others."

Some courts have viewed such active cooperation as less important in class actions because of the specificity of the Rule 23(g) class counsel appointment and the traditional notion of the class action as one self-contained litigation. The convergence of class actions and MDLs in recent years, however, has given rise to the recognition that the ability to communicate and cooperate with others in the leadership structure, and with non-appointed attorneys, remains important whether or not the case is convened as a multidistrict litigation or class actions, individual suits, or a "hybrid" mixture of both. Thus, while Interim Class Counsel appointed under Rule 23(g)(1) or (g)(3) are not fiduciaries toward other counsel (the duty of adequate representation, under Rule 23, runs to the class), the collegial characteristics that courts are advised to seek and enforce in appointing counsel to leadership roles in non-class MDLs still apply in some degree. For example, in mass

tort MDLs, when many lawyers represent individual clients, but only a small segment of them may be designated to serve in a leadership structure, courts have advised the designated leaders, in the language of the *Manual for Complex Litigation*, to "seek consensus . . . when making decisions that may have a critical impact on the litigation" and to "keep the other attorneys in the group advised of the progress of the litigation and consult them about decisions significantly affecting their clients."[45] Such admonitions are less acute in litigation comprised of multiple class actions: by its terms Rule 23(g) puts all lawyers filing such cases on notice that not all lawyers who bring class actions would be appointed to serve as class counsel.

This difference in the expected degree of involvement in leadership decisions by counsel not in leadership positions, as between mass tort MDLs and class action MDLs, creates a challenge in the situation of the "hybrid" MDL — consisting of a group of actions coordinated before a single judge, comprised of two different types of litigation, each with its own norms, culture, and expectations. In such cases, with the leadership structure that includes representatives of both the class and tort sides of the litigation, a premium is placed on counsel who are willing to understand and, within reason, accommodate the different norms, expectations, and styles of "class" and "mass tort" lawyers, especially since, as they occasionally occur, these concepts converge, whether in a class action settlement of mass tort claims, as in the recently approved *NFL Concussion Litigation*, or the "bellwether" trial of class claims or common questions on an "issue" class or statewide class basis, as a step toward an ultimate determination on multi-state or nationwide class claims.

---

[45] MANUAL (FOURTH), *supra* note 27, § 10.222.

# CHAPTER 4

## MEANS, FORMAT, AND CONTENTS OF SETTLEMENT NOTICE

The 2018 amendments to Federal Rule of Civil Procedure 23(c)(2)(B) continue to require the "best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort" for certified (b)(3) litigation classes. The amendments expressly recognize the practice and propriety of sending a single, combined notice advising the class of the proposed certification and settlement of (b)(3) classes under both Rule 23(e)(1) and (c)(2)(B).[46]

The Rule 23(c)(2)(B) notice provision was amended to keep up with evolving means of communication and the rulings in some cases permitting notice by electronic means, including emails, digital media, and social media. The amendments expressly permit notice to be made by one or a combination of means, including "United States mail, electronic means, or other appropriate means."

> **GUIDELINE 12**: In determining whether the "best practicable notice" can be sent in a reasonable manner, the court should focus on the means or combination of means most likely to be effective in the case.

No specific means of communication, including U.S. mail, is preferred across the board. Although the amendments acknowledge that U.S. mail may often be the preferred method, the use of electronic means as an alternative or an additional method of communication in certain circumstances may be more reliable and effective. The parties should explain the proposed method

---

[46] Subdivision (e)(1) (which applies to settlement classes) requires courts to "direct notice in a reasonable manner to all class members who would be bound by the proposal." The 2018 amendments apply the requirements of subdivision (c)(2)(B) to the notice of class-action settlements for (b)(3) classes ("For any class certified under Rule 23(b)(3)—*or upon ordering notice under Rule 23(e)(1) to a class proposed to be certified for purposes of settlement under Rule 23(b)(3)*—the court must direct to class members the best notice that is practicable under the circumstances . . . .") (emphasis added). The committee notes for the amendments to subdivision (e) explain that "notice required under Rule 23(e)(1) . . . should also satisfy the notice requirements of amended Rule 23(c)(2)(B) for a class to be certified under Rule 23(b)(3)[.]"

47

of giving notice and provide the court with a copy of each notice, including screen shots. Viewing the actual notice is especially important if electronic notice is used because contents viewed on screens assume a tone that varies with platform. Further, satisfying the Rule's requirement that the notice "must clearly and concisely state in plain, easily understood language" may involve context-specific consideration when dealing with electronic notice.

> BEST PRACTICE 12A: In assessing whether the particular means of sending notice is most effective, a court should take into account the following general considerations: (1) will the notice effectively reach the class; (2) will the notice actually come to the attention of the class; (3) are the notices informative and easy to understand; and (4) are all class members' rights and options easy to act upon?

Experts can calculate the percentage of a class that will be exposed to a notice by relying on generally accepted methodologies developed for advertising in non-litigation settings. A high percentage of class members can often reasonably be reached by a notice campaign. But if the identities of a significant percentage of class members are unknown, a campaign may require multiple types of notice (*e.g.*, direct notice, publication, digital, or broadcast).

Notices should be designed using contemporary design and layout techniques to command class members' attention when presented with the notice, regardless of delivery format. If possible, notice formats should be tested to demonstrate that they enhance — and do not diminish — class member response. The form and type of the notice, as well as the number of times the notice is seen, directly influence class member engagement.

Notices should contain all of the information required by Rule 23 and should be written in clear, concise, and easily understood language. Calls to action and other significant information, such as the mechanisms to file a claim, to request to be excluded, or to submit an objection, should be immediately and easily identifiable.

48

There should be no unnecessary hurdles for class members to exercise their rights to opt out, object, submit a claim, or make an appearance. All communications — websites, claim forms, and claims processes — should mirror commercial best practices where access to information and the ability to engage (in this case opt out, object, submit a claim, or make an appearance) are at a premium. These practices emphasize easily identifiable formats, buttons, and color schemes to ensure that mechanisms for participating are easily identifiable.

The parties and court should refer to the 10-page booklet on *Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide* issued by the Federal Judicial Center (FJC), which provides extensive guidance on the formatting and contents of class notices.[47]

> BEST PRACTICE 12B: When selecting a means of giving notice, the parties and court should begin by assessing the reliability of the method of communication typically used by the defendant in its regular business to notify its customers or clients.

