FILED ak
RECEIVED
JAN 17 2024
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

IN RE LITHIUM ION BATTERIES ) Case No. 13-MD-02420 YGR (TERM)
ANTITRUST LITIGATION ) MDL 2420

### MOTION TO VACATE ORDERS AT ENTRIES 2767, 2772, AND 2777; TO ENJOIN SECONDARY DISTRIBUTION; TO APPOINT COUNSEL TO THE CLASS TO ASSURE PAYMENTS ARE MADE TO CLAIMANTS

Comes NOW, Michael Sussman ("Sussman"), class member, and files this, his Motion to Vacate Orders at Entries 2767, 2772, and 2777 and to enjoin the secondary distribution:

I. **This Court can vacate the Orders and take control over the money distribution**

This Court maintains jurisdiction over the distribution of class funds in this matter along with administrative matters concerning payment to class members, enforcement of the settlement agreement, and related processes. Alternatively, this Court maintains jurisdiction pursuant to 28 USC 1651, Federal Rule of Civil Procedure 60(b)(1)(mistake, inadvertence, surprise, or excusable neglect); 60(b)(2)(newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(e)); 60(b)(3)(fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party); and 60(b)(6)(any other reason that justifies relief).

One remedy is to appoint a different Class Counsel to assure that payments are made to the class members who made timely claims but were not paid.

## II. Class Counsel Misrepresented a promise to reissue payments to all claimed payments

At Entry 2774, Class Counsel advised this Court that there existed no reason to reopen the first distribution of settlement funds to address technical challenges. What Class Counsel promised to do was:

> In order to maximize payments to class members, IPPs propose an extended Phase I distribution effort for the approximately 20,500 claimants for whom digital payments were not accepted. This limited distribution would require reactivating those claimants' payments and sending a "Last Chance" email, as well as responding to a limited number of class members who have contacted the claims administrators since the September 29, 2023 deadline. Further the claims administrators have agreed to undertake this effort at no additional cost to the class."

That promise occurred on October 23, 2023.

Sussman assumes that this Court relied on that representation when it issued its October 30, 2023, Order at Entry 2777. This Court specifically found that "the claims administrators have offered to conduct, at no cost to the class, additional follow up with the 20,500 claimants who were sent digital payments but who have not accepted them." While this Court did not require the action, it assumed it would occur and changed the second payment deadline until February 7, 2024.

The problem is that this reactivation and "Last Chance" email did not occur. On the contrary, as shown by the email chain with the claims administrators, Sussman began making inquiries and complaints about not receiving payment on October 17, 2023, before the filings and promises.

Indeed, on October 17, 2023, the claims administrators wrote to Sussman and stated, "We confirm that the payment email was sent to you but it was not claimed. We are unfortunately no longer able to reissue this payment." This is what was to be rectified by the promises of Class Counsel.

Thus, under Class Counsel's representations to this Court, Sussman should have had the claim reactivated and sent a "Last Chance" email. That did not happen. When Sussman wrote to the claims administrator on November 16, 2023, they appear to have asserted that what they promised not only did not occur, but was impossible. Specifically, the claims administrator wrote, "Mike, The deadlines were extended to attempt to resend unclaimed payments to the initial email address. *Due to the timing required to update records and the fact that we cannot attempt to email to an email address that has previously failed, the deadline to request a payment email that originally did not deliver to resent has passed.*"

The promise was to send the "Last Chance" email to the emails of the 20,500 claimants, but the November 16, 2023, states that "we cannot attempt to email to an email address that has previously failed." This is a complete contradiction to the promise and representation made to this Court.

### III. Contrary to the representations to this Court, the distribution failures did not affect a small portion of the claimants

On October 25, 2023, Class Counsel filed its "Report of Phase I Distribution of Settlement Funds." While elsewhere, Class Counsel advises that only 20,500 claimants had issues and that it would send "Last Chance"

emails and reactivate those payments (which, as explained above, never happened), the true percentage of individual claimants receiving payment is dismal and disturbing.

First, as to wire transfer payments, every claimant received their money. However, wire transfer was not a payment method offered to ordinary claimants. All of the claimants in this category had representatives (professional companies that received an assignment of the payment, took a commission, and then was responsible to pay the individual/company claimants). These payments cannot be considered when looking at the so-called success of the payments because the money was wired to a few entities and then distributed separately with no involvement from the claims administrator.