In determining which means of communication is the most effective to send class notice, the parties and court should analyze each potential means of communication on a case-by-case (and sometimes intra-case) basis. Among the questions that should be asked are: Is it appropriate and feasible to use the proposed means of communication? How does the defendant regularly conduct communications with its customers during the normal course of business? How do class members generally receive and process information (email, U.S. mail, etc.)? Knowing how a company acquires a contact list, which it uses as part of its regular business, is critical because such lists vary in completeness, accuracy, and up-to-datedness.

---

[47] FED. JUDICIAL CTR., JUDGES' CLASS ACTION NOTICE AND CLAIMS PROCESS CHECKLIST AND PLAIN LANGUAGE GUIDE (2010), https://www.fjc.gov/sites/default/files/2012/NotCheck.pdf.

**GUIDELINE 13**: Best notice practicable includes individual notice to all members who can be identified through reasonable efforts. First-class U.S. mail may often be the preferred primary method of notice.

Historically, first-class U.S. mail was the default choice for direct individual class-member notice. In many cases, notification by mail will remain the most effective means of communication.

But new technology has dramatically altered how people communicate, most evident in younger generations. The Committee Note to amended Rule 23 underscores the effect of the cultural shift: "Counsel should consider which method or methods of giving notice will be most effective; simply assuming that the 'traditional' methods are best may disregard contemporary communication realities."[48]

For a variety of reasons, including cost, customer preference, and effectiveness in context, companies are shifting from direct U.S. mail communication to email or other electronic forms of communication to interact with their customers.

**BEST PRACTICE 13A**: Individual notice to class members often is practicable when the defendant communicates directly with class members as part of its regular business, either relying on U.S. mail postal addresses or email addresses.

The defendant in most class actions is a company or business. In most instances, the defendant maintains a contact database that is used for transactions or billing. Marketing and ongoing business-to-customer lists are typically reliable and usually provide up-to-date contact information. Nonetheless, it is important for the court and parties to understand how the customer list was acquired and maintained.

**BEST PRACTICE 13B**: The deliverability rate of communications with customers can offer a useful indicator of the effectiveness of the means of communication.

In certain circumstances, the parties can determine anticipated delivery rates of either direct mail or email based on prior sent communications. If a company uses customer lists as part of its

---

[48]

marketing or promotional efforts, and if it regularly updates customer contact data, then the company will typically have a good understanding of the deliverability rate of communications with its customers based on past commercial communications. If the deliverability rate, either by U.S. mail or by email, has been poor, there is little reason to believe that using that list or method would result in a better deliverability rate for class notice.

> BEST PRACTICE 13C: The parties and court should be skeptical about contact information that is compiled from free offerings, promotional sign-ups, or promotions.

The parties and court should be sensitive to the potential of bad customer data, which results when consumers provide inaccurate or partial contact information, such as providing false or secondary contact information when signing up for loyalty programs or free offerings in an attempt to minimize junk mail, either through U.S. mail or email. Studies have shown that consumers often give incorrect or incomplete information to a company simply to receive the offering, with no further intention of communicating with that company. Further, traditional and electronic notice deliverability may be limited if the data has been archived or knitted together from disparate sources, without previous database hygiene or updates.

> GUIDELINE 14: Notice by email communication may be the best individual notice practicable under the circumstances if shown to be reliable. It may also be a low-cost supplemental means of notice.

If a company or business regularly conducts its business relying on email communications, such communication may be more effective than U.S. mail. The response rates to electronic notice may be better than those to U.S. mail for class members familiar with a defendant organization. Further, if the email notice is formatted such that a recipient has the ability to quickly scan information in a preview pane on her laptop, tablet, or mobile device, email notice response may be augmented.

51

BEST PRACTICE 14A: The effectiveness of a notice sent by email can be assessed using available metrics. Among the metrics, the *read rate* is the most reliable.

Ascertaining the rate of notices communicated by email can be challenging. Fortunately, there are several recognized metrics that can provide useful information. It is important to understand what the metrics mean and what they are designed to measure.

The *delivered rate* does not report how many emails were sent to an inbox; it simply documents how many messages did not bounce back to the sender. Thus, the delivered rate will include all messages received by inbox placements, spam/junk box placements, and emails blocked without a bounce-back reply.

The *open rate* measures the proportion of messages opened.[49]

The *read rate* is similar to *open rate*, but far more useful, because it accounts for all emails viewed, regardless of image rendering. The *read rate* metric is important because it reveals how your subject lines are viewed by the recipients because the subject line is the first thing the recipients see when the message arrives in their mailbox.

The *ignore rate* is the total number of unread emails deleted out of total emails sent. A high *deleted-before-reading rate* is an indication of a failed campaign. A consistent high *deleted-before-reading rate* reveals problems with the list acquisition or management issues or lost interest in the overall email program.

The *bounce rate* is a hard, viable metric that records the proportion of emails returned to the sender because the recipient address is invalid.[50]

---

[49] Certain applications, such as Ghostery and PixelBlock, can block email tracking, while others can render images as a preview. This creates false positive results for email opens, which further distorts the open rate.
[50] Hard bounces (as opposed to soft bounces) occur if the recipient's email address no longer exists. A *soft-bounce* rate is also a viable metric, though it typically occurs if the recipient's inbox is full.

BEST PRACTICE 14B: The parties and court should consider the capacity and limits of email technology when evaluating its effectiveness for notice purposes.

The parties and court should consider the utility of email based on the demographics of the class and their ability and willingness to use email. Additionally, consideration should be given to the types of device typically used for viewing email, *i.e.*, cell phone, laptop, or desktop. Given that the majority of individuals read email on a smart phone or tablet, email must be personalized and optimized for quick scans on small screens. The wide variety of communication gadgets receiving email communications also raises challenges in determining its deliverability and read rates and effectiveness.

BEST PRACTICE 14C: If individual notice is not practicable or effective, the parties and court should consider notice by digital media to provide the most effective notice under the circumstances, either to supplement other means of notice or as a standalone means.

Individual notice may be impossible or cost-prohibitive under some circumstances. For example, identifying individual unknown customers in a consumer-beverage-labeling class action may be impossible. Similarly, incurring the cost of mailing notices when the individual settlement amount is less than the postage cost is not practicable. In these circumstances, online digital media notice can offer a more effective  means of communication than U.S mail or publication in print newspapers.