Second, the Court must look at checks. The results are disturbing at best. While 952 successful checks valued at $2,504,628.52 were cashed, 385 checks totalling $1,300,824 were not cashed. In dollar terms, over 34% of checks were not received by the claimants. Based on information, as is usually in cases administered by Epiq, no follow up by email occurs and, in violation of the laws of most states, the checks are not turned over to unclaimed property to benefit the claimants. In other words, if, through no fault of the claimant, the check is lost in the mail or not delivered, the claimant has no knowledge and their money is lost.

Third, 946,115 digital payments totalling $6,616,521 were successfully paid. However, 119,750 payments totalling $2,845,202 were not paid. In

dollar terms, this means that 43% percent of payments failed, not just 20,399 "unclaimed" payments.

Class Counsel calls 99,351 payments "undeliverable" in the report, implying that the non-delivery was the fault of the claimant. In other words, certainly, some payments were non-deliverable because the claimant no longer maintains the email address. The claims administrator has no control over this. However, they do not define "non-deliverable." They simply leave it at that. The claims administrator has not broken down the return code.

As shown by Sussman's declaration attached, these "non-deliverable" emails could be the result of the claims administrator overwhelming servers, being flagged for SPAM because of the bulk-nature of the emails, or using improper handshake protocols. If the "non-deliverable" addresses were simply due to "non-existent mailbox" messages, the claims administrator could tell us this. However, the email return coding has not been provided to the Court so no true analysis can occur.

IV. **Monies claims must be turned over to state unclaimed property agencies**

These millions of dollars not received by claimants are not unclaimed funds. The money has been specifically claimed by people who took the time to submit their name and address or email and other information. The laws of each state include provisions where uncashed checks and similar non-received or uncashed payments, including electronic debit cards and payments, are to be turned over. Of course, states have included limitations for *de minimus*

payments, usually under $25 or $50 depending on the state. These provisions are not optional, and the laws cannot be usurped by including a waiver in a settlement agreement or tricking a court into allowing "redistribution" of these funds. California, where this Court sits, requires uncashed checks to be turned over to the unclaimed property division. Their website at https://www.sco.ca.gov/search_upd.html explains that, "California's Unclaimed Property Law ***requires*** financial institutions, insurance companies, corporations, businesses, and certain other entities to report and submit their customers' property to the State Controller's Office when there has been no activity for a period of time (generally three years). Common types of unclaimed property include but are not limited to: bank accounts, stocks, ***uncashed checks***, insurance benefits, wages, and safe deposit box contents." The California Unclaimed Property Law is found at the Code of Civil Procedure, Part 3, Title 10, Chapter 7. The laws and rules are found at https://www.sco.ca.gov/Files-UPD/guide_upd_updlaw.pdf .

Nothing in these laws exempt class actions. There exists no provision that allows an agreement, settlement, or court to waive the provisions.

Failure to comply with these provisions constitutes a violation of the law and is punishable by fines.

Therefore, the 385 checks totalling $1,300,824 and the 119,750 non-deliverable payments totalling $2,845,202 attributed to specific persons or companies, if over the minimum amounts, must be turned over to unclaimed property agencies of the claimant's respective state. The same goes for the

20,399 so-called "unclaimed" money that, as shown by the email chain, was never reactivated as promised by Class Counsel.

**V.   Without permission from the court, recipients of electronic payments were forced into a bizarre contract with Blackhawk/Pathward Bank, which results in money freezes, forced arbitration, among other things.**

Through Sussman's research about the digital payments and discussions with persons that contacted him after he posted complaints on class action forums including www.topclassactions.com , he obtained a copy of the agreement forced upon recipients who receive these electronic payments. None of the terms of the agreement were approved by this Court. A copy of the agreement is attached to these objections.

First, the bank in question, Blackhawk/Pathward Bank, appears to be in the business of issuing class action payments then freezing the cards or charging fees on cards never delivered or received by the recipient. The Better Business Bureau www.bbb.org is filled with hundreds of complaints from people who cannot access their money from these so-called digital and physical payment cards.