The effectiveness of digital media reaching a consumer is largely dependent on the consumer/class demographic in a given case. If the demographic is largely comprised of regular/habitual Internet users, then digital media should play a vital role in the notice program. Correspondingly, if the product or service in question is generally consumed by a less technologically-savvy demographic, then the marketing/notice program(s) should be tailored accordingly.

BEST PRACTICE 14D: The parties and court should consider whether the notice program is using an appropriate media mix that will reach the target population.

If individual notice is not practicable or effective, the parties and court should consider using electronic means. As noted above, the 2018 amendments to Rule 23(c)(2)(B) expressly envision sending notice by a combination of means, which could include direct individual and electronic notice, or might consist of several digital means of communication. Sending class notice using multiple digital media means makes particularly good sense if the attendant costs are relatively low.

American consumers represent many demographic and psychographic[51] groups. They do not all use media in the same way. Not everyone uses social media or even the Internet. Conversely, the number of people reading the print versions of newspapers is declining. Therefore, it is important to evaluate whether the suggested media program comports with the target population's media consumption habits.

GUIDELINE 15: Notice using social media, a subset of digital media, may be effective.

A notice program can include social media custom audiences. Custom audiences can include an audience of known class members. Care should be used to distinguish between demographic or psychographic-based custom audiences, and those based on known class members, such as using known class members' emails to specifically target those class members on social media.

According to a 2016 Pew Research Center study, Facebook continues to be America's most popular social networking platform by a substantial margin: Nearly eight in ten *online* Americans (79%) now use Facebook, more than double or triple the share that uses Twitter

---

[51] Study and classification of people according to their attitudes, aspirations, and other psychological criteria, especially in market research.

(24%), Pinterest (31%), Instagram (32%), or LinkedIn (29%).[52] On a total population basis (accounting for Americans who do not use the Internet at all), that means that 68% of all U.S. adults are Facebook users, while 28% use Instagram, 26% use Pinterest, 25% use LinkedIn, and 21% use Twitter.[53] These statistics are presented for illustration only and may change at rapid pace as consumer Internet habits change and as social media platforms, and the devices that connect to them, continue to evolve.

Social media can be used to supplement a traditional media notice program. Supplemental social media notice can be effective as a reminder notice or as a stand-alone method to increase awareness. Because not all consumers are online, or exclusively use a specific social platform, it is important to remember that custom audiences on social platforms are subsets of: (1) the larger class population (*e.g.*, product purchasers); and (2) a subset of the social platform audience.

Social media can be a useful and efficient tool to reach class members. If social media platforms are included in a notice program, the percentage of the audience using those platforms may be quantified if audience members are readily identifiable.[54]

> **GUIDELINE 16:** A court must evaluate the effectiveness of a notice program that relies on digital media, including social media, as a means to send notice.

The parties should provide the court with information about a notice program that will use electronic means to send notice. The notice program should be transparent, establishing an affected population base and citing all support and research tools used. All calculations for reaching assumptions should be disclosed. The notices should reach a significant percentage of class members, and the notice program should be scaled appropriately to the circumstance.

---

[52] Shannon Greenwood, Andrew Perrin & Maeve Duggan, *Social Media Update 2016*, PEW RES. CTR. (Nov. 11, 2016), http://www.pewinternet.org/2016/11/11/social-media-update-2016/.
[53] *Id.*
[54] Data on the reach of social media come from sources such as GfK, MRI, comScore, Nielsen, or, in some cases, the defendant's own data.

A notice program that has unusually low costs may be the product of shortcuts or may be inaccurately reported. Because of these concerns, low-bid programs may not be the most appropriate or effective notice programs.

> BEST PRACTICE 16A: If notice is sent by digital media, the parties should evaluate and quantify the percentage of class members that the notice will reach.

The notice plan should include an analysis of the makeup of the class. The target audience should be defined and quantified. This can be established through using a known group of customers, or it can be based on a *proxy-media* definition. Both methods have been accepted by the courts and, more generally, by the advertising industry, to determine a population base. A third party is necessary to validate the metrics, particularly because online notice programs may be diminished by viewability issues, consumer distraction, and ad fraud.

If the total population base (or number of class members) is unknown, it is accepted advertising and communication practice to use a *proxy-media* definition, which is based on accepted media research tools and methods that will allow the notice expert to establish that number. The percentage of the population reached by supporting media can then be established.

The effectiveness of the means of communication is measured by *reach* and *frequency*. *Reach* is the number or percent of people exposed at least once to an advertising schedule over a specific period of time. *Net reach* excludes audience duplication across media groups.

*Frequency* is the average number of times that the average person is exposed to an advertising schedule in the specific period of time. It is important to note that there will clearly be people exposed fewer and more times to a message than what is reported as the average frequency. For example, if the average frequency is 3 times (which is generally regarded as necessary to generate action), there are people who will not have been exposed to the message at all, while, at

the same time, there will be those who saw the message once and some who saw it 10 or more times, thus resulting in the above-referenced 3 times average.

If multiple electronic means of sending notice are used, reach figures for separate dissemination methods cannot simply be added to determine reach for the overall notice program. Total audience must be calculated for each publication and the net reach must be calculated for a combination of publications. The reach calculation removes overlap between those people exposed to two or more dissemination methods (*e.g.*, a person who receives a mailing may also be exposed to the notice in a publication).

> BEST PRACTICE 16B: A low *lifetime frequency cap* (three or fewer) is ordinarily an insufficient level at which to expose a target audience sufficiently to the message.

Unlike an average frequency, a *lifetime frequency cap* is a tool to limit digital media transmissions, which is used to control the number of times a person is exposed to an Internet advertisement. It is not a measurement. A frequency cap enables advertisers to guard against "wast[ed] impressions on individuals who visit a specific website" frequently, but setting the cap too low may defeat the effectiveness of the banner advertisement because many who are "reached" by the banner—once or twice, for example—may not have noticed or engaged with the banner.[55] Frequency capping is typically accomplished using Internet browser cookies, which remember the number of times a particular ad appears. Commentators warn that "excessive 'frequency capping'" may result in artificially inflated "reach" forecasts because measurement tools will "assume the ad can be spread more broadly (if possible) in order to meet the budgeted number of impressions and can result in a higher hypothetical reach for a low budget."[56] What results sometimes is an

---

[55] Cameron Azari & Stephanie Fiereck, *What You Need to Know About Frequency Capping in Online Class Action Notice Programs*, BLOOMBERGBNA: CLASS ACTION LITIG. REP. (June 13, 2014), http://www.hilsoft.com/Docs/Class-Action-Reach-Frequency.pdf.
[56] *Id.*

ineffective campaign marked by low response rates. Accordingly, a notice program that includes an average frequency of less than three advertisement exposures should be carefully scrutinized and heavily vetted.