Second, the cardholder agreement contains arbitration clauses that the class members do not see unless they log in and download a copy of the terms of the agreement. None of these arbitration terms were approved by the Court. However, worse, is that the bank promises to pay the arbitration fees, but does not do so, leave the consumer in a state of not being able to sue and not being able to move forward with arbitration. This Court must clarify whether

DigitalPay, the company that caused Blackhawk/Pathward to issue these cards, is responsible for advancing the arbitration fee if Blackhawk/Pathward does not.

Third, the agreement states that the card cannot be used for business transactions and is intended for consumer transactions only. However, many claimants in this action filed their claim on behalf of a business or due to business purchases. It is unclear how the cards can be used since the agreement prohibits thier use by the claimant for business transactions.

Fourth, the agreement states that use or activation of the card constitutes consent for Blackhawk/Pathward to act as custodian. However, if a card is not activated or used, Blackhawk/Pathward then charges dormancy fees and keeps the money. This makes no sense.

Fifth, the agreement provides that if you wish to revoke Blackhawk/Pathward's custodianship of the funds, you must use or transfer the funds from the card. However, there exists no method to transfer funds from the card. Furthermore, using the card necessarily means that the claimant agrees Blackhawk/Pathward may be custodian by the terms of the agreement. In other words, these two terms completely contradict each other.

Sixth, the agreement appears to allow Blackhawk/Pathward to freeze the funds at whim and, if frozen, to still charge dormancy fees. Based on the content of many complaints posted by consumers at www.bbb.org this could be interpreted to be the *modus operandi* of Blackhawk/Pathward.

This Court has not approved these terms, yet claimants are forced into this agreement. If Sussman ever receives his promised payment, he necessarily will be forced into the agreement with Blackhawk/Pathward despite the terms making no sense whatsoever.

This Court must take control over these payments and set the terms of the payment, not allow third-parties without the Court's approval to force unknowing claimants into an agreement that contains contradictions, makes little sense, provides no recourse, is not for business transactions, and allows the unfettered blocking by the third-party bank without limitation.

## VI. Class Counsel has a fiduciary duty to the class and must make sure that claimants are paid. If Class Counsel cannot do the job, this Court must appoint counsel to do it.

"[I]t is unfathomable that the class's lawyer would try to sabotage the recovery of some of his clients." *Pierce v. Visteon Corp.*, 791 F.3d 782, 787 (7th Cir. 2015). Class Counsel's fiduciary duty is to the class as a whole. *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 968 (9th Cir. 2009). However, Class Counsel is not assuring that all claimants are paid and are advocating that over 35% of claimants that did not hire a third-party agency to receive a wire transfer should lose their money due to technical defects in the administration of this litigation.

Worse, Class Counsel forced the claimants into a bizarre contract with Blackhawk/Pathward Bank, a notorious one-star rated institution known for defrauding clients of class action litigations. The responsibility of class counsel

to absent class members whose control over their attorneys is limited does not permit even the appearance of divided loyalties of counsel.'" *Kayes v. Pac. Lumber Co.*, 51 F.3d 1449, 1465 (9th Cir. 1995).  Arguing that claimants who submitted a timely claim should not be paid constitutes a clear disloyalty to absent class members who made timely claims.  "[B]ecause a district court has appointed class counsel who owes a fiduciary duty to the class members, class counsel would be ethically forbidden from sacrificing the class members' interests.  *Allen v. Bedolla*, 787 F.3d 1218, 1223 (9th Cir. 2015).  However, Class Counsel is sacrificing the timely claims of over 35% of members who did not have a claims company submit their claims to them.

This Court must take control over the administration of the payments and implement measures to make sure everyone who submitted a claim is paid through a proper Round I distribution, then turning the claimed money over to unclaimed property, and only then doing a second distribution.  If Class Counsel cannot advocate to make sure most claimants are paid, not just 65% of them, then this Court can appoint an attorney to assist the unpaid class members.

                                            Respectfully submitted,

                                            Mike Sussman
                                            1730 S Federal Hwy 151
                                            Delray Beach FL  33483
                                            drsuss@automatic-mail-server.net

                                            CLASS MEMBERS WHOSE CLAIM
                                            WAS NOT REACTIVATED AS PROMISED