> BEST PRACTICE 16C: The parties should provide the court with an analysis of the metrics that the parties rely on to determine the effectiveness of the means of class notice. If a notice program is reporting reach, it must be supported and validated in a transparent manner.

The estimated scope of the intended notice program should be defined as a validated reach statistic. Media research companies offer services to properly quantify the reach to targeted consumers. These research services provide detailed insight on consumer behaviors and media consumption habits of various populations. These services can calculate net audience reached and should disclose the percent of the class using various media, including television (network, cable, or digital), radio (terrestrial or online), online and social or mobile media.

Several media research tools are available to determine *reach* and *frequency* and filtrating invalid traffic.

- GfK Mediamark Research and Intelligence LLC provides demographic, brand preference, and media-use habits. It also reports on print reach. It does not report on net reach for an online or a social media program. MRI can report on net audience reach for print programs.

- Scarborough reports on newspaper reach and can report on net audience reach for newspaper.

- comScore reports on digital media use, and through various reach and frequency tools, reports net audience reach online including certain social media.

- Nielsen reports on television, radio, and online. It can report net reach through certain reach and frequency tools.

- Both Telmar and IMS have media mixing tools. These software platforms combine audience reach data from the various sources listed above and can report one net audience reach. Mixing tools are like calculators and rely on the user to input *validated* reach data from one of the sources above.

- Integral Ad Science reports on bot fraud and non-human traffic. They are also able to stop impressions from limiting or removing wasted media dollars.

BEST PRACTICE 16D: Social media metrics, such as *clicks*, should not be used as a substitute for a validated reach statistic.

*Clicks* may not be an accurate or reliable performance metric.[57]

Third-party validation is critical to provide the court with an accurate representation of the entire population that is reached. In this rapidly evolving electronic-media world, it is crucial to investigate and evaluate a wide range of social media metrics, including shares, likes, and clicks, while recognizing that the importance of any of these metrics is limited as a stand-alone measure.

BEST PRACTICE 16E: The parties and court should monitor the effectiveness of class notice sent by digital media throughout the notice period.

A notice program should allow for an ongoing analysis of its effectiveness. If multiple formats are used, they should be evaluated and their effectiveness analyzed to minimize factors that diminish class members' ability to exercise their rights. Steps should be taken to ensure that the notice program provides validated impressions (in view, right target audience, right geography, and human traffic) to effectively measure the success of the notice in reaching class members. Any technical measures to limit the number of times a class member will be exposed to the notice should be disclosed and justified with respect to effectiveness. The destination of notices, websites, applications, or network flagship site should be disclosed. The notice program should report on its implementation and disclose the specific sites on which the notice ran. Reporting that a notice ran on a network of sites is insufficient because these networks include sites that vary significantly in popularity. Different websites and different versions of a digital notice can have substantial impact

---

[57] Clicks may include non-human traffic (bots or "scrapers," which are groups of bots), accidental clicks, or clicks that abandon the action without visiting the website. Clicks are not necessarily accurate or representative of how many people saw the advertisement.

on class member engagement and response rates. In certain examples, responses are reduced to a fraction on what could otherwise be obtained if the digital notice campaign were managed.

Website selection, changing ad sizes, word selection, and placement of a court logo on the advertisement are all examples of changes that influence response rates and engagement. Notices can appear in premium positions alongside navigational bars or embedded within articles and editorials. They can expand or take over the screen to call attention to the importance of the content. The length of time the notice appears on the website is important. Without monitoring these, it is possible to provide the illusion of notice without meaningful opportunity for class members to respond.

> **GUIDELINE 17**: A class-notice expert or professional claims administrator can assist the parties and court in ascertaining the effectiveness of using digital media to send notice.

Determining whether notice by means of digital media is most likely to be effective requires an understanding of how media is used and, most importantly, how successful it is in reaching targeted populations. Reach calculation methodology is commonly practiced in advertising and media-planning disciplines, and the expert or claims administrator should be competent to assess the reach of class-action notification. It is important to note, however, that the media landscape is so broad that training and experience in one area does not imply expertise in developing and implementing programs involving multiple forms of media.

A class-notice expert or professional claims administrator should provide evidence demonstrating that the proposed means of electronic notice will: (1) provide the "best practicable" notice; (2) effectively reach a significant percentage of the class; and (3) provide the class members an adequate opportunity to exercise their rights and that those opportunities are not diminished by

60

the structure of the plan. The notice expert should have training or experience in developing and evaluating communications programs that integrate the forms of notice that are being proposed.

> BEST PRACTICE 17A: The parties and court should ensure that the class notice expert or claims administrator is competent to assist them in evaluating the effectiveness of notice by digital media.

In assessing the qualifications of a class-notice expert or professional claims administrator, the parties and court may consider the expert's or administrator's: (1) experience or education with the specific types of media under consideration; (2) professional experience with respect to advertising; (3) membership in an advertising-standards committee; (4) any professional certifications; (5) any credentials or additional training with respect to advertising using both traditional forms and digital; (6) requisite skills to provide an opinion on digital advertising; (7) specific knowledge of current advertising industry, emerging trends, and technology; and (8) any prior experience testifying about class action notice.

> BEST PRACTICE 17B: The parties and court should carefully review the class-notice expert's or administrator's methodology in concluding that notice sent by an electronic means is most effective.

Communication practices and standards evolve alongside new technologies. In a non-litigation setting, this includes the integration of different types of media and evaluation of those media's effectiveness to ensure the best practicable communications program and highest return on investment.

The methodologies and analysis adopted by the class-notice expert or administrator should be consistent with generally-accepted practices and methodologies adopted for developing and evaluating communications programs in a non-litigation setting. With respect to notice plans that integrate traditional and digital media, these methodologies and standards are promulgated by the Media Rating Council. These methodologies and standards provide a conservative, commonly-

accepted, standard way of defining and measuring advertising exposure that is independent of the media being used.

> **GUIDELINE 18:** Language text and formatting may appear differently, depending on the medium it is viewed on. The differences can be sufficiently substantial to degrade the effectiveness of the communication.

The 2018 amendments to Rule 23 do not revise the requirements that the information required by the rule must be stated "clearly and concisely . . . in plain, easily understood language."[58]

The parties should provide the court with demonstrations of how notices will appear on various platforms  — such as smart phones, personal computers, and tablets — to determine whether they are consistent with the guidance provided in the FJC booklet.

> **BEST PRACTICE 18A:** Notices sent by digital media should be formatted appropriately for maximum effectiveness that is consistent with the FJC guidance.

Readers may not read a message on digital media unless they know immediately that it is relevant to them. Drawing reader attention through subheadings and section headers breaks up the content and allows readers to get the most relevant information in a quick scan of the notice. Summary notices should be limited to 500 to 900 words, with links to the full notice.

Headlines should be kept short and succinct. Do not include the entire class definition in the headline of a summary notice or banner notice. Although each component of the definition may be important to the reader, most readers with short attention spans will avoid a wordy headline. A short and broader headline that includes one or two keywords will catch the reader's attention. If more detail regarding the class is necessary, it can be added in the first or second

---

[58] FED. R. CIV. P. 23 committee note to the proposed 2018 amendment. The Federal Judicial Center's guidance on class action notices provides helpful instructions about drafting and formatting these notices. *See generally* JUDGES' CLASS ACTION NOTICE AND CLAIMS PROCESS CHECKLIST, *supra,* note 47.

paragraph of body text or in a subhead. When crafting the headline, limit the use of dates or other information that can instead be included in the body text.

The text of banner notices should be under 200 characters, including spaces, in order to be readable and eye catching. Banner notice text should not be bogged down with detail. Only the basics should be included. Although there may be key qualifying information that relates to the class it's better to be broad. The goal is to get the readers to the settlement website where they can review the summary notice and other relevant information to determine whether they are included in the class.

The flow of text on the page is also important. Ideally, a line of copy shouldn't span more than 50–60 characters across a column. If a line of text is too long a reader's eyes will have difficulty focusing on the text. Where necessary use more columns that are narrower as opposed to one very wide column. This enables ease of reading.

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

## THANK YOU TO OUR SPONSORS!

The Bolch Judicial Institute gratefully acknowledges the financial support of its sponsors.  The Institute's law-reform conferences and other related programs rely on the generosity of sponsors' donations.

## FOUNDING SPONSOR

Garden City Group

## GOLD SPONSORS

Ankura Consulting
Bayer Corporation
Dechert LLP
Garrestson Group
Huntington Bank
Western Alliance Bank

## SILVER SPONSORS

| | |
|---|---|
| Altec, Inc. | Lincoln Financial Group |
| DiCello Levitt & Casey | Medtronic |
| Eli Lilly & Company | Merck |
| Endo International PLC | The Moskowitz Law Firm |
| Exxon Mobil | Motley Rice LLC |
| GE's Power & Water | NastLaw LLC |
| Girard Gibbs LLP | Pfizer, Inc. |
| GlaxoSmithKline | Podhurst Orseck PA |
| Home Depot | Seeger Weiss LLP |
| David W. Ichel, X-Dispute LLC | Skadden Arps Slate Meagher & Flom LLP |
| Kessler Topaz Meltzer & Check LLP | State Farm Insurance |
| King & Spalding | Stone Pigman Walther & Wittmann LLC |
| Kirkland & Ellis LLP | Toyota Motor North America, Inc. |
| Lieff Cabraser Heimann & Bernstein LLP | |

## PROPOSED AMENDMENTS TO THE
## FEDERAL RULES OF CIVIL PROCEDURE[1]

10          FEDERAL RULES OF CIVIL PROCEDURE

1  **Rule 23.  Class Actions**

2                      \* \* \* \* \*

3  **(c)    Certification Order; Notice to Class Members;**
4  **Judgment; Issues Classes; Subclasses.**

5                      \* \* \* \* \*

6        **(2)    *Notice.***

7                      \* \* \* \* \*

8              **(B)    *For (b)(3) Classes.*   For any class certified

9                    under Rule 23(b)(3), ──or upon ordering

10                   notice under Rule 23(e)(1) to a class

11                   proposed to be certified for purposes of

12                   settlement under Rule 23(b)(3)──the court

13                   must direct to class members the best notice

14                   that is practicable under the circumstances,

15                   including individual notice to all members

16                   who can be identified through reasonable

17                   effort.  The notice may be by one or more

18                   of the following: United States mail,

---

[1]   New material is underlined; matter to be omitted is lined through.

FEDERAL RULES OF CIVIL PROCEDURE          11

19              electronic   means,   or   other   appropriate

20              means.     The   notice   must   clearly   and

21              concisely state in plain, easily understood

22              language:

23                              * * * * *

24    **(e)**   **Settlement, Voluntary Dismissal, or Compromise.**

25              The claims, issues, or defenses of a certified class—or

26              a class proposed to be certified for purposes of

27              settlement—may be settled, voluntarily dismissed, or

28              compromised only with the court's approval.   The

29              following procedures apply to a proposed settlement,

30              voluntary dismissal, or compromise:

31         **(1)**   ***Notice to the Class***

32              **(A)**   *Information That Parties Must Provide to*

33                    *the Court.*   The parties must provide the

34                    court with information sufficient to enable

12          FEDERAL RULES OF CIVIL PROCEDURE

35          it to determine whether to give notice of the

36          proposal to the class.

37     **(B)**  *Grounds for a Decision to Give Notice.*

38          The court must direct notice in a reasonable

39          manner to all class members who would be

40          bound by the proposal if giving notice is

41          justified by the parties' showing that the

42          court will likely be able to:

43          **(i)**  approve     the     proposal     under

44               Rule 23(e)(2); and

45          **(ii)**  certify   the   class   for   purposes   of

46               judgment on the proposal.

47   **(2)**  ***Approval of the Proposal.***  If the proposal would

48        bind class members, the court may approve it

49        only after a hearing and only on finding that it is

50        fair, reasonable, and adequate after considering

51        whether:

FEDERAL RULES OF CIVIL PROCEDURE            13

52          **(A)**   the class representatives and class counsel

53                  have adequately represented the class;

54          **(B)**   the proposal was negotiated at arm's length;

55          **(C)**   the relief provided for the class is adequate,

56                  taking into account:

57              **(i)**   the costs, risks, and delay of trial and

58                      appeal;

59              **(ii)**  the effectiveness of any proposed

60                      method of distributing relief to the

61                      class, including the method of

62                      processing class-member claims;

63              **(iii)** the terms of any proposed award of

64                      attorney's fees, including timing of

65                      payment; and

66              **(iv)**  any agreement required to be

67                      identified under Rule 23(e)(3); and

14          FEDERAL RULES OF CIVIL PROCEDURE

68          **(D)**  the proposal treats class members equitably

69          relative to each other.

70    **(3)**  ***Identifying Agreements.***  The parties seeking

71    approval must file a statement identifying any

72    agreement made in connection with the proposal.

73    **(4)**  ***New Opportunity to Be Excluded.***  If the class

74    action was previously certified under

75    Rule 23(b)(3), the court may refuse to approve a

76    settlement unless it affords a new opportunity to

77    request exclusion to individual class members

78    who had an earlier opportunity to request

79    exclusion but did not do so.

80    **(5)**  ***Class-Member Objections.***

81          **(A)**  *In General.*  Any class member may object

82          to the proposal if it requires court approval

83          under this subdivision (e)~~; the objection~~

84          ~~may be withdrawn only with the court's~~

FEDERAL RULES OF CIVIL PROCEDURE          15

85          ~~approval~~.  The objection must state whether

86          it applies only to the objector, to a specific

87          subset of the class, or to the entire class,

88          and also state with specificity the grounds

89          for the objection.

90     **(B)**  *Court Approval Required for Payment in*

91          *Connection with an Objection.*   Unless

92          approved by the court after a hearing, no

93          payment or other consideration may be

94          provided in connection with:

95          **(i)**   forgoing or withdrawing an objection,

96               or

97          **(ii)**  forgoing, dismissing, or abandoning

98               an appeal from a judgment approving

99               the proposal.

100    **(C)**  *Procedure for Approval After an Appeal.*  If

101         approval under Rule 23(e)(5)(B) has not

16          FEDERAL RULES OF CIVIL PROCEDURE

102                been obtained before an appeal is docketed

103                in the court of appeals, the procedure of

104                Rule 62.1 applies while the appeal remains

105                pending.

106    **(f)**    **Appeals.**  A court of appeals may permit an appeal

107                from an order granting or denying class-action

108                certification under this rule, but not from an order

109                under Rule 23(e)(1).if a petition for permission to

110                appeal is filed  A party must file a petition for

111                permission to appeal with the circuit clerk within 14

112                days after the order is entered, or within 45 days

113                after the order is entered if any party is the United

114                States, a United States agency, or a United States

115                officer or employee sued for an act or omission

116                occurring in connection with duties performed on

117                the United States' behalf.  An appeal does not stay

FEDERAL RULES OF CIVIL PROCEDURE          17

118          proceedings in the district court unless the district

119          judge or the court of appeals so orders.

120          * * * * *

## Committee Note

Rule 23 is amended mainly to address issues related to settlement, and also to take account of issues that have emerged since the rule was last amended in 2003.

**Subdivision (c)(2).**   As amended, Rule 23(e)(1) provides that the court must direct notice to the class regarding a proposed class-action settlement only after determining that the prospect of class certification and approval of the proposed settlement justifies giving notice. This decision has been called "preliminary approval" of the proposed class certification in Rule 23(b)(3) actions.  It is common to send notice to the class simultaneously under both Rule 23(e)(1) and Rule 23(c)(2)(B), including a provision for class members to decide by a certain date whether to opt out.  This amendment recognizes the propriety of this combined notice practice.

Subdivision (c)(2) is also amended to recognize contemporary methods of giving notice to class members. Since *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974), interpreted the individual notice requirement for class members in Rule 23(b)(3) class actions, many courts have read the rule to require notice by first class mail in every case.  But technological change since 1974 has introduced other means of communication that may sometimes provide a reliable additional or alternative method for giving notice.

18          FEDERAL RULES OF CIVIL PROCEDURE

Although first class mail may often be the preferred primary method of giving notice, courts and counsel have begun to employ new technology to make notice more effective.  Because there is no reason to expect that technological change will cease, when selecting a method or methods of giving notice courts should consider the capacity and limits of current technology, including class members' likely access to such technology.

Rule 23(c)(2)(B) is amended to take account of these changes.  The rule continues to call for giving class members "the best notice that is practicable."  It does not specify any particular means as preferred.  Although it may sometimes be true that electronic methods of notice, for example email, are the most promising, it is important to keep in mind that a significant portion of class members in certain cases may have limited or no access to email or the Internet.

Instead of preferring any one means of notice, therefore, the amended rule relies on courts and counsel to focus on the means or combination of means most likely to be effective in the case before the court.  The court should exercise its discretion to select appropriate means of giving notice.  In providing the court with sufficient information to enable it to decide whether to give notice to the class of a proposed class-action settlement under Rule 23(e)(1), it would ordinarily be important to include details about the proposed method of giving notice and to provide the court with a copy of each notice the parties propose to use.

In determining whether the proposed means of giving notice is appropriate, the court should also give careful attention to the content and format of the notice and, if

notice is given under both Rule 23(e)(1) and Rule 23(c)(2)(B), any claim form class members must submit to obtain relief.

Counsel should consider which method or methods of giving notice will be most effective; simply assuming that the "traditional" methods are best may disregard contemporary communication realities. The ultimate goal of giving notice is to enable class members to make informed decisions about whether to opt out or, in instances where a proposed settlement is involved, to object or to make claims. Rule 23(c)(2)(B) directs that the notice be "in plain, easily understood language." Means, format, and content that would be appropriate for class members likely to be sophisticated, for example in a securities fraud class action, might not be appropriate for a class having many members likely to be less sophisticated. The court and counsel may wish to consider the use of class notice experts or professional claims administrators.

Attention should focus also on the method of opting out provided in the notice. The proposed method should be as convenient as possible, while protecting against unauthorized opt-out notices.

**Subdivision (e).** The introductory paragraph of Rule 23(e) is amended to make explicit that its procedural requirements apply in instances in which the court has not certified a class at the time that a proposed settlement is presented to the court. The notice required under Rule 23(e)(1) then should also satisfy the notice requirements of amended Rule 23(c)(2)(B) for a class to be certified under Rule 23(b)(3), and trigger the class members' time to request exclusion. Information about the

20          FEDERAL RULES OF CIVIL PROCEDURE

opt-out rate could then be available to the court when it considers final approval of the proposed settlement.

**Subdivision (e)(1).**  The decision to give notice of a proposed settlement to the class is an important event.  It should be based on a solid record supporting the conclusion that the proposed settlement will likely earn final approval after notice and an opportunity to object.  The parties must provide the court with information sufficient to determine whether notice should be sent.  At the time they seek notice to the class, the proponents of the settlement should ordinarily provide the court with all available materials they intend to submit to support approval under Rule 23(e)(2) and that they intend to make available to class members.  The amended rule also specifies the standard the court should use in deciding whether to send notice—that it likely will be able both to approve the settlement proposal under Rule 23(c)(2) and, if it has not previously certified a class, to certify the class for purposes of judgment on the proposal.

The subjects to be addressed depend on the specifics of the particular class action and proposed settlement.  But some general observations can be made.

One key element is class certification.  If the court has already certified a class, the only information ordinarily necessary is whether the proposed settlement calls for any change in the class certified, or of the claims, defenses, or issues regarding which certification was granted.  But if a class has not been certified, the parties must ensure that the court has a basis for concluding that it likely will be able, after the final hearing, to certify the class.  Although the standards for certification differ for settlement and

FEDERAL RULES OF CIVIL PROCEDURE          21

litigation purposes, the court cannot make the decision regarding the prospects for certification without a suitable basis in the record.  The ultimate decision to certify the class for purposes of settlement cannot be made until the hearing on final approval of the proposed settlement.  If the settlement is not approved, the parties' positions regarding certification for settlement should not be considered if certification is later sought for purposes of litigation.

Regarding the proposed settlement, many types of information might appropriately be provided to the court. A basic focus is the extent and type of benefits that the settlement will confer on the members of the class. Depending on the nature of the proposed relief, that showing may include details of the contemplated claims process and the anticipated rate of claims by class members.   Because some funds are frequently left unclaimed, the settlement agreement ordinarily should address the distribution of those funds.

The parties should also supply the court with information about the likely range of litigated outcomes, and about the risks that might attend full litigation. Information about the extent of discovery completed in the litigation or in parallel actions may often be important.  In addition, as suggested by Rule 23(b)(3)(A), the parties should provide information about the existence of other pending or anticipated litigation on behalf of class members involving claims that would be released under the proposal.

The proposed handling of an award of attorney's fees under Rule 23(h) ordinarily should be addressed in the parties' submission to the court.  In some cases, it will be important to relate the amount of an award of attorney's

22          FEDERAL RULES OF CIVIL PROCEDURE

fees to the expected benefits to the class. One way to address this issue is to defer some or all of the award of attorney's fees until the court is advised of the actual claims rate and results.

Another topic that normally should be considered is any agreement that must be identified under Rule 23(e)(3).

The parties may supply information to the court on any other topic that they regard as pertinent to the determination whether the proposal is fair, reasonable, and adequate. The court may direct the parties to supply further information about the topics they do address, or to supply information on topics they do not address. The court should not direct notice to the class until the parties' submissions show it is likely that the court will be able to approve the proposal after notice to the class and a final approval hearing.

**Subdivision (e)(2).** The central concern in reviewing a proposed class-action settlement is that it be fair, reasonable, and adequate. Courts have generated lists of factors to shed light on this concern. Overall, these factors focus on comparable considerations, but each circuit has developed its own vocabulary for expressing these concerns. In some circuits, these lists have remained essentially unchanged for thirty or forty years. The goal of this amendment is not to displace any factor, but rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal.

A lengthy list of factors can take on an independent life, potentially distracting attention from the central

concerns that inform the settlement-review process. A circuit's list might include a dozen or more separately articulated factors. Some of those factors—perhaps many—may not be relevant to a particular case or settlement proposal. Those that are relevant may be more or less important to the particular case. Yet counsel and courts may feel it necessary to address every factor on a given circuit's list in every case. The sheer number of factors can distract both the court and the parties from the central concerns that bear on review under Rule 23(e)(2).

This amendment therefore directs the parties to present the settlement to the court in terms of a shorter list of core concerns, by focusing on the primary procedural considerations and substantive qualities that should always matter to the decision whether to approve the proposal.

Approval under Rule 23(e)(2) is required only when class members would be bound under Rule 23(c)(3). Accordingly, in addition to evaluating the proposal itself, the court must determine whether it can certify the class under the standards of Rule 23(a) and (b) for purposes of judgment based on the proposal.

**Paragraphs (A) and (B).** These paragraphs identify matters that might be described as "procedural" concerns, looking to the conduct of the litigation and of the negotiations leading up to the proposed settlement. Attention to these matters is an important foundation for scrutinizing the substance of the proposed settlement. If the court has appointed class counsel or interim class counsel, it will have made an initial evaluation of counsel's capacities and experience. But the focus at this point is on

24            FEDERAL RULES OF CIVIL PROCEDURE

the actual performance of counsel acting on behalf of the class.

The information submitted under Rule 23(e)(1) may provide a useful starting point in assessing these topics. For example, the nature and amount of discovery in this or other cases, or the actual outcomes of other cases, may indicate whether counsel negotiating on behalf of the class had an adequate information base. The pendency of other litigation about the same general subject on behalf of class members may also be pertinent. The conduct of the negotiations may be important as well. For example, the involvement of a neutral or court-affiliated mediator or facilitator in those negotiations may bear on whether they were conducted in a manner that would protect and further the class interests. Particular attention might focus on the treatment of any award of attorney's fees, with respect to both the manner of negotiating the fee award and its terms.

**Paragraphs (C) and (D).** These paragraphs focus on what might be called a "substantive" review of the terms of the proposed settlement. The relief that the settlement is expected to provide to class members is a central concern. Measuring the proposed relief may require evaluation of any proposed claims process; directing that the parties report back to the court about actual claims experience may be important. The contents of any agreement identified under Rule 23(e)(3) may also bear on the adequacy of the proposed relief, particularly regarding the equitable treatment of all members of the class.

Another central concern will relate to the cost and risk involved in pursuing a litigated outcome. Often, courts may need to forecast the likely range of possible classwide

FEDERAL RULES OF CIVIL PROCEDURE          25

recoveries and the likelihood of success in obtaining such results.  That forecast cannot be done with arithmetic accuracy, but it can provide a benchmark for comparison with the settlement figure.

If the class has not yet been certified for trial, the court may consider whether certification for litigation would be granted were the settlement not approved.

Examination of the attorney-fee provisions may also be valuable in assessing the fairness of the proposed settlement.  Ultimately, any award of attorney's fees must be evaluated under Rule 23(h), and no rigid limits exist for such awards.  Nonetheless, the relief actually delivered to the class can be a significant factor in determining the appropriate fee award.

Often it will be important for the court to scrutinize the method of claims processing to ensure that it facilitates filing legitimate claims.  A claims processing method should deter or defeat unjustified claims, but the court should be alert to whether the claims process is unduly demanding.

Paragraph (D) calls attention to a concern that may apply to some class action settlements—inequitable treatment of some class members vis-a-vis others.  Matters of concern could include whether the apportionment of relief among class members takes appropriate account of differences among their claims, and whether the scope of the release may affect class members in different ways that bear on the apportionment of relief.

26          FEDERAL RULES OF CIVIL PROCEDURE

**Subdivisions (e)(3) and (e)(4).**  Headings are added to subdivisions (e)(3) and (e)(4) in accord with style conventions.  These additions are intended to be stylistic only.

**Subdivision (e)(5).**  The submissions required by Rule 23(e)(1) may provide information critical to decisions whether to object or opt out.  Objections by class members can provide the court with important information bearing on its determination under Rule 23(e)(2) whether to approve the proposal.

**Subdivision (e)(5)(A).**  The rule is amended to remove the requirement of court approval for every withdrawal of an objection.  An objector should be free to withdraw on concluding that an objection is not justified.  But Rule 23(e)(5)(B)(i) requires court approval of any payment or other consideration in connection with withdrawing the objection.

The rule is also amended to clarify that objections must provide sufficient specifics to enable the parties to respond to them and the court to evaluate them.  One feature required of objections is specification whether the objection asserts interests of only the objector, or of some subset of the class, or of all class members.  Beyond that, the rule directs that the objection state its grounds "with specificity."  Failure to provide needed specificity may be a basis for rejecting an objection.  Courts should take care, however, to avoid unduly burdening class members who wish to object, and to recognize that a class member who is not represented by counsel may present objections that do not adhere to technical legal standards.

**Subdivision (e)(5)(B).**   Good-faith objections can assist the court in evaluating a proposal under Rule 23(e)(2).   It is legitimate for an objector to seek payment for providing such assistance under Rule 23(h).

But some objectors may be seeking only personal gain, and using objections to obtain benefits for themselves rather than assisting in the settlement-review process.   At least in some instances, it seems that objectors—or their counsel—have sought to obtain consideration for withdrawing their objections or dismissing appeals from judgments approving class settlements.   And class counsel sometimes may feel that avoiding the delay produced by an appeal justifies providing payment or other consideration to these objectors.   Although the payment may advance class interests in a particular case, allowing payment perpetuates a system that can encourage objections advanced for improper purposes.

The court-approval requirement currently in Rule 23(e)(5) partly addresses this concern.   Because the concern only applies when consideration is given in connection with withdrawal of an objection, however, the amendment requires approval under Rule 23(e)(5)(B)(i) only when consideration is involved.   Although such payment is usually made to objectors or their counsel, the rule also requires court approval if a payment in connection with forgoing or withdrawing an objection or appeal is instead to another recipient.   The term "consideration" should be broadly interpreted, particularly when the withdrawal includes some arrangements beneficial to objector counsel.   If the consideration involves a payment to counsel for an objector, the proper procedure is by motion under Rule 23(h) for an award of fees.

28          FEDERAL RULES OF CIVIL PROCEDURE

Rule 23(e)(5)(B)(ii) applies to consideration in connection with forgoing, dismissing, or abandoning an appeal from a judgment approving the proposal.  Because an appeal by a class-action objector may produce much longer delay than an objection before the district court, it is important to extend the court-approval requirement to apply in the appellate context.  The district court is best positioned to determine whether to approve such arrangements; hence, the rule requires that the motion seeking approval be made to the district court.

Until the appeal is docketed by the circuit clerk, the district court may dismiss the appeal on stipulation of the parties or on the appellant's motion.  See Fed. R. App. P. 42(a).  Thereafter, the court of appeals has authority to decide whether to dismiss the appeal.  This rule's requirement of district court approval of any consideration in connection with such dismissal by the court of appeals has no effect on the authority of the court of appeals to decide whether to dismiss the appeal.  It is, instead, a requirement that applies only to providing consideration in connection with forgoing, dismissing, or abandoning an appeal.

**Subdivision (e)(5)(C).**  Because the court of appeals has jurisdiction over an objector's appeal from the time that it is docketed in the court of appeals, the procedure of Rule 62.1 applies.  That procedure does not apply after the court of appeals' mandate returns the case to the district court.

**Subdivision (f).**  As amended, Rule 23(e)(1) provides that the court must direct notice to the class regarding a

FEDERAL RULES OF CIVIL PROCEDURE            29

proposed class-action settlement only after determining that the prospect of eventual class certification justifies giving notice.  But this decision does not grant or deny class certification, and review under Rule 23(f) would be premature.  This amendment makes it clear that an appeal under this rule is not permitted until the district court decides whether to certify the class.

The rule is also amended to extend the time to file a petition for review of a class-action certification order to 45 days whenever a party is the United States, one of its agencies, or a United States officer or employee sued for an act or omission occurring in connection with duties performed on the United States' behalf.  In such a case, the extension applies to a petition for permission to appeal by any party.  The extension recognizes—as under Rules 4(i) and 12(a) and Appellate Rules 4(a)(1)(B) and 40(a)(1)— that the United States has a special need for additional time in regard to these matters.  It applies whether the officer or employee is sued in an official capacity or an individual capacity.  An action against a former officer or employee of the United States is covered by this provision in the same way as an action against a present officer or employee.  Termination of the relationship between the individual defendant and the United States does not reduce the need for additional time.